UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, Litigation Trustee of the Idearc Inc. *et al.* Litigation Trust, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| VERIZON COMMUNICATIONS INC., VERIZON FINANCIAL SERVICES, LLC, GTE CORPORATION and JOHN W. DIERCKSEN | § § § § § | (JURY DEMANDED) |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

U.S. Bank National Association, Litigation Trustee (the "Trustee") of the Idearc Inc. et al Litigation Trust (the "Trust" or "Plaintiff") hereby files this Original Complaint against Verizon Communications Inc. ("Verizon"), Verizon Financial Services, LLC ("VFS"), GTE Corporation ("GTE") and John W. Diercksen ("Diercksen") and in support thereof shows the following:

## I.

## NATURE OF THE ACTION

1.     Verizon is one of the largest telecommunications, broadband and television programming providers in the United States.  Sometime prior to November of 2006, Verizon devised a scheme under which it would obtain approximately $9.5 billion – not in the marketplace, but through the use of lawyers and Wall Street investment bankers.  At that time, a declining part of Verizon's business was its yellow pages telephone directory business.  Verizon had generated substantial revenues from its print directory business in the past, but by 2006 that business segment's revenues had been steadily declining (for example, revenue dropped by $169

million between 2005 and 2006 alone).  This was due, among other reasons, to the public's declining use of paper telephone directories and increased use of alternative information sources, such as the internet.  Although Verizon had started its own on-line directory website, the revenue generated by that portion of Verizon's business was extremely small compared to the revenue generated by Verizon's print directory business.  In 2006, the revenue from the internet business was only approximately $230 million compared to approximately $2.978 billion for the print directory business.  Moreover, Verizon faced stiff competition in the internet directory business from numerous other companies.  At that time, the historical print directory business was in decline and the viability of internet directory services was yet to be determined.  Successful conversion from print to internet was far from assured.  This made it very doubtful that Verizon would be able to offset the continuing decline in its print directory revenues with increases in revenues from internet based business.   Faced with this unfavorable business situation, Verizon embarked on a plan to turn lemons into lemonade.

2.      Verizon determined that it could obtain approximately $9.5 billion by undertaking a complicated "spin-off" transaction through which Verizon's print and on-line directory businesses would become a stand–alone company, Idearc, Inc. ("Idearc").  Prior to the spin-off, Idearc was a Verizon subsidiary.  Verizon would reap this windfall to the injury of Idearc and Idearc's creditors by stripping Idearc of cash and burdening Idearc with massive debt.  On or about November 17, 2006, Verizon spun-off Idearc as a stand-alone company (the "Spin-off").  In the process, Verizon caused Idearc to (a) transfer almost $2.5 billion in cash to Verizon's wholly owned subsidiary, VFS and (b) incur approximately $9 billion of debt, the proceeds of which were either given to Verizon to retain or used to pay off Verizon's outstanding debt.  Immediately after the Spin-off, Idearc's balance sheet reflected that its debts exceeded its assets

by approximately $9 billion.  Not surprisingly, after limping along for a period of time, Idearc went bankrupt.

3.      To be able to complete the Spin-off, Verizon first needed Idearc's board of directors to approve the transaction.  This is where Diercksen played a key role.  In November 2006, Diercksen was Verizon's Executive Vice President for Strategic Planning.  On information and belief, Diercksen participated in devising and implementing the Spin-off plan.  Rather than allow an Idearc board of directors made up of individuals who were not under Verizon's control to consider whether the Spin-off was in Idearc's best interests, Verizon made its Vice President, Diercksen, the sole member of Idearc's board.  Diercksen then acted as Idearc's sole board member to approve the Spin-off in violation of his fiduciary duties as a board member.  He also violated his duties as a board member by authorizing Idearc to pay dividends to Verizon through the Spin-off.  In furtherance of Verizon's scheme, immediately after approving the Spin-off as the sole director of Idearc, Diercksen "changed hats" and signed on behalf of Verizon all of the key contracts Verizon entered into with Idearc to implement the Spin-off.  Diercksen's clear conflict of interest, standing on both sides of the transaction, prevented him from undertaking an independent and fair analysis of the transaction on behalf of Idearc.

4.      Through proceedings in federal court in the Northern District of Texas, Idearc was reorganized under Chapter 11 of the United States Bankruptcy Code.  Pursuant to Idearc's plan of reorganization in the bankruptcy, the Plaintiff Trust was created and assigned certain causes of action, including Idearc's claims against Verizon and former officers and directors of Verizon and Idearc.  The beneficiaries of the Trust are principally bondholders of, and lenders to, Idearc and its subsidiaries with claims of approximately $6 billion.

5.      Verizon effectively removed approximately $9.5 billion from Idearc without providing Idearc with reasonably equivalent value in exchange.  Verizon cast Idearc adrift, burdened with an anchor of debt around its neck, insolvent and without adequate resources to survive.

6.      Because Verizon received a fraudulent transfer through the actions described above, either (a) the transfers and obligations incurred by Idearc in connection with the Spin-off should be avoided and Verizon should be required to return to the Trust the consideration Verizon received in connection with the Spin-off or (b) the Trust should be awarded a monetary judgment against Verizon in the amount of the difference between the consideration that Verizon received in connection with the Spin-off and the value of the assets received by Idearc. Likewise, Verizon and Diercksen are jointly and severally liable to the Trust as a result of Diercksen's breaches of duty in his role as a member of Idearc's board of directors.

## II.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1334 because, among other things, this cause arises under the United States Bankruptcy Code.  The Court also possesses jurisdiction over this cause because, as shown below in paragraphs 9 – 13 there is complete diversity of citizenship between the parties.  The amount in controversy exceeds $75,000, excluding interest and costs.

8.      Venue is proper under 28 U.S.C. § 1409 and also because a substantial part of the events or omissions giving rise to the Trust's claims occurred in the Northern District of Texas. 28 USC § 1391(a)(2) & (b)(2).

## III.

## THE PARTIES

9.     U.S. Bank National Association is a national banking association.  Its principal place of business is located at 800 Nicollet Mall, Minneapolis, Minnesota 55402.  It is the Trustee of the Trust.  Therefore, the Trust is a citizen of Minnesota.

10.     Verizon is a corporation organized under the laws of Delaware with its principal place of business at 140 West St., New York, New York 10007.  Therefore, Verizon is a citizen of Delaware and New York.  Verizon may be served with process through its registered agent:  C T Corporation System, 111 Eighth Avenue, New York, New York, 10011.

11.     VFS is a limited liability company organized under the laws of Delaware with its principal place of business in Delaware.  VFS' sole member is Verizon.  Therefore, VFS is a citizen of Delaware and New York.  VFS may be served with process through its registered agent:  C T Corporation System, 1209 Orange Street, Wilmington, Delaware 9000010.

12.     GTE is a corporation organized under the laws of  New York with its principal place of business at 140 West St., New York, New York 10007.  Therefore, GTE is a citizen of New York.  GTE may be served with process through its registered agent: C T Corporation System, 111 Eighth Avenue, New York, New York, 10011.

13.     John W. Diercksen ("Diercksen") is a citizen of Connecticut and resides at 47 Puritan Road, Trumbull, Connecticut 06611-4972.

# IV.

## FURTHER FACTUAL BACKGROUND

**A.      The "Spin-Off"**

14.      Prior to November of 2006, Verizon concluded that it should divest itself of certain of its business activities, including its directory business.  Verizon wisely concluded that the business of print directories was in decline since people, particularly younger people, increasingly utilize electronic means to identify providers of goods and services.  Verizon determined to rid itself of its directory business at a time when the overheated capital markets were wildly financing all sorts of improvident ventures.

15.      Verizon's directory business was not the only operation that Verizon jettisoned during that period of market exuberance.  Verizon sold its Hawaiian operations, Hawaiian Telecom.  Verizon also sold its Northern New England operations to Fairpoint Communications, Inc.  By December of 2008, both Hawaiian Telecom and Fairpoint were in bankruptcy.

16.      Verizon attempted to sell its yellow pages directory business in 2005, but was unable to consummate a sale.  Verizon then moved to plan "B" – spin-off Idearc, burden it with the maximum amount of debt possible, then strip Idearc of cash, including proceeds of the loans Verizon caused Idearc to undertake.

17.      To take advantage of the distorted capital markets, Verizon caused Idearc to borrow billions of dollars from JP Morgan Chase Bank, N.A. ("Chase") and other lenders, (including Verizon).  The credit agreement for the Chase loan (the "Credit Agreement") burdened Idearc with over six and a half billion dollars of debt.

18.      On November 17, 2006, in exchange for the contribution from Verizon to Idearc of its failing print and on-line directory publishing business, Verizon caused Idearc to  (i) issue to

Verizon 145,851,861 shares of Idearc's common stock, (ii) issue to Verizon two unsecured notes in equal amounts aggregating $2.850 billion in debt (the "Unsecured Notes"), (iii) become indebted to Verizon in the amount of $4.3 billion pursuant to a Credit Agreement dated November 16, 2006 (the "Verizon Tranche B") that Verizon had caused Idearc to execute, and (iv) transfer to Verizon $2,441,532,374.71 in cash (the "Cash") from loans Verizon caused Idearc to undertake (collectively, (i) - (iv) are the "Fraudulent Consideration").   Also, on November 17, 2006, Verizon spun-off its shares in Idearc to Verizon's shareholders.  Following the Spin-off, Verizon exchanged with its debt holders the Unsecured Notes it was issued and the $4.3 billion Verizon Tranche B for outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness by approximately $7.1 billion (the "Verizon Exchange").

19.    The transfers that occurred on November 17, 2006, referenced in the prior paragraph are more particularly identified as follows:

| Item Transferred | Transferor | Initial Transferee | Further Information |
|---|---|---|---|
| $2,441,532.374.71 | Idearc | VFS | wire transfer made for credit to Verizon |
| $4,300,000,000 indebtedness | Idearc | Verizon | pursuant to the Credit Agreement |
| $1,425,000,000 promissory note | Idearc | Verizon | |
| $1,425,000,000 promissory note | Idearc | Verizon | |

20.     Because the Spin-Off was structured by Verizon as a tax free reorganization, Verizon contributed to Idearc all of Verizon's interests in Idearc Information Services, LLC ("IIS") and other assets that were associated with the directories business of Verizon, which, on information and belief, consisted primarily of licenses to use business software.  Verizon also entered into a series of agreements with Idearc, or its subsidiaries, including, but not limited to, a publishing agreement, a non competition agreement, a branding agreement, a billing and collection agreement, a listing license agreement, an intellectual property agreement, a tax sharing agreement, an employee matters agreement and a transition services agreement (the "Spin-Off Agreements").

**B.      The Spin-Off Saddles Idearc with $9 Billion in Debt**

21.     The Spin-Off was designed and directed by Verizon and implemented through Dierksen, Verizon's Executive Vice President for Strategic Planning, with the assistance of other Verizon officers and directors.  Rather than remain on a sinking ship, Diercksen resigned his position as a director of Idearc the day before the Spin-off and remained at Verizon to enjoy the benefits Verizon received in the Spin-off.

22.     As a result of the Spin-off, Verizon received from Idearc almost $9.5 billion for Verizon's dying directory publishing business that was worth far less than $9.5 billion.  The books and records of Idearc, prepared in accordance with Generally Accepted Accounting Principles, reflected that after the Spin-off Idearc was insolvent by approximately $9 billion with total obligations in excess of $10 billion.  As of December 31, 2006, Idearc's post Spin-off balance sheet showed the following (in billions):

Assets:  $1,318,000,000

Liabilities:  $10,164,000,000

Shareholders Equity :   negative $8,846,000,000

23.     The consummation of the Spin-off rendered Idearc insolvent and left it with unreasonably small assets to support its ongoing business.  As such, the net effect of the Spin-off was to burden Idearc with $9 billion of new debt without Idearc receiving a reasonably equivalent value of assets in return.  The value of the assets Verizon transferred to Idearc, was worth billions less than the Fraudulent Consideration conveyed to Verizon. The Spin-off left Idearc cash deficient, in a dying industry, and heavily burdened with debt.

24.     The Unsecured Notes and the Verizon Tranche B required Idearc to make substantial interest payments (the "Interest Payments").  The Verizon Exchange represented the present value of the future payments to be made by Idearc pursuant to the Unsecured Notes and the Verizon Tranche B, including the Interest Payments.  The Verizon Exchange benefitted Verizon by relieving Verizon of $7.1 billion of its debt.  Between November 17, 2006 and December 31, 2008 Idearc made Interest Payments of approximately $1.2 billion to the holders of the Verizon Tranche B and the holders of the Unsecured Notes.  Consequently, Verizon benefitted from the payment of the Interest Payments since it received the present value of the Interest Payments in the Verizon Exchange.

**C.      Burdened by the Spin-Off Debt, Idearc files for Chapter 11 Bankruptcy Protection**

25.     As could be anticipated, with a declining business and burdened by massive debt from the Spin-off, Idearc, and substantially all of its subsidiaries, filed petitions for relief under Chapter 11 of the United States Bankruptcy Code on March 31, 2009, a mere 28 months after the Spin-off.

26.     On May 7, 2009, Idearc's attorney described to the bankruptcy court the debt load and initial capital structure that Verizon forced upon Idearc as:

It's simply <u>the company, when this spin occurred two and a half years ago it was saddled with too much debt</u>. And that became a problem that the company recognized proactively and very aggressively and moved to remedy in the context of filing this Chapter 11 case.

27.     In stark contrast, Verizon received approximately $9.5 billion in assets from Idearc through the Spin-off.   Verizon's SEC filings reflected a benefit to Verizon of approximately $9 billion:

On November 17, 2006 we completed the spin-off of Idearc to shareowners of Verizon. Verizon distributed a dividend of one share of Idearc common stock for every 20 shares of Verizon common stock. Cash was paid for fractional shares. The distribution of Idearc common stock is considered a tax free transaction for us and for our shareowners, except for the cash payments for fractional shares which are generally taxable. Idearc now owns what was the Verizon domestic print and Internet yellow pages directories publishing operations, which had been the principal component of our Information Services segment. <u>This transaction resulted in an increase of nearly $9 billion in shareowners' equity, as well as a reduction of total debt by more than $7 billion and we received approximately $2 billion in cash</u>.

(emphasis added)

28.     Idearc subsequently filed its *First Amended Plan of Reorganization of Idearc Inc., et al., Debtors* (the "Plan").  After hearings to consider confirmation of the Plan, the Plan was confirmed on December 22, 2009.  The Plan relieved Idearc of approximately $6 billion of debt and valued the reorganized Idearc at approximately $4 billion.

29.     To facilitate the implementation of the Plan, the Trust was created.  Pursuant to the Plan, the Trust received the Litigation Trust Rights (as defined in the Plan, the "Litigation Trust Rights"), including the causes of action against Verizon, VFS, GTE and Diercksen set forth in this Complaint.

30.     Pursuant to the Plan, and section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is "designated as the Debtors' and the Estates' representative and the successor in interest to the Debtors and the Estates for all purposes with respect to all Litigation Trust Rights,

including, without limitation, the commencement, prosecution, settlement and collection thereof."

31.     As such, the Plaintiff files this suit to prosecute Litigation Trust Rights granted to the Trust pursuant to the confirmed Plan.

## V.

## CAUSES OF ACTION

*Count 1:  Fraudulent Transfer Against Verizon and VFS (TEX. BUS. & COM. CODE ANN. §§ 24.005 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550)*

32.     Plaintiff incorporates the foregoing allegations by reference for all purposes.

33.     The transfer of the Fraudulent Consideration to Verizon and VFS was made with actual intent to hinder, delay, or defraud creditors of Idearc.

34.     Idearc did not receive reasonably equivalent value in exchange for the Fraudulent Consideration given to Verizon and VFS in connection with the Spin-off.  The directory business assets received by Idearc in connection with the Spin-off were worth much less than the Fraudulent Consideration transferred by Idearc.

35.     At the time of the Spin-off, Idearc (a) was engaged, or was about to engage, in a business or a transaction for which the remaining assets of Idearc were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed, or reasonably should have believed, that Idearc would incur debts beyond Idearc's ability to pay as they became due.

36.     Verizon and VFS chose to take advantage of a distorted capital market to shift the risk of billions of dollars of debt obligations from itself to Idearc and Idearc's creditors.  Verizon and VFS set adrift a failing business, burdened by massive debt without resources to repay the

debt when it became due.  This doomed structure was designed and implemented by Verizon and VFS for their own benefit through Diercksen, simultaneously an officer of Verizon and the sole director of Idearc.  Verizon and VFS knew that the Spin Off would hinder, delay and defraud creditors of Idearc but proceeded to consummate the transactions.

37.     At all times relevant to the Spin-off, there were actual creditors of Idearc holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b), including, but not limited to, trade creditors, Chase and the lenders pursuant to the Credit Agreement.

38.     Pursuant to TEX. BUS. & COM. CODE ANN. §§ 24.005 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550, either (a) the transfers and obligations incurred by Idearc in connection with the Spin-off should be avoided, and Verizon and VFS should be required to return to the Trust the Fraudulent Consideration Verizon and VFS received in connection with the Spin-off or (b) the Trust should be awarded a monetary judgment against Verizon and VFS in the amount of the difference between the consideration that Verizon and VFS received in connection with the Spin-off and the value of the assets received by Idearc.  The Trust also requests all further relief the Court determines the circumstances may require.

***Count 2:  Fraudulent Transfer Against Verizon and VFS (TEX. BUS. & COM. CODE ANN. §§ 24.006  and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550)***

39.     Plaintiff incorporates the foregoing allegations by reference for all purposes.

40.     Idearc did not receive reasonably equivalent value in exchange for the Fraudulent Consideration given to Verizon and VFS in connection with the Spin-off.

41.     Idearc was insolvent at the time of the Spin-off or became insolvent as a result of the Fraudulent Consideration given to Verizon and VFS in connection with the Spin-off.  The

value of the assets of the doomed directory business transferred to Idearc were worth far less than the Fraudulent Consideration.

42.     At all times relevant to the Spin-off, there were actual creditors of Idearc holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b) including, but not limited to trade creditors, Chase and the lenders pursuant to the Credit Agreement.

43.     Pursuant to TEX. BUS. & COM. CODE ANN. §§ 24.006 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550, either (a) the transfers and obligations incurred by Idearc in connection with the Spin-off should be avoided and Verizon and VFS should be required to return to the Trust the Fraudulent Consideration Verizon and VFS received in connection with the Spin-off or (b) the Trust should be awarded a monetary judgment against Verizon and VFS in the amount of the difference between the consideration that Verizon and VFS received in connection with the Spin-off and the value of the assets received by Idearc.  The Trust also requests all further relief the Court determines the circumstances may require.

*Count 3:   Breach of Fiduciary Duty Against Diercksen*

44.     Plaintiff incorporates the foregoing allegations by reference for all purposes.

*45.*     As a director of Idearc, Diercksen owed fiduciary duties to Idearc and its creditors.  Diercksen's actions set forth above, including but not limited to approving the Spin-off as the sole member of Idearc's board of directors and conceiving of and implementing the Spin-off, violated his fiduciary duties.  As a result of his conflict of interest, Diercksen violated his fiduciary duties as the sole director of Idearc, approving a transaction for the benefit of Verizon to the detriment of Idearc and its creditors.  Moreover, as addressed further in Count 9, Diercksen violated his fiduciary duties to Idearc by authorizing a dividend to Idearc's shareholder in violation of Delaware law.

*46.* In light of the foregoing, (a) the Trust is entitled to recover from Diercksen the actual damages that it suffered as a result of Diercksen's breaches of fiduciary duty, and (b) Diercksen is required to forfeit to the Trust all benefits that he received as result of his breaches of fiduciary duty.

*47.* The Trust also seeks exemplary and punitive damages against Diercksen.

**Count 4:   Aiding and Abetting a Breach of Fiduciary Duty Against Verizon**

48. Plaintiff incorporates the foregoing allegations by reference for all purposes.

49. Verizon and VFS were aware of Diercksen's fiduciary duties as a director of Idearc, but aided and abetted Diercksen's breaches of fiduciary duty throughout the process of conceiving and implementing the Spin-off.  As such, Verizon, VFS and Diercksen are jointly and severally liable (a) for the actual damages that the Trust suffered as a result of Diercksen's breaches of fiduciary duty, (b) must forfeit to the Trust all benefits they received in connection with Diercksen's breaches of fiduciary duty and (c) for punitive and exemplary damages.

**Count 5:   Fraudulent Transfer Against Verizon and VFS ( TEX. BUS. & COM. CODE ANN. §§ 24.005, 24.006 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550)**

50. Plaintiff incorporates the foregoing allegations by reference for all purposes.

51. On November 17, 2006, Verizon caused Idearc Media Corp. ("IMC"), one of the debtor subsidiaries of Idearc, to loan $475,410,408 ("the IMC loan") to Idearc.  In exchange for this loan IMC received a one page illiquid demand note (the "IMC Note") with a value of much less than the amount loaned.

52. The IMC Loan was combined with money borrowed and immediately transferred by Idearc to VFS.  IMC had guaranteed the borrowings under the Credit Agreement.

53.     The transfer of the IMC Loan was made with actual intent to hinder, delay, or defraud creditors of IMC.

54.     IMC did not receive reasonably equivalent value in exchange for the IMC Loan given to Idearc in connection with the Spin-off.

55.     At the time of the IMC Loan, IMC (a) was engaged, or was about to engage, in a business or a transaction for which the remaining assets of IMC were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed, or reasonably should have believed, that IMC would incur debts beyond IMC's ability to pay as they became due.

56.     IMC was insolvent at the time of the IMC Loan, or became insolvent as a result of the IMC Loan.

57.     Verizon and VFS chose to strip IMC of the funds represented by the IMC Loan. Verizon and VFS set adrift a failing business, burdened by massive debt without resources to repay the debt when it became due.  This doomed structure was designed and implemented by Verizon and VFS for their own benefit through Dierksen.  Verizon and VFS knew that the IMC Loan would hinder, delay and defraud creditors of IMC but proceeded to consummate the transaction.  Both VFS and Verizon benefitted from the IMC Loan since VFS is a subsidiary of Verizon.

58.     At all times relevant to the IMC Loan, there were actual creditors of IMC holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b), including, but not limited to, trade creditors, Chase and the lenders pursuant to the Credit Agreement.

59.     Pursuant to TEX. BUS. & COM. CODE ANN. §§ 24.005, 24.006 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550, either (a) the IMC Loan should be avoided and Verizon

and VFS should be required to return to the Trust the amount of the IMC Loan or (b) the Trust should be awarded a monetary judgment against Verizon and VFS in the amount of the difference between the IMC Loan and the value of the IMC Note.  The Trust also requests all further relief the Court determines the circumstances may require.

**Count 6:  Fraudulent Transfer Against GTE and Verizon ( *TEX. BUS. & COM. CODE ANN.* §§ 24.005, 24.006 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550)**

60.     Plaintiff incorporates the foregoing allegations by reference for all purposes.

61.     On November 16, 2006, Verizon caused Idearc Information Services, LLC ("IIS"), one of the debtor subsidiaries of Idearc, to distribute to GTE all of IIS' assets, including the outstanding stock held by IIS of Verizon International Holdings, Inc., Verizon GmbH, Verizon International Telecom Services, Inc. ("TSI"), any remaining assets or liabilities held by IIS in TSI, any cash held by IIS, any debt owed to IIS by VFS, IIS's interest in GTE Directories (B) Sdn. Bhd and all of IIS's liabilities, other than the outstanding common stock of IMC and License Application Corporation and any other assets related to the directory business of Verizon (the "GTE Distribution").    In exchange for the GTE Distribution, IIS received nothing.

62.     IIS also guaranteed the borrowings under the Credit Agreement.

63.     The transfer of the GTE Distribution was made with actual intent to hinder, delay, or defraud creditors of IIS.

64.     IIS did not receive reasonably equivalent value in exchange for the GTE Distribution.

65.     At the time of the GTE Distribution, IIS (a) was engaged, or was about to engage, in a business or a transaction for which the remaining assets of IIS were unreasonably small in

relation to the business or transaction and/or (b) intended to incur, or believed, or reasonably should have believed, that IIS would incur debts beyond IIS's ability to pay as they became due.

66.     IIS was insolvent at the time of the GTE Distribution, or became insolvent as a result of the GTE Distribution.

67.     Verizon and GTE chose to strip IIS of the assets represented by the GTE Distribution.  Verizon and GTE set adrift a failing business, burdened by massive debt without resources to repay the debt when it became due.  This doomed structure was designed and implemented by Verizon and GTE for their own benefit through Diercksen.  Verizon and GTE knew that the GTE Distribution would hinder, delay and defraud creditors of IIS but proceeded to consummate the transaction.  Both GTE and Verizon benefitted from the GTE Distribution since GTE is a subsidiary of Verizon.

68.     At the times relevant to the avoidability of the GTE Distribution, there were actual creditors of IIS holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b), including, but not limited to, trade creditors, Chase and the lenders pursuant to the Credit Agreement.

69.     Pursuant to TEX. BUS. & COM. CODE ANN. §§ 24.005, 24.006 and 24.008 (Vernon 2008) and 11 U.S.C. §§ 544(b) and 550, either (a) the GTE Distribution should be avoided and Verizon and GTE should be required to return to the Trust the amount of the GTE Distribution or (b) the Trust should be awarded a monetary judgment against Verizon and GTE in the amount of the GTE Distribution.  The Trust also requests all further relief the Court determines the circumstances may require.

### Count 7:  Fraudulent Transfer Against Verizon (11 U.S.C. §§ 548 and 550)

70.     Plaintiff incorporates the foregoing allegations by reference for all purposes.

71.     The transfer of the Interest Payments subsequent to March 31, 2007, in an amount in excess of $1,000,000,000 were made within two years before the Petition Date.

72.     The Interest Payments were made as designed by Verizon and Diercksen in connection with the Spin-Off.  Because Verizon and Diercksen controlled Idearc at the time Idearc undertook the obligation to pay the Interest Payments, the transfer of the Interest Payments was made with actual intent to hinder, delay or defraud an entity to which Idearc was or later became indebted on or after the date that the Interest Payments were made.

73.     Since Idearc did not receive reasonably equivalent value in exchange for the Fraudulent Consideration given to Verizon and VFS in connection with the Spin-off, Idearc did not receive reasonably equivalent value in exchange for the Interest Payments which were made as contemplated by the Spin-Off.

74.     Idearc was insolvent at the time of the Interest Payments, or became insolvent as a result of the Interest Payments.

75.     At the time of the Interest Payments, Idearc (a) was engaged, or was about to engage, in a business or a transaction for which the remaining assets of Idearc were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed, or reasonably should have believed, that Idearc would incur debts beyond Idearc's ability to pay as they became due.

76.     Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550, either (a) the Interest Payments that were made subsequent to March 31, 2007 should be recovered or (b) the Trust should be awarded a monetary judgment against Verizon, as the entity for whose benefit the Interest Payments were made, in the amount of the Interest Payments.  The Trust also requests all further relief the Court determines the circumstances may require.

*Count 8:  Unlawful Dividend Against Diercksen and Verizon (Del. Code Ann. tit. 8 §§170, 173 & 174)*

77.     Plaintiff incorporates the foregoing allegations by reference for all purposes.

78.     As stated more fully above, while acting as Idearc's sole director, Diercksen authorized and approved Idearc making the dividends described in this complaint directly to and for the benefit of Idearc's shareholder Verizon.  Diercksen willfully, or at a minimum negligently, authorized and approved the dividends to Verizon even though Idearc lacked a surplus or net profits under which the dividends could legitimately occur pursuant to Del. Code Ann. tit. 8 §§170, 173 & 174.  Diercksen is, therefore, liable to the Trust for the full amount of the unlawful dividends.

79.     Verizon received the dividends, both directly and indirectly, in bad faith and with knowledge of facts indicating the dividends were unlawful.  Consequently, Verizon is likewise liable to the Trust for the full amount of the unlawful dividends.

## VI.

## ATTORNEY'S FEES

Plaintiff seeks recovery of its reasonable and necessary attorney's fees pursuant to TEX. BUS. CORP. ACT, §24.013, *et seq.*

## VII.

## JURY TRIAL DEMAND

80.     Plaintiff requests that all triable issues be determined by a jury.

## VIII.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court enter a judgment as set forth above, setting aside the transfer of the Fraudulent Consideration and the obligations incurred in connection therewith and that Plaintiff be awarded the relief requested herein, along with actual damages, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest at the maximum rates allowed by law, and such further and other relief to which Plaintiff may show itself entitled, both at law and in equity.

Respectfully submitted,

/s/ Patrick D. Keating
Werner A. Powers
State Bar No. 16218800
Robin Phelan
State Bar No. 15903000
Patrick D. Keating
State Bar No. 00794074

HAYNES AND BOONE, L.LP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219-7673
Telephone:     (214) 651-5000
Telecopier:     (214) 651-5940

Nicholas A. Foley
Texas State Bar No. 07208620
Douglas J. Buncher
Texas State Bar No. 03342700
John D. Gaither
Texas State Bar No. 24055516

Neligan Foley, LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
Telephone:     (214) 840-5300
Fax:     (214) 840-5301

**ATTORNEYS FOR U.S. BANK
NATIONAL ASSOCIATION
as Litigation Trustee on Behalf of the
Idearc Inc. et al. Litigation Trust**

D-1863128_9.DOC