UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL | ) | |
| ASSOCIATION, Litigation Trustee of the | ) | |
| Idearc Inc. *et al.* Litigation Trust, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | 3:10-CV-1842-G |
| VS. | ) | |
| | ) | |
| VERIZON COMMUNICATIONS INC., | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendants, Verizon Communications

Inc. ("Verizon"), Verizon Financial Services LLC ("VFS"), GTE Corporation

("GTE"), and John W. Diercksen ("Diercksen") (collectively, the "defendants"), for

partial dismissal of the claims filed by the plaintiff, U.S. National Bank Association

("Bank") (docket entry 14).  For the reasons set forth below, the motion is granted in

part and denied in part.

## I.  BACKGROUND

On November 17, 2006, Verizon spun off its print and on-line directories

business into an independent stand-alone company: Idearc, Inc. ("Idearc").  Plaintiff's

Original Complaint ("Complaint") ¶ 2 (docket entry 1).  Idearc was formerly a

Verizon subsidiary.  *Id.*; Defendants Verizon Communications Inc., Verizon Financial

Services LLC, GTE Corporation, and John W. Diercksen's Motion to Dismiss

Original Complaint and Brief in Support ("Motion") at 3.  To complete the spin-off

transaction, Verizon gave Idearc the entirety of its Idearc Information Services LLC

("Information Services") and domestic print and internet yellow pages directories

publishing operations in exchange for Idearc (1) issuing Verizon 145,851,861 shares

of its common stock; (2) issuing Verizon two unsecured notes totaling $2.85 billion;

(3) transferring $2,441,532,374.71 in cash to Verizon's wholly-owned subsidiary,

VFS; and (4) becoming indebted to Verizon for $4.3 billion pursuant to a credit

agreement dated November 16, 2006 (the "Verizon Tranche B").  Complaint ¶ 18.

Verizon also allegedly caused Information Services to guarantee the loans secured by

the Verizon Tranche B and distribute all of its assets to GTE, another subsidiary of

Verizon, for nothing in return, *id.* ¶ 61 -- leaving Information Services insolvent.  *Id.*

¶ 66.

On November 17, 2006, Verizon allegedly caused Idearc Media Corporation

("IMC"), one of Idearc's debtor subsidiaries, to loan $475,410,408 to Idearc in

exchange for a one-page illiquid demand note "with a value of much less than the

amount loaned."  *Id.* ¶ 51.  Idearc combined this loan with other borrowed money

and transferred it to VFS.  *Id.* ¶ 52.  After the spin-off transaction was completed,

Idearc's balance sheet reflected debt in excess of assets by approximately $9 billion. *Id.* ¶ 2.

Bank alleges that the entire spin-off transaction was a "scheme" devised by Verizon to "obtain approximately $9.5 billion -- not in the marketplace, but through the use of lawyers and Wall Street investment bankers." *Id.* ¶ 1. According to Bank, Verizon had been experiencing a steady decline in its yellow pages telephone directory business, with revenues decreasing by $169 million between 2005 and 2006 alone. *Id.* Faced with the challenges of the "public's declining use of paper telephone directories and increased use of alternative information sources, such as the internet," *id.*, Verizon embarked on the complicated spin-off transaction to "reap [a] windfall to the injury of Idearc and Idearc's creditors by stripping Idearc of cash and burdening Idearc with massive debt." *Id.* ¶ 2.

According to Bank, Verizon could only complete its scheme by securing the approval of Idearc's board of directors, which it did by enlisting Diercksen -- Verizon's Executive Vice President for Strategic Planning -- to serve as "the sole member of Idearc's board." *Id.* ¶ 3. Diercksen approved the spin-off transaction, and he signed "all of the key contracts Verizon entered into with Idearc" to complete the deal. *Id.* Diercksen, however, resigned from his position on Idearc's board one day before the spin-off transaction, and retained his executive position with Verizon thereafter. *Id.* ¶ 21.

- 3 -

Bank points to Idearc's balance sheet as of December 31, 2006 as evidence that the spin-off transaction "rendered Idearc insolvent and left it with unreasonably small assets to support its ongoing business." *Id.* ¶¶ 22, 23. That balance sheet indicated that Idearc had approximately $1.3 billion in assets, compared to about $10.1 billion in liabilities. *Id.* ¶ 22. Bank alleges that the assets Verizon transferred to Idearc were worth billions less than the "fraudulent consideration" that Idearc and its subsidiaries conveyed to Verizon. *Id.* ¶ 23. Bank claims that the spin-off transaction relieved Verizon of approximately $7.1 billion of debt. *Id.* ¶¶ 18, 24.

On March 31, 2009, some 28 months after the spin-off transaction, Idearc petitioned for relief under Chapter 11 of the United States Bankruptcy Code. *Id.* ¶ 25. During the bankruptcy proceedings, Idearc admitted that "when [the spin-off transaction] occurred two and a half years ago it was saddled with too much debt," *id.* ¶ 26, a stark contrast with Verizon's report to the Securities and Exchange Commission that the spin-off transaction "resulted in an increase of nearly $9 billion in [Verizon] shareowners' equity, as well as a reduction of total debt by more than $7 billion and we received approximately $2 billion in cash." *Id.* ¶ 27. Idearc filed an amended reorganization plan in the bankruptcy court; it was confirmed on December 22, 2009. *Id.* ¶ 28. The plan relieved Idearc of approximately $6 billion of debt and valued the reorganized Idearc at approximately $4 billion. *Id.* The plan also created a plaintiff trust and assigned to it certain causes of action, including Idearc's claims

- 4 -

against Verizon and former officers and directors of Verizon and Idearc. *Id.* ¶¶ 4, 29. The beneficiaries of the trust are principally bondholders of, and lenders to, Idearc and its subsidiaries, with claims totaling approximately $6 billion. *Id.* ¶ 4.

On September 15, 2010, Bank, as trustee of the trust created by Idearc's reorganization plan, *id.* ¶ 9, filed suit to prosecute the rights assigned to it under the plan. *Id.* ¶ 31. Bank asserts causes of action against Verizon, VFS, and GTE for actual and constructive fraudulent transfer under the Texas Business and Commerce Code (the "B&C"), and the federal Bankruptcy Code. Complaint ¶¶ 32-43, 50-59, 60-69, 70-76. It also asserts claims for breach of fiduciary duty against Diercksen, *id.* ¶¶ 44-46, aiding and abetting Diercksen's breach of fiduciary duty against Verizon, *id.* ¶¶ 48-49, and unlawful dividend under the General Corporation Law of Delaware against both Diercksen and Verizon. *Id.* ¶¶ 77-79. The defendants now move to dismiss Bank's claims for actual fraudulent transfer as not pleaded with the particularity required by Rule 9(b), F.R. CIV. P., and its claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unlawful dividend for failure to state a claim for which relief may be granted.

## II. ANALYSIS

### A. Dismissal Standard

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina*

*Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations, quotations marks, and brackets omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Id.* (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6).  See *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949-50 (2009).  The court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id*. at 1950.  The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an

entitlement of relief." *Id*.  The plausibility principle does not convert the Rule 8(a)(2)

notice pleading to a "probability requirement," but "a sheer possibility that a

defendant has acted unlawfully" will not defeat a motion to dismiss.  *Id*. at 1949.

The plaintiff must "plead[] factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that

the pleader is entitled to relief.'" *Id*. at 1950 (*quoting* FED. R. CIV. P. 8(a)(2)).  The

court, drawing on its judicial experience and common sense, must undertake the

"context-specific task" of determining whether the plaintiff's allegations "nudge" its

claims against the defendants "across the line from conceivable to plausible."  See *id*.

at 1950, 1952.

Rule 9(b) states that "[i]n alleging fraud . . ., a party must state with

particularity the circumstances constituting fraud. . . ." FED. R. CIV. P. 9(b).  A party

alleging fraud must specify "the who, what, when, where, and how" of the alleged

fraud.  *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th

Cir. 2003); see also *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th

Cir.), *cert. denied*, 522 U.S. 966 (1997).  Rule 9(b)'s heightened pleading "provides

defendants with fair notice of the plaintiff['s] claims, protects defendants from harm

to their reputation and goodwill, reduces the number of strike suits, and prevents [a]

plaintiff[] from filing baseless claims in an attempt to discover unknown wrongs."

*Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1067 (5th Cir. 1994).

## B. Application

Verizon, VFS, and GTE all move to dismiss Bank's claims of actual fraudulent transfer for failure to plead with the particularity required by Rule 9(b). Contending that Bank has failed to state a claim for which relief may be granted, Diercksen moves to dismiss Bank's breach of fiduciary duty claim, Verizon moves to dismiss Bank's claim of aiding and abetting breach of fiduciary duty, and both Diercksen and Verizon move to dismiss Bank's unlawful dividend claim.

### 1. *Actual Fraudulent Transfer Claims*

To state a claim for actual fraudulent transfer under the B&C and the Bankruptcy Code, a creditor must allege that a debtor made a transfer "with actual intent to hinder, delay, or defraud" any creditor of the debtor. Tex. Bus. & Com. Code § 24.005(a)(1) (Vernon 2011); 11 U.S.C. § 548(a)(1)(A). The Fifth Circuit has yet to address whether the heightened pleading standard of Rule 9(b) applies to claims for fraudulent transfer. *E.g., Janvey v. Alguire*, __ F.3d __, No. 10-10617, 2011 WL 2937949, at *11 (5th Cir. July 22, 2011) ("We need not and do not address the issue of whether heightened pleading is required."). But the plaintiff has pleaded its claim with sufficient particularity to satisfy Rule 9(b), thus *a fortiori* providing

adequate notice to Verizon, VFS, and GTE under Rule 8's more liberal pleading standard.[1]

In its complaint, Bank alleges generally that Idearc, Information Services, and IMC -- the respective debtors/transferors in the relevant transactions -- intended to hinder, delay, or defraud their creditors by transferring assets to Verizon in furtherance of the spin-off transaction.[2]  Complaint ¶¶ 33, 53, 63, 72.  According to Bank, Verizon used its control over Idearc to effectuate four distinct asset transfers to Verizon and VFS.  *Id.* ¶¶ 17-19.  Bank identifies the date of these transfers, the amount of each, and the consideration, if any, Verizon and VFS received from Idearc. *Id.*  Bank provides similar information for the transfers made by Information Services

---

[1]    The defendants move to dismiss the plaintiff's fraudulent transfer claims only to the extent that the claims are based on actual fraudulent transfer, Motion at 8, and they tacitly concede that the plaintiff has stated plausible claims for constructive fraudulent transfer, Defendants' Reply in Support of Motion to Dismiss ("Reply") at 3 (docket entry 26) ("Something more must be required than merely pleading the elements of constructive fraud"), -- a cause of action that does not require a debtor to have an actual intent to hinder, delay, or defraud a creditor.  TEX. BUS. & COMM. CODE § 24.005(a)(2); 11 U.S.C. § 548(a)(1)(B)(i)-(ii).  The question on this motion to dismiss, therefore, is whether the plaintiff has alleged enough facts, and with sufficient detail, for the court to reasonably infer that the defendants intended to hinder, delay, or defraud Idearc's creditors by consummating the allegedly fraudulent transfers.  See *Iqbal*, 129 S. Ct. at 1949.

[2]    While these general allegations might not be enough standing alone, when paired with detailed facts identifying the who, what, when, where, and why of the alleged fraud, they permit the court to draw a reasonable inference of fraudulent intent.  *Tuchman*, 14 F.3d at 1068 ("Although scienter may be "averred generally," case law amply demonstrates that pleading scienter requires more than a simple allegation that a defendant had fraudulent intent.  To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud.").

and IMC, *id.* ¶¶ 51-52, 61-62, and alleges that Idearc, Information Services, and IMC did not receive reasonably equivalent value in return for the transfers, *id.* ¶¶ 34, 40, 54, 61, 64, 75, and they were either insolvent when the transfers occurred or became insolvent as a result of the transfers. *Id.* ¶¶ 22, 41, 66.

Bank argues that general allegations of intent suffice under Rule 9(b) but, even if they are not, the specific allegations relating to Verizon's intent are sufficient and Verizon's intent should be imputed, under the control rule, to Idearc, Information Services, and IMC. Response at 4-5. The court agrees.

"Most courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of . . . property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor." *ASARCO LLC v. Americas Mining Corporation*, 396 B.R. 278, 369 (S.D. Tex. 2008); see also *In re Elrod Holdings Corporation*, 421 B.R. 700, 709 (Bankr. D. Del. 2010). Under this rule, "the requisite intent derives from a *transferee* who is in the position to dominate or control the debtor's disposition of his property . . .." *In re Adler, Coleman Clearing Corporation*, 263 B.R. 406, 445 (S.D.N.Y. 2001) (emphasis in original). To invoke the control rule, a plaintiff must allege: (1) the controlling transferee possessed the requisite intent to hinder, delay, or defraud the debtor's creditors; (2) the transferee was in a position to dominate or control; and (3) the domination and control related to the debtor's disposition of the property. *ASARCO*, 396 B.R. at 369. "In the typical case, the

controlling transferee stands either to gain directly or to confer benefits upon others by securing possession of the property and keeping it out of the reach of creditors." *In re Adler*, 263 B.R. at 445.

Bank alleges that Verizon controlled Idearc's, Information Services', and IMC's respective dispositions of property because, prior to the spin-off transaction, Idearc was a Verizon subsidiary, Complaint ¶ 2, and Information Services and IMC were both debtor subsidiaries of Idearc. *Id.* ¶¶ 51, 61. Bank claims that Verizon intended to hinder, delay, or defraud Idearc's creditors by "shift[ing] the risk of billions of dollars of debt obligations from itself to Idearc and Idearc's creditors," *id.* ¶ 36, because it knew the revenues generated from its print directories business, which it unsuccessfully attempted to sell in 2005, *id.* ¶ 16, were steadily declining (decreasing by $169 million between 2005 and 2006 alone). *Id.* ¶ 1. To accomplish its goal, Verizon made Diercksen -- its Executive Vice President for Strategic Planning -- the "sole member of Idearc's board." *Id.* ¶ 3. Diercksen allegedly stood "on both sides of the transaction" by approving the spin-off as Idearc's sole board member, and then "chang[ing] hats" to sign "all of the key contracts Verizon entered into with Idearc to implement the Spin-off," *id.*, and when the spin-off transaction was complete, Idearc's balance sheet showed that "Idearc was insolvent by approximately $9 billion, with total obligations in excess of $10 billion." *Id.* ¶ 22. Bank alleges that the spin-off transaction left Idearc, Information Services, and IMC with remaining assets that

were "unreasonably small in relation to the business" and the parties should have known that the companies "would incur debts beyond [their] ability to pay as they became due." *Id.* ¶¶ 35, 55, 65.  Bank also alleges that Verizon benefitted heftily from the transaction by eliminating $7.1 billion of its debt, *id.* ¶ 24, and securing nearly $2.5 billion in cash that was transferred from Idearc to Verizon's wholly-owned subsidiary, VFS.  *Id.* ¶ 2.  These detailed and particularized allegations show that Verizon had a motive and opportunity to commit the alleged actual fraudulent transfers, and they permit the court to draw a reasonable inference of Verizon's intent.

A recently decided Northern District of Texas case is instructive.  In *Kaye v. Lone Star Fund V (U.S.), L.P.*, __ B.R. __, No. 3:09-CV-2263-M, 2011 WL 1548967, at *19 (N.D. Tex. Apr. 26, 2011) (Lynn, J.), the court denied a motion to dismiss the plaintiff's actual fraudulent transfer claim, asserted under the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), because the plaintiff alleged that (1) the transfer was to an insider; (2) the debtor received less than reasonably equivalent value; and (3) the debtor was insolvent.  *Id.*  The court found that the factual allegations relating to these three statutory "badges of fraud" were enough for the claim to withstand a motion to dismiss for failure to plead fraud with particularity.  *Id.*  The Texas Uniform Fraudulent Transfer Act ("TUFTA") contains an identical, non-exclusive, list of badges of fraud.  TEX. BUS. & COMM. CODE § 24.005(b).  And Bank alleges that

(1) the transfer was to an insider because Idearc was a Verizon subsidiary, (2) Idearc received far less than reasonably equivalent value, in one instance receiving nothing in return, (3) the transfers caused Idearc to become insolvent, with debts exceeding assets by nearly $9 billion, and (4) the transfers occurred shortly after Idearc incurred substantial debts.  Response at 12; Reply at 3.  Verizon argues that Bank has pleaded constructive fraudulent transfer, but not actual fraudulent transfer.  Reply at 3.  As *Kaye* informs, however, Verizon is mistaken; these factual allegations are sufficient to plead a claim of actual fraudulent transfer.  *Kaye*, 2011 WL 1548967, at *19; see also *Alexander v. Holden Business Forms, Inc.*, No. 4:08-CV-0614-Y, 2009 WL 2176582, at *5 (N.D. Tex. July 20, 2009) (Means, J.).  Accordingly, the motions of Verizon, GTE, and VFS to dismiss Bank's actual fraudulent transfer claims are denied.

## 2.  *Breach of Fiduciary Duty Claim*

The parties agree that under Texas' choice-of-law rules, Delaware law controls Diercksen's duties as a board member of Idearc.  Motion at 12; Response at 14; see also *Hollis v. Hill*, 232 F.3d 460, 464-65 (5th Cir. 2000) ("[T]he internal affairs of the foreign corporation . . . are governed by the laws of the jurisdiction of incorporation.").  The defendants, however, argue that Bank cannot bring direct claims for breach of fiduciary duty on behalf of Idearc's creditors because corporate fiduciaries do not owe duties to creditors under Delaware law.  Motion at 15.  They insist that Bank has not stated a cognizable claim because it has not alleged that

Diercksen breached the duties he owed to Verizon, Idearc's parent and sole shareholder. *Id.* at 13-15. Additionally, the defendants contend that Bank cannot seek punitive damages for Diercksen's alleged breach of duty because punitive damages are not available for claims related to a director's duties to a corporation under Delaware law. *Id.* at 16. The court will address each argument in turn.

To begin, the court finds that Bank has standing to assert its breach of fiduciary claim against Diercksen. There is no dispute that Idearc's reorganization plan created the plaintiff trust and assigned it certain causes of action belonging to Idearc. Response at 15 (explaining that the reorganization plan "assigned certain causes of action [to the plaintiff trust], including Idearc's claims . . . ."); Motion at 16 ("Indeed, the Complaint pleads only that the Trust was assigned certain claims belonging to *Idearc*."). A breach of fiduciary duty claim fall squarely in that category. *Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 387 (5th Cir. 2009) (explaining that cause of action for breach of fiduciary duty is property of the corporation, which becomes part of the debtor's estate during a chapter 11 reorganization); *see also North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("[T]he creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties."). The defendants argue, nonetheless, that the plaintiff trust "lacks standing to assert any claims on behalf of Idearc's creditors." Motion at 16.

- 14 -

But this issue does not appear to be in dispute. Bank's claim against Diercksen is one for breach of "his fiduciary duties as the sole director of Idearc, approving a transaction for the benefit of Verizon to the detriment of Idearc and its creditors." Complaint ¶ 45. Bank concedes that "[t]he cause of action for breach of fiduciary duty . . . is a direct cause[] of action of Idearc which now belongs to the Trust, not a cause of action that belongs to Idearc's creditors." Response at 16. Bank, therefore, has standing to assert the breach of fiduciary duty claim against Diercksen that was assigned to it from Idearc as part of the reorganization plan.

The defendants' next argument, that Bank has not stated a cognizable claim for breach of fiduciary duty, is equally unpersuasive. "'[I]n a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.'" *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200 (Del. Ch. 2006) (quoting *Anadarko Petroleum Corporation v. Panhandle Eastern Corporation*, 545 A.2d 1171, 1174 (Del. 1988)). When following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another, "a director of a wholly-owned subsidiary owes [no] duty to second-guess the business judgment of its parent corporation . . .." *Id.* at 201. This rule, however, does not apply when the subsidiary is insolvent or when the transaction at issue would render the subsidiary unable to meet its legal obligations. *Gheewalla*, 930 A.2d at 101; see also *In re*

*Teleglobe Communications Corporation*, 493 F.3d 345, 367 (3d Cir. 2007); *Seidel v. Byron*, 405 B.R. 277, 285 (N.D. Ill. 2009). Instead, "directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefitting a parent corporation that they know will render the subsidiary unable to meet its legal obligations." *Trenwick*, 906 A.2d at 203 & n.96.

Bank alleges that Diercksen stood on both sides of the spin-off transaction, as an executive of Verizon and the sole board member of Idearc. Complaint ¶ 3. It also alleges that Idearc was insolvent at the time, or became insolvent as a result, of the spin-off transaction. *Id.* ¶ 41. More specifically, Bank alleges that shortly after the spin-off transaction was completed, Idearc's balance sheet reflected debts in excess of assets by approximately $9 billion. *Id.* ¶ 22. These factual allegations are sufficient to state a plausible claim for breach of fiduciary duty.[3]

While the court agrees with Bank that it has standing to assert a breach of fiduciary duty claim against Diercksen and it has alleged facts sufficient to state a plausible claim for the same, the court finds no authority to support Bank's demand for punitive damages in connection with its breach of fiduciary duty claim. The

---

[3]     Bank's claim against Diercksen for breach of fiduciary duty is not a fraud-based claim subject to the heightened pleading standards of Rule 9(b). Bank's claim is premised on Diercksen's conduct as the sole board member of Idearc, including standing on both sides of the spin-off transaction and approving the deal that left Idearc insolvent. Thus, Bank's claim must satisfy *Twombly*'s and *Iqbal*'s plausibility standard, not Rule 9(b). See *In re NE 40 Partners, Limited*, 411 B.R. 352, 363 (Bankr. S.D. Tex. 2009).

parties agree that Delaware law controls, and the Delaware Chancery -- a court of equity -- would have jurisdiction over the plaintiff's breach of fiduciary duty claim were it resolved in Delaware.  Motion at 16-17; Response at 16.  Punitive damages are not available for breach of fiduciary duty claims adjudicated in the Delaware Chancery Court.  *Adams v. Calvarese Farms Maintenance Corporation, Inc.*, No. 4262-VCP, 2010 WL 3944961, at *21 n.204 (Del. Ch. Sept. 17, 2010) ("The Legislature has not authorized punitive damages for a director's breach of fiduciary duty."); *Gesoff v. IIC Industries, Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) (explaining that the court "cannot award punitive damages" for claim of breach of fiduciary duty).  Accordingly, the plaintiff cannot pursue punitive damages for that claim here.  Bank's demand for punitive damages from Diercksen for breach of his fiduciary duty is therefore stricken from its complaint.[4]

### 3.   *Aiding and Abetting Breach of Fiduciary Duty*

Bank also asserts a claim against Verizon for aiding and abetting Diercksen's breach of fiduciary duty.  Complaint ¶ 49.  In Delaware, "the four elements of an aiding and abetting claim [are] (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."  *Malpiede v. Townson*,

---

[4]      Bank also seeks punitive damages against Verizon for aiding and abetting Diercksen's breach of fiduciary duty.  Complaint ¶ 49.  For the same reasons, this demand for punitive damages must also be stricken from its complaint.

780 A.2d 1075, 1096 (Del. 2001) (internal quotation omitted). "The critical element is 'knowing participation.'" *In re Del Monte Foods Company Shareholders Litigation*, __ A.3d __, C.A. No. 6027-VCL, 2011 WL 1677458, at *20 (Del. Ch. Feb. 14, 2011).

In the present case, Bank alleges that Verizon intended to defraud Idearc's creditors by "shift[ing] the risk of billions of dollars of debt obligations from itself to Idearc and Idearc's creditors," *id.* ¶ 36, because it knew the revenues generated from its print directories business, which it unsuccessfully attempted to sell in 2005, *id.* ¶ 16, were steadily declining (decreasing by $169 million between 2005 and 2006 alone). *Id.* ¶ 1. More importantly, the complaint details how Verizon appointed one of its senior executives, Diercksen, as the "sole member of Idearc's board." *Id.* ¶ 3. This allowed Diercksen to stand "on both sides of the transaction," *id.*, approve the spin-off transaction -- leaving Idearc nearly $9 billion in the red, *id.* ¶ 22 -- and then resign from Idearc's board the day before the spin-off transaction occurred "to enjoy the benefits Verizon received in the Spin-off." *Id.* ¶ 21. Bank's factual allegations allow the court to reasonably infer that Verizon knowingly aided and abetted Diercksen's breach of fiduciary duty.

Verizon argues, in the alternative, that Bank's aiding and abetting claim is barred by *in pari delicto*, Motion at 20, which prevents a party "from recovering damages if [its] losses are substantially caused by activities the law forbade [it] to

engage in," and the party seeking to recover bears at least "equal fault." *In re American International Group, Inc., Consolidated Derivative Litigation*, 976 A.2d 872, 883 (Del. Ch. 2009), *aff'd*, 11 A.3d 228 (Del. 2010) (table).  Verizon claims that Bank "seeks to recover transfers premised on Idearc's fraudulent intent, while on the other hand it tries to avoid the repercussions of that fraudulent intent on [its aiding and abetting claim]."  Motion at 20.  Bank counters that Verizon admits that the issue of whether the doctrine of *in pari delicto* applies between a sole shareholder and its wholly-owned subsidiary "does not appear to have been litigated in Delaware," Plaintiff's Sur-Reply Brief in Opposition to Defendants' Motion to Dismiss Plaintiff's Original Complaint at 4 ¶ 7 (*quoting* Reply at 7), but refuses to acknowledge persuasive authority in this circuit rejecting the applicability of the doctrine "when corporate insiders, such as sole shareholders who dominate and control a subsidiary" attempt to use the doctrine "to achieve the inequitable result of escaping liability for their wrongdoing."  *Id.* at 4 ¶ 6. Bank cites *ASARCO*, 396 B.R. 278, in support of its position.

In *ASARCO*, the plaintiff/debtor-in-possession sued its former parent for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and fraudulent transfer. *Id.* at 297-98.  The plaintiff alleged that AMC/Grupo populated the subsidiary's board of directors with individuals under its control and caused those board members to force the plaintiff into an unfavorable transaction with AMC/Grupo, which transferred the plaintiff's most valuable assets to another

company under AMC/Grupo's control.  *Id.* at 301.  The defendants argued, among

other things, that the doctrine of *in pari delicto* barred the plaintiff from asserting its

aiding and abetting claim.  *Id.* at 429-30.  The United States District Court for the

Southern District of Texas disagreed because "AMC/Grupo dominated and controlled

ASARCO during the relevant time and dictated the terms of the [relevant]

transaction . . .."  *Id.*  As a result, the court found, "ASARCO (and its creditors) were

not at equal fault," and the *in pari delicto* doctrine did not bar the plaintiff's claim.  *Id.*

        The court finds *ASARCO* persuasive.  Equity prevents a corporate parent from

using the shield of *in pari delicto* when the wrongdoing of a wholly-owned subsidiary is

directly traceable to the parent's exercise of control.  Bank alleges that Verizon

controlled and dominated its wholly-owned subsidiary, Idearc, appointed a corporate

insider as Idearc's sole board member, caused Idearc to approve the spin-off

transaction that left it insolvent, and reaped a $7.1 billion dollar windfall as a result.

Assuming, as the court must at this stage, that these facts are true, Idearc cannot

reasonably be said to be "equally at fault" for the spin-off transaction.  See *ASARCO*,

396 B.R. at 429-30.  Consequently, the doctrine of *in pari delicto* does not prevent

Bank from pursuing its aiding and abetting claim.  Verizon's motion to dismiss that

claim is therefore denied.

- 20 -

4.  *Unlawful Dividend*

Diercksen and Verizon also move to dismiss Bank's claims for unlawful dividend.  They quote Black's Law Dictionary for the proposition that "[a] dividend is a 'portion of the company's earnings or profits distributed pro rata to its shareholders, usually in the form of cash or additional shares.'"  Motion at 22 (*quoting* BLACK'S LAW DICTIONARY 547 (9th ed. 2009)).  They argue that Bank does not allege any *pro rata* distribution from Idearc to Verizon and that Idearc transferred, among other things, 145,851,861 shares of its common stock to Verizon "in exchange for the contribution from Verizon to Idearc of the directories business."  *Id.* (*quoting* Complaint ¶ 18) (internal quotation marks omitted).  Most courts, however, have adopted a more expansive view of what constitutes a "dividend" under Delaware's unlawful-dividend statute.  See, *e.g.*, *In re Buckhead America Corporation*, 178 B.R. 956, 973-74 (D. Del. 1994) ("Relevant authorities indicate, however, that DIA's financing of these transactions [a leveraged buyout of its parent company and sole shareholder, DIC] may properly be treated as an unlawful dividend payment or distribution").

Bank argues that the spin-off transaction "cannot be a purchase [by Idearc] of [Verizon's] directory business because the transaction was structured as a tax free reorganization, not a purchase and sale, and the amount Verizon took from Idearc grossly exceeded the value of the business."  Response at 24-25 (*citing* Complaint

- 21 -

¶ 22).  Bank urges the court to look to the "substance of these transactions" and allow

its unlawful dividend claims, lest shareholders and directors be able to escape liability

for causing unlawful dividends "merely by labeling the distributions as leveraged buy-

outs or, as Verizon did, a tax-free reorganization."  Response at 25.  Bank's position is

amply supported by persuasive authority interpreting Delaware's unlawful-dividend

statute.  See, *e.g.*, *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1001

(S.D.N.Y. 1991) (denying motion to dismiss because "the economic substance of the

transactions in question brings them within the purview of the relevant sections of

the Delaware General Corporation Law."); *Buckhead*, 178 B.R. at 973 (financing of

parent's leveraged-buyout "may properly be treated as an unlawful dividend payment

or distribution"); see also *AT&T Corporation v. Walker*, No. C04-5709FDB, 2006 WL

2927659, at *2 (W.D. Wash. Oct. 12, 2006) ("[T]he substantive economic effect of

a particular transaction that depletes the debtor's assets and transfers them to

shareholders may be actionable as unlawful dividends.").  The court is convinced that

the expansive view of "dividend" propounded by Bank is the correct one.  As a result,

the motions filed by Diercksen and Verizon to dismiss Bank's unlawful-dividend

claims are denied.

## III.  <u>CONCLUSION</u>

For the above-stated reasons, the defendants' motion to dismiss is **GRANTED**

in part and **DENIED** in part.  Bank's demands for punitive damages as relief for

Diercksen's breach of fiduciary duty and Verizon's aiding and abetting are

**DISMISSED**; those requests are hereby **STRICKEN** from Bank's complaint.

     **SO ORDERED**.

September 19, 2011.

_A. Joe Fish_

A. JOE FISH
**Senior United States District Judge**