**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, | ) | |
| Litigation Trustee of the Idearc Inc. *et al.* | ) | |
| Litigation Trust, | ) | |
| | ) | CIVIL ACTION NO. |
| *Plaintiff*, | ) | |
| | ) | 3:10-CV-1842-G |
| v. | ) | |
| | ) | **ECF** |
| VERIZON COMMUNICATIONS INC., | ) | |
| VERIZON FINANCIAL SERVICES, LLC, GTE | ) | |
| CORPORATION and JOHN W. DIERCKSEN, | ) | |
| | ) | |
| *Defendants*. | ) | |

**APPENDIX IN SUPPORT OF DEFENDANTS VERIZON COMMUNICATIONS INC.,**
**VERIZON FINANCIAL SERVICES LLC, GTE CORPORATION, AND JOHN W.**
**DIERCKSEN'S SUPPLEMENTAL PARTIAL MOTION**
**TO DISMISS AND BRIEF IN SUPPORT**

Defendants Verizon Communications Inc., Verizon Financial Services LLC, GTE

Corporation, and John W. Diercksen hereby submit their Appendix in Support of Defendants'

Supplemental Partial Motion to Dismiss and Brief in Support as follows:[1]

| Exhibit No. | App. Page(s) | Description |
|---|---|---|
| 1 | | November 17, 2006 Credit Agreement, Exhibit 10.11 to Idearc, Inc. Form 8-K, Filed Nov. 21, 2006, retrieved from http://www.sec.gov/edgar.shtml |
| 2 | | November 1, 2006 Amendment No. 6 to Idearc, Inc. Form 10, retrieved from http://www.sec.gov/edgar.shtml |
| 3 | | Idearc Inc.'s First Amended Joint Chapter 11 Plan of Reorganization of Idearc, Inc., et al., Debtors (As Modified), Case No. 09-31828, Dkt. No. 1638 (Bankr. N.D. Tex. Dec. 21, 2009) |

---

[1]     Concurrently with this appendix, Defendants are filing a Supplemental Partial Motion to Dismiss and Brief in Support.  Defendants hereby incorporate by reference every document attached to this appendix into their Supplemental Partial Motion to Dismiss and Brief in Support.

**APPENDIX**

Dated:  February 27, 2012

> T. Ray Guy
> Texas Bar No. 08648500
> *ray.guy@weil.com*
> Paige Holden Montgomery
> Texas Bar No. 24037131
> *paige.montgomery@weil.com*
> WEIL, GOTSHAL & MANGES, LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Telephone:  (214) 746-7700
> Facsimile:  (214) 746-7777
>
>
> John B. Strasburger
> Texas Bar No. 19358335
> *john.strasburger@weil.com*
> Alfredo R. Pérez
> Texas Bar No. 15776275
> *alfredo.perez@weil.com*
> WEIL, GOTSHAL & MANGES, LLP
> 700 Louisiana, Suite 1600
> Houston, Texas 77002
> Telephone:  (713) 546-5000
> Facsimile:  (713) 224-9511
>
>
> /s Philip D. Anker_____ _____
> Philip D. Anker (NY Bar No. 4345567)
> (Admitted *Pro Hac Vice*)
> WILMER CUTLER PICKERING HALE AND DORR LLP
> 399 Park Avenue
> New York, NY 10022
> Telephone: 212-230-8800
> Facsimile:  212-230-8888
>
> *Attorneys for Verizon Communications Inc.,*
> *Verizon Financial Services LLC, GTE Corporation,*
> *and John W. Diercksen*

2

**APPENDIX**

# EXHIBIT 1

EX-10.11 14 dex1011.htm CREDIT AGREEMENT

**Exhibit 10.11**

EXECUTION VERSION

---

CREDIT AGREEMENT

dated as of November 17, 2006,

among

IDEARC INC,
as Borrower,

The Lenders Party Hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent

———————

J.P. MORGAN SECURITIES INC.

and

BEAR STEARNS & CO., INC.,
as Joint Lead Arrangers and Joint Bookrunners

———————

BEAR STEARNS CORPORATE LENDING INC.,
as Syndication Agent

and

BANK OF AMERICA, N.A.,

BARCLAYS BANK PLC

and

CITIBANK, N.A.,
as Co-Documentation Agents

---

TABLE OF CONTENTS

ARTICLE I

Definitions

SECTION 1.01. Defined Terms                                                              1
SECTION 1.02. Classification of Loans and Borrowings                                    35
SECTION 1.03. Terms Generally                                                           35
SECTION 1.04. Accounting Terms; GAAP                                                    36

ARTICLE II

The Credits

SECTION 2.01. Commitments                                                               36
SECTION 2.02. Loans and Borrowings                                                      37
SECTION 2.03. Requests for Revolving Borrowings                                         37
SECTION 2.04. Swingline Loans                                                           38
SECTION 2.05. Letters of Credit                                                         39
SECTION 2.06. Funding of Borrowings                                                     45
SECTION 2.07. Interest Elections                                                        46
SECTION 2.08. Termination and Reduction of Commitments                                  47
SECTION 2.09. Repayment of Loans; Evidence of Debt                                      48
SECTION 2.10. Amortization of Term Loans                                                49
SECTION 2.11. Prepayment of Loans                                                       50
SECTION 2.12. Fees                                                                      52
SECTION 2.13. Interest                                                                  53
SECTION 2.14. Alternate Rate of Interest                                                54
SECTION 2.15. Increased Costs                                                           55
SECTION 2.16. Break Funding Payments                                                    56
SECTION 2.17. Taxes                                                                     57
SECTION 2.18. Payments Generally; Pro Rata Treatment; Sharing of Setoffs                59
SECTION 2.19. Mitigation Obligations; Replacement of Lenders                            61
SECTION 2.20. Term Loan Refinancing Facility                                            62
SECTION 2.21. Incremental Facilities                                                    63

ARTICLE III

Representations and Warranties

SECTION 3.01. Organization; Powers                                                      64
SECTION 3.02. Authorization; Enforceability                                             64
SECTION 3.03. Governmental Approvals; No Conflicts                                      65
SECTION 3.04. Financial Condition; No Material Adverse Change                           65
SECTION 3.05. Properties                                                                66

App. - 000002

Contents, p. 2

SECTION 3.06. Litigation and Environmental Matters                                    66
SECTION 3.07. Compliance with Laws and Agreements; Absence of Default                 66
SECTION 3.08. Investment Company Status                                               67
SECTION 3.09. Taxes                                                                   67
SECTION 3.10. ERISA                                                                   67
SECTION 3.11. Disclosure                                                              67
SECTION 3.12. Subsidiaries                                                            67
SECTION 3.13. Insurance                                                               67
SECTION 3.14. Labor Matters                                                           67
SECTION 3.15. Solvency                                                                68
SECTION 3.16. Margin Regulations                                                      68
SECTION 3.17. Spin-Off                                                                68
SECTION 3.18. Security Documents                                                      68
SECTION 3.19. Use of Proceeds and Letters of Credit                                   69

ARTICLE IV

Conditions

SECTION 4.01. Effective Date                                                          70
SECTION 4.02. Each Credit Event                                                       72

ARTICLE V

Affirmative Covenants

SECTION 5.01. Financial Statements and Other Information                              73
SECTION 5.02. Notices of Material Events                                              75
SECTION 5.03. Information Regarding Collateral                                        75
SECTION 5.04. Existence; Conduct of Business                                          76
SECTION 5.05. Payment of Obligations                                                  76
SECTION 5.06. Maintenance of Properties                                               76
SECTION 5.07. Insurance                                                               76
SECTION 5.08. Casualty and Condemnation                                              76
SECTION 5.09. Books and Records; Inspection and Audit Rights                          77
SECTION 5.10. Compliance with Laws                                                    77
SECTION 5.11. Additional Subsidiaries                                                 77
SECTION 5.12. Further Assurances                                                      77
SECTION 5.13. Interest Rate Protection                                                78

ARTICLE VI

Negative Covenants

SECTION 6.01. Indebtedness; Certain Equity Securities                                 78
SECTION 6.02. Liens                                                                   81

App. - 000003

SECTION 6.03. Fundamental Changes　　　　　　　　　　　　　　　　　　　　84
SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions　　　　84
SECTION 6.05. Asset Sales　　　　　　　　　　　　　　　　　　　　　　　87
SECTION 6.06. Sale and Leaseback Transactions　　　　　　　　　　　　　　88
SECTION 6.07. Swap Agreements　　　　　　　　　　　　　　　　　　　　88
SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness　　　　　　88
SECTION 6.09. Transactions with Affiliates　　　　　　　　　　　　　　　　90
SECTION 6.10. Restrictive Agreements　　　　　　　　　　　　　　　　　　92
SECTION 6.11. Fiscal Year　　　　　　　　　　　　　　　　　　　　　　93
SECTION 6.12. Amendment of Material Documents　　　　　　　　　　　　　93
SECTION 6.13. Leverage Ratio　　　　　　　　　　　　　　　　　　　　93
SECTION 6.14. Designation of Unrestricted Subsidiaries　　　　　　　　　　　93

ARTICLE VII

Events of Default

ARTICLE VIII

The Agent

ARTICLE IX

Miscellaneous

SECTION 9.01. Notices　　　　　　　　　　　　　　　　　　　　　　　99
SECTION 9.02. Waivers; Amendments　　　　　　　　　　　　　　　　　100
SECTION 9.03. Expenses; Indemnity; Damage Waiver　　　　　　　　　　　102
SECTION 9.04. Successors and Assigns　　　　　　　　　　　　　　　　104
SECTION 9.05. Survival　　　　　　　　　　　　　　　　　　　　　　107
SECTION 9.06. Counterparts; Integration; Effectiveness　　　　　　　　　　107
SECTION 9.07. Severability　　　　　　　　　　　　　　　　　　　　108
SECTION 9.08. Right of Setoff　　　　　　　　　　　　　　　　　　　108
SECTION 9.09. Governing Law; Jurisdiction; Consent to Service of Process　　　108
SECTION 9.10. WAIVER OF JURY TRIAL　　　　　　　　　　　　　　　109
SECTION 9.11. Headings　　　　　　　　　　　　　　　　　　　　　109
SECTION 9.12. Confidentiality　　　　　　　　　　　　　　　　　　　109
SECTION 9.13. U.S.A. PATRIOT Act　　　　　　　　　　　　　　　　　110
SECTION 9.14. Termination or Release　　　　　　　　　　　　　　　　111
SECTION 9.15. No Fiduciary Relationship　　　　　　　　　　　　　　　111

Schedule 2.01 —　　Commitments
Schedule 3.05 —　　Properties
Schedule 3.06 —　　Disclosed Matters
Schedule 3.12 —　　Subsidiaries
Schedule 3.13 —　　Insurance

App. - 000004

Schedule 6.01    —    Existing Indebtedness
Schedule 6.02    —    Existing Liens
Schedule 6.04    —    Existing Investments
Schedule 6.05
(j)                —    Asset Sales
Schedule 6.09    —    Affiliate Transactions
Schedule 6.10    —    Existing Restrictions

EXHIBITS:

Exhibit A       —    Form of Assignment and Assumption
Exhibit B-1     —    Form of Opinion of General Counsel
Exhibit B-2     —    Form of Opinion of Debevoise & Plimpton LLP
Exhibit B-3     —    Form of Opinion of Richards, Layton & Finger, P.A.
Exhibit C       —    Form of Guarantee and Collateral Agreement
Exhibit D       —    Form of Perfection Certificate
Exhibit E       —    U.S. Tax Compliance Certificate
Exhibit F       —    Form of Aircraft Security Agreement

CREDIT AGREEMENT dated as of November 17, 2006 (this "Agreement"), among IDEARC INC., a Delaware corporation (the "Borrower"), the LENDERS from time to time party hereto and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent") and collateral agent for such lenders (in such capacity, the "Collateral Agent").

A. In connection with the Spin-Off (such term and each other capitalized term used but not defined in these recitals having the meaning assigned thereto in Article I of this Agreement), the Borrower has requested that the Lenders and the Issuing Banks extend credit to it in the form of (a) Revolving Loans in an aggregate principal amount not in excess of $250,000,000 at any time, (b) Swingline Loans in an aggregate principal amount not in excess of $25,000,000 at any time, (c) Letters of Credit in an aggregate face amount not in excess of $50,000,000 at any time, (d) Tranche A Term Loans in an aggregate principal amount not in excess of $1,515,000,000 and (e) Tranche B Term Loans in an aggregate principal amount not in excess of $4,750,000,000. The proceeds of (a) the Revolving Loans and the Swingline Loans will be used for general corporate purposes of the Borrower and the Subsidiaries, (b) the Tranche A Term Loans and a portion of the Tranche B Term Loans will be used to pay a special cash distribution to Verizon in partial consideration for the contribution by Verizon to the Borrower of all the outstanding Equity Interests in VIS and other assets and businesses composing the Acquired Business. The Tranche B Term Loans made by Verizon on the Effective Date will be made through the contribution by Verizon to the Borrower of Equity Interests in VIS and other assets and businesses composing the Acquired Business. Letters of Credit will be used for general corporate purposes of the Borrower and the Subsidiaries.

B. The Lenders are willing to extend such credit to the Borrower and the Issuing Banks are willing to issue Letters of Credit for the account of the Borrower, in each case on the terms and subject to the conditions set forth herein.

C. Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"Acquired Business" means the assets (including the Equity Interests in VIS), liabilities and businesses comprising domestic print and Internet yellow pages

directories publishing operations of Verizon and transferred to the Borrower pursuant to the Distribution Agreement.

"Additional Term Loan Lender" has the meaning assigned to such term in Section 2.20.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder and each of its permitted successors acting in such capacity.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding anything to the contrary in this definition, none of Verizon and its Affiliates will be deemed to be an Affiliate of the Borrower or any Restricted Subsidiary unless (x) any of such Persons is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act of 1934), directly or indirectly, of shares representing 10% or more of the total voting power of the Equity Interests of the Borrower and (y) the first such Person would otherwise be such an Affiliate within the meaning of this definition.

"Agent" means JPMorgan Chase Bank, N.A., in its capacities as Administrative Agent and/or Collateral Agent, and each of its Affiliates and permitted successors acting in any such capacity.

"Aircraft" means any aircraft (including airplanes and helicopters).

"Aircraft Security Agreement" means an aircraft security agreement between the applicable Loan Party and the Collateral Agent in substantially the form set forth in Exhibit F hereto or, if requested by the Borrower or in the case of helicopters, in a form reasonably acceptable to the applicable Loan Party and the Collateral Agent).

"Alternate Base Rate" means, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus $^{1}/_{2}$ of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, as the case may be.

"Applicable Margin" means, for any day, (a) with respect to any Tranche B Term Loan, 1.00% per annum, in the case of an ABR Loan, and 2.00% per

2

annum, in the case of a Eurodollar Loan and (b) with respect to any ABR Loan or Eurodollar Loan that is a Tranche A Loan or a Revolving Loan the applicable rate per annum set forth below under the caption "ABR Spread" or "Eurodollar Spread", as the case may be, based upon the Leverage Ratio as of the most recent determination date; provided that until the Borrower shall have delivered the financial statements and certificate required by Section 5.01(b) and Section 5.01(c) for the period ended on December 31, 2006, the "Applicable Margin" for purposes of clause (b) shall be the applicable rate per annum set forth below in Category 1:

| Leverage Ratio: | ABR Spread | Eurodollar Spread |
|---|---|---|
| Category 1 | | |
| greater than or equal to 5.25 to 1.00 | 0.50% | 1.50% |
| Category 2 | | |
| less than 5.25 to 1.00 | 0.25% | 1.25% |

For purposes of the foregoing, (i) the Leverage Ratio shall be determined as of the end of each fiscal quarter of the Borrower's fiscal year based upon the consolidated financial statements delivered pursuant to Section 5.01(a) or (b) and (ii) each change in the Applicable Margin resulting from a change in the Leverage Ratio shall be effective during the period commencing on and including the date of delivery to the Administrative Agent of such consolidated financial statements indicating such change and ending on the date immediately preceding the effective date of the next such change; provided that the Leverage Ratio shall be deemed to be in Category 1 if the Administrative Agent, at the request of the Required Lenders, so elects after the Borrower fails to deliver the consolidated financial statements required to be delivered by it pursuant to Section 5.01(a) or (b), during the period from the expiration of the time for delivery thereof until such consolidated financial statements are delivered.

"Applicable Percentage" means, with respect to any Revolving Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment. If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the relative amounts of the Revolving Exposures of the Revolving Lenders.

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Asset Disposition" means (a) any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of the Borrower or any Restricted Subsidiary other than (i) sales, transfers or other dispositions described in clauses (a), (b), (c), (d), (e), (f), (g), (i), (j) and (l) of Section 6.05 and (ii) sales, transfers or other dispositions of any property of the Borrower or any Restricted Subsidiary (x) resulting in aggregate Net Proceeds equal to or less than $10,000,000 in a single transaction or series of related transactions and (y) resulting in aggregate Net

3

App. - 000008

Proceeds equal to or less than $25,000,000 in any fiscal year of the Borrower and (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Restricted Subsidiary, with a Fair Market Value immediately prior to such event of at least $10,000,000, but only to the extent that the Net Proceeds therefrom have not been applied to repair, restore or replace such property or asset within 180 days after such event.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

"Available Cash" means, on any Determination Date, an amount (which may be a negative amount) equal to the sum (without duplication) of the following in respect of the Borrower and the Restricted Subsidiaries on a consolidated basis for the period commencing on the Effective Date and ending on the last day of the most recent fiscal quarter for which a certificate shall have been delivered to the Administrative Agent pursuant to Section 5.01(c):

(a) Consolidated Adjusted EBITDA for such period; plus

(b) to the extent not included in calculating such Consolidated Adjusted EBITDA, any extraordinary or non-recurring cash gain during such period, other than any such gain resulting from any sale, transfer or other disposition of assets; minus

(c) without duplication and to the extent included in determining such Consolidated Adjusted EBITDA, the sum of (i) Consolidated Cash Interest Expense for such period, except to the extent constituting Restricted Payments, (ii) all taxes of the Borrower and the Restricted Subsidiaries paid in cash during such period and (iii) any extraordinary or nonrecurring loss, expense or charge paid in cash during such period; provided that amounts shall be included in this clause (c) for any period only to the extent not duplicative of any cost or expense which was (x) included in determining Consolidated Net Income for such period and (y) not added back to Consolidated Net Income in determining Consolidated Adjusted EBITDA for such period.

"Available Distributable Cash" means, on any Determination Date, an amount (which may be a negative amount) equal to the sum of:

(a) Available Cash as of the Determination Date; minus

(b) without duplication, the sum of the following amounts, in each case for the period commencing on the Effective Date and ending on the Determination Date:

4

App. - 000009

(i) the aggregate amount of Restricted Payments made by the Borrower and the Restricted Subsidiaries during such period, other than any such Restricted Payments (A) made to the Borrower or any Restricted Subsidiary, (B) paid from Available Equity Proceeds or (C) permitted under clause (i), (ii), (vii) or (viii) of Section 6.08(a);

(ii) the aggregate amount of Investments, determined net (without duplication of any other netting) of the aggregate amount of cash proceeds received by the Borrower and the Restricted Subsidiaries from any subsequent sale or repayment thereof, made by the Borrower and the Restricted Subsidiaries during such period, other than any such Investments (A) in connection with a Permitted Acquisition, but only to the extent funded with the proceeds of Indebtedness permitted by Section 6.01 (other than proceeds of Revolving Loans), (B) in connection with a Permitted Asset Swap, but only to the extent the consideration paid by the Borrower and the Restricted Subsidiaries consists of assets or properties (other than cash) or cash consideration funded with the proceeds of Indebtedness permitted by Section 6.01 (other than proceeds of Revolving Loans), (C) in the Borrower or any Restricted Subsidiary, (D) funded from Available Equity Proceeds, or (E) permitted under clause (a), (b), (c), (e), (f), (h), (i), (j), (k), (l), (m), (n), (o), (p), (q) (but only to the extent such Investment is reflected in and duplicative of all or a portion of a Permitted Acquisition), (r), (s), (t) or (u) of Section 6.04);

(iii) the aggregate amount of payments made by the Borrower and the Restricted Subsidiaries to repay, prepay, redeem, defease or acquire for value at or prior to stated maturity, or to refund, refinance or exchange, any Indebtedness (other than (A) Revolving Loans hereunder or (B) any Indebtedness incurred pursuant to Section 6.01(a)(iv)) or to make any other scheduled, mandatory or voluntary payment of any such Indebtedness, other than any such payments funded from (1) Available Equity Proceeds, (2) the proceeds of Indebtedness permitted by Section 6.01 (other than proceeds of Indebtedness incurred in reliance on Section 6.01(a)(iv) and proceeds of Revolving Loans) or (3) the proceeds of Refinancing Indebtedness); and

(iv) the aggregate amount of Capital Expenditures made during such period, other than Capital Expenditures financed with (1) Available Equity Proceeds, (2) Net Proceeds from an Asset Disposition not otherwise required to be applied to prepay Loans pursuant to Section 2.10(c) or (3) the proceeds of Indebtedness permitted by Section 6.01 (other than proceeds of Indebtedness incurred in reliance on Section 6.01(a)(iv) and proceeds of Revolving Loans).

"Available Equity Proceeds" means, on any date, (a) the aggregate amount of Equity Proceeds that have been received by the Borrower since the Effective Date minus (b) the aggregate amount of Equity Proceeds that have been expended by the

Borrower and its Subsidiaries on Designated Equity Proceeds Uses on such date or during such period.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.

"Billing and Collection Agreement" means the Billing and Collection Agreement dated as of the Effective Date, between the Borrower and Verizon.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Idearc Inc., a Delaware corporation.

"Borrowing" means (a) Loans of the same Class and Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect or (b) a Swingline Loan.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Branding Agreement" means the Branding Agreement dated as of the Effective Date between the Borrower and Verizon.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, without duplication, the additions to property, plant and equipment and other capital expenditures of the Borrower and its Restricted Subsidiaries on a consolidated basis for such period, determined in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capitalized Lease, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Cash Consideration" means the consideration received by the Borrower or any Restricted Subsidiary for any Asset Disposition that is in the form of cash, Permitted Investments or a combination of the foregoing. For purposes of this provision, each of the following will be deemed to be cash:

6

App. - 000011

(a) any liabilities (as shown on the Borrower's most recent consolidated balance sheet) of the Borrower or any Restricted Subsidiary that are assumed by the transferee of any such assets or Equity Interests pursuant to a written assignment and assumption agreement that releases the Borrower or applicable Restricted Subsidiary from further liability therefor; and

(b) any securities, notes or other obligations received by the Borrower or any Restricted Subsidiary from such transferee that are converted by the Borrower or any Restricted Subsidiary into cash or Permitted Investments within 180 days of the receipt thereof.

"Change in Control" means:

(a) the failure of the Borrower to own, directly or indirectly through one or more wholly-owned Subsidiaries, 100% of the outstanding Equity Interests in VIS;

(b) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or "group" (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) of Equity Interests in the Borrower representing more than 35% of the aggregate voting power represented by the outstanding Equity Interests in the Borrower;

(c) the occupation of a majority of the seats (excluding, for purposes of this clause, vacant seats) on the board of directors of the Borrower by Persons who are not (i) members of the board of directors on the Effective Date, (ii) nominated by the board of directors of the Borrower or (iii) appointed by Persons referred to in clause (i) and (ii) above; or

(d) the occurrence of a "Change of Control" or similar event, as defined in the Senior Unsecured Note Indenture.

"Change in Law" means (a) the adoption of any law, rule or regulation after the Effective Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Effective Date or (c) compliance by any Lender or an Issuing Bank (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's or such Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Effective Date.

"Chattel Paper" has the meaning assigned to such term in the Collateral Agreement.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Tranche A Term Loans, Tranche B Term Loans or Swingline Loans and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving

7

App. - 000012

Commitment, a Tranche A Term Commitment, a Tranche B Term Commitment or a Swingline Commitment. "Class", when used in reference to any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all "Collateral", as defined in any applicable Security Document.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Secured Parties and its permitted successors in such capacity.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrower, the Subsidiary Loan Parties and the Agent, substantially in the form of Exhibit C.

"Collateral and Guarantee Requirement" means the requirement that:

(a) the Collateral Agent shall have received from the Borrower and each Restricted Subsidiary (other than Excluded Subsidiaries) either (i) a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (ii) in the case of any Person that becomes a Restricted Subsidiary (other than an Excluded Subsidiary) after the Effective Date, a supplement to the Collateral Agreement, in substantially the form specified therein (or in such other form as the Borrower and the Collateral Agent may agree), duly executed and delivered on behalf of such Person (within the time frames required by the Loan Documents);

(b) all outstanding Equity Interests in each Subsidiary directly owned by any Loan Party shall have been pledged pursuant to the Collateral Agreement (except that the Loan Parties shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and the Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, if any, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c) all Indebtedness of the Borrower and each Subsidiary that is owing to any Loan Party shall have been pledged pursuant to the Collateral Agreement and, if any such Indebtedness is evidenced by a promissory note (which may be a master note), the Collateral Agent shall have received all such promissory notes (other than promissory notes evidencing items of Indebtedness with a principal amount of $1,000,000 or less; provided that the aggregate principal amount of all such items of Indebtedness shall not exceed $5,000,000), together with note powers or other instruments of transfer with respect thereto endorsed in blank;

(d) all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral

8

http://www.sec.gov/Archives/edgar/data/1367396/000119312506240222/dex1011.htm          2/22/2012

Agent to be filed, registered or recorded to create the Liens intended to be created by the Collateral Agreement (including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreement, shall have been filed, registered or recorded (or arrangements reasonably satisfactory to the Collateral Agent shall have been made to provide for the foregoing) or delivered to the Collateral Agent for filing, registration or recording;

(e) the Collateral Agent shall have received (i) counterparts of a Mortgage with respect to each Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property, (ii) a policy or policies of title insurance issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid and perfected Lien on the Mortgaged Property described therein and (iii) such surveys, abstracts and other documents as the Collateral Agent may reasonably request with respect to any such Mortgage or Mortgaged Property;

(f) the Collateral Agent shall have received counterparts of an Aircraft Security Agreement in respect of any Aircraft with a Fair Market Value of $10,000,000 or more owned wholly and directly by any Loan Party duly executed and delivered by the record owner of such Aircraft; and

(g) each Loan Party shall have used commercially reasonable efforts to obtain all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents (or supplements thereto) to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder, except in each case to the extent the failure to obtain such contents and approvals does not materially and adversely affect the interests of the Secured Parties.

"Commitment" means a Revolving Commitment, Tranche A Commitment or Tranche B Commitment, or any combination thereof (as the context requires).

"Commitment Fee Rate" means, for any day, a rate per annum equal to (a) if the Leverage Ratio on the most recent determination date is 4.75 to 1.00 or higher, 0.375% and (b) otherwise, 0.25%. For purposes of this definition, (i) the Leverage Ratio shall be determined as of the end of each fiscal quarter based on the Borrower's consolidated financial statements delivered pursuant to Section 5.01(a) or 5.01(b) and (ii) each change in the Commitment Fee Rate resulting from a change in the Leverage Ratio shall be effective during the period from and including the day when the Administrative Agent receives the financial statements indicating such change to but excluding the effective date of the next such change; provided that, at the option of the Administrative Agent (or at the request of the Required Lenders), if the Borrower fails to deliver consolidated financial statements to the Administrative Agent as and when required by Section 5.01(a) or 5.01(b), the Commitment Fee Rate will be that set forth in clause (a) above during the period from the expiration of the time specified for such delivery until such financial statements are so delivered.

9

App. - 000014

"Consolidated Adjusted EBITDA" means, for any period, Consolidated Net Income for such period plus (or minus), without duplication:

(a) provision for taxes based on income or profits of the Borrower and the Restricted Subsidiaries for such period, to the extent deducted in computing Consolidated Net Income; plus

(b) Interest Expense of the Borrower and the Restricted Subsidiaries for such period, to the extent deducted in computing Consolidated Net Income; plus

(c) depreciation, amortization (including amortization of intangibles and amortization and write-off of financing costs), goodwill impairment charges and other non-cash expenses of the Borrower and the Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing Consolidated Net Income; plus

(d) any non-cash compensation charge arising from any grant of stock, stock options or other equity-based awards, to the extent deducted in computing Consolidated Net Income; plus

(e) extraordinary losses or non-recurring charges (including any expenses related to the Transactions), severance, relocation costs and curtailments or modifications to pension and post-retirement employee benefit plans; plus

(f) restructuring charges or reserves (including restructuring costs related to acquisitions after the date hereof and to closure/consolidation of facilities); plus

(g) the amount of net cost savings projected by the Borrower in good faith to be realized as a result of specified actions taken during such period (calculated on a *pro forma* basis as though such cost savings had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions, provided that (A) such cost savings are reasonably identifiable and factually supportable, (B) such cost savings are reasonably expected by the Borrower to appear in its financial statements within 24 months after the end of such period, (C) no cost savings shall be added pursuant to this clause (g) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (f) above with respect to such period and (D) the aggregate amount of cost savings added pursuant to this clause (g) shall not exceed $50,000,000 for any period consisting of four consecutive fiscal quarters; plus

(h) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase accounting for the transactions contemplated by any acquisition, in accordance with GAAP, during

10

the eighteen consecutive months following the consummation of such acquisition; <u>plus</u>

(j) any non-cash Statement of Financial Accounting Standards No. 133 income (or loss) related to hedging activities, to the extent deducted in computing Consolidated Net Income; <u>minus</u>

(k) extraordinary gains and non-recurring gains; <u>minus</u>

(l) non-cash items increasing Consolidated Net Income for such period, other than (i) the accrual of revenue consistent with past practice and (ii) the reversal in such period of an accrual of, or cash reserve for, cash expenses in a prior period, but only to the extent such accrual or reserve was not added back to Consolidated Net Income in calculating Consolidated Adjusted EBITDA in a prior period; <u>minus</u>

(l) any income recorded in connection with the disposal of the Borrower's commercial printing operations;

in each case determined on a consolidated basis in accordance with GAAP.

For the purposes of calculating Consolidated Adjusted EBITDA for any period of four consecutive fiscal quarters (each, a "<u>Reference Period</u>"), (i) if at any time during such Reference Period (and after the Effective Date) the Borrower or any of its Restricted Subsidiaries shall have made any Material Disposition (as defined below), the Consolidated Adjusted EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated Adjusted EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such Reference Period or increased by an amount equal to the Consolidated Adjusted EBITDA (if negative) attributable thereto for such Reference Period and (ii) if during such Reference Period (and after the Effective Date) the Borrower or any of its Restricted Subsidiaries shall have made a Material Acquisition, Consolidated Adjusted EBITDA for such Reference Period shall be calculated after giving *pro forma* effect thereto in accordance with Regulation S-X or in such other manner acceptable to the Administrative Agent as if such Material Acquisition occurred on the first day of such Reference Period. As used in this definition, "<u>Material Acquisition</u>" means any acquisition of property or series of related acquisitions of property that (x) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Person and (y) involves the payment of consideration by the Borrower or any of its Restricted Subsidiaries in excess of $25,000,000; and "<u>Material Disposition</u>" means any disposition of property or series of related dispositions of property that (x) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Person and (y) yields gross proceeds to the Borrower or any of its Restricted Subsidiaries in excess of $25,000,000. For purposes of calculating compliance with the Leverage Ratio in Section 6.13, Consolidated Adjusted EBITDA: (a) for the fiscal quarter ended March 31, 2006, shall be deemed to be $390,000,000, (b) for the fiscal quarter ended June 30, 2006, shall be deemed to be

11

App. - 000016

$355,000,000 and (c) for the fiscal quarter ended September 30, 2006, shall be deemed to be $409,000,000. Consolidated Adjusted EBITDA for any fiscal quarter ending during the first twelve months after the Effective Date will be calculated on a *pro forma* basis to give effect to credits projected by the Borrower with respect to combined pension and other post-employment benefits.

"Consolidated Cash Interest Expense" means, for any period, the cash interest expense (including that attributable to Capitalized Leases), net of cash interest income, of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP and before any reduction in respect of Preferred Stock dividends; provided that (a) the net income of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or other distributions actually paid in cash to the Borrower or any Restricted Subsidiary during such period, (b) the net loss of any such Person will be included only to the extent such loss is funded in cash by the Borrower or a Restricted Subsidiary during such period and (c) the income or loss of any Person will be excluded to the extent such income or loss is accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Core Verizon Agreements" means the Publishing Agreement, the Non-Competition Agreement, the Branding Agreement and the Tax Sharing Agreement.

"Debt Issuance" means the incurrence by the Borrower or any Restricted Subsidiary of any Indebtedness in reliance on Section 6.01(xxii) to the extent the Net Proceeds of such Indebtedness are not applied by the Borrower or a Restricted Subsidiary to fund a Permitted Acquisition within 60 days of the incurrence thereof.

"Default" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that defaults in its obligation to fund Loans or any Issuing Bank that defaults in its obligation to issue Letters of Credit.

"Designated Equity Proceeds Use" means the application of Equity Proceeds (a) to consummate a Permitted Acquisition pursuant to Section 6.04(g), (b) to make an Investment pursuant to Section 6.04(d) or (v), (c) to make Capital Expenditures

12

App. - 000017

for additions to property, plant and equipment of the Borrower and its Subsidiaries, (d) to make Restricted Payments pursuant to Section 6.08(a)(ix) or (e) to make Repurchase Expenditures in connection with Optional Repurchases pursuant to Section 6.08(b)(iii).

"Determination Date" means any date on which the amount of Available Cash or Available Distributable Cash is determined hereunder.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disinterested Director" has the meaning assigned to such term in Section 6.09.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six months after the Tranche B Maturity Date; provided, however, that only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such dates shall be deemed to be Disqualified Stock; provided further that any such Equity Interests (including any options, warrants or other rights in respect thereof) issued or sold as compensation and held by future, present or former directors, officers, members of management, employees or consultants of the Borrower or any of its Subsidiaries or family members or relatives thereof, or trusts, partnerships or limited liability companies for the benefit of any of the foregoing, or any of their heirs, executors, successors and legal representatives shall not constitute Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interests that would constitute Disqualified Stock solely because the holders thereof have the right to require the Borrower or any of its Restricted Subsidiaries to repurchase such Equity Interests upon the occurrence of a change of control or a sale of all or substantially all its assets will not constitute Disqualified Stock if the terms of such Equity Interest provide that the Borrower or any Restricted Subsidiary may not repurchase or redeem any such Equity Interest pursuant to such provisions unless such repurchase or redemption complies with Section 6.08. Subject to the preceding provisos, the term "Disqualified Stock" will also include any options, warrants or other rights that are convertible into Disqualified Stock or that are redeemable at the option of the holder, or required to be redeemed, prior to the date that is six months after the Tranche B Maturity Date.

"Distribution Agreement" means the Distribution Agreement dated as of November 15, 2006, between the Borrower and Verizon.

"Dividend Suspension Period" means any period (a) commencing on the first day following the Effective Date (or, if applicable, following the last day of the most recently completed Dividend Suspension Period) on which the Leverage Ratio is greater than 7.00 to 1.00 and (b) ending on the first date thereafter on which the Borrower

delivers financial statements pursuant to Section 5.01(a) or (b) demonstrating that the Leverage Ratio is equal to or less than 7.00 to 1.00 as of the last day of the most recent fiscal quarter covered by such financial statements.

"Documents" has the meaning assigned to such term in the Collateral Agreement.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any State thereof or the District of Columbia.

"dollars" or "$" refers to lawful money of the United States of America.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Employee Matters Agreement" means the Employee Matters Agreement dated as of November 17, between Verizon and the Borrower.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence or Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but excluding any debt security that is convertible into, or exchangeable for, any of the foregoing.

"Equity Proceeds" means the Net Proceeds received by the Borrower after the Effective Date or from the issuance and sale (other than to any Subsidiary) of its

14

App. - 000019

Equity Interests other than Disqualified Stock, but excluding any amounts received pursuant to the Distribution Agreement or any other Core Verizon Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Subsidiary" means (a) any Subsidiary that is not a wholly owned Subsidiary, (b) any Subsidiary that is prohibited by applicable law from guaranteeing the Obligations, (c) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, (d) any Foreign Subsidiary and (e) any Insignificant Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income or net profits, or capital taxes or net worth taxes imposed in lieu of net income or net profits taxes by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its

15

principal office is located or, in the case of any Lender, in which its applicable lending office is located or by any jurisdiction by reason of any connection between such jurisdiction and the Administrative Agent, Lender, Issuing Bank or recipient (other than arising solely from the Loan Documents), (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.19(b)), (i) any withholding tax that is in effect at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that (A) such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding tax pursuant to Section 2.17(a) or (B) such Taxes are imposed as a result of a change in applicable laws, statutes, regulations, treaties or the official interpretation or application thereof, including administrative pronouncements and judicial decisions, occurring after the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or (ii) any tax that is attributable to such Foreign Lender's failure to comply with Section 2.17(e).

"Expanded Core Verizon Agreements" means the Distribution Agreement, the Publishing Agreement, the Non-Competition Agreement, the Branding Agreement, the Intellectual Property Agreement, the Tax Sharing Agreement, the Employee Matters Agreement, the Listings License Agreement, the Billing and Collection Agreement, the Long Term Incentive Plan and the Transition Services Agreement.

"Fair Market Value" means a price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by a Financial Officer of the Borrower, whose determination will be conclusive if evidenced by an officer's certificate.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Covenant" means the covenant set forth in Section 6.13.

"Financial Officer" means the chief financial officer, the principal accounting officer, the treasurer or the controller of the Borrower or any assistant treasurer or assistant controller of the Borrower designated in writing by the chief financial officer, principal accounting officer, treasurer or controller of the Borrower for so long as such designation is effective in accordance with its terms.

16

App. - 000021

"Financing Transactions" means (a) the execution, delivery and performance by the Borrower and each Loan Party of the Loan Documents to which it is to be a party, the borrowing or issuance of Loans, the use of any proceeds thereof on the Effective Date and the issuance of Letters of Credit hereunder and (b) the execution, delivery and performance by each Loan Party of the Senior Unsecured Note Documents to which it is to be a party and the issuance of the Senior Unsecured Notes.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantors" means the Subsidiary Loan Parties.

"Hazardous Materials" means (i) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos or asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances; or (ii) any chemical,

17

App. - 000022

material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law.

"Indebtedness" of any Person means, on any date, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person reflected as a liability on a balance sheet of such Person in accordance with GAAP (or, if no such balance sheet of such Person has been prepared as of such date, as would be reflected as a liability on such balance sheet in accordance with GAAP), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business and (ii) any earn-out obligation reflected as a liability on the balance sheet of such Person (or, if no such balance sheet of such Person has been prepared as of such date, as would be reflected as a liability on such balance sheet in accordance with GAAP)), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of other Persons, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (j) all obligations of such Person under Swap Agreements, after giving effect to applicable netting arrangements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of any obligation under any Swap Agreement on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby.

"Indemnified Taxes" means Taxes other than Excluded Taxes and Other Taxes.

"Information Memorandum" means the Confidential Information Memorandum dated October 2006, as modified or supplemented prior to the Effective Date, relating to the Borrower and the Transactions.

"Initial Lender" means Verizon.

"Insignificant Subsidiary" means any Subsidiary of the Borrower that (a) neither (i) has total assets of with a book value of $5,000,000 or more nor (ii) had revenues for the period of four fiscal quarters most recently completed of $5,000,000 or more and (b) is designated by the Borrower as an "Insignificant Subsidiary"; provided

18

that (A) the book value of all assets of all Insignificant Subsidiaries may not in the aggregate exceed $25,000,000 and (B) the revenues of all Insignificant Subsidiaries for the period of four fiscal quarters most recently completed may not in the aggregate exceed $25,000,000.

"Instrument" has the meaning assigned to such term in the Collateral Agreement.

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Intellectual Property Agreement" means the Intellectual Property Agreement dated as of the Effective Date between Verizon and the Borrower.

"Interest Expense" means, with respect to any Person for any period, the sum, without duplication, of:

(a) the consolidated interest expense of such Person and its subsidiaries for such period, whether paid or accrued, including, without limitation, original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Swap Agreements, but excluding the amortization or write-off of debt issuance costs; plus

(b) the consolidated interest of such Person and its subsidiaries that was capitalized during such period; plus

(c) any interest expense on Indebtedness of another Person that is Guaranteed by such Person or one of its subsidiaries or secured by a Lien on assets of such Person or one of its subsidiaries, whether or not such Guarantee or Lien is called upon;

in each case determined on a consolidated basis in accordance with GAAP.

"Interest Election Request" means a request by the Borrower to convert or continue a Revolving Borrowing or Term Borrowing in accordance with Section 2.07.

"Interest Payment Date" means (a) with respect to any ABR Loan (other than a Swingline Loan), the last day of each March, June, September and December, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day

19

App. - 000024

of such Interest Period and (c) with respect to any Swingline Loan, the day that such Loan is required to be repaid.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter (or nine or 12 months thereafter if, at the time of the relevant Borrowing, all Lenders participating therein agree to make an interest period of such duration available), as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) until the date that is 30 days after the Effective Date, Eurodollar Borrowings may only have Interest Periods of one month's duration. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interest, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit. The amount, as of any date of determination, of any Investment shall be the original cost of such Investment minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash or property as a repayment of principal or a return of capital (including pursuant to any sale or disposition of such Investment), as the case may be. In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall initially be valued at its Fair Market Value at the time of such transfer.

"Issuing Banks" means JPMorgan Chase Bank, N.A. and any other Revolving Lender designated as an Issuing Bank pursuant to Section 2.05(i), in each case in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.05(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

20

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Revolving Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Initial Lender and each Revolving Lender, each Tranche A Lender and each Tranche B Lender listed on Schedule 2.01 and any other Person that shall have become a party hereto in accordance with the terms hereof pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto in accordance with the terms hereof pursuant to an Assignment and Assumption. Unless the context otherwise requires, the term "Lenders" includes the Swingline Lender.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement.

"Leverage Ratio" means, on any date, the ratio of (a) Total Indebtedness as of such date minus the amount of cash and Permitted Investments of the Borrower and the Restricted Subsidiaries on such date, excluding cash and Permitted Investments (i) subject to any consensual Lien (other than Liens referred to in Section 6.02(a)(i), Section 6.02(a)(viii) or Section 6.02(a)(ix)) or (ii) subject to any other contractual restriction specifically requiring the application thereof or of the proceeds thereof to a particular use other than the repayment of Indebtedness to (b) Consolidated Adjusted EBITDA for the most recently ended period of four consecutive fiscal quarters of the Borrower.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on the Reuters "LIBOR01" screen displaying British Bankers' Association Interest Settlement Rates (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period in an amount comparable to such Eurodollar Borrowing. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits and for a maturity comparable to such Interest Period in an amount comparable to such Eurodollar Borrowing are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital

21

App. - 000026

lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Listings License Agreement" means the Listings License Agreement dated as of November 17, 2006, between Idearc Media Corp. and certain subsidiaries of Verizon parties thereto.

"Loan Document Obligations" has the meaning assigned to such term in the Collateral Agreement.

"Loan Documents" means this Agreement and the Security Documents.

"Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Long Term Incentive Plan" means the Long Term Incentive Plan of the Borrower.

"Long-Term Indebtedness" means any Indebtedness that, in accordance with GAAP, constitutes (or, when incurred, constituted) a long-term liability. For purposes of determining the Long-Term Indebtedness of the Borrower and the Restricted Subsidiaries, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or a Restricted Subsidiary shall be excluded.

"Margin Stock" shall have the meaning assigned to such term in Regulation U of the Board.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, assets, or financial condition of the Borrower and the Subsidiaries, taken as a whole, excluding any material adverse effect (i) consisting of the announcement or consummation of the Transactions (including all effects on the business, assets or financial condition of the Borrower and its Subsidiaries that occur or arise to the extent such effects are a direct result of the Transactions), (ii) consisting of the entry into the Expanded Core Verizon Agreements or (iii) resulting directly from the taking of any action required by any Expanded Core Verizon Agreement or (b) the validity or enforceability of, or the rights and remedies, taken as a whole, of the Administrative Agent, the Lenders or the Issuing Banks under, the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), including obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $50,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Subsidiary in respect of any

22

App. - 000027

Swap Agreement on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Material Subsidiary" means any Subsidiary, including its subsidiaries, which meets any of the following conditions: (a) the Borrower's and the other Subsidiaries' investments in and advances to such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal year, (b) the consolidated assets of such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal year or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds 5% of the consolidated pre-tax income from continuing operations of the Borrower and the Subsidiaries for such period.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust, assignment of leases and rents or other security document granting a Lien on any real property and improvements thereto to secure the Obligations. Each Mortgage shall be reasonably satisfactory in form and substance to the Collateral Agent and the Borrower.

"Mortgaged Property" means, initially, each parcel of real property and the improvements thereto owned by a Loan Party and identified on Schedule 3.05, and includes each other parcel of real property and improvements thereto owned by a Loan Party with respect to which a Mortgage is granted pursuant to Section 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, (a) with respect to any Asset Disposition, the aggregate cash proceeds (including (x) payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not the interest component, thereof) and (y) any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Disposition) received by the Borrower or any of its Restricted Subsidiaries in respect of any Asset Disposition, net of (i) the direct costs relating to such Asset Disposition and the sale or other disposition of any such non-cash consideration, including legal, accounting, investment banking and brokerage fees and sales commissions and any relocation expenses incurred as a result thereof, (ii) Taxes paid or payable as a result thereof, in each case, after taking into account any available Tax credits or deductions and any Tax sharing arrangements (including, in respect of any proceeds received in connection with an Asset Disposition of any asset of any Foreign Subsidiary, deductions in respect of withholding taxes that are or would be payable in cash if such funds were repatriated to the United States), (iii) amounts required to be applied to the repayment of Indebtedness or other liabilities secured by a Lien on the asset or assets that were the subject of such Asset Disposition or required to be paid as a result of such Asset Disposition, (iv) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, (v) in the case of any

23

http://www.sec.gov/Archives/edgar/data/1367396/000119312506240222/dex1011.htm          2/22/2012

Asset Disposition by a Restricted Subsidiary of the Borrower, payments to holders of Equity Interests in such Restricted Subsidiary in such capacity (other than such Equity Interests held by the Borrower or any Restricted Subsidiary) to the extent that such payment is required to permit the distribution of such proceeds in respect of the Equity Interests in such Restricted Subsidiary held by the Borrower or such Restricted Subsidiary and (vi) appropriate amounts to be provided by the Borrower or its Restricted Subsidiaries as a reserve against liabilities associated with such Asset Disposition, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Disposition, all as determined in accordance with GAAP; provided that (a) any excess amounts set aside for payment of Taxes pursuant to clause (ii) above that are remaining after such Taxes have been paid in full or the statute of limitations therefor has expired and (b) the amount of any release or reversal of a reserve pursuant to clause (vi), will, in each case when no longer so held, become Net Proceeds; and

(b) with respect to any Debt Issuance by the Borrower or any Restricted Subsidiary, the aggregate cash proceeds received by the Borrower or any of its Restricted Subsidiaries in respect of any Debt Issuance, net of the direct costs relating to such Debt Issuance, including, without limitation, the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary (or, in the case of Taxes, any member thereof) in connection with such incurrence or issuance and, in the case of Indebtedness of any Foreign Subsidiary, deductions in respect of withholding taxes that are or would otherwise be payable in cash if such funds were repatriated to the United States.

"Non-Competition Agreement" means the Non-Competition Agreement dated as of the Effective Date, between the Borrower and Verizon.

"Non-Consenting Lender" means any Lender that withholds its consent to any proposed amendment, modification or waiver to a Loan Document consented to by the Required Lenders, if such proposed amendment, modification or waiver cannot become effective under Section 9.02 without the consent of such Lender.

"Obligations" has the meaning assigned to such term in the Collateral Agreement.

"Offer to Repay" means an offer by the Borrower to repay all or a specified portion of Term Loans at par (and to pay accrued and unpaid interest on any principal amount of Term Loans repaid pursuant to such offer), which offer is made pursuant to and in accordance with the provisions of Section 2.11(f).

"Optional Repurchase" means, with respect to any outstanding Indebtedness, any optional or voluntary repurchase, redemption or prepayment made in cash of such Indebtedness, the related payment in cash of accrued interest to the date of such repurchase, redemption or prepayment on the principal amount of such Indebtedness

24

repurchased, redeemed or prepaid, the payment in cash of associated premiums (whether voluntary or mandatory) on such principal amount and the cash payment of other fees and expenses incurred in connection with such repurchase, redemption or prepayment.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, any Loan Document.

"Participant" has the meaning set forth in Section 9.04.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Perfection Certificate" means a certificate in the form of Exhibit D to the Collateral Agreement or any other form approved by the Collateral Agent.

"Permitted Acquisitions" means any acquisition (by merger, consolidation or otherwise) by the Borrower or a Subsidiary Loan Party of all or substantially all the assets of, or all the Equity Interests in, a Person or division or line of business of a Person, if (a) immediately after giving effect thereto, no Default has occurred and is continuing or would result therefrom, (b) each Subsidiary resulting from such acquisition (and which survives such acquisition) other than any Foreign Subsidiary, shall (except to the extent the terms of any Indebtedness of such Subsidiary which is permitted pursuant to Section 6.01(a)(vii) limit the ability of such Subsidiary to become a Subsidiary Loan Party) be a Subsidiary Loan Party and the Equity Interests of each such Subsidiary shall be owned directly by the Borrower and/or Subsidiary Loan Parties and shall have been (or within 10 Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) pledged pursuant to the Collateral Agreement (subject to the limitations of the pledge of Equity Interests of Foreign Subsidiaries set forth in the definition of "Collateral and Guarantee Requirement"), (c) except to the extent the terms of any Indebtedness of such Subsidiary which is permitted pursuant to Section 6.01(a)(vii) limit the ability of such Subsidiary to satisfy the Guarantee and Collateral Requirement, the Collateral and Guarantee Requirement shall have been (or within 10 Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) satisfied with respect to each such Subsidiary, (d) the Borrower and the Subsidiaries are in Pro Forma Compliance, after giving effect to such acquisition and (e) in the case of any such acquisition for aggregate consideration in excess of $100,000,000, the Borrower has delivered to the Agent an officer's certificate to the effect set forth in clauses (a) and (d) above, together with all relevant financial information for the Person or assets acquired and reasonably detailed calculations demonstrating satisfaction of the requirement set forth in clause (d) above.

"Permitted Additional Debt" means Indebtedness of the Borrower which (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions requiring redemption or repurchase only if and to the extent then permitted by this

25

Agreement), in each case, prior to the date that is six months after the Tranche B Maturity Date and (ii) is not secured, directly or indirectly, by any assets of the Borrower or any Restricted Subsidiary.

"Permitted Asset Swap" means any transfer of properties or assets by the Borrower or any of its Restricted Subsidiaries in which at least 90% of the consideration received by the transferor consists of properties or assets (other than cash) that will be used in a Permitted Business; provided that (a) the aggregate Fair Market Value of the property or assets being transferred by the Borrower or such Restricted Subsidiary is not greater than the aggregate Fair Market Value of the property or assets received by the Borrower or such Restricted Subsidiary in such exchange and (b) the aggregate Fair Market Value of all property or assets transferred by the Borrower and any of its Restricted Subsidiaries in any such transfer, together with the cumulative aggregate Fair Market Value of property or assets transferred in all prior Permitted Asset Swaps, does not exceed 15% of the Borrower's consolidated net revenues for the prior fiscal year.

"Permitted Business" means any businesses or business activity conducted by the Borrower or any Subsidiary on the Effective Date and any business or business activity reasonably incidental or ancillary thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto, including the consummation of the Transactions.

"Permitted Encumbrances" means:

(a) Liens imposed by law for Taxes, assessments or governmental charges which are not delinquent for a period of more than 60 days or are being contested in compliance with Section 5.05;

(b) carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.05;

(c) (i) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, (ii) Liens incurred in the ordinary course of business securing insurance premiums or reimbursement obligations under insurance policies and (iii) Liens securing obligations in respect of letters of credit or bank guarantees that have been posted by the Borrower or any of its Restricted Subsidiaries to support the payment of the items set forth in clauses (i) and (ii) of this clause (c);

(d) (i) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business and (ii) Liens securing obligations in respect of letters of credit or bank guarantees

26

App. - 000031

that have been posted by a Borrower or any of its Restricted Subsidiaries to support the payment of items set forth in clause (i) of this clause (d);

(e) judgment liens in respect of judgments or attachments that do not constitute an Event of Default under clause (j) of Article VII; and

(f) easements, zoning restrictions, rights-of-way, restrictive covenants, irregularities in title and similar encumbrances on real property imposed by law or arising in the ordinary course of business that are not substantial in amount and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Restricted Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means (a) securities issued or fully guaranteed or insured by the United States government or any agency or instrumentality thereof, (b) time deposits, certificates of deposit or bankers' acceptances of (i) any Lender or Affiliate thereof or (ii) any commercial bank having capital and surplus in excess of $500,000,000 and the commercial paper of the holding company of which is rated at least A-2 or the equivalent thereof by S&P or any successor rating agency or at least P-2 or the equivalent thereof by Moody's or any successor rating agency (or if at such time neither is issuing ratings, then a comparable rating of such other nationally recognized rating agency as shall be approved by the Administrative Agent in its reasonable judgment), (c) commercial paper rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of such other nationally recognized rating agency as shall be approved by the Administrative Agent in its reasonable judgment), (d) investments in money market funds complying with the risk limiting conditions of Rule 2a-7 or any successor rule of the Securities and Exchange Commission under the Investment Company Act, (e) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (b) above and (f) investments similar to any of the foregoing denominated in foreign currencies approved by the board of directors of the Borrower, in each case provided in clauses (a), (b), (c) and (f) above only, maturing within twelve months after the date of acquisition.

"Permitted Subordinated Indebtedness" means Indebtedness of the Borrower which (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions requiring redemption or repurchase only if and to the extent then permitted by this Agreement), in each case, prior to the date that is six months after the Tranche B Maturity Date, (ii) is not secured, directly or indirectly, by any assets of the Borrower or any Restricted Subsidiary, (iii) is not exchangeable or convertible into Indebtedness of the Borrower or any Restricted Subsidiary (other than Indebtedness which would qualify as "Permitted Subordinated Indebtedness" hereunder) or Disqualified Stock and (iv) is, together with any Guarantee thereof by any Restricted

27

App. - 000032

Subsidiary (a "<u>Permitted Subordinated Guarantee</u>"), subordinated to the Obligations pursuant to subordination provisions that are no less favorable to the Lenders than those applicable to offerings of "high yield" subordinated debt by similar issuers of similar debt at or about the same time or pursuant to other subordination provisions on terms reasonably satisfactory to the Administrative Agent.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Preferred Stock</u>" means, with respect to any Person, any Equity Interests in such Person that have preferential rights to any other Equity Interests in such Person with respect to dividends or redemptions upon liquidation.

"<u>Prime Rate</u>" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A., as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"<u>Principal Issuing Bank</u>" means an Issuing Bank that, at the time of determination, has outstanding Letters of Credit in an aggregate face amount in excess of $25,000,000.

"<u>Pro Forma Compliance</u>" means, with respect to any event, that the Borrower is in *pro forma* compliance with the Financial Covenant recomputed as if the event with respect to which Pro Forma Compliance is being tested had occurred on the first day of each relevant period with respect to which current compliance with the Financial Covenant would be determined (for example, in the case of the Financial Covenant based on Consolidated Adjusted EBITDA, as if such event had occurred on the first day of the four fiscal quarter period ending on the last day of the most recent fiscal quarter in respect of which financial statements have been delivered pursuant to Section 5.01(a) or (b)). *Pro forma* calculations made pursuant to this definition that require the calculation of Consolidated Adjusted EBITDA on a *pro forma* basis will be made in accordance with the last paragraph of the definition of such term, except that, when testing Pro Forma Compliance with respect to any acquisition or disposition, references to Material Acquisition and Material Disposition in such last paragraph will be deemed to include such acquisition and disposition.

"<u>Projections</u>" has the meaning assigned to such term in Section 3.11.

"<u>Publishing Agreement</u>" means the Publishing Agreement dated as of the Effective Date between the Borrower and Verizon.

28

"<u>Refinancing Indebtedness</u>" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew, refinance, replace, defease or refund, or in exchange for existing Indebtedness ("<u>Refinanced Debt</u>"); <u>provided</u> that (i) such extending, renewing, refinancing, replacing, defeasing or refunding such Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (ii) such Indebtedness has an equal or later final maturity and an equal or longer Weighted Average Life than the Refinanced Debt, (iii) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable in any material respect to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt Guarantees such Indebtedness), (iv) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (vii) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (v) such Indebtedness is issued only by the issuer of such Refinanced Indebtedness and (vi) such Indebtedness is incurred not more than 90 days prior to and not more than 90 days after the date on which such Refinanced Debt is repaid, extended or renewed.

"<u>Refinancing Term Loans</u>" has the meaning assigned to such term in Section 2.20.

"<u>Register</u>" has the meaning set forth in Section 9.04.

"<u>Regulation S-X</u>" means Regulation S-X adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as in effect on the Effective Date.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"<u>Release</u>" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"<u>Replacement Assets</u>" means (a) non-current assets (including any such assets acquired by capital expenditures) that will be used or useful in a Permitted Business or (b) substantially all the assets of a Permitted Business or the voting stock of any Person engaged in a Permitted Business that will become on the date of acquisition thereof a Subsidiary Loan Party.

29

"Repurchase Expenditures" means, with respect to any Optional Repurchase, the aggregate amount of expenditures made or required to be made to effect such Optional Repurchase, including without limitation payments on account of principal, premium and fees payable to holders of the Indebtedness purchased or reacquired in connection with such Optional Repurchase, but excluding payments representing accrued interest to the date of such Optional Repurchase and excluding fees and expenses paid to third parties in connection therewith.

"Required Lenders" means, at any time, Lenders having Revolving Exposures, Term Loans and unused Commitments representing more than 50% of the sum of the total Revolving Exposures, outstanding Term Loans and unused Commitments at such time.

"Responsible Officer" means (a) the chief executive officer and/or the president of the Borrower, (b) the chief operating officer of the Borrower, (c) any Financial Officer, (d) the general counsel of the Borrower and (e) any vice president of the Borrower who has been designated in writing as a Responsible Officer by the chief executive officer or the president of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in the Borrower or any Restricted Subsidiary or of any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Restricted Subsidiary other than a distribution pursuant to the Tax Sharing Agreement.

"Restricted Subsidiary" means any Subsidiary that is not an Unrestricted Subsidiary.

"Revolving Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Revolving Maturity Date and the date of termination of the Revolving Commitments.

"Revolving Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans and to acquire participations in Letters of Credit and Swingline Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Revolving Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable. The initial aggregate amount of the Lenders' Revolving Commitments is $250,000,000.

30

App. - 000035

"Revolving Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Revolving Loans and its LC Exposure and Swingline Exposure at such time.

"Revolving Lender" means a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"Revolving Loan" means a Loan made pursuant to clause (a) of Section 2.01.

"Revolving Maturity Date" means November 17, 2011, or, if such day is not a Business Day, the next preceding Business Day.

"S&P" means Standard & Poor's Ratings Group, Inc.

"Sale and Leaseback Transaction" has the meaning assigned to such term in Section 6.06.

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Parties" has the meaning assigned to such term in the Collateral Agreement.

"Security Documents" means the Collateral Agreement, the Aircraft Security Agreements, if any, the Mortgages and each other security agreement or other instrument or document executed and delivered pursuant to Section 5.11 or 5.12 or pursuant to the Collateral Agreement to secure any of the Obligations.

"Senior Unsecured Note Documents" means the Senior Unsecured Note Indenture and all other instruments, agreements and other documents evidencing or governing the Senior Unsecured Notes or providing for any Guarantee or other right in respect thereof.

"Senior Unsecured Note Indenture" means the Senior Unsecured Notes Indenture dated as of November 17, 2006 among the Borrower, each of the guarantors named therein and U.S. Bank National Association, as trustee.

"Senior Unsecured Notes" means the Borrower's Senior Unsecured Notes due 2016 issued on the Effective Date in the aggregate principal amount of $2,850,000,000, and includes any "Exchange Notes" (as defined in the Senior Unsecured Note Documents) registered with the SEC and exchanged for unregistered Senior Unsecured Notes.

"Special Distribution" means a cash distribution paid by the Borrower to Verizon in an amount not to exceed $2,500,000,000 in partial consideration for the contribution by Verizon to the Borrower of all the outstanding Equity Interests in VIS and other assets and business composing the Acquired Business.

31

"Specified Asset" means owned real property, Aircraft and patents, trademarks, trade names, copyrights and other intellectual property.

"Spin-Off" means the acquisition by the Borrower of the Acquired Business from Verizon in exchange for the issuance or transfer to Verizon of common stock of the Borrower, the Senior Unsecured Notes, the Tranche B Term Loans made by the Initial Lender and the Special Distribution and the distribution by Verizon of the Borrower's common stock to the common shareholders of Verizon, in each case pursuant to the Distribution Agreement.

"Statutory Reserve Rate" means a fraction (expressed as a decimal carried to the sixth decimal place), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower. For purposes of the representations and warranties made herein on (and the conditions to borrowing on) the Effective Date, the Spin-Off shall be assumed to have already been consummated.

"Subsidiary Loan Party" means any Subsidiary that is a party to the Collateral Agreement.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination

App. - 000037

of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination values determined in accordance therewith, such termination values and (b) for any date prior to the date referenced in clause (a), the amounts determined as the mark-to-market values for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

"Swingline Lender" means JPMorgan Chase Bank, N.A., in its capacity as lender of Swingline Loans hereunder.

"Swingline Loan" means a Loan made pursuant to Section 2.04.

"Tax Sharing Agreement" means the Tax Sharing Agreement dated as of the Effective Date, between the Borrower and Verizon.

"Taxes" means any and all present or future taxes (including documentary taxes), levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Loans" means the Tranche A Term Loans and the Tranche B Term Loans.

"Total Indebtedness" means, as of any date, the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding as of such date, determined on a consolidated basis in accordance with GAAP and which would be reflected as long-term debt or short-term debt on a consolidated balance sheet of the Borrower in accordance with GAAP if such balance sheet were prepared on such date. Total Indebtedness shall in all cases be calculated without giving effect to Statement of Financial Accounting Standards No. 133.

"Tranche A Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make a Tranche A Term Loan hereunder on the Effective Date, expressed as an amount representing the principal amount of the Tranche A Term Loan to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The

initial amount of each Lender's Tranche A Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Tranche A Commitment, as applicable. The initial aggregate principal amount of the Lenders' Tranche A Commitments is $1,515,000,000.

"Tranche A Lender" means a Lender with a Tranche A Commitment or an outstanding Tranche A Term Loan.

"Tranche A Maturity Date" means November 17, 2013, or, if such day is not a Business Day, the next preceding Business Day.

"Tranche A Term Loan" means a Loan referred to in clause (b) of Section 2.01.

"Tranche B Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make a Tranche B Term Loan hereunder on the Effective Date, expressed as an amount representing the principal amount of the Tranche B Term Loan to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Tranche B Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Tranche B Commitment, as applicable. The initial aggregate principal amount of the Lenders' Tranche B Commitments is $4,750,000,000.

"Tranche B Lender" means a Lender with a Tranche B Commitment or an outstanding Tranche B Term Loan.

"Tranche B Maturity Date" means November 17, 2014, or, if such day is not a Business Day, the next preceding Business Day.

"Tranche B Term Loan" means a Loan referred to in clause (c) of Section 2.01.

"Transactions" means the Spin-Off and the Financing Transactions.

"Transition Services Agreement" means the Transition Services Agreement dated as of the Effective Date, between the Borrower and Verizon.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Unrestricted Subsidiaries" means any Subsidiary of the Borrower that has been designated as an Unrestricted Subsidiary by the Borrower pursuant to and in compliance with Section 6.14. No Unrestricted Subsidiary may own any Equity Interests of VIS or of any Restricted Subsidiary.

34

App. - 000039

"Verizon" means Verizon Communications Inc., a Delaware corporation.

"VIS" means Verizon Information Services LLC, a Delaware limited liability company, the Equity Interests of which will be transferred to the Borrower in connection with the Spin-Off and which, on the Effective Date, will be a wholly owned Subsidiary of the Borrower.

"Weighted Average Life" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(b) the then outstanding principal amount of such Indebtedness.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar Revolving Borrowing").

SECTION 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

35

SECTION 1.04. <u>Accounting Terms; GAAP.</u> Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof (including any definition) to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Upon any such request for an amendment, the Borrower, the Required Lenders and the Administrative Agent agree to consider in good faith any such amendment in order to amend the provisions of this Agreement so as to reflect equitably such accounting changes so that the criteria for evaluating the Borrower's financial condition shall be the same after such accounting changes as if such accounting changes had not occurred.

ARTICLE II

<u>The Credits</u>

SECTION 2.01. <u>Commitments.</u> (a) Subject to the terms and conditions set forth herein, each Lender agrees to make Revolving Loans to the Borrower from time to time during the Revolving Availability Period in an aggregate principal amount that will not (after giving effect to any concurrent use of the proceeds thereof to repay Swingline Loans or LC Disbursements) result in such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment; <u>provided</u>, <u>however</u>, that Revolving Loans will be available on the Effective Date in an aggregate principal amount not in excess of $10,000,000. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

(b) Subject to the terms and conditions set forth herein, each Tranche A Lender agrees to make a Tranche A Term Loan to the Borrower on the Effective Date in a principal amount not exceeding its Tranche A Commitment. Amounts repaid or prepaid in respect of Tranche A Term Loans may not be reborrowed.

(c) Subject to the terms and conditions set forth herein, each Tranche B Lender agrees to make a Tranche B Loan to the Borrower on the Effective Date in a principal amount not exceeding its Tranche B Commitment. The Initial Lender's obligation to make Tranche B Loans to the Borrower shall be satisfied by its transfer of the Acquired Business to the Borrower as contemplated by the Distribution Agreement. Amounts repaid or prepaid in respect of Tranche B Term Loans may not be reborrowed.

36

App. - 000041

SECTION 2.02. Loans and Borrowings. (a) Each Loan (other than a Swingline Loan) shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b) Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith. Each Swingline Loan shall be an ABR Loan.

(c) At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000; provided that an ABR Revolving Borrowing may be in an aggregate amount that is equal to the entire unused balance of the aggregate Revolving Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(e). Each Swingline Loan shall be in an amount that is an integral multiple of $1,000,000. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of 30 Eurodollar Borrowings outstanding (or, if any loans established pursuant to Section 2.21 are outstanding, 40 Eurodollar Borrowings).

(d) Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Revolving Maturity Date, the Tranche A Maturity Date or the Tranche B Maturity Date or the final maturity date with respect to any class of loans established pursuant to Section 2.21, as applicable.

SECTION 2.03. Requests for Revolving Borrowings. To request funding of a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 10:00 a.m., New York City time, on the date of the proposed Borrowing; provided that any such notice of an ABR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(e) may be given not later than 12:00 noon, New York City time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, email of a "pdf" copy or telecopy to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i) the aggregate amount of such Borrowing;

37

App. - 000042

(ii) the date of such Borrowing, which shall be a Business Day;

(iii) whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv) in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender in the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing. The Borrower shall, not later than 2:00 p.m., New York City time, on the third Business Day prior to the Effective Date give notice to the Administrative Agent, in the manner specified for a Borrowing Request above, of the information specified in clauses (iii) through (v) above with respect to the Term Loans to be issued or made on the Effective Date; provided that any Tranche B Term Loans made on the Effective Date shall be Eurodollar Borrowings with an Interest Period of one month's duration.

SECTION 2.04. Swingline Loans. (a) Subject to the terms and conditions set forth herein, the Swingline Lender agrees to make Swingline Loans to the Borrower from time to time during the Revolving Availability Period, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding $25,000,000 or (ii) the sum of the aggregate Revolving Exposures exceeding the aggregate Revolving Commitments; provided that the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Loan. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Swingline Loans.

(b) To request the funding of a Swingline Loan, the Borrower shall notify the Administrative Agent of such request by telephone (confirmed by email of a "pdf" copy or telecopy), not later than 2:00 p.m., New York City time, on the day of such proposed Swingline Loan. Each such notice shall be irrevocable and shall specify the requested date (which shall be a Business Day) and amount of the requested Swingline Loan. The Administrative Agent will promptly advise the Swingline Lender of any such notice received from the Borrower. The Swingline Lender shall make each Swingline Loan available to the Borrower by means of a credit to the general deposit account of the Borrower with the Swingline Lender (or, in the case of a Swingline Loan made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(e), by remittance

38

App. - 000043

to the Issuing Bank) by 3:00 p.m., New York City time, on the requested date of such Swingline Loan.

(c) The Swingline Lender may by written notice given to the Administrative Agent not later than 12:00 noon, New York City time, on any Business Day require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Revolving Lender, specifying in such notice such Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever; provided that no Lender shall be required to acquire a participation in any Swingline Loan to the extent that doing so would cause the Revolving Exposure of such Lender to exceed such Lender's Revolving Commitment. Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, *mutatis mutandis*, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to the Swingline Lender or to the Administrative Agent, as applicable, if and to the extent such payment is required to be refunded to the Borrower for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower of any default in the payment thereof.

SECTION 2.05. Letters of Credit. (a) General. Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Letters of Credit denominated in dollars for its own account or the account of any Subsidiary, in a form reasonably acceptable to the Administrative Agent and the relevant Issuing Bank on the Effective Date and, at any time and from time to time during the Revolving Availability

39

Period. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, an Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. If any letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, an Issuing Bank relating to any Letter of Credit includes representations and warranties, covenants and/or events of default that do not contain the materiality qualifiers, exceptions or thresholds that are applicable to the analogous provisions of this Agreement or the other Loan Documents, or are otherwise more restrictive, the relevant qualifiers, exceptions and thresholds contained herein shall be incorporated therein or, to the extent more restrictive, shall be deemed for purposes of such application or agreement to be the same as the analogous provisions herein. The Borrower unconditionally and irrevocably agrees that, in connection with any Letter of Credit issued for the account of any Subsidiary, to the fullest extent permitted by applicable law, it will be fully responsible for the reimbursement of LC Disbursements, the payment of interest thereon and the payment of participation fees and other fees due hereunder to the same extent as if it were the sole account party in respect of such Letter of Credit (the Borrower hereby irrevocably waiving to the fullest extent permitted by applicable law any defenses that might otherwise be available to it as a guarantor of the obligations of any other Subsidiary that shall be a joint account party in respect of any such Letter of Credit).

        (b) Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication (including email), if arrangements for doing so have been approved by such Issuing Bank) to an Issuing Bank and the Administrative Agent (no less than three Business Days (or such lesser period of time as such Issuing Bank and the Administrative Agent may agree) in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. If requested by such Issuing Bank, the Borrower also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed $50,000,000 and (ii) the aggregate Revolving Exposures shall not exceed the aggregate Revolving Commitments.

        (c) Expiration Date. Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date that is one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after

40

App. - 000045

such renewal or extension) and (ii) the date that is five Business Days prior to the Revolving Maturity Date; provided, however, that (A) Letters of Credit may, on customary terms, provide for automatic renewals and extensions thereof, unless prior notice of non-renewal is given by the applicable Issuing Bank, for periods not in excess of one year so long as no renewal would extend beyond the date specified in clause (ii) of this sentence and (B) with the consent of the applicable Issuing Bank and the Administrative Agent, Letters of Credit with a term longer than one year shall be permitted so long as such term would not extend beyond the date specified in clause (ii) of this sentence.

(d) Participations. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of any Issuing Bank or the Lenders, the applicable Issuing Bank hereby grants to each Revolving Lender, and each Revolving Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of such Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever; provided that no Lender shall be required to acquire a participation in any Letter of Credit to the extent that doing so would cause the Revolving Exposure of such Lender to exceed such Lender's Revolving Commitment.

(e) Reimbursement. If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 2:00 p.m., New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 12:00 noon, New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 2:00 p.m., New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 12:00 noon, New York City time, on the day of receipt or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 or 2.04 that such payment be financed with an ABR Revolving Borrowing or a Swingline Loan in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and

41

replaced by the resulting ABR Revolving Borrowing or Swingline Loan. If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Revolving Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, *mutatis mutandis*, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the relevant Issuing Bank the amounts so received by it from the Revolving Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the relevant Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to this paragraph to reimburse the applicable Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Revolving Lender pursuant to this paragraph to reimburse an Issuing Bank for any LC Disbursement (other than the funding of ABR Revolving Loans or a Swingline Loan as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f) Obligations Absolute. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section, to the fullest extent permitted by applicable law, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by an Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply strictly with the terms of such Letter of Credit or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. None of the Administrative Agent, the Lenders, any Issuing Bank or any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the applicable Issuing Bank; provided that the provisions of this Section 2.05(f) shall not be construed to excuse the applicable Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that (i) are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents

42

presented under a Letter of Credit comply with the terms thereof or (ii) result from such Issuing Bank's wilful or grossly negligent failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate (s) strictly complying with the terms and conditions of such Letter of Credit. The parties hereto expressly agree that, in the absence of gross negligence or wilful misconduct on the part of the applicable Issuing Bank (as finally determined by a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g) Disbursement Procedures. An Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit issued by it. Such Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by email of a "pdf" copy or telecopy) of such demand for payment and whether such Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation hereunder to reimburse such Issuing Bank and the Revolving Lenders with respect to any such LC Disbursement.

(h) Interim Interest. If an Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Revolving Loans; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.13(c) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (e) of this Section to reimburse such Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i) Addition and Replacement of an Issuing Bank. Any Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Bank. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12(b). From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing

43

Banks, as the context shall require. After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit. A Revolving Lender may become an additional Issuing Bank hereunder pursuant to a written agreement among the Borrower, the Administrative Agent and such Revolving Lender pursuant to which the Borrower designates such Revolving Lender as an Issuing Bank hereunder. The Administrative Agent shall notify the Revolving Lenders of any such additional Issuing Bank.

(j) <u>Cash Collateralization.</u> If any Event of Default under clauses (h) or (i) of Article VII shall occur and be continuing or if the Loans have been accelerated pursuant to Article VII as a result of any other Event of Default, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Revolving Lenders with LC Exposure representing greater than 50% of the total LC Exposure) demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to the LC Exposure as of such date plus any accrued and unpaid interest thereon; <u>provided</u> that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (h) or (i) of Article VII. The Borrower also shall deposit cash collateral pursuant to this paragraph as and to the extent required by Section 2.11(b). Each such deposit under this Section or Section 2.11(b) shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement, and the Borrower hereby grants to the Agent, for the benefit of the Lenders, the Issuing Banks and the Agent, a security interest in all funds and investments from time to time in such account, and in the proceeds thereof, to secure the Loan Document Obligations. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse an Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Lenders with LC Exposure representing greater than 50% of the total LC Exposure), be applied to satisfy Loan Document Obligations in accordance with Section 5.02 of the Collateral Agreement. If the Borrower is required to provide an amount of cash collateral hereunder pursuant to Section 2.11(b), such amount (together with any earnings thereon) (to the extent not applied as aforesaid) shall be returned to the Borrower as and to the extent that, after giving effect to such return, the Borrower would remain in compliance with Section 2.11(b) and no Event of Default shall have occurred and be continuing.

44

(k) Issuing Bank Reports. Unless otherwise agreed by the Administrative Agent, each Issuing Bank shall report in writing to the Administrative Agent (i) on or prior to each Business Day on which such Issuing Bank issues, amends, renews or extends any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Letters of Credit issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and whether the amount thereof shall have changed), it being understood that such Issuing Bank shall not effect any issuance, renewal, extension or amendment resulting in an increase in the aggregate amount of the Letters of Credit issued by it without first obtaining written confirmation from the Administrative Agent that such increase is then permitted under this Agreement (which confirmation shall be delivered by the Administrative Agent within three Business Days following any request therefor), (ii) on each Business Day on which such Issuing Bank makes any LC Disbursement, the date and amount of such LC Disbursement, (iii) on any Business Day on which a Borrower fails to reimburse an LC Disbursement required to be reimbursed to such Issuing Bank on such day, the date of such failure and the amount of such LC Disbursement and (iv) on any other Business Day, such other information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by such Issuing Bank.

SECTION 2.06. Funding of Borrowings. (a) Each Revolving Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided that Swingline Loans shall be made as provided in Section 2.04. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent in New York City and designated by the Borrower in the applicable Borrowing Request; provided that ABR Revolving Loans and Swingline Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(e) shall be remitted by the Administrative Agent to the relevant Issuing Bank.

(b) Unless the Administrative Agent shall have received notice from a Lender prior to the proposed time of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to

45

App. - 000050

ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c) Nothing in this Section 2.06 shall be deemed to relieve any Lender from its obligations to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of a default by such Lender under this Agreement.

SECTION 2.07. <u>Interest Elections.</u> (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or as designated pursuant to Section 2.03 and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or as designated pursuant to Section 2.03. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section shall not apply to Swingline Borrowings, which may not be converted or continued.

(b) To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Revolving Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c) Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i) the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii) the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii) whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv) if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

46

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d) Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender in the relevant Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e) If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to a Eurodollar Borrowing with an Interest Period of one month's duration. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08. Termination and Reduction of Commitments. (a) Unless previously terminated, (i) the Revolving Commitments shall terminate on the Revolving Maturity Date and (ii) the Tranche A Commitments and Tranche B Commitments shall terminate at 5:00 p.m., New York City time, on the Effective Date.

(b) The Borrower may at any time, without premium or penalty, terminate, or from time to time reduce, the Revolving Commitments; provided that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitments to the extent that, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.11, the aggregate Revolving Exposures would exceed the aggregate Revolving Commitments.

(c) The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the consummation of an acquisition, sale or other similar transaction, the receipt of proceeds from the incurrence or issuance of Indebtedness or Equity Interests or the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments shall be permanent. Each reduction of the

47

Commitments shall be made ratably among the Lenders in accordance with the relative amounts of their individual Commitments.

SECTION 2.09. <u>Repayment of Loans; Evidence of Debt.</u> (a) The Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan of such Lender on the Revolving Maturity Date, (ii) to the Administrative Agent for the account of each Term Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.10 and (iii) to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of the Revolving Maturity Date and the first date after such Swingline Loan is made that is the 15th or last day of a calendar month and is at least three Business Days after such Swingline Loan is made; <u>provided</u> that on each date that a Revolving Borrowing is made, the Borrower shall repay all Swingline Loans that were outstanding on the date such Borrowing was requested.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be conclusive evidence of the existence and amounts of the obligations recorded therein, absent demonstrable error; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e) Any Lender may request that Loans of any Class made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably satisfactory to the Administrative Agent and the Borrower; <u>provided</u> that, in order for any such promissory note to be delivered on the Effective Date, the request therefor shall be delivered no later than two Business Days prior to the Effective Date. Such promissory note shall state that it is subject to the provisions of this Agreement. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form.

48

App. - 000053

SECTION 2.10. <u>Amortization of Term Loans.</u> (a) Subject to adjustment pursuant to paragraph (d) of this Section, the Borrower shall repay Tranche A Term Borrowings on each date set forth below in the amount equal to the percentage set forth opposite such date multiplied by the aggregate principal amount of Tranche A Term Loans made on the Effective Date:

| Year | Percentage |
| --- | --- |
| Last day of March, June, September and December during the fiscal year ended December 31, 2009 | 1.25% |
| Last day of March, June, September and December during the fiscal year ended December 31, 2010 | 2.5% |
| Last day of March, June, September and December during the fiscal year ended December 31, 2011 | 3.75% |
| Last day of March, June, September and December during the fiscal year ended December 31, 2012 | 5.00% |
| Last day of March, June and September during the fiscal year ended December 31, 2013 | 12.50% |
| Tranche A Maturity Date | 12.50% |

(b) Subject to adjustment pursuant to paragraph (d) of this Section, the Borrower shall repay Tranche B Term Borrowings (i) on the last day of March, June, September and December of each year, commencing on March 31, 2007, in an amount equal to 0.25% of the aggregate principal amount of the Tranche B Term Loans issued on the Effective Date and (ii) on the Tranche B Maturity Date in an amount equal to the aggregate principal amount of the Tranche B Term Loans then outstanding.

(c) To the extent not previously paid, (i) all Tranche A Term Loans shall be due and payable on the Tranche A Maturity Date and (ii) all Tranche B Term Loans shall be due and payable on the Tranche B Maturity Date.

(d) Any mandatory prepayment of a Tranche A Term Borrowing or a Tranche B Term Borrowing shall be applied to reduce the next four scheduled repayments of the Tranche A Term Borrowings or the Tranche B Term Borrowings, as the case may be, and then on a *pro rata* basis to the remaining installments to be made pursuant to this Section ratably, in accordance with the amounts thereof. Any optional prepayment of Tranche A Term Borrowings or Tranche B Term Borrowings shall be applied to reduce the scheduled repayments of the Tranche A Term Borrowings or Tranche B Term Borrowings, as the case may be, in such manner and in such order as the Borrower specifies in the applicable notice of prepayment. For the avoidance of doubt, the Borrower may make optional prepayments of Tranche A Term Borrowings without making a *pro rata* prepayment of Tranche B Term Borrowings and may make optional

49

App. - 000054

prepayments of Tranche B Term Borrowings without making a *pro rata* prepayment of Tranche A Term Borrowings.

(e) Prior to any repayment of any Term Borrowings hereunder, including pursuant to an Offer to Repay, the Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by telephone (confirmed by email of a "pdf" copy or telecopy) of such selection not later than 11:00 a.m., New York City time, three Business Days before the scheduled date of such repayment. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Term Borrowings shall be accompanied by accrued interest on the amount repaid.

SECTION 2.11. Prepayment of Loans. (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.16), in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $1,000,000 (or $500,000 or more, in the case of Swingline Loans) or, if less, the amount outstanding, subject to the requirements of this Section.

(b) In the event and on such occasion that the aggregate Revolving Exposures exceeds the aggregate Revolving Commitments, the Borrower shall prepay Revolving Borrowings or Swingline Borrowings (or, if no such Borrowings are outstanding, deposit cash collateral in an account with the Administrative Agent pursuant to Section 2.05(j)) in an aggregate amount equal to such excess.

(c) (i) In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Restricted Subsidiary in respect of any Asset Disposition, the Borrower shall, not later than the fifth Business Day after the date on which such Net Proceeds are received, prepay Tranche A Term Borrowings and make an Offer to Repay Tranche B Term Borrowings in an aggregate principal amount equal to such Net Proceeds; provided that if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer to the effect that the Borrower or a Restricted Subsidiary intends to apply (or to contractually commit to apply) the Net Proceeds from such event (or a portion thereof specified in such certificate) within 365 days after receipt of such Net Proceeds to acquire Replacement Assets and certifying that no Default has occurred and is continuing, then no prepayment or Offer to Repay shall be required pursuant to this paragraph in respect of the Net Proceeds from such event (or the portion of such Net Proceeds specified in such certificate, if applicable) except to the extent of any such Net Proceeds that have not been so applied by the end of such 365 day period (or, if within such 365 day period the Borrower or the applicable Restricted Subsidiary shall have entered into any legally binding commitment to acquire Replacement Assets, the later of (i) the last date of such 365 day period and (ii) date that is 180 days after the entry into such legally binding commitment), at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so applied.

(ii) In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Restricted Subsidiary in respect of any Debt

50

Issuance, the Borrower shall, not later than the fifth Business Day after the date on which such Net Proceeds are received (i) if the Leverage Ratio on such day is greater than 5.00 to 1.00, prepay Tranche A Term Borrowings and make an Offer to Repay Tranche B Term Borrowings in an aggregate principal amount equal to 100% of such Net Proceeds and (ii) if the Leverage Ratio on such day is greater than 4.00 to 1.00 but less than or equal to 5.00 to 1.00, prepay Tranche A Term Borrowings and make an Offer to Repay Tranche B Term Borrowings in an aggregate principal amount equal to 50% of such Net Proceeds. No such prepayment or Offer to Repay shall be required if the Leverage Ratio on such day is less than or equal to 4.00 to 1.00.

(d) Within five Business Days following the date on which financial statements are delivered by the Borrower pursuant to Section 5.01(a) or (b) with respect to any fiscal quarter ending during a Dividend Suspension Period, the Borrower will prepay Tranche A Term Borrowings and make an Offer to Repay Tranche B Term Borrowings in an aggregate amount equal to 50% of the amount of any increase in Available Cash during such fiscal quarter. Each such prepayment and Offer to Repay shall be made, subject to the provisions and procedures set forth in Section 2.11(f).

(e) Subject to Section 2.11(f) with respect to the right of Tranche B Lenders to decline an Offer to Repay, the aggregate amount required to be applied to prepayments and Offers to Repay in respect of any such fiscal quarter will be applied thereto on a *pro rata* basis, in accordance with the relative amounts of the then outstanding Term Borrowings, and prepayments will be effected initially on the date specified above and, to the extent additional prepayments are required as a result of Tranche B Lenders declining an Offer to Repay, on the date that any repayment of Tranche B Term Borrowings would be required to be made pursuant to such Offer to Repay.

(f) Any Offer to Repay required to be made pursuant to paragraph (c) or (d) of this Section shall be made by delivery of a notice to such effect to the Administrative Agent (which shall promptly deliver a copy thereof to each Lender) on the date on which such offer is required to be made. Each such notice shall specify the principal amount of Term Borrowings to which such Offer to Repay relates. Each Offer to Repay will require, and the related notice will specify, that repayments of Tranche B Term Borrowings will be made pursuant thereto on the fifth Business Day after the date on which the relevant notice was delivered to the Administrative Agent. Any Tranche B Lender may elect, by notice to the Administrative Agent by telephone (confirmed by email of a "pdf" copy or telecopy) at least one Business Day prior to the prepayment date, to decline all or any portion of any offered prepayment of its Tranche B Term Loans pursuant to this Section. The aggregate amount of the Offers to Repay that would have been applied to Tranche B Term Loans but was so declined shall, on the date that such prepayment would have been required, be applied to prepay outstanding Tranche A Term Loans and, if no Tranche A Term Loans are outstanding, may be used by the Borrower for general corporate purposes.

(g) The Borrower shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by

51

App. - 000056

email of a "pdf" copy or telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of prepayment, (ii) in the case of prepayment of an ABR Borrowing, not later than 2:00 p.m., New York City time, one Business Day before the date of prepayment or (iii) in the case of prepayment of a Swingline Loan, not later than 3:00 p.m., New York City time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment or Offer to Repay, a reasonably detailed calculation of the amount thereof; provided that, if a notice of optional prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08; provided further that the Borrower may provide that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the consummation of an acquisition, sale or other similar transaction, the receipt of proceeds from the incurrence or issuance of Indebtedness or Equity Interests or the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice (other than a notice relating solely to Swingline Loans), the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment or Offer to Repay or to prepay such Borrowing in full. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest and other amounts to the extent required by Sections 2.13 and 2.16.

(h) The Borrower may defer any prepayment or Offer to Repay required by paragraph (c) of this Section until the aggregate amount of Net Proceeds required by paragraph (c) of this Section to be applied to prepay Term Borrowings equals or exceeds $50,000,000, at which time the entire amount of Net Proceeds not applied pursuant to this paragraph will be applied as provided in paragraph (c) of this Section.

SECTION 2.12. Fees. (a) The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender (other than a Defaulting Lender) a commitment fee, which shall accrue at a per annum rate equal to the Commitment Fee Rate on the daily unused amount of each Revolving Commitment of such Lender during the period from and including the Effective Date to but excluding the date on which the Revolving Commitments terminate. Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the date hereof. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). For purposes of computing commitment fees with respect to Revolving Commitments, a Revolving Commitment of

52

a Lender shall be deemed to be used to the extent of the outstanding Revolving Loans and LC Exposure of such Lender (and the Swingline Exposure of such Lender shall be disregarded for such purpose).

(b) The Borrower agrees to pay (i) to the Administrative Agent for the account of each Revolving Lender (other than a Defaulting Lender) a participation fee with respect to its participations in Letters of Credit, which shall accrue at a per annum rate equal to the Applicable Margin from time to time in effect for purposes of determining the interest rate applicable to Eurodollar Revolving Loans on the daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Lender ceases to have any LC Exposure and (ii) to each Issuing Bank a fronting fee, which shall accrue at the rate of 0.175% per annum on the amount of the average daily LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) attributable to Letters of Credit issued by such Issuing Bank during the period from and including the Effective Date to but excluding the later of the date of termination of the Revolving Commitments and the date on which there ceases to be any LC Exposure with respect to Letters of Credit issued by such Issuing Bank, as well as such Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable in arrears on the third Business Day following such last day, commencing on the first such date to occur after the Effective Date; provided that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand. Any other fees payable to any Issuing Bank pursuant to this paragraph shall be payable within 15 days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c) The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(d) All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to the applicable Issuing Bank, in the case of fees payable to it) for distribution, in the case of commitment fees and participation fees, to the Lenders entitled thereto. Fees paid shall not be refundable under any circumstances.

SECTION 2.13. Interest. (a) The Loans comprising each ABR Borrowing (including each Swingline Loan) shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(b) The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c) Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2.00% plus the rate applicable to ABR Revolving Loans as provided in paragraph (a) of this Section.

(d) Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Revolving Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent demonstrable error.

SECTION 2.14. Alternate Rate of Interest. If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a) the Administrative Agent determines (which determination shall be conclusive absent demonstrable error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b) the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the

54

App. - 000059

Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing; provided, however, that, in the case of a notice received pursuant to clause (b) above, if the Administrative Agent is able prior to the commencement of such Interest Period to ascertain, after using reasonable efforts to poll the Lenders giving such notice, that a rate other than the Alternate Base Rate would adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall notify the Borrower of such alternate rate and the Borrower may agree by written notice to the Agent prior to the commencement of such Interest Period to have the Loans included in such Borrowing bear interest for such Interest Period at an interest rate equal to such alternate rate, in which case such alternate interest rate shall apply to all the Eurodollar Loans included in the relevant Borrowing.

SECTION 2.15. Increased Costs. (a) If any Change in Law (except with respect to Taxes, which shall be governed by Section 2.17) shall:

(i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or any Issuing Bank; or

(ii) impose on any Lender or an Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or such Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or such Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b) If any Lender or Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or on the capital of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), then from time to time after submission by

55

such Lender or Issuing Bank to the Borrower of a written request therefor, the Borrower will pay to such Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company for any such reduction suffered.

(c) A certificate of a Lender or Issuing Bank setting forth in reasonable detail the matters giving rise to a claim under this Section 2.15 and the calculation of such claim by such Lender or Issuing Bank or its holding company, as the case may be, shall be delivered to the Borrower and shall be conclusive absent demonstrable error. The Borrower shall pay such Lender or Issuing Bank, as the case may be, the amount shown as due on any such certificate within 15 Business Days after receipt thereof.

(d) Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16. Break Funding Payments. In the event of (a) the payment by or on behalf of the Borrower of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure by the Borrower to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(g) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall consist of an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but excluding the Applicable Margin), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan) over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered promptly to the Borrower and shall be conclusive absent demonstrable error.

56

The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt thereof.

SECTION 2.17. Taxes. (a) Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, directly or indirectly to a Governmental Authority on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A copy of a receipt or any other certificate documenting payment and reasonably acceptable to the Borrower as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent demonstrable error.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) Each Lender that is a Foreign Lender and is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), on or before the date that such Foreign Lender becomes a Lender hereunder or becomes entitled to any payments under any other Loan Document and at such times prescribed by applicable law, such properly completed and executed

57

App. - 000062

documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate; provided that such Foreign Lender has received written notice from the Borrower advising it of the availability of such exemption or reduction and supplying all applicable documentation.

(i) In connection with the foregoing, each Lender that is a Foreign Lender and any Issuing Bank which is not incorporated under the laws of the United States of America or any political subdivision thereof shall on or before the date that any Foreign Lender becomes a Lender hereunder or becomes entitled to any payments under any other Loan Document and at such times prescribed by applicable law:

(A) deliver to the Borrower and the Administrative Agent two duly completed copies of United States Internal Revenue Service Form W-8BEN (certifying that it is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country) or Form W-8ECI, or successor applicable form, as the case may be, in each case certifying that it is entitled to receive all payments hereunder or under any other Loan Document without, or at a reduced rate of withholding of any United States federal income taxes.

(B) in the case of any Foreign Lender or Issuing Bank that is claiming the so-called "portfolio interest exemption", deliver to the Borrower, with a copy to the Administrative Agent, (I) two certificates substantially in the form of Exhibit E (any such certificate, a "U.S. Tax Compliance Certificate") and (II) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN, or successor applicable form, certifying its legal entitlement at the date of such form to an exemption from U.S. withholding tax under the provisions of Section 871 (h) or Section 881(c) of the Code with respect to payments to be made hereunder or under any other Loan Document;

(C) in the case of any Lender or Issuing Bank that is a non-U.S. intermediary or flow-through entity for U.S. federal income tax purposes, deliver to the Borrower and the Administrative Agent, two accurate and complete original signed copies of Internal Revenue Service Form W-8IMY and, if such intermediary or flow-through is not a "qualified intermediary" as defined in Treasury Regulation §1.1441-1(e)(5)(ii) either (I) from each of its beneficiaries or members, two duly completed copies of Internal Revenue Service Form W-8BEN (certifying that each such beneficiary or member is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country), Form W-8ECI or Form W-9, or successor applicable form, as the case may be, in each case so that each such beneficiary or member is entitled to receive all payments hereunder or under any other Loan Document without, or at a reduced rate of withholding of any United States federal income taxes or (II) with respect to each beneficiary or

58

App. - 000063

member of such Lender or Issuing Bank that is claiming the so-called "portfolio interest exemption", (A) two U.S. Tax Compliance Certificates certifying to such Lender's or Issuing Bank's legal entitlement to an exemption from U.S. withholding tax with respect to payments to be made hereunder or under any other Loan Document and (B) two U.S. Tax Compliance Certificates certifying to such beneficiary's or member's legal entitlement to an exemption from U.S. withholding tax with respect to payments to be made hereunder or under any other Loan Document; and

(D) upon reasonable request by the Borrower deliver to the Borrower and the Administrative Agent two further copies of any documentation (as described in paragraphs (i), (ii) or (iii) of this Section 2.17(e)) on or before the date that any such documentation expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form or certificate previously delivered.

(E) Notwithstanding any other provision of this paragraph, such Lender or Issuing Bank shall not be required to deliver any form pursuant to this paragraph that it is not legally able to deliver.

(f) If the Administrative Agent, a Lender or the Issuing Bank determines, in its sole discretion and good faith, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.17 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, such Lender or the Issuing Bank and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent, such Lender or the Issuing Bank, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or the Issuing Bank in the event the Administrative Agent, such Lender or the Issuing Bank is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent, any Lender or the Issuing Bank to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

SECTION 2.18. Payments Generally; Pro Rata Treatment; Sharing of Setoffs. (a) The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 3:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next

59

succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent to such account as the Administrative Agent shall from time to time specify in a notice delivered to the Borrower, except payments to be made directly to the Issuing Bank or Swingline Lender as expressly provided herein and except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b) If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder (after giving effect to all applicable grace periods and cure periods, if any), such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c) If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans, Term Loans or participations in LC Disbursements or Swingline Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans, Term Loans and participations in LC Disbursements and Swingline Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Loans, Term Loans and participations in LC Disbursements and Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the relative aggregate amounts of principal of and accrued interest on their Revolving Loans, Term Loans and participations in LC Disbursements and Swingline Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff

60

and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d) Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender or Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to such Lender or Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or such Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e) If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(c), 2.05(d) or (e), 2.06(b), 2.18(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.19. <u>Mitigation Obligations; Replacement of Lenders.</u> (a) If any Lender or Issuing Bank requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or Issuing Bank or any Governmental Authority for the account of any Lender or Issuing Bank pursuant to Section 2.17, then such Lender or such Issuing Bank shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender or Issuing Bank, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may be, in the future and (ii) would not subject such Lender or Issuing Bank to any unreimbursed cost or expense that such Lender or Issuing Bank deems material and would not otherwise be, in the reasonable judgment of such Lender or Issuing Bank, materially disadvantageous to such Lender or Issuing Bank. The Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender or Issuing Bank in connection with any such designation or assignment.

(b) If (i) any Lender requests compensation under Section 2.15, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender becomes a Defaulting Lender or (iv) any Lender becomes a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests,

61

rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Commitment is being assigned, each Principal Issuing Bank and Swingline Lender), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and funded participations in LC Disbursements and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and such Lender shall be released from all obligations hereunder and (iii) in the case of any such assignment resulting from the status of such Lender as a Non-Consenting Lender, such assignment, together with any assignments by other Non-Consenting Lenders, will enable the Borrower to obtain sufficient consents to cause the applicable amendment, modification or waiver to become effective. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

      SECTION 2.20. <u>Term Loan Refinancing Facility.</u> At any time prior to the Tranche B Maturity Date, the Borrower may, by notice to the Administrative Agent, which shall promptly deliver a copy thereof to each of the Lenders (the "<u>Refinancing Facility Notice</u>"), request the addition of one or more tranches of term loans hereto (the "<u>Refinancing Term Loans</u>"), the proceeds of which will be used solely to refinance all or any portion of the outstanding Tranche B Term Loans; <u>provided</u>, <u>however</u>, that both (x) at the time of any such request and (y) after giving effect to any such Refinancing Term Loans, no Default shall exist and the Borrower shall be in Pro Forma Compliance. The Refinancing Term Loans shall (i) be in an aggregate principal amount not in excess of the then-outstanding aggregate principal amount of the Tranche B Term Loans but in no event less than $50,000,000, (ii) rank *pari passu* in right of payment with the other Loans and rank *pari passu* or junior in right of security with the other Loans and, if junior in right of security to the other Loans, will be subject to intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower, (iii) mature on a date no earlier than the later of (x) the Tranche B Maturity Date and (y) the fifth anniversary of the closing of the Refinancing Term Loans, (iv) have such pricing as may be agreed by the Borrower and the Persons providing such Refinancing Term Loans and (v) otherwise be treated hereunder no more favorably than the Tranche B Term Loans (including with respect to the voluntary and mandatory prepayment provisions); provided, that the terms and provisions applicable to the Refinancing Term Loans may provide for financial or other covenants different or in addition to those applicable to the Tranche B Term Loans only to the extent that such terms and provisions are applicable only during periods after the Tranche B Maturity Date. The Refinancing Facility Notice shall (i) set forth the requested amount of Refinancing Term Loans and outline in summary form the principal economic terms thereof, (ii) offer each Lender the opportunity to offer a commitment (the "<u>Refinancing Commitment</u>") to provide Refinancing Term Loans by giving written notice of such offered commitment to the Administrative Agent and the Borrower prior to the termination of the general

62

syndication of the Refinancing Term Loans and (iii) be provided to each existing Tranche B Lender not less than five Business Days prior to the commencement of the general syndication of the Refinancing Term Loans; provided, however, that no existing Lender will be obligated to subscribe for any portion of such commitments. At any point during or after the general syndication of the Refinancing Term Loans, the Borrower shall have the right to arrange for one or more banks or other financial institutions (any such bank or other financial institution being called an "Additional Term Loan Lender") to extend commitments to provide Refinancing Term Loans; provided that the Additional Term Loan Lenders shall be offered the opportunity to provide the Refinancing Term Loans only on terms previously offered to the existing Lenders pursuant to the Refinancing Facility Notice. Each commitment in respect of Refinancing Term Loans shall become a commitment to lend under this Agreement and any facility for the Refinancing Term Loans shall be implemented hereunder pursuant to an amendment to this Agreement (a "Refinancing Facility Amendment") executed by each of the Borrower, each other Loan Party, each lender agreeing to provide Refinancing Term Loans and the Administrative Agent, which Refinancing Facility Amendment will not require the consent of any other Lender; provided, however, that if less than all the outstanding Tranche B Term Loans are being refinanced with such Refinancing Term Loans, the Refinancing Facility Amendment will require the prior written consent of Tranche B Lenders holding a majority of the outstanding Tranche B Term Loans. The effectiveness of any Refinancing Facility Amendment shall (in addition to any other conditions specified therein) be subject to the satisfaction on the date thereof and, if different, on the date on which the Refinancing Term Loans are made, of each of the conditions set forth in Section 4.02.

SECTION 2.21. Incremental Facilities. Notwithstanding anything to the contrary herein, this Agreement and the other Loan Documents may be amended at any time and from time to time to establish one or more additional classes of term or revolving loans by an agreement in writing entered into by the Borrower, the Administrative Agent and each Person (including any Lender) that shall agree to make a loan of any class so established (but without the consent of any other Lender), and each such Person that shall not already be a Lender shall, at the time such agreement becomes effective, become a Lender with the same effect as if it had originally been a Lender under this Agreement; provided that the aggregate outstanding principal amount of the loans of all classes established pursuant to this Section shall not exceed $750,000,000. Any such agreement shall amend the provisions of this Agreement and the other Loan Documents to set forth the terms of the class of loans established thereby, including the amount and final maturity thereof (which shall not be earlier than the Tranche B Term Maturity Date), in the case of term loans, any provisions relating to amortization or mandatory prepayments or offers to prepay (it being agreed that the Weighted Average Life of such loans may be no less than the then current Weighted Average Life of the Tranche B Term Loans and that provisions for mandatory prepayments of and offers to prepay the term loans of any class may require such term loans to be prepaid or offered the right to be prepaid ratably with the Term Loans but shall not include any additional mandatory prepayment rights) and the interest to accrue and be payable thereon and any fees to be payable in respect thereof, and to effect such other changes (including changes to the provisions of Sections 2.18 and 9.02, the definition of "Required Lenders" and any

63

App. - 000068

other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights under the Loan Documents or make any determination or grant any consent under the Loan Documents) as the Borrower and the Administrative Agent shall deem necessary or advisable in connection with the establishment of any such class of term loans; provided that no such agreement shall amend Article V, VI or VII to establish any affirmative or negative covenant, Event of Default or remedy that by its terms benefits any such class of loans but not the outstanding Loans without the prior written consent of Lenders holding a majority in interest of the outstanding Loans; and provided further, that, if at the time of the establishment of any class of term loans, the Applicable Margin for Tranche B Term Loans is less than the interest rate margin that would be applicable to such class of term loans by more than 0.50% per annum, the Applicable Margin for Tranche B Term Loans shall be increased as necessary so that such rate is not less than the interest rate margin applicable to such class of term loans minus 0.50%. The loans of any class established pursuant to this paragraph shall, to the extent provided in the agreement entered into in connection therewith, be entitled to all the benefits afforded by this Agreement and the other Loan Documents, and shall benefit equally and ratably from the Guarantees and security interests created by the Collateral Agreement and the other Security Documents. The proceeds of loans extended pursuant to this paragraph may not be used directly or indirectly to repay Tranche B Term Loans unless the relevant loans extended pursuant to this paragraph mature on a date no earlier than the later of (x) six months after the Tranche B Maturity Date and (y) the fifth anniversary of the closing of such loans.

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lenders that:

SECTION 3.01. Organization; Powers. Each of the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required by applicable law.

SECTION 3.02. Authorization; Enforceability. The Transactions entered into and to be entered into by each Loan Party are within such Loan Party's corporate (or other organizational) powers and have been duly authorized by all necessary corporate (or other organizational) and, if required, stockholder or member action. This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of the Borrower or such Loan Party (as the case may be), enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting

64

App. - 000069

creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. <u>Governmental Approvals; No Conflicts.</u> The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) any applicable law or regulation, (ii) the charter, by-laws or other organizational documents of the Borrower or any of its Subsidiaries or (iii) any order of any Governmental Authority applicable to the Borrower or such Subsidiary, (c) will not violate or result in a default under any material indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Restricted Subsidiaries, except Liens permitted under Section 6.02 and except with respect to clauses (a), (b)(i) and (iii) and (c) to the extent any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04. <u>Financial Condition; No Material Adverse Change.</u> (a) The Borrower has heretofore furnished to the Lenders (i) its audited consolidated balance sheet and related consolidated statements of income, shareowners' investment and cash flows as of and for the fiscal years ended December 31, 2005, December 31, 2004 and December 31, 2003, reported on by Ernst & Young LLP, independent registered public accounting firm, without qualification and (ii) its unaudited consolidated balance sheet and related unaudited consolidated statements of income and cash flows as of and for the fiscal quarter and the portion of the fiscal year ended September 30, 2006, certified by a Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Acquired Business as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b) The Borrower has heretofore furnished to the Lenders its *pro forma* consolidated balance sheet as of September 30, 2006 prepared giving effect to the Transactions as if such Transactions had occurred on such date. Such *pro forma* consolidated balance sheet (i) has been prepared in good faith based on the same assumptions used to prepare the *pro forma* financial statements included in the Information Memorandum (which assumptions were at the time of the preparation of such *pro forma* balance sheet believed by the Borrower to be reasonable), (ii) accurately reflects all adjustments reasonably believed by the Borrower to be necessary to give effect to the Transactions and (iii) presents fairly, in all material respects, on a *pro forma* basis, the financial position of the Borrower and its consolidated Subsidiaries as of such date, as if the Transactions had occurred on such date.

65

App. - 000070

(c) Since December 31, 2005, there has been no change, development, event, effect, condition or occurrence that, individually or in the aggregate, has had a Material Adverse Effect.

SECTION 3.05. Properties. (a) Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to their business (including its Mortgaged Properties), taken as a whole, except for Liens permitted by Section 6.02 and minor defects in title that do not interfere with its ability to conduct their business as currently conducted and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b) Each the Borrower and its Subsidiaries owns, or has the right to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to their business, taken as a whole, and, to the knowledge of the Borrower, the use thereof by the Borrower and its Restricted Subsidiaries does not infringe upon the rights of any other Person, except, in each case, for such failure to own or have the right to use or such infringement that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c) Schedule 3.05 sets forth the address of each real property that has an individual Fair Market Value (including fixtures and improvements) equal to or greater than $10,000,000 and is owned by the Borrower or any of its Subsidiaries as of the Effective Date after giving effect to the Transactions and indicates each such property that is a Mortgaged Property as of the Effective Date.

SECTION 3.06. Litigation and Environmental Matters. (a) Except for the Disclosed Matters, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters).

(b) Except for either the Disclosed Matters or any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any Environmental Liability.

SECTION 3.07. Compliance with Laws and Agreements; Absence of Default. Each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority, in each case applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

66

App. - 000071

SECTION 3.08. <u>Investment Company Status.</u> None of the Borrower or its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09. <u>Taxes.</u> Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so has not had and would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10. <u>ERISA.</u> No ERISA Event has occurred that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, has had a Material Adverse Effect.

SECTION 3.11. <u>Disclosure.</u> Neither the Information Memorandum nor any of the other written reports, financial statements, certificates or other written information (other than projections, budgets or other estimates or forward-looking statements or information of a general economic or industry nature or reports or studies prepared by third parties that were not expressly commissioned by the Borrower or its Affiliates (collectively, the "<u>Projections</u>")), taken as a whole, furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender prior to the Effective Date in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished prior to the Effective Date) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u> that, with respect to Projections, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time such Projections were prepared, it being understood that projections by their nature are uncertain and no assurance is given that the results reflected in such projections will be achieved.

SECTION 3.12. <u>Subsidiaries.</u> <u>Schedule 3.12</u> sets forth the name of, and the ownership interest of the Borrower in, each Subsidiary of the Borrower and identifies each Subsidiary that is a Subsidiary Loan Party and each Subsidiary that is a Restricted Subsidiary, in each case as of the Effective Date.

SECTION 3.13. <u>Insurance.</u> <u>Schedule 3.13</u> sets forth a description of all insurance maintained by or on behalf of the Borrower and its Subsidiaries as of the Effective Date. As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.

SECTION 3.14. <u>Labor Matters.</u> As of the Effective Date, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened. As of the Effective Date, except as would not,

67

App. - 000072

individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect: (a) the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters; (b) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary; and (c) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

SECTION 3.15. <u>Solvency.</u> Immediately after the consummation of the Transactions to occur on the Effective Date and immediately following the making of each Loan made on the Effective Date and after giving effect to the application of the proceeds of such Loans and to the rights of reimbursement, contribution and subrogation created by the Collateral Agreement, (a) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) each Loan Party will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Effective Date.

SECTION 3.16. <u>Margin Regulations.</u> None of the Borrower or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Loan or any Letter of Credit will be used, directly or indirectly, in any manner that would entail a violation of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.17. <u>Spin-Off.</u> As of the Effective Date, each of the Distribution Agreement and the Core Verizon Agreements has been duly authorized, executed and delivered by the Borrower, and to the knowledge of the Borrower, each of the other parties thereto and constitutes a legal, valid and binding obligation of the Borrower, and to the knowledge of the Borrower, each other party thereto, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. As of the Effective Date, a true, correct and complete copy (including any amendments and waivers) of the Distribution Agreement and of each of the Core Verizon Agreements has been furnished to the Administrative Agent.

SECTION 3.18. <u>Security Documents.</u> (a) The Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties,

68

a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof to the extent described therein. When (a) the actions specified in Section 4.02(b) to the Collateral Agreement have been duly taken, (b) all applicable Instruments, Chattel Paper and Documents in which a security interest is perfected by possession have been delivered to, and/or are in the continued possession of, the Collateral Agent, (c) all deposit accounts, electronic chattel paper and Pledged Equity Interests (each, as defined in the Collateral Agreement), a security interest in which is required to be or is perfected by "control" (as described in the Uniform Commercial Code as in effect in the State of New York from time to time) are under the "control" of the Collateral Agent and (d) the Mortgages have been duly recorded, the security interests granted pursuant thereto shall constitute (to the extent described therein) a perfected security interest in, all right, title and interest of each pledgor or mortgagor (as applicable) party thereto in the Collateral described therein with respect to such pledgor or mortgagor (as applicable), subject, in each case to no other Lien other than Liens permitted under Section 6.02.

(b) When the Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral composed of Intellectual Property in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Collateral Agent shall have, for the ratable benefit of the Secured Parties, a perfected security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case subject to no other Lien other than Liens permitted under Section 6.02, it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof.

(c) The Mortgages entered into on the Effective Date and the Mortgages, if any, entered into after the Effective Date pursuant to Section 5.12 shall be effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed in the proper real estate filing offices, such Mortgages shall constitute a perfected security interest in, all right, title and interest of Loan Parties in such Mortgaged Property and the proceeds thereof, as security for the Obligations, in each case subject to no other Lien other than Liens permitted under Section 6.02.

SECTION 3.19. Use of Proceeds and Letters of Credit. The proceeds of the Revolving Loans and Swingline Loans will be used for general corporate purposes of the Borrower (including making Restricted Payments and payments of Indebtedness permitted under Section 6.08). Letters of Credit will be used for general corporate purposes of the Borrower and the Subsidiaries. The proceeds of the Tranche A Term Loans and a portion of the Tranche B Term Loans made on the Effective Date will be used to fund a cash distribution to Verizon. The Tranche B Term Loans made by the Initial Lender on the Effective Date, together with the Senior Unsecured Notes, will be

69

issued or transferred to Verizon in partial consideration for the transfer to the Borrower of the Acquired Business. No part of the proceeds of any Loan will be used, directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations U and X.

ARTICLE IV

Conditions

SECTION 4.01. <u>Effective Date.</u> The obligations of the Lenders to make Loans and of the Issuing Banks to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a) The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include email of a "pdf" copy or a telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b) The Administrative Agent shall have received a written opinion of (i) William G. Mundy, General Counsel for the Borrower, (ii) Debevoise & Plimpton LLP, special New York counsel for the Borrower and (iii) Richards, Layton & Finger, P.A., special Delaware counsel for the Borrower, substantially in the form of <u>Exhibits B-1</u>, <u>B-2</u> and <u>B-3</u> respectively. The Borrower hereby requests each such counsel to deliver such opinions.

(c) The Administrative Agent shall have received such customary documents and certificates for financing transactions of the type contemplated by this Agreement as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(d) The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02.

(e) The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable invoiced fees, charges and disbursements of counsel)

70

App. - 000075

required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document.

(f) The Collateral and Guarantee Requirement shall have been satisfied and the Administrative Agent shall have received a completed Perfection Certificate dated the Effective Date and signed by an executive officer or Financial Officer of the Borrower, together with all attachments contemplated thereby, including the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.02 or have been (or substantially simultaneously with the closing of the Transactions shall be) released.

(g) The Administrative Agent shall have received evidence that the insurance required by Section 5.07 is (or substantially simultaneously with the closing of the Transactions shall be) in effect.

(h) The Spin-Off shall have been consummated or shall be consummated simultaneously with the initial funding or issuance of the Loans on the Effective Date in accordance with applicable laws and the terms of the Distribution Agreement and any documents related thereto, without any amendment to or waiver or other modification of any term or condition in the Distribution Agreement or any documents related thereto not approved by the Administrative Agent, other than amendments, waivers or modifications that are not material and adverse to the interests of the Lenders. Copies of the Distribution Agreement and any documents related thereto and all certificates, opinions and other documents delivered thereunder shall have been made available to the Administrative Agent and the Administrative Agent shall have received a copy of the Distribution Agreement, certified by a Financial Officer or other executive officer of the Borrower as complete and correct. The structure of the Spin-Off and the other Transactions and all Tax, legal and environmental matters and the accounting treatment related thereto shall be consistent in all material respects with the terms set forth in the Distribution Agreement and the information set forth in the Form 10.

(i) The Senior Unsecured Notes shall have been (or substantially simultaneously with the closing of the Transactions shall be) issued to Verizon in an aggregate principal amount of $2,850,000,000.

(j) The Core Verizon Agreements shall have been executed and delivered and be in full force and effect in accordance with their terms and the Administrative Agent shall have received copies thereof certified by a Financial Officer or other executive officer of the Borrower as complete and correct. Any changes to any Core Verizon Agreement from the drafts most recently furnished

71

App. - 000076

to the Administrative Agent on or prior to November 13, 2006 that are material and adverse to the interests of the Lenders shall be reasonably acceptable to the Administrative Agent.

(k) The Administrative Agent shall have received a certificate from a Financial Officer of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, with respect to the solvency of the Loan Parties on the Effective Date after giving effect to the Transactions.

(l) After giving effect to the Transactions to be consummated on the Effective Date, the Borrower and the Subsidiaries shall have outstanding no Indebtedness or preferred Equity Interests other than (i) the Loans, (ii) the Senior Unsecured Notes and (iii) the Indebtedness set forth in Schedule 6.01.

(m) All consents and approvals required to be obtained from any Governmental Authority (including but not limited to state public utility commissions) or material third parties in connection with the Transactions shall have been obtained to the extent such consents or approvals are required under applicable laws or agreements or otherwise, and all applicable regulatory appeal periods shall have expired. The Administrative Agent shall have received a certificate of a Financial Officer of the Borrower, certifying that there is no claim, action or proceeding pending or, to the knowledge of the Borrower, threatened, by any Governmental Authority to enjoin, restrain or prohibit (or by any other Person that has a reasonable likelihood of enjoining, restraining or prohibiting) the Transactions that has a reasonable likelihood of enjoining, restraining or prohibiting the Transactions, or by any Person that has a reasonable likelihood of imposing burdensome conditions on the Transactions.

(n) The Administrative Agent shall have received copies of the unaudited financial statements for the Acquired Business for the nine months ended September 30, 2006.

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Revolving Lenders to make Loans and of the Issuing Banks to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived by Revolving Lenders holding a majority of the Revolving Commitments) at or prior to 5:00 p.m., New York City time, on November 17, 2006 (and, in the event such conditions are not so satisfied or waived, the Revolving Commitments shall terminate at such time).

SECTION 4.02. Each Credit Event. The obligation of each Lender to make a Loan on any date, and of an Issuing Bank to issue, increase, renew or extend any Letter of Credit on any date, is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the following conditions:

72

App. - 000077

(a) The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date such Loan is made or the date of issuance, increase, renewal or extension of such Letter of Credit, as applicable, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date).

(b) At the time of and immediately after giving effect to such Borrowing or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, no Default shall have occurred and be continuing.

Each funding of Loans and each issuance, increase, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.

ARTICLE V

Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees which are due and payable hereunder shall have been paid in full and all Letters of Credit shall have expired, been terminated or been fully cash collateralized or otherwise provided for in a manner satisfactory to the relevant Issuing Bank and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01. Financial Statements and Other Information. The Borrower will furnish to the Administrative Agent for prompt distribution to each Lender:

(a) no later than 90 days after the end of each fiscal year of the Borrower), the Borrower's audited consolidated balance sheet and related audited consolidated statements of income, shareowners' investments and cash flows, as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP or other independent registered public accounting firm of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b) no later than 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower), (i) the Borrower's unaudited

73

consolidated balance sheet and related unaudited consolidated statements of income, shareowners' investments and cash flows, as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c) concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with the Financial Covenant, (iii) identifying any Permitted Acquisition that has been consummated since the end of the previous fiscal quarter, (iv) attaching a schedule setting forth a computation of Available Cash generated during the most recent fiscal quarter covered by such financial statements and Available Distributable Cash as of the first day after the end of such fiscal quarter and (v) specifying whether a Dividend Suspension Period exists and whether any Offer to Repay is required under Section 2.11(d) in connection with the delivery of such financial statements, and if so, setting forth a computation of the amount thereof;

(d) within 90 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected income and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any significant revisions of such budget;

(e) promptly after the same become publicly available, copies of all periodic reports, proxy statements and registration statements filed by the Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or any other materials distributed by the Borrower to its shareholders generally; and

(f) promptly following any written request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent (including on behalf of any Lender) may reasonably request.

74

App. - 000079

Any financial statement or other information required to be delivered pursuant to this Section 5.01 shall be deemed to have been delivered on the date on which such information is posted on the Borrower's website on the Internet or by the Administrative Agent on an IntraLinks or similar site to which Lenders have been granted access or shall be available on the SEC's website on the Internet at www.sec.gov; provided that if the Borrower elects to post any financial statement or other information on its website, it shall concurrently deliver to the Administrative Agent paper copies of any such financial statement or other information. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of any certificate required by Section 5.01(b) or (c) to the Administrative Agent. If any financial statement or other information required to be delivered under this Agreement shall be required to be delivered on any date that is not a Business Day, such information may be delivered to the Administrative Agent on the next succeeding Business Day after such date.

SECTION 5.02. Notices of Material Events. The Borrower will furnish to the Administrative Agent for prompt further distribution to each Lender written notice of the following promptly after any Responsible Officer obtains actual knowledge thereof:

(a) the occurrence of any Default;

(b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Subsidiary thereof that would reasonably be expected to result in a Material Adverse Effect;

(c) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect; and

(d) any other development that would be materially likely, in the reasonable judgment of the Borrower, to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. Information Regarding Collateral. The Borrower will furnish to the Administrative Agent prompt written notice of any change (a) in any Loan Party's legal name, as reflected in its organization documents, (b) in any Loan Party's jurisdiction of organization or form of organization and (c) in any Loan Party's identity, Federal Taxpayer Identification Number or organization number, if any, assigned by the jurisdiction of its organization. Not later than 30 Business Days after any change referred to in clauses (a) through (c) of the preceding sentence the Borrower shall confirm in writing to the Administrative Agent that (i) all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all

75

times following such change to have a valid, legal and perfected security interest in any Collateral affected by such change for the benefit of the Secured Parties to the extent required by the Collateral Agreement or (ii) that the Borrower has provided to the Administrative Agent all information required for the Collateral Agent to make such filings.

SECTION 5.04. <u>Existence; Conduct of Business.</u> The Borrower will, and will cause each of its Restricted Subsidiaries to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, contracts, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except, in the case of this clause (ii), where the failure to do so would not reasonably be expected to have a Material Adverse Effect; <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any sale of assets permitted under Section 6.05.

SECTION 5.05. <u>Payment of Obligations.</u> The Borrower will, and will cause each of its Restricted Subsidiaries to, pay, discharge or otherwise satisfy its Taxes and other material governmental charges or levies imposed upon it or upon its income or profits or in respect of its property before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP or the failure to pay, discharge or otherwise satisfy such Taxes, charges or levies would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.06. <u>Maintenance of Properties.</u> Except as permitted by Section 6.05, the Borrower will, and will cause each of its Restricted Subsidiaries to, keep and maintain all property necessary to the conduct of its business in good working order and condition, ordinary wear and tear, damage caused by casualty and condemnation excepted, except where the failure to take such actions would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.07. <u>Insurance.</u> The Borrower will, and will cause each of its Restricted Subsidiaries to, maintain, with financially sound and reputable insurance companies or with Verizon or any of its Affiliates, insurance in such amounts (after giving effect to any self-insurance) and against such risks as are, in the Borrower's good faith judgment, customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.

SECTION 5.08. <u>Casualty and Condemnation.</u> The Borrower will furnish to the Administrative Agent prompt written notice of any casualty or other insured damage to any Collateral with a Fair Market Value of more than $10,000,000 or the commencement of any action or proceeding for the taking of any Collateral or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding.

SECTION 5.09. <u>Books and Records; Inspection and Audit Rights.</u> The Borrower will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities to the extent necessary to permit the preparation of financial statements in accordance with GAAP. The Borrower will, and will cause each of its Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon not fewer than five Business Days' prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its appropriate representatives and, with the opportunity for representatives of the Borrower to be present, independent accountants, all at such reasonable times and as often as reasonably requested, <u>provided</u> that (a) the Lenders will coordinate any visits through the Administrative Agent and (b) at times when no Default is continuing, the Borrower shall not be required to pay for more than two visits per year by the Administrative Agent.

SECTION 5.10. <u>Compliance with Laws.</u> The Borrower will, and will cause each of its Restricted Subsidiaries to, comply in all material respects with all laws, rules, regulations, including Environmental Laws, and orders of any Governmental Authority applicable to it, its operations or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.11. <u>Additional Subsidiaries.</u> If any additional Restricted Subsidiary (other than an Excluded Subsidiary) is formed or acquired after the Effective Date, the Borrower will, within 10 Business Days (or such longer period as may be acceptable to the Collateral Agent) after such Subsidiary is formed or acquired, notify the Administrative Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party.

SECTION 5.12. <u>Further Assurances.</u> (a) The Borrower will, and will cause each Subsidiary Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties; <u>provided</u> that the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Borrower or any Subsidiary Loan Party with an individual Fair Market Value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Borrower or any Subsidiary Loan Party as a lessee under a lease. The Borrower also agrees to provide to the Administrative Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

77

(b) If any Specified Asset that has an individual Fair Market Value of more than $10,000,000 is acquired by the Borrower or any Subsidiary Loan Party after the Effective Date or owned by an entity at the time it becomes a Subsidiary Loan Party, the Borrower will notify the Administrative Agent thereof (and the Administrative Agent shall notify the Lenders thereof), and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause the Collateral and Guarantee Requirement to be satisfied with respect to such asset.

SECTION 5.13. Interest Rate Protection. As promptly as practicable, and in any event within 120 days after the Effective Date, the Borrower will enter into, and thereafter for a period of not less than two years will maintain in effect, one or more interest rate protection agreements, to the extent necessary to fix or limit the interest cost to the Borrower with respect to at least 50% of the Long-Term Indebtedness of the Borrower (after taking into account all fixed-rate Long-Term Indebtedness), excluding Revolving Loans and Indebtedness in respect of Letters of Credit and Capital Leases.

## ARTICLE VI

### Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees which are due and payable hereunder have been paid in full and all Letters of Credit have expired, been terminated or been fully cash collateralized or otherwise provided for in a manner satisfactory to the relevant Issuing Bank and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01. Indebtedness; Certain Equity Securities. (a) The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i) Indebtedness created under the Loan Documents and any Permitted Additional Debt or other unsecured Indebtedness of the Borrower or its Restricted Subsidiaries in each case to the extent the Net Proceeds thereof are used to refinance Indebtedness under the Loan Documents;

(ii) Indebtedness under the Senior Unsecured Notes;

(iii) Indebtedness existing on the date hereof and set forth in Schedule 6.01;

(iv) Indebtedness of the Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Borrower or any other Restricted Subsidiary; provided that Indebtedness of any Restricted Subsidiary that is not a Loan Party to the Borrower or any Subsidiary Loan Party shall be subject to Section 6.04;

78

(v) Guarantees by the Borrower of Indebtedness of any Restricted Subsidiary and by any Restricted Subsidiary of Indebtedness of the Borrower or any other Restricted Subsidiary; provided that Guarantees by the Borrower or any Subsidiary Loan Party of Indebtedness of any Restricted Subsidiary that is not a Loan Party shall be subject to Section 6.04;

(vi) (A) Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof; provided that (1) such Indebtedness is incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement and (2) the aggregate principal amount of Capital Lease Obligations and Indebtedness permitted by this clause (vi) shall not exceed $100,000,000 at any time outstanding;

(vii) Indebtedness of any Person that becomes a Restricted Subsidiary after the date hereof; provided that (A) such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary, (B) such Indebtedness does not prevent the Collateral and Guarantee Requirement from being fully satisfied with respect to any such Restricted Subsidiary that is required to become a Subsidiary Loan Party and (C) the Borrower is in Pro Forma Compliance after giving effect to the acquisition of such Restricted Subsidiary; provided, however, that notwithstanding clause (B) above, not more than $175,000,000 aggregate principal amount of such acquired Indebtedness may preclude the grant of Liens on such assets or prohibit the issuance of guarantees pursuant to the Loan Documents or otherwise prevent the Collateral and Guarantee Requirement from being fully satisfied;

(viii) Indebtedness of the Borrower or any Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit in respect of workers' compensation claims or self-insurance obligations;

(ix) Indebtedness of the Borrower or any Restricted Subsidiary in respect of performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees and similar obligations (other than in respect of Indebtedness for borrowed money);

(x) Indebtedness in respect of Swap Agreements permitted by Section 6.07;

(xi) Indebtedness of the Borrower or any Restricted Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

79

App. - 000084

(xii) Indebtedness that constitutes an Investment permitted under Section 6.04;

(xiii) Indebtedness of Foreign Subsidiaries in an aggregate principal amount at any time outstanding not exceeding $10,000,000;

(xiv) Indebtedness incurred by the Borrower or any Restricted Subsidiary representing deferred compensation to employees of the Borrower or any Restricted Subsidiary incurred in the ordinary course of business;

(xv) Indebtedness consisting of promissory notes issued by the Borrower or any Restricted Subsidiary to future, present or former directors, officers, members of management, employees or consultants of the Borrower or any of its Restricted Subsidiaries or their respective estates, heirs, family members, spouses or former spouses to finance the purchase or redemption of Equity Interests in the Borrower as permitted by Section 6.08(a)(iv);

(xvi) Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with any Permitted Acquisition consisting of obligations in respect of indemnification, the adjustment of the purchase price or similar adjustments;

(xvii) Indebtedness consisting of obligations of the Borrower or any Restricted Subsidiary under deferred compensation or other similar arrangements incurred by such Person in connection with Permitted Acquisitions;

(xviii) Indebtedness incurred by Borrower or any Restricted Subsidiary in respect of netting services, overdraft protections and similar arrangements in each case in connection with cash management and deposit accounts;

(xix) Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations of the Borrower or any Restricted Subsidiary contained in supply arrangements, in each case, in the ordinary course of business;

(xx) Indebtedness supported by a Letter of Credit, in a principal amount not in excess of the stated amount of such Letter of Credit;

(xxi) Refinancing Indebtedness of the Borrower or any Restricted Subsidiary incurred in exchange for, or the Net Proceeds of which are used to refund, refinance or replace Indebtedness (other than Indebtedness of the Borrower to any Restricted Subsidiary or of any Restricted Subsidiary to the Borrower or any other Restricted Subsidiary) that was permitted to be incurred under clause (i), (ii), (iii), (vi), (vii) or this clause (xxi) of this paragraph;

(xxii) Permitted Additional Debt and Permitted Subordinated Indebtedness, without any limitation as to amount so long as the Borrower and the Restricted Subsidiaries are in Pro Forma Compliance; provided, however, that if, in good faith judgment of the Borrower, the incurrence of such Indebtedness would

80

reasonably be expected to give rise to an obligation to repay the Term Loans pursuant to Section 2.11(c), the portion of such Indebtedness, the Net Cash Proceeds of which would reasonably be expected to be required to repay Term Loans pursuant to Section 2.11(c), as determined in the good faith judgment of the Borrower, shall mature on a date no earlier than the later of (x) six months after the Tranche B Maturity Date and (y) the fifth anniversary of the incurrence of such Indebtedness;

(xxiii) other Indebtedness of the Borrower or any Restricted Subsidiary, in an aggregate principal amount at any time outstanding pursuant to this clause (xxiii) not in excess of $100,000,000; and

(xxiv) all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described above;

provided, however, that the Borrower and its Restricted Subsidiaries may not apply the proceeds of any Indebtedness incurred in reliance on this Section 6.01(a) directly or indirectly to repay Tranche B Term Loans unless such Indebtedness matures on a date no earlier than the later of (x) six months after the Tranche B Maturity Date and (y) the fifth anniversary of the incurrence of such Indebtedness.

(b) The Borrower will not, nor will it permit any Restricted Subsidiary to, issue any Disqualified Stock.

SECTION 6.02. Liens. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i) Liens created under the Loan Documents;

(ii) Permitted Encumbrances;

(iii) any Lien existing on the date hereof and set forth in Schedule 6.02 on any property or asset of the Borrower or any Restricted Subsidiary; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Restricted Subsidiary (other than proceeds) and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of accrued interest thereon and fees and expenses, including premium and defeasance costs, associated therewith);

(iv) any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Restricted Subsidiary or existing on any property or asset of any Person that becomes a Restricted Subsidiary after the date hereof prior to the time such Person becomes a Restricted Subsidiary; provided that

81

App. - 000086

(A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary (other than proceeds) and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Restricted Subsidiary, as the case may be and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of accrued interest and fees and expenses, including premium and defeasance costs, associated therewith);

(v) Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Restricted Subsidiary (including any such assets made the subject of a Capital Lease Obligation); provided that (A) such Liens secure Indebtedness permitted by clause (vi) of Section 6.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary (other than proceeds);

(vi) Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary (or Guarantees of such Indebtedness), in each case to the extent permitted under Section 6.01(a);

(vii) Liens in favor of the Borrower or any Subsidiary Loan Party;

(viii) Liens that are contractual rights of set-off (w) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (x) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Restricted Subsidiaries, (y) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or (z) arising under or pursuant to banking relationships;

(ix) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(x) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods, in each case entered into in the ordinary course of business;

82

App. - 000087

(xi) Liens securing Refinancing Indebtedness; provided that such Liens do not extend to any property or assets other than the property or assets that secure the Indebtedness being refinanced;

(xii) Liens (x) attaching to advances to a seller of any property to be acquired, (y) consisting of an agreement to dispose of property and (z) on cash earnest money deposits in connection with Investments permitted under Section 6.04;

(xiii) Liens on insurance policies and the proceeds thereof granted in the ordinary course to secure the financing of insurance premiums with respect thereto;

(xiv) any sale or assignment of accounts receivable permitted by Section 6.05;

(xv) licenses, sublicenses, leases or subleases granted to third Persons in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries;

(xvi) precautionary UCC financing statements in respect of operating leases permitted by this Agreement;

(xvii) any interest or title of a licensor, lessor, sublicensor or sublessor under any license or lease permitted by this Agreement;

(xviii) Liens arising under Environmental Laws which (i) are being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP or (ii) arise by operation of law (and not as a result of any grant or consent by the Borrower or any Restricted Subsidiary) to secure performance by the Borrower or its Restricted Subsidiaries of remediation activity, so long as the Borrower and its Restricted Subsidiaries are in compliance with all requirements applicable to such remediation activity;

(xix) in the case of Equity Interests issued by a joint venture or a non-wholly owned Subsidiary, any call or similar right in the nature of a right of first offer or a first refusal right of a third party that is also an investor in such joint venture or Subsidiary and, in the case of Equity Interests issued by a joint venture or Subsidiary, any call or similar right on any nominee, trust or directors' qualifying shares or similar arrangements designed to satisfy requirements of applicable local laws; and

(xx) Liens not otherwise permitted by this Section 6.02 securing obligations and Indebtedness in an aggregate amount not in excess of $75,000,000 at any time outstanding;

provided that notwithstanding the foregoing, no consensual Liens shall exist on Pledged Equity Interests that constitute Collateral other than pursuant to clauses (i), (iv), (xi), (xii), (xix) or (xx) above.

83

App. - 000088

SECTION 6.03. Fundamental Changes. (a) The Borrower will not, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Person may merge into the Borrower in a transaction in which the Borrower is the surviving corporation, (ii) any Person may merge into any other Restricted Subsidiary in a transaction in which the surviving entity is (or upon consummation of such merger becomes a Restricted Subsidiary in accordance with the terms of this Agreement) a Restricted Subsidiary and, if any party to such merger is a Subsidiary Loan Party, a Subsidiary Loan Party, (iii) any Restricted Subsidiary may merge or consolidate with any other Person in order to effect a Permitted Acquisition and (iv) any Restricted Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that any such merger involving a Person that is not a wholly owned Restricted Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b) The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than a Permitted Business.

SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, make, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Restricted Subsidiary prior to such merger) any Investment, except:

(a) the Transactions and Investments resulting from the consummation of the Transactions;

(b) Permitted Investments;

(c) Investments existing on the Effective Date or made pursuant to binding commitments in effect on the Effective Date and, in each case, set forth on Schedule 6.04;

(d) Investments by the Borrower in any Subsidiary and made by any Restricted Subsidiary in the Borrower or any Subsidiary; provided that the aggregate amount of Investments made after the Effective Date by Loan Parties in Subsidiaries that are not Loan Parties shall not exceed (x) the amount of Equity Proceeds used to make such Investments and not applied to other Designated Equity Proceeds Uses plus (y) an amount not to exceed $50,000,000 in each fiscal year; provided, that any amount permitted to be invested pursuant to this clause (y) during any fiscal year and not invested during such fiscal year may be carried over and expended during subsequent fiscal years, provided further that the aggregate amount of Investments made in reliance on this clause (y) may not

84

App. - 000089

exceed $200,000,000 in the aggregate; provided, however, that Investments in Subsidiaries that are not Loan Parties shall not be made pursuant to the contribution or transfer of operating assets of the Borrower and the Restricted Subsidiaries or the grant of intellectual property (other than licenses) granted to the Borrower pursuant to the Intellectual Property Agreement except for such operating assets or intellectual property having a cumulative aggregate Fair Market Value (determined in respect of each transfer or contribution at the time thereof) not in excess of $25,000,000;

(e) Guarantees constituting Indebtedness permitted by Section 6.01; provided that (i) a Subsidiary shall not Guarantee the Indebtedness under the Senior Unsecured Notes unless such Subsidiary also has Guaranteed the Obligations pursuant to the Collateral Agreement, and (ii) the aggregate principal amount of Indebtedness of Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (d) above;

(f) Guarantees by the Borrower or Restricted Subsidiaries of obligations other than Indebtedness of any Foreign Subsidiary or any Unrestricted Subsidiary, provided that the funding of any such guarantees by the Borrower or any Subsidiary Loan Party shall be deemed to constitute an Investment subject to Section 6.04(d) unless reimbursed by such Foreign Subsidiary or such Unrestricted Subsidiary;

(g) Permitted Acquisitions (including any cash earnest money deposits required in connection therewith);

(h) Permitted Asset Swaps;

(i) Investments (including debt obligations and equity securities) acquired (x) in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business or (y) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(j) extensions of trade credit in the ordinary course of business;

(k) Investments received in connection with the sale, transfer, lease or other disposition of any asset permitted by Section 6.05;

(l) Swap Agreements entered into in compliance with Section 6.07;

(m) loans and advances by the Borrower and any of its Restricted Subsidiaries to their employees, officers, members of management, consultants, agents, customers or suppliers (i) in connection with relocation expenses and (ii) for other purposes in an aggregate amount at any time outstanding not in excess of $10,000,000;

85

App. - 000090

(n) Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(o) commission, payroll, travel and similar advances to officers and employees to cover matters that are expected at the time of such advances ultimately to be treated as expenses of the Borrower or any Restricted Subsidiary in accordance with GAAP;

(p) Investments consisting of the licensing or acquisition of, or investment in, intellectual property pursuant to joint marketing arrangements with other Persons;

(q) Investments of any Person existing at the time such Person becomes a Restricted Subsidiary or consolidates or merges with the Borrower or any Restricted Subsidiary (including in connection with a Permitted Acquisition) so long as such Investments were not made in contemplation of such Person becoming a Restricted Subsidiary or of such consolidation or merger;

(r) Investments resulting from pledges or deposits described in clause (c) or (d) of the definition of "Permitted Encumbrance";

(s) Investments in the ordinary course consisting of endorsements of collection or deposit;

(t) advances to customers or suppliers in the ordinary course of business that are, in conformity with GAAP, recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of the Borrower or any of its Restricted Subsidiaries and endorsements for collection or deposit arising in the ordinary course of business;

(u) Investments arising from any transaction permitted by Section 6.08;

(v) so long as no Event of Default has occurred and is continuing or would result therefrom, additional Investments in any Person (other than an Unrestricted Subsidiary) having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (v) since the Effective Date and then outstanding not to exceed the sum (calculated as of the date of such Investment was made after giving effect to all other applications of Available Distributable Cash or Available Equity Proceeds on such date) of (i) Available Distributable Cash plus (ii) Available Equity Proceeds plus (iii) to the extent not netted pursuant to clause (b)(ii) of the definition of "Available Distributable Cash" from the aggregate amount of Investments by the Borrower and the Restricted Subsidiaries since the Effective Date, the aggregate amount of cash proceeds from the net reduction in Investments made pursuant to this clause (v) in any Person since the Effective Date resulting from repayments of loans or advances, or other transfers of assets,

86

App. - 000091

in each case to the Borrower or any Restricted Subsidiary or from the net proceeds received in cash by the Borrower or any Restricted Subsidiary, from the sale of any such Investment; provided that any Investment made pursuant to this clause (v) in any Person that is not a Loan Party at the time such Investment is made may, if such Person thereafter becomes a Loan Party, from and after such date, be deemed to have been made pursuant to clause (d) or (e) of this Section, as the case may be, and not pursuant to this clause (v).

SECTION 6.05. Asset Sales. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any of its Restricted Subsidiaries to issue any additional Equity Interest in such Restricted Subsidiary (other than issuing directors' qualifying shares and other than issuing Equity Interests to the Borrower or a Restricted Subsidiary), except:

(a) sales, transfers, leases and other dispositions of (x) any property (including inventory) and (y) used, surplus, obsolete or worn-out equipment and Permitted Investments, in each case in the ordinary course of business;

(b) sales, transfers, leases and other dispositions to the Borrower or a Subsidiary; provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c) sales of receivables pursuant to the Billing and Collection Agreement;

(d) leases or subleases of property, and licenses or sublicenses of intellectual property, in each case entered into in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(e) dispositions or write-downs of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business or bankruptcy or similar proceedings;

(f) sales, transfers, leases and other dispositions permitted by Sections 6.03, 6.08 and Liens permitted under Section 6.02;

(g) sales, transfers, leases and other dispositions of property constituting Investments permitted under Section 6.04 (i);

(h) dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Restricted Subsidiary;

(i) voluntary terminations of Swap Agreements;

87

(j) sales, leases, transfers or other dispositions identified on Schedule 6.05;

(k) Sale and Leaseback Transactions permitted by Section 6.06;

(l) Permitted Asset Swaps; and

(m) sales, transfers, leases and other dispositions of assets that are not permitted by any other clause of this Section; provided that the aggregate Fair Market Value of all assets sold, transferred or otherwise disposed of in reliance on this clause (m) shall not exceed $250,000,000;

provided that any sales, transfers, leases and other dispositions permitted hereby by clauses (k) or (m) of this Section 6.05 shall be made (x) for Fair Market Value and (y) in the case of sales, transfers, leases or other dispositions permitted by clauses (j), (k) or (m) of this Section 6.05 shall be made for at least 75% Cash Consideration.

SECTION 6.06. Sale and Leaseback Transactions. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (any such transaction, a "Sale and Leaseback Transaction"), except for Sale and Leaseback Transactions having an aggregate Fair Market Value for all such Sale and Leaseback Transactions (determined at the time each such Sale and Leaseback Transaction is consummated with respect to the assets subject thereto) not in excess of $100,000,000; provided, however, that the Borrower applies the Net Proceeds of such Sale and Leaseback Transactions in compliance with Section 2.11(c).

SECTION 6.07. Swap Agreements. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements required by Section 5.13, (b) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Restricted Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries) in the conduct of its business or the management of its liabilities and (c) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or Investment of the Borrower or any Restricted Subsidiary.

SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness. (a) The Borrower will not, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except:

(i) the Borrower may declare and pay the Special Distribution;

88

(ii) the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock);

(iii) Restricted Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests;

(iv) the repurchase, redemption or other acquisition or retirement for value of any Equity Interests in the Borrower or any Restricted Subsidiary held by any future, present or former directors, officers, members of management, employees or consultants of the Borrower or any of its Restricted Subsidiaries or their respective estates, heirs, family members, spouses or former spouses pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement; provided that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year (other than any such Equity Interests repurchased, redeemed, acquired or retired in compensation for any taxes due or payable by the holder thereof) will not exceed the sum of (A) $25,000,000, with unused amounts pursuant to this subclause (A) being carried over to succeeding fiscal years; plus (B) the aggregate Net Proceeds received by the Borrower since the Effective Date as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Borrower to any future, present or former directors, officers, employees or consultants of the Borrower or any of its Restricted Subsidiaries; provided that the amount of any such Net Proceeds that are used to permit a repurchase, redemption or other acquisition under this subclause (B) will, in any event, be excluded from clause (a) of the definition of "Available Equity Proceeds";

(v) the making of any payment in exchange for, or out of the Net Proceeds of, a substantially concurrent sale (other than to a Subsidiary of the Borrower) of, Equity Interests of the Borrower; provided that the amount of any such Net Proceeds that are utilized for any such payment will be excluded for the purposes of calculating "Available Equity Proceeds";

(vi) the acquisition of Equity Interests transferred to, or deemed to be acquired by, the Borrower in payment of all or any portion of the exercise price of options or warrants the issuance of which is not prohibited by this Agreement;

(vii) so long as no Dividend Suspension Period or Event of Default has occurred and is continuing or would result therefrom, the repurchase of Equity Interests of the Borrower constituting fractional shares or in connection with any odd lot purchase program in an aggregate amount since the Effective Date not to exceed $30,000,000;

(viii) so long as no Dividend Suspension Period or Event of Default has occurred and is continuing, or would result therefrom, the payment of dividends by the Borrower on its common stock in an amount not to exceed $100,000,000 in the

89

aggregate for the first two quarterly dividend payments made after the Effective Date;

(ix) so long as no Dividend Suspension Period or Event of Default has occurred and is continuing or would result therefrom, the Borrower may make Restricted Payments with respect to its Equity Interests in an aggregate amount which does not exceed the sum (calculated as of the date on which any such Restricted Payment is made after giving effect to all other applications of Available Distributable Cash or Available Equity Proceeds on such date) of (A) Available Distributable Cash plus (B) Available Equity Proceeds; and

(x) other Restricted Payments in an aggregate amount not exceeding $25,000,000.

The Borrower may pay any dividend within 90 days after the date of declaration thereof, if the Borrower would have been permitted to make such payment under this Section 6.08(a) on the date of such declaration.

(b) The Borrower will not, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on the Senior Unsecured Notes or any Permitted Subordinated Indebtedness or Permitted Additional Debt, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness, except:

(i) payment of fees, expenses and regularly scheduled interest and principal payments as and when due in respect of such Indebtedness;

(ii) refinancings of such Indebtedness to the extent permitted by Section 6.01; and

(iii) so long as no Dividend Suspension Period or Event of Default has occurred and is continuing or would result therefrom, Optional Repurchases of such Indebtedness made with Available Equity Proceeds or Available Distributable Cash, provided that the Repurchase Expenditures in connection therewith on any date do not exceed the sum of Available Equity Proceeds and Available Distributable Cash on such date (in each case, after giving effect to any other application of Available Equity Proceeds or Available Distributable Cash on such date).

SECTION 6.09. Transactions with Affiliates. The Borrower will not, nor will it permit any Restricted Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

90

(a) transactions that are at prices and on terms and conditions not less favorable to the Borrower or such Restricted Subsidiary than could be obtained on an arm's-length basis from unrelated third parties;

(b) the indemnification of directors of the Borrower and the Subsidiaries in accordance with customary practice;

(c) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of the Borrower;

(d) loans or advances to employees of Borrower or any of the Restricted Subsidiaries in accordance with Section 6.04;

(e) transactions among the Borrower and any Subsidiary Loan Parties and transactions among Subsidiary Loan Parties otherwise permitted by this Agreement;

(f) the payment of fees and indemnities to directors, officers and employees of the Borrower and the Subsidiaries in the ordinary course of business;

(g) transactions pursuant to permitted agreements in existence on the Effective Date and set forth on Schedule 6.09 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect;

(h) any employment agreements entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(i) Restricted Payments permitted under Section 6.08;

(j) transactions with Restricted Subsidiaries for the purchase or sale of goods, products, parts and services and entered into in the ordinary course of business in a manner consistent with past practice;

(k) transactions with joint ventures for the purchase or sale of equipment or services entered into in the ordinary course of business and in a manner consistent with past practice; and

(l) payments by the Borrower and any Restricted Subsidiaries pursuant to tax sharing agreements among the Borrower and the Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries.

For purposes of this subsection 6.09, any transaction with any Affiliate involving an amount less than $10,000,000 shall be deemed to have satisfied the standard set forth in clause (a) above if such transaction is approved as being on an arm's length basis by a

91

App. - 000096

majority of the Disinterested Directors of the board of directors of either the Borrower or such Restricted Subsidiary. "Disinterested Director" shall mean, with respect to any Person and transaction, a member of the board of directors of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction.

SECTION 6.10. Restrictive Agreements. The Borrower will not, nor will it permit any Restricted Subsidiary that is not a Guarantor to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to the Secured Parties securing the Obligations, or (b) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Restricted Subsidiary or to Guarantee Indebtedness of the Borrower or any other Restricted Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, Senior Unsecured Note Document, (ii) the foregoing shall not apply to prohibitions, restrictions and conditions existing on the date hereof identified on Schedule 6.10 and to any extension, renewal or modification thereof, other than to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition, (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary pending such sale, provided such restrictions and conditions apply only to the Restricted Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to prohibitions, restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (v)(A) clause (a) of the foregoing shall not apply to customary provisions in leases or other contracts restricting the assignment thereof and (B) clause (b) of the foregoing shall not apply to customary provisions in leases or other contracts restricting the assignment thereof to the extent such provisions restrict the distribution of such lease or other contract, (vi) the foregoing shall not apply to prohibitions, restrictions or conditions applicable to any Person or the property or assets of a Person acquired by the Borrower or any of its Restricted Subsidiaries existing at the time of such acquisition and not incurred in connection with or in contemplation of such acquisition, which restriction or condition is not applicable to any Person or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired and any amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacements or refinancings thereof, provided that the restrictions and conditions in any such amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacement or refinancings are no more restrictive, taken as a whole, than those in effect on the date of the acquisition, (vii) the foregoing shall not apply to prohibitions, restrictions or conditions on cash or other deposits or net worth imposed by customers or required by insurance, surety or bonding companies, in each case, under contracts entered into in the ordinary course of business, (viii) the foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness, provided that the terms of any such restrictions

92

or conditions are not materially less favorable, taken as a whole, as determined by the Borrower in good faith, to the Lenders than the restrictions or conditions contained in the predecessor agreements and (ix) the foregoing shall not apply to customary provisions in joint venture agreements, limited liability company agreements of joint ventures and other similar agreements.

SECTION 6.11. <u>Fiscal Year.</u> The Borrower shall not change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

SECTION 6.12. <u>Amendment of Material Documents.</u> The Borrower will not, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under (i) any Senior Unsecured Note Document or (ii) its certificate of incorporation, by-laws or other organizational documents, if, taken as a whole, such amendment, modification or waiver is materially adverse to the interests of the Lenders. The Borrower will not, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under any Core Verizon Agreement, if such amendment, modification or waiver would reasonably be expected to have a material adverse effect on the ability of the Borrower to perform its principal obligations under the Loan Documents.

SECTION 6.13. <u>Leverage Ratio.</u> The Borrower will not permit the Leverage Ratio to exceed 7.25 to 1.00 as of the last day of any fiscal quarter of the Borrower.

SECTION 6.14. <u>Designation of Unrestricted Subsidiaries.</u> (a) The Borrower may not at any time designate any Restricted Subsidiary in existence on the Effective Date as an Unrestricted Subsidiary. The Borrower may after the Effective Date designate any newly formed or acquired subsidiary as an Unrestricted Subsidiary under this Agreement if on the date of such designation:

(i) such subsidiary does not own any Equity Interests of any Restricted Subsidiary;

(ii) no Event of Default shall have occurred and be continuing at the time of or after giving effect to such designation;

(iii) after giving effect to such designation and any related Investment to be made in such designated Subsidiary by the Borrower or any Restricted Subsidiary (which shall in any event include any existing Investment in such Person at the time it is designated as an Unrestricted Subsidiary), any such existing Investment and related Investment would comply with Section 6.04;

(iv) the Borrower has delivered to the Administrative Agent (A) written notice of such designation and (B) a certificate, dated the effective date of such designation, of a Financial Officer stating that no Event of Default has occurred and is continuing and setting forth reasonably detailed calculations demonstrating that the Borrower is in Pro Forma Compliance as of such date.

93

(b) The Borrower may at any time designate an Unrestricted Subsidiary as a Restricted Subsidiary if (i) no Event of Default shall have occurred and be continuing at the time of or after giving effect to such designation, (ii) after giving effect to such designation, the Borrower is in Pro Forma Compliance and (iii) the Borrower has delivered to the Administrative Agent (A) written notice of such designation and (B) a certificate, dated the effective date of such designation, of a Financial Officer stating that no Event of Default has occurred and is continuing and setting forth reasonably detailed calculations demonstrating Pro Forma Compliance as of such date.

(c) Notwithstanding the foregoing, no Subsidiary may be designated an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for purposes of the Senior Unsecured Notes or any Permitted Additional Debt. Each designation of an Unrestricted Subsidiary as a Restricted Subsidiary shall be irrevocable, and any such designated Restricted Subsidiary may not thereafter become an Unrestricted Subsidiary.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

(a) the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c) any representation or warranty made or deemed made by or on behalf of the Borrower or any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.04 (with respect to the existence of the Borrower), 5.11 or in Article VI;

(e) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue

94

unremedied for a period of 30 days after written notice thereof from the Administrative Agent to the Borrower (which notice will promptly be given at the request of any Lender);

(f) the Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period specified in the agreement or instrument governing such Indebtedness);

(g) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity and all applicable notices specified in the agreement or instrument evidencing such Indebtedness shall have been given and any applicable grace period specified in the agreement or instrument evidencing such Indebtedness shall have expired; provided that this clause (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale, transfer or other disposition of the property or assets securing such Indebtedness and (ii) Indebtedness that by its terms becomes due or is required to be repurchased as a result of changes in tax laws, regulations or the interpretation or application thereof;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Material Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Material Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

95

(j) one or more judgments for the payment of money in an aggregate amount in excess of $50,000,000 (net of amounts covered by insurance, provided that the insurance carriers have been notified of such judgment and have not contested liability therefor) shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(k) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

(l) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and, except to the extent otherwise permitted under the Collateral Agreement or any other relevant Security Document, perfected Lien on any Collateral having, in the aggregate, a value in excess of $50,000,000, with the priority required by the applicable Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreement or to file Uniform Commercial Code continuation statements;

(m) a Change in Control shall occur;

(n) any Guarantee under the Collateral Agreement (other than the Guarantee of an Insignificant Subsidiary) for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall assert in writing that the Collateral Agreement or any Guarantee thereunder has ceased to be or is not enforceable; or

(o) the material breach of or material loss of rights under any Core Verizon Agreement that has resulted in a material adverse effect on the business, operations, assets or financial condition of the Borrower and the Subsidiaries, taken as a whole;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may with the consent of the Required Lenders, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole or in part, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and

96

all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

ARTICLE VIII

The Agent

Each of the Lenders and each Issuing Bank hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity (other than as Agent). The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or wilful misconduct. The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or

97

App. - 000102

conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon other than as a result of its gross negligence or wilful misconduct. The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts other than as a result of its gross negligence or wilful misconduct.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent in the exercise of its reasonable judgment. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Subject to the appointment and acceptance of a successor to the Agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders, the Issuing Banks and the Borrower. Upon any such resignation, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed and such consent not to be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing), to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, with the consent of the Borrower (such consent shall not be unreasonably withheld or delayed and such consent shall not be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing), on behalf of the Lenders and the Issuing Bank, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Agent and Collateral Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing between the Borrower and such successor. After any Agent's resignation hereunder, the provisions of this Article and Section 9.03

98

shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Each Lender and Issuing Bank acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and Issuing Bank also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

Neither the joint lead arrangers, the syndication agent nor the co-documentation agents listed on the cover page to this Agreement shall have any duties or responsibilities hereunder in their capacities as such.

ARTICLE IX

Miscellaneous

SECTION 9.01. Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i) if to the Borrower, to it at Idearc Inc., 2200 West Airfield Drive, DFW Airport, TX 75261, Attention of William G. Mundy (Telecopy No. (972) 453-6829);

(ii) if to the Agent, to JPMorgan Chase Bank, N.A., Attention of James DeLeon (Telecopy No. (713) 750-2666), with a copy to James Stone (Telecopy No. (212) 270-4584);

(iii) if to the Swingline Lender, to JPMorgan Chase Bank, N.A., James DeLeon (Telecopy No. (713) 750-2666), with a copy to James Stone (Telecopy No. (212) 270-4584); and

(iv) if to any other Lender or to any Issuing Bank, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b) Notices and other communications to the Lenders and the Issuing Banks hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent and the Borrower; provided that the

99

App. - 000104

foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

(c) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02. <u>Waivers; Amendments.</u> (a) No failure or delay by the Agent, any Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent, the Issuing Banks and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default at the time.

(b) Except as otherwise provided in Sections 2.20 and 2.21, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; <u>provided</u> that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or LC Disbursement held by any Lender or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of such Lender, (iii) postpone the maturity of any Lender's Loan, or any scheduled date of payment of the principal amount of any Lender's Term Loans under Section 2.10, or the required date of reimbursement of any LC Disbursement held by any Lender, or any date for the payment of any interest or fees payable to any Lender hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of such Lender (it being understood that the waiver of any mandatory prepayment of Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest), (iv) change Section 2.18(b) or (c) in a manner that

100

would alter the *pro rata* sharing of payments required thereby or change the last sentence of Section 2.08(c) in a manner which would alter the *pro rata* reduction of Commitments thereby, without the written consent of each Lender adversely affected thereby (it being understood that an amendment shall not be deemed to change such provisions in such manner to the extent it effects an increase in the commitments of any Lender or in the aggregate amount of commitment of any Class), (v) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights hereunder or thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be) (it being understood that an amendment shall not be deemed to change such provisions in such manner to the extent it effects an increase in the commitments of any Lender or in the aggregate amount of commitments of any Class), (vi) release any Subsidiary Loan Party that is a Material Subsidiary from its Guarantee under the Collateral Agreement (except as expressly provided herein or in the Collateral Agreement), or limit its liability in respect of such Guarantee, without the written consent of each Lender, (vii) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender, (viii) change any provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to, or the Collateral benefiting, Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each affected Class (it being understood that this clause (viii) shall not apply to any provision of this Agreement not involving the rights in respect of payments due to, or Collateral benefiting, any Lender, including any amendment, modification or waiver of any representation or warranty, covenant, mandatory prepayment event or Event of Default) or (ix) limit the rights of the Tranche B Lenders to decline Offers to Repay as provided in Section 2.11, without the written consent of Tranche B Lenders holding a majority of the outstanding Tranche B Loans; provided, further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent, any Issuing Bank or the Swingline Lender without the prior written consent of the Agent, such Issuing Bank or the Swingline Lender, as the case may be, and (B) notwithstanding anything in this Section to the contrary, any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of the Lenders of one or more Classes (but not the Lenders of one or more other Classes) may be effected by an agreement or agreements in writing entered into by the Borrower and requisite percentage in interest of the affected Class or Classes of Lenders that would be required to consent thereto under this Section if such Class or Classes of Lenders were the only Class or Classes of Lenders hereunder at the time. Notwithstanding the foregoing, no condition set forth in Section 4.02 shall be waived without the written consent of the Administrative Agent and Revolving Lenders holding a majority of the Revolving Commitments. Subject to the immediately preceding sentence, but notwithstanding the other provisions of this paragraph, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Agent (and, if their rights or obligations are affected thereby, the Issuing Banks and the

101

Swingline Lender) if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under the Loan Documents. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have the right to approve or disapprove any waiver, amendment or other modification to any Loan Document, except for waivers, amendments or other modifications that relate to any of the matters described in the provisos to this Section 9.02(b).

SECTION 9.03. Expenses; Indemnity; Damage Waiver. (a) The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent, the joint lead arrangers listed on the cover page of this Agreement and their Affiliates, including the reasonable fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent, such joint arrangers and such Affiliates and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and whose retention has been approved in writing by the Borrower, in connection with the structuring, arrangement and syndication of the credit facilities provided herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Agent, any Issuing Bank or any Lender (including the reasonable fees, charges and disbursements of counsel) in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit, provided that the Borrower shall not be required to pay out of pocket expense incurred in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and the preparation and the administration of the Loan Documents to the extent such expenses are attributable to the Loans made by the Initial Lender on the Effective Date.

(b) The Borrower shall indemnify the Agent, each Issuing Bank, each Lender, each joint lead arranger listed on the cover page of this Agreement and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of counsel for any Indemnitee, incurred by or asserted against any Indemnitee (excluding Taxes, which are governed by Section 2.17) arising out of, in connection with, or as a result of (i) the structuring, arrangement, and syndication of the credit facilities provided for herein, (ii) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their obligations thereunder or the consummation of the Spin-Off and the Financing Transactions described in clause (a) of the definition of Financing Transactions, (iii) any Loan or Letter of Credit or the use of the proceeds

102

App. - 000107

therefrom (including any refusal by an Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iv) any actual or alleged presence or Release of Hazardous Materials on or from any Mortgaged Property or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether such claim, litigation, investigation or proceeding is brought by a third party or the Borrower or any of its Affiliates and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent (i) that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or wilful misconduct of, or breach of its obligations under this Agreement or any other Loan Document by, such Indemnitee or any of its Related Parties or (ii) not resulting from the breach of a representation or warranty, the non-compliance with an obligation, or a wrongful or negligent act or omission, by the Borrower or any of its Affiliates and brought by any Indemnitee against one or more other Indemnitees.

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to the Agent, an Issuing Bank or the Swingline Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Agent, such Issuing Bank or the Swingline Lender, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent, the Issuing Bank or the Swingline Lender in its capacity as such. For purposes hereof, a Lender's "*pro rata share*" shall be determined based upon its share of the sum of the total Revolving Exposures, outstanding Term Loans and unused Commitments at the time.

(d) No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the wrongful use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent arising from the bad faith, gross negligence or wilful misconduct of such Indemnitee or any of its Related Parties, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Effective Date).

(e) All amounts due under this Section shall be payable not later than 15 Business Days after written demand therefor, together with an invoice setting forth in reasonable detail such amounts and the basis therefor.

103

SECTION 9.04. <u>Successors and Assigns.</u> (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby (including any Affiliate of an Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their successors and assigns permitted hereby (including any Affiliate of an Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, each Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in paragraph (b)(ii) below and applicable law, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A) the Borrower, <u>provided</u> that no consent of the Borrower shall be required (x) for an assignment by a Revolving Lender to an existing Revolving Lender or an assignment of Term Loans to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below), (y) for an assignment by the Initial Lender or, (z) if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing, to any assignee; and

(B) the Administrative Agent (and, in the case of an assignment of all or a portion of any Lender's obligations in respect of its LC Exposure, each Principal Issuing Bank), <u>provided</u> that no consent of the Administrative Agent or an Issuing Bank, as the case may be, shall be required for an assignment of Term Loans to an assignee that is a Lender immediately prior to giving effect to such assignment, an Affiliate of a Lender or an Approved Fund.

(ii) Assignments shall be subject to the following conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 in the case of

104

Revolving Loans or Revolving Commitments and $1,000,000 in the case of Term Loans, unless each of the Borrower and the Administrative Agent expressly consent to the assignment of a lesser amount, provided that (i) no such consent of the Borrower shall be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing and (ii) the principal amount of concurrent assignments to related Approved Funds shall be aggregated for purposes of determining compliance with the foregoing minimum assignment amounts.

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than an natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) any entity or an Affiliate of an entity that administers or manages a Lender.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled

105

to the benefits of Sections 2.15, 2.16, 2.17 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time, which register shall indicate that each lender is entitled to interest paid with respect to such Loans and LC Disbursements (the "Register"). Absent demonstrable error, the entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, each Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, each Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i) Any Lender may, without the consent of, or notice to, the Borrower, the Administrative Agent, the Issuing Bank or the Swingline Lender, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and

106

App. - 000111

2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.17 (e) as though it were a Lender.

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05. Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof

107

and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07. <u>Severability.</u> Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08. <u>Right of Setoff.</u> If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender (other than deposits held in a custodial, trust or fiduciary capacity), irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09. <u>Governing Law; Jurisdiction; Consent to Service of Process.</u> (a) This Agreement shall be construed and enforced in accordance with and governed by the law of the State of New York without giving effect to its principles or rules of conflicts of laws to the extent that the same are not mandatorily applicable by statute and by the application of the laws of another jurisdiction would be required thereby.

(b) Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any

108

App. - 000113

other Loan Document shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any other party or its properties in the courts of any jurisdiction.

(c) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10. <u>WAIVER OF JURY TRIAL.</u> EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11. <u>Headings.</u> Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12. <u>Confidentiality.</u> Each of the Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' trustees, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or

109

any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement for the benefit of the Borrower containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any pledgee referred to in Section 9.04(d) or (iii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower (other than a source actually known by such party to be bound by confidentiality obligations). For the purposes of this Section, "Information" means all information received from the Borrower or its Related Parties relating to the Borrower, its Subsidiaries or its business, other than any such information that is available to the Agent, any Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower (other than a source actually known by such party to be bound by confidentiality obligations). Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord other its own confidential information.

Each Lender acknowledges that Information furnished to it pursuant to this Agreement may include material non-public information concerning the Borrower and its Related Parties or its or their securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with the procedures and applicable law, including Federal, State and foreign securities laws.

All Information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and the Subsidiaries and its and their Related Parties or securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal, State and foreign securities laws.

SECTION 9.13. U.S.A. PATRIOT Act. The Administrative Agent, each Lender and each Issuing Bank hereby notifies the Borrower, for itself and its Subsidiaries, that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow the Administrative Agent, such Lender and such Issuing Bank to identify the Loan Parties in accordance with the Act.

110

App. - 000115

SECTION 9.14. <u>Termination or Release.</u> (a) At such time as the Loans, the Borrower's obligations to reimburse the Issuing Banks pursuant to Section 2.05(e) for LC Disbursements, all accrued interest and fees under this Agreement, and all other obligations under the Loan Documents then due and payable (other than (i) obligations under Sections 2.15, 2.17 and 9.03 that are not then due and payable and (ii) obligations in respect of outstanding Letters of Credit) shall have been paid in full in cash, the Commitments have been terminated and all Letters of Credit shall have been discharged, cash collateralized in an amount not to exceed 100% of the stated amount of such Letter of Credit or other arrangements made to the reasonable satisfaction of the Administrative Agent and the Issuing Bank thereof (each of which shall have confirmed such satisfaction by written notice to the Borrower), the Collateral shall be released from the Liens created by the Security Documents, and the obligations (other than those expressly stated to survive termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b) A Subsidiary Loan Party shall automatically be released from its obligations under the Collateral Agreement and any other Loan Document and the security interests in the Collateral of such Subsidiary Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary of the Borrower.

(c) Upon any sale or other transfer by any Loan Party of any Collateral that is permitted under this Agreement to any Person that is not a Loan Party, or upon the effectiveness of any written consent to the release of the security interest granted by the Collateral Agreement in any Collateral pursuant to Section 9.02 of this Agreement, the security interest in such Collateral shall be automatically released.

(d) In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 9.14, the Collateral Agent shall execute and deliver to any Loan Party at such Loan Party's expense all documents that such Loan Party shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 9.14 shall be without recourse to or warranty by the Collateral Agent or any Lender.

SECTION 9.15. <u>No Fiduciary Relationship.</u> The Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the Financing Transactions described in clause (a) of the definition thereof occurring on or prior to the Effective Date and the exercise of their rights and the performance of their obligations under the Loan Documents, the Borrower and the Subsidiaries, on the one hand, and the Administrative Agent, the Arrangers, the Lenders, the Issuing Banks and their Affiliates (each acting in their capacity as Administrative Agent, Arranger, Lender or Issuing Bank hereunder), on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Arrangers, the Lenders or the Issuing Banks, and no such duty will be deemed to have arisen in connection therewith.

111

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers or representatives as of the day and year first above written.

IDEARC INC.,

by /s/ Andrew Coticchio
Name: Andrew Coticchio
Title: Chief Financial Officer and Treasurer

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent

by /s/ Thomas H. Kozlark
Name: Thomas H. Kozlark
Title: Vice President

App. - 000117

# EXHIBIT 2

# IDEARC INC.

## FORM 10-12B/A
(Amended Registration Statement)

## Filed 11/1/2006

| Address | 2200 WEST AIRFIELD DRIVE |
| --- | --- |
| | DFW AIRPORT, Texas 75261 |
| Telephone | (972) 453-7000 |
| CIK | 0001367396 |
| Industry | Not Assigned |
| Fiscal Year | 12/31 |



http://www.edgar-online.com/
© Copyright 2006.  All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

File No. 001-32939

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# AMENDMENT NO. 6
### TO
# FORM 10

### GENERAL FORM FOR REGISTRATION OF SECURITIES
#### Pursuant to Section 12(b) or 12(g) of
#### The Securities Exchange Act of 1934

---

# IDEARC INC. *
##### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **20-5095175** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| | |
| **2200 West Airfield Drive** | |
| **DFW Airport, TX** | **75261** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(972) 453-7000**
**(Registrant's telephone number, including area code)**

---

*Copies to:*

| | |
|---|---|
| **Katherine J. Harless** | **Jeffrey J. Rosen, Esq.** |
| **President** | **Steven J. Slutzky, Esq.** |
| **Idearc Inc.** | **Debevoise & Plimpton LLP** |
| **2200 West Airfield Drive** | **919 Third Avenue** |
| **DFW Airport, TX 75261** | **New York, New York 10022** |
| **(972) 453-7000** | **(212) 909-6000** |

---

**Securities to be registered pursuant to Section 12(b) of the Act:**

| Title of each class to be registered | Name of each exchange on which each class is to be registered |
|---|---|
| Common Stock, par value $0.01 per share | The New York Stock Exchange, Inc. |

**Securities to be registered pursuant to Section 12(g) of the Act:**
**None**

---

\* The registrant was formerly named Verizon Directories Disposition Corporation. Effective as of October 18, 2006, the registrant changed its name to Idearc Inc.

**INFORMATION REQUIRED IN REGISTRATION STATEMENT**

**CROSS-REFERENCE SHEET BETWEEN INFORMATION STATEMENT AND ITEMS OF FORM 10**

This Amendment No. 6 to the Registration Statement on Form 10 (the "Form 10") incorporates by reference information contained in the information statement filed as Exhibit 99.1 hereto (the "Information Statement"). The cross-reference table below identifies where the items required by Form 10 can be found in the Information Statement.

| Item No. | Item Caption | Location in Information Statement |
|---|---|---|
| 1. | Business | See "Summary," "Risk Factors," Cautionary Statement Regarding Forward-Looking Statements," "The Spin-Off," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Industry," "Our Business" and "Relationship Between Verizon and Our Company After the Spin-Off." |
| 1A. | Risk Factors | See "Risk Factors." |
| 2. | Financial Information | See "Summary," "Selected Financial Information," "Pro Forma Financial Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." |
| 3. | Properties | See "Our Business—Properties." |
| 4. | Security Ownership of Certain Beneficial Owners and Management | See "Security Ownership of Certain Beneficial Owners." |
| 5. | Directors and Executive Officers | See "Management." |
| 6. | Executive Compensation | See "The Spin-Off—Treatment of Stock Options and Other Stock-Based Awards," "Management" and "Relationship Between Verizon and Our Company After the Spin-Off—Employee Matters Agreement." |
| 7. | Certain Relationships and Related Transactions | See "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Management" and "Relationship Between Verizon and Our Company After the Spin-Off." |
| 8. | Legal Proceedings | See "Our Business—Legal Proceedings." |
| 9. | Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matters | See "Summary," "The Spin-Off," "Capitalization," "Dividend Policy" and "Description of Our Capital Stock." |
| 10. | Recent Sales of Unregistered Securities | See "Description of Our Capital Stock—Sales of Unregistered Securities." |
| 11. | Description of Registrant's Securities to be Registered | See "The Spin-Off," "Dividend Policy" and "Description of Our Capital Stock." |
| 12. | Indemnification of Directors and Officers | See "Indemnification of Directors and Officers." |
| 13. | Financial Statements and Supplementary Data | See "Pro Forma Financial Information" and "Index to Financial Statements" and the statements referenced thereon. |
| 14. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | Not applicable. |

1

**Item 15.      Financial Statements and Exhibits.**

**(a) Financial Statements**

The following financial statements are included in the Information Statement as filed as part of this Registration Statement.

Report of Ernst & Young LLP, Independent Registered Public Accounting Firm
Statements of Income for the years ended December 31, 2005, 2004 and 2003
Balance Sheets as of December 31, 2005 and 2004
Statements of Parent's equity for the years ended December 31, 2005, 2004 and 2003
Statements of Cash Flows for the years ended December 31, 2005, 2004 and 2003
Notes to Financial Statements

Unaudited Interim Financial Statements:
Statements of Income for the nine months ended September 30, 2006 and 2005
Balance Sheets as of September 30, 2006 and December 31, 2005
Statements of Cash Flows for the nine months ended September 30, 2006 and 2005
Notes to Financial Statements (Unaudited)

Financial Statement Schedule:
     Schedule II—Valuation and Qualifying Accounts for three years ended December 31, 2005, 2004 and 2003

**(b) Exhibits**

The following exhibits are filed herewith unless otherwise indicated:

| Exhibit Number | Description |
| --- | --- |
| 3.1* | Amended and Restated Certificate of Incorporation of the Registrant |
| 3.2* | Amended and Restated Bylaws of the Registrant |
| 10.1* | Form of Distribution Agreement |
| 10.2* | Form of Transition Services Agreement |
| 10.3* | Form of Publishing Agreement |
| 10.4* | Form of Non-Competition Agreement |
| 10.5* | Form of Branding Agreement |
| 10.6* | Form of Listings License Agreement |
| 10.7* | Form of Billing Services Agreement |
| 10.8* | Form of Intellectual Property Agreement |
| 10.9* | Form of Tax Sharing Agreement |
| 10.10* | Form of Employee Matters Agreement |
| 10.11* | 2002 Employment Agreement of Katherine J. Harless |
| 10.12* | Form of Indemnification Agreement |
| 21.1 | Subsidiaries of the Registrant |
| 99.1 | Information Statement |

*  Previously filed.

2

**SIGNATURES**

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the registrant has duly caused this Amendment No. 6 to the registration statement to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: November 1, 2006

IDEARC INC.

By:   / S / K ATHERINE J. H ARLESS

Name:     Katherine J. Harless

Title:     President

3

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 3.1* | Amended and Restated Certificate of Incorporation of the Registrant |
| 3.2* | Amended and Restated Bylaws of the Registrant |
| 10.1* | Form of Distribution Agreement |
| 10.2* | Form of Transition Services Agreement |
| 10.3* | Form of Publishing Agreement |
| 10.4* | Form of Non-Competition Agreement |
| 10.5* | Form of Branding Agreement |
| 10.6* | Form of Listings License Agreement |
| 10.7* | Form of Billing Services Agreement |
| 10.8* | Form of Intellectual Property Agreement |
| 10.9* | Form of Tax Sharing Agreement |
| 10.10* | Form of Employee Matters Agreement |
| 10.11* | 2002 Employment Agreement of Katherine J. Harless |
| 10.12* | Form of Indemnification Agreement |
| 21.1 | Subsidiaries of the Registrant |
| 99.1 | Information Statement |

\* Previously filed.

Exhibit 21.1

**Idearc Inc.**

The following is a list of entities expected to be subsidiaries of Idearc Inc. upon the effectiveness of the spin-off, along with each entity's place of incorporation or organization.

| Name of Subsidiary | Jurisdiction of Formation |
| --- | --- |
| Idearc Information Services Inc.* | Delaware |
| Idearc Media Corp. | Delaware |
| Idearc Media Services – East Inc. | Delaware |
| Idearc Media Services – West Inc. | Delaware |
| Idearc Media Sales – West Inc. | Delaware |
| Idearc Media Sales East LLC | Delaware |
| Idearc Media Sales – East Co. | Maryland |
| License Application Corporation** | Delaware |
| Second License Application Corporation** | Delaware |
| VIS Inceptor, LTD** | United Kingdom |

\*     In connection with the spin-off, this entity will be converted into a limited liability company.
\*\*     In connection with the spin-off, each of these subsidiaries is expected to be renamed.

**Exhibit 99.1**

**Ivan Seidenberg**
Chairman and Chief Executive Officer



**Verizon Communications Inc.**
140 West Street
New York, New York 10007

November 1, 2006

To Our Stockholders:

I am pleased to inform you that the board of directors of Verizon Communications Inc., which we refer to as Verizon, has approved the spin-off of the companies that comprise our domestic print and Internet yellow pages directories publishing operations. In connection with the spin-off, Verizon will transfer to Idearc Inc., which we refer to as Idearc, all of its ownership interest in Idearc Information Services Inc., which will be converted into a limited liability company, and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations. Idearc is a newly-formed corporation. The spin-off will be completed by making a pro rata distribution to Verizon stockholders of all of the outstanding shares of common stock of Idearc. The distribution will take place on or about November 17, 2006. In the distribution, each Verizon stockholder will receive one share of Idearc common stock for every 20 shares of Verizon common stock held as of 5:00 p.m., Eastern Time, on November 1, 2006. Idearc common stock is expected to be listed on the New York Stock Exchange under the symbol "IAR."

The spin-off will separate our current business into two distinct companies with independent ownership and management. We believe that this will provide an opportunity for Verizon stockholders to enhance the value of their investment by allowing each of Verizon and Idearc to separately focus on maximizing opportunities for its distinct business. In addition, we believe that the two companies, each with its own financial characteristics, may appeal to different types of investors.

As a stockholder of Verizon common stock on the record date for the distribution, you will automatically receive shares of Idearc common stock unless you sell your Verizon shares before the distribution date in the "regular way" market as described in the enclosed information statement. However, if you own fewer than 20 shares of Verizon common stock, you will receive a cash payment in lieu of a fractional share. You do not need to take any action or pay any consideration to receive the shares of Idearc in the distribution. Please do not send us certificates representing your shares of Verizon common stock.

We have received a private letter ruling from the Internal Revenue Service that, for United States Federal income tax purposes, the distribution of Idearc common stock to Verizon stockholders will qualify as a tax-free distribution. However, any cash that you receive in lieu of any fractional share of Idearc common stock to which you may be entitled generally will be taxable to you. It is a condition to completing the spin-off that we receive a favorable opinion of counsel confirming the spin-off's tax-free status.

I encourage you to read the enclosed information statement, which is being provided to all Verizon stockholders on the record date for the distribution. It describes the spin-off in detail, including the conditions to the spin-off, and contains important business and financial information about Idearc.

We remain committed to working on behalf of our stockholders to build long-term value. We appreciate your interest and continued support.

Sincerely,

*Ivan Seidenberg*

App. - 000125

**Table of Contents**



**Idearc Inc.**
**2200 West Airfield Drive**
**DFW Airport, TX 75261**

November 1, 2006

Dear Stockholder:

We are very pleased to welcome you as a stockholder of Idearc Inc., which is expected to become an independent company following receipt of all required approvals related to its spin-off from Verizon Communications Inc., which we refer to as Verizon, on or about November 17, 2006. Idearc Inc. will consist primarily of assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations that are currently reported in Verizon's Information Services segment in its financial statements.

Our strategy is to continue to connect our advertising customers with buyers through a variety of cost-effective products that include print and Internet yellow pages directories. Our products include: print yellow pages; print white pages; an Internet yellow pages directory, SuperPages.com ® ; and an information directory for wireless subscribers, SuperPages ® Mobile. We will continue to be the exclusive official publisher of Verizon print directories in the markets in which Verizon is currently the incumbent local exchange carrier.

We believe that our independence will allow us to more effectively focus on meeting our financial and business objectives and provides an opportunity to deliver more value to you as a stockholder than we could as a subsidiary of Verizon. The Idearc Inc. shares are expected to be listed on the New York Stock Exchange under the symbol "IAR".

I encourage you to learn more about Idearc Inc. and the objectives we will pursue as an independent public company by reading the enclosed information statement. It describes the spin-off in detail, including the conditions to the spin-off. We look forward to your support and participation as a stockholder of Idearc Inc.

Sincerely,

Katherine J. Harless
President

Table of Contents

**INFORMATION STATEMENT**



# Idearc Inc.

## Common Stock

We are currently a subsidiary of Verizon Communications Inc., which we refer to as Verizon. Verizon has decided to spin off its domestic print and Internet yellow pages directories publishing operations by distributing all of our common stock to its stockholders as a tax-free dividend, except that you will be taxed on any cash that you receive in lieu of any fractional shares of our common stock to which you are entitled. At the distribution date, our assets, liabilities, businesses and employees will consist of those currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations and are currently reported in Verizon's Information Services segment in its financial statements. After the distribution, you will own shares of both companies.

For every 20 shares of Verizon common stock, par value $0.10 per share, which we refer to as the Verizon common stock, that you hold as of 5:00 p.m., Eastern Time, on November 1, 2006, the record date for the distribution, you will receive one share of our common stock, par value $0.01 per share, which we refer to as the Idearc common stock or our common stock. For United States Federal income tax purposes, the distribution of our common stock is not expected to be taxable. You will receive cash instead of any fractional share of our common stock to which you are entitled, and that cash will generally be taxable to you. We expect Verizon to distribute shares of our common stock to its stockholders on or about November 17, 2006. As discussed more fully in this information statement, if you sell shares of Verizon common stock in the "regular way" market, and the sale of the shares settles before the distribution date, you will be selling your right to receive shares of Idearc common stock in the distribution. See "The Spin-Off—Trading Between the Record Date and Distribution Date."

Verizon stockholders are not being requested to vote on the spin-off and you do not have to take any other action in order to receive shares of Idearc common stock. You will not be required to pay anything for the Idearc shares or to surrender any of your shares of Verizon common stock. **We are not asking you for a proxy. Please do not send us a proxy or your stock certificates.**

Until the shares of Idearc common stock begin trading on a "when issued" basis on or about November 6, 2006, there will be no market for trading its common stock. We expect to list Idearc common stock on the New York Stock Exchange, under the symbol "IAR".

**In reviewing this information statement, you should carefully consider the matters described under the caption " Risk Factors " beginning on page 14.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined if this information statement is truthful or complete. Any representation to the contrary is a criminal offense.

This information statement does not constitute an offer to sell or the solicitation of an offer to buy any securities.

**The date of this information statement is November 1, 2006.**

Table of Contents

# Table of Contents

| | Page |
|---|---|
| Questions and Answers About the Spin-Off | 1 |
| Summary | 5 |
| Risk Factors | 14 |
| Cautionary Statement Regarding Forward-Looking Statements | 29 |
| The Spin-Off | 31 |
| Dividend Policy | 38 |
| Capitalization | 39 |
| Selected Financial Information | 40 |
| Pro Forma Financial Information | 41 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 49 |
| Industry | 65 |
| Our Business | 68 |
| Management | 88 |
| Security Ownership of Certain Beneficial Owners | 102 |
| Relationship Between Verizon and Our Company After the Spin-Off | 103 |
| Description of Our Capital Stock | 112 |
| Description of Certain Indebtedness | 114 |
| Shares Eligible for Future Sale | 118 |
| Indemnification of Directors and Officers | 119 |
| Where You Can Find More Information | 120 |
| Index to Financial Statements | F-1 |

*This information statement is being furnished solely to provide information to Verizon stockholders who will receive shares of our common stock in the distribution. It is not and is not to be construed as an inducement or encouragement to buy or sell any of our securities or any securities of Verizon. This information statement describes our business, the relationship between Verizon and us, and how the spin-off affects Verizon and its stockholders, and provides other information to assist you in evaluating the benefits and risks of holding or disposing of our common stock that you will receive in the distribution. You should be aware of certain risks relating to the spin-off, our business and ownership of our common stock, which are described under the heading "Risk Factors."*

*You should not assume that the information contained in this information statement is accurate as of any date other than the date on the cover. Changes to the information contained in this information statement may occur after that date, and we undertake no obligation to update the information, except in the normal course of our public disclosure obligations and practices.*

*The information statement refers to the following trademarks: Verizon ®, Idearc ™, Idearc Media ™, the Idearc logo, the Idearc Media logo, SuperPages.com ® and SuperPages ®.*

i

Table of Contents

## QUESTIONS AND ANSWERS ABOUT THE SPIN-OFF

**Q:  Why am I receiving this document?**

A:   Verizon is delivering this document to you because you were a holder of Verizon common stock on the record date for the distribution of our shares of common stock. Accordingly, you are entitled to receive one share of our common stock for every 20 shares of Verizon common stock that you held on the record date at 5:00 p.m., Eastern Time. No action is required for you to participate in the distribution. The distribution will take place on or about November 17, 2006.

**Q:  What will happen in the spin-off?**

A:   Verizon will transfer to Idearc Inc., or Idearc, all of its ownership interest in Idearc Information Services Inc., or Idearc Information Services, which will be converted into a limited liability company prior to the contribution, and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations (which we refer to collectively as the contribution). In exchange for the contribution, Idearc will:

- issue to Verizon additional shares of Idearc common stock to be distributed to Verizon's stockholders pro rata in the spin-off, which we refer to as the distribution;

- issue to Verizon senior unsecured notes and a portion of the loans under the tranche B facility, which we collectively refer to as the Idearc debt obligations; and

- transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

We expect that Verizon will seek to exchange the Idearc debt obligations for certain outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness. Assuming Verizon and its creditors consummate the exchange, we expect Verizon's creditors to immediately resell the Idearc debt obligations. See "Description of Certain Indebtedness".

After the contribution, Verizon will spinoff Idearc to the stockholders of Verizon by distributing all its shares of Idearc common stock to Verizon stockholders on a pro rata basis.

As a result of the spin-off, Idearc will become an independent public company, although Idearc will continue to have a number of significant commercial arrangements with Verizon. Idearc common stock is expected to be listed on the New York Stock Exchange under the symbol "IAR".

**Q:  What is Idearc and why is Verizon separating Idearc's operations and distributing its stock?**

A:   Idearc will be an independent company that will operate the domestic print and Internet yellow pages directories publishing operations currently conducted by Verizon directly and indirectly through its subsidiaries, which is currently reported in Verizon's Information Services segment in its financial statements. The separation of Idearc from Verizon will result in two independent companies.

Verizon's board of directors considered potential benefits in making its determination to effect the spin-off. Among other things, Verizon's board of directors considered that the spin-off may:

- allow each company to separately focus on its core business, which may facilitate the potential expansion and growth of each of Verizon and Idearc;

- allow each company to determine its own capital structure;

- enhance Idearc's ability to execute a potential acquisition strategy more effectively; and

- permit Idearc to enhance the efficiency and effectiveness of equity-based compensation programs offered to its employees.

For a further explanation of the reasons for the spin-off and more information about our business, see "The Spin-Off—Reasons for the Spin-Off" and "Our Business."

1

Table of Contents

**Q:    What will Idearc's relationship be with Verizon after the spin-off?**

A:    We will be an independent public company. In connection with the spin-off, we expect to enter into certain agreements with Verizon to define the initial relationship between Verizon and us with respect to a number of services that will be provided. For example, pursuant to the terms of a publishing agreement, Verizon will name us the exclusive official publisher of Verizon print directories of wireline listings in markets where Verizon is the current incumbent local exchange carrier. The other agreements will define responsibility for obligations arising before and after the spin-off, including, among others, obligations relating to our employees, certain transition services and taxes.

We expect the commercial agreements between us and Verizon to include:

- a transition services agreement;
- a publishing agreement;
- a non-competition agreement;
- a branding agreement;
- a listings license agreement;
- a billing and collection agreement;
- an intellectual property agreement;
- a tax sharing agreement; and
- an employee matters agreement.

In addition, it is expected that we will continue to purchase wireless and wireline voice and data services from Verizon and its affiliates for approximately five years following the spin-off.

For additional information on our relationship with Verizon after the spin-off, see "Relationship Between Verizon and Our Company After the Spin-Off."

**Q:    What sort of challenges will Idearc face as an independent company?**

A:    We will continue to be a print and Internet yellow pages directories publisher and we will continue to face many of the same challenges that we have historically faced, including competition from independent directory publishers in certain markets and competition from search engines and portals on the Internet that provide classified directory information.

Furthermore, as an independent public company, we will incur capital and other costs associated with developing and implementing our own support functions. We will incur costs as a result of changes that we expect to occur in our structure, personnel needs, financing and operations. In addition, following the spin-off, we will have approximately $9,115 million of total indebtedness. See "Risk Factors—Risk Factors Relating to the Spin-Off" and "—Risk Factors Relating to Our Business."

**Q:    How will Idearc be managed?**

A:    Katherine J. Harless has been the President of our newly-formed corporation, Idearc, since June 2006. Ms. Harless currently serves as President and Chief Executive Officer of Idearc Information Services, a position she has held since 2000. Ms. Harless has over 33 years of experience in the telecommunications and directory publishing industries. Ms. Harless will be supported by an experienced management team that has an average of 25 years of experience in the telecommunications and directory publishing industries. Our initial board of directors will consist of five members, four of whom will be independent. See "Management."

2

**Table of Contents**

**Q:    How will my ownership in Verizon change as a result of the distribution?**

A:    The number of shares of Verizon common stock that you own will not change as a result of the distribution. After the distribution, you will also own shares of our common stock unless you receive only cash because you are entitled to receive a fractional share.

**Q:    What is the record date for the distribution?**

A:    The record date was November 1, 2006, and ownership was determined as of 5:00 p.m., Eastern Time, on that date. When we refer to the "record date," we are referring to that time and date.

**Q:    When will the distribution occur?**

A:    Shares of our common stock will be distributed on or about November 17, 2006. We refer to this date as the distribution date.

**Q:    What do I have to do to participate in the distribution?**

A:    Nothing. Stockholders of Verizon common stock on the record date are not required to pay any cash or deliver any other consideration, including any shares of Verizon common stock, for the shares of our common stock to be distributed to them.

**Q:    How will shares of Idearc common stock be distributed to me?**

A:    If you were a holder of shares of Verizon common stock on the record date, you will receive shares of our common stock in book-entry form. Record stockholders will receive additional information from the transfer agent of Idearc shortly after the distribution date. Beneficial holders will receive information from their brokerage firms or other nominees. See "The Spin-Off—When and How You Will Receive Our Common Stock."

**Q:    If I sell my shares of Verizon common stock before the distribution date, will I still be entitled to receive shares of Idearc common stock in the distribution with respect to the shares of Verizon common stock that I sold?**

A:    Beginning shortly after the record date and continuing until the distribution date, there will be two markets in Verizon common stock on the New York Stock Exchange: a "regular way" market and an "ex-distribution" market. If you own shares of Verizon common stock on the record date and sell those shares on the regular way market before the distribution date, you will also be selling your entitlement to the shares of Idearc common stock that would have been distributed to you and, therefore, you will not receive Idearc shares. If you sell shares on the ex-distribution market, you will not sell your entitlement to the shares of Idearc common stock and, therefore, you will receive Idearc shares even though you have sold your shares of Verizon common stock after the record date.

**Q:    How can I sell my Idearc shares after the distribution?**

A:    If you are a record holder of Idearc shares after the distribution date, you may request that the transfer agent either sell your book entry shares or send electronically all or a portion of your book entry shares to a broker for a sale.

If you hold your shares through a brokerage account, your book entry shares can be moved to or from your brokerage account electronically through the transfer agent's direct registration system. You should contact your broker for more information.

3

**Table of Contents**

**Q:    How will fractional shares be treated in the distribution?**

A:    Fractional shares of our common stock will not be issued. If you would be entitled to receive a fractional share of our common stock in the distribution, you will receive a cash payment instead of the fractional share. For an explanation of how the cash payments for fractional shares will be determined, see "The Spin-Off—Treatment of Fractional Shares."

**Q:    What are certain United States Federal income tax consequences to Verizon stockholders resulting from the spin-off?**

A:    Assuming that the spin-off qualifies as tax-free to Verizon, Idearc and Verizon stockholders for United States Federal income tax purposes under Section 355 and related provisions of the Internal Revenue Code of 1986, as amended, or the Code, Verizon stockholders will not recognize any gain or loss for United States Federal income tax purposes upon the receipt of shares of Idearc common stock in the spin-off, except for any gain or loss attributable to the receipt of cash in lieu of fractional shares of Idearc common stock. The spin-off is conditioned upon Verizon's receipt of a private letter ruling from the Internal Revenue Service, or the IRS, to the effect that the spin-off will qualify as tax-free to Verizon, Idearc and Verizon stockholders for United States Federal income tax purposes under Section 355 and related provisions of the Code. Verizon received this private letter ruling in September 2006. The spin-off is also conditioned upon the receipt by Verizon of an opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special tax counsel to Verizon, to the effect that the spin-off will similarly qualify as tax-free to Verizon, Idearc and Verizon stockholders under Section 355 and related provisions of the Code. Certain United States Federal income tax consequences of the spin-off are described in more detail under "The Spin-Off—Certain United States Federal Income Tax Consequences of the Spin-Off."

**Q:    How will Idearc common stock trade?**

A:    Idearc common stock is expected to be listed on the New York Stock Exchange under the symbol "IAR". On or about November 6, 2006, we expect that trading of shares of Idearc common stock will begin on a "when issued" basis. When issued trading refers to a sale or purchase made conditionally because the security has been authorized but has not yet been issued. We cannot predict the trading prices for Idearc common stock before or after the distribution date. See "The Spin-Off—Trading Before the Distribution Date."

**Q:    Do I have appraisal rights?**

A:    No. Holders of Verizon common stock have no appraisal rights in connection with the spin-off.

**Q:    Will Idearc pay dividends on its common stock?**

A:    We currently expect to pay dividends at an annual rate of approximately $1.37 per share, but only if and to the extent dividends are declared by our board of directors and permitted by applicable law and by the terms of our financing arrangements. Dividend payments are not guaranteed and our board of directors may decide, in its absolute discretion, not to pay dividends.

All decisions regarding the declaration and payment of dividends, including with respect to the initial dividend, will be at the discretion of our board of directors and will be evaluated from time to time in light of our financial condition, earnings, growth prospects, funding requirements, applicable law and other factors our board of directors deems relevant. See "Dividend Policy."

**Q:    Who is the transfer agent for Idearc common stock?**

A:    The transfer agent for Idearc common stock is Computershare Trust Company, N.A.

4

Table of Contents

# SUMMARY

*This summary highlights selected information contained in this information statement. We urge you to carefully read this information statement in its entirety. References in this information statement to "we," "us" or "our" are to Idearc and its subsidiaries.*

## Our Company

We are the second largest yellow pages directories publisher in the United States as measured by revenues, and we believe that we have the nation's leading Internet yellow pages directory. Our products include: print yellow pages; print white pages; an Internet yellow pages directory, SuperPages.com; and an information directory for wireless subscribers, SuperPages Mobile. Following the spin-off, our assets, liabilities, businesses and employees will consist of those currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations. We will continue to be the exclusive official publisher of Verizon print directories in the markets in which Verizon is currently the incumbent local exchange carrier, which we refer to as our incumbent markets. We will also continue to use the highly recognized Verizon brand on our print directories in our incumbent markets, as well as in our current markets in which Verizon is not the incumbent, which we refer to as our independent markets.

We, together with our predecessors, have over 125 years of experience in the print directory business and we believe that we have consistently held a leading market position in our incumbent markets. In 2005, we estimate that our print directories had an aggregate market share of approximately 72% in our top fifteen incumbent metropolitan statistical areas, as measured by revenues. In 2005, these markets accounted for approximately half of our revenues. We publish our directories in 358 markets in 35 states across the United States, providing a geographically diversified revenue base. In 2006, we expect to publish approximately 1,280 distinct directory titles, including 1,160 directory titles in our incumbent markets and 120 directory titles in our independent markets, and distribute approximately 136 million copies of these directories to businesses and residences in the United States. In addition, in 1996, we launched SuperPages.com, which includes approximately 17 million business listings and tens of millions of residential listings in the United States. In August 2006, SuperPages.com had approximately 18.4 million unique visitors and approximately 200 million searches. We believe that we have an opportunity to increase the revenues from our independent print and Internet yellow pages directories businesses over the next several years.

We generate our revenues primarily through the sale of print directory advertising. Approximately 90% of our revenues for fiscal year 2005 came from the sale of advertising in print yellow pages directories, and approximately 4% of our revenues came from the sale of advertising in print white pages directories. The remaining 6% came from SuperPages.com. For the year ended December 31, 2005, we generated revenues of $3,374 million and operating income of $1,641 million. For the nine month period ended September 30, 2006, on a pro forma basis to give effect to the spin-off and the related transactions, we generated revenues of approximately $2,420 million and operating income of approximately $1,100 million.

Our strategy is to continue to connect our advertising customers with buyers through a variety of cost-effective products that include print and Internet yellow pages directories and other complementary products. In order to execute our strategy, we will continue to rely on our core strengths, including our leading market position in our incumbent markets, our large, locally-based sales force, the highly recognized Verizon brand, our diverse and attractive markets, our leading position in the Internet yellow pages directory market and our product innovation.

We describe in this information statement the print and Internet yellow pages directories publishing operations to be contributed to us by Verizon in connection with the spin-off as if it were our business for all historical periods described. However, we are a newly-formed entity that will not independently conduct any

5

Table of Contents

operations before the spin-off. References in this document to our historical assets, liabilities, products, businesses, employees or activities generally refer to the historical assets, liabilities, products, businesses, employees or activities of the contributed businesses as they were conducted as part of Verizon and its subsidiaries before the spin-off. Our historical financial results as part of Verizon contained in this information statement may not be indicative of our financial results in the future as an independent company or reflect what our financial results would have been had we been an independent company during the periods presented.

In this information statement, references made to our print directories refer to print directories which consist primarily of wireline listings and classified advertisements directed primarily to telephone service customers in a given geographic area.

Our principal executive offices are located at 2200 West Airfield Drive, DFW Airport, TX 75261 and our main telephone number is (972) 453-7000. We were incorporated in Delaware in June 2006.

6

Table of Contents

**The Spin-off**

| | |
|---|---|
| ***Assets, Liabilities and Directories Publishing Operations Transferred to Idearc*** | In connection with the spin-off, we expect to enter into a distribution agreement with Verizon that will contain the key provisions relating to the separation of our business from Verizon and the distribution of our shares of common stock. The distribution agreement will identify the assets to be transferred, liabilities to be assumed and contracts to be assigned to us by Verizon and by us to Verizon in the separation and describe when and how these transfers, assumptions and assignments will occur. In connection with the spin-off, we expect to enter into an employee matters agreement with Verizon providing for the allocation of assets, liabilities and responsibilities with respect to certain employee benefit plans, policies and compensation programs. See "Relationship Between Verizon and Our Company After the Spin-Off—Distribution Agreement" and "—Employee Matters Agreement." |
| ***Relationship with Verizon After the Spin-off*** | In connection with the spin-off, we expect to enter into agreements with Verizon to define the initial relationship between Verizon and us with respect to a number of services that will be provided. These agreements will become effective immediately after the consummation of the spin-off. In particular, we expect to enter into a transition services agreement under which we and Verizon will provide each other with certain services on an interim basis. In addition, we expect to enter into a publishing agreement, a non-competition agreement, a branding agreement, a listings license agreement, a billing and collection agreement and an intellectual property agreement, in each case with Verizon. We also expect to enter into an agreement with Verizon providing for the sharing of taxes incurred before and after the spin-off, certain indemnification rights with respect to tax matters and certain restrictions to preserve the tax-free status of the spin-off. See "Risk Factors—Risk Factors Relating to the Spin-Off." These agreements with Verizon may involve, or may appear to involve, conflicts of interest. In addition, some of these agreements may be subject to early termination. See "Relationship Between Verizon and Our Company After the Spin-Off." |
| ***Management of Idearc*** | After the spin-off, we will have an initial board of directors consisting of five directors. After the initial term, directors will be elected each year at our annual meeting of stockholders. See "Management—Board of Directors Structure."

We expect that our designated executive officers will continue to serve in their respective designated capacities after the spin-off. See "Management—Directors and Executive Officers." |

7

Table of Contents

*Debt*

In connection with the spin-off, we expect to enter into new credit facilities, which we refer to as the new credit facilities, providing for an aggregate amount of approximately $6,515 million, consisting of (i) a senior secured five-year revolving credit facility in a principal amount of approximately $250 million and (ii) senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of (a) a tranche A term loan facility of approximately $1,515 million (the tranche A facility) and (b) a tranche B term loan facility of approximately $4,750 million (the tranche B facility, and together with the tranche A facility, the term loan facilities).

In exchange for the contribution, Idearc will (i) issue to Verizon additional shares of Idearc common stock to be distributed to Verizon's stockholders pro rata in the spin-off, (ii) issue to Verizon senior unsecured notes and a portion of the loans under the tranche B facility, which we collectively refer to as the Idearc debt obligations, and (iii) transfer to Verizon up to approximately $2,500 million from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

We will have approximately $9,115 million of indebtedness after the spin-off. We anticipate that immediately following the spin-off, we will have combined cash and equivalents of approximately $100 million and available liquidity under the revolving credit facility of approximately $250 million. We expect that the terms of these financing arrangements may include covenants that, among other things, will require us to satisfy certain financial tests, maintain certain financial ratios and restrict our ability to incur additional indebtedness. To the extent permitted, we may also incur additional indebtedness from time to time for general corporate purposes, including working capital requirements, capital expenditures and future acquisitions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources." See also "Risk Factors—Risk Factors Relating to the Spin-Off—Following the spin-off, we will have substantial indebtedness, which could have a negative impact on our financing options and liquidity positions," "Risk Factors—Risk Factors Relating to the Spin-Off—Our financing arrangements will subject us to various restrictions that could limit our operating flexibility" and "Risk Factors—Risk Factors Relating to Ownership of Our Common Stock—Our capital raising may adversely affect holders of our common stock through the issuance of more senior securities or through dilution."

*Timeline of Key Events Related to the Spin-off*

*Before the Distribution Date:*

•  The Verizon board of directors will determine the record date for the dividend of our common stock to Verizon stockholders, declare the dividend and determine the distribution ratio.

8

Table of Contents

- Our common stock is expected to begin trading on a "when issued" basis.

- Verizon will mail this information statement to its stockholders.

- We expect that Verizon and its creditors will enter into an exchange agreement pursuant to which Verizon will agree to exchange the Idearc debt obligations for certain outstanding Verizon debt.

*On the Distribution Date:*

- We expect that we will enter into a number of agreements with Verizon, including:

  - a distribution agreement;

  - a transition services agreement;

  - a publishing agreement;

  - a non-competition agreement;

  - a branding agreement;

  - a listings license agreement;

  - a billing and collection agreement;

  - an intellectual property agreement;

  - a tax sharing agreement; and

  - an employee matters agreement.

- Verizon will receive an opinion of counsel as to the tax-free nature of the distribution (Verizon received an IRS private letter ruling in September 2006 as to the tax-free nature of the distribution).

- Verizon will transfer to us all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations, which we refer to as the contribution.

- In exchange for the contribution, we will (1) issue to Verizon additional shares of our common stock, (2) issue to Verizon the Idearc debt obligations and (3) transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

- Verizon will distribute its shares of our common stock pro rata to all of its stockholders of record as of the record date.

- We expect that Verizon will seek to exchange the Idearc debt obligations for certain outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness.

9

Table of Contents

- Assuming Verizon and its creditors consummate the exchange of the Idearc debt obligations for certain outstanding Verizon debt, we expect Verizon's creditors to immediately resell the Idearc debt obligations.

*Following the Distribution Date:*

- Our board of directors will approve various actions related to the spin-off as described in this information statement, including:

  - our corporate governance documents and policies;

  - the adoption of certain benefit plans; and

  - our dividend policy.

- We expect that our common stock will begin trading on the NYSE on a regular way basis under the symbol "IAR" on the first trading day following the distribution date.

- We will operate as an independent public company.

| | |
|---|---|
| ***Dividend Policy*** | We expect to pay dividends at an annual rate of approximately $1.37 per share, but only if and to the extent dividends are declared by our board of directors and permitted by applicable law and by the terms of our financing arrangements. Dividend payments are not guaranteed and our board of directors may decide, in its absolute discretion, not to pay dividends.<br><br>All decisions regarding the declaration and payment of dividends, including with respect to the initial dividend, will be at the discretion of our board of directors and will be evaluated from time to time in light of our financial condition, earnings, growth prospects, funding requirements, applicable law and other factors our board of directors deems relevant. See "Dividend Policy." |
| ***Certain Anti-takeover Effects*** | Our certificate of incorporation and bylaws and certain provisions of Delaware law will have the effect of making it more difficult for a potential acquirer to obtain control of our company in a transaction not approved by our board of directors. Moreover, certain provisions of the tax sharing agreement that we expect to enter into with Verizon in connection with the spin-off could discourage potential acquisition proposals. See "Risk Factors—Risk Factors Relating to Ownership of Our Common Stock—Anti-takeover provisions of our certificate of incorporation and bylaws, the terms of our spin-off from Verizon and certain provisions of Delaware law could delay or prevent a change of control that you may favor" and "Description of Our Capital Stock—Common Stock—Anti-Takeover Provisions." |
| ***Certain United States Federal Income Tax Consequences of the Spin-Off*** | Assuming that the spin-off qualifies as tax-free to Verizon, Idearc and Verizon stockholders for United States Federal income tax purposes under Section 355 and related provisions of the Code, Verizon |

10

Table of Contents

stockholders will not recognize any gain or loss for United States Federal income tax purposes upon the receipt of shares of Idearc common stock in the spin-off, except for any gain or loss attributable to the receipt of cash in lieu of fractional shares of Idearc common stock. The spin-off is conditioned upon Verizon's receipt of a private letter ruling from the IRS (which Verizon received in September 2006) to the effect that the spin-off will qualify as tax-free to Verizon, Idearc and Verizon stockholders for United States Federal income tax purposes under Section 355 and related provisions of the Code. The spin-off is also conditioned upon the receipt by Verizon of an opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special tax counsel to Verizon, to the effect that the spin-off will similarly qualify as tax-free to Verizon, Idearc and Verizon stockholders under Section 355 and related provisions of the Code. Certain United States Federal income tax consequences of the spin-off are described in more detail under "The Spin-Off—Certain United States Federal Income Tax Consequences of the Spin-Off."

***Risk Factors***   You should review the risks relating to the spin-off, our business and ownership of our common stock described in "Risk Factors."

11

**Table of Contents**

## Summary Historical and Pro Forma Financial Data

The following table sets forth our summary of historical and pro forma financial data. The following financial data as of December 31, 2004 and 2005 and for the years ended December 31, 2003, 2004 and 2005 have been derived from our financial statements, which were audited by Ernst & Young LLP. The financial position as of December 31, 2003, and the results of operations, cash flow data and financial position as of and for the years ended December 31, 2001 and 2002 and as of and for the nine months ended September 30, 2005 and 2006, have been derived from our unaudited financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included. The following information should be read together with our financial statements and the notes related to those financial statements. See "Selected Financial Information," "Pro Forma Financial Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Index to Financial Statements."

Our financial information may not be indicative of our future performance and does not necessarily reflect what our financial condition and results of operations would have been had we operated as an independent, stand-alone entity during the periods presented, particularly since many changes will occur in our operations and capitalization as a result of our spin-off from Verizon.

The pro forma financial information presented reflects our financial results as fully described in the notes to our consolidated financial statements included in this information statement and gives effect to the following pro forma transactions:

- repayment of a note receivable from Verizon;

- the issuance of approximately 146 million shares of Idearc common stock (using the distribution ratio of one share of Idearc common stock for every 20 shares of Verizon common stock);

- the incurrence by Idearc of up to approximately $9,115 million of debt comprised of:

  - approximately $2,850 million of senior unsecured notes; and

  - senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of:

    - a tranche A term loan facility of approximately $1,515 million; and

    - a tranche B term loan facility of approximately $4,750 million; and

- a cash distribution by Idearc to Verizon. If the pro forma transactions had occurred as of September 30, 2006, Idearc would have distributed approximately $2,380 million to Verizon consisting of the proceeds from the tranche A term loan facility of approximately $1,515 million, approximately $485 million of proceeds from loans under the tranche B facility, and approximately $380 million of the $480 million note receivable due from Verizon as of September 30, 2006, resulting in a remaining cash balance of approximately $100 million. The precise amount of this cash distribution will increase or decrease depending on the amount of cash on hand and the amount of the note receivable due from Verizon as of the date of the closing of the transactions, but will not exceed $2,500 million.

In exchange for the contribution by Verizon to Idearc of all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations, Idearc will: (i) issue to Verizon additional shares of Idearc common stock, the senior unsecured notes and a portion of the loans under the tranche B facility, and (ii) transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

12

**Table of Contents**

The pro forma adjustments do not give effect to non-recurring separation costs, which include costs for rebranding and brand launch, information technology systems and infrastructure transition, SuperPages.com platform development and employee and other costs, estimated to be approximately $124 million pre-tax and approximately $76 million on an after-tax basis. We expect to fund these costs from available cash. Due to the scope and complexity of the underlying projects, the amount of these costs could increase or decrease materially and the timing of incurrence of these costs could change. See "Pro Forma Financial Information."

The pro forma adjustments do not give effect to the annual costs that will result from establishing or expanding the corporate support services for our business, including information technology, human resources, treasury, tax, risk management, accounting and financial reporting, investor relations, pension management, legal, procurement and other services. We expect these costs to be substantially similar to our historical costs.

| | For the Years Ended December 31, | | | | | For the Nine Months Ended September 30, | | Pro Forma for Nine Months Ended September 30, |
|---|---|---|---|---|---|---|---|---|
| | **2001 (unaudited)** | **2002 (unaudited)** | **2003 (audited)** | **2004 (audited)** | **2005 (audited)** | **2005 (unaudited)** | **2006 (unaudited)** | **2006 (unaudited)** |
| | | | | | (in millions) | | | |
| Operating revenue | $ 3,831 | $ 3,760 | $ 3,675 | $ 3,513 | $ 3,374 | $ 2,553 | $ 2,420 | $ 2,420 |
| Operating income | 1,994 | 1,764 | 1,477 | 1,601 | 1,641 | 1,265 | 1,060 | 1,100 |
| Income from operations before cumulative effect of accounting change [1] | 1,203 | 1,095 | 895 | 972 | 1,025 | 788 | 673 | 363 |
| Net income (loss) | 1,203 | 1,095 | (568) | 972 | 1,025 | 788 | 673 | 363 |

| | As of December 31, | | | | | As of September 30, | | Pro Forma As of September 30, |
|---|---|---|---|---|---|---|---|---|
| | **2001 (unaudited)** | **2002 (unaudited)** | **2003 (unaudited)** | **2004 (audited)** | **2005 (audited)** | **2005 (unaudited)** | **2006 (unaudited)** | **2006 (unaudited)** |
| Total assets | $ 3,688 | $ 3,336 | $ 1,359 | $ 1,402 | $ 1,412 | $ 1,350 | $ 1,456 | $ 1,121 |
| Long-term obligations | — | — | — | — | — | — | — | 9,115 |
| Parent's equity/shareowners' investment | 1,895 | 1,843 | 226 | 317 | 325 | 297 | 389 | (8,998) |

(1)   Effective January 1, 2003, we changed our method for recognizing revenues and expenses from the publication-date method to the amortization method. The publication-date method, which we used prior to January 1, 2003, recognizes revenues and direct expenses when the directories are published. Under the amortization method, which has increasingly become the industry standard, revenues and direct expenses (paper, printing and initial distribution costs) are recognized over the life of the directory, which is usually twelve months. The accounting change affected the timing of the recognition of revenues and expenses but did not result in any impact on cash flows. The cumulative effect of the accounting change resulted in a one-time charge of $2,381 million ($1,463 million after-tax).

13

Table of Contents

## RISK FACTORS

*You should carefully consider the risks described below, together with all of the other information included in this information statement, in evaluating our company and our common stock. If any of the risks described below actually occurs, our business, financial results, financial condition and stock price could be materially adversely affected.*

### Risk Factors Relating to the Spin-Off

***Our historical financial information may not be indicative of our future results as an independent company.***

The historical financial information we have included in this information statement may not reflect what our results of operations, financial position and cash flows would have been had we been an independent company during the periods presented or be indicative of what our results of operations, financial position and cash flows may be in the future when we are an independent company. This is primarily a result of the following three factors:

- our historical financial information reflects allocations for services historically provided by Verizon, and we expect these allocations to be different from the costs we will incur for these services in the future as a smaller independent company, including with respect to services we expect will be provided by Verizon under a transition services agreement and other commercial service agreements. We expect that, in some instances, the costs incurred for these services as a smaller independent company will be higher than the share of total Verizon expenses allocated to us historically;

- our historical financial information does not reflect the debt and related interest expense that we will incur as part of the spin-off, including debt we will incur in order to issue debt obligations to Verizon in partial consideration of Verizon's contribution to us of the directories publishing operations; and

- the historical financial information does not reflect the increased costs associated with being an independent company, including changes that we expect in our cost structure, personnel needs, financing and operations of the contributed business as a result of the spin-off from Verizon and from reduced economies of scale.

For additional information about the past financial performance of our business and the basis of the presentation of the historical financial statements, see "Selected Financial Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the historical financial statements and the accompanying notes included elsewhere in this information statement.

***We have no history operating as an independent company and we may incur increased costs after the spin-off or as a result of the spin-off that may cause our profitability to decline.***

Historically, our business has been principally operated as one of Verizon's business units, and Verizon has performed many corporate functions for our operations, including managing financial and human resources systems, internal auditing, investor relations, treasury services, select accounting functions, finance and tax administration, benefits administration, legal, regulatory, and corporate branding functions. We currently pay Verizon for the performance of these services. Following the spin-off, Verizon will provide support to us with respect to certain of these functions on a transitional basis for periods not to exceed 18 months. We will need to replicate certain facilities, systems, infrastructure and personnel to which we will no longer have access after our spin-off from Verizon. We will incur capital and other costs associated with developing and implementing our own support functions in these areas. These costs may exceed our current payments to Verizon.

In addition, there may be an adverse operational impact on our business as a result of the significant time of our management and other employees and internal resources that will need to be dedicated to building these capabilities during the first few years following the spin-off that otherwise would be available for other business

14

Table of Contents

initiatives and opportunities. When we begin to operate these functions independently, if we have not developed adequate systems and business functions, or obtained them from other providers, we may not be able to operate our company effectively and our profitability may decline.

In addition, we have historically benefited from Verizon's size and purchasing power in procuring goods and services. Following the spin-off, as an independent company, we may be unable to obtain goods and services at prices and on terms as favorable as those obtained before the spin-off, which could decrease our overall profitability.

***Our spin-off from Verizon could adversely affect our business and profitability due to limitations on our use of the Verizon brand following the spin-off.***

As a business unit of Verizon, we have marketed our products and services using the Verizon brand name and logo, and we believe the association with Verizon has provided us with preferred status among our customers and employees due to Verizon's globally recognized brands and perceived high-quality products and services.

In connection with the spin-off, we expect to enter into a branding agreement with Verizon that will grant us a limited right to, among other things, use certain Verizon service and trade marks in connection with publishing certain print directories and identify ourselves as Verizon's official print directory publisher. These rights will extend for up to 30 years, subject to certain terms and conditions. While we will continue to use the Verizon brand on our print directories in our incumbent markets and our independent markets, we will not be able to use Verizon as part of our name and may not advertise ourselves as a Verizon company.

Our right to use the Verizon brand following the spin-off will be subject to our compliance with the terms and conditions of the branding agreement and publishing agreement. See "Relationship Between Verizon and Our Company After the Spin-Off—Branding Agreement" and "—Publishing Agreement."

***If we are not successful in achieving brand recognition for our new brand, our competitive position will be weakened and we may lose market share.***

We will incur substantial costs associated with launching and marketing our new brand. However, we cannot assure you that we will be successful in achieving brand recognition for our new brand.

***If the distribution does not qualify as a tax-free transaction, tax could be imposed on Verizon stockholders.***

The spin-off is conditioned upon Verizon's receipt of a private letter ruling from the IRS to the effect that the spin-off, including (i) the contribution of all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations to Idearc, (ii) the receipt by Verizon of Idearc common stock, the Idearc debt obligations and cash delivered to Verizon from cash on hand and from the proceeds of a portion of the term loans incurred under the new credit facilities, (iii) the expected exchange by Verizon of the Idearc debt obligations for certain outstanding Verizon debt and (iv) the distribution by Verizon of Idearc common stock to Verizon stockholders, will qualify as tax-free to Verizon, Idearc and Verizon stockholders for United States Federal income tax purposes under Section 355 and related provisions of the Code. Verizon received this private letter ruling in September 2006. Although a private letter ruling from the IRS generally is binding on the IRS, if the factual representations or assumptions made in the letter ruling request are untrue or incomplete in any material respect, then Verizon will not be able to rely on the ruling. Furthermore, the IRS will not rule on whether a distribution satisfies certain requirements necessary to obtain tax-free treatment under Section 355 of the Code. Rather, the private letter ruling will be based upon representations by Verizon that these conditions have been satisfied, and any inaccuracy in the representations could prevent Verizon from relying on the ruling.

The spin-off is also conditioned upon the receipt by Verizon of an opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special tax counsel to Verizon, to the effect that the spin-off will similarly qualify as tax-free to Verizon, Idearc and Verizon stockholders under Section 355 and related provisions of the Code. The opinion will

15

Table of Contents

rely on the IRS letter ruling as to matters covered by the ruling. The opinion will be based on, among other things, certain assumptions and representations as to factual matters made by Verizon and Idearc, which, if incorrect or inaccurate in any material respect, would jeopardize the conclusions reached by counsel in its opinion. The opinion will not be binding on the IRS or the courts, and the IRS or the courts may not agree with the opinion.

Notwithstanding receipt by Verizon of the private letter ruling and opinion of counsel, the IRS could determine that the distribution should be treated as a taxable transaction if it determines that any of the representations, assumptions or undertakings that were included in the request for the private letter ruling is false or has been violated of if it disagrees with the conclusions in the opinion that are not covered by the IRS ruling. If the distribution fails to qualify for tax-free treatment, it will be treated as a taxable dividend to Verizon stockholders in an amount equal to the fair market value of Idearc common stock issued to Verizon stockholders.

***If the distribution does not qualify as a tax-free transaction, tax could be imposed on Verizon and Verizon stockholders, and Idearc may be required to indemnify Verizon for the tax.***

As explained in the prior risk factor, the distribution may not be tax-free to Verizon. Furthermore, events subsequent to the distribution could cause Verizon to recognize gain on the distribution, including as a result of Section 355(e) of the Code. Although the taxes resulting from the spin-off not qualifying for tax-free treatment for United States Federal income tax purposes generally would be imposed on Verizon stockholders and Verizon, under the tax sharing agreement, Idearc would be required to indemnify Verizon and its affiliates against all tax-related liabilities caused by the failure of the spin-off to qualify for tax-free treatment for United States Federal income tax purposes (including as a result of Section 355(e) of the Code) to the extent these liabilities arise as a result of any action taken by Idearc or any of its affiliates following the spin-off or otherwise result from any breach of any representation, covenant or obligation of Idearc or any of its affiliates under the tax sharing agreement or any other agreement entered into by Idearc in connection with the spin-off. See "Relationship Between Verizon and Our Company After the Spin-Off—Tax Sharing Agreement."

***Idearc is agreeing to certain restrictions to preserve the tax-free treatment of the distribution to Verizon, which may reduce its strategic and operating flexibility.***

The covenants in, and our indemnity obligations under, the tax sharing agreement may limit our ability to pursue strategic transactions or engage in new business or other transactions that may maximize the value of our business. The covenants in, and our indemnity obligations under, the tax sharing agreement will also limit our ability to modify the terms of, pre-pay, or otherwise acquire any of the the tranche B term loans or the senior unsecured notes. Further, as it relates to Section 355(e) specifically, these covenants and indemnity obligations might discourage, delay or prevent a change of control that you may consider favorable.

***Following the spin-off, we will have substantial indebtedness, which could have a negative impact on our financing options and liquidity position.***

In connection with the spin-off, we will issue to Verizon senior unsecured notes and a portion of the loans under the tranche B facility, which we expect that Verizon will seek to exchange for certain outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness. Assuming Verizon and its creditors consummate this exchange, we expect Verizon's creditors to immediately resell the senior unsecured notes and the loans under the tranche B facility. We will also transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility. As a result, following the spin-off, we will have approximately $9,115 million of total debt outstanding and approximately $100 million of cash on hand, and we expect to have net interest expense of approximately $689 million annually. As of September 30, 2006, on a pro forma basis after giving effect to the transactions, we would have had $250 million available for additional borrowing under the revolving credit facility.

Our overall leverage and the terms of our financing arrangements could:

- limit our ability to obtain additional financing in the future for working capital, capital expenditures and acquisitions;

16

Table of Contents

- limit our ability to refinance our indebtedness on terms acceptable to us or at all;

- limit our ability to adapt to changing market conditions;

- restrict us from making strategic acquisitions or cause us to make non-strategic divestitures;

- require us to dedicate a significant portion of our cash flow from operations to paying the principal of and interest on our indebtedness, thereby limiting the availability of our cash flow to fund future capital expenditures, working capital and other corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the telecommunications industry;

- place us at a competitive disadvantage compared with competitors that have less debt;

- make it more difficult for us to pay our anticipated cash dividends; and

- make us more vulnerable to economic downturns and limit our ability to withstand competitive pressures.

***Our financing arrangements will subject us to various restrictions that could limit our operating flexibility.***

We expect that our financing arrangements will contain restrictions, covenants and events of default that, among other things, will require us to satisfy certain financial tests and maintain certain financial ratios and restrict our ability to incur additional indebtedness and to refinance our existing indebtedness. The terms of these financing arrangements and any future indebtedness may impose various restrictions and covenants on us that could limit our ability to pay dividends, respond to market conditions, provide for capital investment needs or take advantage of business opportunities by limiting the amount of additional borrowings we may incur. These restrictions may include compliance with, or maintenance of, certain financial tests and ratios, including minimum interest coverage ratio and maximum leverage ratio, and may limit or prohibit our ability to, among other things:

- incur additional debt and issue preferred stock;

- create liens;

- redeem and/or prepay certain debt;

- pay dividends on our stock or repurchase stock;

- make certain investments;

- engage in specified sales of assets;

- enter into transactions with affiliates;

- enter new lines of business;

- engage in consolidation, mergers and acquisitions;

- make certain capital expenditures; and

- pay dividends and make other distributions.

These restrictions on our ability to operate our business could seriously harm our business by, among other things, limiting our ability to take advantage of financing, merger and acquisition and other corporate opportunities. See "Description of Certain Indebtedness."

Various risks, uncertainties and events beyond our control could affect our ability to comply with these covenants and maintain these financial tests and ratios. Failure to comply with any of the covenants in our existing or future financing arrangements would result in a default under those arrangements and under other arrangements containing cross-default provisions. A default would permit lenders to accelerate the maturity for the debt under these agreements and to foreclose upon any collateral securing the debt and to terminate any commitments to lend. Under these circumstances, we might have insufficient funds or other resources to satisfy all our obligations, including our obligations under the notes. In addition, the limitations imposed by any financing arrangements on our ability to incur additional debt and to take other actions might significantly impair our ability to obtain other financing.

17

Table of Contents

*The agreements that we expect to enter into with Verizon may involve, or may appear to involve, conflicts of interest.*

Because the spin-off involves the separation of Verizon's domestic print and Internet yellow pages directories publishing operations into an independent company, we expect to enter into certain agreements with Verizon to provide a framework for our initial relationship with Verizon following the spin-off. We are negotiating these agreements with Verizon while we are still a wholly owned subsidiary of Verizon. Accordingly, the persons who are expected to become our officers are employees or officers of Verizon or its subsidiaries and have an obligation to serve the interests of Verizon and its subsidiaries. As a result, they could be viewed as having a conflict of interest.

Following the spin-off, Verizon may compete with us through Verizon's Internet (subject to a one year restriction relating to Internet yellow pages services), broadband and wireless services. Verizon may also compete with us through the publication of print directory products in markets other than our incumbent markets.

*The loss of any of our key agreements with Verizon could have a material adverse effect on our business.*

In connection with our spin-off from Verizon, we expect to enter into several agreements with Verizon, including a publishing agreement, a branding agreement and a non-competition agreement. Under the publishing agreement, Verizon will name us the exclusive official publisher of Verizon print directories in markets in which Verizon currently is the incumbent local exchange carrier, which we refer to as our incumbent markets. We believe that acting as the exclusive official publisher of directories for Verizon provides us with a competitive advantage in those markets. Under the branding agreement, Verizon will grant us a limited right to, among other things, use certain Verizon service and trade marks in connection with publishing certain print directories and identify ourselves as its official print directory publisher. Under the non-competition agreement, Verizon will generally agree not to publish tangible or digital media directory products consisting principally of wireline listings and classified advertisements of subscribers in our incumbent markets.

Each of these agreements with Verizon will have an initial term of 30 years from the date of the spin-off, subject to certain early termination rights. These agreements may be terminated by Verizon prior to their stated term under specified circumstances, some of which are beyond our reasonable control or which could require extraordinary efforts or the incurrence of material excess costs on our part in order to avoid breach of the applicable agreement. Each of these agreements will have a cross-default provision, so that a termination under any of the agreements may, at Verizon's option, lead to a partial or complete termination of rights under any of the other agreements. It is possible that these agreements will not remain in place for their full stated term or that we may be unable to avoid all potential breaches of or defaults under these agreements. See "Relationship Between Verizon and Our Company After the Spin-Off."

*Our inability to enforce the non-competition agreement with Verizon may impair the value of our business.*

We expect that under a non-competition agreement, Verizon will generally agree not to publish tangible or digital media directory products consisting principally of wireline listings and classified advertisements of subscribers in our incumbent markets directed primarily at customers in these markets. However, under applicable law, a covenant not to compete is only enforceable:

•  to the extent it is necessary to protect a legitimate business interest of the party seeking enforcement;

•  if it does not unreasonably restrain the party against whom enforcement is sought; and

•  if it is not contrary to the public interest.

Enforceability of a non-competition covenant is determined by a court based on all of the facts and circumstances of the specific case at the time enforcement is sought. For this reason, it is not possible for us to predict whether, or to what extent, a court would enforce Verizon's covenants not to compete against us during

18

**Table of Contents**

the term of the non-competition agreement. If a court were to determine that the non-competition agreement is unenforceable, Verizon could compete directly against us in the previously restricted markets. Our inability to enforce the non-competition agreement with Verizon could have a material adverse effect on our financial condition or results of operations.

***Verizon will continue to provide transition services to us following the spin-off; if these transition services were prematurely halted or if we were unable to replicate the transition services internally, our business would be materially adversely affected.***

We expect to enter into a transition services agreement with Verizon under which Verizon will provide certain specified services to us on an interim basis. Among the principal services expected to be provided by Verizon to us are information technology application and support services as well as data center services. In addition, we expect that under a billing and collection agreement, Verizon will continue to bill and collect, on our behalf, amounts owed by certain of our accounts, which are also Verizon local telephone customers, for our directory services.

Certain performance standards and estimated costs will be specified in the transition services agreement as well as the billing and collection agreement, and we expect Verizon to appropriately discharge its obligations under these agreements consistent with the specified standards and estimated costs. However, we cannot assure you that all of these functions will be successfully executed on a timely basis or that we will not have to expend extraordinary efforts or material costs in excess of those estimated in these agreements. Further, any interruption in these services or these extraordinary efforts or costs could have a material adverse effect on our financial condition or results of operations.

In addition, approximately half of our systems development activity underlying our Internet yellow pages directory products and services has been historically performed by Verizon. While we expect to enter into a transition services agreement with Verizon under which Verizon will continue to provide these services for periods not to exceed 18 months, we cannot assure you that we will be able to successfully migrate away from these systems on time. If we were not able to achieve this migration, our Internet yellow pages directory business could be materially adversely affected.

***Verizon's regulatory obligation to publish white pages directories in its incumbent markets may change over time, which may result in an increase in our future operating costs.***

Pursuant to state public utilities commission requirements, Verizon must publish and distribute white pages directories of certain residences and businesses that order or receive local telephone service from Verizon. The legal and regulatory provisions also require Verizon, in specified cases, to include information relating to the provision of telephone service provided by Verizon and other carriers in the service area, as well as information relating to local and state governmental agencies. The costs of publishing, printing and distributing the directories are included in our operating expenses.

We expect that, pursuant to a publishing agreement, we will be required to discharge Verizon's regulatory obligation to publish white pages directories in its incumbent markets. If any additional legal requirements are imposed on Verizon with respect to this obligation, we would be obligated to comply with these requirements on behalf of Verizon, even if this were to increase our publishing costs. We expect that, pursuant to the publishing agreement, until the eighth anniversary of the distribution, Verizon will generally be obligated to reimburse us for 50% of any net increase in our costs of publishing white pages directories that satisfy its publishing obligations to the extent these increased costs exceed $2.5 million in a given year and are the direct result of changes in legal requirements. After the eighth anniversary, Verizon will generally not be obligated to reimburse us for any increase in our costs of publishing directories that satisfy its publishing obligations. Our results of operations relative to competing directory publishers that do not have those obligations could be adversely affected if we were not able to increase our revenues to cover any of these unreimbursed compliance costs.

19

Table of Contents

***Potential liabilities may arise due to fraudulent transfer considerations, which would adversely affect our financial condition and our results of operations.***

In connection with the spin-off, Verizon intends to undertake several corporate restructuring transactions which, along with the spin-off, may be subject to Federal and State fraudulent conveyance and transfer laws. If, under these laws, a court were to determine that, at the time of the spin-off, any entity involved in these restructuring transactions or the spin-off:

- was insolvent,

- was rendered insolvent by reason of the spin-off,

- had remaining assets constituting unreasonably small capital, or

- intended to incur, or believed it would incur, debts beyond its ability to pay these debts as they matured,

the court could void the spin-off, in whole or in part, as a fraudulent conveyance or transfer. The court could then require our stockholders to return to Verizon some or all of the shares of our common stock issued pursuant to the spin-off, or require Verizon or us, as the case may be, to fund liabilities of the other company for the benefit of creditors. The measure of insolvency will vary depending upon the jurisdiction whose law is being applied. Generally, however, an entity would be considered insolvent if the fair value of its assets were less than the amount of its liabilities or if it incurred debt beyond its ability to repay the debt as it matures.

***If a court were to hold that the spin-off is not a legal dividend, it would adversely affect our financial condition and our results of operations.***

The spin-off is subject to Delaware corporate law, which includes a provision governing corporate distributions. A court could later determine that the spin-off was invalid under Delaware corporate law and reverse the transactions. The resulting complications, costs and expenses would materially adversely affect our financial condition and results of operations.

***Our rights under certain of the agreements we expect to enter into with Verizon could be impaired if there were bankruptcy proceedings brought by or against Verizon during the term of these agreements.***

As described above, in connection with our spin-off from Verizon, we expect to enter into several agreements with Verizon, including a publishing agreement, a branding agreement and a non-competition agreement. If a bankruptcy case were to be commenced by or against Verizon, it is possible that all or part of the applicable agreements could be considered an executory contract and could therefore be subject to rejection by Verizon or by a trustee appointed in a bankruptcy case.

If one or more of these agreements were rejected, the applicable agreement might not be specifically enforceable. If the publishing agreement were rejected, we would, among other things, no longer be entitled to be the exclusive official publisher of Verizon print directories in our incumbent markets. We could also lose our right under the branding agreement to, among other things, use certain Verizon service and trade marks in connection with publishing certain directories and, to the extent described above, identify ourselves as its exclusive official print directory publisher in our incumbent markets. If the non-competition agreement were rejected and specific enforcement were not available, Verizon would, among other things, no longer be precluded from publishing specified directory products in the applicable restricted markets.

The loss of any rights under any of these agreements with Verizon could have a material adverse effect on our financial condition or results of operations.

***Our designated executive team has not previously worked together to lead an independent company.***

While the persons expected to be our executive officers have significant industry experience and significant experience managing business units, they have not worked together as managers of an independent, stand-alone company. Our success will depend, in part, on the ability of our executives to work effectively as a team in this new environment.

20

Table of Contents

### Risk Factors Relating to Our Business

***We face widespread competition from other print directory publishers that may reduce our market share and harm our financial performance.***

The United States directory advertising industry is highly competitive. There are a number of directory publishers. Major publishers include R.H. Donnelley, Yellow Book (the U.S. business of Yell Group), AT&T and BellSouth. Smaller independent publishers include Valley Yellow Pages, Ambassador Yellow Pages and White Publishing. We compete with Yellow Book in the majority of our major markets and, to a much lesser degree, with one or more of the other publishers in some markets. In the 316 incumbent markets and 42 independent markets in which we publish directories, we estimate that our competitors publish 4,808 directories with a circulation of 403 million copies. Our two largest competitors are Yellow Book and AT&T. We estimate that, on average, there are three competing directories in each of our local markets. In addition, any of these directory publishers could elect to publish directories in the future in any of our markets in which they do not currently publish directories. For example, we estimate that 157 new competitive directories were introduced in our top ten markets in 2004 through 2005 and 53 new competitive directories in 2005 through 2006. Since 2003, we have exited three independent markets because they were not making or not expected to make a meaningful positive contribution to our profitability.

Competition from other yellow pages publishers affects our ability to attract and retain advertisers and to increase advertising rates. The effect of competition on our revenues can be seen in the decreasing revenue trend, on a total operating revenue basis of 2.3%, 4.4% and 4.0% in 2003, 2004 and 2005, respectively. We expect competition to affect future revenue growth. We also compete for advertising sales with other traditional media, including the Internet, newspapers, magazines, radio, outdoor, direct mail, telemarketing, billboards and television. We may not be able to compete effectively with these companies for advertising sales or acquisitions in the future.

***If we fail to anticipate or respond adequately to changes in technology and user preferences, our competitive position in this market could be materially adversely affected.***

Advances in technology have brought and will likely continue to bring new participants, new products and new channels to the industry, including increasing use of electronic delivery and electronic search engines/services. For instance, national search companies, including Google and Yahoo!, are focusing on local commercial search initiatives. The yellow pages directory advertising business is subject to changes arising from developments in technology, including information distribution methods and users' preferences. The Internet has emerged as an attractive medium for advertisers and its use, including as a means to transact commerce through wireless devices, has resulted in new technologies being developed and services provided that compete with our traditional products and services. As a result of these factors, our growth and future financial performance may depend on our ability to develop and market new products and services and create new distribution channels, while enhancing existing products, services and distribution channels, to incorporate the latest technological advances and accommodate changing user preferences, including the use of the Internet. We may not be able to adapt our business successfully to these changes in technology.

We and other directory publishers are increasingly advertising, marketing and selling online products to supplement our traditional print products. Through our Internet yellow pages directory, SuperPages.com, we compete with the Internet yellow pages directories of major and independent directory publishers, including Yellowpages.com (a joint venture held by AT&T and BellSouth), as well as other Internet sites that provide classified directory information, including Switchboard.com and Citysearch.com, and with search engines and portals, some of which have entered into affiliate agreements with us or with other major directory publishers. We cannot assure you that we will be able to compete effectively with these other companies, some of which have greater resources than we do, for advertising in the future. Our Internet strategy may be adversely affected if major search engines build local sales forces or otherwise begin to more effectively reach small local businesses.

21

Table of Contents

*Declining usage of print yellow pages directories may adversely affect our business.*

Overall references to print yellow pages directories in the United States have gradually declined from 15.1 billion in 2002 to 14.5 billion in 2005. We believe the decline is primarily attributable to increased usage of Internet yellow pages directory products, particularly in business-to-business and retail categories, as well as the proliferation of very large retail stores for which consumers and businesses may not reference the yellow pages. We believe that over the next several years, references to print yellow pages directories may continue to gradually decline as consumers may increasingly turn to digital and interactive media delivery devices for local commercial search information.

There can be no assurance that usage of our print directories will not continue to decline at the existing rate or more severely. Any decline in usage of our print directories could:

- impair our ability to maintain or increase advertising prices;

- cause businesses to reduce or discontinue purchases of advertising space in our yellow pages directories; and

- discourage other businesses from purchasing advertising space in our yellow pages directories.

Any of the factors that may contribute to a decline in usage of our print directories, or a combination of them, could impair our revenues and have a material adverse effect on our business.

*We may not have access to capital on acceptable terms or at all.*

Following the spin-off, we will no longer benefit from Verizon's investment grade status and our credit ratings are expected to be substantially lower than the current ratings of Verizon. Differences in credit ratings affect the interest rates at which we may sell debt securities or borrow funds, as well as the amounts of indebtedness and types of financing structures that may be available to us. We may not be able to raise the capital we require on acceptable terms, or at all. If we are not able to obtain sufficient financing, we may be unable to maintain or grow our business, including through acquisitions. In addition, our financing costs may be higher following the spin-off. Further issuances of equity securities will be subject to limitations imposed on us in the tax sharing agreement that we expect to enter into with Verizon.

*We are a holding company and rely on dividends, interest and other payments, advances and transfers of funds from our subsidiaries to meet our debt service and other obligations.*

Following the spin-off, we will be a holding company and will conduct all of our operations through our subsidiaries. As a result, we will rely on dividends, loans and other payments or distributions from our subsidiaries to meet our debt service obligations and enable us to pay interest and dividends. The ability of our subsidiaries to pay dividends or make other payments or distributions to us will depend substantially on their respective operating results and will be subject to restrictions under, among other things, the laws of their jurisdiction of organization (which may limit the amount of funds available for the payment of dividends), agreements of those subsidiaries, the terms of our financing arrangements and the terms of any future financing arrangements of our subsidiaries. See "Description of Certain Indebtedness."

*Our dependence on third-party providers of printing and distribution services could materially affect us.*

We depend on third parties to print and distribute our directories. We must rely on the systems of our third-party service providers, their ability to perform key operations on our behalf in a timely manner and in accordance with agreed levels of service and their ability to attract and retain sufficient qualified personnel to perform our work. A failure in the systems of one of our third-party service providers, or their inability to perform in accordance with the terms of our contracts or to retain sufficient qualified personnel, could have a material adverse effect on our business, results of operations and financial condition. In February 2006, we entered into a nine-year printing agreement with R.R. Donnelley & Sons, Inc., or RRD, pursuant to which RRD prints all of our directories. Printing is one of our largest costs, accounting for approximately 6% of our total

22

Table of Contents

costs. Because of the large print volume and specialized binding of directories, there are only a limited number of companies capable of servicing our printing needs. Accordingly, the inability or unwillingness of RRD to perform its obligations under the printing agreement could have a material adverse effect on our business.

We are a party to contracts with Alternate Postal Direct, Inc., Directory Distribution Associates, Inc., Team Air Worldwide and Product Development Corporation for the distribution of our directories. Although we are currently in negotiations to renew our contracts, these contracts expire on December 31, 2006. There are a limited number of companies that could service our distribution needs. Accordingly, the inability or unwillingness of our distributors to provide distribution services to us on acceptable terms or at all could have a material adverse effect on our business.

While we are parties to long-term contracts with the third parties who provide our key operational services to us, we may not be able to maintain our current relationships with these or any other third-party service providers. If we were to lose the services of any of our key third-party service providers, we would be required either to hire sufficient staff to perform the provider's services in-house or to find an alternative service provider. In some cases, including the printing of our directories, it would be impracticable for us to perform the function internally. Even when not impracticable, in the event we were required to perform any of the services that we currently outsource, it is unlikely that we would be able to perform them on a cost-effective basis. In each case, there are a limited number of alternative third-party service providers, if any.

### *Increased competition in local telephone markets could reduce the benefits of using the Verizon brand name.*

Federal Communications Commission rules regarding local number portability, advances in communications technology (including wireless devices and voice over Internet protocol) and demographic factors (including potential shifts in younger generations from wireline telephone communications towards wireless or other communications technologies) may erode the market position of telephone service providers, including Verizon. If Verizon does not remain the incumbent local exchange carrier in any particular local service area, the value of our license to use the Verizon brand name in particular local telephone markets may be less than we presently anticipate, and we may not realize some of the existing benefits of our commercial arrangements with Verizon.

### *Fluctuations in the price or availability of paper could materially affect us.*

The principal raw material we use is paper. For the year ended December 31, 2005, paper accounted for approximately 8% of our total operating costs. All of the paper we use is supplied by eight companies. Pursuant to our agreements with these companies, they are obligated to provide up to 100% of our annual forecasted paper requirements. The price of paper under the agreements is set each year based on total tonnage by supplier, paper basis weights, production capacity, and market price and demand. The contracts generally expire on December 31, 2008.

We do not engage in hedging activities to limit our exposure to increases in paper prices. In the future, the price of paper may fluctuate significantly due to changes in supply and demand. We cannot assure you that we will have access to paper in the necessary amounts or at reasonable prices or that any increases in paper costs would not have a material adverse effect on our business, results of operations or financial condition.

### *Additional regulation regarding information technology could lead to increased costs.*

As the Internet yellow pages directories industry develops, specific laws relating to the provision of Internet services and the use of Internet and Internet-related applications may become relevant. Regulation of the Internet and Internet-related services is itself still developing both formally by, for instance, statutory regulation, and also less formally by, for instance, industry self regulation. If our regulatory environment becomes more restrictive, including by increased Internet regulation, our profitability could decrease.

23

**Table of Contents**

***Our sales of advertising to national accounts are coordinated by third parties that we do not control.***

Approximately 14% to 15% of our directory advertising revenues for the period from 2003 to 2005 were derived from the sale of advertising to national or large regional chains, including rental car companies, insurance companies and pizza delivery businesses, each of which generally purchases advertising in numerous directories. In order to sell advertising to these accounts, we contract with certified marketing representatives, or CMRs, who are independent third parties that act as agents for national companies and design their advertisements, arrange for the placement of those advertisements in directories and provide billing services. We accept orders from approximately 165 CMRs and employ five national account managers to manage our sales to national customers. As a result, our relationships with these national advertisers depend significantly on the performance of these third party CMRs. We rely particularly on one CMR, TMP Worldwide Inc., whose billings were approximately 21% of total national revenues for the year ended December 31, 2005. If some or all of the CMRs with whom we have existing relationships with were unable or unwilling to transact business with us on acceptable terms or at all, this inability or unwillingness could materially adversely affect our business. In addition, any decline in the performance of the CMRs with whom we contract could harm our ability to generate revenues from our national accounts and could materially adversely affect our business.

***We have agreements with several major search engines and portals, the discontinuance of which may adversely affect our business.***

We have expanded our electronic product line by establishing relationships with several other Internet yellow pages directory providers, portals and search engines, which make our content easier for search engines to access and provide a response to general searches on the Internet. Under those agreements, we place our advertising customers' advertisements on major search engines, which gives us access to a higher volume of traffic than we could generate on our own without relinquishing the customer relationship. The search engines benefit from our local sales force and full-service capabilities for attracting and serving advertisers that might not otherwise transact business with search engines. The loss of any of these agreements could adversely affect our business.

***Our reliance on small and medium-sized businesses could materially affect us.***

As of December 31, 2005, approximately 85% of our directory advertising revenues were derived from selling advertising to local businesses, which are generally small and medium-sized businesses. In the ordinary course of our directory operations, we extend credit to these customers for advertising purchases. We currently directly bill over 50% of our customers representing approximately 457,000 accounts with average account balances of approximately $547. Full collection of delinquent accounts can take many months or may never occur. As of December 31, 2005, bad debt expense for all of our accounts amounted to approximately $167 million, or 4.9% of our revenues. Small and medium-sized businesses tend to have fewer financial resources and higher rates of failure than large businesses. In addition, the proliferation of very large retail stores may continue to harm small and medium-sized business. Consequently, although we attempt to mitigate exposure to the risks that result from serving some businesses through credit screening and collection of advance payments under certain circumstances, we cannot assure you that we will not be materially adversely affected by the failure of small and medium-sized businesses to meet their financial obligations to us.

***Loss of key personnel or our inability to attract and retain highly qualified individuals in the directories publishing business could materially adversely affect our business.***

We depend on the continued services of key personnel, including our experienced senior management team, as well as our regional sales management personnel. The loss of key personnel could have a material adverse effect on our business. Our separation from Verizon could also adversely affect our ability to attract and retain key personnel.

Our ability to achieve our operating goals depends to a significant extent on our ability to identify, hire, train and retain qualified individuals in the directories publishing business.

24

App. - 000152

**Table of Contents**

*Turnover among sales representatives could materially adversely affect our business.*

A loss of a significant number of experienced sales representatives would likely result in fewer sales of advertising in our directories and could materially adversely affect our business. In 2003, we lost a substantial portion of our sales force due to a management voluntary separation program offered by Verizon to substantially all of its non-union employees and certain union employees. In 2005, our average sales representative voluntary turnover rate was approximately 28%. We expend significant resources and management time on identifying and training our sales representatives. Our ability to attract and retain qualified sales personnel depends on numerous factors outside of our control, including conditions in the local employment markets in which we operate. A substantial decrease in the number of sales representatives could materially adversely affect our results of operations, financial condition and liquidity, as well as our ability to service our debt.

*We could be affected by certain changes in labor matters.*

As of December 31, 2005, approximately 30% of our employees were represented by unions. In addition, some of our key suppliers' employees are represented by unions. Work stoppages or slow downs involving our union represented employees, or those of our suppliers, could significantly disrupt our operations and increase operating costs, which would have a material adverse effect on our business. For instance, in October 2005, 313 of our employees, of which 282 were sales representatives, went on strike for approximately 14 weeks.

In addition, a greater percentage of our work force could become represented by unions. Currently, 1,466 of our employee sales representatives, representing 47% of our sales representatives, are covered by union contracts that will expire between June 2007 and October 2009, and 717 of our employee non-sales representatives, representing 17% of our non-sales representatives, are covered by union contracts that will expire between June 2007 and June 2009. If one union decides to strike, and other unions are able to honor its picket line, it could have a material adverse effect on our business. See "Our Business—Employees."

*A prolonged economic downturn could adversely materially affect our business.*

We derive substantially all of our net revenues from the sale of advertising. Typically, our advertising revenues, as well as those of yellow pages publishers in general, do not fluctuate widely with economic cycles. However, a prolonged national or regional economic recession or certain events that could produce major changes in shopping patterns, including a terrorist attack, could have a material adverse effect on our business.

In addition, any residual economic effects of, and uncertainties regarding the general possibility, express threat or future occurrence of terrorist attacks or other related disruptive events or the United States' continuing or expanded involvement in war, especially with respect to the major markets in which we operate that depend heavily on travel, tourism or the military, could materially adversely affect our business.

*A significant portion of our operations is in the Eastern states and, consequently, we may be subject to greater business risk than more geographically diversified directory publishers.*

A significant portion of our operations is in the Eastern areas of the United States and we do not expect that we will significantly expand our operations outside those areas in the foreseeable future. As a result, we will likely continue to be dependent upon our Eastern operations for a significant portion of our cash flow. As a result, we are subject to the following risks:

- a downturn in local or regional economic conditions;
- an increase in competition in those areas;
- changes in local and state governmental laws and regulations; and
- natural and other disasters in those areas.

In addition, our print product business has been adversely affected in urban markets in the Eastern states by difficult market conditions, including major disruptions of urban shopping and commuting patterns, declining consumer usage and intense competition. We have implemented specific strategies to stabilize our revenues in these markets. We cannot assure you that those strategies will be successful.

25

App. - 000153

Table of Contents

*The loss of important intellectual property rights could adversely affect our prospects and results of operations.*

Some trademarks, including the Verizon brand name and other intellectual property rights, are key to our business. We rely upon a combination of copyright and trademark laws as well as contractual arrangements to establish and protect our intellectual property rights. We are required from time to time to bring lawsuits against third parties to protect our intellectual property rights. Similarly, from time to time, we may be party to proceedings by third parties challenging our rights. We cannot be sure that any lawsuits or other actions brought by us will be successful or that we will not be found to infringe the intellectual property rights of third parties. As the Internet grows, it may prove more onerous to protect our trade names, including SuperPages.com, from domain name infringement or to prevent others from using Internet domain names that associate their business with ours. Although we are not aware of any material infringements of any trademark rights that are significant to our business, we have received claims in the past and any lawsuits, regardless of their outcome, could result in substantial costs and diversion of resources and could have a material adverse effect on our business, financial condition or results of operations. Furthermore, the loss of important intellectual property rights, including trademarks, could have a material adverse effect upon our business, financial condition and results of operations.

Our right to use the Verizon brand following the spin-off will be subject to our compliance with the terms and conditions of the branding agreement and other agreements we expect to enter into with Verizon.

*Environmental compliance costs and liabilities could adversely affect our operating results, including our cash available for operations.*

Our operations, as well as the properties that we own and lease for our business, are subject to stringent laws and regulations relating to environmental protection. Our failure to comply with applicable environmental laws, regulations or permit requirements, or the imposition of liability related to waste disposal or other matters arising under these laws, could result in civil or criminal fines, penalties or enforcement actions, third-party claims for property damage and personal injury or requirements to clean up property or other remedial actions. Some of these laws provide for "strict liability," which can render a party liable for environmental or natural resource damage without regard to negligence or fault on the part of the party.

In addition, new environmental laws and regulations, new interpretations of existing laws and regulations, increased governmental enforcement or other developments could require us to make additional unforeseen expenditures. Many of these laws and regulations are becoming increasingly stringent, and the cost of compliance with these requirements can be expected to increase over time. To the extent that the costs associated with meeting any of these requirements are substantial and not adequately provided for, there could be a material adverse effect on our business, financial condition and results of operations.

*Our exposure to legal proceedings could have a material adverse effect on our operating results or financial condition.*

Various lawsuits and other claims typical for a business of our size are pending against us. In addition, from time to time, we receive communications from government or regulatory agencies concerning investigations or allegations of noncompliance with laws or regulations in jurisdictions in which we operate. We do not expect that the ultimate resolution of pending regulatory and legal matters in future periods will have a material effect on our financial condition. However, any potential judgments, fines or penalties relating to these matters may have a material effect on our results of operations in the period in which they are recognized. See "Business—Legal Proceedings."

We are also exposed to defamation, breach of privacy claims and other litigation matters relating to our directories business, as well as methods of collection, processing and use of personal data. The subjects of our data and users of data collected and processed by us could also have claims against us if our data were found to be inaccurate, or if personal data stored by us were improperly accessed and disseminated by unauthorized

26

**Table of Contents**

persons. We may be party to litigation involving defamation, privacy claims and other matters that could have a material adverse effect on our business, financial condition or results of operations or otherwise distract our management.

*Our reliance on technology could have a material adverse effect on our business.*

Most of our business activities rely to a significant degree on the efficient and uninterrupted operation of our computer and communications systems and those of third parties. Any failure of current or, in the future, new systems could impair our collection, processing or storage of data and the day-to-day management of our business. This could have a material adverse effect on our business, financial condition and results of operations.

Our computer and communications systems are vulnerable to damage or interruption from a variety of sources. Despite precautions taken by us, a natural disaster or other unanticipated problems that lead to the corruption or loss of data at our facilities could have a material adverse effect on our business, financial condition and results of operations.

## Risk Factors Relating to Ownership of Our Common Stock

*The market price and trading volume of our common stock may be volatile.*

Prior to the spin-off, there will have been no trading market for our common stock. Our common stock is expected to be listed on the New York Stock Exchange. Trading in our common stock is expected to commence on a "when issued" basis on or about November 6, 2006.

Neither we nor Verizon can assure you as to the trading prices of our common stock after the spin-off. Until our common stock is fully distributed and an orderly market develops, the prices at which our stock trades may fluctuate significantly. In addition, the combined trading prices of Verizon common stock and our common stock after the spin-off may, in the aggregate, be less than, equal to or greater than the trading prices of Verizon common stock prior to the spin-off. The market price for our common stock may fluctuate in response to many things, including but not limited to:

- our quarterly or annual earnings or those of other companies in our industry;

- changes in earnings estimates or recommendations by research analysts;

- investor perceptions;

- new laws or regulations or new interpretations of laws or regulations applicable to our business;

- changes in accounting standards, policies, guidance, interpretations or principles; and

- general economic and industry conditions.

A portion of Verizon's common stock is held by index funds tied to the Standard & Poor's 500 Index or other stock indices. Because we may no longer be included in those indices at the time of the spin-off, those index funds may be required to sell our common stock. Consequently large amounts of our common stock could be sold in the open market in connection with the spin-off. We cannot predict the number of buyers that will be in the market at that time. In addition, our smaller size and different investment characteristics may not appeal to the current investor base of Verizon, which may seek to dispose of large amounts of our common stock following the spin-off. There is no assurance that there will be sufficient buying interest to offset those sales and, accordingly, the price of our common stock could be depressed and have periods of high volatility.

*Our capital raising may adversely affect holders of our common stock through the issuance of more senior securities or through dilution.*

In addition to the new financing arrangements we expect to enter in connection with the spin-off, we may need to incur additional debt or issue securities in order to fund working capital needs, capital expenditures and product development requirements or to make acquisitions and other investments. Due to limitations with respect to issuances of equity securities in the tax sharing agreement we expect to enter into with Verizon, we may seek

27

Table of Contents

to raise additional capital in the form of debt, which could increase our leverage and reduce our credit ratings. Further, any debt securities or preferred stock we issue will have liquidation rights, preferences and privileges senior to those of holders of our common stock. Among other reasons, if we were to raise funds through the issuance of common stock, we might lower the per share amount of any dividends that we issue.

***Our financing arrangements will contain significant limitations on our ability to pay dividends on shares of our common stock.***

Our financing arrangements will contain significant restrictions on our ability to pay dividends on shares of our common stock based on our meeting certain performance measures and complying with other conditions. Our ability to comply with these performance measures may be affected by events beyond our control, including prevailing economic, financial and industry conditions.

A breach of any of the covenants, ratios or tests contained in our financing arrangements could result in a default under the financing arrangements. Any events of default or breach of certain provisions in our financing arrangements could prohibit us from paying any dividends to you. See "Description of Certain Indebtedness."

***There is no assurance that we will declare dividends or have the available cash to make dividend payments.***

Although we will have a policy of paying dividends on our common stock, there can be no assurance that funds will be available for this purpose in the future. The declaration and payment of dividends will be subject to the sole discretion of our board of directors, will not be cumulative, and will depend upon our profitability, financial condition, capital needs, future prospects, and other factors deemed relevant by our board of directors, and will be restricted by the terms of our financing arrangements.

***Anti-takeover provisions of our certificate of incorporation and bylaws, the terms of our spin-off from Verizon and certain provisions of Delaware law could delay or prevent a change of control that you may favor.***

Some provisions to be included in our certificate of incorporation and bylaws may discourage, delay or prevent a merger or other change of control that stockholders may consider favorable or may impede the ability of the holders of our common stock to change our management. Provisions in our certificate of incorporation and bylaws, among other things, will:

- limit the right of stockholders to call special meetings of stockholders;

- regulate how stockholders may present proposals or nominate directors for election at annual meetings of stockholders;

- require unanimous written consent of stockholders to take any action without a meeting; and

- authorize our board of directors to issue preferred stock in one or more series, without stockholder approval.

Under the tax sharing agreement we expect to enter into with Verizon, we will indemnify Verizon for the tax resulting from any acquisition or issuance of our equity securities after the distribution that triggers the application of Section 355(e) of the Code. This indemnity obligation might discourage, delay or prevent a change of control that you may consider favorable.

In addition, several of the agreements that we expect to enter into with Verizon, including certain commercial service agreements, require Verizon's consent to any assignment by us of our rights and obligations under the agreements. The consent rights in these agreements might discourage, delay or prevent a transaction that you may consider favorable.

Finally, following the spin-off, we will be subject to Section 203 of the Delaware General Corporation Law, which may have an anti-takeover effect with respect to transactions not approved in advance by our board of directors, including discouraging takeover attempts that might result in a premium over the market price for shares of our common stock.

28

Table of Contents

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

We make forward-looking statements in this information statement. These forward-looking statements relate to our outlook or expectations for earnings, revenues, expenses, asset quality or other future financial or business performance, strategies or expectations, or the impact of legal, regulatory or supervisory matters on our business, results of operations or financial condition. Specifically, forward-looking statements may include:

- statements relating to our plans, intentions, expectations, objectives or goals, including those relating to the establishment of our new brand and the benefits of the spin-off;

- statements relating to our future economic performance, business prospects, revenues, income and financial condition following the spin-off, and any underlying assumptions relating to those statements; and

- statements preceded by, followed by or that include the words "will," "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "target" or similar expressions.

These statements reflect our management's judgment based on currently available information and involve a number of risks and uncertainties that could cause actual results to differ materially from those in the forward-looking statements. With respect to these forward-looking statements, our management has made assumptions regarding, among other things, customer usage, customer growth and retention, pricing, operating costs, technology and the economic and regulatory environment.

Future performance cannot be ensured. Actual results may differ materially from those in the forward-looking statements. Some factors that could cause our actual results to differ include:

- our revenues and operating costs may be different than expected following the spin-off;

- our ability to establish our new company brand and our ability to effectively use the Verizon brand in conjunction with our company brand, where permitted;

- a determination by the IRS that the distribution should be treated as a taxable transaction;

- our different capital structure as an independent company, including our access to capital, credit ratings, indebtedness and ability to raise additional financing;

- volatility in the equity market;

- the effects of vigorous competition in the markets in which we operate;

- the effects of other mergers and consolidations in the industries relevant to our operations and unexpected announcements or developments from others in those industries;

- the costs and business risks associated with providing new services and entering new markets;

- the impact of new, emerging or competing technologies on our business;

- the impact of any adverse change in the ratings assigned to our debt by ratings agencies on the cost of our financing and our ability to raise additional financing if needed;

- the uncertainties related to bankruptcies affecting industries relevant to our operations;

- the uncertainties related to the implementation of our business strategy, including our strategy to stabilize the decline in print product revenues in certain urban markets;

- unexpected results of litigation filed against our company;

- material changes to our operating agreements with Verizon;

- material changes to our contracts with unions;

29

Table of Contents

- inability of third parties to perform their obligations under agreements related to our business operations; and

- other risks referenced from time to time in our future filings with the SEC and those factors listed under "Risk Factors."

You are cautioned not to place undue reliance on any forward-looking statements, which speak only as of the date of this information statement. Except as required by law, we undertake no obligation to publicly update or release any revisions to these forward-looking statements to reflect any events or circumstances after the date of this information statement or to reflect the occurrence of unanticipated events.

30

Table of Contents

## THE SPIN-OFF

### Background

In December 2005, Verizon announced its intention to explore various strategies with its directories publishing operations, including a divestiture of our company.

In October 2006, Verizon announced its intention to pursue the spin-off of the companies that currently comprise Verizon's domestic print and Internet yellow pages directories publishing operations. We expect the spin-off to occur on or about November 17, 2006 through a tax-free distribution by Verizon of its shares of our common stock to Verizon's stockholders.

On October 18, 2006, the Verizon board of directors declared a dividend on Verizon common stock consisting of shares of our common stock. The dividend will be paid on or about November 17, 2006, the distribution date, in the amount of one share of our common stock for every 20 shares of Verizon common stock outstanding on the record date at 5:00 p.m., Eastern Time, as described below.

You will not be required to pay any cash or other consideration or to surrender or exchange your shares of Verizon common stock to receive the dividend of our common stock.

### Structure

In connection with the spin-off, Verizon will transfer to Idearc all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations (which we refer to collectively as the contribution). In exchange for the contribution, Idearc will:

- issue to Verizon additional shares of Idearc common stock to be distributed to Verizon's stockholders pro rata in the spin-off;

- issue to Verizon, in transactions exempt from registration under the Securities Act, senior unsecured notes and a portion of the loans under the tranche B facility, which we collectively refer to as the Idearc debt obligations; and

- transfer to Verizon up to approximately $2,500 million from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

We expect that Verizon will seek to exchange the Idearc debt obligations for certain outstanding Verizon, thereby reducing Verizon's outstanding indebtedness. Assuming Verizon and its creditors consummate the exchange, we expect Verizon's creditors to immediately resell the Idearc debt obligations.

After the contribution, Verizon will spinoff Idearc to the stockholders of Verizon by distributing all of its shares of Idearc common stock to Verizon stockholders on a pro rata basis.

As a result of the spin-off, Idearc will become an independent public company, although Idearc will continue to have a number of significant commercial arrangements with Verizon. No vote of Verizon stockholders is required or being sought in connection with the spin-off and Verizon stockholders have no appraisal rights in connection with the spin-off.

### Reasons for the Spin-Off

Verizon's board of directors has determined that separating our business from Verizon is in the best interests of Verizon and its stockholders. Verizon's board of directors considered potential benefits in making its determination to effect the spin-off. Among other things, Verizon's board of directors considered that the spin-off may:

- allow each company to separately focus on its core business, which may facilitate the potential expansion and growth of each of Verizon and Idearc;

31

Table of Contents

- allow each company to determine its own capital structure;

- enhance Idearc's ability to execute a potential acquisition strategy more effectively; and

- permit Idearc to enhance the efficiency and effectiveness of equity-based compensation programs offered to its employees.

Neither we nor Verizon can assure you that, following the spin-off, any of these benefits will be realized to the extent anticipated or at all.

Verizon's board of directors also considered a number of other factors in evaluating the spin-off, including:

- the potential for significant incremental costs to Idearc to replicate certain systems, infrastructure and personnel to which it will no longer have access after the spin-off;

- the impact on Idearc's business of incurring a substantial amount of debt;

- the possibility that Idearc may experience disruptions in its business as a result of the spin-off;

- the difficulties associated with launching and gaining market recognition of Idearc's new brand and the limitations on Idearc's right to use the Verizon brand;

- the limitations placed on Idearc as a result of the tax sharing and other agreements that it is expected to enter into with Verizon in connection with the spin-off; and

- the risk that the combined trading prices of Idearc common stock and Verizon common stock after the spin-off may be lower than the trading price of Verizon's common stock before the spin-off.

Ultimately, Verizon's board of directors concluded that the potential benefits of the spin-off outweigh these factors.

## The Number of Shares You Will Receive

For every 20 shares of Verizon common stock that you owned at 5:00 p.m., Eastern Time, on November 1, 2006, the record date, you will receive one share of our common stock on the distribution date.

If you sell your shares of Verizon common stock and the sale of the shares settles before the distribution date in the "regular way" market, you will not receive shares of our common stock in the distribution. Please see the following section "—Trading Before the Distribution Date."

## Trading Before the Distribution Date

### *Verizon Common Stock*

After the SEC declares effective the registration statement of which this information statement is a part, and beginning shortly after the record date and continuing until the distribution date, there will be two markets in Verizon common stock on the New York Stock Exchange: a "regular way" market and an "ex-distribution" market. If you own shares of Verizon common stock on the record date and sell those shares on the regular way market before the distribution date, you will also be selling your entitlement to the shares of our common stock that would have been distributed to you and, therefore, you will not receive Idearc shares. If you sell shares on the ex-distribution market, you will not sell your entitlement to the shares of our common stock and, therefore, you will receive Idearc shares even though you have sold your shares of Verizon common stock after the record date.

32

Table of Contents

*Our Common Stock*

On or about November 6, 2006, trading of shares of our common stock is expected to begin on a "when issued" basis. When issued trading refers to a sale or purchase made conditionally because the security has been authorized but has not yet been issued. The when issued trading market is a market for shares of our common stock that will be distributed to Verizon stockholders on the distribution date. If you owned shares of Verizon common stock on the record date and did not sell those shares in the regular way market, then you may trade your entitlement to shares of our common stock, without the shares of Verizon common stock you own, on the when issued trading market. On the first trading day following the distribution date, when issued trading with respect to our common stock will end and regular way trading will begin. We expect that any when issued trades of our common stock will settle within three trading days after the distribution date. When issued trading is under the trading symbol "IAR wi" which is different from our regular way trading symbol. Following the distribution date, shares of our common stock are expected to be listed under the trading symbol "IAR." If the spin-off does not occur, all when issued trading will be null and void.

### When and How You Will Receive Our Common Stock

We anticipate that on November 17, 2006, Verizon will release to our transfer agent shares of our common stock to be distributed. As part of the distribution, we expect to adopt a book-entry share transfer and registration system for our common stock. This means that instead of receiving physical share certificates, registered holders of Verizon common stock entitled to the distribution will have their shares of our common stock distributed on the distribution date credited to book-entry accounts established for them by the transfer agent. To the extent permitted by applicable Delaware law, the shares of our common stock will be uncertificated and we will not issue any physical share certificates. We expect that the transfer agent will mail an account statement to each registered holder stating the number of shares of our common stock credited to the holder's account. After the distribution, you may request a transfer of your shares of our common stock to a brokerage or other account.

For those holders of Verizon common stock who hold their shares through a broker, bank or other nominee, the transfer agent will credit the shares of our common stock to the accounts of those nominees who are registered holders, who, in turn, will credit their customers' accounts with our common stock. We anticipate that brokers, banks and other nominees will generally credit their customers' accounts with our common stock on the same day that their accounts are credited, which is expected to be the distribution date.

### Treatment of Fractional Shares

The transfer agent will not deliver any fractional shares of our common stock in connection with the distribution. Instead, the transfer agent will aggregate all fractional shares and sell them on behalf of those holders who otherwise would be entitled to receive a fractional share. We anticipate that these sales will occur as soon as practicable after the distribution date. Those holders will then receive a cash payment in the form of a check or wire transfer, as applicable, in an amount equal to their pro rata share of the total net proceeds of those sales. If you physically hold Verizon stock certificates or hold your stock in book-entry form, your check for any cash that you may be entitled to receive instead of fractional shares of our common stock will be mailed to you separately, or if applicable and practicable, a deposit will be made by wire transfer provided you are enrolled in direct deposit.

It is expected that all fractional shares held in street name will be aggregated and sold by brokers or other nominees according to their standard procedures and that brokers or other nominees may request the transfer agent to sell the fractional shares on their behalf. You should contact your broker or other nominee for additional details.

None of Verizon, our company or the transfer agent will guarantee any minimum sale price for the fractional shares of our common stock. Neither we nor Verizon will pay any interest on the proceeds from the sale of fractional shares. The receipt of cash in lieu of fractional shares will generally be taxable to the recipient stockholders. See "—Certain United States Federal Income Tax Consequences of the Spin-Off."

33

Table of Contents

**Treatment of Stock Options and Other Stock-Based Awards**

The exercise price of and number of shares of Verizon common stock underlying options to purchase shares of Verizon common stock held by any current or former Verizon employee (including a Verizon employee who is our employee at the time of the spin-off) will be adjusted, in an amount yet to be determined, pursuant to the terms of the applicable Verizon equity incentive plans, taking into account the change in the value of Verizon common stock as a result of the spin-off.

In order to avoid adverse tax treatment for option holders under the Code, the number of shares of Verizon common stock subject to the adjusted options will be rounded down to the nearest whole share, and the per-share exercise price will be rounded up to the nearest whole cent.

Verizon restricted stock units, or RSU's, awarded pursuant to Verizon equity incentive plans and held by any current or former Verizon employee (including a Verizon employee who is our employee at the time of the spin-off) at the time of the spin-off will continue to represent the right to receive the cash value equivalent of the hypothetical shares of Verizon common stock subject to the award. Each current or former employee who holds Verizon RSU's at the time of the spin-off will receive additional Verizon RSU's approximately equal to the cash value of our common stock that would be received with respect to each hypothetical share of Verizon common stock held by the current or former employee under the RSU program.

Verizon performance stock units, or PSU's, awarded pursuant to Verizon equity incentive plans and held by any current or former Verizon employee (including a Verizon employee who is our employee at the time of the spin-off) at the time of the spin-off will continue to represent the right to receive the cash value equivalent of the hypothetical shares of Verizon common stock subject to the award. Each current or former employee who holds Verizon PSU's at the time of the spin-off will receive additional Verizon PSU's approximately equal to the cash value of our common stock that would be received with respect to each hypothetical share of Verizon common stock held by the current or former employee under the PSU program.

**Interests of Verizon Officers and Directors in the Spin-Off**

To the extent that Verizon officers and directors hold shares of Verizon common stock, they will be entitled to receive shares of our common stock in the distribution on the same terms as other Verizon stockholders.

**Certain United States Federal Income Tax Consequences of the Spin-Off**

The following summarizes certain United States Federal income tax consequences of the spin-off. This summary is based on the Code, the Treasury regulations promulgated under the Code, and interpretations of the Code and the Treasury regulations by the courts and the IRS, all as they exist as of the date hereof and all of which are subject to change, possibly with retroactive effect. This summary is limited to stockholders of Verizon that are United States holders, as defined immediately below. A United States holder is a beneficial owner of Verizon common stock that is, for United States Federal income tax purposes:

- an individual who is a citizen or a resident of the United States;

- a corporation, or other entity taxable as a corporation for United States Federal income tax purposes, created or organized under the laws of the United States or any State thereof or the District of Columbia;

- an estate, the income of which is subject to United States Federal income taxation regardless of its source; or

- a trust, if (i) a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons have the authority to control all of its substantial decisions, or (ii) in the case of a trust that was treated as a domestic trust under the law in effect before 1997, a valid election is in place under applicable Treasury regulations.

34

Table of Contents

Further, this summary does not discuss all of the tax considerations that may be relevant to Verizon stockholders in light of their particular circumstances, nor does it address the consequences to stockholders subject to special treatment under the United States Federal income tax laws, including:

- insurance companies;

- dealers or traders in securities or currencies;

- tax-exempt organizations;

- financial institutions;

- mutual funds;

- partnerships or other entities classified as partnerships for United States Federal income tax purpose and investors in these entities;

- holders who hold their shares as a hedge or as part of a hedging, straddle, conversion, synthetic security, integrated investment or other risk-reduction transaction;

- holders who are subject to the alternative minimum tax; or

- holders who acquired their shares upon the exercise of employee stock options or otherwise as compensation.

In addition, this summary is limited to stockholders that hold their Verizon common stock as a capital asset. Finally, this summary does not address any estate, gift or other non-income tax consequences or any state, local or foreign tax consequences.

VERIZON STOCKHOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE UNITED STATES FEDERAL, STATE AND LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE SPIN-OFF TO THEM IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES.

The spin-off is conditioned upon Verizon's receipt of a private letter ruling from the IRS to the effect that the spin-off, including (i) the contribution of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations to Idearc, (ii) the receipt by Verizon of Idearc common stock, the Idearc debt obligations and cash delivered to Verizon from cash on hand and from the proceeds of a portion of the term loans incurred under the new credit facilities, (iii) the expected exchange by Verizon of the Idearc debt obligations for certain outstanding Verizon debt, and (iv) the distribution by Verizon of Idearc common stock to Verizon stockholders, will qualify as tax-free to Verizon, Idearc and Verizon stockholders for United States Federal income tax purposes under Section 355 and related provisions of the Code. Verizon received this private letter ruling in September 2006. Although a private letter ruling from the IRS generally is binding on the IRS, if the factual representations or assumptions made in the letter ruling request are untrue or incomplete in any material respect, then Verizon will not be able to rely on the ruling. Furthermore, the IRS will not rule on whether a distribution satisfies certain requirements necessary to obtain tax-free treatment under Section 355 of the Code. Rather, the private letter ruling will be based upon representations by Verizon that these conditions have been satisfied, and any inaccuracy in the representations could prevent Verizon from relying on the ruling.

The spin-off is also conditioned upon the receipt by Verizon of an opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special tax counsel to Verizon, to the effect that the spin-off will similarly qualify as tax-free to Verizon, Idearc and Verizon stockholders under Section 355 and related provisions of the Code. The opinion will rely on the IRS letter ruling as to matters covered by the ruling. The opinion will be based on, among other things, certain assumptions and representations as to factual matters made by Verizon and Idearc, which, if incorrect or inaccurate in any material respect, would jeopardize the conclusions reached by counsel in its opinion. The opinion will not be binding on the IRS or the courts, and the IRS or the courts may not agree with the opinion.

35

Table of Contents

Assuming that the spin-off qualifies as described above: (i) no gain or loss will be recognized by (and no amount will be included in the income of) Verizon stockholders upon the receipt of shares of Idearc common stock in the spin-off; (ii) any cash received in lieu of fractional share interests in Idearc will give rise to capital gain or loss equal to the difference between the amount of cash received and the tax basis allocable to the fractional share interests (determined as described below); (iii) the aggregate tax basis of the Verizon common stock and the Idearc common stock in the hands of each Verizon stockholder after the spin-off (including any fractional interests to which the stockholder would be entitled) will equal the aggregate tax basis of the Verizon common stock held by the stockholder immediately before the spin-off, allocated between the Verizon common stock and the Idearc common stock in proportion to the relative fair market value of each on the date of the spin-off; and (iv) the holding period of the Idearc common stock received by each Verizon stockholder will include the holding period at the time of the spin-off of the Verizon common stock on which the distribution is made.

Notwithstanding receipt by Verizon of the private letter ruling and opinion of counsel, the IRS could assert that the spin-off does not qualify for tax-free treatment for United States Federal income tax purposes. If the IRS were successful in taking this position, Verizon stockholders and Verizon could be subject to significant United States Federal income tax liability. In general, Verizon stockholders would be subject to tax as if they had received a taxable distribution equal to the fair market value of the Idearc common stock that was distributed to them and the gain recognized by Verizon likely would include the entire fair market value of the stock of Idearc as well as the Idearc debt securities. In addition, even if the spin-off otherwise were to qualify for tax-free treatment for United States Federal income tax purposes, it would become taxable to Verizon pursuant to Section 355(e) of the Code if 50% or more of the shares of either Verizon common stock or Idearc common stock were acquired, directly or indirectly, as part of a plan or series of related transactions that included the spin-off. If the IRS were to determine that acquisitions of Verizon common stock or Idearc common stock, either before or after the spin-off, were part of a plan or series of related transactions that included the spin-off, this determination could result in the recognition of gain by Verizon under Section 355 (e). In that case, the gain recognized by Verizon likely would include the entire fair market value of the stock of Idearc, and would be very substantial. In connection with the request for the IRS private letter ruling and the opinion of Verizon's counsel, Verizon has represented that the spin-off is not part of any plan or series of related transactions. Even if Section 355(e) were to cause the spin-off to be taxable to Verizon, the spin-off would remain tax-free to Verizon's stockholders.

Although the taxes resulting from the spin-off not qualifying for tax-free treatment for United States Federal income tax purposes generally would be imposed on Verizon stockholders and Verizon, under the tax sharing agreement Idearc expects to enter into with Verizon, Idearc would be required to indemnify Verizon and its affiliates against all tax-related liabilities caused by the failure of the spin-off to qualify for tax-free treatment for United States Federal income tax purposes (including as a result of Section 355(e) of the Code) to the extent these liabilities arise as a result of any action taken by Idearc or any of its affiliates following the spin-off or otherwise result from any breach of any representation, covenant or obligation of Idearc or any of its affiliates under the tax sharing agreement or any other agreement that will be entered into by Idearc with Verizon in connection with the spin-off. See "Relationship Between Verizon and Our Company After the Spin-Off—Tax Sharing Agreement."

## Results of the Distribution

Immediately following the spin-off, we expect to have outstanding approximately 146,000,000 shares of our common stock, based on the number of shares of Verizon common stock outstanding on October 14, 2006. The actual number of shares of our common stock to be distributed will depend on the actual number of shares of Verizon common stock outstanding on the record date.

Immediately following the spin-off, we expect to have approximately 899,750 holders of record of shares of our common stock, based on the number of record holders of Verizon common stock on October 14, 2006. This number includes those Verizon stockholders who are only entitled to receive a cash payment for fractional shares.

App. - 000164

Table of Contents

**Listing and Trading of Our Common Stock**

Before November 1, 2006, there will be no public market for our common stock. On or about November 6, 2006, trading of shares of our common stock is expected to begin on a when issued basis. Our common stock is expected to be listed on the New York Stock Exchange under the symbol "IAR." Following the spin-off, Verizon common stock will continue to trade on the New York Stock Exchange under the symbol "VZ."

Neither we nor Verizon can assure you as to the trading price of our common stock after the spin-off or as to whether the combined trading prices of our common stock and Verizon's common stock after the spin-off will, in the aggregate, be less than, equal to or greater than the trading prices of Verizon common stock before the spin-off. See "Risk Factors—Risk Factors Relating to Ownership of Our Common Stock."

The shares of our common stock distributed to Verizon's stockholders will be freely transferable, except for shares received by individuals who are our affiliates and except for certain shares issued under employee plans. Individuals who may be considered our affiliates after the spin-off include individuals who control, are controlled by or are under common control with us, as those terms generally are interpreted for federal securities law purposes. This may include some or all of our executive officers and directors. Individuals who are our affiliates will be permitted to sell their shares of our common stock only pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements of the Securities Act, including the exemptions afforded by Section 4(1) of the Securities Act or Rule 144 thereunder.

As of the distribution date, based on their holdings of Verizon common stock as of October 1, 2006, we estimate that our directors and officers will collectively hold 4,960 shares of our common stock that will be subject to these restrictions.

37

Table of Contents

## DIVIDEND POLICY

We expect to pay dividends at an annual rate of approximately $1.37 per share, but only if and to the extent dividends are declared by our board of directors and permitted by applicable law and by the terms of our financing arrangements. Dividend payments are not guaranteed and our board of directors may decide, in its absolute discretion, not to pay dividends. Dividends on our common stock are not cumulative. All decisions regarding the declaration and payment of dividends, including with respect to the initial dividend, will be at the discretion of our board of directors and will be evaluated from time to time in light of our financial condition, earnings, growth prospects, funding requirements, applicable law and other factors our board of directors deems relevant. Idearc is a newly-formed entity and, therefore, has not paid dividends in the past. In addition, our overall leverage could require us to dedicate a significant portion of our cash flow from operations to paying the principal of and interest on our indebtedness, thereby reducing funds available for other corporate purposes, and make it more difficult for us to pay our anticipated cash dividends. See "Risk Factors—Risk Factors Relating to the Spin-Off—Following the spin-off, we will have substantial indebtedness, which could have a negative impact on our financing options and liquidity position."

### Restrictions on Payment of Dividends Under Delaware Law

Under Delaware law, we can only pay dividends either out of "surplus" (which is defined as total assets at fair market value minus total liabilities, minus statutory capital) or out of current or the immediately preceding year's earnings. Although we believe we will have sufficient surplus or earnings to pay dividends at the anticipated levels during the first year following the spin-off, our board will seek periodically to assure itself of this before actually declaring any dividends.

### Restrictions on Payment of Dividends Under Our Financing Arrangements

Our financing arrangements will contain significant restrictions on our ability to pay dividends on shares of our common stock based on our meeting certain performance measures and complying with other conditions. Our ability to comply with these performance measures may be affected by events beyond our control, including prevailing economic, financial and industry conditions.

For example, we expect that our new credit facilities and our notes will include covenants that specifically limit our ability to pay dividends. Under the new credit facilities we expect to be generally restricted from paying dividends except in specified circumstances. See "Description of Certain Indebtedness—New Credit Facilities—Permitted Distributions." We expect the indenture governing the notes to include similar provisions limiting our ability to pay dividends.

A breach of any of the covenants, ratios or tests contained in our financing arrangements could result in a default under the financing arrangements. Any events of default or breach of certain provisions in our financing arrangements could prohibit us from paying any dividends to you.

38

**Table of Contents**

## CAPITALIZATION

The following table sets forth our capitalization as of September 30, 2006, on a historical and pro forma basis to give effect to the following pro forma transactions:

- repayment of a note receivable from Verizon;

- the issuance of approximately 146 million shares of Idearc common stock (using the distribution ratio of one share of Idearc common stock for every 20 shares of Verizon common stock);

- the incurrence by Idearc of up to approximately $9,115 million of debt comprised of:

  - approximately $2,850 million of senior unsecured notes; and

  - senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of:

    - a tranche A term loan facility of approximately $1,515 million; and

    - a tranche B term loan facility of approximately $4,750 million; and

- a cash distribution by Idearc to Verizon. If the pro forma transactions had occurred as of September 30, 2006, Idearc would have distributed approximately $2,380 million to Verizon consisting of the proceeds from the tranche A term loan facility of approximately $1,515 million, approximately $485 million of proceeds from loans under the tranche B facility, and approximately $380 million of the $480 million note receivable due from Verizon as of September 30, 2006, resulting in a remaining cash balance of approximately $100 million. The precise amount of this cash distribution will increase or decrease depending on the amount of cash on hand and the amount of the note receivable due from Verizon as of the date of the closing of the transactions, but will not exceed $2,500 million.

In exchange for the contribution by Verizon to Idearc of all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently related primarily to Verizon's domestic print and Internet yellow pages directories publishing operations, Idearc will: (i) issue to Verizon additional shares of Idearc common stock, the senior unsecured notes and a portion of the loans under the tranche B facility, and (ii) transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

You should read this table together with "Selected Financial Information," "Pro Forma Financial Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical and pro forma condensed financial statements and notes to those statements included elsewhere in this information statement.

| | As of September 30, 2006 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | (in millions) | |
| Cash | $ — | $ 100 |
| Note receivable from Verizon | 480 | — |
| Total cash and note receivable | $ 480 | $ 100 |
| Long-term debt: | | |
| New credit facilities | | |
| Tranche A term loan facility | $ — | $ 1,515 |
| Tranche B term loan facility | — | 4,750 |
| Senior unsecured notes | — | 2,850 |
| Total long-term debt | — | 9,115 |
| Parent's equity/shareowners' investment | 389 | (8,998) |
| Total capitalization | $ 389 | $ 117 |

App. - 000167

Table of Contents

## SELECTED FINANCIAL INFORMATION

The following table sets forth our summary of historical and pro forma financial data. The following financial data as of December 31, 2004 and 2005 and for the years ended December 31, 2003, 2004 and 2005 have been derived from our financial statements, which were audited by Ernst & Young LLP. The financial position as of December 31, 2003, and the results of operations, cash flow data and financial position as of and for the years ended December 31, 2001 and 2002 and as of and for the nine months ended September 30, 2005 and 2006, have been derived from our unaudited financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included. The following information should be read together with our financial statements and the notes related to those financial statements. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Index to Financial Statements."

Our financial information may not be indicative of our future performance and does not necessarily reflect what our financial condition and results of operations would have been had we operated as an independent, stand-alone entity during the periods presented, particularly since many changes will occur in our operations and capitalization as a result of our spin-off from Verizon.

| | For the Years Ended December 31, | | | | | For the Nine Months Ended September 30, | | Pro Forma for Nine Months Ended September 30, |
|---|---|---|---|---|---|---|---|---|
| | 2001 (unaudited) | 2002 (unaudited) | 2003 (audited) | 2004 (audited) | 2005 (audited) | 2005 (unaudited) | 2006 (unaudited) | 2006 (unaudited) |
| | (in millions) | | | | | | | |
| Operating revenue | $ 3,831 | $ 3,760 | $ 3,675 | $ 3,513 | $ 3,374 | $ 2,553 | $ 2,420 | $ 2,100 |
| Operating income | 1,994 | 1,764 | 1,477 | 1,601 | 1,641 | 1,265 | 1,060 | 1,100 |
| Income from operations before cumulative effective of accounting change [1] | 1,203 | 1,095 | 894 | 972 | 1,025 | 788 | 673 | 363 |
| Net income (loss) | 1,203 | 1,095 | (568) | 972 | 1,025 | 788 | 673 | 363 |

| | As of December 31, | | | | | As of September 30, | | Pro Forma As of September 30, |
|---|---|---|---|---|---|---|---|---|
| | 2001 (unaudited) | 2002 (unaudited) | 2003 (unaudited) | 2004 (audited) | 2005 (audited) | 2005 (unaudited) | 2006 (unaudited) | 2006 (unaudited) |
| Total assets | $ 3,688 | $ 3,336 | $ 1,359 | $ 1,402 | $ 1,412 | $ 1,350 | $ 1,456 | $ 1,121 |
| Long-term obligations | — | — | — | — | — | — | — | 9,115 |
| Parent's equity/shareowners' investment | 1,895 | 1,843 | 226 | 317 | 325 | 297 | 389 | (8,998) |

(1) Effective January 1, 2003, we changed our method for recognizing revenues and expenses from the publication-date method to the amortization method. The publication-date method, which we used prior to January 1, 2003, recognizes revenues and direct expenses when the directories are published. Under the amortization method, which has increasingly become the industry standard, revenues and direct expenses (paper, printing and initial distribution costs) are recognized over the life of the directory, which is usually twelve months. The accounting change affected the timing of the recognition of revenues and expenses but did not result in any impact on cash flows. The cumulative effect of the accounting change resulted in a one-time charge of $2,381 million ($1,463 million after-tax).

40

App. - 000168

Table of Contents

## PRO FORMA FINANCIAL INFORMATION

The unaudited pro forma financial information presented below has been derived from our audited financial statements as of and for the year ended December 31, 2005 and unaudited financial statements for the nine months ended September 30, 2005 and 2006. The pro forma adjustments and notes to the pro forma financial information give effect to the transactions described below. The unaudited pro forma financial information should be read together with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and notes related to those financial statements included elsewhere in this information statement.

The unaudited pro forma statement of operations for the year ended December 31, 2005 and interim periods ended September 30, 2005 and 2006 have been prepared as if the transactions described below had occurred as of January 1, 2005. The unaudited pro forma interim balance sheet as of September 30, 2006 has been prepared as if the transactions described below occurred on September 30, 2006. The pro forma adjustments are based on the best information available and assumptions that management believes are reasonable. The unaudited pro forma financial information is for illustrative and informational purposes only and is not intended to represent or be indicative of what our results of operations or financial position would have been had the transactions described below occurred on the dates indicated. The unaudited pro forma financial information also should not be considered representative of our future results of operations or financial position.

The pro forma financial information presented reflects our financial results as fully described in the notes to our consolidated financial statements included in this information statement and gives effect to the following pro forma transactions:

- repayment of a note receivable from Verizon;

- the issuance of approximately 146 million shares of Idearc common stock (using the distribution ratio of one share of Idearc common stock for every 20 shares of Verizon common stock);

- the incurrence by Idearc of up to approximately $9,115 million of debt comprised of:

  - approximately $2,850 million of the notes; and

  - senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of:

    - a tranche A term loan facility of approximately $1,515 million; and

    - a tranche B term loan facility of approximately $4,750 million; and

- a cash distribution by Idearc to Verizon. If the pro forma transactions had occurred as of September 30, 2006, Idearc would have distributed approximately $2,380 million to Verizon consisting of the proceeds from the tranche A term loan facility of approximately $1,515 million, approximately $485 million of proceeds from loans under the tranche B facility, and approximately $380 million of the $480 million note receivable due from Verizon as of September 30, 2006, resulting in a remaining cash balance of approximately $100 million. The precise amount of this cash distribution will increase or decrease depending on the amount of cash on hand and the amount of the note receivable due from Verizon as of the date of the closing of the transactions, but will not exceed $2,500 million.

In exchange for the contribution by Verizon to Idearc of all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations, Idearc will: (i) issue to Verizon additional shares of Idearc common stock, the senior unsecured notes and a portion of the loans under the tranche B facility, and (ii) transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

See the notes to unaudited pro forma financial information included herein for a more detailed discussion of these pro forma transactions.

41

Table of Contents

The pro forma adjustments do not give effect to non-recurring separation costs estimated to be approximately $124 million pre-tax and approximately $76 million on an after-tax basis. We expect to fund these costs from available cash. Due to the scope and complexity of the underlying projects, the amount of these costs could increase or decrease materially and the timing of incurrence of these costs could change. The following table sets forth our estimated non-recurring separation costs by category and period:

| | Year Ending December 31, | | | |
| | 2006 (Estimate) | 2007 and 2008 (Estimate) (in millions) | | Total (Estimate) |
|---|---|---|---|---|
| Re-branding and brand launch | $    3 | $    27 | | $    30 |
| Employee and other | 11 | 8 | | 19 |
| Information technology systems and infrastructure | 3 | 1 | | 4 |
| Transition cost | 17 | 52 | | 69 |
| SuperPages.com platform development | 2 | — | | 2 |
| Total pre-tax | $    36 | $    88 | | $    124 |
| Total after-tax [1] | $    22 | $    54 | | $    76 |

(1)    Based on a 39% tax rate.

A portion of the costs will be capitalized and amortized over its useful life and other costs will be expensed as incurred depending on their nature.

The pro forma adjustments do not give effect to the annual costs that will result from establishing or expanding the corporate support services for our business, including information technology, human resources, treasury, tax, risk management, accounting and financial reporting, investor relations, pension management, legal, procurement and other services. We expect these costs to be substantially similar to our historical costs.

Historically, we reimbursed Verizon for specific goods and services it provided to, or arranged for, us based on tariffed rates, market prices or negotiated terms that approximated market rates. These goods and services included items such as communications and data processing services, office space, professional fees and insurance coverage.

We also reimbursed Verizon for our share of costs incurred by Verizon to provide services on a common basis to all of its subsidiaries. These costs included allocations for legal, security, treasury, tax and audit services. The allocations were based on actual costs incurred by Verizon and periodic studies that identified employees or groups of employees who were totally or partially dedicated to performing activities that benefited us. In addition, we reimbursed Verizon for general corporate costs that indirectly benefited us, including costs for activities such as investor relations, financial planning, marketing services and benefits administration. These allocations were based on actual costs incurred by Verizon, as well as on our size relative to other Verizon subsidiaries. We believe that these cost allocations are reasonable for the services provided. We also believe that these cost allocations are consistent with the nature and approximate amount of the costs that we would have incurred on a stand-alone basis.

The pro forma adjustments do not give effect to the impact of the sale of our Hawaii operations that were sold in May 2005. For the year ended December 31, 2005, Hawaii operating revenues were $22 million, operating expenses were $6 million, operating income was $16 million and net income was $10 million. See "Summary—Summary Historical and Pro Forma Financial Data."

The pro forma adjustments do not give effect to the impact of the new printing agreement, dated February 16, 2006, with RRD. As a result of this agreement, we will no longer derive revenue or incur expense from commercial printing services. See note 15 to the audited financial statements for additional information on our printing agreement with RRD. For the nine months ended September 30, 2006, commercial printing revenue was $7 million and operating expense was $4 million. In 2005, commercial printing revenue was $24 million and operating expense was $22 million. See "Summary—Summary Historical and Pro Forma Financial Data."

App. - 000170

**Table of Contents**

**Idearc Inc.**
**Unaudited Pro Forma Statement of Operations**
**For the Year Ended December 31, 2005**

| | Historical | The Transactions | Pro-Forma |
|---|---|---|---|
| | | (dollars in millions, except per share amount) | |
| **Operating Revenue** | | | |
| Print products | $ 3,147 | $ — | $ 3,147 |
| Electronic | 197 | — | 197 |
| Other | 30 | — | 30 |
| **Total Operating Revenue** | 3,374 | — | 3,374 |
| **Operating Expense** | | | |
| Selling | 646 | (32) [1] | 614 |
| Cost of sales | 622 | (12) [1] | 610 |
| General and administrative | 374 | (8) [1] | 366 |
| Depreciation and amortization | 91 | — | 91 |
| **Total Operating Expense** | 1,733 | (52) | 1,681 |
| **Operating Income** | 1,641 | 52 | 1,693 |
| Interest income and (expense), net | 16 | (718) [2] | (702) |
| **Income before income taxes** | 1,657 | (666) | 991 |
| Provision for income taxes | 632 | (260) [2] | 372 |
| **Net Income (Loss)** | $ 1,025 | $ (406) | $ 619 |
| **Pro forma basic and diluted earnings per common share** | | | $ 4.24 |
| **Pro forma basic and diluted shares outstanding (in millions)** | | | 146 [3] |

43

Table of Contents

**Idearc Inc.**
**Unaudited Pro Forma Statement of Operations**
**For the Nine Months Ended September 30, 2005**

| | Historical | The Transactions | Pro-Forma |
|---|---|---|---|
| | (dollars in millions, except per share amount) | | |
| **Operating Revenue** | | | |
| Print products | $ 2,383 | $ — | $ 2,383 |
| Electronic | 147 | — | 147 |
| Other | 23 | — | 23 |
| **Total Operating Revenue** | 2,553 | — | 2,553 |
| **Operating Expense** | | | |
| Selling | 456 | (25) [1] | 431 |
| Cost of sales | 461 | (9) [1] | 452 |
| General and administrative | 303 | (5) [1] | 298 |
| Depreciation and amortization | 68 | — | 68 |
| **Total Operating Expense** | 1,288 | (39) | 1,249 |
| **Operating Income** | 1,265 | 39 | 1,304 |
| Interest income and (expense), net | 10 | (537) [2] | (527) |
| **Income before income taxes** | 1,275 | (498) | 777 |
| Provision for income taxes | 487 | (194) [2] | 293 |
| **Net Income** | $ 788 | $ (304) | $ 484 |
| **Pro forma basic and diluted earnings per common share** | | | $ 3.32 |
| **Pro forma basic and diluted shares outstanding (in millions)** | | | 146 [3] |

44

App. - 000172

Table of Contents

**Idearc Inc.**
**Unaudited Pro Forma Statement of Operations**
**For the Nine Months Ended September 30, 2006**

| | Historical | The Transactions | Pro-Forma |
|---|---|---|---|
| | | (dollars in millions, except per share amount) | |
| **Operating Revenue** | | | |
| Print products | $ 2,241 | $ — | $ 2,241 |
| Electronic | 167 | — | 167 |
| Other | 12 | — | 12 |
| **Total Operating Revenue** | 2,420 | — | 2,420 |
| **Operating Expense** | | | |
| Selling | 533 | (27) [1] | 506 |
| Cost of sales | 474 | (8) [1] | 466 |
| General and administrative | 286 | (5) [1] | 281 |
| Depreciation and amortization | 67 | — | 67 |
| **Total Operating Expense** | 1,360 | (40) | 1,320 |
| **Operating Income** | 1,060 | 40 | 1,100 |
| Interest income and (expense), net | 21 | (548) [2] | (527) |
| **Income before income taxes** | 1,081 | (508) | 573 |
| Provision for income taxes | 408 | (198) [2] | 210 |
| **Net Income** | $ 673 | $ (310) | $ 363 |
| **Pro forma basic and diluted earnings per common share** | | | $ 2.49 |
| **Pro forma basic and diluted shares outstanding (in millions)** | | | 146 [3] |

45

Table of Contents

**Idearc Inc.**
**Unaudited Pro Forma Balance Sheet**
**As of September 30, 2006**

| | Historical | The Transactions (dollars in millions) | Pro-Forma |
|---|---|---|---|
| **Assets** | | | |
| Current assets | | | |
| Cash | $ — | $ 100 [4] | $ 100 |
| Note receivable from Verizon | 480 | (480) [4] | — |
| Accounts receivable, net of allowance of $75 | 325 | — | 325 |
| Deferred directory costs | 136 | — | 136 |
| Prepaid expenses and other | 49 | — | 49 |
| Total current assets | 990 | (380) | 610 |
| Property, plant and equipment | 459 | — | 459 |
| Less accumulated depreciation | (322) | — | (322) |
| | 137 | — | 137 |
| Goodwill | 73 | — | 73 |
| Other intangible assets, net | 107 | — | 107 |
| Deferred tax asset | 149 | (70) [5][6] | 79 |
| Other assets | — | 115 [5] | 115 |
| Total assets | $ 1,456 | $ (335) | $ 1,121 |
| **Liabilities and Parent's Equity/Shareowners' Investment** | | | |
| Current liabilities | | | |
| Accounts payable and accrued liabilities | $ 312 | $ — | $ 312 |
| Deferred revenues | 198 | — | 198 |
| Other | 30 | — | 30 |
| Total current liabilities | 540 | — | 540 |
| Non-current liabilities | | | |
| Long term-debt | — | 9,115 [4] | 9,115 |
| Employee benefit obligations | 524 | (63) [6] | 461 |
| Other liabilities | 3 | — | 3 |
| Total non-current liabilities | 527 | 9,052 | 9,579 |
| Parent's equity/shareowners' investment | | | |
| Common stock, $.01 par value, 146,000,000 shares issues and outstanding | — | 2 | 2 |
| Parent's equity | 389 | (389) | — |
| Additional paid in capital | — | (9,000) | (9,000) |
| Total parent's equity/shareowners' investment | 389 | (9,387) | (8,998) |
| Total liabilities and parent's equity/shareowners' investment | $ 1,456 | $ (335) | $ 1,121 |

46

Table of Contents

**Idearc Inc.**
**Notes to Unaudited Pro Forma Financial Information**

(1) Reflects the expected ongoing pension credit stemming from the 414(l) pension asset transfer. In connection with the spin-off, the pension assets will be transferred to us on a fully funded basis. In 2005, we recorded an annual combined pension/other post-employment benefits, or OPEB, expense of $48 million and on a pro forma basis, we expect to record an annual combined pension/OPEB credit of $4 million. In the nine-month period ended September 30, 2005 and 2006, we reflected a pension/OPEB credit of $3 million. Our expected ongoing annual pension credit and OPEB expense is based on demographic data as of January 1, 2005, the most recent date for which information is available to Idearc.

(2) Reflects the adjustment to record interest expense on $9,115 million of debt, the amortization of debt issuance costs of approximately $13 million annually and approximately $10 million for each nine-month period, and the associated estimated income taxes. In addition, reflects the elimination of the interest income currently earned on the note receivable from Verizon. See note (4) below. The tax effect of the pro forma adjustments was calculated using the estimated statutory federal and state tax rate of 39% applicable to our operating companies.

The following table sets forth the effective interest rates for the senior unsecured notes and for each component of the new credit facilities, based on our current expectations regarding the terms governing these obligations:

|  | Principal Outstanding (dollars in millions) | Effective Interest Rate |
|---|---|---|
| New credit facilities |  |  |
|   Revolving credit facility | $     — | 6.90% |
|   Tranche A term loan facility | 1,515 | 6.90% |
|   Tranche B term loan facility (hedged portion) | 4,442 | 7.57% |
|   Tranche B term loan facility | 308 | 7.40% |
| Senior unsecured notes | 2,850 | 8.00% |
| **Total** | $ 9,115 |  |

The assumed blended interest rate for the total long-term debt was estimated to be 7.59%. The interest rate on the revolving credit facility and the tranche A term loan facility was assumed to be LIBOR plus 150 basis points. The interest rate on the tranche B term loan facility was assumed to be LIBOR plus 200 basis points. We have assumed that we would enter into interest rate hedging contracts to fix the interest rate on a portion of the tranche B term loan facility at an additional cost of 17 basis points. In preparing the pro forma financial statements, we assumed a 90-day LIBOR rate of 5.4%, based on the rate as of October 26, 2006. A ¼% change in the assumed blended interest rate would result in a change in interest expense of approximately $23 million annually and approximately $17 million for each nine-month period.

Debt issuance costs will be amortized over the life of the related debt. Debt issuance costs, the related amortization period and our annual cost are estimated as follows:

|  | Issuance Costs | Amortization Number of Years (dollars in millions) | Per Year |
|---|---|---|---|
| New credit facilities |  |  |  |
|   Revolving credit facility | $   2.0 | 5 | $   0.3 |
|   Tranche A term loan facility | 9.0 | 7 | 1.4 |
|   Tranche B term loan facility | 29.0 | 8 | 3.8 |
| Senior unsecured notes | 75.0 | 10 | 7.5 |
| **Total** | $ 115.0 |  | $ 13.0 |

47

**Table of Contents**

A summary of the effects of the adjustments on interest expense are as follows:

| | For the twelve months Ended December 31, 2005 | For the nine months Ended September 30, 2005 | For the nine months Ended September 30, 2006 |
|---|---|---|---|
| | | (dollars in millions) | |
| Estimated interest income from operating cash | $ 3 | $ 2 | $ 2 |
| Estimated interest expense | (692) | (519) | (519) |
| Estimated interest expense, net | (689) | (517) | (517) |
| Amortization of debt issuance costs | (13) | (10) | (10) |
| Elimination of historical interest income | (16) | (10) | (21) |
| Total estimated adjustment on interest expense | $ (718) | $ (537) | $ (548) |

See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

(3)   The number of shares used to compute pro forma basic earnings per share is the number of shares of common stock estimated to be outstanding at the distribution date, using the distribution ratio of one share of our common stock for every 20 shares of Verizon common stock outstanding at September 30, 2006.

(4)   Reflects the recapitalization of our business through the series of the following transactions:

- repayment of a note receivable from Verizon;

- the issuance of approximately 146 million shares of Idearc common stock (using the distribution ratio of one share of Idearc common stock for every 20 shares of Verizon common stock);

- the incurrence by Idearc of up to approximately $9,115 million of debt comprised of:

  - approximately $2,850 million of senior unsecured notes; and

  - senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of:

    - a tranche A term loan facility of approximately $1,515 million; and

    - a tranche B term loan facility of approximately $4,750 million; and

- a cash distribution by Idearc to Verizon. If the pro forma transactions had occurred as of September 30, 2006, Idearc would have distributed approximately $2,380 million to Verizon consisting of the proceeds from the tranche A term loan facility of approximately $1,515 million, approximately $485 million of proceeds from loans under the tranche B facility, and approximately $380 million of the $480 million note receivable due from Verizon as of September 30, 2006, resulting in a remaining cash balance of approximately $100 million. The precise amount of this cash distribution will increase or decrease depending on the amount of cash on hand and the amount of the note receivable due from Verizon as of the date of the closing of the transactions, but will not exceed $2,500 million.

In exchange for the contribution by Verizon to Idearc of all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations, Idearc will: (i) issue to Verizon additional shares of Idearc common stock, the senior unsecured notes and a portion of the loans under the tranche B facility, and (ii) transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

(5)   We reflect the incurrence of approximately $115 million in debt issuance costs in connection with the $9,115 million debt issuance. These costs will be deferred and amortized as interest expense over the term of the debt. In addition, a deferred tax liability of $45 million is established and reflected as a reduction to our deferred tax asset.

(6)   Reflects the one-time adjustment to record a stock compensation expense of approximately $27 million associated with Verizon-based stock options and other stock-based awards and the subsequent payment to Verizon of the entire liability associated with the Verizon long-term incentive plan.

48

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis of our financial condition and results of operations covers periods prior to the consummation of the spin-off and the related transactions, which we refer to as the transactions. Accordingly, the discussion and analysis of historical periods does not reflect the significant impact that the transactions will have on us, including significantly increased leverage and debt service requirements. In addition, the statements in the discussion and analysis regarding industry outlook, our expectations regarding the future performance of our business and the other non-historical statements in the discussion and analysis are forward-looking statements. These forward-looking statements are subject to numerous risks and uncertainties, including, but not limited to, the risks and uncertainties described in the "Risk Factors" section. Our actual results may differ materially from those contained in any forward-looking statements. You should read the following discussion together with the section entitled "Risk Factors," "Cautionary Statement Regarding Forward-Looking Statements," "Selected Financial Information," "Pro Forma Financial Information," "—Liquidity and Capital Resources" and our financial statements and related notes thereto included elsewhere in this information statement.

Our financial information may not be indicative of our future performance and does not necessarily reflect what our financial condition and results of operations would have been had we operated as an independent, stand-alone entity during the periods presented, particularly since many changes will occur in our operations and capitalization as a result of the transactions.

### Overview

We are the second largest yellow pages directories publisher in the United States as measured by revenues, and we believe that we have the nation's leading Internet yellow pages directory. Our products include: print yellow pages; print white pages; an Internet yellow pages directory, SuperPages.com; and an information directory for wireless subscribers, SuperPages Mobile. Following the transactions, our assets, liabilities, businesses and employees will consist of those currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations. We will continue to be the exclusive official publisher of Verizon print directories in the markets in which Verizon is currently the incumbent local exchange carrier, which we refer to as our incumbent markets. We also will continue to use the Verizon brand on our print directories in our incumbent markets, as well as in our current markets in which Verizon is not the incumbent, which we refer to as our independent markets. For the year ended December 31, 2005, we generated revenue of $3,374 million and operating income of $1,641 million.

We are currently a subsidiary of Verizon. On October 18, 2006, Verizon announced its intention to pursue the spin-off of the companies that currently comprise Verizon's domestic print and Internet yellow pages directories publishing operations. The spin-off, now expected to occur on or about November 17, 2006, will occur through a tax-free distribution by Verizon of all of its shares of our common stock to Verizon's stockholders. In connection with the spin-off, we expect to enter into a distribution agreement with Verizon containing the key provisions relating to the separation of our business from Verizon. The distribution agreement will identify the assets to be transferred, liabilities to be assumed and contracts to be assigned to us. Our capital structure will change significantly on the date of the spin-off from Verizon.

### Stand-alone Company

We have historically operated as the print and Internet yellow pages directories businesses of Verizon and not as a stand-alone company. The financial statements included in this information statement have been derived from the historical financial statements of Verizon, and include the assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations that are currently reported in Verizon's Information Services segment in its financial statements. To

49

Table of Contents

prepare these financial statements, we specifically identified all assets, liabilities, businesses and employees primarily related to those operations. We believe these specific identifications are reasonable; however, the resulting amounts could differ from amounts that would be determined if we operated on a stand-alone basis. Because of our relationship with Verizon, our historical results of operations, financial position and cash flows are not necessarily indicative of what they would have been had we operated without the shared resources of Verizon. Accordingly, our financial statements are not necessarily indicative of our future results of operations, financial position and cash flows. See our financial statements and related notes thereto included in this information statement.

Historically, we reimbursed Verizon for specific goods and services it provided to, or arranged for, us based on tariffed rates, market prices or negotiated terms that approximated market rates. These goods and services included items such as communications and data processing services, office space, professional fees and insurance coverage.

We also reimbursed Verizon for our share of costs incurred by Verizon to provide services on a common basis to all of its subsidiaries. These costs included allocations for legal, security, treasury, tax and audit services. The allocations were based on actual costs incurred by Verizon and periodic studies that identified employees or groups of employees who were totally or partially dedicated to performing activities that benefited us. In addition, we reimbursed Verizon for general corporate costs that indirectly benefited us, including costs for activities such as investor relations, financial planning, marketing services and benefits administration. These allocations were based on actual costs incurred by Verizon, as well as on our size relative to other Verizon subsidiaries. We believe that these cost allocations are reasonable for the services provided. We also believe that these cost allocations are consistent with the nature and approximate amount of the costs that we would have incurred on a stand-alone basis.

Upon the consummation of the transactions, we will become a stand-alone company. We expect that the costs we will incur as a stand-alone company will initially include payment for services we expect to be provided by Verizon under a transition services agreement, which will become effective immediately after the consummation of the transactions. Under the transition services agreement, Verizon will continue to provide certain services that it has historically provided to us, including portions of requirements relating to information technology, financial services, and human resources for a period from 6 to 18 months. During the period of the transition services agreement, we will incur one-time costs for transition activities and may incur some duplicative expenses as we start up certain stand-alone functions. We estimate these one-time costs to be approximately $124 million pre-tax and approximately $76 million on an after-tax basis. We expect to fund these costs from available cash. Following the full implementation of our stand-alone functions and the termination of the transition services agreement, we expect costs for the stand-alone services to be similar to our historical costs. However, there can be no assurance that our costs will not exceed our historical cost allocations for similar services. See "Pro Forma Financial Information" for an estimate of our separation costs by category and period.

*Basis of Presentation*

Our financial statements were prepared using the specific financial accounting records of the entities that comprise the domestic print and Internet yellow pages directories publishing operations of Verizon. These entities include Idearc Media Corp., Idearc Media Sales—East Co., Idearc Media Sales—West Inc., Idearc Media Services—East Inc. and Idearc Media Services-West Inc. These financial statements have been presented using the historical results of operations and historical basis of assets and liabilities of these businesses. All significant intercompany accounts and transactions have been eliminated.

The financial statements are prepared using United States generally accepted accounting principles (U.S. GAAP). These principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities and the reported amounts of revenues and expenses. Actual results could differ from those estimates and assumptions. Examples of significant

50

Table of Contents

estimates include the allowance for doubtful accounts, the recoverability of property, plant and equipment, goodwill and other intangible assets, valuation allowances on tax assets and liabilities, and pension and postretirement benefit assumptions. See "Critical Accounting Policies" for a summary of the critical accounting policies used in preparing our financial statements.

Additionally, the assets and liabilities included in our financial statements may differ from our assets and liabilities upon completion of the transactions. The spin-off will be completed on the terms contained in the distribution agreement we expect to enter into with Verizon. Our management believes that all historical costs of operations have been reflected in the financial statements.

*New Financing Arrangements*

In connection with the transactions, as partial consideration for the acquired business, we expect to issue to Verizon senior unsecured notes, which we refer to as the notes, and a portion of the loans under the tranche B facility. We will also transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility. We expect that the terms of the credit agreement governing the new credit facilities and the indenture governing the notes will include covenants that, among other things, may require us to satisfy certain financial tests, maintain certain financial ratios, restrict our ability to create liens, which could limit our ability to incur additional indebtedness, and restrict the ability of our subsidiaries to incur additional indebtedness. To the extent permitted, we may also incur additional indebtedness from time to time for general corporate purposes, including working capital requirements, capital expenditures and future acquisitions.

We anticipate that upon completion of the transactions, we will have combined cash and equivalents of approximately $100 million and available liquidity under the revolving credit facility of $250 million. We expect to have approximately $9,115 million of indebtedness upon completion of the transactions.

*Operating Revenue*

We derive our operating revenue primarily from the sale of advertising in our print directories, which we refer to as print products revenue. Of our total 2005 operating revenue of $3,374 million, $3,147 million, or 93.3% came from the sale of advertising in our print directories. Revenue from our Internet yellow pages directory, SuperPages.com, which we refer to as electronic revenue, generated $197 million, or 5.8% of our total 2005 operating revenue. Other revenue sources produced $30 million, or 0.9%, of our total 2005 operating revenue.

Growth in operating revenue can be affected by several factors, including changes in advertising customers, changes in the pricing of advertising, changes in the quantity of advertising purchased per customer, changes in the size of the sales force and the introduction of additional products, which generate incremental revenues. We continue to face competition in our print directories markets as well as from other advertising media, including cable television, radio and the Internet. Over the past several years, as a result of this competition, among other things, our print products revenue in our incumbent markets has declined. However, these declines have been offset in part by growth in our independent directories business and Internet yellow pages business.

For the full year ended December 31, 2006, we currently estimate that our total operating revenue, excluding the revenue associated with our Hawaii operations that were sold in May 2005 and commercial printing operations that were discontinued in March 2006, will be approximately 3.0% less than our total operating revenue, on the same basis, for the year ended December 31, 2005. This decline reflects the continuing amortization of our published results from 2005 and the early part of 2006, offset in part by the recent improvements in our published results described below and the continuing growth of our Electronic revenue. We also currently estimate that our operating income margin, including the effects of depreciation and amortization, for the year ended December 31, 2006, will be approximately 45%. The impact of depreciation and amortization on our operating income margins for that period was approximately 3%. However, for the reasons discussed above in the introduction to "Management's discussion and analysis of financial condition and results of

51

Table of Contents

operations," there can be no assurance that our operating revenue and our operating income margin for the full year ended December 31, 2006 will not be materially different from these estimates.

*Print Products.* Advertising in print directories is sold a number of months prior to the date each title is published. We recognize revenue ratably over the life of each directory, which is usually 12 months, using the amortization method of accounting, with revenue recognition commencing in the month of publication. A portion of the revenue reported in any given year represents sales activity and in some cases, publication of directories, that occurred in the prior year. Print advertising is sold to two customer sets: local advertisers, comprised of small and medium-sized businesses that advertise in a limited geographical area, and national advertisers, comprised of larger businesses that advertise regionally or nationally. The proportion of print product revenue attributable to local and national advertisers has historically been consistent over time, with 84.6%, 85.4% and 85.8% attributable to local revenue and 15.4%, 14.6% and 14.2% attributable to national revenue in 2005, 2004 and 2003, respectively.

Our print products revenue performance varies depending on the market and area of the country. Some of our markets in the densely populated urban areas along the East coast of the United States have been more adversely impacted by difficult market conditions, including declining market usage and intense competition. These markets represent a significant portion of our print products revenue. Market specific strategies have been implemented to mitigate further revenue declines in these and other markets. To the extent these strategies are successful, we believe the decline in our print products revenues may diminish over time. However, because we have only recently begun implementing these strategies, and because of the effects of our amortization method of accounting, the results of these initiatives may not be reflected in our results of operations for some time.

Management uses the results of directories as they are published as a leading indicator of amortized print products revenue. Published results represents the revenue to be amortized over the life of the directory. See "—Critical Accounting Policies—Revenue Recognition." Recently, published results have begun to improve as current sales activities and strategies take effect. Evidencing this, we currently estimate that published results for the full year ended December 31, 2006, will only decline by 2.5% to 3.0% relative to published results for the year ended December 31, 2005, adjusted to exclude results associated with our Hawaii operations that were sold in May 2005. This compares favorably to the approximately 5.6% decline in published results on the same basis between 2004 and 2005. However, for the reasons discussed above in the introduction to "management's discussion and analysis of financial condition and results of operations," there can be no assurance that our published results for the full year ended December 31, 2006 will not be materially different from this estimate.

*Electronic.* Our Internet yellow pages directory, SuperPages.com, earns revenue from two sources: fixed-fee services and performance-based advertising products. Fixed-fee services include advertisement placement on our SuperPages.com web site, and web site development and hosting for our advertisers. Revenue from fixed-fee services is recognized monthly over the life of the service. Performance-based advertising products revenue is earned when consumers connect with our SuperPages.com advertisers by a "click" through to their web sites or a phone call to their businesses. Performance-based advertising products revenue is recognized when there is evidence that qualifying transactions have occurred.

*Other Revenue* . Other revenue includes commercial printing services and the sale of directories. On February 16, 2006, we entered into a nine year printing agreement with RRD. As a result of this agreement, we will no longer derive revenue from commercial printing services. See Note 15 to the financial statements for additional information on our printing agreement with RRD.

## Operating Expense

Operating expense is comprised of four expense categories: (1) selling, (2) cost of sales, (3) general and administrative and (4) depreciation and amortization.

Table of Contents

*Selling.* Selling expense includes the sales and sales support organizations, including base salaries and sales commissions paid to the local sales force, national sales commissions paid to independent certified marketing representatives, local marketing and promotional expenses, sales training and customer care. All selling costs are expensed as incurred. In 2005, selling expense of $646 million represented 37.3% of total operating expense and 19.1% of total operating revenue.

In 2003, Verizon offered a management voluntary separation program to substantially all of its non-union and certain union employees, including our sales force. A substantial portion of our sales force accepted this program offer, including representatives with limited experience and tenure, as well as sales representatives nearing retirement. As a result, sales were negatively impacted causing reductions in amortized revenue over time. Since 2003, we have focused on rebuilding our sales force through incremental hiring to higher staffing levels. Our sales force headcount remained relatively constant in 2004 and 2005. In 2006, we increased our sales force headcount by approximately 500 sales representatives.

The management voluntary separation program has impacted our financial results both from a revenue and an expense perspective. Because we recognize revenue over the life of a directory but expense selling costs when incurred, the impact of a change in headcount on revenues and expenses does not entirely occur in the same year. Although we began to increase our hiring in 2004, we continued to see the management voluntary separation program negatively impact our sales into 2004 and 2005 directories, which was subsequently reflected in amortized revenues recognized in 2004, 2005 and into 2006. The continuing impact on revenues also results from the six to eighteen month ramp up in productivity for new hires, and the sales cycle for print directories, which can be as long as six months.

While an increase in total headcount will generally result in higher selling expenses, this can be offset by sales force turnover. In 2004, headcount increased while turnover rates remained relatively high, due in part to the significant number of new hires, therefore, our selling expenses reflected reduced employee related costs. Our headcount level remained relatively constant in 2005.

*Cost of Sales* . Cost of sales includes the costs of producing and distributing both print and Internet yellow pages directories, including publishing operations, web site development, paper, printing, directory distribution and Internet traffic costs. Costs directly attributable to producing print directories are amortized over the average life of a directory. These costs include paper, printing and initial distribution. All other costs are expensed as incurred. In 2005, cost of sales of $622 million represented 35.9% of total operating expense and 18.4% of total operating revenue.

*General and Administrative.* General and administrative expense includes corporate management and governance functions, which are comprised of finance, human resources, real estate, marketing, legal, public affairs, billing and receivables management. In addition, general and administrative expense includes bad debt, operating taxes, insurance, image and brand advertising and other general expenses. All general and administrative costs are expensed as incurred. In 2005, general and administrative expense of $374 million represented 21.6% of total operating expense and 11.1% of total operating revenue. Historically, our general and administrative expense has included the costs of other services, including real estate, information technologies, legal, finance and human resources, shared among Verizon affiliates; however, after the consummation of the transactions and the termination of the transition services agreement, we will incur and bear these costs directly.

*Depreciation and Amortization.* In 2005, depreciation and amortization expense of $91 million represented 5.3% of total operating expense and 2.7% of total operating revenue. In 2005, depreciation expense for property, plant and equipment was $45 million and software amortization was $46 million.

App. - 000181

**Table of Contents**

## Results of Operations

### Nine Months Ended September 30, 2006 Compared to Nine Months Ended September 30, 2005

The following table sets forth our operating results for the nine months ended September 30, 2006 and 2005:

(Unaudited)

| Nine Months Ended September 30, | 2006 | 2005 (in millions) | Change | % |
|---|---|---|---|---|
| Print products | $2,241 | $2,383 | $(142) | (6.0)% |
| Electronic | 167 | 147 | 20 | 13.6% |
| Other | 12 | 23 | (11) | (47.8)% |
| Operating Revenue | 2,420 | 2,553 | (133) | (5.2)% |
| Selling | 533 | 456 | 77 | 16.9% |
| Cost of sales | 474 | 461 | 13 | 2.8% |
| General and administrative | 286 | 303 | (17) | (5.6)% |
| Depreciation and amortization | 67 | 68 | (1) | (1.5)% |
| Operating Expense | 1,360 | 1,288 | 72 | 5.6% |
| Net income | $ 673 | $ 788 | $(115) | (14.6)% |

### Operating Revenue

Operating revenue of $2,420 million in the first nine months of 2006 decreased $133 million, or 5.2%, compared to $2,553 million in the first nine months of 2005 for the reasons described below.

*Print Products.* Revenue from print products of $2,241 million in the first nine months of 2006 decreased $142 million, or 6.0%, compared to $2,383 million in the first nine months of 2005. Of this decline, $22 million was from the sale of our Hawaii operations in 2005. The remainder of this decline resulted from reduced advertiser renewals, partially offset by the addition of new advertisers, increases in advertiser spending and revenue from new product offerings. While the number of print advertisers declined 10.2% to 762,000 at September 30, 2006 from 849,000 at September 30, 2005, the average annual amortized revenue per print advertiser increased by 5.7%, to $3,775 in the first nine months of 2006 from $3,570 in the first nine months of 2005. Growth in average annual amortized revenue per print advertiser has resulted primarily from our success in retaining higher-value print advertisers. We continued to face competition in the print directory market and from other advertising media, including cable television, radio and the Internet.

*Electronic* . Electronic revenue of $167 million in the first nine months of 2006 increased $20 million, or 13.6%, compared to $147 million in the first nine months of 2005, as we continued to expand our product offerings, market reach and advertiser base. The growth rate was lower than that realized in 2005 due to the introduction of performance-based advertising products and a resulting customer shift to these products from fixed-fee advertising products. Performance-based products are at an earlier stage of development and have not yet reached their anticipated level of revenue growth. At September 30, 2006, the number of electronic advertisers was approximately 212,000, up 30,000, or 16.5%, from September 30, 2005.

*Other Revenue* . Other revenue includes commercial printing services and the sale of directories. Other revenue of $12 million in the first nine months of 2006 decreased $11 million, or 47.8%, compared to $23 million in the first nine months of 2005. This decrease is attributable to the elimination of commercial printing services revenue resulting from the sale of our printing assets in February 2006 to R.R. Donnelley & Sons, Inc.

### Operating Expense

Operating expense of $1,360 million in the first nine months of 2006 increased $72 million, or 5.6%, compared to $1,288 million in the first nine months of 2005.

54

Table of Contents

*Selling.* Selling expense of $533 million in the first nine months of 2006 increased $77 million, or 16.9%, compared to $456 million in the first nine months of 2005. This increase was primarily driven by higher employee related costs associated with hiring approximately 500 additional sales representatives, increased sales commissions and advertising intended to stimulate revenue growth.

*Cost of Sales* . Cost of sales of $474 million in the first nine months of 2006 increased $13 million, or 2.8%, compared to $461 million in the first nine months of 2005. This increase was primarily due to traffic costs associated with SuperPages.com, increased employee related costs, and increased distribution costs, partially offset by lower printing costs.

*General and Administrative.* General and administrative expense of $286 million in the first nine months of 2006 decreased $17 million, or 5.6%, compared to $303 million in the first nine months of 2005. Bad debt expense of $101 million in the first nine months of 2006 decreased by $25 million, or 19.8%, compared to $126 million in the first nine months of 2005. Bad debt expense as a percent of total operating revenue was 4.2% for the first nine months of 2006 compared to 4.9% for the first nine months of 2005. This decrease in bad debt expense was due to changes in our credit policies and improvements to our collection processes. The decrease in bad debt expense was partially offset by higher employee related costs.

*Depreciation and Amortization* . Depreciation and amortization expense of $67 million in the first nine months of 2006 decreased $1 million, or 1.5%, compared to $68 million in the first nine months of 2005.

### Net Income

Net income of $673 million in the first nine months of 2006 decreased $115 million, or 14.6%, compared to $788 million in the first nine months of 2005, primarily due to the after-tax effects of the items described above.

### Year Ended December 31, 2005 Compared to Year Ended December 31, 2004

The following table sets forth our operating results for 2005 and 2004:

| Years Ended December 31, | 2005 | 2004 | Change | % |
|---|---|---|---|---|
| | | (in millions) | | |
| Print products | $3,147 | $3,318 | $(171) | (5.2)% |
| Electronic | 197 | 165 | 32 | 19.4% |
| Other | 30 | 30 | — | — |
| Operating Revenue | 3,374 | 3,513 | (139) | (4.0)% |
| Selling | 646 | 681 | (35) | (5.1)% |
| Cost of sales | 622 | 582 | 40 | 6.9% |
| General and administrative | 374 | 563 | (189) | (33.6)% |
| Depreciation and amortization | 91 | 86 | 5 | 5.8% |
| Operating Expense | 1,733 | 1,912 | (179) | (9.4)% |
| Net income | $1,025 | $ 972 | $ 53 | 5.5% |

### Operating Revenue

Our 2005 operating revenue of $3,374 million declined $139 million, or 4.0%, compared to $3,513 million in 2004 for the reasons described below.

*Print Products.* Revenue from print products of $3,147 million in 2005 decreased $171 million, or 5.2%, from $3,318 million in 2004. Of this decline, $44 million was from the sale of our Hawaii operations in the

55

Table of Contents

second quarter of 2005. The remainder of this decline resulted from reduced advertiser renewals, partially offset by the addition of new advertisers, increases in advertiser spending and revenue from new product offerings. While the number of print advertisers declined 11.8% to 822,000 at the end of 2005 from 932,000 at the end of 2004, the average annual amortized revenue per print advertiser increased by 4.7%, to $3,588 in 2005 from $3,428 in 2004. Growth in average annual amortized revenue per print advertiser has resulted primarily from our success in retaining higher-value print advertisers. Although we had partially restored our sales force staffing levels by the end of 2005, Verizon's 2003 management voluntary separation program that affected sales into 2004 and 2005 publications continued to negatively impact print products revenue amortized in 2005. We also continued to face competition in the print directory market and from other advertising media, such as cable television, radio and the Internet.

*Electronic.* Our electronic revenue of $197 million in 2005 grew $32 million, or 19.4%, from $165 million in 2004, as we continued to expand our product offerings, market reach and advertiser base. At the end of 2005, the number of electronic advertisers was approximately 186,000, up 19,000, or 11.4%, over the end of 2004.

*Other Revenue.* Other revenue includes commercial printing services and the sale of directories. Revenue from these sources did not change year-over-year.

## Operating Expense

Operating expense of $1,733 million in 2005 declined $179 million, or 9.4%, compared to $1,912 million in 2004.

*Selling* . Selling expense of $646 million in 2005 decreased $35 million, or 5.1%, compared to $681 million in 2004. This decrease was primarily driven by lower sales commission expense due to reduced sales. Additional cost reductions were driven by lower local advertising expense, contractor costs, and facility costs.

*Cost of Sales* . Cost of sales of $622 million in 2005 increased $40 million, or 6.9%, compared to $582 million in 2004. This increase was primarily driven by increased printing and distribution costs associated with increased paper costs, additional directory volumes for our market expansion program, and our roll out of companion directories in many of our existing markets.

*General and Administrative.* General and administrative expense of $374 million in 2005 decreased by $189 million, or 33.6%, compared to $563 million in 2004. This decrease was primarily due to a $66 million, or 28.3% reduction in bad debt expense to $167 million in 2005, compared to $233 million in 2004. Bad debt expense as a percentage of total operating revenue was 4.9% in 2005 compared to 6.6% in 2004. This decrease was due to changes in our credit policies and improvements to our collection processes. Reduced contractor expenses associated with lower outside collection agency fees and reduced system conversion activities, lower litigation costs than were experienced in 2004 due to the resolution of our litigation with Yellow Book, and decreased employee related costs also contributed to lower general and administrative expense in 2005 compared to 2004.

*Depreciation and Amortization* . Depreciation and amortization expense of $91 million in 2005 increased $5 million in 2005, or 5.8%, compared to $86 million in 2004, primarily due to increased software amortization.

## Net Income

Net income of $1,025 million in 2005 increased $53 million, or 5.5%, compared to $972 million in 2004, primarily due to the after-tax effects of the items described above.

App. - 000184

Table of Contents

### Year Ended December 31, 2004 Compared to Year Ended December 31, 2003

The following table sets forth our operating results for 2004 and 2003:

| Years Ended December 31, | 2004 | 2003 | Change | % |
|---|---|---|---|---|
| | | (in millions) | | |
| Print products | $3,318 | $3,490 | $ (172) | (4.9)% |
| Electronic | 165 | 136 | 29 | 21.3% |
| Other | 30 | 49 | (19) | (38.8)% |
| Operating Revenue | 3,513 | 3,675 | (162) | (4.4)% |
| Selling | 681 | 674 | 7 | 1.0% |
| Cost of sales | 582 | 593 | (11) | (1.9)% |
| General and administrative | 563 | 855 | (292) | (34.2)% |
| Depreciation and amortization | 86 | 76 | 10 | 13.2% |
| Operating Expense | 1,912 | 2,198 | (286) | (13.0)% |
| Net income | $ 972 | $ (568) | $1,540 | — |

### Operating Revenue

Our 2004 operating revenue of $3,513 million declined $162 million, or 4.4%, compared to $3,675 million in 2003 for the reasons described below.

*Print Products.* Revenue from print products of $3,318 million in 2004 decreased $172 million, or 4.9%, compared to $3,490 million in 2003. This decline resulted from reduced advertiser renewals, partially offset by the addition of new advertisers, increases in advertiser spending and revenue from new product offerings. While the number of print advertisers declined 7.2% from 1,004,000 at the end of 2003 to 932,000 at the end of 2004, the average annual amortized revenue per print advertiser increased to $3,428 in 2004 from $3,405 in 2003. Growth in average annual amortized revenue per print advertiser has resulted primarily from lower spending print advertisers comprising the majority of print advertisers that did not renew. Sales force performance had been reduced as a result of Verizon's 2003 management voluntary separation program, which significantly reduced the size of our sales force at the end of 2003. Although we had partially restored our sales force staffing levels by the end of 2004, we believe the management voluntary separation program continued to negatively affect sales in 2004 publications. We also continue to face competition in the print directory market and from other advertising media, such as cable television, radio and the Internet.

*Electronic* . Electronic revenue of $165 million in 2004 grew $29 million, or 21.3%, compared to $136 million in 2003, as we continued to expand our product offerings, market reach and advertiser base. At the end of 2004, the number of electronic advertisers was approximately 167,000, up 26,000, or 18.4%, from the end of 2003.

*Other Revenue.* Other revenue of $30 million in 2004 decreased $19 million, or 38.8%, compared to $49 million in 2003. This decrease was primarily due to the elimination of sales commission revenue that had been earned in 2003 and prior years from our sales force selling into Alltel directories pursuant to an agency agreement with Alltel, as well as reduced commercial printing services revenue.

### Operating Expense

Operating expense of $1,912 million in 2004 declined $286 million, or 13.0%, compared to $2,198 million in 2003.

*Selling* . Selling expense of $681 million in 2004 increased $7 million, or 1.0%, compared to $674 million in 2003. This increase was primarily driven by increased local advertising expense, national sales commissions and contractor costs, partially offset by reduced employee related costs. In 2004, headcount increased while turnover rates remained relatively high, due in part to the significant number of new hires, therefore, our selling expenses reflected reduced employee related costs.

**Table of Contents**

*Cost of Sales* . Cost of sales of $582 million in 2004 decreased $11 million, or 1.9%, compared to $593 million in 2003. This decrease was primarily driven by lower printing costs and reduced employee related costs associated with Verizon's 2003 management voluntary separation program, partially offset by higher Internet traffic costs associated with volume growth of our Internet yellow pages directory, SuperPages.com.

*General and Administrative* . General and administrative expense of $563 million in 2004 decreased by $292 million, or 34.2%, compared to $855 million in 2003. This decline was primarily driven by a one-time charge of $250 million in the fourth quarter of 2003, associated with severance, pension and postretirement benefits for the employees who accepted Verizon's 2003 management voluntary separation program offer, as well as the effect of an asset impairment charge recorded in 2003. Another source of the decline was a $64 million, or 21.5%, reduction in bad debt expense to $233 million in 2004 compared to $297 million in 2003. Bad debt expense as a percentage of total operating revenue was 6.6% in 2004 compared to 8.1% in 2003. This decrease was due to changes in our credit policies and improvements to our collection processes. These reductions were partially offset by increased contractor expenses associated with outside collection agency fees and system conversion activities, and increased costs associated with the resolution of our litigation with Yellow Book in 2004.

*Depreciation and Amortization* . Depreciation and amortization expense of $86 million in 2004 increased $10 million, or 13.2%, compared to $76 million in 2003, primarily due to increased software amortization.

### Net Income

Net income of $972 million in 2004 increased $77 million, or 8.6%, compared to net income before the cumulative effect of the accounting change of $1,463 million in 2003. This increase was primarily due to the after-tax effects of the items described above.

Net loss in 2003 of $568 million included the impact of our revenue recognition accounting change, which resulted in an after-tax charge of $1,463 million. See note 2 to the financial statements for discussion on the revenue recognition accounting change.

### Liquidity and Capital Resources

#### Historical

Historically, our principal source of liquidity was cash flow generated from operations. We have historically generated sufficient cash flow to fund our operations and investments and to make dividend payments to Verizon. We have a financial services arrangement with Verizon Financial Services LLC. We can, along with other Verizon affiliates, borrow or advance funds on a day-to-day (demand) basis. Because these borrowings and advances are based on a variable interest rate and demand note basis, the carrying value of the notes approximate fair market value. We were in a note receivable position of $480 million at September 30, 2006, $348 million at December 31, 2005 and $241 million at December 31, 2004.

The following table sets forth a summary of cash flow for the nine months ended September 30, 2006 and 2005:

| (Unaudited) Nine Months Ended September 30, | 2006 | 2005 | Change |
|---|---|---|---|
| | | (in millions) | |
| **Cash Flows Provided By (Used In)** | | | |
| Operating activities | **$ 794** | $ 959 | $(165) |
| Investing activities | **(20)** | (34) | 14 |
| Financing activities | **(774)** | (925) | 151 |
| **Increase (Decrease) In Cash and Cash Equivalents** | **$ —** | $ — | $ — |

58

**Table of Contents**

Our primary source of funds continues to be cash generated from operations. In the first nine months of 2006, cash from operations decreased $165 million, or 17.2%, compared to the same period of 2005, primarily due to reduced revenues and increased selling expense.

Historically, we experienced a cash outflow of approximately $20 million annually for OPEB costs. We expect to continue to experience a similar level of annual OPEB costs subsequent to the spin-off.

Cash used in investing activities decreased $14 million, or 41.2%, in the first nine months of 2006 compared to the same period in 2005, primarily due to cash proceeds of $20 million from the sale of our printing plant assets in the first quarter of 2006 and a decrease in capital expenditures to $40 million from $52 million in the first nine months of 2006 and 2005, respectively, partially offset by the cash outlay of $16 million in the third quarter of 2006 for the acquisition of Inceptor Inc. (See note 6 to our unaudited consolidated financial statements).

Cash used in financing activities decreased $151 million, or 16.3%, in the first nine months of 2006, compared to the first nine months of 2005, primarily due to a decrease of $192 million in dividends and returns of capital paid to Verizon affiliates of $642 million in the first nine months of 2006 from $834 million in the first nine months of 2005. The decrease in dividends was partially offset by the change in our affiliate note receivable of $41 million.

The following table sets forth a summary of cash flow for 2005 and 2004:

| Years Ended December 31, | 2005 | 2004 | Change |
|---|---|---|---|
| | | (in millions) | |
| **Cash Flow Provided By (Used In)** | | | |
| Operating activities | $ 1,239 | $ 1,170 | $ 69 |
| Investing activities | (76) | (77) | 1 |
| Financing activities | (1,163) | (1,093) | (70) |
| **Increase (Decrease) In Cash and Cash Equivalents** | $ — | $ — | $ — |

In 2005, cash from operations increased $69 million, or 5.9%, compared to 2004 primarily due to the impact of severance payments made in 2004 associated with Verizon's 2003 management voluntary separation program and legal fees paid in 2004 associated with the resolution of the Yellow Book litigation, partially offset by higher income tax payments.

Cash used in investing activities decreased $1 million, or 1.3%, in 2005 compared to 2004 due to capital expenditures decreasing $7 million to $78 million in 2005 from $85 million in 2004 and an increase in cash from our short-term investment activity of $13 million, partially offset by cash proceeds of $19 million received in 2004 from the sale of facilities. Our short-term investments include principally cash equivalents held in trust accounts for payment of employee benefits.

Cash used in financing activities increased $70 million, or 6.4%, in 2005 compared to 2004 due to an increase of $124 million in dividends and returns of capital paid to Verizon affiliates of $1,058 million in 2005 from $934 million in 2004, partially offset by the change in our affiliate note receivable of $54 million.

The following table sets forth a summary of cash flow for 2004 and 2003:

| Years Ended December 31, | 2004 | 2003 | Change |
|---|---|---|---|
| | | (in millions) | |
| **Cash Flow Provided By (Used In)** | | | |
| Operating activities | $ 1,170 | $ 1,243 | $ (73) |
| Investing activities | (77) | (77) | — |
| Financing activities | (1,093) | (1,166) | 73 |
| **Increase (Decrease) In Cash and Cash Equivalents** | $ — | $ — | $ — |

App. - 000187

Table of Contents

In 2004, cash from operations decreased $73 million, or 5.9%, compared to 2003 due to an increase in severance payments associated with Verizon's 2003 management voluntary separation program, higher legal fees paid in 2004 associated with the resolution of the Yellow Book litigation, reduced revenues, and increased operating costs, partially offset by lower income tax payments.

Cash used in investing activities remained unchanged between 2004 and 2003. Capital expenditures increased $13 million to $85 million in 2004 from $72 million in 2003 and short-term investment activity increased $6 million, offset by cash proceeds of $19 million received in 2004 from the sale of facilities. Our short-term investments include principally cash equivalents held in trust accounts for payment of employee benefits.

Cash used in financing activities decreased $73 million, or 6.3%, in 2004 compared to 2003 due to a decrease of $111 million in dividends and returns of capital paid to Verizon affiliates of $934 million in 2004 from $1,045 million in 2003, partially offset by the change in our affiliate note receivable of $38 million.

*Post Transactions*

Upon the closing of the transactions, we expect to enter into the new credit facilities providing for an aggregate amount of approximately $6,515 million, consisting of (i) a senior secured five-year revolving credit facility in a principal amount of approximately $250 million, and (ii) senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of (a) a tranche A term loan facility of approximately $1,515 million (the tranche A facility) and (b) a tranche B term loan facility of approximately $4,750 million (the tranche B facility).

In connection with the transactions, we expect to issue to Verizon the notes and a portion of the loans under the tranche B facility, which we refer to as the Idearc debt obligations, as partial consideration for Verizon's contribution to us of the acquired business. We expect that Verizon will seek to exchange the Idearc debt obligations for certain outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness. Assuming Verizon and its creditors consummate the exchange, we expect Verizon's creditors to immediately resell the Idearc debt obligations. In addition, we will transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility. To the extent permitted, we may also incur additional indebtedness from time to time for general corporate purposes, including working capital requirements, capital expenditures and future acquisitions.

Following the transactions, our primary source of liquidity will continue to be cash flow generated from operations. We anticipate that upon consummation of the transactions, we will have combined cash and equivalents of approximately $100 million and available liquidity under the revolving credit facility of approximately $250 million. We expect the revolving credit facility to be available to pay fees and expenses in connection with the spin-off and related transactions, for working capital and for general corporate purposes, and that up to approximately $50 million will be available for letters of credit. We expect that our primary liquidity requirements will be for debt service on the new credit facilities and the notes, payments of dividends, if any, capital expenditures and working capital.

Currently, we directly bill more than 50% of our customers. By the end of 2007, we anticipate migrating our remaining customers to our direct billing system. In connection with the transactions, we expect to enter into a billing and collection agreement with Verizon that will become effective upon the consummation of the transactions. Under that agreement, Verizon will continue to bill and collect from our customers who have not migrated to our billing system. These remaining customers, who are also Verizon local telephone customers, consist primarily of smaller customers serviced by our telephone call center. See "Risk Factors—Risk Factors Relating to the Spin-Off—Verizon will continue to provide transition services to us following the spin-off; if these transition services were prematurely halted or if we were unable to replicate the transition services internally, our business would be materially adversely affected."

60

**Table of Contents**

In connection with the transactions, we expect to incur approximately $6,265 million of borrowings under the new credit facilities and approximately $2,850 million of indebtedness with the issuance of the notes. Consequently, after the consummation of the transactions, we will be significantly leveraged. On a pro forma basis, as of September 30, 2006, we would have had outstanding $9,115 million in aggregate indebtedness, with approximately $250 million of additional borrowing capacity available under the revolving credit facility. As a result, we will be required to apply a significant amount of cash to service our debt obligations. For the year ended December 31, 2005 and the nine months ended September 30, 2006, on a pro forma basis after giving effect to the transactions, our net interest expense, including the amortization of debt issuance costs, would have been $702 million and $527 million, respectively.

The credit agreement and the indenture governing the notes are expected to contain negative and affirmative covenants and requirements affecting us and domestic subsidiaries that we create or acquire, with certain exceptions to be provided in those agreements. Specifically, the credit agreement and the indenture governing the notes are expected to contain negative covenants and restrictions including: restrictions on liens, sale-leaseback transactions, debt, dividends and other restricted junior payments, redemptions and stock repurchases, consolidations and mergers, acquisitions, asset dispositions, investments, loans, advances, changes in line of business, changes in fiscal year, restrictive agreements with subsidiaries, transactions with affiliates and capital expenditures.

In addition, the credit agreement and the indenture governing the notes are expected to contain events of default, including, but not limited to, for failure to pay principal or interest when due, change of control, covenant defaults and cross-default.

Following the spin-off, we expect our credit ratings to be substantially lower than the current ratings of Verizon. Differences in credit ratings affect the interest rates at which we may sell debt securities or borrow funds, as well as the amounts of indebtedness and types of financing structures that may be available to us. See "Risk Factors—Risk Factors Relating to Our Business—We may not have access to capital on acceptable terms or at all."

Our contractual obligations as of December 31, 2005 are summarized below:

| | | Payments due by period | | | |
|---|---|---|---|---|---|
| | **Total** | **Within 1 year** | **1-3 years** (in millions) | **3-5 years** | **More than 5 years** |
| Long-term debt obligations | $— | $ — | $— | $— | $ — |
| Capital (finance) lease obligations | — | — | — | — | — |
| Operating lease obligations | 76 | 26 | 44 | 5 | 1 |
| Purchase obligations | — | — | — | — | — |
| Other long-term liabilities reflected on balance sheet | — | — | — | — | — |
| Total | $ 76 | $ 26 | $ 44 | $ 5 | $ 1 |

61

Table of Contents

The following table presents our contractual obligations on a pro forma basis as of December 31, 2005 after giving effect to the transactions.

| | Total | Within 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Long-term debt obligations | $ 9,115 | $ 48 | $ 171 | $ 474 | $ 8,422 |
| Interest payments on long-term debt obligations [1] | 6,416 | 692 | 1,378 | 1,351 | 2,995 |
| Capital (finance) lease obligations | — | — | — | — | — |
| Operating lease obligations | 76 | 26 | 44 | 5 | 1 |
| Purchase obligations | — | — | — | — | — |
| Other long-term liabilities reflected on balance sheet | — | — | — | — | — |
| Total | $15,607 | $ 766 | $1,593 | $1,830 | $ 11,418 |

(1)   Interest expense is calculated by using the interest expense rates and assumptions described in note 2 to our Pro Forma Financial Information. See "Pro Forma Financial Information."

We currently expect to pay a regular dividend beginning in 2007. We currently expect to pay cash dividends of approximately $1.37 per share per annum, which will initially represent an aggregate of approximately $200 million per year, to the holders of our common stock, but only if and to the extent dividends are declared by our board of directors and permitted by applicable law. Our ability to pay a dividend will be impacted by our ongoing ability to generate cash from operations. Following the transactions, payments on approximately $9,115 million of indebtedness and our dividends will account for the majority of our financing activities. The declaration and payment of future dividends to holders of our common stock will be at the discretion of our board of directors, and will depend upon many factors, including our financial condition, earnings, growth prospects, funding requirements, applicable law, compliance with the covenants in the instruments governing our debt and other factors our board of directors deems relevant. Under the terms of the credit agreement and the indenture governing the notes, dividends will be restricted. See "Dividend Policy" and "Pro Forma Financial Information."

We may from time to time seek to retire our outstanding debt through cash purchases and/or exchanges for equity securities, in open market purchases, privately negotiated transactions or otherwise. These repurchases or exchanges, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors. In addition, we may issue additional debt, subject to compliance with our debt instruments, if prevailing market conditions are favorable to doing so.

Our ability to make payments on and to refinance our indebtedness and to fund planned capital expenditures will depend on our ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under the credit facility will be adequate to meet our future cash needs for the next year.

We cannot assure you, however, that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under the new credit facilities in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs. If we consummate an acquisition, our debt service requirements could increase. We may be required to refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all. See "Risk Factors—Risk Factors Relating to the Spin-Off—Following the spin-off, we will have substantial indebtedness, which could have a negative impact on our financing options and liquidity position."

App. - 000190

Table of Contents

### Critical Accounting Policies

A summary of the critical accounting policies used in preparing our financial statements are as follows:

*Revenue Recognition*

We earn revenues primarily from print and Internet yellow pages directory publishing. The sale of advertising in print directories is the primary source of revenues. We recognize revenues ratably over the life of each directory using the amortization method of accounting, with revenue recognition commencing in the month of publication. Our Internet yellow pages directory, SuperPages.com, earns revenues from two sources: fixed-fee and performance-based advertising products. Fixed-fee advertising includes advertisement placement on our SuperPages.com web site and web site development and hosting for our advertisers. Revenues from fixed-fee advertisers are recognized monthly over the life of the advertising service. Performance-based advertising products revenues are earned when consumers connect with our SuperPages.com advertisers by a "click" through to their web sites or a phone call to their businesses. Performance-based advertising products revenues are recognized when there is evidence that qualifying transactions have occurred.

For "click" through transactions, participating web site links are each assigned a unique identification number and, on a daily basis, our system counts each "click" to the web site. We exclude non-qualifying clicks through proprietary technology and through independent verification. For performance-based advertising in the form of telephone calls to our advertisers, we assign the advertiser a unique telephone number, which we use to track qualifying transactions. In these performance-based transactions, we set the click or call bid price daily and multiply it by the number of qualifying transactions occurring on that day.

*Expense Recognition*

Direct costs related to the production of directories are recognized ratably over the life of each directory under the deferral and amortization method. Direct costs include paper, printing and initial distribution. Paper costs are stated on an average cost basis. All other costs are recognized as incurred.

*Accounts Receivable*

Accounts receivable is recorded net of an allowance for doubtful accounts. The allowance for doubtful accounts is calculated using a percentage of sales method based upon collection history and an estimate of uncollectible accounts. Management may exercise its judgment in adjusting the provision as a consequence of known items, including current economic factors and credit trends. Accounts receivable adjustments are recorded against the allowance for doubtful accounts. Bad debt expense as a percentage of revenue was 4.2% for the nine months ended September 30, 2006 and 4.9%, 6.6% and 8.1% for the years ended December 31, 2005, 2004 and 2003, respectively.

*Income Taxes*

We account for income taxes in accordance with SFAS 109, "Accounting for Income Taxes." Deferred tax assets or liabilities are recorded to reflect the future tax consequences of temporary differences between the financial reporting basis of assets and liabilities and their tax basis at each year-end. These amounts are adjusted, as appropriate, to reflect changes in tax rates expected to be in effect when the temporary differences reverse. We have been included in Verizon's consolidated Federal and State income tax returns. The provision for income taxes in our consolidated financial statements has been determined as if we filed our own consolidated tax returns separate and apart from Verizon.

*Employee Benefit Plans*

We participate in certain Verizon benefit plans. Under these plans, pension, post-retirement health care and life insurance benefits earned during the year, as well as interest on projected benefit obligations, are accrued currently. Prior service costs and credits resulting from changes in plan benefits are amortized over the average

63

Table of Contents

remaining service period of the employees expected to receive benefits. In December 2005, Verizon announced that participants in its management pension plans, including our management employees, will no longer earn pension benefits or earn service towards our retiree medical subsidy after June 30, 2006.

## Recent Accounting Pronouncements

### Stock-Based Compensation

In December 2004, the Financial Accounting Standards Board (FASB) issued SFAS No. 123(R), "Share-Based Payment," which revises SFAS No. 123, "Accounting for Stock-Based Compensation." SFAS No. 123(R) requires all share-based payments to employees, including grants of employee stock options, be recognized as compensation expense based on their fair value. Effective January 1, 2003, we adopted the fair value recognition provisions of SFAS No. 123. We adopted SFAS No. 123(R) effective January 1, 2006, using the modified prospective method, and the impact on our results of operations or financial position is not material.

### Uncertainty in Income Taxes

In July 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (FIN 48). FIN 48 requires the use of a two-step approach for recognizing and measuring tax benefits taken or expected to be taken in a tax return and disclosures regarding uncertainties in income tax positions. We are required to adopt FIN 48 effective January 1, 2007. The cumulative effect of initially adopting FIN 48 will be recorded as an adjustment to opening retained earnings in the year of adoption and will be presented separately. Only tax positions that meet the more likely than not recognition threshold at the effective date may be recognized upon adoption of FIN 48. We are currently evaluating the impact this new standard will have on our future results of operations and financial position.

### Quantitative and Qualitative Disclosures about Market Risk

As of September 30, 2006, on a pro forma basis after giving effect to the transactions, we would have had approximately $6,265 million of debt outstanding under the new credit facilities. We expect that the new credit facilities will be subject to variable rates. Accordingly, our earnings and cash flow will be affected by changes in interest rates. Assuming that all of the $6,265 million of debt outstanding under the new credit facilities were subject to variable rates, and assuming a $1/4$% percentage point change in the average interest rate, we estimate that our interest expense for the nine months ended September 30, 2006 would have changed by approximately $12 million, without taking into account any potential required hedging under the instruments governing our debt. The $2,850 million of senior unsecured notes will be subject to a fixed rate. See "Pro Forma Financial Information."

64

**Table of Contents**

## INDUSTRY

The entire U.S. advertising market generated approximately $278 billion in revenues in 2005, with directory advertising estimated to have captured approximately 5.8% share of the advertising market. Unlike other advertising, directory advertising is characterized as primarily "directional" advertising, or advertising targeted at consumers who are actively seeking information and who are prepared to purchase a product or service. Directory advertising competes with all other forms of media advertising, including the Internet, newspapers, magazines, radio, outdoor, direct mail, telemarketing, billboards and television. The U.S. directory advertising industry generated approximately $15.9 billion in revenues in 2005, with a total circulation of approximately 447 million directories. Historically, the U.S. directory advertising industry has been dominated by the large publishing businesses of incumbent local exchange carriers, which we refer to as the incumbents. The industry is currently dominated by publishers that are either owned by, or have agreements to publish print directories for, the incumbents, which we refer to as the incumbent publishers. Mergers have recently reduced the number of incumbent publishers to four: AT&T, Idearc, BellSouth, and R.H. Donnelley. AT&T is in the process of acquiring BellSouth, which, when complete, will further reduce the number of incumbent publishers.

In this information statement, when we refer to our print directories, we are referring to print directories which consist primarily of wireline listings and classified advertisements directed primarily to telephone service customers in a given geographic area.

## Local Versus National Advertising

While directory advertising is sold on both a local and national basis, local advertising from small and medium-sized businesses constitutes the majority of directory advertising revenues. Over the past seven years, local directory advertising constituted approximately 85% of total revenues for the U.S. directory advertising industry. This is consistent with our experience, where in 2005, local advertising comprised approximately 85% of our print directory advertising revenues.

## Competition within the Industry

The industry can be divided into two major groups of directory advertising publishers: (i) publishers that are either owned by, or have agreements to publish directories for, incumbent local exchange carriers and (ii) independent publishers, including Yellow Book and Valley Yellow Pages. As the table below illustrates, while the independent publishers' revenues have increased over the past several years, the incumbent publishers remain the dominant players, with approximately 82% of total revenues in 2004 for the U.S. directory advertising industry. According to the Kelsey Group, a provider of strategic research and analysis, incumbent print revenue is expected to decrease at a compounded annual growth rate, or CAGR, of approximately 1.7% from 2006 to 2010, and during this same period, the Kelsey Group projects independent print revenue to have a CAGR of approximately 10.9%.

### U.S. print directory market share: 2001 – 2004

| | 2001 | % of total | 2002 | % of total | 2003 | % of total | 2004 | % of total | CAGR '01-'04 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (dollars in billions) | | | | |
| Incumbent publishers [1] | $ 12.9 | 87.2% | $ 12.8 | 86.1% | $ 12.4 | 84.0% | $ 12.4 | 81.8% | |
| % growth yearly | *4.6 %* | | *(0.6 )%* | | *(3.2 )%* | | *(0.1 )%* | | *(1.3 )%* |
| Independent publishers | 1.9 | 12.8% | 2.1 | 13.9% | 2.4 | 16.0% | 2.8 | 18.2% | |
| % growth yearly | *12.0 %* | | *10.0 %* | | *14.1 %* | | *16.7 %* | | *13.6 %* |
| Total Print | $ 14.8 | 100.0% | $ 14.9 | 100.0% | $ 14.8 | 100.0% | $ 15.2 | 100.0% | |
| % growth yearly | *7.0 %* | | *0.8 %* | | *(0.8 )%* | | *2.6 %* | | *0.9 %* |

*Source: Veronis Suhler Stevenson, Communications Industry Forecast, July 2005.*

(1) Incumbent publishers changed accounting methodology in 2003 to amortize revenues over the life of a directory, rather than recognizing revenues on the publication. These publishers did not restate their 2002 revenues.

**Table of Contents**

As the table below illustrates, the U.S. directory advertising industry remains highly concentrated. The incumbent publishers, AT&T, Idearc, BellSouth and R.H. Donnelley cumulatively generated approximately $11.8 billion of total U.S. directory advertising revenues in 2005. The independent segment comprised just over 19% of total directory-related advertising revenues in 2005.

### U.S. Directory Advertising Publishers

| | 2005 Revenues (in billions) |
|---|---|
| AT&T [1] | $   3.7 |
| Idearc | 3.4 |
| BellSouth [1] | 2.1 |
| R.H. Donnelley [2] | 2.6 |
| Yellow Book [3] | 1.5 |
| Others | 2.6 |
| Total | $   15.9 |

(1)   AT&T is in the process of acquiring BellSouth. Following the merger, AT&T/Bell South directory advertising revenues would have been $5.8 billion in 2005.
(2)   Pro forma for the merger of R.H. Donnelley and Dex Media, which closed in January 2006.
(3)   Represents the U.S. business of the Yell Group, Ltd.

We believe that the incumbent publishers have a number of advantages over smaller independent competitors. The incumbent publishers can generally deliver a better value proposition to advertisers (measured in terms of cost per reference, or an advertiser's cost per contact generated from advertising through a publisher's product or service) because those publishers tend to have higher usage in the market, largely due to their long-term presence in a particular market, their association with the incumbent and user perception of accuracy of their directories. Incumbent publishers also tend to benefit from established customer bases and solid, cost-efficient operations infrastructures. These factors force independent publishers to compete on price to build their customer bases. This results in advertising rates lower than the rates offered by the incumbent publishers. The existing infrastructure, scale of business and pricing premium typically allow the incumbent publishers to achieve higher EBITDA margins than their independent competitors.

### Competition with Other Media

We believe yellow pages advertising is the preferred form of advertising for many small and medium-sized businesses because of its relatively low cost, directional nature, broad demographic and geographic distribution, enduring presence, high customer usage and ability to deliver a high return on investment. Yellow pages are well-organized sources of information for consumers, featuring comprehensive lists of businesses in their local area. In addition, we believe that a single exposure to a yellow pages advertisement for a consumer who is ready to make a purchase is far more valuable than multiple exposures in other media at times when the consumer is not prepared to make a purchase. In other words, consumers "opt in" to yellow pages, creating a high conversion rate between exposure and purchase.

While overall advertising tends to track an economy's business cycle, directory advertising tends to be more stable and does not fluctuate widely with economic cycles due to its frequent use by small to medium-sized businesses, often as their principal or only form of advertising. Directory advertising is also less influenced by business cycles because failure to advertise in a given directory cannot be remedied until the subsequent edition of that directory is published, which is usually one year later. Moreover, we and other directory publishers give priority placement within a directory classification to our longest-tenured advertisers. As a result, advertisers

66

Table of Contents

have a strong incentive to renew their directory advertising purchases from year to year in order to maintain their priority placement within the directory. Directory advertising is also typically actively marketed by a sales force that contacts customers in person and by telephone with a view to establishing a relationship.

As the table below highlights, U.S. directory advertising industry revenues increased approximately 5.4% in 2001, while other major media segments generally declined.

### Advertising spending by media category: 1999 – 2004

| Year | U.S. Directories | Revenue Growth | Television(1) | Revenue Growth (dollars in billions) | Radio | Revenue Growth | Newspaper | Revenue Growth |
|---|---|---|---|---|---|---|---|---|
| 1999 | $ 13.2 | 6.9% | $ 49.4 | 6.3% | $17.7 | 12.3% | $ 50.7 | 5.8% |
| 2000 | $ 14.3 | 8.1% | $ 56.2 | 13.8% | $19.8 | 12.3% | $ 53.4 | 5.3% |
| 2001 | $ 15.0 | 5.4% | $ 50.9 | (9.5)% | $18.4 | (7.5)% | $ 49.1 | (8.0)% |
| 2002 | $ 15.2 | 1.3% | $ 54.7 | 7.6% | $19.4 | 5.7% | $ 49.1 | 0.0% |
| 2003 | $ 15.4 | 0.9% | $ 55.9 | 2.1% | $19.6 | 1.0% | $ 50.1 | 2.1% |
| 2004 | 15.9 | 3.7% | $ 62.1 | 11.2% | $20.0 | 2.1% | $ 52.2 | 4.0% |
| '99–'04 CAGR | | 3.8% (2) | | 4.7% | | 2.5% | | 0.6% |

*Source: Veronis Suhler Stevenson, Communications Industry Forecast, July 2005.*
(1)    Includes broadcast television and cable and satellite television; excludes barter syndication.
(2)    Includes Internet yellow pages revenues.

## The Internet

The Internet has emerged as an attractive medium for advertisers. Advances in technology have brought and will likely continue to bring new participants, new products and new channels to the industry, including increasing use of electronic delivery and electronic search engines/services. For instance, national search companies, including Google and Yahoo!, are focusing on local commercial search initiatives. The yellow pages directory advertising business is subject to changes arising from these developments in technology, including information distribution methods and users' preferences. The use of the Internet as a means to transact commerce through wireless devices has resulted in new technologies being developed and services provided that compete with our traditional products and services.

Some directory publishers operate an Internet yellow pages directory business. Publishers, including us, are increasingly advertising, marketing and selling online products to supplement their traditional print offerings. We believe that the local search online advertising industry will have a compounded annual growth rate, or CAGR, of approximately 19.4% from 2006 to 2010. With SuperPages.com, our Internet yellow pages directory business, we believe that we are in a strong position to leverage this growth. We believe SuperPages.com is the nation's leading Internet yellow pages directory. For instance, SuperPages.com was the first Internet yellow pages directory to offer both fixed-fee and performance-based advertising products options. In addition, SuperPages.com has a wide range of enhancements, including user reviews, links to web-based shopping information, self- and full-serve fulfillment options and an accompanying search engine marketing option for businesses that do not have the resources or capabilities to navigate Internet marketing.

**Table of Contents**

## OUR BUSINESS

**Overview**

We are the second largest yellow pages directories publisher in the United States as measured by revenues, and we believe that we have the nation's leading Internet yellow pages directory. Our products include: print yellow pages; print white pages; an Internet yellow pages directory, SuperPages.com; and an information directory for wireless subscribers, SuperPages Mobile. Following the spin-off, our assets, liabilities, businesses and employees will consist of those currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations. We will continue to be the exclusive official publisher of Verizon print directories in the markets in which Verizon is currently the incumbent local exchange carrier, which we refer to as our incumbent markets. We also will continue to use the highly recognized Verizon brand on our print directories in our incumbent markets, as well as in our current markets in which Verizon is not the incumbent, which we refer to as our independent markets.

We, together with our predecessors, have over 125 years of experience in the print directory business and we believe that we have consistently held a leading market position in our incumbent markets. In 2005, we estimate that our print directories had an aggregate market share of approximately 72% in our top fifteen incumbent metropolitan statistical areas, as measured by revenues. In 2005, these markets accounted for approximately half of our revenues. We publish our directories in 358 markets in 35 states across the United States, providing a geographically diversified revenue base. In 2006, we expect to publish approximately 1,280 distinct directory titles, including 1,160 directory titles in our incumbent markets and 120 directory titles in our independent markets, and distribute approximately 136 million copies of these directories to businesses and residences in the United States. In addition, in 1996, we launched SuperPages.com, which includes approximately 17 million business listings and tens of millions of residential listings in the United States. In August 2006, SuperPages.com had approximately 18.4 million unique visitors and approximately 200 million searches. We believe that we have an opportunity to increase the revenues from our independent print and Internet yellow pages directories businesses over the next several years.

We generate our revenues primarily through the sale of print directory advertising. Approximately 90% of our revenues for fiscal year 2005 came from the sale of advertising in print yellow pages directories, and approximately 4% of our revenues came from the sale of advertising in print white pages directories. The remaining 6% came from SuperPages.com. For the year ended December 31, 2005, we generated revenues of $3,374 million and operating income of $1,641 million. For the nine month period ended September 30, 2006, on a pro forma basis to give effect to the spin-off and the related transactions, we generated revenues of approximately $2,420 million and operating income of approximately $1,100 million.

Our strategy is to continue to connect our advertising customers with buyers through a variety of cost-effective products that include print and Internet yellow pages directories and other complementary products. In order to execute our strategy, we will continue to rely on our core strengths, including our leading market position in our incumbent markets, our large, locally-based sales force, the highly recognized Verizon brand, our diverse and attractive markets, our leading position in the Internet yellow pages directory market and our product innovation.

We believe that businesses choose our products and services because they value: the return on investment they achieve relative to other media when advertising through our products and services; the fact that a large number of consumers who consult yellow pages directories actually make a purchase; the broad and diverse demographic and geographic base of consumers that use our products and services, including our advanced Internet products and relationships with several search engines; and the quality of our client service and support.

With an average of approximately 5,000 directory headings in the primary directory in each of our markets, we serve advertisers across a diverse range of industries and geographic areas. As of September 30, 2006, we had a total of approximately 755,000 local print customers consisting primarily of small and medium-sized businesses and approximately 7,000 national print customers.

68

Table of Contents

## Competitive Strengths

We believe that we possess the following strengths that will enable us to continue to compete successfully in the local advertising market:

*Leading market position* . We are the second largest yellow pages directories publisher in the United States as measured by revenues, and we believe that we have the nation's leading Internet yellow pages directory. We are the exclusive official publisher of Verizon print directories in our incumbent markets, in which we distributed 100 million print directories in 2005. In 2005, we estimate that our print directories had an aggregate market share of approximately 72% in our top fifteen incumbent metropolitan statistical areas, as measured by revenues. In 2005, these markets accounted for approximately half of our revenues. We believe our position as the exclusive official publisher of Verizon print directories in our incumbent markets drives consumer usage of our directories. In addition, we believe that Verizon's long-term presence as the incumbent local exchange carrier in these markets, as well as the highly recognized Verizon brand, have positioned us as a preferred directory for both consumers and local advertisers.

*Highly recognized Verizon brand.* In connection with the spin-off, we expect to enter into a 30-year publishing agreement with Verizon, under which we will remain the exclusive official print directory publisher of Verizon Yellow Pages in our incumbent markets . Pursuant to a branding agreement with Verizon, we will continue to use the highly recognized Verizon brand on our print directories in our incumbent and current independent markets. We believe that using the Verizon brand will allow us to continue to enjoy the benefits of its high recognition. In addition, we will invest in brand awareness campaigns that introduce our new brand and reinforce the benefits we offer our customers.

*Diverse and attractive markets* . We currently publish our directories in 316 incumbent markets and 42 independent markets. We operate in 35 states across the United States, including New York, New Jersey, Pennsylvania, Massachusetts, Florida, California, Virginia, Maryland, Texas and North Carolina. We have a geographically diversified revenue base, with the Northeast region accounting for 34% of revenues, the Mid-Atlantic region accounting for 31% of revenues, the West region accounting for 18% of revenues and the Southeast and Central regions accounting for 17% of revenues. Our markets are attractive for local and national advertisers due to high concentrations of well-educated and affluent residents and consumer spending that tends to be higher than the national average. We select independent markets by assessing a combination of market attractiveness based on potential for sustained growth, their ability to make a meaningful positive contribution to our profitability within two to three years of entry, the current competitive landscape, their business growth characteristics and proximity to our existing sales force. In 2006, we expect to publish approximately 1,280 distinct directory titles, including 1,160 directory titles in our incumbent markets and 120 directory titles in our independent markets. In 2005, our top ten directories, as measured by revenues, accounted for only 12% of our revenues and no single directory accounted for more than 2% of our revenues.

*Superior value proposition for our advertisers* . We believe directory advertising provides our advertisers with a greater value proposition than other media because it targets consumers at the key time when they are actively seeking information to make a purchase. In 2005, according to the *Yellow Pages Association Usage Study* , 83% of consumers using yellow pages directories contacted advertisers listed in those directories and 44% of those consumers actually made a purchase. We believe that our directory advertising generally provides a competitive cost per reference. Cost per reference is a measure of an advertiser's cost per contact (e.g., a telephone call) generated from advertising through our products and services. We also believe that our directory advertising provides a higher return on investment than many other local advertising alternatives, including newspapers, television and radio. We offer our customers an array of complementary products in which they can list their advertisements, including smaller-sized portable Verizon Yellow Pages Companion Directories, community directories in specific neighborhoods, SuperPages.com and SuperPages Mobile.

*Large, locally-based sales force* . As of December 31, 2005, we had approximately 3,000 sales representatives throughout the United States. The majority of our sales force is locally-based and operates from

69

Table of Contents

56 regional offices and consists of premise sales representatives who generally focus on high-revenue customers. We believe the size, local presence and local market knowledge of our sales force is a competitive advantage that enables us to develop and maintain long-standing relationships with our advertisers. Our local print customer renewal rate (which excludes the loss of customers that did not renew because they are no longer in business) has remained above 85% over the past three years. In addition, we have well-established training programs, practices and procedures to manage the productivity and effectiveness of our sales force. See "—Sales and Marketing."

*Leading Internet yellow pages directory* . In 1996, we launched SuperPages.com. We view SuperPages.com as a natural extension of, and complement to, our print directories, enabling us to deliver additional high quality leads for our customers. We believe that SuperPages.com, which includes approximately 17 million business listings and tens of millions of residential listings in the United States, is the nation's leading Internet yellow pages directory. For instance, SuperPages.com was the first Internet yellow pages directory to offer both fixed-fee and performance-based advertising products options. In addition, it has a wide range of enhancements, including user reviews, links to web-based shopping information, self- and full-serve fulfillment options and an accompanying search engine marketing option for businesses that do not have the capabilities or resources to navigate Internet marketing. Under agreements with several major search engines, we place local advertising content on the search engines' web sites, providing us with higher traffic volume while retaining the customer relationship. We believe that even as search engines develop their own local search capabilities, they will continue to find these agreements beneficial because our local sales force provides them access to local advertising content without having to invest in their own local sales force.

*Product innovation and product adaptation* . We offer a broad product portfolio that provides our customers additional high quality leads. In addition to our print directories, we offer print extensions, such as Solutions at Hand magazines and Solutions Direct mail packages, our Internet yellow pages directory, SuperPages.com, and a broad and well-established distribution platform. We believe we are adept at both developing innovative products and adapting quickly to consumer preferences, thus enabling us to maintain our strong position in the directories market. For instance, in 1996, we launched SuperPages.com to enter into the Internet yellow pages directory business and to complement and support our print yellow pages base. Since then we have further developed SuperPages.com to adapt to market demands and advances in technology and to effectively compete against and partner with other online information providers. In addition, in 2005, we introduced Verizon Yellow Pages Companion Directories, which are convenient, smaller-sized directories that are distributed in conjunction with the full-size Verizon Yellow Pages. Advertising in the companion directories is available only to businesses that maintain or increase their programs in the core directory. Within a year of introducing our smaller-sized directories, we became the largest publisher of smaller-sized companion directories. We also currently publish more smaller-sized companion directories than any other publishers and are the largest publisher of Hispanic directories in the United States with 59 directories with advertisements in both English and Spanish and in Spanish only.

*Diverse customer base.* We generate a significant portion of our revenues from our large base of over 755,000 local print customers as of September 30, 2006. We do not depend to any significant extent on the sale of advertising to a particular industry or to a particular advertiser and our customer renewal rates (which excludes the loss of customers that did not renew because they are no longer in business) have consistently been over 85% for the past three years. In 2005, no single customer accounted for more than 0.06% of our revenues, with our top ten customers representing less than 0.5% of our revenues.

*Resilient business model.* Despite a substantial reduction in our sales force in 2003 resulting from a management voluntary separation program offered to all of Verizon's non-union and certain union employees, we experienced a decline in revenue of only approximately 4.4% from 2003 to 2004 and approximately 4.0% from 2004 to 2005, and maintained operating income margins, including the effects of depreciation and amortization, of 46% in 2004 and 49% in 2005. The impact of depreciation and amortization on our operating income margins was approximately 2% and 3% in 2004 and 2005, respectively.

70

Table of Contents

*Favorable cash flow characteristics.* Our business benefits from strong revenue visibility, low capital requirements and significant cash flow generation. The pre-sold nature of directory advertising provides significant revenue and cash flow visibility because advertisers typically enter into one-year contracts and pay on a monthly basis. The capital expenditure requirements of our business are modest, amounting to less than $85 million annually or less than 2.5% of the total operating revenue for each of the last three years. As a result, we generate strong free cash flow.

*Experienced management team* . We have a strong and experienced senior management team across all areas of our organization, including sales, finance, operations, marketing and customer service. Our senior management team has an average of approximately 25 years of experience in the telecommunications and directory publishing industries. We expect our management team to participate in equity ownership through an incentive compensation program.

## Business Strategy

Our strategy is to continue to connect our advertising customers with buyers through a variety of cost-effective products that include print and Internet yellow pages directories and other complementary products. In order to execute our strategy, we will continue to rely on our core strengths, including our leading market position in our incumbent markets, our large, locally-based sales force, the highly recognized Verizon brand, our diverse and attractive markets, our leading position in the Internet yellow pages directory market and our product innovation.

The principal elements of our business strategy include:

- *Invest in our print business and related growth initiatives.* As an independent company we will further invest in our sales force, products, and advertising and continue to selectively expand into additional markets.

- *Enhance advertiser value* . To further improve advertisers' return on investment, we will continue to implement and refine programs that align each advertiser's costs with the value of the advertising program purchased. In addition, to continue to be a preferred directory for consumers and advertisers, we will introduce and market new products that provide our advertisers with additional opportunities to reach consumers and further reduce advertisers' cost per reference.

- *Leverage the Verizon brand and promote our new brand* . We will continue to use the Verizon brand on our print directories in our incumbent and current independent markets. We believe that using the Verizon brand will allow us to continue to enjoy the benefits of its broad recognition. In addition, we will invest in brand awareness campaigns that introduce our new brand as well as reinforce the benefits we offer our customers.

- *Continue to leverage and invest in our large, locally-based sales force* . We will continue to recruit, hire and train additional sales representatives to ensure that we can take full advantage of market opportunities. We will continue to invest in and develop training programs to enhance our sales force productivity and to effectively manage our customer relationships. We will employ a number of sales representatives slightly above necessary levels in order to maintain an adequate number of trained, professional sales representatives. We believe that our sales force will further penetrate the markets we currently serve and increase our sales volume. Furthermore, we will continue to offer an incentive-based compensation plan, which we believe will result in increased productivity and lower employee turnover.

- *Further develop our Internet yellow pages directory service and continue to establish relationships with Internet companies* . We will continue to improve SuperPages.com, as well as pursue additional relationships with major search engines and Internet content providers. We will take advantage of our local sales force infrastructure and broad customer base to further develop relationships with Internet companies. We believe that our full-service offerings and relationships with Internet companies will continue to differentiate us from our competitors.

71

**Table of Contents**

- ***Continue to implement market-specific strategies*** . We intend to continue to implement market-specific strategies to stabilize the decline in print product revenues in certain densely populated urban areas along the East coast of the United States and to improve our performance in other markets. Examples of these strategies include continued investment in the local sales force, adjusting the geographic reach of specific directories to reflect changing demographics and shopping patterns, adjusting the timing and method of directory distribution and expanding our product line.

In addition to our business strategies listed above, we may from time to time in the future seek to grow our business by making acquisitions or entering into partnerships and joint ventures.

## History

We began publishing directories as part of the "Bell system" under AT&T. In 1936, GTE was founded and shortly thereafter began publishing directories. GTE continued to expand its directory business during the subsequent decades. In 1984, the local exchange businesses (including the directory operations) of AT&T were reorganized into seven "regional bell operating companies," which were spun-off as independent entities. Two of those entities, NYNEX and Bell Atlantic, combined their businesses when Bell Atlantic acquired NYNEX in 1997 in a "merger of equals" transaction. The combined directory operations of NYNEX, Bell Atlantic and GTE began doing business as Verizon Information Services Inc. after GTE became a wholly-owned subsidiary of Bell Atlantic in 2000 in a "merger of equals" transaction and Bell Atlantic was renamed Verizon Communications Inc.

## Markets

In 2005, we published directories in 358 markets in 35 states across the United States. In 2006, we expect to publish approximately 1,280 distinct directory titles, including 1,160 directory titles in our incumbent markets and 120 directory titles in our independent markets, and distribute approximately 136 million copies of these directories to businesses and residences in the United States. In 2005, our top ten directories, as measured by revenues, accounted for only 12% of our revenues and no single directory accounted for more than 2% of our revenues. Our directories are generally well-established in their communities and cover contiguous geographic areas to create a strong local market presence and achieve selling efficiencies.

The map below shows the markets in which we operated as of August 2006. As the map illustrates, we derive a significant portion of our print revenues from the sale of directory advertising in various regions in the United States.



72

**Table of Contents**

We operate in large and small markets in the United States. As the chart below illustrates, we have a geographically diversified revenue base.



**Note** : The West region includes print revenue from our independent markets.

The table below shows, as of December 31, 2005, our top twenty-five metropolitan statistical areas, as well as the number of directory titles, circulation and the percentages of our print revenues generated in those areas:

| | Metropolitan Statistical Area | Number of Directory Titles | Total Circulation (in millions) | % of Print Revenues |
|---|---|---|---|---|
| 1 | New York et al, NY-NJ-PA | 102 | 17.2 | 15.6% |
| 2 | Philadelphia et al, PA-NJ-DE-MD | 43 | 6.4 | 7.6% |
| 3 | Boston-Cambridge-Quincy, MA-NH | 48 | 5.4 | 5.9% |
| 4 | Washington et al, DC-VA-MD-WV | 24 | 6.1 | 5.7% |
| 5 | Tampa-St. Petersburg et al, FL | 20 | 4.3 | 4.9% |
| 6 | Los Angeles-Long Beach et al, CA | 58 | 6.6 | 4.8% |
| 7 | Riverside et al, CA | 28 | 2.6 | 2.9% |
| 8 | Baltimore-Towson, MD | 14 | 3.1 | 2.5% |
| 9 | Virginia Beach et al, VA-NC | 9 | 2.6 | 2.3% |
| 10 | Providence et al, RI-MA | 14 | 1.7 | 2.2% |
| 11 | Dallas-Fort Worth-Arlington, TX | 19 | 4.4 | 2.0% |
| 12 | Pittsburgh, PA | 28 | 2.7 | 1.9% |
| 13 | Seattle-Tacoma-Bellevue, WA | 6 | 2.0 | 1.7% |
| 14 | Sarasota-Bradenton-Venice, FL | 8 | 1.0 | 1.6% |
| 15 | Richmond, VA | 6 | 1.7 | 1.6% |
| 16 | Portland-Vancouver et al, OR-WA | 9 | 1.6 | 1.0% |
| 17 | Albany-Schenectady-Troy, NY | 10 | 0.8 | 1.0% |
| 18 | Worcester, MA | 9 | 0.5 | 1.0% |
| 19 | Allentown-Bethlehem et al, PA-NJ | 8 | 0.6 | 0.9% |
| 20 | Oxnard-Thousand Oaks-Ventura, CA | 7 | 0.6 | 0.9% |
| 21 | Manchester-Nashua, NH | 4 | 0.4 | 0.9% |
| 22 | Springfield, MA | 10 | 0.6 | 0.8% |
| 23 | Lakeland, FL | 7 | 0.4 | 0.7% |
| 24 | Portland et al, ME | 6 | 0.6 | 0.7% |
| 25 | Buffalo-Niagara Falls, NY | 7 | 0.1 | 0.7% |
| | Total | 504 | 74.0 | |

App. - 000201

Table of Contents

The table below shows, as of December 31, 2005, our directory revenues and other data in each state in which we operate:

| States | Number of Directory Titles | Total Circulation (in millions) | % of Print Revenue |
|--------|---------------------------|--------------------------------|-------------------|
| NY | 117 | 16.9 | 12.5% |
| PA | 134 | 12.4 | 11.5% |
| CA | 130 | 12.6 | 10.4% |
| NJ | 62 | 6.8 | 10.4% |
| MA | 75 | 7.0 | 8.5% |
| FL | 54 | 10.5 | 8.2% |
| VA | 43 | 8.3 | 7.7% |
| MD | 36 | 6.3 | 5.3% |
| TX | 79 | 7.5 | 3.1% |
| WA | 21 | 2.5 | 2.4% |
| NH | 22 | 1.5 | 2.1% |
| IN | 38 | 1.5 | 1.8% |
| RI | 9 | 1.2 | 1.5% |
| ME | 19 | 1.5 | 1.4% |
| OH | 43 | 1.5 | 1.3% |
| DE | 8 | 0.9 | 1.2% |
| WV | 27 | 1.3 | 1.2% |
| OR | 16 | 1.8 | 1.1% |
| IL | 55 | 1.3 | 1.1% |
| MI | 44 | 1.0 | 0.9% |
| DC | 1 | 0.5 | 0.8% |
| VT | 9 | 0.6 | 0.6% |
| WI | 30 | 0.7 | 0.6% |
| NC | 10 | 1.1 | 0.6% |
| KY | 15 | 1.1 | 0.5% |
| MN | 35 | 2.1 | 0.5% |
| SC | 14 | 0.5 | 0.4% |
| AZ | 5 | 1.8 | 0.4% |
| CO | 4 | 1.4 | 0.2% |
| ID | 6 | 0.2 | 0.2% |
| UT | 2 | 0.7 | 0.2% |
| MO | 3 | 0.4 | 0.2% |
| CT | 1 | * | 0.1% |
| IA | 39 | 0.3 | 0.1% |
| AL | 3 | 0.2 | 0.1% |
| NV | 1 | 0.1 | 0.1% |
| OK | 1 | * | 0.0% |
| Total | 1,211 | 116 | 100.0% |

* Represents a total circulation of less than 100,000.

## Incumbent Markets

We publish our directories in 316 incumbent markets. Directories printed in these markets generated approximately 91% of our revenues in 2005. In 2005, we estimate that our print directories had an aggregate market share of approximately 72% in our top fifteen incumbent metropolitan statistical areas, as measured by

74

App. - 000202

Table of Contents

revenues. In 2005, these markets accounted for approximately half of our revenues. Our incumbent markets are attractive for local and national advertisers due to high concentrations of well-educated and affluent residents and consumer spending that tends to be higher than the national average.

In connection with the spin-off, we expect to enter into a number of agreements with Verizon to preserve the benefits of being the exclusive official publisher of Verizon print directories in our incumbent markets. We expect these agreements to include a publishing agreement, a branding agreement and a non-competition agreement, each of which has an initial term of 30 years from the date of the spin-off. Under the publishing agreement, Verizon will name us the exclusive official publisher of Verizon print directories of wireline listings in its current incumbent markets. In the branding agreement, Verizon will grant us a limited right to, among other things, use certain Verizon service and trade marks in connection with publishing certain print directories and identify ourselves as its official print directory publisher. Under the non-competition agreement, Verizon will generally agree not to publish tangible or digital media directory products consisting principally of wireline listings and classified advertisements of subscribers in our incumbent markets.

We believe that serving as the exclusive official publisher of Verizon print directories in our incumbent markets provides us with a competitive advantage. Incumbent publishers can generally deliver a better value proposition to advertisers (measured in terms of cost per reference, or an advertiser's cost per contact generated from advertising through a publisher's product or service) because those publishers tend to have a higher frequency of consumer usage in the market, largely due to their long-term presence in a particular market and user perception of accuracy, completeness and trustworthiness of their directories. Incumbent publishers also tend to benefit from established customer bases and solid, cost-efficient operations infrastructures. We believe that Verizon's long-term presence as the incumbent local exchange carrier in our incumbent markets, as well as our ongoing association with the Verizon brand, has positioned us as a preferred directory for both consumers and local advertisers.

### Independent Markets

In 2002, we launched an initiative to expand into markets where Verizon is not the incumbent local exchange carrier. We currently operate in 42 independent markets, in which we publish 105 distinct directory titles. In 2005, directories published in these markets generated approximately 3% of our revenues. In the independent markets in which we operated in 2005, we had a 5.8% compounded annual growth rate in revenues from 2002 to 2005. Our independent strategy enables us to compete with other publishers while broadening our geographic presence.

We believe that Verizon's national brand presence provides us with a competitive advantage in our current independent markets. The branding agreement we expect to enter into with Verizon will grant us a limited right to use the Verizon brand on our print directories in our current independent markets, in a small number of other markets we are currently considering entering and, under certain circumstances, in other markets we might wish to enter into in the future. Our right to use the Verizon brand in these markets is non-exclusive and subject to a number of conditions. This agreement will have an initial term of 30 years from the date of the spin-off.

We select independent markets by assessing a combination of market attractiveness based on potential for sustained growth, their ability to make a meaningful positive contribution to our profitability within two to three years of entry, the current competitive landscape, their business growth characteristics and their proximity to our existing sales force. As a result, we exited three independent markets since 2003 because they were not making or not expected to make a meaningful positive contribution to our profitability.

### Products

Our main products are print yellow pages directories, which generated approximately 90% of our revenues in 2005, and print white pages directories. We also operate an Internet yellow pages directory, SuperPages.com, and provide direct and database marketing services.

75

**Table of Contents**

*Print Directories*

    In 2006, we expect to publish approximately 1,280 distinct directory titles, consisting of: directories that contain only yellow pages; directories that contain only white pages; directories that contain both white and yellow pages; smaller-sized companion directories; directories that include advertisements in both English and Spanish; and directories in Spanish only. In addition to our print directories, we recently began to offer complementary products, such as Solutions at Hand magazines and Solutions Direct mail packages.

    Our directories are designed to meet the advertising needs of local and national businesses and the informational needs of consumers. The diversity of our advertising options enables us to create customized advertising programs that are responsive to specific customer needs and financial resources. Our yellow pages and white pages directories are also efficient sources of information for consumers, featuring a comprehensive list of businesses in the local market.

    *Yellow Pages Directories* . In 2005, we generated approximately 90% of our revenues from the sale of advertising in our yellow pages directories. The following range of paid advertising options is available in our yellow pages directories:

- *Listing Options.* An advertiser may:

  - pay for listings additional headings;

  - pay to have its listing highlighted or printed in bold or superbold text, which increases visibility; and/or

  - purchase extra lines of text to include information, including hours of operation or a more detailed description of its business.

- *In-column Advertising Options.* For greater prominence on a page, an advertiser may expand its basic alphabetical listing by purchasing advertising space in the column in which the listing appears. In-column advertisements' features include bolding, special fonts, color and graphics. An advertiser can also purchase priority placement positioning within its heading to more prominently promote its business. The cost of in-column advertising depends on the size and type of the advertisement purchased.

- *Display Advertising Options.* A display advertisement allows businesses to include a wide range of information, illustrations, photographs and logos. Display advertisements are usually placed at the front of a heading, ordered first by size and then by advertiser seniority. This process of ordering provides a strong incentive to advertisers to increase the size of their advertisements and to renew their advertising purchases from year to year to ensure that their advertisements receive priority placement. Display advertisements range in size from a quarter column to as large as two pages (a "double truck" advertisement). The cost of display advertisements depends on the size and type of advertisement purchased.

- *Specialty Products.* In addition to the above advertisement options, we offer products that allow businesses to increase visibility or better target specific types of consumers. Our specialty products include:

  - savings cards, color coupons and special offers that enable advertisers to deliver promotional offers to consumers;

  - advertising space in a variety of specialty guides included in our directories that list services by specialization or service area, including Golf Guides, Health and Wellness Guides, Dining Guides, Women- and Minority-Owned Business Guides and Sports Team-Related Guides;

  - gatefold sections, specialty tabs and double page advertisements that provide businesses with extra space to include more information in their advertisements; and

  - metered telephone numbers that provide advertisers with information about the consumer responses to an advertisement.

Table of Contents

*White Pages Directories* . Pursuant to state public utilities commission requirements, Verizon must publish and distribute white pages directories of certain residences and businesses that order or receive local telephone service from Verizon. The legal and regulatory provisions also require Verizon, in specified cases, to include information relating to the provision of telephone service provided by Verizon and other carriers in the service area, as well as information relating to local and state governmental agencies. We expect to enter into a publishing agreement with Verizon under which we will publish and distribute these directories on Verizon's behalf. Pursuant to the publishing agreement, we will provide a white pages listing free of charge to every residence and business with local wireline telephone service in the area, as well as a courtesy listing in the yellow pages for specified business customers. The listing will include the name, address and phone number of the residence or business unless the wireline customer requests not to be listed or published. The costs of publishing, printing and distributing the directories are included in our operating expenses. For a more detailed description of the publishing agreement, see "Relationship Between Verizon and Our Company After the Spin-Off—Publishing Agreement." We also publish white pages directories in selected independent markets when we believe doing so will positively impact our business.

In 2005, we derived approximately 4% of our revenues from the sale of advertising in our white pages directories. Advertising options include bolding and highlighting for added visibility, extra lines for the inclusion of supplemental information and in-column and display advertisements. Verizon's local exchange carrier subsidiaries also derive revenues from the sale of certain supplemental listing information in the white pages directories pursuant to state tariffs. In the publishing agreement, Verizon will agree to share with us 5% of any revenue over a certain baseline amount, determined on a state-by-state basis, that it derives from the sale of supplemental listing information.

### Internet Yellow Pages Directory and Internet Products

*Overview* . In 1996, we launched SuperPages.com. We view SuperPages.com as a natural extension of, and a complement to, our print directories. We believe that SuperPages.com, which includes approximately 17 million business listings and tens of millions of residential listings in the United States, is the nation's leading Internet yellow pages directory. For instance, it was the first Internet yellow pages directory to offer both fixed-fee and performance-based advertising products options. In August 2006, SuperPages.com had approximately 18.4 million unique visitors and approximately 200 million searches.

Print yellow pages and Internet yellow pages directories are complementary platforms. We believe that consumers tend to use print directories to search for local goods and services found within a market, while they tend to use Internet yellow pages directories to search for local goods and services in other areas. SuperPages.com complements the print yellow pages directories products we can offer to advertisers, creating more content and meeting the preferences of Internet-savvy shoppers and businesses. We offer user-friendly navigation and search functions that make it easy for consumers to find the specific products or services they need. SuperPages.com enables users to find local and national businesses and compare goods and services before connecting with merchants across the United States.

*Features* . SuperPages.com provides the following features:

- fully searchable content, with a single search box similar in design and functionality to popular search engines, that allows users to search the entire content of an advertisement, rather than by keyword, and provides refined geographic search capabilities;

- approximately 17 million business listings, tens of millions of residential listings and more than 8.5 million Internet-specific business profiles;

- fixed-fee advertising that allows advertisers to purchase an annual listing or advertisement in specific geographic zones;

- performance-based advertising products, or PBAPs, that allow an advertiser to pay only for calls to its business or clicks to its web site;

77

**Table of Contents**

- full-service management of PBAPs to serve the needs of small businesses that cannot or do not want to manage their programs themselves;

- full-service assistance in developing and maintaining web sites for small businesses;

- self-service management options for advertisers that are technologically-inclined;

- consumer reviews that enable consumers to comment about a business or service and search for other consumers' comments;

- links to business web sites;

- restaurant and hotel reservation options;

- promotional coupons;

- shopping search services that allow consumers to research and compare products and services from multiple web sites;

- movie listings and show times;

- street and aerial maps;

- driving directions; and

- availability on wireless phones through SuperPages Mobile and SuperPages SMS text messaging.

In addition, we provide search engine marketing, or SEM, services through which we place local advertising content on major search engines as well as on SuperPages.com. Through SEM services, we increase our advertisers' reach and return on investment, thus aiding our ability to retain them as customers and grow their programs. Our agreements with several search engines give us access to a higher volume of traffic than we could generate on our own while retaining our relationship with our customer. The search engines benefit from our local sales force and full-service capabilities for attracting and serving advertisers that might not otherwise transact business with them.

For all of our print directory customers, we provide a basic listing on SuperPages.com at no charge. As with our print directories, businesses may pay to enhance their listings on SuperPages.com and for other premium advertising products. Approximately 186,000 customers currently pay to advertise on SuperPages.com. Options that are available include extra lines, posting of replicas of print advertisements, web site and email links, pop-up windows, priority placement and banners.

***Agreements with search engines and other Internet companies*** . As described above, we have agreements with several major search engines and portals. Under those agreements, we place our local advertising content on major search engines, which gives us access to a higher volume of traffic than we could generate on our own while retaining the customer relationship. The search engines benefit from our local sales force and full-service capabilities for attracting advertisers that might not otherwise transact business with search engines. As opposed to directly competing with these search engines, our strategy is to collaborate with them, pairing our local sales reach with their extensive distribution network.

We have also entered into strategic agreements with other Internet companies to provide enhanced search capabilities. For example, SuperPages.com users may view street and aerial maps.

## Sales and Marketing

The marketing of directory advertisements is primarily a direct sales effort that requires both maintaining existing customers and developing new customers. Existing customers comprise our core advertiser base, and a large number of these customers have advertised in our directories for many years. In 2005, we retained approximately 85% of our local print customers from the previous year. We base our local print customer renewal rate on the number of unique local print customers that have renewed advertising. We do not include

78

**Table of Contents**

customers that did not renew because they are no longer in business. Unique local print customers are counted once regardless of the number of advertisements they purchase or the number of directories in which they advertise. Our renewal rate would not be impacted if any of these customers were to renew some, but not all, of their advertising. This high renewal rate reflects the importance of our directories to our local customers, for whom yellow pages directory advertising is, in many cases, the primary form of advertising. Larger national companies also use advertising in our directories as an integral part of their national advertising strategies.

We believe the experience of our sales force has enabled us to develop long-term relationships with our customers, which, in turn, promotes a high rate of customer renewal.

We believe that our sales force will further penetrate the markets that we currently serve and increase our sales volume. To further improve the productivity of our sales force, we have initiated various programs, including:

- managing lower-end accounts through a specialized low-cost mail-out, auto-renewal and telemarketing center;

- introducing a program that converts bold listings to half-space advertisements in order to enhance advertiser value and strengthen our relationship with our advertising customers;

- using new technology to improve the efficiency of our telemarketing center;

- equipping sales representatives with computer programs that accelerate the sales input process;

- managing our information systems through one integrated information system; and

- enhancing our initial sales training program and field coaching and mentoring programs.

We initiated these programs in 2004 and they are still in the process of implementation.

*Local Sales Force*

Each yellow pages sale, whether made in person, by telephone or through direct mail, is an individual transaction designed to meet the individual needs of a specific business. As the products have become more complex and as competition has required advertisers to make more choices, the sales process has also become more complex. A sales representative now spends more time learning and perfecting a sales pitch and preparing for a sales call. In addition, the average time a sales representative spends with a customer has increased.

Therefore, we believe our success in the marketplace is highly influenced by the size and proficiency of our local sales force. The more well-trained, experienced sales representatives we employ, the better able we are to call upon all prospective clients and, when we do, to customize programs to meet specific needs.

As of December 31, 2005, our local sales force comprised approximately 3,000 sales representatives, including sales management, operating out of 56 regional offices throughout the United States. We believe the size, local presence and local market knowledge of our sales force is a competitive advantage that enables us to develop and maintain long-standing relationships with our advertisers. These relationships allow us to respond to market needs and to effectively and efficiently deploy new products and services in the markets in which we operate. Our average local print revenue per sales representative is approximately $1.1 million and our average local print revenue per advertiser is approximately $3,588. As of June 30, 2006, our annualized average sales representative voluntary turnover rate was approximately 24%. We are actively engaged in recruiting, hiring and training additional sales representatives to ensure that we can take full advantage of market opportunities. Part of this ramp up in our sales force is in response to external competition, part reflects our expansion into new markets and part is the final phase of recovery from a significant drop in personnel we experienced in 2003.

In 2003, Verizon offered a management voluntary separation program to substantially all of its non-union and certain union employees, including our sales force. A substantial portion of our sales force accepted the

79

**Table of Contents**

voluntary separation offer, including sales representatives with limited experience and tenure, as well as sales representatives nearing retirement. As a result, we had insufficient sales staffing for several major sales cycles. This activity came in the midst of intense competition in our markets. Since 2003, we have focused on rebuilding our sales force to necessary staffing levels. Because it typically takes from 6 to 18 months for sales representatives to become fully proficient, we still are impacted by this event. We believe this sales force reduction was, and continues to be, a major contributor to the decline in our local yellow pages revenues in 2005 and the first quarter of 2006.

We will continue to staff our sales force slightly above necessary levels in order to maintain an adequate number of trained, professional sales representatives and sales managers.

Our sales force is divided into four principal groups:

- *Premise Sales Representatives* . Our premise sales representatives, which represented 55% of our sales force in 2005, generally focus on high-revenue customers with whom they typically interact on a face-to-face basis at the customer's place of business. Within this group, we have specialized sales representatives who handle major accounts.

- *Telephone Sales Representatives* . Our telephone sales representatives, which represented 37% of our sales force in 2005, generally focus on medium-sized customers with whom they typically interact over the telephone. Telephone sales represent our principal source of new advertisers.

- *Centralized Sales Representatives* . Our centralized sales representatives, which represented 7% of our sales force in 2005, include both centralized account representatives, who generally focus on the smallest accounts, and prospector sales representatives, who generally focus on prospective customers. These representatives manage both mail-out and telephone contact with lower-end customers.

- *Internet Sales Representatives* . Our Internet sales representatives, which represented 1% of our sales force in 2005, sell listings on SuperPages.com, web site development and related products to businesses located outside our traditional sales boundaries and to businesses that would not normally advertise in the print yellow pages. Internet sales are also made by our premise, telephone and centralized sales representatives.

We assign our customers among these groups based on a careful assessment of expected advertising expenditures. This practice allows us to deploy our sales force in an effective manner. A majority of our sales force is locally-based, operating out of 56 regional offices. Our local sales force presence facilitates the personal, long-term relationships with local customers necessary to maintain a high rate of local print customer renewal, which has remained above 85% over the past three years. See "—Sales and Marketing."

Formal training is important to maintain a highly productive sales force. New sales representatives receive approximately eight weeks of training in their first year, including classroom training on sales techniques, our product portfolio, customer care and ethics. Following classroom training, they are accompanied on sales calls by experienced sales personnel for further training. They then receive ongoing training, field coaching and mentoring. Our commitment to developing the best sales practices are intended to ensure that sales representatives are able to give advertisers high-quality service and advice on appropriate advertising products and services.

We have well-established training programs, practices and procedures to manage the productivity and effectiveness of our sales force. Each sales representative has a specified customer assignment consisting of both new business leads and renewing advertisers and is accountable for meeting sales goals in each two-week pay period. Our sales representatives are compensated in the form of base salary and incentive-based compensation. Approximately 42% of the total compensation paid to our sales force is in the form of commissions and other incentive-based compensation, resulting in sales force compensation that is largely tied to sales performance.

80

**Table of Contents**

*National Sales Force*

In addition to our local sales personnel, we have a separate sales channel to serve our national customers. National customers are typically national or large regional chains, including rental car companies, insurance companies and pizza delivery businesses, that purchase advertisements in many yellow pages directories in multiple geographical regions. In order to sell to national companies, we use the services of third-party certified marketing representatives, or CMRs, who design and create advertisements for national companies and place those advertisements in yellow pages directories nationwide. Some CMRs are departments or subsidiaries of general advertising agencies, while others are specialized agencies that focus solely on directory advertising. The national company pays the CMR, which then pays us after deducting its commission. We have contracts with approximately 165 CMRs and employ five national business development managers to manage our selling efforts to national customers.

## Customers

As of September 30, 2006, we had approximately 755,000 local print customers who purchased advertising in our directories. Approximately 80% of our revenues in 2005 were generated by the sale of our advertising to local customers, which are generally small and medium-sized businesses. Approximately 14% of our revenues in 2005 were generated by sales to national advertisers. The remaining 6% of our revenues in 2005 were generated from sources other than sales of advertising in our print directories, including our Internet yellow pages directory, SuperPages.com, and direct marketing services.

We do not depend to any significant extent on the sale of advertising to a particular industry or to a particular advertiser. For 2005, no single account accounted for more than 0.06% of our revenues, with our top ten customers representing less than 0.5% of our revenues. The diversity of our customer base reduces exposure to adverse economic conditions that may affect particular geographic regions or particular industries and provides additional stability in operating results. The table below, which sets forth 2005 information relating to our largest directory headings, demonstrates this diversity:

| Directory heading | % of print revenues |
|---|---|
| Lawyers/Attorneys | 6.9% |
| Dentists | 2.9% |
| Insurance | 2.1% |
| Plumbing contractors | 1.8% |
| Pest control services | 1.2% |
| Storage-household and commercial | 1.2% |
| Movers | 1.0% |
| Electric contractors | 0.9% |
| Physicians and surgeons | 0.9% |
| Roofing contractors | 0.8% |
| Total | 19.7% |

We enjoy high customer renewal rates. From 2004 to 2005 our annual local print customer renewal rate remained stable at approximately 85%, which we believe compares favorably with the renewal rates of our competitors. See "—Sales and Marketing."

The training that we provide to our sales representatives emphasizes fostering long-term relationships with customers, and our incentive-based compensation structure rewards sales representatives who retain a high percentage of their accounts. In addition, our customers often do not reduce or eliminate directory spending during difficult economic periods because failure to advertise cannot be remedied until the replacement directory

81

Table of Contents

is published, usually one year later. Moreover, most directory publishers, including us, give priority placement within a directory classification to long-time customers. As a result, businesses have a strong incentive to renew their directory advertising purchases from year to year, even during difficult economic times, so they do not lose their placement within the directory.

## Publishing, Production and Distribution

We generally publish our directories on a 12-month cycle. The publishing cycles for our directories are staggered throughout the year, which allows us to efficiently use our infrastructure and sales capabilities and the resources of our third-party vendors. The following are the major steps of the publication and distribution process:

- *Selling.* The sales cycle of a directory varies based on the size of the revenue base and can range from a few weeks to six months. In the months prior to publication, our sales force approaches potential new customers in an effort to expand our customer base. Potential new customers include businesses that have operated in the area for some time but did not purchase advertising in the most recent edition of our directory, as well as newly-formed businesses and businesses that have only recently moved into the area. At the same time, our sales force contacts existing customers and encourages them to renew and increase the size and, therefore, prominence of their advertisements and to purchase other products in our portfolio.

- *Generation of advertisements.* Upon entering into an agreement with a customer, we use our proprietary software and a team of in-house graphic artists to create an advertisement in collaboration with the advertiser.

- *Pre-press activities* . Sales typically cease one month prior to publication, at which time we do not accept additional customers. Once a directory has closed, pre-press activities commence. Pre-press activities include finalizing artwork, proofing and paginating the directories. When the composition of the directory is finalized, we deliver the directory pages to a third-party printer.

- *Printing* . R. R. Donnelley & Sons, Inc. prints our directories. Substantially all of the paper that we use is supplied by eight different suppliers. Pursuant to our current agreements, our suppliers are required to provide up to 100% of our annual forecasted paper requirements. Prices under these agreements are negotiated each year based on prevailing market rates, market demand, production capacity and the total tonnage for each supplier. In 2005, paper costs were 8% of our total operating and general administrative costs. Most of these agreements expire on December 31, 2008. The time required to print a directory depends on its size and may be as long as one month.

- *Transportation* . We transport the directories from the printing locations to our distributors by truck and rail on a publication-by-publication basis using approximately 30 different carriers.

- *Distribution* . Our goal is to deliver our directories to all residences and businesses in the geographical areas for which we produce directories. We primarily use four vendors to distribute our directories. Distribution begins as soon as the first completed directories are produced. Depending on the circulation and size of the directory, distribution ranges from three to eight weeks.

## Billing and Credit Control

Currently, we directly bill more than 50% of our customers. By the end of 2007, we anticipate migrating our remaining customers to our direct billing system. We expect to enter into a billing and collection agreement with Verizon that will become effective upon the consummation of the spin-off. Under the agreement, Verizon will continue to bill and collect from our customers who have not migrated to our billing system. These remaining customers, who are also Verizon local telephone customers, will consist primarily of smaller customers serviced by our telephone call center.

In 2003, in order to reduce our bad debt expense, we implemented a new billing and collections program, which resulted in more stringent policies, process reengineering and system improvements. By the end of 2004,

82

Table of Contents

some aspects of the program were implemented. These initial efforts helped reduce our bad debt expense from 8.1% in 2003 to 6.6% in 2004. During 2005, we continued to implement additional new processes, which further reduced our bad debt expense to 4.9% in 2005. For the nine months ended September 30, 2006, our bad debt expense was 4.2%. We expect to fully implement these enhancements in 2006.

Because most directories are published on 12-month cycles, we bill most of our customers, many of which are small or medium-sized businesses, over the course of that 12-month period. Fees for national advertisers are typically billed upon issue of each directory in which advertising is placed by CMRs, after deduction of commissions. Because we do not usually enter into contracts with our national advertisers, we are subject to the credit risk of CMRs on sales to those advertisers, to the extent we do not receive fees in advance.

We manage collection of accounts receivable by conducting initial credit checks of new customers under certain circumstances, reducing the time taken to resolve billing inquiries and, where appropriate, requiring personal guarantees from business owners. We check all new orders from existing customers for payments that are past due to us prior to publishing the new order. When applicable, based on credit policy, we use both internal and external data to decide whether to sell to a prospective customer. In some cases, where appropriate, we may also require the customer to prepay part or all of the amount of its order. Beyond efforts under certain circumstances to assess credit risk, we employ well-developed collection strategies using an integrated system of internal, external and automated means to engage with customers concerning payment obligations.

## Competition

The United States directory advertising industry is highly competitive. We compete with many different advertising media, including newspapers, radio, television, the Internet, billboards, outdoor, direct mail, telemarketing and other yellow pages directory publishers. There are a number of independent directory publishers, including Yellow Book (the U.S. business of Yell Group), with which we compete in every major market. To a lesser extent, we compete with other directory publishers, including AT&T, BellSouth, R.H. Donnelley and White Publishing in markets where Verizon is not the incumbent local exchange carrier. We compete with these publishers on cost per reference, quality, features and distribution. We estimate that, on average, there are one to four competing directories in each of our local markets.

As the exclusive official publisher of Verizon print directories of wireline listings in our incumbent markets, we believe we have an advantage over our independent competitors due to the strong awareness of the Verizon brand, higher usage of our directories by consumers and our long-term relationships with our customers. See "Relationship Between Verizon and Our Company After the Spin-Off—Publishing Agreement." Under the non-competition agreement we expect to enter into with Verizon, which has an initial term of 30 years from the date of the spin-off, Verizon will generally agree not to publish tangible or digital media directory products consisting principally of wireline listings and classified advertisements of subscribers in our incumbent markets as long as we meet our obligations under the publishing agreement in those markets.

### Competition with Other Directory Publishers

We have competed with other directory publishers for well over a decade and in some markets have, at times, had as many as seven different print yellow pages competitors. In the past, much of this competition was from small publishers that had minimal impact on our performance. However, over the past five years, Yellow Book and several other regional competitors have become far more aggressive and have grown their businesses through both acquisition and expansion.

We have competition in more than 90% of our markets, including our incumbent markets where we are the exclusive official Verizon publisher and the independent markets we have penetrated. Our largest competitor is Yellow Book, which for the past five years has specifically targeted our primary markets. As a result, Yellow Book is a market participant in most of our incumbent markets nationwide.

83

Table of Contents

We believe that we are defending our leading market position in our incumbent markets both in terms of usage and advertising revenue. On the usage side, we believe that we have remained a preferred source of information for consumers by innovating our product line with the addition of smaller-sized companion directories and directories in Spanish, with marketing initiatives aimed at increasing usage and with various distribution strategies. On the advertising revenue side, we believe that we have countered our competitors' pricing strategies with differentiated product offerings that suit our customers' advertising needs and with value-enhancing programs that provide customers with a competitive cost per reference compared with other print directory publishers.

Although advertising on the Internet still represents only a small part of the total advertising market, as the Internet grows, it may become increasingly important as an advertising medium. We compete directly through our Internet yellow pages directory, SuperPages.com, with the Internet yellow pages directories of the independent publishers and some of the major directory publishers. In addition, we compete with other Internet sites providing classified directory information, including Yellowpages.com, Switchboard.com and Citysearch.com, and with search engines and portals, some of which have entered into agreements with other major directory publishers. However, we have entered into agreements with several search engines, pursuant to which we place local advertising content on their web sites, giving us access to a higher volume of traffic.

## Patents, Trademarks and Licenses

Following the spin-off, we will own several patents, patent applications, service marks and trademarks in the United States and other countries, including SuperPages.com ® and SuperPages ®. In addition, in connection with the spin-off, we expect to enter into a branding agreement with Verizon that will give us limited rights to use the Verizon name and logo in conjunction with the publication of our print directories in specified markets and an intellectual property agreement that will govern our and Verizon's rights with respect to certain other intellectual property currently shared by us and Verizon. See "Relationship Between Verizon and Our Company After the Spin-Off—Branding Agreement" and "—Intellectual Property Agreement." We consider the following trademarks to be material to our operations: Idearc ™, Idearc Media ™, the Idearc logo, the Idearc Media logo, SuperPages.com ® and SuperPages ®. We will have a program to file applications for trademarks, service marks and patents where we believe this protection is appropriate.

We also expect to enter into an intellectual property agreement with Verizon in connection with the spin-off, which will permit us to use, in the operation of our print and Internet yellow pages directory business, certain intellectual property owned or licensed by Verizon. See "Relationship Between Verizon and Our Company After the Spin-Off—Intellectual Property Agreement."

We have received claims in the past, and may in the future receive claims, that we infringe on the intellectual property of others. These claims can be time-consuming and costly to defend and can divert management resources. If these claims are successful, we could be forced to pay significant damages or stop selling certain products or services. We also could enter into licenses with unfavorable terms, including royalty payments, which could adversely affect our business.

84

App. - 000212

Table of Contents

### Employees

At December 31, 2005, we had approximately 7,100 employees. We believe that our employee relations are good. At December 31, 2005, approximately 2,200 of our employees were represented by unions. The following tables show the unions, expiration dates and number of employees covered by our contracts with unions, for our sales representatives and for our other employees:

| Sales Representatives | Union | Expiration (year/month) | Number of Employees Represented by Unions |
|---|---|---|---|
| New England | CWA[1] | 06/07 | 315 |
| West Orange, NJ | CWA | 08/08 | 99 |
| New York | CWA | 10/08 | 343 |
| Pennsylvania | CWA | 02/09 | 287 |
| New Jersey | CWA | 10/09 | 178 |
| Maryland/Virginia | CWA | 10/09 | 244 |
| Total sales representatives represented by unions | | | 1,466 |
| **Non-Sales Representatives** | | | |
| New England | CWA | 06/07 | 248 |
| North Greenbush, NY | IBEW[2] | 06/07 | 164 |
| Potomac, MD | CWA | 08/08 | 51 |
| Elkins Park, PA | CWA | 08/08 | 59 |
| Valley Forge, PA | CWA | 06/09 | 195 |
| Total non-sales representatives represented by unions | | | 717 |
| Total employees represented by unions | | | 2,183 |

(1)   Communications Workers of America
(2)   International Brotherhood of Electrical Workers

### Properties

Our property mainly consists of land and buildings. Our corporate headquarters are located in DFW Airport, TX and are subleased from an affiliate of Verizon Realty Corp. and we expect to maintain our lease following the spin-off. Although most of our offices are leased, we own several of our facilities. We believe that our existing facilities are in good working condition and are suitable for their intended purposes.

The following locations are administrative facilities except that the Los Angeles, CA and Des Plaines, IL facilities are printing plants and the Martinsburg, WV and Fullerton, CA facilities are warehouse/distribution centers.

| Location | (Sq. Ft.) |
|---|---|
| **Owned** | |
| Los Angeles, CA | 320,412 |
| Martinsburg, WV | 191,068 |
| Los Alamitos, CA | 149,326 |
| St. Petersburg, FL | 100,000 |
| Marlton, NJ | 32,200 |

85

Table of Contents

| Location | (Sq. Ft.) |
|---|---|
| **Leased** | |
| DFW Airport, TX | 418,824 |
| Irving, TX (Executive Drive) | 152,121 |
| Middleton, MA | 128,746 |
| Fullerton, CA | 112,944 |
| Des Plaines, IL | 89,201 |
| Norristown, PA | 72,880 |
| Everett, WA | 69,179 |
| N. Greenbush (Troy), NY | 63,198 |
| Coppell, TX (651 Canyon) | 56,784 |
| Coppell, TX (750 Canyon) | 55,555 |
| Irving, TX (Fuller Drive) | 52,893 |

## Seasonality

Our business is not significantly impacted by seasonality.

## Environmental Matters

Our operations and our owned and leased properties are subject to many laws and regulations relating to the protection of the environment and human health and safety including those governing air emissions, waste disposal, and the cleanup of contamination. While we believe we are in material compliance with these requirements, we could incur significant fines, penalties, costs or liabilities related to damage claims or remediation obligations in the event we violate these requirements or the permits required for our operations. In addition, because these laws may become more stringent and our processes may change, the amount and timing of future expenditures to achieve or maintain compliance may vary substantially from those currently anticipated.

Some environmental laws may impose liability for the investigation and cleanup of environmental contamination on current or former property owners or occupants, regardless of knowledge or the legality of the disposal practices at the time they occurred. Although we are not currently aware of any material obligations at properties we now or previously owned, leased, or operated or at sites we sent our waste for disposal, we may be required to conduct remedial activities in the future which may be material to our business and we also may be subject to claims for property damage, personal injury, natural resource damages or other issues as a result of these matters.

## Legal Proceedings

Various lawsuits and other claims typical for a business of our size are pending against us. In addition, from time to time, we receive communications from government or regulatory agencies concerning investigations or allegations of noncompliance with laws or regulations in jurisdictions in which we operate.

We establish reserves for specific liabilities in connection with regulatory and legal actions that we deem to be probable and estimable. In other instances, including the matters described below, we are not able to make a reasonable estimate of any liability because of the uncertainties related to either the outcome and/or the amount or range of loss. We do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition. However, any potential judgments, fines or penalties relating to these matters may have a material effect on our results of operations in the period in which they are recognized.

We are currently subject to a class action lawsuit and a purported class action lawsuit from current and former sales representatives located in California, New York, Pennsylvania, and New Jersey. The plaintiffs in

86

Table of Contents

these cases claim that we reduced their incentive pay through offsets for cancellations, non-renewals and credits on customer accounts and shifted a general business risk of loss to our sales representatives through the assignment of accounts which we allegedly knew would not renew their purchases, or would renew them at a lower level. The plaintiffs seek amounts that they allege were unlawfully deducted from their wages, civil penalties, interest, attorneys' fees and costs. The plaintiffs also seek amounts for overtime they allege they worked for which they were not paid. These cases are at varying stages of defense and the ultimate outcome is not determinable.

We are subject to a purported class action that was filed on February 28, 2006 with the Washington Superior Court in King County. The plaintiff seeks to represent a class of persons that received a pre-recorded message from Verizon that was delivered by an automatic dialing and answering device (ADAD). The plaintiff claims that the use of an ADAD to deliver a pre-recorded message violates Washington state law and that Verizon transmitted deceptive caller-identification information with the message. The plaintiff, on behalf of himself and the class he purports to represent, seeks an unspecified amount of damages (but not less than $500 per plaintiff) and injunctive and declaratory relief. Our motion for summary judgment, which asserted that the calls at issue did not violate Washington state law, that the claims are pre-empted under the Federal Communications Act and that, if construed in the manner alleged by the plaintiff to create liability as to defendants, the Washington statute would be an unconstitutional restriction on speech, was denied by the trial court. We have filed notice that we intend to seek discretionary review of this order of the trial court with the appellate courts in Washington. The parties have also agreed to a voluntary mediation of the plaintiff's claims in December and a stay of further trial court proceedings pending the outcome of the mediation. The ultimate outcome of this case is not determinable.

**Available Information**

Our Internet address will be *www. idearc.com* . Please note that information contained on our web site is not incorporated by reference into this information statement or the registration statement of which this information statement is a part. Our Internet address is included in this information statement as an inactive textual reference only. We will make available free of charge most of our future SEC filings through our Internet web site as soon as reasonably practicable after we file them with the SEC. You will be able to access our future SEC filings via a hyperlink on our web site to the SEC's web site.

After the spin-off, we will also make available on our web site the charters of our Audit Committee, our Human Resources Committee, and our Nominating and Corporate Governance Committee, as well as the corporate governance guidelines adopted by our board of directors and our code of business conduct for employees and directors. We will also provide these documents, without charge, at the written request of any stockholder of record. Requests for copies should be mailed to the name and address listed under "Where You Can Find More Information."

87

**Table of Contents**

# MANAGEMENT

### Directors and Executive Officers

The following table sets forth the information as of October 15, 2006 regarding the individuals who are expected to serve as our board of directors and executive officers following the spin-off. Verizon will elect our directors prior to the consummation of the spin-off. In connection with the spin-off, Ms. Harless will, in consultation with the board of directors, determine our other senior management positions.

| Name | Age | Position(s) |
|---|---|---|
| Katherine J. Harless | 55 | President, Chief Executive Officer and Director |
| Andrew Coticchio | 50 | Chief Financial Officer and Treasurer |
| Frank P. Gatto | 52 | Area President—Northeast |
| W. Scott Hanle | 58 | Area President—West |
| Sandra Lee Henjum | 46 | Area President—Southeast and Central |
| Scott B. Laver | 51 | Area President—Mid-Atlantic |
| William G. Mundy | 56 | Vice President—Secretary and General Counsel |
| Michael D. Pawlowski | 45 | Vice President—Marketing and Strategic Planning |
| John W. Diercksen | 56 | Director [1] |
| John J. Mueller | 50 | Director [2] |
| Donald B. Reed | 62 | Director |
| Stephen L. Robertson | 55 | Director |
| Thomas S. Rogers | 52 | Director |

(1)   Mr. Diercksen currently serves as our sole director. He will not serve as a director after the consummation of the spin-off.

(2)   It is expected that our corporate governance guidelines will provide for a chairman of the board who will not be an officer or employee of the company (a "non-executive chairman"). The individuals who will be members of our board immediately after the consummation of the spin-off have indicated that they expect to name Mr. Mueller to serve as non-executive chairman and he has indicated that he is prepared to accept the appointment.

*Katherine J. Harless* has been the President of our newly-formed corporation, Idearc Inc., since June 2006, and is expected to be our President, Chief Executive Officer and director. Ms. Harless currently serves as President and Chief Executive Officer of Idearc Information Services, a position she has held since 2000. Prior to holding that position, Ms. Harless served as President of GTE Airfone. She also serves on the board of directors of the Yellow Pages Association, the Toro Company and the Verizon Foundation, as well as on the advisory board of the University of Texas McCombs School of Business.

*Andrew Coticchio* has been our Chief Financial Officer and Treasurer since October 13, 2006. He currently serves as Vice President—Finance and Chief Financial Officer of Idearc Information Services, a position he has held since March 2003. Mr. Coticchio served as President and Chief Executive Officer of Verizon Capital Group from July 2000 to March 2003.

*Frank P. Gatto* is expected to be Area President of our Northeast region. He currently serves in this role at VIS, a position he has held since June 2005. Mr. Gatto served as Senior Vice President—Operations of Idearc Information Services from September 2001 to June 2005 and as Vice President—Finance and Chief Financial Officer of the Puerto Rico Telephone Company from September 1999 to September 2001.

*W. Scott Hanle* is expected to be Area President of our West region. He currently serves in this role at Idearc Information Services, a position he has held since 2003. Mr. Hanle served as Group President—International of Idearc Information Services from 2000 to 2003. Prior to holding that position, he served as Vice President—Finance of GTE Information Services from February 1992 to 2000.

88

Table of Contents

*Sandra Lee Henjum* is expected to be Area President of our Southeast and Central regions. She currently serves in this role at Idearc Information Services, a position she has held since September 2003. Ms. Henjum served as Group Vice President—Human Resources of Idearc Information Services from July 2000 to September 2003.

*Scott B. Laver* is expected to be Area President of our Mid-Atlantic region. He currently serves in this role at Idearc Information Services, a position he has held since September 2005. Mr. Laver served as President—Internet of Idearc Information Services from 2004 to 2005 and as President—SuperPages Canada and the Northwest from June 2001 to December 2003.

*William G. Mundy* has been our Vice President, Secretary and General Counsel. He currently serves as Vice President and General Counsel of Idearc Information Services, a position he has held since 2000. He served as Vice President and General Counsel of GTE Network Services from September 1997 to 2000.

*Michael D. Pawlowski* is expected to be our Vice President—Marketing and Strategic Planning. He currently serves in this role at Idearc Information Services, a position he has held since March 2005. Mr. Pawlowski served as Vice President—Marketing and Customer Relations of Verizon International Operations from 2000 to March 2005.

*John W. Diercksen* became our sole director in June 2006. He is not, however, expected to serve as our director after the consummation of the spin-off. Mr. Diercksen currently serves as Executive Vice President—Strategy, Development and Planning of Verizon, a position he has held since June 2003. Mr. Diercksen served as Senior Vice President of Investor Relations of Verizon from July 2000 to June 2003. Prior to holding that position, Mr. Diercksen served as the acting President of Bell Atlantic's Directory Group, a position he had held since January 2000.

*John J. Mueller* is expected to serve on our board of directors. Mr. Mueller currently is a business consultant. Previously, Mr. Mueller served as Chief Executive Officer and President of Valor Telecommunications LLC, or Valor, from 2004 to 2006. Mr. Mueller also served as Chief Executive Officer and President and as a member of the board of directors of Valor Communications Group, Inc., Valor's parent company, from 2005 to 2006. Mr. Mueller was appointed to Valor Communications Group, Inc.'s board of directors following the consummation of its initial public offering. Prior to becoming Valor's Chief Executive Officer and President, Mr. Mueller held the positions of Valor's President and Chief Operating Officer. Mr. Mueller joined Valor in April 2002 as Executive Vice President and Chief Operating Officer. In July 2006, Alltel Corporation spun-off its wireline telecommunications business and it merged with Valor Communications Group, Inc., a local provider of telecommunications services, to form Windstream Corporation. Prior to joining Valor, Mr. Mueller spent 23 years at Cincinnati Bell Inc. serving in various positions including: President, Cincinnati Bell Telephone Company; General Manager—Consumer Markets, and President and Chief Executive Officer of CBD, Cincinnati Bell's directory subsidiary. In 2006 Mr. Mueller successfully completed an exam to be certified as having core competencies as a board member following completion of an executive education program sponsored by the UCLA Anderson School of Management.

*Donald B. Reed* is expected to serve on our board of directors. Mr. Reed currently serves on the board of directors of CSG Systems International Inc.; Intervoice, Inc.; and St. Lawrence Cement Group, Inc. From May 2000 to January 2003, Mr. Reed served as the Chief Executive Officer of Cable and Wireless Global, or C&W, a unit of Cable & Wireless plc (UK). C&W provided Internet protocol and data services to business customers in the United States, Europe and Japan. Mr. Reed served in various other executive positions at C&W from June 1998 to May 2000. Mr. Reed also served for 30 years in various executive positions at New England Telephone, NYNEX Corporation and Bell Atlantic Corporation, including as: NYNEX's Vice President of Government Affairs in Washington, D.C.; Vice President of NYNEX Human Resources; President of NYNEX Information Resources, the directory operations of NYNEX; and President and Group Executive of NYNEX Corporation.

*Stephen L. Robertson* is expected to serve on our board of directors. Mr. Robertson is currently a business consultant. Previously, Mr. Robertson served as President of Convergys International, a unit of Convergys

89

**Table of Contents**

Corporation, from 2002 to 2005. Convergys Corporation, or Convergys, is a global outsourcing solutions company. Mr. Robertson also served as Convergys' Executive Vice President of North American Operations from 2000 to 2002 and as Convergys' President of Telecom Solutions from 1996 to 2000. Prior to joining Convergys, Mr. Robertson served 22 years in the telecommunications industry with Cincinnati Bell Corporation and Southwestern Bell Corporation. Mr. Robertson also served on the respective senior executive committees of Convergys and Cincinnati Bell Corporation.

*Thomas S. Rogers* is expected to serve on our board of directors. Mr. Rogers currently serves as President and Chief Executive Officer of TiVo Inc., a position he has held since July 2005. He also currently serves on the board of directors of TiVo Inc., a provider of television-based interactive and entertainment services. Mr. Rogers previously served as Chairman of the Board of Teleglobe International Holdings, Ltd., a provider of international voice, data, internet, and mobile roaming services, from November 2004 to February 2006. Mr. Rogers also served as Chairman of TRget Media LLC, a media industry investment and operations advisory firm, from July 2003 to July 2005. Mr. Rogers served as the Senior Operating Executive for media and entertainment for Cerberus Capital Management, a large private equity firm, from 2004 to July 2005. Prior to holding that position, Mr. Rogers served as Chairman and Chief Executive Officer of Primedia, Inc., a print, video, and online media company, from October 1999 to April 2003. From January 1987 until October 1999, Mr. Rogers held positions with National Broadcast Company, Inc., or NBC, including President of NBC Cable and Executive Vice President.

## Board of Directors Structure

After the spin-off, we will have an initial board of directors consisting of five directors. Our bylaws will provide that the number of members will be fixed by a majority vote of the board of directors. Our certificate of incorporation and bylaws will provide that the board of directors will consist of one class, with our directors being elected each year at our annual meeting of stockholders. Our board of directors may be removed with or without cause by a majority vote of stockholders. Most of our directors are expected to be independent, non-employee directors who meet the criteria for independence required by the New York Stock Exchange. We expect that membership on the Audit Committee, Human Resources Committee and Nominating and Governance Committee will be limited to independent, non-employee directors. We will keep our board of directors informed about our business through discussions with management, materials we provide to them, visits to our offices and their participation in board of directors and board committee meetings.

Our board of directors is expected to adopt corporate governance guidelines that, along with the charters of our board committees and our code of business conduct for employees and board of directors, will provide the framework for the governance of our company.

## Committees

The standing committees of our board of directors will be an Audit Committee, a Human Resources Committee and a Nominating and Corporate Governance Committee, each of which is described below.

### *Audit Committee*

We expect that all members of our Audit Committee will be independent directors. Our Audit Committee will operate under a written charter to be adopted by our board of directors which will reflect standards set forth in SEC regulations and NYSE rules. The composition and responsibilities of our Audit Committee and the attributes of its members, as reflected in its charter, will be in accordance with applicable requirements for corporate audit committees. The charter will be reviewed, and amended if necessary, on an annual basis. The full text of our Audit Committee's charter will be found on our website at *www.idearc.com* or provided upon request made to our Secretary.

App. - 000218

**Table of Contents**

As will be set forth in more detail in the charter, our Audit Committee will assist the board of directors in its oversight responsibilities relating to the integrity of our financial statements and our systems of internal controls, our independent auditors' qualifications and independence, the performance of our internal audit function and independent auditors, our compliance with legal and regulatory requirements, and the preparation of an audit committee report to be included in our annual proxy statement. Our management and internal auditors will have primary responsibility for the financial statements and the reporting process, including systems of internal controls over financial reporting. Our independent auditors will be responsible for auditing our financial statements and expressing an opinion as to their conformity with accounting principles generally accepted in the U.S.

In the performance of its oversight function, our Audit Committee will:

- have sole responsibility for the appointment, compensation, retention, and oversight of the independent auditors, including pre-approval of any non-audit work performed by the independent auditors;

- review and discuss with management and the independent auditors our audited financial statements;

- discuss with management the types of information to be disclosed in earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- discuss with management policies with respect to risk assessment and risk management;

- review with the independent auditors any audit problems or difficulties encountered during their audit work and management's response to such matters;

- meet with our Chief Executive Officer and Chief Financial Officer to discuss the processes that they have undertaken to evaluate the accuracy and fair presentation of our financial statements and the effectiveness of our system of internal controls and procedures;

- discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61 relating to communications with audit committees;

- discuss with our internal and independent auditors the overall scope and plans for their respective audits;

- meet with the internal and independent auditors, with and without management present, to discuss the results of their examinations, their evaluations of our internal controls and the overall quality of our financial reporting;

- review annually the independent auditors' report describing the independent auditors' internal quality-control procedures, any material issues raised by the internal auditors' most recent internal quality-control review, peer review or PCAOB review, and the written disclosures and letter required by Independence Standards Board Standard No. 1 relating to independence discussions with audit committees;

- discuss with the independent auditors their independence from our company and our management;

- set clear hiring policies for employees and former employees of the independent auditors;

- oversee our internal audit function and our compliance with legal and regulatory requirements;

- prepare the audit committee report required by the SEC to be included in our annual proxy statement;

- conduct an annual self-evaluation of its performance; and

- report regularly to our full board of directors.

## Human Resources Committee

We expect that all members of our Human Resources Committee will be independent directors. The Human Resources Committee will operate under a written charter to be adopted by the board of directors. The charter will be reviewed, and amended if necessary, on an annual basis. The full text of our Human Resources

91

Table of Contents

Committee's charter will be found on our website at *www.idearc.com* or provided upon request made to our Secretary. As will be set forth in more detail in its charter, the Human Resources Committee will have oversight responsibility for our incentive compensation and equity-based compensation plans, our executive compensation policies, objectives and programs, and the compensation of our directors and executive officers.

### Nominating and Corporate Governance Committee

We expect that all members of our Nominating and Corporate Governance Committee will be independent directors. The Nominating and Corporate Governance Committee will operate under a written charter to be adopted by the board of directors. The charter will be reviewed, and amended if necessary, on an annual basis. The full text of our Nominating and Corporate Governance Committee's charter will be found on our website at *www.idearc.com* or provided upon request made to our Secretary. As will be set forth in more detail in its charter, the Nominating and Corporate Governance Committee will primarily be responsible for establishing criteria and qualifications for the members of our board of directors, assessing the membership needs of our board of directors, identifying individuals qualified to become members of our board of directors, and recommending to the board of directors the director nominees to be elected by the Company's stockholders. The Nominating and Corporate Governance Committee will also advise our board of directors on corporate governance matters and oversee evaluations of the effectiveness of the board of directors, each committee of the board of directors, and management.

### Compensation of Directors

We expect to establish a director compensation program comparable to that of companies of similar size and complexity. It is expected that a committee of our board of directors will recommend director compensation levels to the full board of directors, which will set the compensation based on those recommendations. We expect that a committee of our board of directors will review and report to the board of directors on the director compensation program on a regular basis and that the committee will likely retain an outside advisor to assist in its review and report on the program.

### Independence of Directors

We expect that most of our directors will be independent, non-employee directors who meet the criteria for independence set forth by the New York Stock Exchange. We expect that our board of directors will limit membership of the Audit Committee, Human Resources Committee, and Nominating and Corporate Governance Committee to independent, non-employee directors.

### Historical Compensation of Our Executive Officers

The following table contains compensation information for the person expected to become our Chief Executive Officer and four other persons who are expected to become our executive officers and who, based on employment with Verizon and its subsidiaries, were the most highly compensated for the year ended December 31, 2005. We refer to these persons collectively as our Named Officers. All of the information included in this table reflects compensation earned by the individuals for services with Verizon and its subsidiaries. All references in the following tables to stock options, performance stock units, or PSU's, and restricted stock units, or RSU's, relate to awards of stock options, PSU's and RSU's granted by Verizon. These amounts or the type of equity-based grant do not necessarily reflect the compensation these persons will receive following the distribution, which could be higher or lower, because historical compensation was determined by Verizon and future compensation levels will be determined based on the compensation policies, programs and procedures to be established by our Human Resources Committee.

92

Table of Contents

*Summary Compensation Table*

| Name and Principal Position | Year | Annual Compensation | | Long-term Compensation Awards | | | |
| | | Salary ($) | Bonus ($) | Restricted Stock Award(s) ($) | Securities Underlying Options | Long Term Payout | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|
| Katherine J. Harless<br>President and Chief Executive Officer | 2005 | $483,000 | $543,375 | $2,415,299[1] | 0 | $ 0 | $ 274,391[2] |
| Andrew Coticchio<br>Chief Financial Officer | 2005 | $308,500 | $259,109 | $ 694,155[1] | 0 | $ 0 | $ 112,799[2] |
| Frank P. Gatto<br>Area President—Northeast | 2005 | $272,800 | $200,508 | $ 614,102[1] | 0 | $ 0 | $ 106,341[2] |
| Michael D. Pawlowski<br>Vice President—Marketing and Strategic Planning | 2005 | $284,885 | $178,092 | $ 505,561[1] | 0 | $ 0 | $ 76,098[2] |
| W. Scott Hanle<br>Area President—West | 2005 | $269,700 | $186,093 | $ 607,250[1] | 0 | $ 0 | $ 139,864[2] |

(1)   The data reflects the dollar value of the PSU's and RSU's based on the average price of Verizon's common stock on the grant date, February 2, 2005. Actual payment of the PSU's is determined based on Verizon's total shareholder return, or TSR, relative to the TSR of the companies that make up the Standard & Poor's 500 and to the TSR of certain companies in Verizon's telecommunication, broadband, wireless and cable industry peer group. On each dividend payment date, RSU's are credited to the participant's account. The number of RSU's is determined by dividing the dividend that would have been paid on the shares represented by the stock units in the participant's account by the average price of Verizon's common stock on the New York Stock Exchange Composite Transaction Tape on the dividend payment date. Based on the closing price of Verizon's common stock on December 31, 2005, the aggregate unit amounts and dollar value held by the Named Officers as of December 31, 2005 was:

| Name | Number of PSU's | Number of RSU's | Aggregate Dollar Value |
|---|---|---|---|
| Ms. Harless | 41,662 | 27,772 | $2,091,361 |
| Mr. Coticchio | 11,973 | 7,982 | $ 601,055 |
| Mr. Gatto | 10,594 | 7,060 | $ 531,739 |
| Mr. Pawlowski | 6,852 | 7,682 | $ 437,755 |
| Mr. Hanle | 10,470 | 6,987 | $ 525,806 |

Following the distribution, all PSU's and RSU's will remain related to the common stock of Verizon, but will be adjusted to reflect the distribution of Idearc common stock to Verizon's stockholders.

93

App. - 000221

Table of Contents

(2)   The column "All Other Compensation" includes: Verizon contributions to a qualified saving plans, the non-qualified executive deferral plan, or the EDP, and the Verizon excess pension plan, or the VEPP, on behalf of the Named Officer. In addition, when Verizon terminated its split dollar life insurance program, to maintain commensurate life insurance benefits for senior managers, the executive life insurance program, or the VELIP, was restructured so that Verizon partially pays for life insurance coverage for each Named Officer in the form of a bonus. The 2005 Verizon contributions for these plans that were made to the Named Officers are as follows:

### Total All Other Compensation

| Name | EDP | VEPP | Savings Plan | VELIP |
|------|-----|------|--------------|-------|
| Ms. Harless | $180,483 | $19,110 | $ 10,500 | $64,298 |
| Mr. Coticchio | $ 76,261 | $ 6,895 | $ 10,500 | $19,143 |
| Mr. Gatto | $ 67,224 | $ 4,396 | $ 10,500 | $24,221 |
| Mr. Pawlowski | $ 61,390 | $ 4,595 | $ 10,113 | $     0 |
| Mr. Hanle | $ 66,292 | $ 4,179 | $ 10,500 | $58,893 |

### Option Exercises and Fiscal Year-End Values

None of our Named Officers exercised any Verizon stock options in 2005. The following table summarizes the value at December 31, 2005 of options to purchase Verizon common stock then held by our Named Officers.

*Aggregated Year-end Option Values*

| | Number of Securities Underlying Unexercised Options at December 31, 2005 | | Value of Unexercised In-the-Money Options at December 31, 2005 | |
|------|------------------|------------------|------------------|------------------|
| | Exercisable (#) | Unexercisable (#) | Exercisable ($) [1] | Unexercisable ($) [1] |
| Ms. Harless | 569,498 | 84,366 | $    0 | $    0 |
| Mr. Coticchio | 164,814 | 21,666 | 0 | 0 |
| Mr. Gatto | 110,654 | 19,533 | 0 | 0 |
| Mr. Pawlowski | 83,200 | 13,100 | 0 | 0 |
| Mr. Hanle | 149,730 | 19,300 | 0 | 0 |

(1)   The value of the unexercised, in-the-money options is determined by multiplying the number of shares underlying the option by the difference between the exercise price of the option and the fair market value of the Verizon common stock, at December 31, 2005, of $30.12. As of December 31, 2005, no options were in-the-money.

### Retirement Plans, Pension Plans and Savings Plan

The Verizon management pension plan, or VMPP, is a noncontributory, tax-qualified pension plan for salaried employees that provides for distribution of benefits in a lump sum or an annuity, at the participant's election.

All participant pension benefits under the VMPP are calculated using a cash balance formula that provides for pay credits equal to 4%-7% (depending upon age and service) of annual eligible pay up to the statutory limit on compensation ($210,000 in 2005), for each year of service following the conversion to cash balance. In general, eligible pay includes base salary and short-term incentives, exclusive of certain senior manager or other incentive compensation, and other similar types of payments. Additionally, monthly interest credits are made to the participant's account balance based upon the prevailing market yields on certain U.S. Treasury obligations. In

94

Table of Contents

order to record these pay and interest credits, the plan administrator maintains a hypothetical account balance for each participant. However, as part of the transition to a cash balance formula, all participants who had at least 10 years of service with Verizon and its subsidiaries as of January 1, 2002 received benefits under an alternative formula, referred to as the "highest average pay formula," if that formula provides a higher benefit than the cash balance formula. Under this alternative formula, pensions are computed on 1.35% of eligible pay for average annual salary for the five highest consecutive years up to the statutory limit on compensation ($210,000 in 2005), for each year of service. Each of our Named Officers has his or her benefits under the VMPP calculated under the final pay formula. As of December 31, 2005, the actual years of service credited under the VMPP for Ms. Harless and Messrs. Coticchio, Gatto, Pawlowski and Hanle were 33, 21, 27, 21 and 32, respectively.

The following table illustrates the estimated annual benefits payable pursuant to the highest average pay formula under the VMPP based on a maximum compensation limit in 2005 of $210,000. The table assumes normal retirement at age 65 and is calculated on a single life annuity basis, based upon final average earnings and years of service.

## Pension Plan Table

| Final Average Earnings | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 | 40 |
| $210,000 | $ 42,525 | $ 56,700 | $ 70,875 | $ 85,050 | $ 99,225 | $ 113,400 |

Effective July 1, 2006, Verizon management employees, including Named Officers, no longer earn pension benefits under the VMPP and the VEPP. For all management employees, including the Named Officers, earning pension benefits as of June 30, 2006, Verizon enhanced the pension benefit earned as of that date, adding 18 months of additional pay credits to the cash balance pension accounts and, if applicable, 18 months of service to the highest average pay pension calculation.

Section 415 of the Code places certain limitations on pension benefits that may be paid from the trusts of tax-qualified plans, such as the VMPP. Accordingly, any pension amounts for executive officers that exceed that limit will be paid from our assets under the VEPP. The VEPP is a nonqualified, unfunded, supplemental retirement plan. The VEPP is provided to all eligible Verizon employees. Our Named Officers began participating in the VEPP as of January 1, 2005. Their participation in the VEPP is limited to the cash balance formula; they are not eligible for the highest average pay formula under the VEPP. This means that Named Officers (as well as all other participating employees) were eligible to receive pay credits 2005 equal to 4%-7% (depending on age and service) under the VEPP on all eligible compensation that exceeds the IRS qualified pay limits ($210,000 in 2005). This is the same pay-credit percentage range received under the cash balance formula in the VMPP, up to the applicable IRS qualified payments. Verizon's executive officers may also elect to participate in the EDP. The EDP is a nonqualified, unfunded, deferred compensation plan. The EDP allows the approximately 2700 active participants to defer voluntarily the receipt of up to 100% of their eligible compensation. Eligible compensation consists of:

I.   a participant's base salary in excess of the Code limit on compensation for qualified retirement plans ($210,000 in 2005);

II.  the participant's short-term incentive award; and

III. other bonuses that the plan administrator determines are eligible for deferral.

If any participant elects to defer eligible income, we provide a matching contribution equal to the rate of match under the qualified savings plan for management employees. That rate was 100% of the first 4% of eligible compensation deferred and 50% of the next 2% of eligible compensation deferred. Effective July 1, 2006, Verizon began to provide an enhanced savings opportunity under the qualified savings plan for management employees. Verizon will provide a matching contribution equal to 100% of 6% of eligible

95

Table of Contents

compensation deferred or contributed to the savings plan. In addition, Verizon management employees may be eligible for an additional performance related matching contribution of up to 3% of eligible compensation if certain pre-established performance criteria are met.

## Employment Agreement

### Katherine J. Harless

In 2002, Verizon entered into an employment agreement with Katherine J. Harless. In exchange for the benefits offered under that agreement, Ms. Harless has agreed not to engage in competitive activities or to interfere with Verizon's business relations for a specified period of time following the termination of her employment. Pursuant to the terms of her agreement, Verizon will assign the agreement to Idearc prior to the distribution.

The current term of Ms. Harless' agreement ends June 30, 2008. We expect to enter into a new employment agreement with Ms. Harless after the distribution, geared specifically to her position as our Chief Executive Officer. Ms. Harless' existing agreement would be replaced by the new agreement. We have retained the services of an outside compensation consulting firm to assist us in connection with the design and preparation of the new agreement. That process is currently ongoing. The discussion below relates to Ms. Harless' current agreement.

Ms. Harless will receive the compensation and benefits outlined below for the term of her agreement. If Ms. Harless resigns or retires, she will be entitled only to the benefits that would be provided to a similarly situated senior executive upon termination. If her employment terminates following a change in control of Verizon, or due to a good reason, or as a result of death or disability, she will generally receive the same benefits as if she were involuntarily terminated without cause. However, if Ms. Harless' termination is the result of a death or disability, her lump sum separation payment will be equal to her base salary plus 50% of her maximum short-term bonus opportunity. In addition, if Ms. Harless' termination is the result of a disability, the lump sum payment will be offset by amounts payable under any Verizon-sponsored disability plan. If Ms. Harless' employment is involuntarily terminated without cause, her outstanding stock options will vest and will be exercisable until the earlier of five years after the date of termination or the maximum term of each option. In addition, her PSU's and RSU's will vest and will become payable on the scheduled date, provided that, with respect to the PSU's, Verizon attains the applicable performance goals. All separation payments provided to Ms. Harless under her employment agreement are in lieu of Verizon-sponsored severance.

Ms. Harless' agreement provides for a two-year term that ends on June 30, 2008. Thereafter, the term of employment will automatically renew for successive two-year terms unless Verizon provides advance written notice of its intention not to renew the agreement. Any notice of non-renewal does not entitle Ms. Harless to any separation benefits under the agreement. Ms. Harless' agreement provides for:

- An annual base salary of not less than her annual base salary as of July 1, 2002;

- An annual short-term bonus between 0 and 1.5 times her base salary; and

- An annual long-term bonus opportunity of at least 4.25 times her base salary.

If Ms. Harless' employment is involuntarily terminated without cause, she will receive a lump sum payment equal to two times (i) her base salary and (ii) 50% of her maximum short-term bonus opportunity. Any separation payment made to Ms. Harless under the terms of her agreement will be offset by the then-current balance in her special retention account established at the closing of the merger in 2000 between Bell Atlantic Corporation and GTE Corporation.

## Pension Plans and Savings Plans

Our management employees participate in certain Verizon pension plans, including the VMPP and the Verizon Enterprises Management Pension Plan. These are noncontributory defined benefit pension plans. In

Table of Contents

December 2005, Verizon announced that Verizon management employees would no longer earn pension benefits after June 30, 2006 and that new Verizon management employees hired after December 31, 2005 would not be eligible for pension benefits. These changes applied to our management employees.

Our management employees also participate in the Verizon Savings Plan for Management Employees. Under this plan, participants have been entitled to make contributions on a pre-tax basis and receive matching contributions in accordance with the terms of the plan. Effective as of the completion of the spin-off from Verizon, our management employees will no longer be eligible to participate in this savings plan. They will instead be eligible to participate in a new savings plan maintained by Idearc. Our Named Officers will participate in the Idearc management savings plan on the same terms as other eligible participants in that plan.

**Employee Stock Purchase Plan**

After the completion of the spin-off from Verizon, we may adopt an employee stock purchase plan, including an "employee stock purchase plan" within the meaning of Section 423 of the Code. The purpose of the plan would be to assist our employees in purchasing shares of common stock from us at a discounted purchase price. As of the date of this information statement, we have not adopted any employee stock purchase plan, but we will continue to evaluate the desirability of a plan, and if in the future a plan is deemed to be in our best interests and the best interests of our stockholders, we will consider adopting a plan.

**Equity Awards**

Currently, RSU's and PSU's are awarded pursuant to Verizon's equity incentive plan and guidelines. After the completion of the spin-off from Verizon, we anticipate continuing this practice pursuant to equity incentive plan and guidelines we adopt; however, we will continually evaluate this approach to ensure it is in the best interests of the company and our stockholders. In addition to RSU's and PSU's, we may also grant to certain employees, consultants and directors stock appreciation rights, shares of restricted stock, restricted stock units, dividend equivalents, performance share awards, performance stock unit awards, deferred stock awards, performance-based awards, or other stock-based awards, with terms and conditions as the board of directors (or, if applicable, the human resources committee of the board of directors) may establish.

**Employment Continuity**

To ensure continuity through the spin-off and for a defined period thereafter, we may provide for a management continuity plan for senior executives (including each of the Named Officers and other employees as deemed necessary). If such a continuation plan is implemented, we expect that it will provide certain severance protection against involuntary termination of employment during a certain period following the distribution, with additional protections that would apply to termination of employment in connection with a change in control transaction. We are currently working with an outside compensation consulting firm in connection with a potential executive continuation program.

**Long-Term Incentive Plan**

We anticipate that before the distribution our Human Resources Committee, which will then consist solely of our newly appointed independent directors, will adopt a long-term incentive plan substantially similar to Verizon's existing plan, contingent on the distribution. We expect that our current sole stockholder, Verizon, in its capacity as sole stockholder, will approve that long-term incentive plan. Approval of this long-term incentive plan by Verizon would satisfy the requirement of the New York Stock Exchange that equity based compensation plans receive stockholder approval, and consequently, awards that we make under this long-term incentive plan after the distribution will generally not be subject to further vote by our stockholders. We intend to submit changes to this plan, including increases in the number of shares available for awards and additional plan features to our stockholders for approval at our first annual meeting of stockholders after the distribution. We also intend

Table of Contents

to submit the performance criteria under the long-term incentive plan to our stockholders at our first annual meeting of stockholders occurring more than 12 months after the distribution date for the sole purpose of obtaining the deduction available under Section 162(m) of the Internal Revenue Code for certain compensation to our executive officers.

We have worked with our outside compensation consultants in order to design a plan that is consistent with the long-term incentive plans adopted by companies in a similar position as us. Set forth below is a summary of some the principal features of the plan we expect to have in place on the distribution.

### Purpose

The plan would be intended to (1) optimize our profitability and growth through long-term incentives that are consistent with our goals and that link the interests of participants to those of our stockholders, (2) provide participants with an incentive for excellence in individual performance, (3) provide flexibility to help us motivate, attract, and retain the services of participants who make significant contributions to our success, and (4) allow participants to share in our success.

### Administration and Participation

All of our and our subsidiaries' employees and non-employee directors will be eligible to participate in the plan. In general, the plan will be administered by our Human Resources Committee. The Human Resources Committee may delegate its authority to persons other than its members, subject to such limitations as may be imposed by the plan or applicable law or stock exchange rules.

### Types of Awards

Our Human Resources Committee has the authority to grant various types of awards to employees under the plan. These types of awards include:

*Performance Shares and Performance Units* . Performance shares and performance units are linked to our performance over a performance cycle designated by our Human Resources Committee. The initial value of a performance share will be the fair market value of a share of our common stock on the date of grant. The initial value of a performance unit will be established by our Human Resources Committee at the time of grant. These awards will be paid only to the extent that we attain the corresponding performance goals. These awards are payable in cash, common stock, or a combination of both, as determined by our Human Resources Committee.

*Restricted Stock and Restricted Stock Units* . Restricted stock and restricted stock units represent grants of our common stock or stock units that are subject to a risk of forfeiture or other restrictions that lapse when one or more performance or other objectives, as determined by our Human Resources Committee, are achieved. The value of a restricted stock unit must equal the fair market value of one share of common stock on the date of the grant. Any awards will be subject to such conditions, restrictions, and contingencies as our Human Resources Committee determines. Restricted stock units are payable in cash, common stock, or a combination of both, as determined by our Human Resources Committee.

*Stock Options* . Each stock option represents the right to purchase a specified number of shares of our common stock, at a fixed grant price that cannot be less than the fair market value of the shares on the grant date. The plan does not permit re-pricing of any previously granted stock options. The maximum term of a stock option is 10 years from the date of grant. Any option will be exercisable in accordance with terms established by our Human Resources Committee. The purchase price of an option may be payable in cash, Common Stock (valued at fair market on the day of exercise), or a combination of

98

Table of Contents

both. The plan authorizes our Human Resources Committee to grant non-qualified stock options as well as incentive stock options that comply with the requirements of Section 422(b) of the Code.

*Other Awards* . The Human Resources Committee has authority to grant other awards. These awards may include stock appreciation rights, or SARs, or other share equivalents that are denominated, payable in, performance-based cash incentives, valued in whole or in part by reference to, or otherwise related to shares of common stock. The Human Resources Committee has the discretion to determine the terms and conditions of any such awards.

The Corporate Governance Committee of our Board would have the authority to grant awards and to make other determinations under the plan with respect to the non-employee directors.

### Payment of Awards

Our Human Resources Committee will determine the date on which awards are payable and may permit or require a participant to defer payment of all or a portion of an award subject to conditions established by our Human Resources Committee. If awards are paid in shares of common stock, our Human Resources Committee shall determine whether the shares will be subject to restrictions on transfer or provisions regarding forfeiture of the shares.

### Limitation on Shares and Awards

We will be authorized to issue up to 2,500,000 shares of common stock (adjusted for certain capital changes) under the plan. Shares will be considered to be issued under the plan when awards denominated in shares are made to a participant. However, certain transactions will restore the number of shares available under the plan. These transactions include (1) the payout in cash of an award originally awarded in shares, (2) a cancellation, termination, expiration, or forfeiture of shares subject to an award, and (3) payment of an option price or tax withholding obligation with previously acquired shares or by withholding shares that otherwise would have been acquired on exercise.

During the term of the plan, in any calendar year, no more than 200,000 shares may be covered by plan awards made to any one participant, and no more than $5,000,000 may be earned by a participant under a performance based cash incentive award.

No awards have been granted under the plan. The exact number of future stock options and other awards that may be allocated to any one individual or group of individuals under the plan is not presently determinable.

### Amendment and Termination of the Plan

Unless it is terminated earlier, the plan will remain in effect until all shares subject to the plan have been purchased, acquired, or forfeited, and all cash awards have been paid or forfeited, pursuant to the plan's provisions. However, in no event may an award be granted after 10 years from the effective date of the plan. During the term of the plan, our Human Resources Committee may alter, amend, suspend, or terminate the plan, in whole or in part, subject to the terms of the plan, including the Change in Control provisions discussed below. Any amendment that would cause the plan to fail to comply with any requirement of applicable law, regulation, or rule if it were not approved by stockholders will not be effective unless our stockholders approve the amendment.

If certain events occur, our Human Resources Committee shall adjust the number, type and price of shares subject to outstanding awards, and the award limits, to prevent dilution or enlargement of the benefits available under the plan and of the rights of participants. These events include a stock split or a corporate transaction, including a merger, consolidation, separation, spin-off, or other distribution of our stock or property, any reorganization, any partial or complete liquidation, or other similar events.

99

Table of Contents

### Change in Control

In order to protect the rights of the participants, the plan provides that, in the event of a Change in Control, as defined in the plan, all stock options and SARs awarded under the plan since its effective date will become immediately exercisable, and any restriction periods and restrictions imposed on awards granted under the plan since its effective date will lapse, with all such awards payable in full.

### Federal Income Tax Considerations

The federal income tax consequences of the various types of awards available under the plan can be summarized as follows.

*Stock Options and SARs* . A participant will not recognize any income, and we will not be entitled to a corresponding deduction, upon the grant of a non-qualified stock option, incentive stock option, or SAR under the plan.

Under current tax law, a participant who exercises a non-qualified stock option or SAR will recognize income on the difference between the fair market value of the common stock on the date of exercise and the grant price. We will be entitled to a tax deduction equal in amount to the income recognized by the participant. Income taxes and other payroll taxes will be withheld from income recognized to the extent required by law.

No income is recognized by a participant upon the exercise of an incentive stock option. However, the difference between the fair market value of the Common Stock on the date of exercise and the grant price is a tax preference item that must be considered in determining whether the participant is subject to alternative minimum tax. If the participant does not dispose of the shares acquired through the exercise of an incentive stock option within two years after the date of grant or one year after the exercise date, any income recognized on the date of sale will be subject to tax as a capital gain. If the above holding period requirements are not met, part or all of any income recognized on the date of sale will be subject to tax as ordinary income, and we will be entitled to a tax deduction in an equal amount.

An incentive stock option becomes a non-qualified stock option if it is exercised more than three months after the participant has terminated his or her employment with us (twelve months if termination is due to death or disability).

*Restricted Stock Units, Performance Units, and Performance Shares* . A participant who is granted a restricted stock unit, performance unit, or performance share will not realize taxable income at the time of grant. Generally, the participant will have compensation income at the time of distribution equal to the amount of cash received and the then-fair market value of the distributed shares, and we will be entitled to a corresponding deduction.

*Restricted Stock* . A participant who has been granted shares of restricted stock will not realize taxable income at the time of grant, and we will not be entitled to a corresponding deduction, assuming that the shares are nontransferable and that the restrictions create a "substantial risk of forfeiture" for federal income tax purposes. Upon the vesting of stock subject to an award, the holder will realize ordinary income in an amount equal to the then-fair market value of those shares, and we will be entitled to a corresponding deduction. Gains or losses realized by the participant upon disposition of such shares will be treated as capital gains and losses. A participant may elect to have income recognized at the date of grant of restricted stock and to have the applicable capital gain holding period commence as of that date. If this election is made, we will be entitled to a corresponding deduction as of the date of grant.

*Deduction Limits and Performance Measures* . A federal income tax deduction generally is unavailable for annual compensation in excess of $1,000,000 paid to the chief executive officer or any of the four other most highly compensated officers. However, "performance-based" compensation is not counted against this limit. The

100

Table of Contents

Human Resources Committee may designate certain awards under the plan as intended to be "performance-based" compensation and must condition such awards on the achievement of performance goals. To satisfy the requirements that apply to "performance-based" compensation, the performance measures must be approved by our stockholders, subject to transition relief that would apply generally to grants made before the 2008 annual stockholder meeting. The performance measures that may be used by our Human Resources Committee will be based on one or more of the following performance measures, as selected by our Human Resources Committee: income measures (including, but not limited to, gross profit, operating income, earnings before or after taxes, or earnings per share); return measures (including, but not limited to, return on assets, investment, equity, or sales); debts measures (including debt multiples); cash flow return on investments (which equals net cash flows divided by owners equity); gross revenues; market value added; economic value added; and share price (including, but not limited to, growth measures and total stockholder return). It is expected that the foregoing performance measures will be submitted for stockholder approval at the 2008 annual stockholder meeting (if not sooner).

101

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

Verizon currently owns all of our outstanding shares of common stock. None of our director nominees or the persons expected to become our executive officers currently owns any shares of our common stock, but those who own shares of Verizon common stock will be treated as other holders and, accordingly, will receive shares of our common stock in the distribution.

The following table sets forth the number of shares of Verizon common stock and the number of shares of our common stock that will be held by our director nominees, the persons expected to become our executive officers immediately upon completion of the spin-off and each stockholder that we believe will be a beneficial owner of more than 5% of any class of our outstanding voting securities immediately after the spin-off, assuming there are no changes in each person's holdings of Verizon common stock since October 1, 2006, and based on our estimates as of October 1, 2006, using the distribution ratio of one share of our common stock for every 20 shares of Verizon common stock, with no fractional shares. The beneficial owners listed in the table may have also been granted Verizon stock options or may have interests in units whose value is derived from the value of Verizon common stock, including RSU's, PSU's and deferral units in the EDP and its predecessor plan. These stock options and units are not shown in the table because no additional shares of our common stock will result from the ownership of these stock options and units by the beneficial owners.

The mailing address of each director and executive officer shown in the table below is c/o Idearc Inc., 2200 West Airfield Drive, DFW Airport, Texas 75261.

| | Shares Beneficially Owned | | | |
|---|---|---|---|---|
| Name and Address of Beneficial Owner | Number of Shares of Verizon Common Stock [2] | Percentage of Class | Number of Shares of Idearc Common Stock | Percentage of Class |
| Katherine J. Harless | 21,442[3] | * | 1,072 | * |
| Andrew Coticchio | 258 | * | 12 | * |
| Frank P. Gatto | 2,105[4] | * | 105 | * |
| W. Scott Hanle | 11,025 | * | 551 | * |
| Sandra Lee Henjum | 3,536 | * | 176 | * |
| Scott B. Laver | 3,421 | * | 171 | * |
| William G. Mundy | 1,990 | * | 99 | * |
| Michael D. Pawlowski | 1,166 | * | 58 | * |
| John W. Diercksen [1] | 29,634 | * | 1,481 | * |
| John J. Mueller | — | * | — | * |
| Donald B. Reed | 24,345 | * | 1,217 | * |
| Stephen L. Robertson | — | * | — | * |
| Thomas S. Rogers | 379 | * | 18 | * |
| Executive Officers and Directors as a Group (13 persons) | 99,301 | * | 4,960 | * |

(1) Mr. Diercksen currently serves as our sole director. He will not serve as a director after the consummation of the spin-off. We will appoint our directors prior to the consummation of the spin-off.
(2) This amount includes shares credited under the Verizon Savings Plan for Management Employees.
(3) As of October 1, this amount includes 7,237 shares jointly held by Ms. Harless.
(4) As of October 1, this amount includes 2,003 shares jointly held by Mr. Gatto.
* Beneficial ownership of less than 1%.

App. - 000230

Table of Contents

## RELATIONSHIP BETWEEN VERIZON AND OUR COMPANY AFTER THE SPIN-OFF

Following the spin-off, we will operate as an independent company. To effect the spin-off and to provide a framework for our initial relationship with Verizon, we expect to enter into certain agreements with Verizon. The following is a summary of the expected material terms of those agreements. The summaries below are qualified in their entirety by reference to the full text of the agreements.

### Distribution Agreement

The distribution agreement will contain the key provisions relating to the separation of our business from Verizon and the distribution of our common stock. The distribution agreement will identify the assets to be transferred, liabilities to be assumed and contracts to be assigned to us by Verizon and by us to Verizon in the separation and describe when and how these transfers, assumptions and assignments will occur. The agreement will also include procedures by which we and Verizon will become independent companies. In addition, we expect to enter into other agreements with Verizon governing various interim and ongoing relationships between Verizon and us in connection with the spin-off. These agreements, which will become effective in connection with the consummation of the spin-off, include:

- a transition services agreement;
- a publishing agreement;
- a non-competition agreement;
- a branding agreement;
- a listings license agreement;
- a billing and collection agreement;
- an intellectual property agreement;
- a tax sharing agreement; and
- an employee matters agreement.

### *Contribution and Separation*

In connection with the spin-off, Verizon will transfer to Idearc all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations (which we collectively refer to as the contribution). In exchange for the contribution, Idearc will:

- issue to Verizon additional shares of Idearc common stock to be distributed to Verizon's stockholders pro rata in the spin-off;
- issue to Verizon senior unsecured notes and a portion of the loans under the tranche B facility, which we collectively refer to as the Idearc debt obligations; and
- transfer to Verizon cash from cash on hand, from the proceeds of the loans under the tranche A facility and from the proceeds from the remaining portion of the loans under the tranche B facility.

We expect that Verizon will seek to exchange the Idearc debt obligations for certain outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness. Assuming Verizon and its creditors consummate the exchange, we expect Verizon's creditors to immediately resell the Idearc debt obligations.

Generally, neither we nor Verizon will make any representation or warranty as to: the assets, businesses or liabilities transferred or assumed; any consent or approvals required in connection with the transfer or assumption; the value or freedom from any lien or other security interest of any assets transferred; the absence of any defenses or freedom from counterclaim relating to any claim of either us or Verizon; and the legal sufficiency of any assignment, document, or instrument delivered to convey title to any asset transferred.

103

**Table of Contents**

Except as expressly set forth in any ancillary agreement, all assets were transferred on an "as is," "where is" basis, and we, as opposed to Verizon, will bear the economic and legal risks that the conveyance is insufficient to vest good and marketable title, free and clear of any lien or other security interest, that any necessary consents or approval were not obtained, and that requirements of laws or judgments were not complied with.

*Termination*

The distribution agreement will provide that it can be terminated at any time by Verizon. Verizon may elect to terminate the distribution agreement for any of several reasons, including if Verizon determines that the distribution is not in the best interests of its stockholders or if any of the following events does not occur:

- the receipt of any required regulatory approvals;

- the SEC declaring effective the registration statement, of which this information statement is a part;

- receipt of surplus, solvency and certain other opinions;

- receipt of a private letter ruling from the I.R.S. (which Verizon received in September 2006) and a tax opinion; and

- a national securities exchange or a national market quotation system will have accepted for listing or trading, as applicable, the shares of Idearc common stock to be issued in the distribution, subject to official notice of issuance.

The covenants contained in the distribution agreement that are to be performed prior to the distribution date shall terminate upon the distribution, and thereafter, neither Verizon nor Idearc shall have any right, claim or action of any nature whatsoever for failure of the other to perform any of those covenants.

*Indemnification*

Under the distribution agreement, we will indemnify Verizon and its representatives and affiliates against certain losses resulting from our failure to pay or satisfy any liabilities related to our business and any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated in this information statement or necessary to make the statements herein not misleading, in each case to the extent relating to Idearc and its subsidiaries.

Under the distribution agreement, Verizon will indemnify us and our representatives and affiliates against certain losses arising out of or resulting from (i) Verizon's failure to pay or satisfy any liabilities related to its business and (ii) any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated in this information statement or necessary to make the statements herein not misleading, in each case except to the extent relating to Idearc and its subsidiaries.

Indemnification with respect to taxes will be governed by the tax sharing agreement.

*Further Action*

The distribution agreement will provide that we and Verizon will cooperate to effect any contributions, assignments, transfers or assumptions not completed on the distribution date, due to approval, consent or other issues, as promptly as practicable following that date.

*Access to Information*

Subject to applicable confidentiality provisions and other restrictions, we and Verizon will provide to each other any information in that company's possession that the requesting party reasonably needs for audit, accounting, regulatory, claims, litigation and tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations and its obligations under the distribution agreement.

Table of Contents

*Mutual Release of Pre-Closing Claims*

We and Verizon will agree to release each other from any and all claims that we may have against the other party which arise out of or relate to events, circumstances or actions taken by the other party occurring or failing to occur or any conditions existing at or prior to the time of the spin-off. The mutual release will be subject to specified exceptions set forth in the distribution agreement. These specified exceptions will include:

- any obligation to pay for goods or services prior to the distribution date;

- any liabilities or other obligations assumed, transferred, assigned allocated or arising under any of the other agreements entered into with Verizon in connection with the spin-off or any contract contemplated thereby;

- any liability release of which would result in the release of any person other than Idearc, Verizon or their respective subsidiaries; and

- except as otherwise set forth in the other ancillary agreements or identified in the distribution agreement.

*Insurance*

Following the spin-off, we will be responsible for obtaining and maintaining our own insurance coverage and will no longer be an insured party under Verizon insurance policies, except in specified circumstances to be set forth in the distribution agreement.

**Transition Services Agreement**

Under the transition services agreement, Verizon will provide certain specified services to us on an interim basis. Among the principal services expected to be provided by Verizon to us are information technology application and support services as well as data center services.

The services will generally be provided for periods from six to eighteen months following the spin-off unless a particular service is terminated pursuant to the agreement. We will generally be able to terminate that service on 30 days advance notice, subject to extension by Verizon of up to an additional 30 days.

We will pay fees to Verizon for the services provided, which generally will be intended to allow Verizon to recover all of its direct and indirect costs.

In general, services will be provided on an "as is" basis. Verizon will not be liable to us under the transition services agreement for direct damages in excess of the fees received by Verizon in the aggregate. We will generally be obligated to indemnify Verizon against all third party claims relating to the services provided.

The amount we anticipate to pay to Verizon for services rendered pursuant to the transition services agreement is approximately $30 million (exclusive of reimbursements of third party costs), assuming each service runs for the full period as contemplated by the terms of the transition services agreement.

**Publishing Agreement**

Under the publishing agreement, Verizon will name us its exclusive official print directory publisher of print listings and classified advertisements of its wireline telephone customers in the geographic areas in which Verizon is currently the incumbent local exchange carrier, which we refer to as Verizon's service areas. Pursuant

105

**Table of Contents**

to state public utilities commission requirements, Verizon must publish and distribute white pages directories of certain residences and businesses that order or receive local telephone service from Verizon. In addition, pursuant to tariffs, results of various proceedings and agreements with other telephone companies and resellers of local telephone service, Verizon must publish and distribute certain white pages directories and yellow pages directories. We will agree in the publishing agreement to fulfill Verizon's legal and contractual obligations to publish and distribute white pages and yellow pages directories and to include certain listing information, in each of Verizon's service areas, generally at no cost to Verizon or its customers, and, at Verizon's option, we will be obligated to fulfill Verizon's publishing obligations in any new areas in which Verizon becomes the incumbent local exchange carrier in the future, unless we determine in good faith that the costs associated with fulfilling those obligations would outweigh the benefits of obtaining the rights provided in the branding agreement for these areas. In fulfilling these obligations, we must comply with all regulatory requirements related to the publishing and distribution of these directories, as well as other specific requirements set forth in the publishing agreement. We cannot quantify or otherwise estimate the value of the publishing agreement.

### Subscriber Information

Pursuant to the listings license agreement for the use of subscriber list information and subscriber delivery information discussed below, Verizon will be required to provide us with information about subscribers, including names, addresses and telephone numbers for the purpose of publishing and delivering directories. The terms and conditions of the listings license agreement will be for the most part governed by federal regulations. If federal law no longer requires Verizon to provide subscriber information under nondiscriminatory and reasonable terms, Verizon will be required by the terms of the publishing agreement to continue to license the information to us on terms, including price, at least as favorable as those then being offered by Verizon to any person doing business in that service area. However, if Verizon does not license subscriber information to at least two other bona fide purchasers of this information, the prices that Verizon charges us for the information will equal the average price that other independent local exchange carriers of comparable size charge for this information.

### Supplemental Listings

We will agree to publish certain supplemental listing information in the white pages directories that Verizon sells or may sell to its customers. Verizon will agree to share with us 5% of any revenue over a certain baseline amount, determined on a state-by-state basis, that it derives from the sale of this supplemental listing information.

### Sale of Access Lines

In the event of a disposition by Verizon of any of its access lines, Verizon will agree to require the acquirer to enter into with us, and we will agree to enter into with the acquirer, binding agreements substantially similar to the publishing agreement, the non-competition agreement and the branding agreement (to the extent applicable) with respect to the relevant access lines.

### Verizon Services

Pursuant to the publishing agreement we expect to enter with Verizon, we will agree to use Verizon's local, long distance, wireless and data services on an exclusive basis, subject to certain limited exceptions, until the fifth anniversary of the effective date of the publishing agreement, subject to certain limited exceptions. These services must be substantially equivalent to the type, prices and quality of services provided by other providers of these services.

### Non-Solicitation

During the two-year period following the date of the spin-off, and the two-year period following the termination of the publishing agreement, we and Verizon will agree not to solicit certain of the other's employees or to induce certain of the other's employees to terminate their relationship with the other. In addition, Verizon will agree not to solicit or hire any members of our senior management team during these periods.

106

Table of Contents

### Non-Competition

During the term of the publishing agreement, we may not directly or indirectly engage in the business of publishing, marketing, selling or distributing (or selling advertising for inclusion in) any directory products that materially compete with or are significant substitutes for any directory products we publish in any Verizon service area pursuant to the publishing agreement. If we acquire an entity or business that is engaged in the operations described above, we must divest or otherwise terminate these operations within 12 months of acquiring the entity or business.

In the event that the publishing agreement is terminated with respect to any Verizon service area, these restrictions will cease to apply with respect to that service area. However, if termination is the result of a breach by us of the publishing agreement, we will be prohibited from including on the cover or spine of any print directory product primarily distributed in the applicable service areas, or the home page or similar feature of any Internet yellow pages directory product primarily directed at persons or businesses within the applicable service areas, any name or brand (other than the name or brand of the incumbent local exchange carrier in the applicable service area) identified with any provider of telecommunication services or video services. This restriction will apply until the earlier of the fifth anniversary of the date of the termination and the 30th anniversary of the date of the spin-off.

If we were acquired by another company that was engaged in the business of publishing directories in any Verizon service area, these activities would not constitute a violation of these non-competition restrictions.

### Term and Termination

The publishing agreement will remain in effect for 30 years from the date of the spin-off. The agreement will automatically renew for additional five-year terms unless we or Verizon provide at least 24 months notice of termination.

Verizon may terminate the publishing agreement in its entirety if we materially breach this agreement in a manner that has the effect of abrogating our performance and Verizon's enjoyment of the benefits of this agreement, or if we fail to discharge Verizon's publishing obligation with respect to 20% of Verizon's subscribers. If we breach our obligation with respect to a particular directory in a manner that results in a material and continuing failure to discharge the publishing obligation with respect to that directory, Verizon may terminate this agreement with respect to the affected service area. If the publishing agreement is terminated with respect to one or more service areas, the branding agreement, and with it our right to use the Verizon brand, will automatically terminate to the same extent.

We may terminate the publishing agreement in its entirety if Verizon materially breaches the agreement in a manner that has the effect of abrogating its performance and our enjoyment of the benefits of the agreement. If Verizon materially breaches its obligation with respect to a certain service area in a manner that has the effect of abrogating its performance and our enjoyment of the benefits of this agreement with respect to the affected service area, we may terminate this agreement with respect to this service area. Any termination of the publishing agreement will automatically result in a termination of the branding agreement to the same extent. See "—Branding Agreement."

### Indemnification

We will indemnify Verizon for losses resulting from (i) our failure to perform our obligations under the publishing agreement, (ii) any third-party claims resulting from errors in listings and advertisements of Verizon's customers in our directories or omissions of listings and advertisements of Verizon's customers in our directories, in each case unless caused by Verizon, (iii) any claims that our directories violate or infringe the intellectual property rights, or require the consent, of any third party and (iv) any claims relating to the conduct of our business following the spin-off.

107

Table of Contents

Verizon will indemnify us for losses resulting from (i) its failure to perform its obligations under the publishing agreement, (ii) any third-party claims brought against us in connection with our performance of our obligation to publish the directories that Verizon is legally required to publish as a result of any error in the information regarding Verizon subscribers supplied to us by Verizon in any white pages that is caused by Verizon and is not the result of our negligence or breach of our obligations, but then only if and to the extent and in the amount that these losses would have been incurred by Verizon if Verizon were publishing these directories and used the subscriber information in furtherance thereof, (iii) any claims that the rights to identify ourselves as Verizon's official print directory publisher and to use Verizon's branding on the directories violate or infringe the intellectual property rights, or require the consent, of any third party and (iv) any claims relating to the conduct of Verizon's business following the spin-off.

### Successors

We will agree to cause any successor acquiring our business, and Verizon will agree to cause any successor acquiring its business, to agree to the terms of the publishing agreement, the non-competition agreement, the branding agreement, the billing and collection agreement, the listings license agreement and the intellectual property agreement.

## Non-Competition Agreement

Under the non-competition agreement, Verizon will generally agree not to, and to cause its affiliates (other than any entity as to which Verizon does not possess the sole right to cause the entity to enter into contractual arrangements) not to, publish, market, sell or distribute tangible or digital media directory products consisting principally of wireline listings and classified advertisements of subscribers in Verizon's service areas or any of our independent markets directed primarily at customers in the service areas or any of our independent markets. If Verizon disposes of any of its access lines and the acquirer of the access lines enters into binding agreements with us, as discussed in more detail in "—Publishing Agreement—Sale of Access Lines," the non-competition agreement will terminate with respect to the applicable Verizon service area or portion thereof.

The non-competition agreement will restrict Verizon from competing with us in the Internet yellow pages business for a period ending one year after the effective date of the agreement, subject to certain exceptions, but will not otherwise prohibit Verizon from competing with us in the electronic directory products business, including by competing with SuperPages.com, although Verizon will be prohibited from using the SuperPages and Directories Corp. brands. In addition, Verizon will not be prohibited from publishing tangible or digital media directory products consisting principally of wireless or mobile telephone listings, classified advertisements and a "411" or similar service that delivers information in the form of a voice response (live or automated), text message, web page link or download to a wireless or mobile telephone in response to a user-initiated request. There will be a number of other exceptions and clarifications to the scope of Verizon's non-compete obligations.

The restrictions to be contained in the non-competition agreement will apply to any successor of Verizon. However, the successor will not, subject to certain limitations, be prohibited from continuing to publish any directory products it was publishing at the time it agreed to the transaction by which it became Verizon's successor.

The non-competition agreement will remain in effect with respect to the Verizon service areas for a period of 30 years from the date of the spin-off. With respect to each of our current and certain prospective independent markets, the non-competition agreement will remain in effect until the fifth anniversary of the date of the spin-off, except that it may be terminated with respect to any independent market prior to the fifth anniversary if Verizon becomes a local exchange carrier in the independent market that is subject to legal and contractual obligations to publish and distribute white pages and yellow pages directories or acquires a business not more than 20% of the revenues of which are derived from the publication of print telephone directories and the business publishes one or more telephone directories which are primarily distributed in the independent market. If the non-competition agreement is terminated with respect to any of our current or certain prospective

108

Table of Contents

independent markets prior to the five year anniversary of the spin-off for either of these reasons, our rights under the branding agreement with respect to the independent market(s) will terminate 18 months after the termination of the non-competition agreement. See "—Branding Agreement." In addition, if the publishing agreement is terminated in accordance with its terms, any party to the non-competition agreement may terminate it immediately. See "—Publishing Agreement—Term and Termination."

## Branding Agreement

Under the branding agreement, Verizon will grant us a limited right to (i) for a limited time and on a non-exclusive basis, phase out our use of certain Verizon marks in connection with the operation of our business, (ii) for the term of the branding agreement and on an exclusive basis, use certain Verizon marks in connection with publishing print directories in Verizon's current wireline local exchange service areas and identify ourselves as its official print directory publisher, (iii) for the term of the branding agreement and on a non-exclusive basis, use certain Verizon marks in connection with publishing print directories in our current independent markets, (iv) for a certain period of time and on a non-exclusive basis, use certain Verizon marks in connection with publishing directories in certain geographic areas outside Verizon's service areas and (v) for the term of the branding agreement and on a non-exclusive basis, use certain Verizon brands in connection with our wireless yellow pages directories business. In all cases, our use of the name and the Verizon marks must be in accordance with Verizon's trademark and branding requirements. Our and Verizon's rights to other intellectual property currently shared by us and Verizon will be governed by a separate intellectual property agreement. See "—Intellectual Property Agreement." We cannot quantify or otherwise estimate the value of the branding agreement.

Under the branding agreement, we may grant sublicenses with respect to certain licenses to our subsidiaries, resellers, agents, distributors and dealers in connection with conduct in certain geographic areas; however, we may not grant any sublicense without Verizon's prior written approval. In addition, the sublicensees must agree in writing to compliance with the terms of the branding agreement.

Under the branding agreement, we will be prohibited from including on certain prominent portions of our directory products, including the front or back cover or spines of our print directory products any advertising for, or any name or brand identified with, any provider of telecommunications services or video services (other than Verizon), except as required by applicable legal requirements.

We may terminate the branding agreement at any time. Verizon may terminate the branding agreement with respect to any of Verizon's service areas if we fail to correct a deficiency in our use of any of the Verizon marks after Verizon has given us notice of the deficiency. In addition, if we or any of our subsidiaries directly or indirectly engage in the provision of telecommunication services or video services in any of Verizon's service areas, Verizon may terminate the branding agreement with respect to the affected service area. However, if our owner or an affiliate of ours is a provider of telecommunication services outside of Verizon's service areas, Verizon may not terminate this agreement, so long as our owner or an affiliate of ours does not provide telecommunication services in connection with our directory products in any of Verizon's service areas. If Verizon has terminated the branding agreement with respect to 20% or more of its subscribers in the service areas, it may then terminate the branding agreement in its entirety. In addition, if the non-competition agreement is terminated with respect to any of our independent markets prior to the five year anniversary of the spin-off for either of the reasons discussed above in the last paragraph of the description of the non-competition agreement, our rights under the branding agreement with respect to the applicable independent market(s) will terminate 18 months after the termination of the non-competition agreement.

Unless otherwise terminated, the branding agreement will terminate upon the termination of the publishing agreement. If the publishing agreement is terminated with respect to some but not all of Verizon's service areas, the branding agreement will automatically terminate with respect to these service areas. In addition, if Verizon disposes of any of its access lines, as discussed in more detail in "—Publishing Agreement—Sale of Access Lines," or if Verizon ceases operations as a local exchange carrier in a service area the branding agreement will terminate with respect to the applicable Verizon service area or portion thereof.

109

Table of Contents

**Listings License Agreement**

We expect to enter into a listings license agreement with Verizon under which Verizon will grant to us a non-exclusive, non-transferable restricted license of subscriber listing information for persons and businesses that receive local exchange telephone services from Verizon Telephone Companies at prices set forth in the agreement. The listings license agreement will be consistent with the regulations promulgated by the Federal Communications Commission, which requires that telephone companies license their subscriber listing information to publishers of directories. We will be entitled to use the listing information (other than information regarding non-listed subscribers) for publishing directories in any format, and for soliciting advertising and listings for these directories. We will be entitled to use the listing information (including the non-listed subscriber information) for purposes of distributing directories in any format. The agreement will have an initial term of one year, subject to automatic renewal for additional one year terms until either Verizon or we terminate the agreement. The publishing agreement, however, will require Verizon to continue to license the listing and delivery information to us for as long as the publishing agreement is in effect and so long as, among other things, we are in compliance with the listings license agreement or cure any breaches to Verizon's satisfaction.

The amount we anticipate to pay to Verizon for services rendered pursuant to the listings license agreement is approximately $2.5 million per year.

**Billing Services Agreement**

Under the billing services agreement, which we refer to as the billing and collection agreement, Verizon will continue to bill and collect from our customers who are not migrated to our billing system. These remaining customers, who are also Verizon local telephone customers, consist primarily of smaller customers serviced by our telephone call center. Currently, we directly bill more than 50% of our customers. By the end of 2007, we anticipate migrating our remaining customers to our direct billing system.

The amount we anticipate to pay to Verizon for services rendered pursuant to the billing and collection agreement is approximately $1.3 million.

**Intellectual Property Agreement**

Under the intellectual property agreement, we will have the right to use, under specified conditions, certain intellectual property owned or licensed by Verizon in the operation of our print and online directory business. The intellectual property agreement will govern our relationship with Verizon with respect to patents, software, copyrights, know how and other proprietary information. Our use of Verizon marks will be governed by a separate branding agreement, as discussed above. See "—Branding Agreement."

The intellectual property agreement will provide that we and Verizon will irrevocably assign to the other an undivided joint ownership interest in specified proprietary software, non-statutory intellectual property and proprietary business information. We and Verizon will each have the right to use, copy, reproduce, improve, create derivative works or transfer this intellectual property, subject to specified restrictions.

We will grant to Verizon a royalty-free, fully paid-up, irrevocable, nonexclusive license under certain of our statutory intellectual property (excluding any trademarks and copyrights in advertising copy) to make, use or sell products and services. We will also irrevocably assign to Verizon all right, title and interest of ours in and to customer listing data.

Verizon will grant to us a personal, royalty-free, fully paid-up, irrevocable (subject to certain limitations), nonexclusive and nontransferable (subject to specified limitations) license to use, in the United States, intellectual property owned by Verizon, to the extent used in operating our business as of the date of the distribution. We will also have the right to copy, reproduce and improve this intellectual property. In addition, Verizon will irrevocably assign to us all right, title and interest of Verizon in and to specified statutory intellectual property.

110

Table of Contents

For a period of three years from the date of the distribution, we and Verizon will agree not to grant any licenses to use specified intellectual property to any person who competes directly with Verizon or us, respectively. The intellectual property agreement will not terminate unless terminated by Verizon in the event of our bankruptcy. Also, Verizon will have the right to terminate all licenses in the event of a material default by us.

## Tax Sharing Agreement

The tax sharing agreement will govern Verizon's and our respective rights, responsibilities and obligations with respect to tax liabilities and benefits, the preparation and filing of tax returns, the control of audits and other tax matters.

We and our subsidiaries currently join with Verizon in the filing of a consolidated return for United States Federal income tax purposes and also join with Verizon in the filing of certain consolidated, combined and unitary returns for state and local purposes. However, for periods beginning after the spin-off, we will not join with Verizon in the filing of any Federal, State, local or foreign consolidated, combined or unitary tax returns.

In addition to generally allocating responsibility for tax liabilities for periods prior to and subsequent to the spin-off, the tax sharing agreement will provide that we would be required to indemnify Verizon and its affiliates against all tax-related liabilities caused by the failure of the spin-off to qualify for tax-free treatment for United States Federal income tax purposes (including as a result of Section 355(e) of the Code) to the extent these liabilities arise as a result of any action taken by us or any of our affiliates following the spin-off or otherwise result from any breach of any representation, covenant or obligation of us or any of our affiliates under the tax sharing agreement or any other agreement entered into by us in connection with the spin-off.

The covenants in, and our indemnity obligations under, the tax sharing agreement may limit our ability to pursue strategic transactions or engage in new business or other transactions that may maximize the value of our business. The covenants in, and our indemnity obligations under, the tax sharing agreement will also limit our ability to modify the terms of, pre-pay, or otherwise acquire any of the the tranche B term loans or the senior unsecured notes. Further, as it relates to Section 355(e) specifically, these covenants and indemnity obligations might discourage, delay or prevent a change of control that you may consider favorable.

Though valid as between the parties, the tax sharing agreement will not be binding on the IRS and will not affect the several liability of Verizon and us for all United States Federal income taxes of the consolidated group relating to periods prior to the spin-off.

## Employee Matters Agreement

The employee matters agreement will address the treatment of employees and former employees with respect to their participation in employee benefit plans as well as certain human resources matters relating to policies, programs, labor contracts and employee status. It will also address the distribution of liabilities relating to employees and former employees under the employee benefit plans.

Our rank and file employees immediately following the distribution will, as a general rule, participate in employee benefit plans sponsored by Idearc, which will provide comparable benefits to those benefits provided to these employees before the distribution. The employee matters agreement will also contain additional information relating to service recognition under our plans; recognition of co-pays, deductibles, and out of pocket maximums and the like under our welfare benefit plans; and the transfer of assets and liabilities from Verizon plans to Idearc plans.

111

Table of Contents

## DESCRIPTION OF OUR CAPITAL STOCK

*We have summarized below the material terms of our capital stock that are expected to be in effect following the spin-off. You are encouraged to read our certificate of incorporation and bylaws, which will be filed as exhibits to the registration statement of which this information statement is a part, for greater detail on the provisions that may be important to you.*

### Sales of Unregistered Securities

In connection with our incorporation, we issued one share of our common stock, par value $.01 per share, to Verizon in consideration of an aggregate capital contribution of $.01 by Verizon. This issuance was exempt from registration under the Securities Act pursuant to Section 4 (2) thereof because the issuance did not involve any public offering of securities.

### Common Stock

#### *General Provisions Relating to Our Common Stock*

*Authorized Shares* . At the time of the spin-off, we will be authorized to issue up to 225,000,000 shares of common stock.

*Voting Rights* . Each outstanding share of our common stock will be entitled to one vote per share on each matter to be voted on by the holders of our common stock. Our stockholders will not be entitled to cumulative voting of their shares in elections of directors.

*Dividends* . Subject to the prior dividend rights of holders of any shares of preferred stock, holders of shares of our common stock will be entitled to receive dividends as declared by our board of directors out of funds that are legally available for that purpose. We currently expect to pay dividends at an annual rate of approximately $1.37 per share, but only if and to the extent dividends are declared by our board of directors and permitted by applicable law and by the terms of our financing arrangements. Dividend payments are not guaranteed and our board of directors may decide, in its absolute discretion, not to pay dividends. Dividends on our common stock are not cumulative. All decisions regarding the declaration and payment of dividends, including with respect to the initial dividend, will be at the discretion of our board of directors and will be evaluated from time to time in light of our financial condition, earnings, growth prospects, funding requirements, applicable law and other factors our board of directors deems relevant. See "Dividend Policy."

*Liquidation Rights* . If our company is liquidated, dissolved or wound up, the prior rights of creditors and the aggregate liquidation preference of any preferred stock then outstanding will be satisfied first. The holders of our common stock will be entitled to share in our remaining assets on a pro rata basis.

*Preemptive Rights* . No holder of shares of our common stock or any security convertible into our common stock will have any preemptive right to acquire shares of our common stock.

*Transfer Agent and Registrar* . The transfer agent and registrar for our common stock is Computershare Trust Company, N.A.

To the extent permitted by applicable Delaware law, shares of our common stock will be uncertified, and transfer will be reflected by book entry.

### *Anti-Takeover Provisions*

*Special Meetings* . Under our bylaws, a special meeting of stockholders may be called only by the Chairman of the board of directors, the President or the board of directors.

112

Table of Contents

*Notice Provisions Relating to Stockholder Proposals and Nominees* . Our bylaws will require stockholders to give us advance written notice of a proposal or director nomination in order to have the proposal or the nominee considered at an annual meeting of stockholders. The notice must usually be given not less than 120 days before the first anniversary of the preceding year's annual meeting.

*Unanimous Consent of Stockholders in Lieu of Meeting* . Under our certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders may be taken without a meeting if a consent in writing is signed by all of the stockholders entitled to vote.

*Delaware Anti-Takeover Law* . Following the spin-off, we will be subject to Section 203 of the Delaware General Corporation Law, an anti-takeover law. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years following the date that person became an interested stockholder, unless the business combination or the transaction in which the person became an interested stockholder is approved in a prescribed manner. Generally, a "business combination" includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. Generally, an "interested stockholder" is a person that, together with affiliates and associates, owns, or within three years before the determination of interested stockholder status did own, 15% or more of a corporation's voting stock. The existence of this provision may have an anti-takeover effect with respect to transactions not approved in advance by our board of directors, including discouraging attempts that might result in a premium over the market price for shares of our common stock.

## Preferred Stock

### General Provisions Relating to Our Preferred Stock

Preferred stock may be issued by us from time to time in one or more series, each of which is to have the voting powers, designation, preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions as are stated in our certificate of incorporation or in resolutions adopted by our board of directors. At the time of the spin-off, we will be authorized to issue up to 25,000,000 shares of preferred stock.

The board of directors will have the authority to create one or more series of preferred stock and, with respect to each series, to fix or alter as permitted by law:

- the number of shares and the distinctive designation of the series;

- the dividend rights;

- any redemption rights, terms and prices;

- the terms of any retirement or sinking funds;

- the rights, terms and prices, if any, by which the shares may be convertible into, or exchangeable for, other shares;

- the voting power, if any; and

- any other terms, conditions, special rights and protective provisions.

*Dividends* . No dividend may be declared and set apart for payment on any series of preferred stock unless a ratable dividend has likewise been paid, or declared and set apart for payment, on all outstanding shares of preferred stock of each other series entitled to cumulative dividends that ranks equally as to dividends.

*Dissolution Rights* . If our company is dissolved and there are insufficient assets available to pay in full the preferential amount to which the holders of preferred stock are entitled over the holders of common stock, then the assets, or the proceeds of the assets, will be distributed among the holders of each series of preferred stock ratably in accordance with the sums that would be payable on the distribution if all sums payable were discharged in full.

113

**Table of Contents**

## DESCRIPTION OF CERTAIN INDEBTEDNESS

**New Credit Facilities**

Upon the closing of the spin-off, we expect to enter into new credit facilities that will provide for an aggregate amount of approximately $6,515 million in financing, consisting of the following:

- a senior secured five-year revolving credit facility in a principal amount of approximately $250 million, and

- senior secured term loan facilities in an aggregate amount of approximately $6,265 million consisting of:

  - tranche A term loan facility of approximately $1,515 million (the tranche A facility); and

  - tranche B term loan facility of approximately $4,750 million (the tranche B facility and together with the tranche A facility, the term loan facilities).

We refer to the revolving credit facility and the term loan facilities as the new credit facilities.

We expect to issue to Verizon senior unsecured notes and a portion of the loans under the tranche B facility as partial consideration for Verizon's contribution to us of all of its ownership interest in Idearc Information Services and other assets, liabilities, businesses and employees currently primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations. We expect to use the proceeds from the loans under the tranche A facility and the proceeds from the remaining portion of the loans under the tranche B facility to make a cash payment to Verizon. We expect that the revolver will be available for working capital and for general corporate purposes, and that up to $50 million will be available under the revolver for letters of credit. We expect that no amount will initially be drawn under the revolver on the closing date of the spin-off.

*Interest Rate and Fees* . Amounts outstanding under the new credit facilities are expected to bear interest, at our option, at either a rate equal to (i) an alternate base rate plus an applicable margin set forth in the credit agreement or (ii) an adjusted LIBOR rate plus an applicable margin set forth in the credit agreement.

We expect to pay certain fees with respect to the new credit facilities, including: (i) a commitment fee on the daily unused amount of the revolving credit facility, (ii) fronting fees on letters of credit issued under the new credit facilities and (iii) customary annual administration fees.

*Mandatory Prepayments* . We expect that, subject to certain conditions and exceptions, the new credit facilities will require us to prepay outstanding loans under the tranche A facility and make mandatory offers to repay outstanding loans under the tranche B facility in an amount equal to (a) 100% of the net proceeds from dispositions of certain assets and casualty insurance condemnation awards and similar recoveries, in each case, which are not reinvested in replacement assets within a specified period and (b) a percentage (based on our leverage ratio) of the proceeds of certain unsecured and subordinated indebtedness that we incur (other than proceeds used to fund certain business acquisitions). In addition, we expect that, following the end of each fiscal quarter ending during a dividend suspension period (as defined below), the new credit facilities will require us to prepay outstanding loans under the tranche A facility and make mandatory offers to repay outstanding loans under the tranche B facility, in an aggregate amount equal to 50% of the amount of any increase in available cash (as defined in our new credit agreement) during such fiscal quarter.

*Voluntary Commitment Reductions and Prepayments* . We expect that the new credit facilities will provide for voluntary commitment reductions and prepayments of loans, subject to certain conditions and restrictions.

*Covenants* . We expect that the new credit facilities will contain affirmative and negative covenants that, among other things, limit or restrict our ability (as well as the ability of our restricted subsidiaries) to (i) create liens and encumbrances; (ii) incur debt; (iii) merge, dissolve, liquidate or consolidate; (iv) make acquisitions and

114

investments; dispose of or transfer assets; (v) pay dividends or make other payments in respect of our capital stock (other than certain permitted payments, including permitted distributions described below); (vi) amend material documents; (vii) change the nature of our or our restricted subsidiaries business; (viii) make certain payment and prepayments of certain debt; (ix) engage in certain transactions with affiliates; and (x) enter into sale/leaseback or hedging transactions.

In addition, we expect that the financial covenant under the new credit facilities will require us to maintain a total leverage ratio not greater than 7.25 to 1.00 measured as of the last day of any fiscal quarter (to be defined as the ratio of (a) total indebtedness as of such date minus unrestricted cash and cash equivalents to (b) consolidated adjusted EBITDA as that term is to be defined in our new credit agreement). This financial covenant requirement is based on discussions with the lenders and our current expectations. The definitive requirements may vary.

*Permitted Distributions.* Subject to certain conditions and restrictions, we expect the restricted payments covenant, in addition to permitting payments pursuant to customary carve-outs and baskets, to permit us to pay:

- a special distribution to Verizon as described under "The Spin-Off";

- dividends on our common stock in an amount not to exceed $100 million in the aggregate for the first two quarterly dividend payments made after the closing date; and

- dividends in an aggregate amount which does not exceed the sum (calculated as of the date of the dividend payment after giving effect to all other applications of available distributable cash or available equity proceeds on such date) of (A) available distributable cash plus (B) available equity proceeds.

We expect that "available distributable cash" will be defined in our new credit facilities as: (a) available cash (as defined below) as of the date of determination; *minus* , without duplication, the sum of the following amounts, in each case for the period commencing on the closing date of the new credit facilities and ending on the date of determination of available distributable cash, (i) the aggregate amount of restricted payments made during such period, other than any such restricted payments (A) made to us or any of our restricted subsidiaries, (B) paid from available equity proceeds, (C) payable solely in our equity interests on our equity interests (other than in disqualified stock), in payment of the special distribution described above, for payment of fractional shares, for payment of shares pursuant to an "odd-lot" program and the payment of the first two quarterly dividends described above; (ii) the aggregate amount of certain investments, (iii) the aggregate amount of payments made by us or our restricted subsidiaries to repay, prepay, redeem, defease or acquire for value at or prior to stated maturity, or to refund, refinance or exchange, any indebtedness (other than (A) revolving loans or (B) certain intercompany indebtedness)) or make any other scheduled, mandatory or voluntary payment of any such indebtedness, other than any such payments funded from (1) available equity proceeds, (2) the proceeds of indebtedness permitted by the "Indebtedness; Certain Equity Securities" covenant in our new credit facilities (other than proceeds of (A) revolving loans or (B) certain intercompany indebtedness) or (3) the proceeds of refinancing indebtedness; and (iv) the aggregate amount of capital expenditures, made during such period, other than capital expenditures financed with (1) available equity proceeds, (2) net proceeds from an asset disposition not otherwise required to be applied to prepay loans or (3) the proceeds of indebtedness permitted by the "Indebtedness; Certain Equity Securities" covenant in our new credit facilities (other than proceeds of (A) revolving loans or (B) certain intercompany indebtedness).

We expect that "available equity proceeds" will be defined in our new credit facilities as: (a) on any date, the aggregate amount of equity proceeds that have been received by us since the closing date of the new credit facilities *minus* (b) the aggregate amount of equity proceeds that have been expended by us and our subsidiaries on permitted acquisitions, to make investments in our subsidiaries or for our restricted subsidiaries to make investments in us or our subsidiaries, to make certain other investments, to make certain other restricted payments, to make capital expenditures or to make repurchase expenditures in connection with optional repurchases of the notes and certain other indebtedness, on such date or since the closing date.

We expect that "available cash" will be defined in our new credit facilities as: on any date of determination, an amount (which may be a negative amount) equal to the sum (without duplication) of the following in respect

115

Table of Contents

of us and our restricted subsidiaries on a consolidated basis for the period commencing on the closing date and ending on the last day of the most recent fiscal quarter for which a certificate certifying the financial statements shall have been delivered to the administrative agent : (a) consolidated adjusted EBITDA (as defined in our new credit facilities) for such period; *plus* (b) any extraordinary or non-recurring cash gain during such period, other than any such gain resulting from any sale, transfer or other disposition of assets; *minus* (c) without duplication and to the extent included in determining such consolidated adjusted EBITDA, the sum of (i) consolidated cash interest expense for such period, except to the extent constituting restricted payments; (ii) all taxes of us and our restricted subsidiaries paid in cash during such period; and (iii) any extraordinary or nonrecurring loss, expense or charge paid in cash during such period; *provided* that amounts shall be included in this clause (c) for any period only to the extent not duplicative of any cost or expense which was (x) included in determining consolidated net income for such period and (y) not been added back to consolidated net income in determining consolidated adjusted EBITDA for such period.

If our total leverage ratio received as of the last day of any fiscal quarter is greater than 7.00 to 1.00, we will be required to suspend dividends and certain other restricted payments, unless otherwise permitted under the first bullet point above or otherwise permitted under the credit agreement until we are able to deliver financial statements demonstrating that our leverage ratio is equal to or less than 7.00 to 1.00 (the period of such suspension, a "divided suspension period").

*Unrestricted Subsidiaries* . We expect that the new credit facilities will permit us, subject to investment limitations, to designate and invest in newly formed or acquired subsidiaries as "Unrestricted Subsidiaries" that will not be subject to the covenants or other provisions of the new credit facilities, will not be guarantors or obligors under the new credit facilities and will not be taken into account for purposes of the financial covenant or other financial computations under the new credit facilities.

*Guarantees and Collateral* . We expect that the obligations under the new credit facilities will be guaranteed by us and each of our existing and future direct and indirect U.S. restricted subsidiaries, subject to certain exceptions (the "subsidiary loan parties"). In addition, we expect that our obligations will be secured by a perfected security interest in certain of our and the subsidiary loan parties' personal property and owned real property, in each case, now owned or later acquired, including a pledge of all equity interests and notes owned by us and each subsidiary loan party, provided that only 65% of the voting equity interests of non-U.S. subsidiaries that are held by us or the subsidiary loan parties will be required to be pledged in respect of the obligations under the new credit facilities. We expect that the new credit facilities will also be secured by all proceeds and products of the property and assets described above.

*Events of Default* . We expect that the new credit facilities will contain customary events of default such as non-payment of obligations under the new credit facilities, violation of affirmative and negative covenants, material inaccuracy of representations, defaults under other material debt, bankruptcy, ERISA and judgment defaults, change of control, loss of lien perfection or priority or unenforceability of guarantees and material breach of or loss of rights under certain agreements with Verizon, in certain cases, with agreed-upon cure periods and other limitations.

## Senior Notes

In connection with the spin-off, Idearc will issue $2,850 million in principal amount of Senior Notes due 2016, or the notes, to Verizon.

*Guarantees* . The notes will be guaranteed by Idearc Information Services and each other existing and future subsidiary that is a guarantor under the new credit facilities. The guarantees will be general unsecured obligations of the guarantors. Accordingly, they will rank: equally in right of payment with all of our guarantors' existing and future unsecured senior debt; senior in right of payment with all of our guarantors' existing and future subordinated debt; effectively subordinated to our guarantors' existing and future secured debt to the extent of

116

Table of Contents

the assets securing such debt, including the guarantees by the guarantors of obligations under the new credit facilities; and effectively subordinated to all of the liabilities of the subsidiaries of our non-guarantor subsidiaries, including trade payables and preferred stock.

*Ranking and Subordination* . The notes will be our general unsecured obligations. Accordingly, they will rank: equally in right of payment with all our existing and future unsecured senior debt; senior in right of payment to all our future subordinated debt; effectively subordinated to our existing and future secured debt to the extent of the assets securing such debt, including all borrowings under the new credit facilities; and effectively subordinated to all of the liabilities of our non-guarantor subsidiaries, including trade payables and preferred stock.

*Optional Redemption* . We may redeem some or all of the notes on or after November 15, 2011 at the redemption prices described in the indenture governing the notes, plus accrued and unpaid interest.

*Change of Control* . Upon the occurrence of a change of control, unless we have exercised our right to redeem all of the notes as described above, each holder may require us to repurchase such holder's notes, in whole or in part, at a purchase price equal to 101% of the principal amount thereof plus accrued and unpaid interest to the purchase date.

*Certain Covenants.* The indenture governing the notes, among other things, will limit our ability and the ability of our restricted subsidiaries to: incur additional indebtedness; incur liens; pay dividends or make distributions in respect of capital stock or make certain other restricted payments or investments; sell assets, including capital stock of restricted subsidiaries; agree to payment restrictions affecting restricted subsidiaries; enter into transactions with affiliates; and merge, consolidate or sell substantially all of our assets.

117

Table of Contents

### SHARES ELIGIBLE FOR FUTURE SALE

Sales, or the availability for sale, of substantial amounts of our common stock in the public market could adversely affect our common stock's prevailing market price. Upon completion of the spin-off, we will have outstanding an aggregate of approximately 146,000,000 shares of our common stock, based upon the shares of Verizon common stock outstanding as of October 14, 2006, assuming no exercise of outstanding options. All of the shares will be freely tradeable without restriction or further registration under the Securities Act, unless the shares are owned by our "affiliates" as that term is defined in Rule 405 under the Securities Act. Restricted securities may be sold in the public market only if registered or if they qualify for an exemption from registration under Rule 144, which is summarized below.

### Rule 144

In general, under Rule 144 as currently in effect, an affiliate would be entitled to sell within any three-month period a number of shares that does not exceed the greater of:

- 1% of the number of shares of our common stock then outstanding; or

- the average weekly trading volume of our common stock on the New York Stock Exchange during the four calendar weeks preceding the filing of notice of Form 144 with respect to the sale.

Sales under Rule 144 are also subject to manner of sale provisions and notice requirements and to the availability of current public information about us.

As of the distribution date, based on their holdings of Verizon common stock as of October 1, 2006, we estimate that our directors and officers will collectively hold 4,960 shares of our common stock that will be subject to these restrictions.

118

Table of Contents

## INDEMNIFICATION OF DIRECTORS AND OFFICERS

The following summary is qualified in its entirety by reference to the complete text of the statutes referred to below, our certificate of incorporation and bylaws.

We are incorporated under the laws of the state of Delaware.

Section 145 of the Delaware General Corporation Law, or the DGCL, provides that a corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. Section 145 further provides that a corporation similarly may indemnify any such person serving in any such capacity who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor, or a derivative action, by reason of the fact that he is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Delaware Court of Chancery or such other court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Delaware Court of Chancery or such other court shall deem proper.

Our certificate of incorporation will provide for the indemnification of directors, officers and certain authorized representatives of the corporation to the fullest extent permitted by the DGCL, except that our certificate of incorporation will provide for indemnification in a derivative action or suit initiated by a director, officer or authorized representative of the corporation only if our board of directors authorized the initiation of that action or suit. In addition, as permitted by the DGCL, our certificate of incorporation will provide that our directors shall have no personal liability to us or our stockholders for monetary damages for breach of fiduciary duty as a director, except (1) for any breach of the director's duty of loyalty to us or our stockholders, (2) for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law, (3) under Section 174 of the DGCL or (4) for any transaction from which a director derived an improper personal benefit.

Following the spin-off, we intend to enter into individual indemnification agreements with each member of our board of directors and each of our senior officers. The indemnification agreements will be intended to assure that our directors and senior officers are indemnified to the maximum extent permitted under applicable law.

119

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed a registration statement on Form 10 with the SEC with respect to the shares of our common stock being distributed as contemplated by this information statement. This information statement is a part of, and does not contain all of the information set forth in, the registration statement and the exhibits and schedules to the registration statement. For further information with respect to our company and our common stock, please refer to the registration statement, including its exhibits and schedules. Statements made in this information statement relating to any contract or other document are not necessarily complete, and you should refer to the exhibits attached to the registration statement for copies of the actual contract or document. You may review a copy of the registration statement, including its exhibits and schedules, at the SEC's public reference room, located at 100 F Street, N.E., Washington, D.C. 20549, as well as on the Internet web site maintained by the SEC at www.sec.gov. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. Information contained on any web site referenced in this information statement is not incorporated by reference into this information statement or the registration statement of which this information statement is a part. Our Internet address is included in this information statement as an inactive textual reference only.

After the spin-off, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with the Exchange Act, we will file periodic reports, proxy statements and other information with the SEC. Our future filings will be available from the SEC as described above.

After the spin-off, we will make available free of charge most of our future SEC filings through our Internet web site ( *www. idearc.com* ) as soon as reasonably practicable after we file these materials with the SEC. You will be able to access these future SEC filings via the hyperlink that we will provide on our web site to the SEC's web site. You may also request a copy of our future SEC filings at no cost, by writing or telephoning us at:

Idearc Inc.
2200 West Airfield Drive
DFW Airport, TX 75261
(972) 453-7000

We will furnish holders of our common stock with annual reports containing consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles and audited and reported on, with an opinion expressed, by an independent public accounting firm.

You should rely only on the information contained in this information statement or to which we have referred you. We have not authorized any person to provide you with different information or to make any representation not contained in this information statement.

120

Table of Contents

## INDEX TO FINANCIAL STATEMENT S

|  | Page |
|---|---|
| **Audited Consolidated Financial Statements for Idearc Inc.** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Income for the years ended December 31, 2005, 2004 and 2003 | F-3 |
| Consolidated Balance Sheets at December 31, 2005 and 2004 | F-4 |
| Consolidated Statements of Changes in Parent's Equity for the years ended December 31, 2005, 2004 and 2003 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2005, 2004 and 2003 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| **Unaudited Consolidated Financial Statements for Idearc Inc.** | |
| Consolidated Statements of Income for the nine months ended September 30, 2006 and 2005 | F-20 |
| Consolidated Balance Sheets at September 30, 2006 and December 31, 2005 | F-21 |
| Consolidated Statements of Cash Flows for the nine months ended September 30, 2006 and 2005 | F-22 |
| Notes to Consolidated Financial Statements | F-23 |
| **Financial Statement Schedule II** | |
| Valuation and Qualifying Accounts | F-27 |

F-1

Table of Contents

## Report of Independent Registered Public Accounting Firm

**The Board of Directors and Shareholders of Idearc Inc. (formerly named Verizon Directories Disposition Corporation)**

We have audited the accompanying consolidated balance sheets of Idearc Inc. and Subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of income, parent's equity, and cash flows for each of the three years in the period ended December 31, 2005. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Idearc Inc. and Subsidiaries at December 31, 2005 and 2004, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note 2 to the consolidated financial statements, Idearc Inc. changed its methods of accounting for directory revenues and stock-based compensation effective January 1, 2003.

**/s/ Ernst & Young LLP**

New York, New York
March 10, 2006

F-2

Table of Contents

## Consolidated Statements of Income Idearc Inc. and Subsidiaries

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 (in millions) | 2003 |
| **Operating Revenue** | | | |
| Print products | **$3,147** | $3,318 | $ 3,490 |
| Electronic | **197** | 165 | 136 |
| Other | **30** | 30 | 49 |
| **Total Operating Revenue** | **3,374** | 3,513 | 3,675 |
| **Operating Expense** | | | |
| Selling | **646** | 681 | 674 |
| Cost of sales (exclusive of depreciation and amortization) | **622** | 582 | 593 |
| General and administrative | **374** | 563 | 855 |
| Depreciation and amortization | **91** | 86 | 76 |
| **Total Operating Expense** | **1,733** | 1,912 | 2,198 |
| **Operating Income** | **1,641** | 1,601 | 1,477 |
| Interest income and (expense), net | **16** | 12 | 2 |
| **Income Before Provision for Income Taxes and Cumulative Effect of Accounting Change** | **1,657** | 1,613 | 1,479 |
| Provision for income taxes | **632** | 641 | 584 |
| **Income Before Cumulative Effect of Accounting Change** | **1,025** | 972 | 895 |
| Cumulative effect of accounting change, net of tax | **—** | — | (1,463) |
| **Net Income (Loss)** | **$1,025** | $ 972 | $ (568) |

See Notes to Consolidated Financial Statements.

F-3

**Table of Contents**

**Consolidated Balance Sheets Idearc Inc. and Subsidiaries**

| | At December 31, | |
| --- | ---: | ---: |
| | 2005 | 2004 |
| | (in millions) | |
| **Assets** | | |
| Current assets | | |
|     Note receivable due from Verizon | $ **348** | $ 241 |
|     Accounts receivable, net of allowances of $80 and $135 | **366** | 420 |
|     Deferred directory costs | **168** | 176 |
|     Prepaid expenses and other | **60** | 82 |
| Total current assets | **942** | 919 |
| Property, plant and equipment | **511** | 486 |
|     Less: accumulated depreciation | **347** | 309 |
| | **164** | 177 |
| Goodwill | **70** | 70 |
| Other intangible assets, net | **123** | 130 |
| Deferred tax assets | **113** | 103 |
| Other assets | **—** | 3 |
| Total assets | **$1,412** | $1,402 |
| **Liabilities and Parent's Equity** | | |
| Current liabilities | | |
|     Accounts payable and accrued liabilities | $ **332** | $ 312 |
|     Deferred revenue | **209** | 211 |
|     Other | **43** | 104 |
| Total current liabilities | **584** | 627 |
| Employee benefit obligations | **499** | 451 |
| Other liabilities | **4** | 7 |
| Parent's equity | **325** | 317 |
| Total liabilities and parent's equity | **$1,412** | $1,402 |

See Notes to Consolidated Financial Statements.

F-4

Table of Contents

**Consolidated Statements of Changes in Parent's Equity Idearc Inc. and Subsidiaries**

| | Parent's Equity |
| --- | --- |
| | (in millions) |
| Balance at December 31, 2002 | $  1,840 |
| Net income (loss) | (568) |
| Dividends and returns of capital | (1,045) |
| Other | (1) |
| Balance at December 31, 2003 | 226 |
| Net income | 972 |
| Dividends and returns of capital | (934) |
| Other | 53 |
| Balance at December 31, 2004 | 317 |
| **Net income** | **1,025** |
| **Dividends** | **(1,058)** |
| **Other** | **41** |
| **Balance at December 31, 2005** | **$    325** |

See Notes to Consolidated Financial Statements.

F-5

**Table of Contents**

**Consolidated Statements of Cash Flows Idearc Inc. and Subsidiaries**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2005** | **2004** | **2003** |
| | | (in millions) | |
| **Cash Flows from Operating Activities** | | | |
| Net income (loss) | **$ 1,025** | $   972 | $   (568) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization expense | **91** | 86 | 76 |
| Employee retirement benefits | **48** | 61 | 156 |
| Deferred income taxes | **11** | 123 | (32) |
| Provision for uncollectible accounts | **167** | 233 | 297 |
| Cumulative effect of accounting change, net of tax | **—** | — | 1,463 |
| Changes in current assets and liabilities | | | |
| Accounts receivable | **(121)** | (217) | (228) |
| Deferred directory costs | **6** | (41) | 30 |
| Other current assets | **—** | 1 | 2 |
| Accounts payable and accrued liabilities | **(44)** | (99) | 35 |
| Other, net | **56** | 51 | 12 |
| Net cash provided by operating activities | **1,239** | 1,170 | 1,243 |
| **Cash Flows from Investing Activities** | | | |
| Capital expenditures (including capitalized software) | **(78)** | (85) | (72) |
| Other, net | **2** | 8 | (5) |
| Net cash used in investing activities | **(76)** | (77) | (77) |
| **Cash Flows from Financing Activities** | | | |
| Change in note receivable | **(105)** | (159) | (121) |
| Dividends paid / returns of capital | **(1,058)** | (934) | (1,045) |
| Net cash used in financing activities | **(1,163)** | (1,093) | (1,166) |
| Increase (decrease) in cash and cash equivalents | **—** | — | — |
| Cash and cash equivalents, beginning of year | **—** | — | — |
| Cash and cash equivalents, end of year | **$   —** | $   — | $   — |

See Notes to Consolidated Financial Statements.

F-6

Table of Contents

**Notes to Consolidated Financial Statements Idearc Inc. and Subsidiaries**

**Note 1**

**Description of Business and Summary of Significant Accounting Policies.**

**Description of Business**

Idearc Inc. (formerly named Verizon Directories Disposition Corporation) and its subsidiaries, or Idearc, is one of the nation's largest providers of yellow and white page directories and related advertising products. Our products include yellow and white page directories, SuperPages.com (www.superpages.com), our Internet yellow pages directory and online shopping resource, and SuperPages Mobile, an information directory for wireless subscribers.

In 2005, we provided sales, publishing and other related services for more than 1,200 directories in 35 states and the District of Columbia in the U.S., with a total circulation of approximately 116 million copies.

We are the exclusive publisher of Verizon-branded yellow and white pages, operating primarily in the states where Verizon is the incumbent local exchange carrier. Our publishing agreement with Verizon will remain in effect 30 years from the date of the spin-off and will automatically renew for additional five-year terms unless we or Verizon provide at least 24 months notice of termination.

SuperPages.com, our Internet yellow pages directory service, has more than 17 million U.S. businesses listed and an advertiser base of approximately 186,000 at December 31, 2005. SuperPages.com enables users to find local and national businesses and compare goods and services of merchants across the country.

**Basis of Presentation**

Idearc is comprised of the domestic operating companies of the Verizon Information Services business segment, including Idearc Media Inc. (formerly named Verizon Directories Corp.), Idearc Media Sales—East Co. (formerly named Verizon Directories Sales—East Co.), Idearc Media Sales—West Inc. (formerly named Verizon Directories Sales—West Inc.), Idearc Media Services—East Inc. (formerly named Verizon Directories Services—East Inc.) and Idearc Media Services—West Inc. (formerly named Verizon Directories Services—West Inc.).

**Consolidation**

The consolidated financial statements include the financial statements of Idearc and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated.

**Use of Estimates**

We prepare our financial statements using U.S. generally accepted accounting principles, which require management to make estimates and assumptions that affect reported amounts and disclosures. Actual results could differ from those estimates.

Examples of significant estimates include the allowance for doubtful accounts, the recoverability of property, plant and equipment, intangible assets and other long-lived assets, valuation allowances on tax assets, and pension and postretirement benefit assumptions.

**Revenue Recognition**

We earn revenue primarily from print and online directory publishing. The sale of advertising in printed directories is the primary source of revenue. The company recognizes revenue ratably over the life of each directory using the amortization method of accounting, with revenue recognition commencing in the month of publication.

Our online directory, SuperPages.com, earns revenue from two sources: fixed-fee and performance-based advertising. Fixed-fee advertising includes advertisement placement on our SuperPages.com website, and

F-7

Table of Contents

website development and hosting for our advertisers. Revenue from fixed-fee advertisers is recognized monthly over the life of the advertising service. Performance-based advertising revenue is earned when consumers connect with our SuperPages.com advertisers by a "click" through to their website or a phone call to their business. Revenue from performance-based advertising is recognized when there is evidence that qualifying transactions have occurred.

### Expense Recognition

Costs directly attributable to producing directories are amortized over the average life of a directory. These costs include paper, printing and initial distribution. All other costs are recognized as incurred.

### Barter Transactions

We enter into certain transactions where a third party provides directory placement arrangements, sponsorships, or other media advertising in exchange for placing their advertising in our print or online directories. Due to the subjective nature of barter transactions, we do not recognize revenue and expense from these transactions. If recognized, revenue associated with barter transactions would be less than 2% of total revenue.

### Accounts Receivable

Accounts receivable is recorded net of an allowance for doubtful accounts.

The allowance for doubtful accounts is calculated using a percentage of sales method based upon collection history and an estimate of uncollectible accounts. Management may exercise its judgment in adjusting the provision as a consequence of known items, such as current economical factors and credit trends. Accounts receivable adjustments are recorded against the allowance for doubtful accounts.

### Deferred Directory Costs

We include in deferred directory costs unamortized costs directly attributable to producing directories (paper, printing and initial distribution).

### Note Receivable Due from Verizon

The company and its subsidiaries have a financial services agreement with Verizon Financial Services, LLC that allows the company to contribute to or have internal access to working capital funds. The company is currently in a receivable position.

The financial services agreement specifies that certain Verizon affiliates will borrow or advance funds on a day-to-day (demand) basis to finance its ordinary business and capital requirements. Since these borrowings and advances are based on a variable interest rate and demand note basis, the carrying value of the notes approximate fair market value.

### Property, Plant, Equipment and Depreciation

We record property, plant and equipment at cost. Property, plant and equipment is depreciated on a straight-line basis over the estimated useful lives of the assets, which are presented in the following table:

|  | Estimated Useful Lives (in years) |
|---|---|
| Land improvements and buildings | 7-30 |
| Leasehold improvements | 1-5 |
| Computer, data processing, and other equipment | 3-7 |
| Furniture and fixtures | 7 |
| Other | 3 |

F-8

**Table of Contents**

The cost of additions and improvements are capitalized and expenditures for repairs and maintenance, including the cost of replacing minor items not considered substantial betterments, are expensed as incurred. When property, plant and equipment assets are sold or retired, the related cost and accumulated depreciation are deducted from the accounts and any gains or losses on disposition are recognized in income.

## Goodwill and Other Intangible Assets

### Goodwill

Goodwill is the excess of the acquisition cost of businesses over the fair value of the identifiable net assets acquired. In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," impairment testing for goodwill is performed at least annually unless indicators of impairment exist. The impairment test for goodwill uses a two-step approach, which is performed at the entity level (the reporting unit). Step one compares the fair value of the reporting unit (calculated using a discounted cash flow method) to its carrying value. If the carrying value exceeds the fair value, there is a potential impairment and step two must be performed. Step two compares the carrying value of the reporting unit's goodwill to its implied fair value (i.e., fair value of reporting unit less the fair value of the unit's assets and liabilities, including identifiable intangible assets). If the carrying value of goodwill exceeds its implied fair value, the excess is required to be recorded as an impairment.

### Other Intangible Assets

Other intangible assets are comprised of internal-use software, which we capitalize if it has a useful life in excess of one year, in accordance with Statement of Position (SOP) No. 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." Subsequent additions, modifications or upgrades to internal-use software are capitalized only to the extent that they allow the software to perform a task it previously did not perform. Software maintenance and training costs are expensed in the period in which they are incurred.

Capitalized internal-use software costs are amortized using the straight-line method over their useful lives and reviewed for impairment in accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," which only requires testing whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. If any indicators are present, a recoverability test is performed by comparing the carrying amount of the asset to the net undiscounted cash flows expected to be generated from the asset. If the net undiscounted cash flows do not exceed the carrying amount (i.e., the asset is not recoverable), an additional step is performed, which determines the fair value of the asset and records impairment, if any. Each reporting period, the useful life determination of the intangible assets is reevaluated to assess whether events and circumstances warrant a revision in their remaining useful lives.

For information related to the carry amounts of goodwill and other intangible assets, see Note 6.

## Income Taxes

We account for income taxes in accordance with SFAS 109, "Accounting for Income Taxes." Deferred tax assets or liabilities are recorded to reflect the future tax consequences of temporary differences between the financial reporting basis of assets and liabilities and their tax basis at each year-end. These amounts are adjusted, as appropriate, to reflect enacted changes in tax rates expected to be in effect when the temporary differences reverse. The Company has been included in Verizon's consolidated federal and state income tax returns. The provision for income taxes in our consolidated financial statements has been determined as if the Company filed its own consolidated income tax returns separate and apart from Verizon.

## Stock-Based Compensation

We participate in employee compensation plans sponsored by Verizon with awards of Verizon common stock.

F-9

**Table of Contents**

Prior to 2003, we accounted for stock-based employee compensation under Accounting Principals Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations, and followed the disclosure-only provisions of SFAS No. 123, "Accounting for Stock-Based Compensation."

Effective January 1, 2003, we adopted the fair value recognition provisions of SFAS No. 123, using the prospective method (as permitted under SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure") to all new awards granted, modified or settled after January 1, 2003. Under the prospective method, employee compensation expense in the first year will be recognized for new awards granted, modified, or settled. The options generally vest over a term of three years, therefore the expenses related to stock-based employee compensation included in the determination of net income (loss) for 2005, 2004 and 2003 are less than what would have been recorded if the fair value method was also applied to previously issued awards. See Note 2 for additional information on the impact of adopting SFAS No. 123.

## Employee Benefit Plans

We participate in certain Verizon benefit plans. Under these plans, pension, post-retirement health care and life insurance benefits earned during the year, as well as interest on projected benefit obligations, are accrued currently. Prior service costs and credits resulting from changes in plan benefits are amortized over the average remaining service period of the employees expected to receive benefits.

In December 2005, Verizon announced that participants in its management pension plans, including our management employees, will no longer earn pension benefits or earn service towards our retiree medical subsidy after June 30, 2006. See Note 8 for additional information.

## Recent Accounting Pronouncements

### *Stock-Based Compensation*

In December 2004, the FASB issued SFAS No. 123(R), "Share-Based Payment," which revises SFAS No. 123, "Accounting for Stock-Based Compensation." SFAS No. 123(R) requires all share-based payments to employees, including grants of employee stock options, be recognized as compensation expense based on their fair value. Effective January 1, 2003, the company adopted the fair value recognition provisions of SFAS No. 123. We plan to adopt SFAS No. 123(R) effective January 1, 2006, using the modified prospective method and expect that any impact on our results of operations or financial position will not be material.

## Note 2
## Accounting Changes

### Cumulative Effect of Accounting Change

On January 1, 2003, we changed our method for recognizing revenues and expenses from the publication-date method to the amortization method. The publication-date method recognizes revenues and direct expenses when the directories are published. Under the amortization method, which has increasingly become the industry standard, revenues and direct expenses (paper, printing and initial distribution costs), are recognized over the life of the directory, which is usually twelve months. The accounting change affected the timing of the recognition of revenue and expenses but did not result in any impact on cash flows. The cumulative effect of the accounting change resulted in a one-time charge of $2,381 million ($1,463 million after-tax).

### Stock Based Compensation

We participate in employee compensation plans sponsored by Verizon with awards of Verizon common stock. As discussed in Note 1, we adopted the fair value recognition provisions of SFAS No. 123, "Accounting for Stock-Based Compensation," using the prospective method as permitted under SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure—an amendment of FASB Statement No. 123."

F-10

Table of Contents

The following table illustrates the effect on net income (loss) if the fair value method had been applied to all outstanding and unvested options in each period:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | | (in millions) | |
| Net income (loss), As Reported | **$1,025** | $972 | $(568) |
| Add: Stock option-related employee compensation expense included in reported net income (loss), net of related tax effects | **4** | 4 | 3 |
| Deduct: Total stock option-related employee compensation expense determined under fair value based method for all awards, net of related tax effects | **(4)** | (4) | (10) |
| *Pro forma net income (loss)* | **$1,025** | $972 | $(575) |

After-tax compensation expense for other stock-based compensation included in net income (loss) as reported for the years ended December 31, 2005, 2004 and 2003 was $11 million, $6 million, and $3 million, respectively.

## Note 3
## Sales of Business

### Sales of Businesses, Net

*Verizon Information Services Hawaii*

During the second quarter of 2004, Verizon entered into an agreement to sell our directory markets in Hawaii to an affiliate of The Carlyle Group. This transaction closed during the second quarter of 2005. In connection with this transaction, our Hawaii operations were transferred to our parent at net book value with no gain or loss recognized by the company. Hawaii results of operations are included in our financial statements through the second quarter of 2005 and do not exist in subsequent periods. Revenue was $22 million, $66 million and $67 million in 2005, 2004 and 2003, respectively.

## Note 4
## Other Strategic Actions / Special Items

### Employee-Related Items

During 2004, we recorded pretax pension settlement losses of $10 million ($6 million after-tax) related to employees that received lump-sum pension distributions during 2004 in connection with the voluntary separation plan for employees that accepted the separation offer in the fourth quarter of 2003. These charges were recorded in accordance with SFAS No. 88, "Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits," which requires that settlement losses be recorded once prescribed payment thresholds have been reached.

During 2003, we recorded pretax charges of $259 million associated with employee related costs, primarily due to a voluntary separation program offered in the fourth quarter of 2003, resulting in a charge of $250 million associated with pension, other post retirement benefits and severance costs for employees who accepted the separation package.

F-11

**Table of Contents**

**Note 5**
**Property, Plant and Equipment**

The following table displays the details of property, plant and equipment as of December 31, which is stated at cost:

|  | At December 31, | |
|---|---|---|
|  | 2005 | 2004 |
|  | (in millions) | |
| Land, land improvements and buildings | $ 68 | $ 68 |
| Leasehold improvements | 57 | 56 |
| Computer, data processing, and other equipment | 314 | 299 |
| Furniture and fixtures | 56 | 54 |
| Other | 16 | 9 |
|  | 511 | 486 |
| Less: Accumulated depreciation | 347 | 309 |
| Total | $ 164 | $ 177 |

Depreciation expense for the years ended December 31, 2005, 2004 and 2003, was $45 million, $46 million and $47 million, respectively.

**Note 6**
**Goodwill and Other Intangible Assets**

**Goodwill**

There were no changes to the carrying amount of goodwill during 2005 or 2004.

**Other Intangible Assets**

|  | At December 31, | |
|---|---|---|
|  | 2005 | 2004 |
|  | (in millions) | |
| Internal use software: | | |
| Gross carrying amount | $ 292 | $ 253 |
| Less: Accumulated amortization | 169 | 123 |
| Net book value | $ 123 | $ 130 |

Internal use software is amortized over a 3 to 7 year period. Amortization expense was $46 million, $40 million, and $29 million for the years ended December 31, 2005, 2004 and 2003, respectively. This expense is estimated to be $44 million in 2006, $34 million in 2007, $22 million in 2008, $13 million in 2009 and $6 million in 2010 for the software capitalized at December 31, 2005.

**Note 7**
**Leasing Arrangements**

We lease certain facilities and equipment for use in our operations under operating leases. Total net rent expense under operating leases amounted to $32 million in 2005, $33 million in 2004 and $35 million in 2003.

F-12

**Table of Contents**

The aggregate minimum net rental commitments under noncancelable leases at December 31, 2005, are shown for the periods below:

| Years: | Operating Leases (in millions) |
|---|---|
| 2006 | $ 26 |
| 2007 | 20 |
| 2008 | 14 |
| 2009 | 10 |
| 2010 | 5 |
| Thereafter | 1 |
| Total minimum rental commitments | $ 76 |

## Note 8
## Employee Benefits

We participate in Verizon's benefit plans. Verizon maintains noncontributory defined benefit pension plans for many of our management and associate employees. The postretirement health care and life insurance plans for our retirees and their dependents are both contributory and noncontributory and include a limit on the company's share of cost for recent and future retirees. We also sponsor defined contribution savings plans to provide opportunities for eligible employees to save for retirement on a tax-deferred basis. We use a measurement date of December 31 for our pension and postretirement health care and life insurance plans.

The structure of Verizon's benefit plans does not provide for the separate determination of certain disclosures for our company.

### Pension and Other Postretirement Benefits

Pension and other postretirement benefits for some of our employees are subject to collective bargaining agreements. Modifications in benefits have been bargained from time to time, and Verizon may also periodically amend the benefits in the management plans.

### Benefit Cost

| | Pension At December 31, | | | Health Care and Life At December 31, | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 (in millions) | 2003 | 2005 | 2004 (in millions) | 2003 |
| Net periodic benefit cost | $ 19 | $ 19 | $ 15 | $ 29 | $ 33 | $ 22 |
| Settlement loss | — | 10 | 1 | — | — | — |
| Special termination benefits | — | — | 106 | — | — | 17 |
| Curtailment loss (gain) | 11 | — | 4 | (11) | — | (10) |
| Subtotal | 11 | 10 | 111 | (11) | — | 7 |
| Total cost | $ 30 | $ 29 | $126 | $ 18 | $ 33 | $ 29 |

In December 2005, Verizon announced that Verizon management employees will no longer earn pension benefits or earn service towards the company retiree medical subsidy after June 30, 2006. In addition, new management employees hired after December 31, 2005 are not eligible for pension benefits and managers with less than 13.5 years of service as of June 30, 2006 are not eligible for company-subsidized retiree healthcare or retiree life insurance benefits. Beginning July 1, 2006, management employees will receive an increased company match on their savings plan contributions.

F-13

Table of Contents

As a result of these changes, we recorded a loss of $11 million for pension curtailments and a gain of $11 million for retiree medical curtailments, which were recorded in accordance with SFAS No. 88, "Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits," and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions."

We recorded pension settlement losses of $10 million in 2004 and $1 million in 2003, related to employees that received lump-sum distributions in connection with the voluntary separation plan that commenced in the fourth quarter of 2003. These charges were recorded in accordance with SFAS No. 88, which requires that settlement losses be recorded once prescribed payment thresholds have been reached.

In connection with the fourth quarter of 2003 management voluntary separation plan, we recorded charges of $106 million and $17 million, respectively, for pension and postretirement benefit enhancements. Also in 2003, we recorded a pension curtailment loss of $4 million and a postretirement benefit gain of $10 million related to a significant reduction of the expected years of future service. In addition, this program resulted in utilization of our employee severance plans and related reserves (see Severance Benefits).

Amounts recognized in the balance sheets consist of:

| | Pension | | Health Care and Life | |
| | At December 31, | | At December 31, | |
| | 2005 | 2004 | 2005 | 2004 |
| | (in millions) | | | |
| Employee benefit obligations | $ 232 | $ 212 | $ 180 | $ 178 |

The changes in the employee benefit asset and obligations from year to year were caused by a number of factors, including changes in actuarial assumptions (see Assumptions), curtailments and settlements.

**Assumptions**

The actuarial assumptions used are based on market interest rates, past experience, and management's best estimate of future economic conditions. Changes in these assumptions may impact future benefit costs and obligations.

The weighted-average assumptions used in determining benefit obligations are as follows:

| | Pension | | Health Care and Life | |
| | At December 31, | | At December 31, | |
| | 2005 | 2004 | 2005 | 2004 |
| Discount rate | 5.75% | 5.75% | 5.75% | 5.75% |
| Rate of future increases in compensation | 4.00 | 5.00 | 4.00 | 4.00 |

The weighted-average assumptions used in determining net periodic cost are as follows:

| | Pension | | | Health Care and Life | | |
| | Years Ended December 31, | | | Years Ended December 31, | | |
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Discount rate | 5.75% | 6.25% | 6.75% | 5.75% | 6.25% | 6.75% |
| Expected return on plan assets | 8.50 | 8.50 | 8.50 | 7.75 | 8.50 | 8.50 |
| Rate of compensation increase | 5.00 | 5.00 | 5.00 | 4.00 | 4.00 | 4.00 |

In order to project the long-term target investment return for the total portfolio, estimates are prepared for the total return of each major asset class over the subsequent 10-year period, or longer. Those estimates are based on a combination of factors including the following: current market interest rates and valuation levels, consensus

F-14

**Table of Contents**

earnings expectations, historical long-term risk premiums and value-added. To determine the aggregate return for the pension trust, the projected return of each individual asset class is then weighted according to the allocation to that investment area in the trust's long-term asset allocation policy.

The assumed health care cost trend rates are as follows:

|  | Health Care and Life | | |
|  | At December 31, | | |
|  | **2005** | **2004** | **2003** |
| Health care cost trend rate assumed for next year | **10.00%** | 10.00% | 10.00% |
| Rate to which cost trend rate gradually declines | **5.00%** | 5.00% | 5.00% |
| Year the rate reaches level it is assumed to remain thereafter | **2010** | 2009 | 2008 |

## Savings Plans and Employee Stock Ownership Plans

Substantially all of our employees are eligible to participate in savings plans maintained by Verizon. Verizon maintains four leveraged employee stock ownership plans (ESOPs) for its employees. Under these plans, a certain percentage of eligible employee contributions are matched with shares of Verizon's common stock. We recognize savings plan cost based on our matching obligation attributable to our participating employees. We recorded total savings plan costs of $17 million, $16 million, and $18 million in years 2005, 2004, and 2003, respectively.

## Severance Benefits

We maintain ongoing severance plans for both management and associate employees, which provide benefits to employees that are terminated. The costs for these plans are accounted for under SFAS No. 112, "Employers' Accounting for Postemployment Benefits." We accrue for severance benefits based on the terms of our severance plans over the estimated service periods of the employees. The accruals are also based on the historical run-rate of actual severances and expectations for future severances.

The following table provides an analysis of our severance liability:

| Year | Beginning of Year | Charged to Expense [a] | Payments (in millions) | Other | End of Year |
|---|---|---|---|---|---|
| **2005** | $   **18** | $   **4** | $   **(5)** | $ **(1)** | $   **16** |
| 2004 | 104 | — | (80) | (6) | 18 |
| 2003 | $   28 | $   139 | $   (63) | $— | $   104 |

(a)    Includes accruals for ongoing employee severance.

F-15

Table of Contents

**Note 9**
**Income Taxes**

The components of the provision for income taxes are as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| | | (in millions) | |
| Current | | | |
| Federal | $ 536 | $ 432 | $ 524 |
| State and local | 85 | 86 | 92 |
| | 621 | 518 | 616 |
| Deferred | | | |
| Federal | 9 | 97 | (26) |
| State and local | 2 | 26 | (6) |
| | 11 | 123 | (32) |
| Total provision for income taxes | $ 632 | $ 641 | $ 584 |

The following table shows the principal reasons for the difference between the effective income tax rate and the statutory federal income tax rate:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| | | (in millions) | |
| Statutory federal income tax rate | 35.0% | 35.0% | 35.0% |
| State and local income tax, net of federal tax benefits | 3.4 | 4.5 | 3.8 |
| Other, net | (0.3) | 0.2 | 0.7 |
| Effective income tax rate | 38.1% | 39.7% | 39.5% |

Deferred taxes arise because of differences in the book and tax bases of certain assets and liabilities. Significant components of deferred income tax assets/liabilities are shown in the following table:

| | At December 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| | (in millions) | |
| Deferred income tax assets: | | |
| Employee benefits | $ 182 | $ 171 |
| Uncollectible accounts receivable | 31 | 51 |
| Other | 41 | 30 |
| Gross deferred income tax assets | 254 | 252 |
| Deferred income tax liabilities: | | |
| Depreciation | 60 | 50 |
| Deferred directory costs | 48 | 43 |
| Other | — | 2 |
| Gross deferred income tax liabilities | 108 | 95 |
| Net deferred income taxes | $ 146 | $ 157 |
| Amounts included in consolidated balance sheets: | | |
| Current assets (in prepaid expenses and other) | $ 33 | $ 54 |
| Non-current assets | 113 | 103 |
| | $ 146 | $ 157 |

F-16

**Table of Contents**

No valuation allowance was recorded in 2004 and 2005, because we believe that based on all available evidence it is more likely than not that the gross deferred tax assets will be realized.

**Note 10**
**Segment Information**

**Reportable Segment**

We are managed as a single business segment. Our multi-product business is comprised of yellow and white page directories, SuperPages.com, our online directory and search services, and SuperPages Mobile, our directory and information services on wireless telephones. These products are all offered by our sales force that is located in local markets across the United States.

**Note 11**
**Additional Financial Information**

The tables that follow provide additional financial information related to our consolidated financial statements:

**Balance Sheet Information**

|  | At December 31, | |
|---|---|---|
|  | **2005** | **2004** |
|  | (in millions) | |
| **Accounts Receivable** | | |
| Amounts billed by Verizon Domestic Telecom on behalf of Idearc | **$ 114** | $ 140 |
| Amounts billed by Idearc | **318** | 364 |
| Other | **14** | 51 |
|  | **446** | 555 |
| Less: allowance for doubtful accounts | **80** | 135 |
|  | **$ 366** | **$ 420** |
| **Accounts Payable and Accrued Liabilities** | | |
| Accounts payable | **$ 82** | $ 97 |
| Accrued expenses | **76** | 60 |
| Accrued vacation pay | **25** | 25 |
| Accrued salaries and wages | **46** | 43 |
| Accrued taxes | **103** | 87 |
|  | **$ 332** | **$ 312** |

**Cash Flow Information**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2005** | **2004** | **2003** |
|  | | (in millions) | |
| **Cash Paid (Received):** | | | |
| Income taxes, net of amounts refunded | **$ 480** | $ 390 | $ 497 |
| Interest | **(15)** | (11) | (2) |

App. - 000265

Table of Contents

## Note 12
## Transactions with Verizon and related Subsidiaries

Our consolidated financial statements include the following transactions with Verizon and related subsidiaries:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| | | (in millions) | |
| Dividends paid and returns of capital | $1,058 | $934 | $1,045 |
| Operating expenses | 100 | 106 | 117 |
| Interest income (expense), net | 14 | 4 | 2 |

We reimbursed Verizon for specific goods and services it provided to, or arranged for, us based on tariffed rates, market prices or negotiated terms that approximated market rates. These goods and services included items such as communications and data processing services, office space, professional fees and insurance coverage.

We also reimbursed Verizon for our share of costs incurred by Verizon to provide services on a common basis to all of its subsidiaries. These costs included allocations for legal, security, treasury, tax and audit services. The allocations were based on actual costs incurred by Verizon and periodic studies that identified employees or groups of employees who were totally or partially dedicated to performing activities that benefited us. In addition, we reimbursed Verizon for general corporate costs that indirectly benefited us, including costs for activities such as investor relations, financial planning, marketing services and benefits administration. These allocations were based on actual costs incurred by Verizon, as well as on our size relative to other Verizon subsidiaries. We believe that these cost allocations are reasonable for the services provided. We also believe that these cost allocations are consistent with the nature and approximate amount of the costs that we would have incurred on a stand-alone basis.

In addition, we pay dividends and other distributions to Verizon based upon on available cash balances.

## Note 13
## Commitments and Contingencies

### Litigation

Various lawsuits and other claims typical for a business of our size are pending against us. In addition, from time to time, we receive communications from government or regulatory agencies concerning investigations or allegations of noncompliance with laws or regulations in jurisdictions in which we operate.

We establish reserves for specific liabilities in connection with regulatory and legal actions that we deem to be probable and estimable. In other instances, including the matters described below, we are not able to make a reasonable estimate of any liability because of the uncertainties related to either the outcome and/or the amount or range of loss. We do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition. However, any potential judgments, fines or penalties relating to these matters may have a material effect on our results of operations in the period in which they are recognized.

We are currently subject to a class action lawsuit and a purported class action lawsuit from current and former sales representatives located in California, New York, Pennsylvania, and New Jersey. The plaintiffs in these cases claim that we reduced their incentive pay through offsets for cancellations, non-renewals and credits on customer accounts and shifted a general business risk of loss to our sales representatives through the assignment of accounts which we allegedly knew would not renew their purchases, or would renew them at a lower level. The plaintiffs seek amounts that they allege were unlawfully deducted from their wages, civil penalties, interest, attorneys' fees and costs. The plaintiffs also seek amounts for overtime they allege they worked for which they were not paid. These cases are at varying stages of defense and the ultimate outcome is not determinable.

F-18

**Table of Contents**

We are subject to a purported class action that was filed on February 28, 2006 with the Washington Superior Court in King County. The plaintiff seeks to represent a class of persons that received a pre-recorded message from Verizon that was delivered by an automatic dialing and answering device (ADAD). The plaintiff claims that the use of an ADAD to deliver a pre-recorded message violates Washington state law and that Verizon transmitted deceptive caller-identification information with the message. The plaintiff, on behalf of himself and the class he purports to represent, seeks an unspecified amount of damages (but not less than $500 per plaintiff) and injunctive and declaratory relief. Our motion for summary judgment, which asserted that the calls at issue did not violate Washington state law, that the claims are pre-empted under the Federal Communications Act and that, if construed in the manner alleged by the plaintiff to create liability as to defendants, the Washington statute would be an unconstitutional restriction on speech, was denied by the trial court. We have filed notice that we intend to seek discretionary review of this order of the trial court with the appellate courts in Washington. The parties have also agreed to a voluntary mediation of the plaintiff's claims in December and a stay of further trial court proceedings pending the outcome of the mediation. The ultimate outcome of this case is not determinable.

## Note 14
## Quarterly Financial Information (Unaudited)

| Quarter Ended | | Operating Revenue | | Operating Income (in millions) | | Net Income |
|---|---|---|---|---|---|---|
| **2005** | | | | | | |
| March 31 | $ | 869 | $ | 429 | | $ 265 |
| June 30 | | 850 | | 402 | | 251 |
| September 30 | | 834 | | 434 | | 272 |
| December 31 | | 821 | | 376 | | 237 |
| 2004 | | | | | | |
| March 31 | $ | 895 | $ | 427 | | $ 263 |
| June 30 | | 880 | | 400 | | 243 |
| September 30 | | 874 | | 398 | | 238 |
| December 31 | | 864 | | 376 | | 228 |

## Note 15
## Subsequent Events

## Long-Term Printing Contract with R. R. Donnelley & Sons

On February 16, 2006, we entered into a nine-year printing agreement with R.R. Donnelley and Sons (Donnelley). Transition of all printing work was completed in late March 2006. Beginning in the second quarter of 2006, Donnelley will print all of our directories. Prior to this arrangement, Donnelley printed approximately 60% of our directories and we printed the remaining directories at our own printing plant facilities. By outsourcing all directory printing services to Donnelley, we expect to realize reduced printing and shipping costs over the contract term. Under a separate contract, Donnelley purchased our existing printing plant assets. As a result, we have terminated approximately 250 printing plant employees in the first half of 2006.

F-19

Table of Contents

## Consolidated Statements of Income Idearc Inc. and Subsidiaries

| (Unaudited) | Nine Months Ended September 30, | |
|---|---|---|
| | 2006 | 2005 |
| | (in millions) | |
| **Operating Revenue** | | |
| Print products | $ 2,241 | $ 2,383 |
| Electronic | 167 | 147 |
| Other | 12 | 23 |
| **Total Operating Revenue** | 2,420 | 2,553 |
| **Operating Expense** | | |
| Selling | 533 | 456 |
| Cost of sales (exclusive of depreciation and amortization) | 474 | 461 |
| General and administrative | 286 | 303 |
| Depreciation and amortization | 67 | 68 |
| **Total Operating Expense** | 1,360 | 1,288 |
| **Operating Income** | 1,060 | 1,265 |
| Interest income and (expense), net | 21 | 10 |
| **Income Before Provision for Income Taxes** | 1,081 | 1,275 |
| Provision for income taxes | 408 | 487 |
| **Net Income** | $ 673 | $ 788 |

See Notes to Consolidated Financial Statements.

F-20

Table of Contents

### Consolidated Balance Sheets Idearc Inc. and Subsidiaries

|  | At September 30, | | At December 31, |
| --- | ---: | --- | ---: |
| (Unaudited) | 2006 | | 2005 |
|  | (in millions) | | |
| **Assets** | | | |
| Current assets | | | |
| Note receivable due from Verizon | $ 480 | | $ 348 |
| Accounts receivable, net of allowances of $75 and $80 | 325 | | 366 |
| Deferred directory costs | 136 | | 168 |
| Prepaid expenses and other | 49 | | 60 |
| Total current assets | 990 | | 942 |
| Property, plant and equipment | 459 | | 511 |
| Less: accumulated depreciation | 322 | | 347 |
|  | 137 | | 164 |
| Goodwill | 73 | | 70 |
| Other intangible assets, net | 107 | | 123 |
| Deferred tax assets | 149 | | 113 |
| Total assets | $ 1,456 | | $ 1,412 |
| **Liabilities and Parent's Equity** | | | |
| Current liabilities | | | |
| Accounts payable and accrued liabilities | $ 312 | | $ 332 |
| Deferred revenue | 198 | | 209 |
| Other | 30 | | 43 |
| Total current liabilities | 540 | | 584 |
| Employee benefit obligations | 524 | | 499 |
| Other liabilities | 3 | | 4 |
| Parent's equity | 389 | | 325 |
| Total liabilities and parent's equity | $ 1,456 | | $ 1,412 |

See Notes to Consolidated Financial Statements.

F-21

Table of Contents

**Consolidated Statements of Cash Flows Idearc Inc. and Subsidiaries**

| | Nine Months Ended September 30, | |
| | 2006 | 2005 |
|---|---|---|
| (Unaudited) | (in millions) | |
| **Cash Flows from Operating Activities** | | |
| Net income | $ 673 | $ 788 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization expense | 67 | 68 |
| Employee retirement benefits | 33 | 36 |
| Deferred income taxes | (16) | 10 |
| Provision for uncollectible accounts | 101 | 126 |
| Changes in current assets and liabilities | | |
| Accounts receivable | (60) | (81) |
| Deferred directory costs | 32 | 41 |
| Other current assets | (2) | (1) |
| Accounts payable and accrued liabilities | (49) | (66) |
| Other, net | 15 | 38 |
| Net cash provided by operating activities | 794 | 959 |
| **Cash Flows from Investing Activities** | | |
| Capital expenditures (including capitalized software) | (40) | (52) |
| Acquisition | (16) | — |
| Proceeds from sale of printing assets | 20 | — |
| Other, net | 16 | 18 |
| Net cash used in investing activities | (20) | (34) |
| **Cash Flows from Financing Activities** | | |
| Change in note receivable | (132) | (91) |
| Dividends paid / returns of capital | (642) | (834) |
| Net cash used in financing activities | (774) | (925) |
| Increase (decrease) in cash and cash equivalents | — | — |
| Cash and cash equivalents, beginning of year | — | — |
| Cash and cash equivalents, end of period | $ — | $ — |

See Notes to Consolidated Financial Statements.

F-22

Table of Contents

**Notes to Consolidated Financial Statements Idearc Inc. and Subsidiaries**
**(Unaudited)**

**Note 1**
**Basis of Presentation**

  The accompanying unaudited condensed consolidated financial statements have been prepared based upon Securities and Exchange Commission (SEC) rules that permit reduced disclosure for interim periods. These financial statements reflect all adjustments that are necessary for a fair presentation of results of operations and financial condition for the interim periods shown including normal recurring accruals and other items. The results for the interim periods are not necessarily indicative of results for the full year.

**Note 2**
**Stock-Based Compensation**

  Effective January 1, 2006, the Company adopted SFAS No. 123(R) "Share-Based Payment" utilizing the modified prospective method. SFAS No. 123(R) requires the measurement of stock-based compensation expense based on the fair value of the award on the date of grant. Under the modified prospective method, the provisions of SFAS No. 123(R) apply to all awards granted or modified after the date of adoption. There was no impact to the Company.

  Previously, effective January 1, 2003, the Company adopted the fair value recognition provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" using the prospective method (as permitted under SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure") for all new awards granted, modified or settled after January 1, 2003.

  The Company participates in all employee compensation plans sponsored by Verizon with awards of Verizon common stock.

*Verizon Communications Long Term Incentive Plan*

  The Verizon Communications Long Term Incentive Plan (the "Plan"), effective January 1, 2001, permits the grant of nonqualified stock options, incentive stock options, restricted stock, restricted stock units, performance shares, performance share units and other awards. The maximum number of shares for awards is 200 million.

*Restricted Stock Units*

  The Plan provides for grants of restricted stock units (RSUs) that vest at the end of the third year of the grant. The RSUs are classified as liability awards because the RSUs will be paid in cash upon vesting. The RSU award liability is measured at its fair value at the end of each reporting period and, therefore, will fluctuate based on the performance of Verizon's stock.

  Included in the Company's stock-based compensation expense for the nine months ended September 30, 2006 is a portion of the cost related to restricted stock granted in 2006, 2005 and 2004.

  Changes in the Company's RSUs outstanding for the nine months ended September 30, 2006 were as follows:

| | Restricted Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| | (shares in thousands) | |
| Outstanding restricted stock units at beginning of year | 405 | $ 36.12 |
| Granted | 324 | 31.73 |
| Cancels/Forfeitures | (3) | 35.29 |
| Outstanding restricted stock units at end of period | 726 | $ 33.67 |

F-23

Table of Contents

*Performance Share Units*

The Plan also provides for grants of performance share units (PSUs) that vest at the end of the third year of the grant. The 2006, 2005 and 2004 PSUs will be paid in cash upon vesting. The 2003 PSUs were paid out in February 2006 in Verizon shares.

The target award is determined at the beginning of the period and can increase (to a maximum 200% of the target) or decrease (to zero) based on a key performance measure, Total Shareholder Return (TSR). At the end of the period, the PSU payment is determined by comparing Verizon's TSR to the TSR of a predetermined peer group and the S&P 500 companies. All payments are subject to approval by the Board's Compensation Committee. The PSUs are classified as liability awards because the PSU awards will be paid in cash upon vesting. The PSU award liability is measured at its fair value at the end of each reporting period and, therefore, will fluctuate based on the performance of Verizon's stock as well as Verizon's TSR relative to the peer group's TSR and S&P 500 TSR.

Changes in the Company's PSUs outstanding for the nine months ended September 30, 2006 were as follows:

| | Restricted Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| | (shares in thousands) | |
| Outstanding performance share units at beginning of period | 1,110 | $ 36.84 |
| Granted | 486 | 31.82 |
| Payments | (196) | 38.54 |
| Cancels/Forfeitures | (10) | 37.56 |
| Outstanding performance share units at end of period | 1,390 | $ 34.23 |

As of September 30, 2006, unrecognized compensation expense related to the unvested portion of the Company's RSUs and PSUs was approximately $26 million and is expected to be recognized over a weighted-average period of approximately 2 years.

*Other Stock-Based Compensation Expense*

After-tax compensation expense for other stock based compensation included in net income as reported for nine months ended September 30, 2006 and 2005 was $13 million and $9 million, respectively.

*Stock Options*

The Plan provided for grants of stock options to employees at an option price per share of 100% of the fair market value of Verizon Stock on the date of grant. Each grant has a 10 year life, vesting equally over a three year period, starting at the date of the grant. We have not granted new stock options since 2004.

Included in the Company's stock-based compensation expense for the nine months ended September 30, 2006 is the applicable portion of the cost related to 2003 stock option grants. The stock options granted before 2003 were fully vested as of the beginning of 2005.

Changes in the Company's stock options outstanding for the first nine months of 2006 were as follows:

| | Number of Options | Weighted Average Exercise Price |
|---|---|---|
| | (shares in thousands) | |
| Options outstanding, beginning of year | 13,621 | $ 47.62 |
| Granted | — | — |
| Exercised | (66) | 32.28 |
| Cancelled | (1,260) | 44.53 |
| Options outstanding, end of period | 12,295 | $ 48.03 |
| Options exercisable, end of period | 11,971 | $ 48.26 |

F-24

**Table of Contents**

For the nine months ended September 30, 2006 and 2005 after-tax compensation expense for stock options was $2 million and $3 million, respectively.

As of September 30, 2006, unrecognized compensation expense related to the unvested portion of stock options was approximately $1 million and is expected to be recognized over the next six months.

**Note 3**
**Goodwill and Other Intangible Assets**

*Goodwill*

Changes in the carrying amount of goodwill for the nine months ended September 30, 2006 are as follows:

| (dollars in millions) | |
| --- | --- |
| Balance at December 31, 2005 | $ 70 |
| Acquisitions | 20 |
| Goodwill reclassifications and other | (17) |
| Balance at September 30, 2006 | $ 73 |

*Other Intangible Assets*

The major components of our other intangible assets follows:

| | At September 30, 2006 | | At December 31, 2005 |
| --- | --- | --- | --- |
| | | (in millions) | |
| Internal use software: | | | |
| Gross carrying amount | $ 264 | $ | 292 |
| Less: Accumulated amortization | 157 | | 169 |
| Net book value | $ 107 | $ | 123 |

Internal use software is amortized over a 3 to 7 year period. Amortization expense was $35 million and $34 million for the nine months ended September 30, 2006 and 2005, respectively. This expense is estimated to be $11 million for the remainder of 2006, $39 million in 2007, $27 million in 2008, $16 million in 2009 and $7 million in 2010 for the software capitalized at June 30, 2006.

**Note 4**
**Employee Benefits**

We participate in certain Verizon benefit plans. Verizon maintains noncontributory defined benefit pension plans for substantially all employees. In addition, Verizon maintains postretirement health care and life insurance plans for our retirees and their dependents, which are both contributory and non-contributory and include a limit on the company's share of cost for certain recent and future retirees.

In December 2005, Verizon announced that participants in its management pension plans, including our management employees, will no longer earn pension benefits or earn service towards our retiree medical subsidy after June 30, 2006, after receiving an 18-month enhancement of the value of their pension and retiree medical subsidy. In addition, new management employees hired after December 31, 2005, are not eligible for pension benefits and managers with less than 13.5 years of service as of June 30, 2006, are not eligible for company-subsidized retiree healthcare or retiree life insurance benefits. Beginning July 1, 2006, management employees received an increased company match on their savings plan contributions.

F-25

Table of Contents

*Net Periodic Cost*

The following table summarizes the benefit costs related to our pension and postretirement health care and life insurance plans:

| Nine Months Ended September 30, | Pension | | Health Care and Life | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | | (in millions) | | |
| Net periodic benefit cost | $14 | $ 14 | $ 23 | $ 22 |
| Settlement (gains) | (4) | — | — | — |
| Total Cost | $10 | $ 14 | $ 23 | $ 22 |

During the third quarter, one of Verizon's pension plans' lump sum pension distributions surpassed the settlement threshold equal to the sum of service cost and interest cost requiring settlement recognition for all cash settlements year to date and recorded a $4 million settlement gain.

*Employer Contributions*

During the nine months ended September 30, 2006, we made no contributions to our qualified pension trusts, and contributed $2 million to our nonqualified pension plans and $14 million to our other postretirement benefit plans.

*Severance Benefits*

During the nine months ended September 30, 2006, we paid severance benefits of $8 million. At September 30, 2006, we had a remaining severance liability of $11 million, which includes future contractual payments to employees separated as of September 30, 2006.

## Note 5
## Sale of Printing Assets

*Long-Term Printing Contract with R. R. Donnelley & Sons*

On February 16, 2006, we entered into a nine year printing agreement with R.R. Donnelley & Sons, Inc. (Donnelley). Transition of all printing work was completed in late March 2006. Beginning in the second quarter of 2006, Donnelley printed all of the company's directories. Prior to this arrangement, Donnelley printed approximately 60% of the company's directories and we printed the remaining directories at our own printing plant facilities. By outsourcing all directory printing services to Donnelley, we expect to realize reduced printing and shipping costs over the contract term. Under a separate contract, Donnelley purchased our existing printing plant assets. As a result, we have terminated approximately 250 printing plant employees in the first half of 2006.

## Note 6
## Acquisition

On July 20, 2006 we purchased Inceptor Inc., a provider of search marketing technology, for approximately $16 million. Inceptor was a privately held company with 45 employees. This transaction will help SuperPages.com to further maximize Internet traffic to advertisers who want qualified sales leads. The transaction complements existing search engine marketing products both companies provide. Inceptor earlier this year launched an enhanced version of its BidCenter platform for managing pay-per-click advertising that features specialized functionality designed for interactive advertising agencies and resellers.

F-26

Table of Contents

**Schedule II—Valuation and Qualifying Accounts**

**Idearc Inc.**

For the Years Ended December 31, 2005, 2004 and 2003

| | Balance at Beginning of Period | Additions Charged to Expenses [a] | Deductions [b] (in millions) | Balance at End of Period |
|---|---|---|---|---|
| Allowance for Uncollectible Accounts Receivable: | | | | |
| **Year 2005** | **$ 135** | **218** | **(273)** | **$ 80** |
| Year 2004 | $ 150 | 306 | (321) | $ 135 |
| Year 2003 | $ 171 | 356 | (377) | $ 150 |

(a)   Includes sales allowance (recorded as contra revenue) and bad debt expense.
(b)   Amounts written off as sales adjustments and uncollectibles, net of recoveries.

F-27

# EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | **Case No. 09-31828(BJH)** |
| **IDEARC INC.**, *et al.*, | § § | **(Chapter 11)** |
| Debtors.[1] | § § § | **(Jointly Administered)** |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION
OF IDEARC INC., *ET AL.*, DEBTORS
(AS MODIFIED)**

Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

and

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, Texas  78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

Counsel for Debtors and Debtors-in-Possession

As Modified:  December 21, 2009

---

[1]     The Debtors in these related cases are:  Idearc Inc., Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services-East Inc., Idearc Media Services-West Inc., Idearc Media Sales West Inc., Idearc Media Sales-East LLC, Idearc Media Sales-East Co., License Application Corporation and Second License Application Corporation.

# TABLE OF CONTENTS

Page

1.    RULES OF CONSTRUCTION AND DEFINITIONS ................................................. 1

        1.1    Rules of Construction ......................................................................... 1
        1.2    Definitions ............................................................................................ 2

2.    CLASSIFICATION OF CLAIMS AND INTERESTS ................................................. 12

        2.1    Introduction ........................................................................................ 12
        2.2    Unclassified Claims ........................................................................... 12
        2.3    Classification of Claims and Interests .............................................. 12

3.    TREATMENT OF CLAIMS AND INTERESTS ......................................................... 13

        3.1    Unclassified Claims ........................................................................... 13
        3.2    Unimpaired Classes of Claims and Interests .................................... 14
        3.3    Impaired Voting Classes of Claims .................................................. 14
        3.4    Impaired Nonvoting Classes of Claims and Interests ...................... 15
        3.5    Reservation of Rights Regarding Claims .......................................... 16
        3.6    Impairment Controversies ................................................................. 16

4.    ACCEPTANCE OR REJECTION OF THE PLAN ..................................................... 16

        4.1    Impaired Classes of Claims and Interests Entitled to Vote .............. 16
        4.2    Acceptance by an Impaired Class ...................................................... 16
        4.3    Presumed Acceptances by Unimpaired Classes ............................... 16
        4.4    Classes Deemed to Reject Plan ......................................................... 16
        4.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................. 16
        4.6    Tabulation of Votes on a Non-Consolidated Basis ........................... 17
        4.7    Confirmation of All Cases ................................................................. 17

5.    MEANS FOR IMPLEMENTATION OF THE PLAN .................................................. 17

        5.1    Continued Corporate Existence ......................................................... 17
        5.2    Certificates of Incorporation and By-laws ........................................ 18
        5.3    New Term Loan Agreement ............................................................... 18
        5.4    Cancellation of Old Securities and Agreements ............................... 18
        5.5    Intercompany Claims ......................................................................... 19
        5.6    Authorization and Issuance of the New Common Stock; New Term Loans ....... 19
        5.7    New Equity Incentive Plan; Further Participation in Incentive Plans ............... 21
        5.8    Directors and Officers of Reorganized Debtors ................................ 21
        5.9    Revesting of Assets ............................................................................ 22
        5.10    Restructuring Transactions ............................................................. 22
        5.11    Indemnification of Debtors' Directors, Officers, and Employees ....... 22
        5.12    Preservation of Rights of Action; Resulting Claim Treatment ........... 23
        5.13    Exemption From Certain Transfer Taxes ........................................ 24

i

Page

5.14    Corporate Action ............................................................................................ 24
5.15    Plan Supplement ............................................................................................ 24

6.      TREATMENT OF CONTRACTS AND LEASES ........................................................ 24

6.1     Assumed Contracts and Leases ...................................................................... 24
6.2     Payments Related to Assumption of Contracts and Leases .............................. 25
6.3     Rejected Contracts and Leases ...................................................................... 25
6.4     Compensation and Benefit Programs .............................................................. 26
6.5     Certain Indemnification Obligations ................................................................ 27
6.6     Extension of Time to Assume or Reject ........................................................... 27
6.7     Claims Arising from Assumption or Rejection .................................................. 27

7.      PROVISIONS GOVERNING DISTRIBUTIONS ......................................................... 27

7.1     Distributions for Claims Allowed as of Effective Date ...................................... 27
7.2     Distribution to Holders of Allowed Claims ....................................................... 28
7.3     Calculation of Distribution Amounts of New Common Stock .............................. 28
7.4     Application of Distribution Record Date ........................................................... 29
7.5     Withholding and Reporting Requirements ........................................................ 29
7.6     Setoffs ......................................................................................................... 29
7.7     Allocation of Distributions ............................................................................. 30

8.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
        OF THE PLAN ................................................................................................... 30

8.1     Conditions to Confirmation ............................................................................ 30
8.2     Conditions to Effective Date ........................................................................... 30
8.3     Waiver of Conditions ..................................................................................... 31

9.      RETENTION OF JURISDICTION ........................................................................... 31

9.1     Scope of Retention of Jurisdiction .................................................................. 31
9.2     Failure of the Bankruptcy Court to Exercise Jurisdiction ................................... 33

10.     MISCELLANEOUS PROVISIONS .......................................................................... 33

10.1    Professional Fee Claims and Substantial Contribution Claims ........................... 33
10.2    Dissolution of Creditors Committee ................................................................ 33
10.3    Payment of Statutory Fees ............................................................................. 33
10.4    Successors and Assigns and Binding Effect ..................................................... 33
10.5    Compromises and Settlements ....................................................................... 34
10.6    Releases and Satisfaction of Subordination Rights ........................................... 34
10.7    Releases by Debtors ...................................................................................... 34
10.8    Discharge of the Debtors; Other Releases ....................................................... 35
10.9    Injunction ..................................................................................................... 36
10.10   Exculpation and Limitation of Liability ............................................................ 37
10.11   Term of Injunctions or Stays .......................................................................... 38
10.12   Modifications and Amendments ...................................................................... 38
10.13   Severability of Plan Provisions ....................................................................... 38

App. - 000278

Page

10.14   Revocation, Withdrawal, or Non-Consummation .................................................. 38
10.15   Notices .............................................................................................................. 39
10.16   Computation of Time .......................................................................................... 39

App. - 000279

## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF IDEARC INC., *ET AL.*, DEBTORS

## INTRODUCTION

Idearc Inc., Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services – East Inc., Idearc Media Services – West Inc., Idearc Media Sales – West Inc., Idearc Media Sales – East LLC, Idearc Media Sales – East Co., License Application Corporation, and Second License Application Corporation (collectively, the "Debtors") hereby propose this First Amended Joint Plan of Reorganization (as amended, modified, or supplemented from time to time, the "Plan") for the resolution of their outstanding claims and interests.  Reference is made to the First Amended Disclosure Statement that the Debtors distributed contemporaneously herewith (as amended, modified, or supplemented from time to time, the "Disclosure Statement") for a discussion of the Debtors' history, businesses, assets, results of operations, projections for future operations and risk factors, and a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.  The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code (as defined in Section 1.2 of the Plan).

All holders of claims who are entitled to vote on the Plan are encouraged to read each of the Plan and the Disclosure Statement in its entirety before voting to accept or reject the Plan.  Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined in Section 1.2 of the Plan) and Article 10 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

## 1.   RULES OF CONSTRUCTION AND DEFINITIONS

### 1.1   *Rules of Construction*

(a)   For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms used in the Plan and not otherwise defined in the Plan shall have the meanings ascribed to them in Section 1.2 of the Plan.  Any capitalized term used in the Plan that is not defined in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

(b)   Whenever the context requires, terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

(c)   Any reference in the Plan to (i) a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and (ii) an existing document, exhibit, or other agreement means such document, exhibit or other agreement as it may be amended, modified, or supplemented from time to time.

(d)      Unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan.

(e)      The words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan.

(f)      Captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

(g)      The rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

1.2     *Definitions*

"**Administrative Agent**" means JPMorgan Chase Bank, N.A., in its capacity as the administrative agent under the Credit Agreement.

"**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, and (v) Cure payments for contracts and leases that are assumed under Section 365 of the Bankruptcy Code.

"**Allowed**" means a Claim (i) that is a Filed Claim and as to which either (a) no objection to its allowance has been timely filed, or (b) any objection to its allowance has been settled or withdrawn by the Debtors or has been denied by a Final Order; (ii) that is not Disputed by the Debtors in the Schedules; (iii) that has been listed in the Schedules as Disputed by the Debtors but has been settled, determined, resolved or adjudicated, as the case may be, in the procedural manner in which such Claim would have been settled, determined, resolved or adjudicated if the Chapter 11 Case had not been commenced; (iv) that has been expressly allowed in the Plan; or (v) that has been adjudicated before the Bankruptcy Court and is allowed by a Final Order; *provided, however*, that except as set forth in Sections 10.7, 10.8 and/or 10.10 of this Plan, all Allowed Claims shall remain subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

"**Allowed Rejection Damages Claim Amount**" means an amount no greater than the amount calculated in accordance with Section 502(b)(6) of the Bankruptcy Code.

"**Bankruptcy Code**" means Sections 101 et seq., of title 11 of the United States Code, as now in effect or hereafter amended.

App. - 000281

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Texas or such other court as may have jurisdiction over the Chapter 11 Case or any aspect thereof.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bar Date**" means the last day for holders of Claims to file Claims against the Debtors with the Bankruptcy Court, which date is August 10, 2009, for the filing of general Proofs of Claim and September 26, 2009, for the filing of governmental Proofs of Claim.

"**Business Day**" means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Rule 9006(a) of the Bankruptcy Rules), on which commercial banks are open for business in New York, New York and Dallas, Texas.

"**Cash**" means legal tender of the United States or equivalents thereof.

"**Cash Collateral Order**" means, collectively, the interim order and the final order entered by the Bankruptcy Court on April 1, 2009, and April 29, 2009, respectively, authorizing the Debtors to use the cash collateral of the Lenders and granting adequate protection to the Lenders.

"**Chapter 11 Case**" means the jointly administered cases of the Debtors under Chapter 11 of the Bankruptcy Code.

"**Claim**" means (i) the right to payment against any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"**Claims Agent**" means Kurtzman Carson Consultants LLC.

"**Class**" means a category of holders of Claims or Interests, as described in Article 2 of the Plan.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confirmation**" means confirmation of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

"**Confirmation Date**" means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

"**Confirmation Hearing**" means the hearing to consider Confirmation of the Plan under Section 1128 of the Bankruptcy Code.

3

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

"**Convenience Claim**" means an Allowed General Unsecured Claim, including Allowed Rejection Damages Claims, or Unsecured Note Claim, in respect of which the holder thereof has elected, in its sole discretion, to classify all, but not less than all, of such holder's General Unsecured Claims, including Rejection Damages Claims, or Unsecured Note Claim, as applicable, as one Convenience Claim.

"**Credit Agreement**" means that certain Credit Agreement, dated as of November 17, 2006, by and among the Administrative Agent, Idearc, as borrower, and the Lenders, as the same may have been subsequently modified, amended, or supplemented, together with all collateral and other documents, promissory notes, guarantees, instruments and agreements related thereto.

"**Credit Facility Claim**" means a Claim arising or existing under or related to any of the following indebtedness issued pursuant to, or otherwise collateralized pursuant to, the Credit Agreement, the Swap Agreements or the Guarantee and Collateral Agreement: (i) approximately $6.2 billion in principal amount (after giving effect to the adequate protection payment made pursuant to the Cash Collateral Order) outstanding under the Credit Agreement and (ii) the Swap Obligations.

"**Creditor**" means any Person who holds a Claim against any of the Debtors.

"**Creditors Committee**" means the official committee of unsecured creditors appointed pursuant to Section 1102(a) of the Bankruptcy Code in the Chapter 11 Case on April 14, 2009, as reconstituted from time to time.

"**Cure**" means, with respect to the assumption of a contract or lease pursuant to Section 365(b) of the Bankruptcy Code, (i) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties thereto or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by such parties under a contract or lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law, or (ii) the taking of such other actions as may be agreed upon by such parties or ordered by the Bankruptcy Court.

"**Debtors**" has the meaning set forth in the introductory paragraph of the Plan, and includes such entities in their capacity as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

"**Disbursing Agent**" means Reorganized Idearc or any other Person designated by the Debtors in their sole discretion on or before the Effective Date to serve as disbursing agent under the Plan, or, with respect to the Unsecured Note Claims, the Indenture Trustee or such other Person as the Indenture Trustee designates.

"**Disclosure Statement**" has the meaning set forth in the introductory paragraph of the Plan, as subsequently may be amended, supplemented, or modified from time to time, and

App. - 000283

that is prepared, approved and distributed in accordance with Section 1125 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules.

"**Disputed**" means, with respect to a Claim, (i) if a Proof of Claim bar date for such Claim has been established pursuant to a Final Order, (a) a Claim as to which a Proof of Claim is not timely filed, (b) a Filed Claim as to which the time period set for the Debtors to file an objection to such Claim has not expired, or (c) a Filed Claim as to which the Debtors have timely filed an objection but the Claim has not been settled by the Debtors or determined, resolved, or adjudicated by Final Order; (ii) if a Proof of Claim bar date has not been established for such Claim, a Claim as to which (a) the Debtors dispute their liability in any manner that would have been available to them had the Chapter 11 Case not been commenced, and (b) the liability of the Debtors has not been settled by the Debtors or determined, resolved, or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction; (iii) that has been expressly disputed in the Plan; or (iv) that has been permitted to be adjudicated before the Bankruptcy Court and has not been allowed by a Final Order.

"**Distributable Cash**" means all Cash on hand held by the Debtors on the Effective Date in excess of an amount which shall not be less than $270 million (inclusive of the $120 million to be distributed to Holders of Allowed Claims in Sub-Class 1 of Class 4 pursuant to Article 3.3(b)(1) of the Plan) but which shall be subject to certain adjustments, as may be agreed by the Debtors and the Administrative Agent, to account for normalized levels of accounts payable for the Reorganized Debtors, restructuring-related expenses incurred during the Chapter 11 Case prior to the Effective Date or under the Plan and to be paid after the Effective Date, and estimated tax payments for the 2009 tax year to be made by the Reorganized Debtors after the Effective Date, the initial calculation of which shall be filed in the Plan Supplement.

"**Distribution Date**" means, (i) for any Claim that is an Allowed Claim on the Effective Date, (a) for any portion that was due prior to the Effective Date on or as soon as practicable after the Effective Date but not later than the first Business Day that is 20 days after the Effective Date or (b) for any portion that is due after the Effective Date, at such time as such portion becomes due in the ordinary course of business and/or in accordance with its terms; (ii) for any Claim that is not an Allowed Claim on the Effective Date, the later of (a) the date on which the applicable Debtor becomes legally obligated to pay such Claim; and (b) the date on which the Claim becomes an Allowed Claim; *provided, however,* that a later date may be established by order of the Bankruptcy Court upon motion of the Debtors, the Reorganized Debtors, or any other party.

"**Distribution Record Date**" means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

"**Effective Date**" means the Business Day upon which all conditions to the consummation of the Plan as set forth in <u>Section 8.2</u> of the Plan have been satisfied or waived as provided in <u>Section 8.3</u> of the Plan, and is the date on which the Plan becomes effective.

"**Electing Holder**" means an Eligible Subscriber who has timely executed and delivered a Plan Election.

App. - 000284

"**Eligible Subscriber**" means each holder of an Allowed Class 3 Claim and an Allowed Class 4 Unsecured Note Claim or Allowed Class 4 General Unsecured Claim, but excluding the Standby Purchasers.

"**Employee Programs**" means all of the Debtors' employee benefit programs, plans, policies, and agreements, including, without limitation, (i) all employee welfare benefit plans within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) all employee pension benefit plans within the meaning of Section 3(2) of ERISA, (iii) all employment, bonus, retention, long and short-term incentive, executive transition and other severance, compensation, and other similar agreements, and (iv) all other employee compensation, benefit, and reimbursement programs, plans, policies, and agreements, but excluding any equity incentive plans, equity ownership plans, or any equity-based plans of any kind of the Debtors.

"**ERISA**" means the Employee Retirement Security Act of 1974, as amended.

"**Estate**" means, individually, the estate of each Debtor in the Chapter 11 Case and, collectively, the estates of all Debtors in the Chapter 11 Case, created pursuant to Section 541 of the Bankruptcy Code.

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Filed Claim**" means a Claim for which a Proof of Claim has been (i) timely filed with the Claims Agent prior to the Bar Date, or (ii) filed with the Claims Agent after the Bar Date but deemed to have been filed prior to the Bar Date pursuant to a Final Order of the Bankruptcy Court.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, or the docket of any such other court, the operation or effect of which has not been stayed, reversed, or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

"**General Unsecured Claim**" means an unsecured Claim in respect of which the holder thereof has not elected to have such Claim classified as a Convenience Claim, and that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Unsecured Credit Facility Claim, Unsecured Note Claim or Subordinated Claim. This definition specifically includes, without limitation, any Rejection Damages Claim or any Claim for penalties on, with respect to, or arising in connection with, any Priority Tax Claim or Secured Tax Claim.

"**Guarantee and Collateral Agreement**" means the Guarantee and Collateral Agreement, dated as of November 17, 2006, by and among the Administrative Agent, Idearc and the Subsidiary Debtors parties thereto, as the same may have been subsequently modified,

App. - 000285

amended, or supplemented, together with all collateral and other documents, instruments and agreements related thereto.

"**Idearc**" means Idearc Inc., a Delaware corporation and the ultimate parent corporation of the Subsidiary Debtors.

"**Idearc Interest**" means, collectively, all equity interests in Idearc outstanding prior to the Effective Date, including, without limitation, any preferred stock, common stock, restricted stock, restricted stock units, stock options or any other equity-based award settled in shares or other right to purchase the stock of Idearc (whether or not arising under or in connection with any employment agreement), together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in Idearc prior to the Effective Date.

"**Impaired**" means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Indemnification Obligation**" means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to by-laws, partnership agreements, limited liability company agreements, articles or certificates of incorporation or similar organizational documents or pursuant to contracts or otherwise.

"**Indenture**" means that certain Indenture dated as of November 17, 2006, among Idearc, the Subsidiary Debtors named therein as guarantors and the Indenture Trustee, which Indenture governs all obligations arising under or in connection with the Unsecured Notes.

"**Indenture Trustee**" means U.S. Bank National Association, or its successor, in its capacity as an indenture trustee for the Unsecured Notes.

"**Indenture Trustee Expenses**" means any reasonable, unpaid fees of the Indenture Trustee, and reasonable, unpaid out-of-pocket costs and expenses, including reasonable fees and expenses of counsel, incurred by the Indenture Trustee through the Effective Date, except any such costs and expenses as may be attributable to the Indenture Trustee's negligence or willful misconduct.

"**Interest**" means the legal, equitable, contractual, or other rights of any Person (i) with respect to Idearc Interests, (ii) with respect to Subsidiary Interests, or (iii) to acquire or receive either of the foregoing.

"**Lease Rejection Motion**" means any motion filed by the Debtors in the Bankruptcy Court wherein the Debtors seek to reject certain of their leases of nonresidential real property.

"**Lenders**" means the holders of the Credit Facility Claims; provided, however, that Verizon is not included as a "Lender" for purposes of the Plan.

"**Lien**" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

App. - 000286

"**Litigation Rights**" means the claims, rights of action, suits, or proceedings, including applicable privileges, including the right to object to claims, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, including, without limitation, claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code.

"**Litigation Trust**" means the trust to be established on the Effective Date pursuant to the Litigation Trust Agreement for the sole benefit of certain Class 4 Claims to hold the Litigation Trust Rights.

"**Litigation Trustee**" means the trustee of the Litigation Trust appointed under the Litigation Trust Agreement.

"**Litigation Trust Advisory Committee**" means a three (3) member committee, two (2) of which members shall be appointed by the Creditors Committee, and one (1) of which members shall be appointed by the Administrative Agent, to serve as advisors to the Litigation Trustee as set forth in the Litigation Trust Agreement.

"**Litigation Trust Agreement**" means the agreement to be created pursuant to Section 5.12 of the Plan.

"**Litigation Trust Rights**" means the Litigation Rights of the Debtors and the Debtors' Estates consisting of claims or causes of action, including applicable privileges, (i) arising under or pursuant to Chapter 5 of the Bankruptcy Code, which include, but are not limited to, actions involving setoffs, preferences and fraudulent transfers (except for such claims and causes of action against Persons, other than Verizon, that are designated in writing by the Reorganized Debtors, the pursuit of which by the Litigation Trust, in the reasonable judgment of the Reorganized Debtors, would interfere with the business of the Reorganized Debtors), and (ii) belonging to the Debtors and the Debtors' Estates against the Debtors' officers or directors, but only to the extent that insurance coverage exists for such claims or causes of action and further limited to the proceeds of such insurance coverage.  Unless otherwise released or enjoined by the Plan, compromise approved by the Bankruptcy Court, or other order of the Bankruptcy Court, Litigation Trust Rights shall also include all claims and causes of action of the Debtors and the Estates, including applicable privileges, against Verizon, Houlihan, Lokey, Howard and Zukin Financial Advisors, Inc. and other Persons relating to the spinoff of the Debtors from Verizon, including, without limitation, avoidance causes of action under Bankruptcy Code sections 544, 547, 548, 550 and 551 and claims and causes of action for (a) breach of fiduciary duty, (b) fraud, (c) fraud in the inducement, (d) aiding and abetting a breach of fiduciary duty, (e) illegal dividends, (f) unjust enrichment, and (g) violations of state and federal securities laws or other applicable state or federal law.  Causes of Action against the Debtors' officers and directors shall be limited as set forth in the Plan.

"**New Board**" means the Board of Directors of Reorganized Idearc to be approved pursuant to the Plan to serve as of the Effective Date and identified in the Plan Supplement.

App. - 000287

"**New Common Stock**" means the new common stock of Reorganized Idearc to be authorized and issued under Section 5.6 of the Plan, with terms substantially as set forth in the New Idearc Governing Documents to be included in the Plan Supplement.

"**New Equity Incentive Plan**" means the new equity incentive plan of Reorganized Idearc to be adopted by the New Board pursuant to Section 5.7 of the Plan.

"**New Idearc Governing Documents**" means the certificate of incorporation of Reorganized Idearc, Standby Purchase Agreement, the by-laws of Reorganized Idearc in the form annexed to the Standby Purchase Agreement, and any other governing corporate document with respect to Reorganized Idearc.

"**New Securities**" means, collectively, the New Common Stock and any other securities issued pursuant to the Plan.

"**New Term Loans**" means the senior secured term loans in the original aggregate principal amount of $2.75 billion to be issued to the holders of Secured Credit Facility Claims by Reorganized Idearc, guaranteed by the Reorganized Subsidiaries and collateralized by substantially all the assets (including Cash) of the Reorganized Debtors pursuant to the New Term Loan Agreement.

"**New Term Loan Agreement**" means that certain Term Loan Agreement to be entered into by Reorganized Idearc as borrower as of the Effective Date pursuant to which the New Term Loans will be issued.

"**Old Securities**" mean collectively, the Idearc Interests, the Unsecured Notes, and any other note, bond, or indenture evidencing or creating any public indebtedness or obligation of any Debtor.

"**Other Priority Claim**" means a Claim against any of the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

"**Other Secured Claim**" means a Secured Claim arising prior to the Petition Date against any of the Debtors, other than a Secured Credit Facility Claim.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation created by ERISA to administer the mandatory pension plan termination insurance program established under Title IV of ERISA.

"**Pension Plans**" has the meaning set forth in Section 6.4 of the Plan.

"**Person**" means any person, individual, firm, partnership, corporation, trust, association, company, limited liability company, joint stock company, joint venture, governmental unit, or other entity or enterprise.

"**Petition Date**" means March 31, 2009, the date on which the Debtors filed their petitions for relief commencing the cases that are being administered as the Chapter 11 Case.

App. - 000288

"**Plan**" has the meaning set forth in the introductory paragraph of the Plan and includes all exhibits, as the same may be amended, modified, or supplemented from time to time.

"**Plan Election**" means the exercise of an election by an Eligible Subscriber pursuant to the Plan, which election shall be made solely in each such Eligible Subscriber's discretion, to receive cash in lieu of some or all of the shares of New Common Stock such Eligible Subscriber would otherwise be entitled to receive under the Plan in an amount equal to the value of such shares based on a $260 million equity value or, if the Standby Purchasers elect to increase the price per share payable under the Standby Purchase Agreement, such greater price; provided, that if the number of shares of New Common Stock subject to Plan Elections exceeds the number of shares of New Common Stock equal to 45% of the shares of New Common Stock outstanding as of the Effective Date minus the number of shares of New Common Stock which the Standby Purchasers will receive under the Plan on account of their Claims, then the number of shares of New Common Stock subject to all of the Plan Elections will be reduced pro rata among all Electing Holders; provided further, that in the event of such a pro rata reduction, each Electing Holder shall receive cash for a fewer number of shares than such Electing Holder selected in its Plan Election, and shares of New Common Stock for the balance of the shares selected in such Electing Holder's Plan Election.

"**Plan Supplement**" means the supplement to the Plan containing, without limitation, the forms of the New Idearc Governing Documents, the Reorganized Subsidiary Governing Documents, the Litigation Trust Agreement, the Registration Rights Agreement, the New Term Loan Agreement, the New Equity Incentive Plan and the designation of the New Board.

"**Priority Tax Claim**" means a Claim that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means any professional employed by the Debtors or the Creditors Committee in the Chapter 11 Case by order of the Bankruptcy Court, excluding any of the Debtors' ordinary course professionals.

"**Professional Fee Claim**" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Effective Date.

"**Pro Rata**" means, at any time, the proportion that the amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or Classes, unless the Plan provides otherwise.

"**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court in the Chapter 11 Case.

"**Registration Rights Agreement**" means the Registration Rights Agreement to be entered into by Reorganized Idearc as of the Effective Date.

10

App. - 000289

"**Reinstated**" means (i) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (A) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, or of a kind that Section 365(b)(2) expressly does not require to be cured, (B) reinstating the maturity of such Claim as such maturity existed before such default, (C) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (D) if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(l)(A) of the Bankruptcy Code, compensating the holder of such Claim (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, and (E) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim is entitled; *provided, however*, that any Claim that is Reinstated under the Plan shall be subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

"**Rejection Damages Claim**" means a Claim arising from any Debtor's rejection of a contract or lease, which Claim shall be treated as a General Unsecured Claim and shall be subject to the terms and conditions set forth in the Plan.

"**Reorganized Debtor**" means any reorganized Debtor or its successor on or after the Effective Date.

"**Reorganized Idearc**" means reorganized Idearc and its successors, on and after the Effective Date.

"**Reorganized Subsidiary**" means a reorganized Subsidiary Debtor and its successors on or after the Effective Date.

"**Reorganized Subsidiary Governing Documents**" means articles or certificates of incorporation, by-laws, articles of organization, partnership agreements, operating agreements, and similar governing corporate documents with respect to a Reorganized Subsidiary, as amended or amended and restated pursuant to the Plan.

"**Schedules**" means, collectively, the schedules of assets and liabilities, the list of equity interests, and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

"**Secured Claim**" means a Claim (i) that is secured by a Lien on property in which an Estate has an interest, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a Claim that is subject to a valid right of setoff; (ii) to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff,

App. - 000290

as applicable; (iii) the amount of which is agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim or determined, resolved, or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction; or (iv) that is otherwise designated as a Secured Claim pursuant to this Plan.

"**Secured Credit Facility Claim**" means the aggregate amount of Credit Facility Claims that are Secured Claims which (i) were, as of the Petition Date, $4.0 billion and (ii) for the purposes of this Plan, shall be Allowed in the amount of $3.75 billion (after giving effect to the $250 million adequate protection payment made pursuant to the Cash Collateral Order). Solely for purposes of classification and treatment under this Plan, this definition also includes all Claims, Liens, 507(b) Claims (as defined in the Cash Collateral Order) and other rights that were created under the Cash Collateral Order in favor of the holders of Secured Credit Facility Claims.

"**Secured Tax Claim**" means a Priority Tax Claim that is also a Secured Claim, but is treated like a Priority Tax Claim pursuant to section 1129(a)(9)(D) of the Bankruptcy Code.

"**Standby Purchase Agreement**" means the Standby Purchase Agreement among Idearc and the Standby Purchasers, together with certain related transaction documents, previously approved by order of the Bankruptcy Court, pursuant to which the Standby Purchasers will fund cash to the Debtors in exchange for shares of New Common Stock that would otherwise be distributed to Electing Holders.

"**Standby Purchasers**" means Paulson & Co. Inc. and certain investment funds and accounts managed by Paulson & Co. Inc.

"**Subordinated Claim**" means any Claim against any of the Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which includes any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damages arising from the purchase or sale of an Old Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim.

"**Subsidiary Debtors**" means, collectively, Idearc Information Services LLC, Idearc Media LLC, License Application Corporation, Second License Application Corporation, Idearc Media Sales-East Co., Idearc Media Sales-East LLC, Idearc Media Sales-West Inc., Idearc Media Services-East Inc., and Idearc Media Services-West Inc, each of which is a Debtor in the Chapter 11 Case and a direct or indirect wholly-owned subsidiary of Idearc.

"**Subsidiary Interest**" means, collectively, all of the issued and outstanding shares of stock or membership interests of the Subsidiary Debtors, existing prior to the Effective Date, which stock and interests are owned, directly or indirectly, by Idearc.

"**Substantial Contribution Claim**" means a claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Case pursuant to Sections 503(b)(3), (4), or (5) of the Bankruptcy Code.

App. - 000291

Case 4:09-cv-00283-A   Document 14   Filed 10/27/09   Entered 10/27/09 17:24:52   Page 17 of 52   PageID 2217
Case 09-30823-bjh11   Doc 688   Filed 12/10/09   Entered 12/10/09 13:24:52   Desc

Main Document      Page 17 of 48

"**Swap Agreement**" means any Swap Agreement (as defined in the Credit Agreement) the obligations under which constitute Obligations (as defined in the Guarantee and Collateral Agreement).

"**Swap Obligations**" means the Debtors' obligations for all amounts arising under Swap Agreements that have been terminated by the counter-parties thereto, estimated as of the Petition Date to be approximately $550 million (after giving effect to the adequate protection payment made pursuant to the Cash Collateral Order), and which obligations are secured pursuant to the Guarantee and Collateral Agreement on a *pari passu* basis with the other Credit Facility Claims and deemed indebtedness under the Credit Agreement.

"**Unimpaired**" means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Unsecured Credit Facility Claim**" means the aggregate amount of Credit Facility Claims after deducting the Secured Credit Facility Claim which, for the purposes of the Plan, shall be Allowed in the amount of $3.03 billion.

"**Unsecured Notes**" means the 8% senior unsecured notes in the original principal amount of $2.85 billion due 2016 issued by Idearc pursuant to the Indenture.

"**Unsecured Note Claim**" means any Claim for outstanding principal or accrued but unpaid interest due under the Unsecured Notes, other than any Indenture Trustee Expenses, in respect of which the holder thereof has not elected to have such Claim classified as a Convenience Claim which, for the purposes of the Plan, shall be Allowed in the amount of $2.936 billion.

"**Verizon**" means Verizon Communications Inc., its affiliates, and its current and former officers and directors.

"**Voting Deadline**" means the deadline established by the Bankruptcy Court by which each holder of a Claim in Classes that are entitled to vote on the Plan must submit the ballot indicating each such holder's vote on the Plan.

"**Voting Record Date**" means the date established by the Bankruptcy Court for determining the holders of Claims entitled to vote on the Plan.

## 2.    CLASSIFICATION OF CLAIMS AND INTERESTS

### 2.1    *Introduction*

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  A Claim or Interest may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

13

App. - 000292

2.2    *Unclassified Claims*

In accordance with Section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Secured Tax Claims have not been classified.

2.3    *Classification of Claims and Interests*

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 3 | Secured Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Note Claims, Unsecured Credit Facility Claims and General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote – Any Holder of a General Unsecured Claim or Unsecured Note Claim that Elects Treatment as a Convenience Claim is Deemed to Accept |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Idearc Interests | Impaired | Deemed to Reject |

## 3.    TREATMENT OF CLAIMS AND INTERESTS

3.1    *Unclassified Claims*

(a)    **Administrative Claims**

With respect to each Allowed Administrative Claim, except as otherwise provided for in Section 10.1 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of

14

App. - 000293

business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

(b)    <strong>Priority Tax Claims and Secured Tax Claims</strong>

Each holder of an Allowed Priority Tax Claim or an Allowed Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim or an Allowed Secured Tax Claim, as shall have been determined by the Debtors, (i) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) such different treatment as to which the applicable Debtor and such holder have agreed in writing; *provided*, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date), than the treatment set forth in <u>clause (i)</u> above; or (iii) payment in full in Cash on the later of the Distribution Date or the date on which such Claim becomes an Allowed Claim.

Each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim shall not receive any Cash or other distribution on account of a penalty on, with respect to, or arising in connection with, such Allowed Priority Tax Claims or Allowed Secured Tax Claims. All penalties on, with respect to, or arising in connection with, any Priority Tax Claim or Secured Tax Claim shall be treated as Class 4 General Unsecured Claims.

3.2    *Unimpaired Classes of Claims and Interests*

(a)    <strong>Class 1:  Other Priority Claims</strong>

On, or as soon as reasonably practicable after, the latest of (i) the Distribution Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash on the Effective Date equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided*, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date), than the treatment set forth in <u>clause (A)</u> above.

(b)    <strong>Class 2: Other Secured Claims</strong>

At the election of the Debtors, either (i) the legal, equitable, and contractual rights of each holder of an Other Secured Claim will be Reinstated or (ii) each holder of an Other Secured Claim shall receive treatment so as to render Unimpaired such Other Secured Claim.

3.3    *Impaired Voting Classes of Claims*

(a)    <strong>Class 3:  Secured Credit Facility Claims</strong>

15

Each holder of an Allowed Secured Credit Facility Claim will receive, on the Effective Date and in full discharge of, in exchange for, and on account of such Allowed Secured Credit Facility Claim, its Pro Rata share of: (i) Distributable Cash; (ii) $2.75 billion in principal amount of the New Term Loans, which represents all of the New Term Loans to be issued on the Effective Date; and (iii) shares of New Common Stock representing 85% of the New Common Stock to be issued and outstanding on the Effective Date; provided, that to the extent the holder of an Allowed Secured Credit Facility Claim is an Electing Holder, pursuant to its Plan Election, such Electing Holder shall receive cash in lieu of some or all of such shares of New Common Stock, and the shares of New Common Stock subject to each Electing Holder's Plan Election shall instead be distributed to the Standby Purchasers, in accordance with, and subject to the limitations contained in, the Plan and the Standby Purchase Agreement.

In addition, each holder of an Allowed Secured Credit Facility Claim shall retain any payment received by it pursuant to the Cash Collateral Order.  Any replacement or other Liens created pursuant to the Cash Collateral Order shall terminate and shall have no further force and effect as of the Effective Date.

Notwithstanding the foregoing, if the approximately $2.7 million of letters of credit issued under the Credit Agreement remain undrawn as of the Effective Date, the Debtors will either, with the consent of such issuing bank: (i) cash collateralize such letters of credit in an amount equal to 105% of the undrawn amount of any such letters of credit, (ii) return any such letters of credit to the issuing bank undrawn and marked "cancelled", or (iii) provide a "back to back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 105% of the then undrawn amount of such letters of credit.

(b)    **Class 4:  Unsecured Note Claims, Unsecured Credit Facility Claims and General Unsecured Claims**

(1)  Sub-Class 1.

Each holder of an Allowed Unsecured Note Claim and each holder of an Allowed General Unsecured Claim (to the extent the holder of such General Unsecured Claim has elected treatment under this Sub-Class 1) will receive, on, or as soon as reasonably practicable after, the Effective Date and in full discharge of, in exchange for, and on account of such Allowed Claim, its Pro Rata share of (i) $120 million in Cash; (ii) shares of the New Common Stock representing 15% of the New Common Stock to be issued and outstanding on the Effective Date, provided, that to the extent the holder of an Allowed Unsecured Note Claim or Allowed General Unsecured Claim is an Electing Holder, pursuant to its Plan Election, such Electing Holder shall receive cash in lieu of some or all of such shares of New Common Stock, and the shares of New Common Stock subject to each Electing Holder's Plan Election shall instead be distributed to the Standby Purchasers, in accordance with, and subject to the limitations contained in, the Plan and the Standby Purchase Agreement; and (iii) the first $30 million of distributions, if any, to be made from the Litigation Trust to be established on the Effective Date; provided, that all distributions in excess of $30 million, if any, to be made from the Litigation Trust shall be distributed Pro Rata to all Holders of Allowed Unsecured Credit Facility Claims, Allowed Unsecured Note Claims and Allowed General Unsecured Claims (to

16

the extent the holder of such General Unsecured Claim has elected treatment under this Sub-Class 1) (the "Sub-Class 1 Distribution"). Each holder of an Allowed Unsecured Credit Facility Claim waives its rights to receive its Pro Rata share of the distributions described in clauses (i) and (ii) above and the first $30 million of distributions made pursuant to clause (iii) above on account of such Allowed Unsecured Credit Facility Claim.

(2)    Sub-Class 2.

The Reorganized Debtors shall retain $3 million from the Lenders' share of the Distributable Cash, to be distributed to Holders of Allowed General Unsecured Claims. Each Holder of an Allowed General Unsecured Claim will, on or as soon as reasonably practicable after the Effective Date, receive in Cash an amount equal to the lesser of (i) 25% of such Holder's Allowed General Unsecured Claim and (ii) such Holder's Pro Rata share of $3 million, as determined by the proportion such Holder's Allowed General Unsecured Claim bears to the aggregate amount of all Allowed General Unsecured Claims (the "Sub-Class 2 Distribution"). Any Holder of an Allowed General Unsecured Claim may elect, by so noting on its timely executed and delivered Plan Election, to receive in lieu of its Sub-Class 2 Distribution, its Pro Rata share of the Sub-Class 1 Distribution; provided, that the Pro Rata share of $3 million attributable to all Holders of Allowed General Unsecured Claims that timely elect to receive the Sub-Class 1 Distribution shall be added to the cash component of the Sub-Class 1 Distribution described in clause (b)(1)(i) above and be distributed ratably to all Holders of Allowed Unsecured Note Claims and Allowed General Unsecured Claims that elect to receive the Sub-Class 1 Distribution.

(c)    **Class 5:  Convenience Claims**

Each holder of Allowed General Unsecured Claims or Allowed Unsecured Note Claims may elect, in its sole discretion, to classify all, but not less than all, of such holder's Allowed General Unsecured Claims or Allowed Unsecured Note Claims, as applicable, as one Convenience Claim. Each holder of an Allowed Convenience Claim or Allowed Unsecured Note Claim will receive on, or as soon as reasonably practicable after, the Effective Date and in full discharge of, in exchange for, and on account of all of such holder's Allowed Convenience Claims or Allowed Unsecured Note Claims, as applicable, a single Cash payment equal to 25% of its Allowed Convenience Claim, up to a maximum of $2,500; *provided, however,* that for purposes of the Plan and the distributions to be made hereunder, the aggregate amount of distributions to holders of Convenience Claims will be limited to $2.4 million.

3.4    *Impaired Nonvoting Classes of Claims and Interests*

(a)    **Class 6:  Subordinated Claims**

Under the Plan, Subordinated Claims will not receive or retain any property on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.

(b)    **Class 7:  Idearc Interests**

App. - 000296

All Idearc Interests of any kind shall be cancelled as of the Effective Date and the holders thereof shall not receive or retain any property under the Plan on account of such Interests.

### 3.5 *Reservation of Rights Regarding Claims*

Except as otherwise explicitly provided in the Plan, including, without limitation, Sections 10.7, 10.8 and/or 10.10 hereof, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### 3.6 *Impairment Controversies*

If a controversy arises as to whether any Claim, or any class of Claims, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## 4. ACCEPTANCE OR REJECTION OF THE PLAN

### 4.1 *Impaired Classes of Claims and Interests Entitled to Vote*

Holders of Claims in the Impaired Voting Class of Claims are entitled to vote as a Class to accept or reject the Plan. Accordingly, the votes of holders of Claims in Classes 3 and 4 are entitled to vote with respect to the Plan; *provided, however*, by electing to participate in Class 5, holders of General Unsecured Claims who participate in Class 5 are deemed to have voted to accept the Plan.

### 4.2 *Acceptance by an Impaired Class*

In accordance with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least 2/3 in dollar amount and more than 1/2 in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 4.3 *Presumed Acceptances by Unimpaired Classes*

Claims in Classes 1 and 2 are Unimpaired under the Plan. Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim holders shall not be solicited.

### 4.4 *Classes Deemed to Reject Plan*

Holders of Claims and Interests in Classes 6 and 7 are not entitled to receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

App. - 000297

4.5    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

In view of the deemed rejection of the Plan by Classes 6 and 7, the Debtors request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code. In addition, the Debtors are prepared to request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) with respect to Class 4, if Class 4, voting as a Class, rejects the Plan. The Debtors reserve the right to alter, amend, or modify the Plan, the Plan Supplement, or any exhibit, in accordance with the provisions of the Plan, including, without limitation, <u>Section 10.12</u> of the Plan, as necessary to satisfy the requirements of Section 1129(b) of the Bankruptcy Code.

4.6    *Tabulation of Votes on a Non-Consolidated Basis*

Notwithstanding <u>Section 5.5</u>, the Debtors will tabulate all votes on the Plan on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies Sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor. For each Debtor that satisfies 1129(a)(8) and/or (10) of the Bankruptcy Code, and provided that all other requirements of the Plan are met, the inclusion of such Debtor into a single Estate as set forth in <u>Section 5.5</u> shall be deemed to occur by operation of the Plan. For each Debtor that fails to satisfy either Sections 1129(a)(8) or (10) of the Bankruptcy Code, the inclusion of such Debtor into a single Estate pursuant to the settlement set forth in <u>Section 5.5</u> shall be subject to a determination of the Bankruptcy Court that the settlement satisfies the requirements for approval under Sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, which determination may be made at the Confirmation Hearing. If all Classes of Claims against a Debtor vote to accept the Plan, then the settlement set forth in <u>Section 5.5</u> as to that Debtor shall occur without any evidentiary showing. If one or more, but less than all, Impaired Classes of Claims against a Debtor vote to accept the Plan, then the approval of the settlement set forth in <u>Section 5.5</u> as to that Debtor shall be addressed as part of satisfying the requirements of Section 1129(b) as to that Debtors' rejecting Classes in order to implement the settlement set forth in <u>Section 5.5</u> as to that Debtor. In lieu of obtaining the approval of the settlement of intercompany Claims and related matters as contemplated by <u>Section 5.5</u> with respect to any Debtor, the Debtors reserve the right to modify the Plan to appropriately address the rights of the holders of Allowed Claims against such Debtor.

4.7    *Confirmation of All Cases*

Except as provided in <u>Section 10.14</u>, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

# 5.    MEANS FOR IMPLEMENTATION OF THE PLAN

5.1    *Continued Corporate Existence*

The Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated and pursuant to the New Idearc Governing Documents in the case of Reorganized Idearc, and pursuant to the Reorganized Subsidiary Governing Documents in the case of the Reorganized Subsidiaries.

App. - 000298

5.2    *Certificates of Incorporation and By-laws*

The certificate or articles of incorporation, by-laws, articles of organization, or operating agreement, as applicable, of each Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code; and, as amended, shall constitute the New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents. The New Idearc Governing Documents shall be in the forms annexed to the Standby Purchase Agreement and the Reorganized Subsidiary Governing Documents shall be in substantially the forms of such documents included in the Plan Supplement.

5.3    *New Term Loan Agreement*

On the Effective Date, the New Term Loan Agreement, together with the New Term Loans and guarantees evidencing obligations of the Reorganized Subsidiary Debtors thereunder, and all other security documents, instruments, and agreements to be executed and delivered in connection therewith on the Effective Date, shall become effective. The New Term Loans issued pursuant to the New Term Loan Agreement and all obligations under the New Term Loan Agreement and related documents shall be paid as set forth in the New Term Loan Agreement and such related documents.

5.4    *Cancellation of Old Securities and Agreements*

(a)    On the Effective Date, except as otherwise provided for herein, (i) the Old Securities shall be deemed extinguished, cancelled and of no further force or effect, and (ii) the obligations of the Debtors (and the Reorganized Debtors) under any agreements, indentures, or certificates of designations governing the Old Securities and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor with respect to the Old Securities shall be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person; *provided, however*, that the Unsecured Notes, the Indenture and the Credit Agreement shall continue in effect solely for the purposes of (A) allowing the holders thereof to receive the distributions provided for such Claims hereunder, (B) allowing the Disbursing Agent to make distributions on account of such Claims, (C) preserving the rights of the Indenture Trustee under the Indenture, including without limitation: (i) the Indenture Trustee's rights, if any, to pursue claims or actions against non-Debtors, (ii) the Indenture Trustee's charging lien rights, and (iii) the Indenture Trustee's rights with respect to compensation, reimbursement of expenses (including attorney's fees), and indemnity under the Indenture; provided, however, that except for payment of Indenture Trustee Expenses or as otherwise provided in this Plan, the personal liability of the Debtors under the Indenture shall be discharged on the Effective Date of the Plan pursuant to 11 U.S.C. § 1141; and (D) preserving the Administrative Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Credit Agreement in respect of any claim or cause of action asserted against the Administrative Agent by a Person that is not party to the Credit Agreement; provided, however, that any claim or right to payment

20

on account of such indemnification shall be an unsecured claim and shall not be secured in any of the assets of the Debtors, the Reorganized Debtors or their affiliates.

(b)     Subsequent to the performance by the Indenture Trustee or its agents of any duties that are required under the Plan, the Confirmation Order or under the terms of the Indenture, the Indenture Trustee and its agents shall be relieved of, and released from, all obligations associated with the Unsecured Notes arising under the Indenture or under other applicable agreements or law and the Indenture shall be deemed to be discharged.

5.5     *Intercompany Claims*

In settlement and compromise of certain existing and potential disputes regarding intercompany Claims and related matters, pursuant to Sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan treats the Debtors as comprising a single Estate solely for purposes of voting on the Plan (except as set forth in Section 4.6), confirmation of the Plan and making Distributions under the Plan in respect of Claims against the Debtors. Such settlement and compromise shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities. This settlement and compromise (and the treatment derived therefrom) serves only as a mechanism to effect a fair distribution of value to the Debtors' creditors.

Reorganized Idearc will continue to own 100% of the stock of its subsidiaries, the other Debtors. Therefore, any positive or negative effect from the forgiveness of intercompany Claims, while it may inure to the benefit or detriment of a particular Subsidiary Debtor, would have no net effect on Idearc. Thus, the cancellation of intercompany Claims results in no net positive or negative effect on the holders of unsecured Claims in Class 4 who will receive distributions of Idearc stock in payment of their Claims regardless of which subsidiary is alleged to owe the claim.

Although the Debtors may have rights of setoff associated with intercompany claims, the Debtors have elected to treat these Claims as unsecured for purposes of settlement. As a result of such settlement and compromise, intercompany Claims between and among the Debtors shall, solely for purposes of receiving Distributions under the Plan, be deemed resolved under the Plan and therefore neither entitled to vote on the Plan nor to receive any distributions under the Plan.

Notwithstanding the foregoing, the Debtors may otherwise restructure, in their discretion, intercompany Claims for all other purposes other than for the making of Distributions under the Plan.

5.6     *Authorization and Issuance of the New Common Stock; New Term Loans*

(a)     Reorganized Idearc will, subject to and in compliance with the Plan and the Standby Purchase Agreement, (i) provide for authorization of the New Idearc Governing Documents including, without limitation, the New Common Stock, (ii) issue on the Effective

App. - 000300

Case 09-08842-jbK Doc 688 Filed 11/10/09 Entered 11/10/09 17:24:52 PageID:226

Main Document    Page 26 of 48

Date shares of New Common Stock for distribution to holders of Allowed Secured Credit Facility Claims, which number of shares shall represent 85% of the New Common Stock to be issued and outstanding on the Effective Date; (iii) issue on the Effective Date shares of New Common Stock for distribution to holders of Allowed Unsecured Note Claims and any holder of an Allowed General Unsecured Claim who timely elects to receive in lieu of its Sub-Class 2 Distribution, its Pro Rata share of the Sub-Class 1 Distribution, which number of shares shall represent 15% of the New Common Stock to be issued and outstanding on the Effective Date; and (iv) reserve for issuance shares of New Common Stock (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) for distributions of equity-based awards granted under the New Equity Incentive Plan, which shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date.  A total of approximately 15 million shares of New Common Stock will be issued pursuant to clauses (ii) and (iii) above.

(b)    The New Common Stock issued under the Plan shall be subject to dilution based upon (i) the issuance of New Common Stock and the grant of equity-based awards pursuant to the New Equity Incentive Plan as set forth in Section 5.6 of the Plan, and (ii) any other shares of New Common Stock issued after the Effective Date.

(c)    The Reorganized Debtors will authorize the New Term Loans issued on the Effective Date by Reorganized Idearc and guaranteed by the Reorganized Subsidiaries pursuant to the New Term Loan Agreement.  On the Effective Date, the Reorganized Debtors and Holders of Allowed Secured Credit Facility Claims shall become parties to and bound by the terms of the New Term Loan Agreement, regardless of whether any such party actually executes the New Term Loan Agreement.  The New Term Loans will be in an aggregate principal amount equal to $2.75 billion and will mature on the sixth anniversary of the Effective Date.  The New Term Loans will bear interest at an annual rate of LIBOR (to be defined in the New Term Loan Agreement) plus 800 basis points with a LIBOR floor of 3.0%.  If at any time on or after the first year anniversary of the issuance of the Term Loans, Reorganized Idearc has a fixed charge coverage ratio (to be defined in the New Loan Agreement) of less than 1.25:1.00, then for the remaining term of the New Term Loans Reorganized Idearc will have the option to pay up to 250 basis points of the 800 basis points spread over LIBOR in kind, with the balance payable in cash. The New Term Loans will be guaranteed by all Reorganized Subsidiaries, including the Reorganized Debtors, and will be secured by substantially all of the assets (including Cash) of the Reorganized Debtors.  The New Term Loan Agreement will provide for no mandatory amortization of the New Term Loans, but will provide for an annual cash flow sweep equal to 67.5% of free cash flow.  Reorganized Idearc will have the right to make open market purchases of a certain amount of New Term Loans, subject to terms and conditions that will be set forth in the New Term Loan Agreement.  The Debtors will use reasonable best efforts to obtain ratings on the New Term Loans from two out of the following three ratings agencies: Standard & Poor's, Fitch Ratings or Moody's.  The material terms and conditions of the New Term Loans are set forth in the Disclosure Statement.  The form of the New Term Loan Agreement will be filed with the Plan Supplement.

(d)    The issuance and distribution of the New Securities pursuant to the Plan shall be authorized and entitled to the protections under Section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by

22

App. - 000301

the New Idearc Governing Documents; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

(e)     It is intended that Reorganized Idearc will be subject to periodic filing requirements pursuant to the Exchange Act. Pursuant to Rule 12g-3(a) of the Exchange Act, the New Common Stock will be deemed registered under Section 12(g) of the Exchange Act. Reorganized Idearc will file with the SEC a Form 8-A to register the New Common Stock under Section 12(b) of the Exchange Act in connection with its application to list the New Common Stock for trading on NASDAQ as of the Effective Date.

(f)     Reorganized Idearc will enter into the Registration Rights Agreement, in the form annexed to the Standby Purchase Agreement, for the benefit of the Standby Purchasers and any other creditor to be issued 5% or more of the New Common Stock as of the Effective Date. On the Effective Date, the Reorganized Debtors and all such creditors shall become parties to and bound by the terms of the Registration Rights Agreement, regardless of whether any such party actually executes the Registration Rights Agreement.

5.7     *New Equity Incentive Plan; Further Participation in Incentive Plans*

(a)     On the Effective Date, Reorganized Idearc shall be authorized and directed to establish and implement the New Equity Incentive Plan as of the Effective Date. Awards granted thereunder may be in the form of stock options, stock appreciation rights, restricted stock, and other forms of equity-based awards. The New Equity Incentive Plan shall be promulgated by the New Board for the benefit of such members of management, employees, and directors of the Reorganized Debtors as are designated by the New Board, or a committee designated by the New Board, in its sole and absolute discretion, on such terms as to timing of issuance, manner and timing of vesting, duration, individual entitlement and all other terms, as such terms are determined by the New Board in its sole and absolute discretion. The New Equity Incentive Plan may be amended or modified from time to time by the New Board. All decisions as to entitlement to participate after the Effective Date in any equity or equity-based plans shall be within the sole and absolute discretion of the New Board or a committee designated by the New Board. Reorganized Idearc will reserve shares of New Common Stock (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) for distributions of equity incentive awards to be granted under the New Equity Incentive Plan, which number of shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date.

(b)     Any pre-existing understandings, either oral or written, between the Debtors and any current or former member of management, any employee, or any other Person as to entitlement to (i) any pre-existing equity or equity-based awards or (ii) participate in any pre-existing equity incentive plan, equity ownership plan or any other equity-based plan shall be null and void as of the Effective Date and shall not be binding on Reorganized Idearc on or following the Effective Date.

5.8     *Directors and Officers of Reorganized Debtors*

(a)     The New Board shall consist of not less than seven (7) individuals, and except as set forth below, all of whom (including the chairman of the New Board) shall be designated by representatives of the holders of the Allowed Secured Credit Facility Claims. To the extent set forth in the Standby Purchase Agreement, the Standby Purchasers may also have the right to designate an additional member to the New Board. The chief executive officer of Reorganized Idearc will also be a member of the New Board. The New Board and committees of the New Board must satisfy the independence, financial literacy, and other requirements of applicable law and any securities exchange upon which the New Common Stock is listed. The election of the New Board shall be approved by the Bankruptcy Court in the Confirmation Order. Thereafter, the New Board shall be elected in accordance with the New Idearc Governing Documents.

(b)     The New Board shall appoint the directors of the Reorganized Subsidiaries to serve in their respective capacities after the Effective Date until replaced or removed in accordance with the Reorganized Subsidiary Governing Documents.

(c)     The officers of Idearc shall continue to serve in their same respective capacities after the Effective Date. The officers of the Reorganized Subsidiaries shall continue to serve in their same respective capacities after the Effective Date.

5.9     *Revesting of Assets*

Except as otherwise provided herein, the property of each Debtor's Estate shall revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Claims and Interests.

5.10    *Restructuring Transactions*

After the Effective Date, with the consent of its Board of Directors or other applicable governing body, each of the Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of their respective businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtors, to achieve corporate or operational efficiencies, or to otherwise improve financial results; *provided, however*, that such transactions or actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan, or the New Term Loan Agreement. Such transactions or actions may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate.

App. - 000303

5.11   *Indemnification of Debtors' Directors, Officers, and Employees*

Upon the Effective Date, the New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents shall contain provisions that, to the fullest extent permitted by applicable law, (i) eliminate the personal liability of the Debtors' directors, officers, and key employees serving before, on, and after the Petition Date and the Reorganized Debtors' directors, officers, and key employees serving on and after the Effective Date for monetary damages; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify those of the Debtors' directors, officers, and key employees serving prior to, on, and/or after the Petition Date, and the Reorganized Debtors' directors, officers, and key employees serving on and after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

5.12   *Preservation of Rights of Action; Resulting Claim Treatment*

Except for the Litigation Trust Rights and as otherwise provided in the Plan, the Confirmation Order, or the Plan Supplement, and in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor shall retain all of its Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person. Each Debtor or Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Litigation Rights.

On the Effective Date, the Debtors and the Estates shall preserve and transfer to the Litigation Trust the Litigation Trust Rights, with good, clean title to such property, free and clear of all liens, charges, Claims, encumbrances and interests, to be pursued by the Litigation Trustee for the benefit of holders of Allowed Unsecured Note Claims, Allowed Unsecured Credit Facility Claims and Allowed General Unsecured Claims (to the extent the holders of such Allowed General Unsecured Claims have elected treatment under Sub-Class 1 of Class 4 of the Plan) as provided in the Plan and Litigation Trust Agreement. The Litigation Trust will be established for the sole purpose of prosecuting the Litigation Trust Rights and distributing the proceeds thereof in accordance with the Plan and the Litigation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business.

The Litigation Trust shall be administered by the Litigation Trustee who shall be identified prior to the conclusion of the Confirmation Hearing. The appointment of the initial Litigation Trustee and the terms of its compensation shall be subject to the approval of the Bankruptcy Court.

Upon creation of the Litigation Trust, holders of Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Creditors (to the extent the holders of such General Unsecured Claims have elected the treatment under Sub-Class 1 of Class 4) in Class 4 will become the beneficiaries of the Litigation Trust as their respective interests may appear. The Litigation Trustee may make interim distributions to beneficiaries of the Litigation Trust in the exercise of its reasonable business judgment. Upon the settlement, conclusion of litigation and collection of all of the claims in the Litigation Trust, after the payment of all costs and expenses of collection, the Litigation Trustee must distribute the corpus of the Litigation Trust Pro Rata to the beneficiaries of the Litigation Trust.

App. - 000304

The Litigation Trustee appointed pursuant to the Litigation Trust Agreement will, subject to the terms of the Litigation Trust Agreement, have full power, authority, and standing to prosecute, compromise, or otherwise resolve the Litigation Trust Rights. The Reorganized Debtors will not be subject to any counterclaims with respect to the Litigation Trust Rights.

As soon as practicable after the Effective Date, the Reorganized Debtors shall transfer to the Litigation Trust $2,500,000 to pay certain of the expenses of the members of the Litigation Trust Advisory Committee and certain of the fees and expenses of the Litigation Trustee and its professionals for administering the Litigation Trust and prosecuting Litigation Trust Rights in the Litigation Trust in accordance with the Plan. The Litigation Trustee may be able to supplement this initial funding through settlement payments and the collection of judgments, by borrowing funds to finance litigation, or by retaining contingent fee counsel.

All objections to claims shall be brought no later than 180 days after the Effective Date. For avoidance of doubt, the Litigation Trust is a party in interest with respect to all objections to General Unsecured Claims (to the extent the holders of such General Unsecured Claims have elected treatment under Sub-Class 1 of Class 4 of the Plan) and all compromises of claim objections. The Reorganized Debtors shall prosecute in good faith all objections to claims that constitute Litigation Rights at the expense of the Reorganized Debtors. The Reorganized Debtors shall give reasonable notice to the Litigation Trust of all claim objections filed by the Reorganized Debtors. Following the 90th day after the Effective Date (or with respect to a particular claim, upon such earlier date that the Reorganized Debtors advise the Litigation Trust that they do not intend to prosecute an objection to such claim), (i) the Litigation Trust, at its sole expense, shall have the right to prosecute in good faith any claim objection to any General Unsecured Claim (to the extent the holder of such General Unsecured Claim has elected treatment under Sub-Class 1 of Class 4 of the Plan) that has not been prosecuted by the Reorganized Debtors and (ii) any other affected party in interest may object to and shall have standing to object to any General Unsecured Claim. Upon the request of the Litigation Trust and with reasonable notice, the Reorganized Debtors shall consult with the Litigation Trustee and the Litigation Trust Advisory Committee regarding objections to General Unsecured Claims (to the extent the holders of such General Unsecured Claims have elected treatment under Sub-Class 1 of Class 4 of the Plan), provide the Litigation Trustee and the Litigation Trust Advisory Committee with all reasonably requested information regarding objections to such Claims, and the Reorganized Debtors shall not compromise or settle a Claim without giving reasonable notice to the Litigation Trustee. Neither the Litigation Trust nor the Litigation Trustee shall be required, or have any obligation, to object to any General Unsecured Claim if the holder of such General Unsecured Claim has not elected treatment under Sub-Class 1 of Class 4 of the Plan.

5.13    *Exemption From Certain Transfer Taxes*

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by a Debtor or a Reorganized Debtor to secure the New Term Loans, shall not be taxed under any law imposing a stamp tax, real estate transfer tax, sales or use tax, or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

App. - 000305

5.14    *Corporate Action*

On the Effective Date, the adoption and filing of the New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents and all actions contemplated by the Plan shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders of the Debtors or Reorganized Debtors.  On the Effective Date, the appropriate chief executive officer, president, chief financial officer, general counsel, or any other appropriate officer or director of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan, or as may be appropriate to effectuate or further evidence the transactions contemplated by the Plan, in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations, or consents except for express consents required under the Plan.  Any secretary or assistant secretary of Reorganized Idearc, or any applicable Reorganized Subsidiary, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

5.15    *Plan Supplement*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least ten Business Days prior to the Voting Deadline.  Upon such filing, all documents included in the Plan Supplement may be inspected via the Bankruptcy Court's electronic filing system at https://ecf.txnb.uscourts.gov or at www.kccllc.net/idearc.  Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors in accordance with Section 10.15 of the Plan.  The Debtors reserve the right to alter, amend, or modify the Plan Supplement at any time prior to the Effective Date.

## 6.    TREATMENT OF CONTRACTS AND LEASES

6.1    *Assumed Contracts and Leases*

(a)    Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Supplement, as of the Effective Date, (i) any contract or lease to which a Debtor is a party as of the Petition Date shall be deemed to be and treated as though it is an executory contract or unexpired lease, as applicable, subject to Section 365 of the Bankruptcy Code; and (ii) each Debtor shall be deemed to have assumed such contracts and leases to which it is a party unless such contract or lease (w) was previously assumed or rejected upon motion by a Final Order, including, without limitation, the Final Order entered granting any Lease Rejection Motion, (x) previously expired or terminated pursuant to its own terms, (y) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date; or (z) is listed on Exhibit B to the Disclosure Statement or any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of the Confirmation Order, all of which will be rejected, as of the Effective Date, pursuant to the terms of the Plan.  The Confirmation Order shall constitute an order of the Bankruptcy Court

App. - 000306

under Section 365(a) of the Bankruptcy Code approving the contract and lease assumptions described above, as of the Effective Date.

(b)     Each contract and lease that is assumed shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease and (ii) all contracts or leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

6.2     *Payments Related to Assumption of Contracts and Leases*

Any monetary amounts by which each contract and lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(l) of the Bankruptcy Code, by payment of the Cure amount. **The Debtors' proposed Cure amounts can be found (i) via the Internet at** http://www.kccllc.net/Idearc/cureamounts**, or (ii) by writing to Idearc, c/o Kurtzman Carson Consultants LLC, 2355 Alaska Avenue, El Segundo, California 90245, by calling (866) 967-0670, or by emailing** idearcinfo@kccllc.com**.**

If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption; *provided, however,* that the Reorganized Debtors shall be authorized to reject any contract or lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order, renders assumption of such contract or lease unfavorable to the Reorganized Debtors.  In the event the Reorganized Debtors so reject any previously assumed contract or lease, and such rejection gives rise to a Rejection Damages Claim, such Rejection Damages Claim arising out of such rejection shall be limited to the Allowed Rejection Damage Claim Amount.

6.3     *Rejected Contracts and Leases*

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease.  Any contracts or leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors. As of the Effective Date, the Debtors will reject the executory contracts and unexpired leases set forth on Exhibit B to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" filed by the Debtors with the Bankruptcy Court before the entry of the Confirmation Order.

App. - 000307

6.4   *Compensation and Benefit Programs*

(a)   Except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all Employee Programs in effect before the Effective Date, shall be deemed to be, and shall be treated as though they are, contracts that are assumed under the Plan.  Nothing contained herein shall be deemed to modify the existing terms of Employee Programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder; *provided, however,* (i) the Employee Programs shall be assumed as modified so as to remove the provisions of Idearc's tax-qualified defined contribution plan pertaining to equity interests in Idearc, and (ii) to the extent any change of control provision contained in any Employee Program would be triggered solely as a result of the transactions required for the Plan to become effective, such agreements will not be assumed unless a waiver of the change of control provision is executed by the employee having the benefit of such change of control provision, which waiver will waive any change of control that might otherwise be triggered solely as a result of the transactions required for the Plan to become effective, but will provide that any such change of control provisions will otherwise remain in full force and effect, and therefore may be triggered as a result of any transactions that occur after the Effective Date.

(b)   As of the Effective Date, any and all equity incentive plans, equity ownership plans, or any other equity-based plans entered into before the Effective Date, including Claims arising from any change of control provision therein, shall be deemed to be, and shall be treated as though they are, contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order.  Any Claims resulting from such rejection shall constitute Idearc Interests and shall be treated in accordance with Section 3.4(b) of the Plan.  For the avoidance of doubt, in no event shall this Section 6.4(b) be held to impair any Employee Program.

(c)   The Debtors and the Reorganized Debtors, as the case may be, will continue to be the contributing sponsors of the Idearc Pension Plan for Management Employees and the Idearc Pension Plan for Collectively Bargained Employees (the "Pension Plans") as defined in section 3(35) of ERISA.  The Confirmation Order will provide that (i) the Pension Plans are subject to the minimum funding requirements of ERISA and the Code, (ii) no provision of the Plan of Reorganization, the Confirmation Order or section 1141 of the Bankruptcy Code shall, or shall be construed to, discharge, release or relieve the Debtors or any other party from any liability with respect to the Pension Plans under ERISA or the Code, and (iii) that neither the PBGC nor the Pension Plans will be enjoined from enforcing such liability as a result of any provisions in the Plan of Reorganization or the Confirmation Order for satisfaction, release or discharge of Claims.

6.5   *Certain Indemnification Obligations*

Indemnification Obligations owed to those of the Debtors' directors, officers, and employees serving prior to, on, and after the Petition Date shall be deemed to be, and shall be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy

29

App. - 000308

Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) shall survive the Effective Date of the Plan and remain unaffected by the Plan, irrespective of whether obligations are owed in connection with an occurrence prior to or after the Petition Date.

### 6.6    *Extension of Time to Assume or Reject*

**Notwithstanding anything set forth in <u>Article 6</u> of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is 30 days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.   The deemed assumption provided for in <u>Section 6.1(a)</u> of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.**

### 6.7    *Claims Arising from Assumption or Rejection*

(a)    **Except as otherwise provided in the Plan or by Final Order of the Bankruptcy Court, all (i) Allowed Claims arising from the assumption of any contract or lease shall be treated as Administrative Claims pursuant to <u>Section 3.1(a)</u> of the Plan; and (ii) Allowed Rejection Damages Claims shall be treated as General Unsecured Claims pursuant to and in accordance with the terms of <u>Section 3.3(b)</u> of the Plan.**

(b)    **If the rejection by a Debtor, pursuant to the Plan or otherwise, of a contract or lease results in a Rejection Damages Claim, then such Rejection Damages Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the Claims Agent and served upon counsel to the Reorganized Debtors on or prior to the later of (i) 30 days after entry of the order authorizing the rejection of such contract or lease and (ii) 15 days after the date designated as the rejection date in the order authorizing the rejection of such contract or lease.  The Debtors reserve their rights to object to any Rejection Damages Claim.**

## 7.    PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1    *Distributions for Claims Allowed as of Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date.  The Reorganized Debtors shall have the right, in their discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

### 7.2    *Distribution to Holders of Allowed Claims*

(a)    **Except with respect to the Unsecured Note Claims, Unsecured Credit Facility Claims and Secured Credit Facility Claims** and unless otherwise agreed to between the

App. - 000309

Debtors and the holder of an Allowed Claim, the Debtors shall make initial and interim distributions to the holders of Allowed Claims in the same manner and to the same addresses as such payments are made in the ordinary course of the Debtors' businesses.

(b)      No distributions shall be made on Disputed Claims until and unless such Disputed Claim becomes an Allowed Claim.

(c)      In order to permit initial and interim distributions under the Plan, the Debtors or the Reorganized Debtors shall establish reasonable reserves for Disputed Claims; provided that the Debtors or the Reorganized Debtors, as applicable, shall not be required to reserve for any duplicative Secured Credit Facility Claims, Unsecured Credit Facility Claims or Unsecured Note Claims.

(d)      On the Effective Date, distributions to (i) holders of Allowed Unsecured Note Claims shall be delivered to the Indenture Trustee or, if directed by the Indenture Trustee, will be delivered to the Disbursing Agent for distribution to such holders, and (ii) holders of Allowed Secured Credit Facility Claims and Unsecured Credit Facility Claims shall be delivered to the Administrative Agent or, if directed by the Administrative Agent, will be delivered to the Disbursing Agent for distribution to such holders.

(e)      On or before the Effective Date, the Debtors shall designate the Person (whether Reorganized Idearc or an independent third party) to serve as the Disbursing Agent under the Plan on mutually agreeable terms and conditions.  If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized Idearc.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

7.3     *Calculation of Distribution Amounts of New Common Stock*

No fractional shares of New Common Stock shall be issued or distributed under the Plan.  Each Person entitled to receive New Common Stock shall receive the total number of whole shares of New Common Stock to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Common Stock, the actual distribution of shares of such stock shall be rounded to the next higher or lower whole number as follows: (a) fractions 1/2 or greater shall be rounded to the next higher whole number and (b) fractions of less than 1/2 shall be rounded to the next lower whole number.  Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving zero shares of New Common Stock, such Person shall receive one share of New Common Stock.

7.4     *Application of Distribution Record Date*

At the close of business on the Distribution Record Date, the transfer ledgers for the Unsecured Notes, the indebtedness under the Credit Agreement and the obligations under the Swap Agreements shall be closed, and there shall be no further changes in the record holders of

such indebtedness. The Reorganized Debtors, the Disbursing Agent, the Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Unsecured Notes, indebtedness under the Credit Agreement or Swap Agreements occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

7.5    *Withholding and Reporting Requirements*

In connection with the Plan and all distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any such withholding tax obligations imposed on the Disbursing Agent by any governmental unit, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has either made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations, or timely provided the Disbursing Agent with either an IRS Form W-9 or an applicable IRS Form W-8 certifying that such holder is not subject to U.S. Federal withholding tax with respect to such distribution. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Indenture Trustee or the Disbursing Agent, as the case may be, until such time as the Disbursing Agent is satisfied with the holder's arrangements for any withholding tax obligations.

7.6    *Setoffs*

Except for any Claim that is expressly Allowed under the Plan, the Reorganized Debtors may, but shall not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder.

7.7    *Allocation of Distributions*

All distributions received under the Plan by holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued but unpaid interest, if any, with respect to such Claim.

App. - 000311

## 8.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

8.1    *Conditions to Confirmation*

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with <u>Section 8.3</u> of the Plan:

(a)    an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered;

(b)    the Bankruptcy Court shall have entered an Order, which may be the Confirmation Order, in both the Chapter 11 Case and the applicable adversary proceeding, approving the settlement of the adversary proceeding styled *The Official Committee of Unsecured Creditors, on behalf of Idearc Inc., Plaintiff, v. JPMorgan Chase Bank, N.A., as Administrative Agent for the Lenders* (Adversary No. 09-03248) (BJH) and related litigation described in the *Joint Motion of Official Committee of Unsecured Creditors, Debtors, JPMorgan Chase Bank, N.A., as Agent, and Certain MatlinPatterson Entities, Pursuant to Sections 105(a), 1128 and 1129 of the Bankruptcy Code and Fed. R. Bankr. P. 9019(a), for an Order Approving Global Settlement in Support of Plan of Reorganization*; and

(c)    the proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Administrative Agent and the Creditors Committee.

8.2    *Conditions to Effective Date*

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with <u>Section 8.3</u> of the Plan:

(a)    the Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Debtors, the Administrative Agent and the Creditors Committee, and shall, among other things:

(i)    provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including without limitation, to enter into, implement, and perform under the contracts, instruments,  and other agreements or documents created in connection with the Plan;

(ii)    execute the New Term Loan Agreement;

(iii)    authorize the issuance of the New Securities pursuant to Section 1145 of the Bankruptcy Code; and

(iv)    provide that, notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

(b)    the Confirmation Order shall not then be stayed, vacated, or reversed;

App. - 000312

(c)    the New Idearc Governing Documents, the Reorganized Subsidiary Governing Documents and the New Term Loan Agreement shall be in form and substance reasonably satisfactory to the Debtors, the Administration Agent and the Creditors Committee, and, to the extent any of such documents contemplates execution by one or more Persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived;

(d)    all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained; and

(e)    all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

8.3    *Waiver of Conditions*

Each of the conditions set forth in <u>Sections 8.1</u> and <u>8.2</u> of the Plan, with the express exception of the conditions contained in <u>Section 8.1(a)</u> and <u>Sections 8.2(a)(i)</u>, <u>(ii)</u>, and <u>(iii)</u>, and (b), may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however,* that such waiver will not be effective without the consent of the Administrative Agent and the Creditors Committee, which consent shall not be unreasonably withheld or delayed.

## 9.    RETENTION OF JURISDICTION

9.1    *Scope of Retention of Jurisdiction*

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

(a)    with respect to Filed Claims or to the extent necessary with respect to other Claims, allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    hear and determine all applications for Professional Fees and Substantial Contribution Claims; *provided, however*, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)    hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtor is a party or with respect to

App. - 000313

which a Debtor may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

      (d)      effectuate performance of and payments under the provisions of the Plan;

      (e)      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case or the Litigation Rights;

      (f)      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and execute and implement all contracts, instruments and other agreements or documents created in connection with the Plan or the Confirmation Order;

      (g)      hear and determine any disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided, however*, that any dispute arising under or in connection with the New Term Loan Agreement shall be dealt with in accordance with the provisions thereof;

      (h)      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

      (i)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

      (j)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

      (k)      hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

      (l)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

      (m)      except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

      (n)      hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

      (o)      hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

App. - 000314

(p)    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(q)    enter a final decree closing the Chapter 11 Case.

9.2    *Failure of the Bankruptcy Court to Exercise Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in <u>Section 9.1</u> of the Plan, the provisions of this <u>Article 9</u> shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## 10.    MISCELLANEOUS PROVISIONS

10.1    *Professional Fee Claims and Substantial Contribution Claims*

All final requests for payment of Professional Fee Claims and any Substantial Contribution Claims must be filed and served on the Reorganized Debtors, their counsel, counsel to the Administrative Agent and other necessary parties in interest no later than 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such requests for payment must be filed and served on the Reorganized Debtors, their counsel, counsel to the Administrative Agent, other necessary parties in interest and the requesting Professional or other entity no later than 20 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

10.2    *Dissolution of Creditors Committee*

The Creditors Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Section 1103 of the Bankruptcy Code. On the Effective Date, the Creditors Committee shall be dissolved, the Creditors Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Creditors Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (a) all Professional Fee Claims, (b) any Substantial Contribution Claims, and (c) any appeals of the Confirmation Order.

10.3    *Payment of Statutory Fees*

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Reorganized Debtors. The obligation of each of the Reorganized Debtors to pay quarterly fees to the Office of the United States Trustee pursuant to Section 1930 of Title 28 of the United States Code shall continue until such time as a particular Chapter 11 Case is closed, dismissed or converted.

App. - 000315

10.4    *Successors and Assigns and Binding Effect*

   The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person, including, without limitation, the Reorganized Debtors and all other parties in interest in the Chapter 11 Case.

10.5    *Compromises and Settlements*

   From and after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and/or Litigation Rights (other than Litigation Trust Rights) and other claims that they may have against other Persons without any further approval by the Bankruptcy Court.  Until the Effective Date, the Debtors expressly reserve the right to compromise and settle Claims against them and Litigation Rights (other than Litigation Trust Rights) or other claims that they may have against other Persons, subject to the approval of the Bankruptcy Court if, and to the extent, required.

10.6    *Releases and Satisfaction of Subordination Rights*

   All Claims against the Debtors and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any claimed subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in <u>Article 3</u> of the Plan.  Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claimed subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors reserve all rights to equitably subordinate any Claim against the Debtors to other Claims against the Debtors, and the Litigation Trust reserves all rights to equitably subordinate any Claim against the Debtors in Sub-Class 1 of Class 4 to other Claims against the Debtors in Sub-Class 1 of Class 4; provided, however, nothing shall permit the Debtors or the Litigation Trust to subordinate any Allowed Unsecured Note Claims (other than claims held by Verizon or subject to §510(b) of the Bankruptcy Code), or any Allowed Credit Facility Claim (other than claims held by Verizon).

10.7    *Releases by Debtors*

   **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Debtors or the Debtors' Estates, including, without limitation, any successor to the Debtors or the Debtors' Estates or any Estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code ("<u>Estate Representative</u>"), shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any fraudulent transfer or other claims related to the spin-off of the Debtors from Verizon), and liabilities whatsoever, including for negligence, but excluding for willful misconduct, or gross negligence, in connection with or related to the**

App. - 000316

Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors, the Reorganized Debtors or any Estate Representative to enforce the Plan and the contracts, instruments, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtors, the Estates, the Reorganized Debtors, or any Person seeking to exercise the rights of the Debtors or the Debtors' Estates, including, without limitation, an Estate Representative, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, the Reorganized Debtors or any Person seeking to exercise the rights of the Debtors or the Debtors' Estates, including, without limitation, an Estate Representative, against (i) any of the other Debtors and any of the Debtors' non-Debtor subsidiaries, (ii) any of the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case (but only to the extent in excess of insurance coverage), (iii) any current Professionals of the Debtors (including, without limitation, current financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their successors and assigns), (iv) the Administrative Agent, the Lenders (except the current or former officers and directors of the Debtors as holders of Credit Facility Claims, but subject to the release granted in clause (ii) above) and their respective professionals (including, without limitation, financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their respective successors and assigns), (v) the members (but not in their individual capacities) and Professionals of the Creditors Committee, (vi) the Holders of Unsecured Note Claims (except the current and former officers and directors of the Debtors as holders of such claims, but subject to the release granted in clause (ii) above), (vii) the Indenture Trustee and its respective professionals (including, without limitation, financial advisors, attorneys, investment bankers, accountants, consultants or other professionals, agents and their respective successors and assigns), and (viii) with respect to each of the above-named Persons, such Person's principals, employees, agents, affiliates, current and former officers and directors (but, in the case of current and former officers and directors of any of the Debtors or any of the Debtors' non-Debtor subsidiaries, only to the extent in excess of insurance coverage); *provided, however*, that nothing in this <u>Section 10.7</u> shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, noncompete or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors. Notwithstanding anything contained herein, the Plan does not release the claims of any Person against Verizon or Houlihan, Lokey, Howard and Zukin Financial Advisors, Inc.

10.8    *Discharge of the Debtors; Other Releases*

(a)    Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for a complete discharge of all Claims of any nature whatsoever against the Debtors, or any of their assets or properties and,

App. - 000317

regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, and upon the Effective Date the Debtors, and each of them, shall be deemed discharged under Section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan.

(b)     As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Idearc Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

(c)     As of the Effective Date, each holder of a Claim that affirmatively checks the box on their ballot titled "Third-Party Release Pursuant to Plan" will forever release, waive and discharge all Claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the Reorganized Debtors, the officers, directors and employees of the Debtors who were either serving in such capacities as of the Confirmation Date, or who had served in such capacities during the Chapter 11 Case, the officers, directors and employees of the Reorganized Debtors serving in such capacity after the Effective Date, the Administrative Agent and the Lenders and, with respect to each of the above-named Persons, such Person's principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Case, the Plan or the Reorganized Debtors (other than the rights under the Plan and the contracts, instruments and other agreements or documents delivered or to be delivered under the Plan) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Case, the Plan or the Reorganized Debtors.  Notwithstanding anything contained herein, the Plan does not release the claims of any Person against Verizon or Houlihan, Lokey, Howard and Zukin Financial Advisors, Inc.

App. - 000318

(d)     Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, neither the Plan nor the Confirmation Order will release, discharge or exculpate the Debtors, the Reorganized Debtors or any third party from any debt owed to the Pension Plans or the PBGC under ERISA or the Code or enjoin or prevent the Pension Plans and the PBGC from collecting any such liability from a liable party.

10.9    *Injunction*

(a)     **Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property or any Person seeking to exercise the rights of the Debtors or the Debtors' Estates (including, without limitation, any Estate Representative) on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors or any Person seeking to exercise the rights of the Debtors or the Debtors' Estates (including, without limitation, any Estate Representative); or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

(b)     **Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Sections 10.6, 10.7, or 10.10 of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, terminated Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities against any Person released pursuant to Sections 10.6, 10.7 and 10.10: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

(c)     **Without limiting the effect of the foregoing provisions of this Section 10.9 upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 10.9.  Notwithstanding anything contained herein, the injunction provided herein does not apply to the claims of any Person against Verizon or Houlihan, Lokey, Howard and Zukin Financial Advisors, Inc.**

App. - 000319

10.10  *Exculpation and Limitation of Liability*

(a)     **None of the Debtors, the Reorganized Debtors or their respective subsidiaries, the Creditors Committee, the Administrative Agent or the Lenders, the Indenture Trustee, the Holders of Unsecured Note Claims, or any of their respective principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including acts or omissions which are the result of negligence, but excluding acts or omissions which are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

(b)     **Notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against any Debtor, any Reorganized Debtor, any of its subsidiaries, the Administrative Agent or the Lenders, the Creditors Committee, the Indenture Trustee, the Holders of Unsecured Note Claims, or any of their respective present or former principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including acts or omissions which are the result of negligence but excluding acts or omissions which are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.**

10.11  *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

App. - 000320

10.12  *Modifications and Amendments*

The Debtors may, with the consent of the Administrative Agent, which consent shall not be unreasonably withheld or delayed, alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, with the consent of the Administrative Agent, which consent shall not be unreasonably withheld or delayed, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

10.13  *Severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

10.14  *Revocation, Withdrawal, or Non-Consummation*

The Debtors reserve the right to, with the consent of the Administrative Agent, which consent shall not be unreasonably withheld or delayed, revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

10.15  *Notices*

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or a Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i)

App. - 000321

certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and (d) addressed as follows:

For the Debtors:

Idearc Inc.
2200 West Airfield Drive
P.O. Box 619810
D/FW Airport, Texas 75261
Facsimile:  (972) 453-6869
Attention:  General Counsel

with copies to:

Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Facsimile: (214) 855-8200
Attention:  Toby L. Gerber

10.16   *Computation of Time*

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

[*Signature Page Follows*]

App. - 000322

Dated:  December 21, 2009

Idearc Inc.
Idearc Information Services LLC
Idearc Media LLC
License Application Corporation
Second License Application Corporation
Idearc Media Sales-East Co.
Idearc Media Sales-East LLC
Idearc Media Sales-West Inc.
Idearc Media Services-East Inc.
Idearc Media Services-West Inc.


By:_____*/s/ Samuel D. Jones*_____
    Samuel D. Jones
    Executive Vice President, Chief Financial
    Officer and Treasurer, Idearc Inc.

Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

and

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, Texas  78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

*Signature Page*