UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, Litigation Trustee of the Idearc Inc. *et al.* Litigation Trust, | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | CIVIL ACTION NO. 3:10-CV-1842-G |
| VERIZON COMMUNICATIONS INC., *et al*., | § § § | **FILED UNDER SEAL** |
| Defendants. | § § § | |

**PLAINTIFF'S MOTION AND BRIEF TO SUPPLEMENT
THE RECORD IN SUPPORT OF ITS FIRST MOTION FOR
PARTIAL SUMMARY JUDGMENT (ILLEGAL DIVIDEND)
AND REQUEST FOR EXPEDITED CONSIDERATION**

U. S. Bank National Association, Litigation Trustee of the Idearc, Inc., *et al.* Litigation Trust ("Plaintiff" or "the Trust") files this Motion and Brief to Supplement the Record in Support of its First Motion for Partial Summary Judgment (Illegal Dividend) (Doc. No. 332) and Request for Expedited Consideration, and would show the Court as follows:

**I.**

**FACTUAL BACKGROUND**

1.      The wheels on the Defendants' case have come off.  On June 27, 2012, Plaintiff deposed one of the Defendants' eight expert witnesses, Defendants' "flagship" expert:  Professor Laura T. Starks from the University of Texas, McCombs School of Business.  Professor Starks was identified as Defendants' expert after Plaintiff filed its Motion for Partial Summary

Judgment.  Professor Starks conducted a study of spin off transactions as part of her engagement.

*See* Starks deposition at pp. 57, 64-65 [App. at 9-11. ]

      2.      Professor Starks identified thirty-one other spin off transactions which were

typical of the spin off transaction at issue in this lawsuit.  Starks deposition at pp. 71, 78 [App.

at 12, 15.]  When asked if any of those transactions involved payment of a dividend, she testified

as follows:

    Q:    Did any of those exchanges involve
           distributions, to use your term?

    A:    There were some exchanges where they used the
           term "dividend," but whether that was a true legal
           dividend or whether that was an exchange, I don't know.

    Q:    And the ones that you looked at where they
           used the term "dividend," can you identify them for me?

    A:    Some of them you could find in the exhibits.

    Q:    Would you please identify the ones that use
           the term "dividend."

    A:    The Merck and Medco used the term "dividend."

    Q:    Can you speak up?  I'm so sorry.

    A:    The Merck and Medco.

    Q:    Okay.

    A:    The Viad-Travelers Express.
           The Sara Lee-Hanesbrands.

    Q:    Say it again?

    A:    Sara Lee-Hanesbrands.

Q:      Sara Lee?  Okay.

A:      Viacom-New Viacom.
        First Data-Western Union
        ADP-Broadridge.

*Id*. at pp. 197-198 [App. at 18, 19.]  (objections omitted)

3.      Of the thirty-one "typical" spins, none of the spins involving the payment of both cash and debt securities to the parent company characterized the payment as an "exchange."  The Court will recall that the term "exchange" is the *farce de jour* used by Defendants to explain to this Court how a dividend is not a dividend.  The Court will also recall how Verizon manufactured a $2.5 billion tax basis from a $300 million tax basis so that it could suck out $2.5 billion in cash tax free from the Yellow Pages Business.  *See* Brief in Support of Plaintiff's Omnibus Response to Defendants' Motions for Summary Judgment [DOC 430] at pp. 24-25 & n. 87.  Finally, the Court will recall how Diercksen swore he declared a "dividend" of cash and debt before he changed his sworn testimony.  This was a return on Verizon's investment.  Defendants cannot escape liability for causing and receiving an unlawful dividend merely by relabeling the dividend as an "exchange."  There is no such animal under Delaware corporate law.

4.      Conveniently, Professor Starks overlooked the one spin that Debevoise and Skadden used as the model for the Idearc spin:  the Valor spin.  In that spin, Alltel received cash and "debt securities" – just like Verizon.  In Valor, the assets received by Alltel were accurately called a "dividend."[1]

---

[1]      It is unclear from the Valor spin documents whether the term "dividend" refers to both the cash and notes received by Alltel or just the cash.  Fortunately, however, no such problem exists in this case in light of Diercksen's testimony that he declared a dividend consisting of both cash and notes.  [App. at 645]

5.      Appendix Exhibit "1-B" is the Valor S-4 that was used by Defendants as the model for the Idearc Spin.  Just like the Idearc Spin, the Valor spin was designed by Bear Stearns, Verizon's financial advisor on the Idearc Spin.  [App. at 49, 90, 381-384.]  The tax attorneys for the Valor spin were Skadden Arps, the same tax attorneys for the Idearc Spin. [App. at 54, 69.]  Indeed, John Meuller was the CEO of Valor, and he was handpicked to be the Chairman of the Board for the newly spun-off Idearc.  [App. at 100, 220.]  *See also* Starks deposition at pp. 74-75, 94-95. [App. at 13-14, 16-17.]

6.      Exhibit "1-C" to Starks deposition establishes that the Valor spin was used as the model for the Idearc spin.  [App. at 513. ]  The distribution agreement in the Valor S-4 deserves special attention.   [App. at 337-366.]  The Valor distribution agreement follows the same format as the distribution agreement in the case at bar.  *See* Appendix Exhibit "1-E," the Idearc Distribution Agreement.  [App. at 601-635.]  Indeed, both agreements also have a paragraph 2.6 describing how cash and debt securities will be transferred by the spun off company to the parent company.

7.      There is a critically significant difference between paragraph 2.6 in the model Valor distribution agreement and that same paragraph in the Idearc distribution agreement. The Valor distribution agreement speaks of a "Special Dividend," whereas paragraph 2.6 of the Idearc agreement is couched terms of a "Special Distribution."  *Compare* [App. at 349.] with [App. at 616.]  The change in the paragraph 2.6(a) language in the Idearc Distribution Agreement clearly reflects an intentional decision to try to disguise what everyone knew to be a dividend as a "distribution."

8.      In any event, Professor Starks candidly admitted that, from a financial standpoint, a dividend is a "distribution:"

Q:      What's a dividend to you, from a finance
        perspective?

A:      From a finance perspective, a dividend is a
        distribution from a corporation.

[App. at 18.]  Professor Starks' testimony was confirmed by Exhibit 936 to her deposition, an e-mail in which Mr. Rievman, the tax partner at Skadden, Arps, acknowledged that the "distribution" should have been called a dividend.  [App. 20-23, 636].

9.      Verizon's change in paragraph 2.6 of the Distribution Agreement, substituting the term "Special Distribution" for "Special Dividend," in the Valor model distribution agreement is as transparent as Defendant Diercksen's changing his testimony from having declared a "dividend" to having made an "exchange."  Why go to such lengths to obscure the truth?  There is nothing wrong about declaring a "lawful" dividend.  So why bend over backwards in an effort to avoid the word "dividend?"

10.      There is only one answer – Defendants know that if it was a dividend they lose. They know that Diercksen could not lawfully declare a dividend because Idearc had no assets on October 31, the date of his resolution that improperly delegated to an Idearc officer the authority to sign the Distribution Agreement and thereby decide to pay a dividend from Idearc to Verizon. Moreover, Defendants have judicially admitted that neither Diercksen nor the New Board ever took board action to declare the dividend.  The dividend from Idearc to Verizon was, therefore, unlawful.  Yet a staggering $9.8 billion dividend was declared and paid based solely on the written promise of a mere officer of Idearc – Andrew Coticchio.  Officers cannot declare and pay dividends.  They never could.

11.     And even if Diercksen at the helm of an assetless corporation could have lawfully declared a dividend to be paid after he resigned from the Board, he has sworn that he made no effort to ascertain whether Idearc had adequate capital and surplus.  [App. at 647.]  Now even Defendants' hired expert has deserted them – swearing that the term "distribution," the term used instead of "dividend" in the Distribution Agreement, is the functional equivalent of a dividend.

12.     There simply is no triable issue of fact.

## II.

## RELIEF REQUESTED

13.     Professor Starks' expert testimony goes directly to the illegal dividend issue currently pending before the Court.  That testimony was not given until after the close of briefing on Plaintiff's First Motion for Partial Summary Judgment (Illegal Dividend).  Accordingly, Plaintiff requests that this Court order that the summary judgment record in support of Plaintiff's First Motion for Partial Summary Judgment (Illegal Dividend) be supplemented with the deposition testimony of Professor Starks and accompanying materials from that deposition which are contained in the Appendix filed in support of this Motion.

14.     Expedited treatment of this motion is necessary because the Plaintiff's Motion for Partial Summary Judgment is fully briefed and ripe for resolution by the Court.

Respectfully Submitted,

/s/ Werner A. Powers

Werner A. Powers
State Bar No. 16218800
Robin Phelan
State Bar No. 15903000
Patrick Keating
State Bar No. 00794074
David Taubenfeld
Texas Bar No. 19679450

HAYNES AND BOONE LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219-7673
Telephone:     (214) 651-5000
Telecopier:     (214) 651-5940


Nicholas A. Foley
Texas State Bar No. 07208620
Douglas J. Buncher
Texas State Bar No. 03342700
John D. Gaither
Texas State Bar No. 24055516

NELIGAN FOLEY LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
Telephone:     (214) 840-5300
Telecopier:     (214) 840-5301

ATTORNEYS FOR U.S. BANK
NATIONAL ASSOCIATION
as Litigation Trustee on Behalf of the
Idearc Inc. et al. Litigation Trust

## CERTIFICATE OF CONFERENCE

On June 30 and July 2, 2012, Movant conferred with opposing counsel concerning the matters raised in the foregoing Motion.  No agreement could be reached, however, and this matter is, therefore, presented to the Court for determination.

/s/ Werner A. Powers

## CERTIFICATE OF SERVICE

On July 17, 2012, the undersigned electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The undersigned hereby certifies that all counsel and/or *pro se* parties of record have been electronically served in accordance with Federal Rule of Civil Procedure 5(b)(2).

/s/ Werner A. Powers
Werner A. Powers

D-2075572_1.DOC