UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, Litigation Trustee of the Idearc Inc. *et al.* Litigation Trust, | ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) ) | 3:10-CV-1842-G |
| VS. | ) ) | |
| VERIZON COMMUNICATIONS INC., ET AL., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves claims arising out of Verizon's spin-off of its domestic directories business into a separate company, then known as Idearc.  The plaintiff is U.S. Bank National Association ("U.S. Bank"), acting as litigation trustee of the Idearc Inc. *et al.* Litigation Trust.  Plaintiff's Amended Complaint and Jury Demand (Filed Under Seal) ("Complaint") at 1 (docket entry 216).  The defendants are Verizon Communications Inc. ("Verizon"), GTE Corporation ("GTE"), John W. Diercksen ("Diercksen"), and Verizon Financial Services, LLC ("VFS").  *Id.* at 1.

This order decides a series of pending motions for summary judgment:[1]

(1) Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's First Motion") (docket entry 332); (2) Verizon Defendants' Consolidated Motion for Summary Judgment ("Verizon Defendants' Motion") (docket entry 371); and (3) John W. Diercksen's Motion for Summary Judgment ("Diercksen's Motion") (docket entry 373).

For the reasons set forth below, these motions are granted in part and denied in part.

## I. BACKGROUND

While the plaintiff and the defendants generally agree on the facts underlying this case, they have very different interpretations of those facts. To highlight these differences, the court will present the background of this case as both sides have presented it to the court.

---

[1] The plaintiff has also filed thee motions that relate to the briefing of these summary judgment motions: (1) Plaintiff's Motion and Brief to Strike Evidence Filed in Support of Both (A) the Verizon Defendants' Partial Motion for Summary Judgment and (B) John W. Diercksen's Motion for Summary Judgment (docket entry 428); (2) Plaintiff's Motion and Brief to Supplement the Record in Support of Its First Motion for Partial Summary Judgment (Illegal Dividend) and Request for Expedited Consideration (docket entry 448); and (3) Plaintiff's Unopposed Motion for Leave to File Supplemental Appendix in Support of Plaintiff's Motions to Strike Defendants' Summary Judgment Evidence and Brief in Support Thereof (docket entry 482). These three motions are **DENIED** as moot.

A.  <u>The Defendants' Version</u>

The origins of the Idearc spin-off date back to 2005.  Verizon Defendants'
Brief in Support of their Consolidated Motion for Summary Judgment ("Verizon
Defendants' Brief") at 4 (docket entry 372).  At that time, Verizon decided to divest
itself of its domestic directories business, which consisted of print yellow pages, print
white pages, an online yellow pages directory, and an information directory for
mobile phone customers.  *Id*.  The domestic directories business was managed as a
single unit within Verizon, known as Verizon Information Services ("VIS").  *Id*. at 4-
5.

The defendants insist that the spin-off was designed to be in the best interests
of both Verizon and the directories business.  They characterize VIS as a "cash cow"
that produced billions in steadily recurring revenue.  *Id*. at 5.  Notwithstanding the
value of VIS, the defendants urge that they thought VIS would be better off if it were
an independent company, because VIS management would be able to focus on the
development of the directories business.  *Id*.  By allowing VIS to take on "a more
flexible corporate structure," Verizon also hoped that VIS would be better able to
deal with the changes wrought in the industry by the internet.  *Id*. at 5-6.  According
to the defendants, at least five leading investment banks agreed with Verizon's
assessment that VIS would be worth more as a separate company than as a part of
Verizon.  *Id*. at 6.  At this time, Goldman Sachs, Morgan Stanley, and Credit Suisse

estimated that the enterprise value of a stand-alone VIS would be between $12 billion and $20 billion.  *Id*.

In December of 2005, Verizon began to explore how it could restructure VIS and the directories business.  *Id*. at 7.  Verizon considered disposing of Idearc via an "outright sale."  *Id*.  However, a straightforward sale would have subjected Verizon to billions of dollars in taxes.  Brief in Support of Plaintiff's Omnibus Response in Opposition to Defendants' Motions for Summary Judgment ("Plaintiff's Omnibus Response Brief") at 24-25 (docket entry 430).  As a result, Verizon's investment banks, JPMorgan Chase ("JPMorgan") and Bear Stearns, recommended to Verizon that the directories business be consolidated and spun off to Verizon shareholders in a tax-free transaction.  Verizon Defendants' Brief at 7.  In turn, Verizon received a private letter ruling from the Internal Revenue Service that the spin-off would qualify as a tax-free reorganization under the Internal Revenue Code.  Plaintiff's Omnibus Response Brief at 25.

Verizon incorporated the Verizon Directories Disposition Corporation ("VDDC") as a Delaware corporation in June of 2006.  Verizon Defendants' Brief at 8.  Diercksen served as VDDC's sole director.  *Id*.  On October 18, 2006, VDDC changed its name to Idearc.  *Id*. at 9.

According to the defendants, JPMorgan and Bear Stearns estimated, after completing their due diligence, that the directories business would have a post-spin-

off value of between $11.5 billion and $12.5 billion.  *Id.* at 10.  From this estimate,

JPMorgan and Bear Stearns concluded that Idearc could support $9 billion in debt,

and have the remaining capacity to pay $200 million in dividends to its shareholders.

*Id*.  The banks determined that Verizon could optimize shareholder value by having

Idearc take on $9.1 billion in debt:  Idearc would issue $7.1 billion in notes to

Verizon, and then borrow $2 billion to fund part of a $2.4 billion cash distribution to

Verizon.  *Id*.  At this time, Idearc's future managers were comfortable with this

proposed capital structure.  *Id.* at 10-11.

      As part of the restructuring, Idearc filed a Form 10 registration statement with

the Securities and Exchange Commission.  *Id*. at 11.  This form gave extensive

information about the directories business, Idearc's future capital structure, and the

anticipated spin-off of Idearc shares to Verizon shareholders.  *Id*. at 11-12.  This form

also listed a number of "risk factors" that investors in Idearc should take into

consideration.  *Id*.  The Form 10 filed by Idearc also disclosed that Verizon and

Idearc were expected to enter into a number of long term contracts, including a tax

sharing agreement.  *Id*. at 12.  According to the defendants, the agreement imposed

limits on Idearc's ability to refinance its debt and its ability to pursue certain strategic

transactions.  *Id*.

      In preparing for the spin-off, Verizon also retained financial advisory firm

Houlihan Lokey to provide an independent assessment of whether Idearc would be

solvent following the spin-off.  *Id*. at 14.  Based on its analysis, Houlihan valued the directories business at between $11.5 billion and $13.3 billion, which would exceed the $9.1 billion in debt that Idearc would be incurring as part of the spin-off.  *Id*. at 14-15.

During the summer of 2006, Verizon management and Diercksen selected the five individuals who would become Idearc's directors after the spin-off.  *Id*. at 16. These individuals -- Kathy Harless, John Mueller, Stephen Robertson, Donald Reed, and Thomas Rogers -- each had "significant experience in the directories, telecommunications, and electronic media industries."  *Id*. at 7, 16.

Throughout October and November of 2006, Idearc's future executive officers, VIS managers, JPMorgan, and Bear Stearns met with potential investors to generate financial support for Idearc.  *Id*. at 13.  According to the defendants, the financial community responded to Idearc "with enthusiasm."  *Id*.  Analysts from Barclays and Wachovia issued reports estimating that Idearc, post-spin-off, would have a total enterprise value of approximately $12 billion.  *Id*.  Moreover, the Idearc debt offerings were oversubscribed, meaning that total orders for the debt ($19.5 billion) far exceeded the $9.1 billion in debt financing that Idearc sought.  *Id*. at 13-14.

On October 18, 2006, the Verizon board of directors approved the proposed Idearc spin-off.  *Id*. at 17-18.  On October 31, 2006, Diercksen, as Idearc's sole director, authorized Idearc to participate in the restructuring.  *Id*. at 18.  Before the

spin-off occurred, Diercksen resigned as director of Idearc. *Id*. On November 16, 2006, one day before the spin-off, the five new Idearc directors were formally appointed. *Id*. Each of the new directors then purported to execute a resolution ratifying and approving the spin-off. *Id*. at 18-19. In a previous order, the court has concluded that this resolution is invalid as a matter of law. *See* Memorandum Opinion and Order of August 8, 2012 ("August 8, 2012 Memorandum") at 6-8 (docket entry 485).

The Idearc spin-off occurred on November 17, 2006. Verizon Defendants' Brief at 19. Verizon transferred to Idearc the domestic directories business. *Id*. In return, Idearc transferred cash and debt to Verizon worth approximately $9.6 billion. *Id*. This transfer consisted of $2.4 billion in cash ($1.95 billion in borrowed cash and $500 million in cash on hand) and $7.15 billion in debt ($2.850 billion in two promissory notes ("the notes") and $4.3 billion pursuant to a Credit Agreement ("the Verizon Tranche B")). *Id*.; *see also* Complaint ¶¶ 18-19. In addition, Idearc issued to Verizon an additional 145,851,861 shares of Idearc common stock. On the same day, Verizon distributed all of Idearc's common stock to its shareholders, with each shareholder receiving one share of Idearc stock for every twenty shares of Verizon common stock. *Id*. at 19-20. Verizon exchanged the $7.15 billion in Idearc debt with $7.08 billion in Verizon debt, which JPMorgan and Bear Stearns had purchased

on the open market.  *Id*. at 4, 20.  JPMorgan and Bear Stearns then sold the Idearc

debt to hundreds of financial institutions.  *Id*.

On November 17, 2006, when trading of Idearc common stock began, the

market valued Idearc's equity at more than $3.8 billion.  *Id*. at 20.  A few days later,

on the first business day after the spin-off, the market valued Idearc's equity at

around $4.1 billion, or $28.20 per share.  *Id*.  At its peak, on June 4, 2007, Idearc

stock reached an intra-day high of $38.00, which valued its equity at approximately

$5.5 billion.  *Id*.  Idearc's daily closing stock price remained above $27.00 for almost

a year after the spin-off.  *Id*. at 21.

During the first year or so of its existence as a separate company, Idearc

managed to perform reasonably well.  *Id*.  It paid discretionary dividends of $50

million per quarter for five calendar quarters, and it purchased an electronic media

business for $225 million in cash.  *Id*.  Ernst & Young, Idearc's independent auditors,

gave Idearc unqualified audit opinions in 2006 and 2007.  *Id*.  Finally, Idearc paid

nearly $1 billion in interest payments to its bondholders.  *Id*. at 21-22.

By the fall of 2007, however, the value of Idearc's stock began to drop.  *Id*. at

21-22.  The value of its shares continued to fall until, on March 31, 2009, Idearc filed

a bankruptcy petition under Chapter 11 in the United States Bankruptcy Court for

the Northern District of Texas.  *Id*. at 22.

B.  The Plaintiff's Version

As stated previously, the parties do not appear to dispute the facts underlying the Idearc spin-off.  Instead, the plaintiff's version is essentially a "behind the scenes" look at why Verizon spun off its directories business.  The plaintiff argues that this story shows that Idearc was insolvent at the time of the spin-off, and that it was destined to fail.

According to the plaintiff, Verizon decided that it should consider divesting itself of assets that were not focused on its core business areas.  Plaintiff's Omnibus Response Brief at 11.  Verizon put Diercksen in charge of the divestiture of the directories business.  *Id*.  As a part of this effort, Diercksen and others analyzed the Verizon directories' business.  *Id*. at 11-12.  This analysis allegedly revealed "a business in decline."  *Id*. at 12-13.

When Diercksen's team tried to value VIS -- *i.e.*, the directories business -- as a stand-alone business, they knew its value would be "very sensitive to growth expectations and any transaction generated tax shield."  *Id*. at 13.  Diercksen's team estimated VIS's value using three potential rates of growth:  (1) if VIS grew at negative 5%, its historical growth rate, VIS would be worth $6.5 billion; (2) if VIS grew at negative 2%, its projected growth rate, VIS would be worth $7.6 billion; and (3) if VIS grew at positive 2%, its upside growth rate, VIS would be worth $10.4 billion.  *Id*. at 13.

According to the evidence provided by the plaintiff, Verizon was not sanguine about the future of the directories business.  Verizon Chief Executive Officer Ivan Seidenberg ("Seidenberg") noted that the internet was causing "a major secular change" in the directories business.  *Id*. at 14-15.  Moreover, one Verizon employee noted that VIS' previous efforts "to fend off competition . . . [had not] been successful", and that the decline in VIS' business was "not encouraging."  *Id*. at 15.  However, Diercksen also noted that the market had a "more bullish view of [Verizon's] directories unit than [Verizon's] internal plan for VIS."  *Id*. at 16.  According to the plaintiff, the defendants decided to spin-off VIS to take advantage of the market's differing perspective on the future value of the directories business.  *Id*.

Verizon also commissioned a report from McKinsey & Co., a well-known consulting firm, to help VIS develop the strongest possible five-year business plan.  *Id*. at 17.  According to the plaintiff, the McKinsey report was even more pessimistic than the evaluation done by Diercksen's team.  *Id*.  As a result, some at Verizon saw VIS's outlook as "morbidly depressing" and compared VIS to "a leaking bucket."  *Id*. at 17-18.  As a result, the plaintiff contends, Verizon did everything that it could to spin the directories business as a turnaround story.  *Id*. at 18-20.  Verizon also retained Morgan Stanley to evaluate the directories business spin-off.  *Id*. at 20.  In

August of 2006, Morgan Stanley told Verizon that if VIS continued its historical growth trend, it would be insolvent.  *Id*. at 20-21.

In the months before the spin-off, Diercksen was the only person acting on behalf of Idearc.  During the summer of 2006, Diercksen was Idearc's sole director. *Id*. at 23.  The future members of Idearc's board of directors were persuaded not to be involved in any of the pre-spin-off negotiations.  *Id*. at 23.  In addition, Idearc did not have independent counsel until a month before the spin-off occurred.  *Id*. at 24. Verizon apparently made the conscious decision to make sure that there was no one looking out for Idearc's future interests.  *Id*. at 23.  As one of Verizon's lawyers wrote, "[s]ince we basically decided not to give [Idearc] eyes, ears, limbs and advisors until close to closing, I am not sure why we would want to give it a brain."  *Id*.

When Verizon made its presentations to prospective lenders regarding the Idearc spin-off, Verizon stated that VIS had a "resilient business model," had "positive recent results," and argued that it was a "great company well positioned for the future."  *Id*. at 27.  Moreover, Verizon blamed VIS' recent poor performance on "one-time event[s]."  *Id*.  In particular, according to the plaintiff, Verizon withheld its internal belief that the directories business was going through a "secular change," that Idearc's problems were not a "fix-it-up issue," and that a turnaround was "nowhere in sight."  *Id*. at 28.

After the spin-off, Idearc functioned well as a separate company for about a year.  However, by November of 2007, it was clear to Diercksen that Idearc had significant structural problems.  *Id*. at 34.  In an e-mail to Seidenberg, Diercksen wrote that sales were falling "dramatically," and that there was significant conflict among Idearc's upper management.  *Id*.  Diercksen wrote that he had "[s]een this movie before."  *Id*.  A year and a half later, Idearc would file for bankruptcy.

## C.  Procedural Background

On March 31, 2009, Idearc filed for Chapter 11 bankruptcy.  *Id*.  A plan of reorganization was confirmed for Idearc on December 22, 2009.  Complaint ¶ 28. Under this plan, Idearc's creditors (who held $9.7 billion in secured and unsecured bank debt and notes) recovered $270 million in cash, $2.75 billion in new secured bank debt, and new equity interests in the reorganized Idearc, now known as Supermedia.  Plaintiff's Omnibus Response Brief at 35.  The plan valued the reorganized Idearc business at $2.8 billion.  *Id*.

In addition, Idearc's creditors were also given the right to receive the proceeds of litigation brought by a litigation trust, which was assigned certain causes of action, including Idearc's claims against Verizon and former officers and directors of Verizon. Complaint ¶¶ 4, 29.

On September 15, 2010, U.S. Bank, as trustee of the trust created by Idearc's reorganization plan, filed this suit to prosecute the rights assigned to it under the

plan.  In its complaint, U.S. Bank asserted causes of action against the defendants for fraudulent transfer, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, unlawful dividend, promoter liability, unjust enrichment, and alter ego. Complaint ¶¶ 32-133.

The court has already decided two motions to dismiss in this case, decisions which dismissed parts of the plaintiff's complaint.  Memorandum Opinion and Order of September 19, 2011 ("September 19, 2011 Memorandum") (docket entry 106); Memorandum Opinion and Order of July 31, 2012 ("July 31, 2012 Memorandum") (docket entry 489).  The court has also granted a motion to strike the plaintiff's jury demand (docket entry 288), and denied a motion to reconsider that order (docket entry 459).  The court has recently denied Verizon and VFS' motion for partial summary judgment ("August 6, 2012 Memorandum") (docket entry 483).  The court has also recently granted in part and denied in part the plaintiff's second motion for partial summary judgment.  August 8, 2012 Memorandum.

The plaintiff and all of the defendants have filed motions for summary judgment.  Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c)(1).[2]  A fact is material if the governing substantive

---

[2]     Disposition of a case through summary judgment "reinforces the
(continued...)

law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber,* 353 F.3d 393, 405 (5th

---

[2](...continued)
purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

Cir. 2003).  The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara*, 353 F.3d at 405.

## II.  ANALYSIS

### A.  The Value of Idearc at the Time of the Spin-Off

Much of this case is based on the plaintiff's contention that Idearc was insolvent on November 17, 2006 (the date of the spin-off), or that Idearc did not receive reasonably equivalent value in the spin-off for the cash and debt it gave Verizon.[3]  Under Texas law, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation[.]"  TEX. BUS. & COM. CODE § 24.003(a).  The parties agree that Idearc was encumbered with $9.1 billion in debt at the time of the spin-off.  In order to determine whether Idearc was solvent at the time of the spin-off, the court must make a determination of the fair valuation of Idearc's assets on November 17, 2006.  On that date, Idearc's assets were the Verizon domestic directories business.

---

[3]      In the context of a spin-off, the insolvency analysis and the reasonably equivalent value analysis are essentially the same.  See *VFB LLC v. Campbell Soup Company*, 482 F.3d 624, 636 (3rd Cir. 2007).

The defendants provide a number of arguments tending to show that Idearc was worth far more than $9.1 billion on November 17, 2006.  Idearc's common stock, as reflected by trading on the New York Stock Exchange, was valued at between $3.9 billion and $5.5 billion for nearly a year after the spin-off.  Verizon Defendants' Brief at 24.  The $2.85 billion in senior unsecured notes that Idearc issued to Verizon, which became available for public investment in June of 2007 (roughly six months after the Iderac spin-off), traded near or above their face value for about six months.  *Id*. at 28-29.  Idearc reported revenues of around $3 billion in both 2007 and 2008, and paid dividends to its shareholders worth $250 million.  *Id*. at 30.  Towards the end of 2007, analysts continued to recommend that investors hold their Idearc stock.  *Id*. and n.123.

Moreover, the defendants point to the actions of a number of sophisticated entities as evidence that Idearc was solvent at the time of the spin-off.  Many banks and financial institutions were willing to participate in the spin-off, either by making loans to Idearc or by acquiring Idearc debt.  *Id*. at 31.  These institutions made the decision to invest in Idearc only after completing their own independent investigations.  *Id*. at 32.  This suggests that they believed in Idearc and thought that it was solvent at the time of the spin-off.  In addition, Houlihan Lokey, a financial advisor, valued the directories business at between $11.5 billion and $13.3 billion.

*Id*. at 34.  Ernst & Young gave Idearc an unqualified audit opinion for both 2006 and 2007.  *Id*. at 37.

Finally, the defendants urge that the actions of the parties involved in the spin-off demonstrate that all involved believed that Idearc would be a solvent independent company.  The defendants assert that the prior and future management of the directories business developed financial models that demonstrated that Idearc would be solvent.  *Id*. at 35.  Moreover, the fact that Verizon entered into many long term contracts with Idearc suggests that Verizon believed that Idearc would be an enduring, solvent company.  *Id*. at 37.

The plaintiff, by contrast, maintains that Idearc was worth far less than $9.1 billion.  The plaintiff notes that Verizon's own internal analysis (before the spin-off) suggested that if the directories business continued to decline at its current rate, an independent Idearc would be worth only $6.5 billion.  Plaintiff's Omnibus Response Brief at 37.  The plaintiff also points to reports from McKinsey and Morgan Stanley that cast doubt on Verizon's projections about Idearc, as well as internal Verizon e-mails suggesting that Verizon did not believe Idearc would be a flourishing independent company.  *Id*.  Finally, the plaintiff contends that a report by Carlyn Taylor demonstrates that Idearc was insolvent at the time of the spin-off.  *Id*. at 38-39.

Because there is a genuine dispute of material fact among the parties, and because a reasonable factfinder could determine that Idearc was either worth more or less than $9.1 billion, the defendants' motion for summary judgment on Idearc's solvency is denied.

### B.   Counts 1 and 2:  Fraudulent Transfer Claims (Against Verizon and VFS)

In Counts 1 and 2, the plaintiff brings fraudulent transfer claims against both Verizon and VFS.  Complaint ¶¶ 32-43.

On November 17, 2006, as a part of the Idearc spin-off, Idearc transferred to VFS $2,441,532,374.71 in cash.[4]  Complaint ¶¶ 18-19.  This cash was wired from Idearc's account at Mellon Bank to Verizon's account at Mellon Bank.  Plaintiff's Omnibus Response Brief at 90 n.277.  The plaintiff argues that this transfer was a fraudulent transfer avoidable under 11 U.S.C. § 544(b), and recoverable against the defendants under 11 U.S.C. § 550(a).  However, the court concludes that 11 U.S.C. § 546(e) bars the plaintiff's recovery of the cash alleged to have been fraudulently transferred.  As a result, VFS' motion for summary judgment on Counts 1 and 2 is granted.

---

[4]      In addition to the $2.4 billion cash transfer, the plaintiff's complaint also alleged that the transfers of Idearc shares and debt to Verizon were fraudulent. *See* Complaint ¶¶ 18-19.  These parts of the plaintiff's claims were previously dismissed by the court.  *See* July 31, 2012 Memorandum at 7-19, 22-25.  The plaintiff also alleged that Idearc's assumption of contractual liabilities constituted a fraudulent transfer.  Complaint ¶¶ 18-19.  The defendants do not appear to have addressed this part of Counts 1 and 2 in their motions for summary judgment.

1. *Legal Standard*

Section 544(b) provides that a bankruptcy trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable[.]"  In this case, the applicable law is Texas' fraudulent transfer law.  *See* TEX. BUS. & COM. CODE §§ 24.005-06.  Complaint ¶¶ 32-43.  If a transfer of property is avoided under Section 544, then the bankruptcy trustee can recover the value of such property to the extent that it is avoided.  11 U.S.C. § 550(a).

However, 11 U.S.C. § 546(e) states that, notwithstanding Section 544, a bankruptcy trustee may not avoid a transfer that is a "settlement payment" made by, to, or for the benefit of a "financial institution."  Congress enacted Section 546(e) to "minimize the displacement caused in the commodities and securities markets in the event [of] a major bankruptcy affecting those industries."  *In re Olympic Natural Gas Company*, 294 F.3d 737, 742 n.5 (5th Cir. 2002) (*quoting* H.R. Rep. No. 97-420, at 1 (1982)).  Section 546(e) therefore stands "at the intersection of two important national legislative policies . . . on a collision course -- the policies of bankruptcy and securities law."  *In re Resorts International, Inc.*, 181 F.3d 505, 515 (3rd Cir.) (internal quotation marks omitted), *cert. denied*, 528 U.S. 1021 (1999)

The Code defines a "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement

payment on account, a final settlement payment, or any other similar payment commonly used the securities trade[.]" 11 U.S.C. § 741(8).  Many courts have recognized that the bankruptcy code's definition of a settlement payment is "as opaque as it is circular." *Buchwald v. Williams Energy Marketing and Trading Company*, 460 B.R. 360, 367 n.33 (Bankr. S.D.N.Y. 2011) (quoting *Global Crossing Estate Representative v. Alta Partners Holdings LDC*, 385 B.R. 52, 57 n.1 (Bankr. S.D.N.Y. 2008)).  Most courts agree that the Code's understanding of a settlement payment is "extremely broad" and encompasses "most transfers of money or securities made to complete a securities transaction." *Contemporary Industries Corporation v. Frost*, 564 F.3d 981, 985-86 (8th Cir. 2009); see also *Enron Creditors Recovery Corporation v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334, 336-37 (2nd Cir. 2011); *In re Resorts International, Inc.*, 181 F.3d at 515.

The bankruptcy code defines "financial institution" to include "a Federal Reserve bank, or an entity that is a commercial or savings bank." 11 U.S.C. § 101(22)(A).

## 2. *Application*

In this case, Section 546(e) bars the plaintiff from recovering the $2.4 billion in cash as a fraudulent transfer.  First, the cash that Idearc paid to VFS at the time of the spin-off was a settlement payment, because it "completed a securities transaction."  In the spin-off, Verizon gave Idearc the directories business, in the form

of stock in Idearc Information Services, LLC ("IIS"), and in return Idearc gave

Verizon cash, debt, and Idearc stock.  This was a securities transaction, because the

IIS stock, Idearc stock, and Idearc debt are all securities.  *See* 11 U.S.C. § 101(49)

(defining that the term "security" to include "note[s]," "stock[s]," and "bond[s]").

Second, Mellon Bank is a financial institution within the meaning of Section

101(22)(A).  Finally, the transfer was made "by" a financial institution because

Mellon Bank transferred the cash from Idearc to Verizon.  Thus, Section 546(e)

applies, and the plaintiff's Section 544(b) fraudulent transfer claims concerning the

$2.4 billion cash transfer are barred.

The plaintiff argues, in response, that the $2.4 billion cash transfer from Idearc

to Verizon was not a settlement payment because "[t]ransfers that do not implicate

the securities settlement process are not the type of transfers that Congress intended

to protect from avoidance and thus are not 'settlement payments[.]'"  Plaintiff's

Omnibus Response Brief at 81.  However, the Fifth Circuit has rejected an

interpretation of Section 546(e) that would make its application contingent upon a

settlement payment being "cleared or settled through a centralized system[.]"  *In re*

*Olympic Natural Gas Company*, 294 F.3d at 742 (concluding that the term settlement

payment should be interpreted "very broadly").

The plaintiff also insists that Congress did not intend for Section 546(e) to

apply to the transfers in this case, which were "non-arm's-length intercompany

transactions between Verizon and Idearc, an entity it wholly controlled." Plaintiff's

Omnibus Response Brief at 78. However, many courts have expressed reluctance to

create an extra-textual exception to Section 546(e). See *Contemporary Industries*

*Corporation*, 564 F.3d at 984-85 (looking to the "plain language" of the "relevant

statutory text"); see also *Kaiser Steel Corporation v. Charles Schwab & Company*, 913

F.2d 846, 850 (10th Cir. 1990) ("[B]ecause of the variety and scope of different

securities transactions, and the absence of any restrictions in sections 546(e) and

741(8), it would be an act of judicial legislation to establish such a limitation.").

Additionally, the plaintiff emphasizes that the transfer was not made "by"

Mellon Bank, because it was acting purely as an intermediary or conduit. Plaintiff's

Omnibus Response Brief at 86-90. In *Munford v. Valuation Research Corporation*, 98

F.3d 604, 610 (11th Cir. 1996), *cert. denied*, 522 U.S. 1068 (1998), the Eleventh

Circuit held that a bank did not operate as a financial institution within the meaning

of Section 546(e) because "the bank here was nothing more than an intermediary or

conduit." *Id*. The *Munford* court stated that

> Funds were deposited with the bank and when the bank
> received the shares from the selling shareholders, it sent
> funds to them in exchange. The bank never acquired a
> beneficial interest in either the funds or the shares.

*Id*. However, many courts have criticized and rejected the *Munford* court's analysis.

See *In re Refco, Inc. Securities Litigation*, No. 07-MDL-1902-GEL, 2009 WL 7242548,

at *6-8 (S.D.N.Y. Nov. 13, 2009) (Report and Recommendation of the Special

- 22 -

Master) ("The predominant view in the Circuits -- that 'financial institution' means what it says and covers financial institutions even when they act only as a conduit for a settlement payment -- is cogent and persuasive."), *adopted in* 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010).  In *Contemporary Industries Corporation*, 564 F.3d at 987-88, the Eighth Circuit noted that Section 546(e) "does not expressly require that the financial institution obtain a beneficial interest in the funds."  See also *In re QSI Holdings, Inc.*, 571 F.3d 545, 550 (6th Cir. 2009) ("[T]he plain language of § 546(e) simply does not require a 'financial institution' to have a 'beneficial interest' in the transferred funds.") (citing *In re Resorts International, Inc.*, 181 F.3d at 516), *cert. denied*, __ U.S. __, 130 S.Ct. 1141 (2010).

Finally, the plaintiff submits that Section 546(e) does not apply to intentional fraudulent transfers.  Plaintiff's Omnibus Response Brief at 97.  Section 546(e) states that a trustee may not avoid certain transfers "[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title[.]"  This list pointedly excludes 11 U.S.C. § 548(a)(1)(A), which deals with transfers made "with actual intent to hinder, delay, or defraud[.]"  However, under Texas fraudulent transfer law, which is incorporated into federal bankruptcy law through Section 544, a transfer made or obligation incurred by a debtor is fraudulent as to a present or future creditor if the debtor made the transfer or incurred the obligation "with actual intent to hinder, delay, or defraud any creditor of the debtor[.]"  TEX. BUS. & COM. CODE § 24.005(a)(1).  The plaintiff

suggests that its fraudulent transfer claim under Sections 24.005(a)(1) and 544(b) should not be barred under Section 546(e), because that claim is functionally similar to a Section 548(a)(1)(A) claim.  This interpretation, however, is in direct conflict with the clear language of Section 546(e), which operates notwithstanding all of Section 544.  If Congress wished to exclude state law "actual intent" fraudulent transfer claims from the operation of Section 546(e), it could have expressly done so. The fact that Congress did expressly exclude Section 548(a)(1)(A) implies that it did not want to exclude state "actual intent" fraudulent transfer claims.

For these reasons, VFS' motion for summary judgment is granted on the plaintiff's fraudulent transfer claims concerning the $2.4 billion in cash transferred from Idearc to Verizon at the time of the spin-off.

### C.  <u>Count 3:  Breach of Fiduciary Duty Claim</u><br><u>(Against Diercksen)</u>

In Count 3, the plaintiff brings a breach of fiduciary duty claim against Diercksen.  Complaint ¶¶ 44-46.  Diercksen makes a number of arguments as to why his motion for summary judgment should be granted.  Because the court is not persuaded by any of these arguments, Dierksen's motion for summary judgment is denied.

First, Diercksen maintains that he did not breach any fiduciary duties to Idearc because, as Idearc was a wholly owned subsidiary of Verizon, Diercksens' only fiduciary duties were owed to Verizon.  Corrected Brief in Support of Defendant

John W. Diercksen's Motion for Summary Judgment ("Diercksen's Brief") at 16 (docket entry 406). Diercksen is right to argue that generally "in a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007) (table). However, as this court has already recognized, "[t]his rule . . . does not apply when the subsidiary is insolvent or when the transaction at issue would render the subsidiary unable to meet its legal obligations." September 19, 2011 Memorandum at 15-16 (citing *North American Catholic Education Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007); *In re Teleglobe Communications Corporation*, 493 F.3d 345, 367 (3rd Cir. 2007); *Seidel v. Byron*, 405 B.R. 277, 285 (N.D. Ill. 2009)). Instead, "directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting a parent corporation that they know will render the subsidiary unable to meet its legal obligations." *Trenwick*, 906 A.2d at 203 & n.96. As the court explained above, there is a dispute of material fact as to whether Idearc was insolvent at the time of the spin-off. Consequently, Diercksen's motion for summary judgment must be denied.

The parties dispute whether or not Idearc was a wholly owned subsidiary of Verizon before November 17, 2006. Idearc's official minute book shows that the Idearc board authorized the issuance of one share of Idearc stock to Verizon. Reply

- 25 -

Brief in Support of Defendant John W. Dierkcsen's Motion for Summary Judgment

("Diercksen's Reply") at 2-3 (docket entry 447).  The Minute Book also shows that

on June 22, 2006, a share certificate was signed by Katherine Harless (who was

elected an officer of Idearc on the same day) and issued to Verizon.  *Id*.

In response, the plaintiff avers that Idearc's official stock registry does not

reflect that any shares of Idearc stock were issued to Verizon before the spin-off

Plaintiff's Omnibus Response Brief at 22.  However, "when the stock ledger is blank

or non-existent, the [court] has the power to consider other evidence to ascertain and

establish stockholder status."  *Rainbow Navigation, Inc. v. Pan Ocean Navigation, Inc.*,

535 A.2d 1357, 1359 (Del. 1987); see also *Anadarko Petroleum Corporation v.*

*Panhandle Eastern Corporation*, 545 A.2d 1171, 1175 (Del. 1988) ("We do not view

the . . . preparation of a stock ledger as determinative of the nature of the

relationship[.]").  The plaintiff also argues that because the stock certificate was also

apparently signed by William Mundy on June 22, 2006, who was not yet an Idearc

officer, the stock certificate was not valid.  Plaintiff's Omnibus Sur-Reply on

Defendants' Motion for Summary Judgment ("Plaintiff's Sur-Reply") at 2 (docket

entry 486).  The plaintiff provides no citation that supports this conclusion, and

admits that the certificate was signed by Harless, who was an Idearc officer at that

time.  *Id*.  at 1-2.  Finally, the plaintiff has not put forth any evidence that any other

entity owned Idearc at the time leading up to the spin-off.  While the parties dispute

- 26 -

the material fact of Idearc's ownership before the spin-off, no reasonably factfinder could conclude that Idearc was not a wholly owned subsidiary of Verizon up to and including November 16, 2006.

Diercksen has also moved for summary judgment on the grounds that he fulfilled any and all fiduciary duties owed to parties other than Verizon.  After reviewing the parties' submissions, the court concludes that Diercksen is not entitled to summary judgment on this ground.  Assuming that Diercksen did owe fiduciary duties to a party other than Verizon, the court will have to determine the contours of the fiduciary duties owed, the effect of any applicable presumptions or safe harbors, and whether Diercksen met his fiduciary obligations under Delaware law.  Each of these determinations is intertwined with a series of material factual disputes that the court cannot resolve on this motion.

Diercksen argues that, even if his actions as Idearc director breached a fiduciary duty he owed to Idearc, he cannot be liable because he did not *cause* any injury to Idearc.  Diercksen's Brief at 29.  Diercksen argues that his actions in preparation for the spin-off were "non-binding" on Idearc's newly appointed board. Because it was the new board, rather than Diercksen, that formally authorized the distributions at issue in this case, Diercksen contends that he did not cause any harm at all.  The court is not persuaded by this argument.  Diercksen's actions as an Idearc board member before the spin-off clearly caused the spin-off to occur.  While

Diercksen's actions may have been non-binding legally on the newly appointed Idearc board, in reality the board had no choice but to sign off on the spin-off.

Diercksen also moves for summary judgment on any claims that the plaintiff has brought against him personally, in excess of applicable insurance coverage. Diercksen's Brief at 30.  In the Idearc plan of reorganization, the plaintiff was assigned Idearc's claims against its directors and officers, "but only to the extent that insurance coverage exists for such claims or causes of action and further limited to the proceeds of such insurance coverage." *Id*.  Because Diercksen was a director of Idearc before the spin-off, this provision applies to the claims brought against him.   In response, the plaintiff points to different language in the plan, which states that "[n]otwithstanding anything contained herein, the Plan does not release the claims of any Person against Verizon[.]"  Plaintiff's Omnibus Response Brief at 63.  Moreover, the term "Verizon" is defined to include current and former officers of Verizon Communications Inc.  *Id*.  Diercksen was a Verizon officer at the time of the spin-off, and he continues to be a Verizon officer today.  *Id*.  However, the insurance coverage limitation applies, because the claims brought against Diercksen arise from actions taken as a director of Idearc.

In addition, the Idearc plan's release of liability for Idearc directors does not apply to claims for wilful misconduct or gross negligence.  Plaintiff's Omnibus Response Brief at 64.  Because there is a genuine dispute of material fact among the

parties as to Diercksen's state of mind at the time of the spin-off, the court cannot conclude at this time that the release applies to all claims brought against Diercksen.

The plaintiff has also moved for summary judgment on part of its fiduciary duty claim.  Plaintiff's Brief in Support of its Motion for Partial Summary Judgment ("Plaintiff's First Motion Brief") at 7-11 (docket entry 333).  It argues that Diercksen failed to fulfill his fiduciary duties to Idearc by failing to ascertain whether Idearc had adequate capital and surplus from which to declare a dividend.  *Id*. at 8-9.  The court has considered and rejected the plaintiff's argument in section II.H, *infra*.

For the reasons stated above, Diercksen's motion for summary judgment on the breach of fiduciary duty claim is denied on all grounds, except it is granted on any claim brought in excess of the applicable insurance coverage.  The plaintiff's motion for summary judgment on the fiduciary duty claim is denied.

### D.  Count 4:  Aiding and Abetting a Breach of Fiduciary Duty Claim (Against Verizon and VFS)

In Count 4, the plaintiff brings a claim of aiding and abetting a breach of fiduciary duty against Verizon and VFS.  Complaint ¶¶ 47-48.  Verizon and VFS have moved for summary judgment on this claim, arguing that Diercksen did not breach any fiduciary duties owed to Idearc or its creditors.  Verizon Defendants' Brief at 60.  Because the court denied most of Diercksen's motion for summary judgment on the fiduciary duty claim, the court will deny Verizon's and VFS' motion as well.

E.  Count 5:  Fraudulent Transfer Claim
(Against Verizon and VFS)

In Count 5, the plaintiff brings a fraudulent transfer claim against Verizon and

VFS.  Complaint ¶¶ 49-58.  This claim is brought under TEX. BUS. & COM. CODE

§§ 24.005, 24.006, 24.008 and 11 U.S.C. §§ 544(b) and 550 for one aspect of the

spin-off transaction.

After the spin-off, Idearc was a holding company that conducted its operations

through its subsidiaries.  Verizon Defendants' Brief at 61.  Idearc's principal asset was

its 100% ownership of IIS, another holding company.  *Id*.  In turn, IIS' principal asset

was its 100% ownership of Idearc Media Corp. ("IMC"), which held the domestic

directories business.  *Id*. On November 17, 2006, IMC loaned approximately $475

million in cash to Idearc, in exchange for a one page demand note.  *Id*. at 62.

The defendants make three arguments as to why they are entitled to summary

judgment on Count 5.  First, the defendants argue that they are entitled to summary

judgment because IMC was solvent at the time of the spin-off.  *Id*. at 61-62.  Because

there is a dispute of material fact on the value of the directories business, this

argument fails.  The defendants also argue that they are entitled to summary

judgment on the plaintiff's constructive fraudulent transfer claims under TEX. BUS. &

COM. CODE §§ 24.005(2) and 24.006 because IMC received from Idearc "reasonably

equivalent value" in the form of the demand note.  *Id*. at 62.  Because the value of the

demand note depends, in part, on Idearc's solvency, this argument fails.  Finally, the

defendants argue that they are entitled to summary judgment on the plaintiff's actual intent fraudulent transfer claim under TEX. BUS. & COM. CODE § 24.005(a)(1) because there is no evidence of any such actual intent.  *Id.* at 62-63.  The court is not persuaded by this argument.  Consequently, the defendants' motion for summary judgment on Count 5 is denied.

F.  Count 6:  Fraudulent Transfer Claim
(Against GTE and Verizon)

In Count 6, the plaintiff brings a fraudulent transfer claim against GTE and VFS.  Complaint ¶¶ 59-68.  This claim was brought under TEX. BUS. & COM. CODE §§ 24.005, 24.006, 24.008 and 11 U.S.C. §§ 544(b) and 550 for one aspect of the spin-off transaction.

On November 16, 2006, IIS, one of Idearc's debtor subsidiaries, distributed to GTE all of IIS' international directories assets.  Verizon Defendants' Brief at 63. These assets included:

> "the outstanding stock held by IIS of Verizon International Holdings, Inc., Verizon GmbH, Verizon International Telecom Services, Inc. ("TSI"), any remaining assets or liabilities held by IIS in TSI, any cash held by IIS, any debt owed to IIS by VFS, IIS's interest in GTE Directories (B) Sdn. Bhd and all of IIS's liabilities, other than the outstanding common stock of IMC and License Application Corporation and any other assets related to the directory business of Verizon."

Complaint ¶ 60.  In return, GTE transferred to IIS various domestic directories assets. Verizon Defendants' Brief at 63 n.202.  "These transfers were part of the internal

- 31 -

corporate restructuring that Verizon undertook in anticipation of the Spin-Off." *Id*. at 63.

In support of their motion for summary judgment, the defendants argue that plaintiff has no evidence to support its allegations regarding IIS' solvency, its receipt of reasonably equivalent value, or any intent to defraud in connection with the transfer. For the same reasons set forth in the discussion of Count 5, the court is not persuaded by the defendants' arguments. Moreover, the court has already dealt with the defendants' "qualifying creditor" argument in a previous opinion. *See* August 6, 2012 Memorandum at 4-16. For these reasons, the defendants' motion for summary judgment on Count 6 is denied.

### G. Count 7: Fraudulent Transfer Claim (Against Verizon)

In Count 7, the plaintiff brings a fraudulent transfer claim against Verizon for more than $1,000,000,000, for the interest payments made by Idearc to its banks and bondholders during the two years preceding Idearc's bankruptcy. Complaint ¶¶ 69-75.

Under 11 U.S.C. § 548, a bankruptcy trustee can avoid a transfer of property or the incurrence of an obligation that was made within two years before the bankruptcy petition was filed, if certain requirements are met. Moreover, a bankruptcy trustee can recover for such a transfer from "the initial transferee of such

transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1).

In this case, it is clear that the plaintiff cannot recover from Verizon on the interest payments. First, because Verizon did not receive the payments, it was not "the initial transferee." Second, Verizon was not "the entity for whose benefit the payments were made." The paradigmatic entity for whose benefit a transfer was made is a guarantor. See *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir. 1988). There is no suggestion that Verizon was a guarantor for the Idearc debt.

The plaintiff responds that Verizon did benefit from the interest payments because they arose out of the spin-off transaction, in which Verizon was able to retire $7.1 billion in outstanding debt. Plaintiff's Omnibus Response Brief at 109. In particular, the plaintiff argues, "[b]y exchanging $7.1 billion of Idearc notes and other debt for $7.1 billion of outstanding Verizon debt Verizon received the full present value of the embedded interest payments." *Id*. at 110.

The court is not persuaded by the plaintiff's argument. The court acknowledges that Idearc's obligation to pay interest to its banks and bondholders did arise out of the spin-off, which did substantially benefit Verizon. However, the interest payments themselves, made months and years after the spin-off, did not benefit Verizon. Moreover, if Idearc had failed to make these interest payments, it

does not appear as if Verizon would have been adversely affected.  This suggests that Verizon did not in fact benefit from the interest payments.

The plaintiff cites *In re TOUSA*, 680 F.3d 1298 (11th Cir. 2012), to support its argument that Verizon benefited from the interest payments.  *Id*. at 109-10.  In that case, TOUSA owed money to the Transeastern Lenders.  *Id*. at 1301.  TOUSA paid off this debt to the Transeastern Lenders with proceeds of a loan provided by the New Lenders.  *Id*.  The New Lenders loan was secured by a lien on assets of TOUSA's subsidiaries.  *Id*.  After TOUSA and its subsidiaries declared bankruptcy, the bankruptcy court avoided the liens as a fraudulent transfer, and made the Transeastern Lenders disgorge most of the money they had received from TOUSA. *Id*.  The Eleventh Circuit affirmed this decision, after concluding that the Transeastern Lenders constituted entities for whose benefit the liens were transferred. *Id*. at 1313-15.  The court focused on the loan agreements themselves, "which required that the proceeds of the loans secured by the liens be transferred to the Transeastern Lenders."  *Id*. at 1313.

After reviewing *TOUSA*, the court does not see anything that affects its analysis.  The *TOUSA* opinion deals only with the initial payment to the Transeastern lenders of proceeds of the New Lenders' loan, and not with any subsequent interest payments on the New Lenders' loans.  Because Count 7 deals with the subsequent servicing of the Idearc debt, *TOUSA* is inapposite.

The plaintiff also argues that "[t]he party who forces a debtor to make a transfer is almost always the entity for whose benefit such transfer was made, and thus is generally always subject to strict liability." *In re Lucas Dallas, Inc.*, 185 B.R. 801, 809 (9th Cir. B.A.P. 1995) (internal quotations omitted). The plaintiff contends that Verizon forced Idearc to incur the obligation to make the debt payments, and in consequence, Verizon was an entity for whose benefit the interest payments were made. Plaintiff's Omnibus Response Brief at 110. This is irrelevant, since Verizon did not force Idearc to make the interest payments, as Verizon and Idearc were separate corporations when the interest payments were made.

Therefore, the defendants' motion for summary judgment on Count 7 of the plaintiff's complaint is granted.

### H.  Count 8:  Unlawful Dividend Claim (Against Diercksen and Verizon)

The plaintiff has brought a claim for unlawful dividend against Verizon and Diercksen.  Complaint ¶¶ 76-78.

#### 1. *Legal Standard*

A dividend is a disbursement made by a corporation to its shareholders that arises solely out of their status as shareholders. See *Penington v. Commonwealth Hotel Construction Corporation*, 155 A. 514, 517 (Del. 1931) (dividends are "payment to the stockholders as a return upon their investment"); *Muhich v. Commissioner of Internal Revenue*, 238 F.3d 860, 863 n.8 (7th Cir. 2001) (dividends are conferred by the

corporation "without an expectation of reimbursement" from the shareholder).

Under Delaware law,[5] the directors of a corporation may declare and pay a dividend

to the shares of its capital stock only out of the corporation's surplus.  8 DEL. C.

§ 170; see also id. § 173 ("No corporation shall pay dividends except in accordance

with this chapter.").  A corporation's surplus is "the excess of net assets over the par

value of the corporation's issued stock."  *Klang v. Smith Food & Drug Centers, Inc.*, 702

A.2d 150, 153 (Del. 1997); *see also* 8 DEL. C. § 154.  "Net assets are the amount by

which total assets exceed total liabilities."  *Id*. § 154.  In this case, the par value of

each share of Idearc stock was one cent.  Brief in Support of Defendants' Response to

Plaintiff's Motion for Partial Summary Judgment ("Defendants' Response to

Plaintiff's First Motion") at 14 (docket entry 363).  Because Idearc issued more than

146 million shares, the total par value of Idearc's stock was approximately $1.46

million.

A corporate director who wilfully or negligently violates Section 173 shall be

jointly and severally liable to the full amount of the unlawful dividend with interest.

*Id*. § 174.  However, a director shall be fully protected if he reasonably relied in good

---

[5]  Because Idearc was incorporated in Delaware, Delaware law applies.  *See* TEX. BUS. ORGS. CODE §§ 1.102-.103, 1.105 (providing that the law of the state of incorporation governs "(1) the rights, powers, and duties of [a corporation's] governing authority, governing persons, officers, owners, and members; and (2) matters relating to its membership or ownership interests").

faith upon opinions, reports, and statements presented to the corporation by professionals and experts. *Id.* § 172.

The purpose of the unlawful dividend statutes is to protect the rights of creditors by preventing directors from depleting their corporation's ability to repay its debts. *In re Color Tile, Inc.*, No. 98-358 2000 WL 152129 at *2 (D. Del. Feb. 9, 2000). "There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness, before any distribution among the shareholders." *In re Buckhead America Corporation*, 178 B.R. 956, 972 (D. Del. 1994) (quoting *Hamor v. Taylor-Rice Engineering Company*, 84 F. 392, 395 (C.C.D. Del. 1897)). If a corporation pays a dividend to its stockholders that is greater than the corporation's surplus at the time, that corporation's creditors have a cause of action against the directors of the indebted corporation.

As the court has already explained, most courts have adopted an expansive view of what constitutes a dividend under the Delaware unlawful dividend statute. *See* September 19, 2011 Memorandum at 21. As a result, the court will look to the substance of transactions to see if it depleted a corporation's assets. See *In re Buckhead America Corporation*, 178 B.R. at 973-74 ("Relevant authorities indicate, however, that DIA's financing of these transactions [a leveraged buyout of its parent company and sole shareholder, DIC] may properly be treated as an unlawful dividend

payment or distribution"); see also *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1001 (S.D.N.Y. 1991) (denying motion to dismiss because "the economic substance of the transactions in question brings them within the purview of the relevant sections of the Delaware General Corporation Law."); *AT&T Corporation v. Walker*, No. C04-5709FDB, 2006 WL 2927659, at *2 (W.D. Wash. Oct. 12, 2006) ("[T]he substantive economic effect of a particular transaction that depletes the debtor's assets and transfers them to shareholders may be actionable as unlawful dividends.").

### 2. *Application*

#### (a)  Surplus

Both the plaintiff and the defendants have moved for summary judgment on the plaintiff's unlawful dividend claim.  The plaintiff maintains that because Idearc was insolvent at the time of the spin-off, it could not have paid a lawful dividend to Verizon.  The defendants contend, on the other hand, that Idearc was solvent at the time of the spin-off and therefore was entitled to pay a lawful dividend to Verizon.

As explained earlier, a corporation can pay a dividend to its shareholders out of its surplus.  A corporation's surplus is the excess of its net assets over the par value of the corporation's issued stock.  *Id.* § 154.  Net assets are the amount by which total assets exceed total liabilities.  *Id*. § 154.  Because the par value of Idearc's issued stock ($1.46 million) is essentially negligible, the question of whether Idearc had a surplus

is dependent upon whether its total assets exceeded its total liabilities.  However, as this court has explained, there is a dispute of material fact as to the value of the directories business -- *i.e.*, the assets of Idearc -- at the time of the spin-off.  Because the court will need to decide this factual issue at trial, the court must deny both the plaintiff's and the defendants' motions for summary judgment on the unlawful dividend claim.

In addition, in order to prevail on its unlawful dividend claim, the plaintiff will have to demonstrate that Diercksen wilfully or negligently declared an unlawful dividend.  8 DEL. C. § 172.  Because there is a dispute of material fact as to Diercksen's state of mind at the time of the spin-off, the defendants' motion for summary judgment must fail.

(b)  Exchange

The defendants urge that the transfer of cash, debt, and Idearc stock to Verizon was not a dividend.  Verizon Defendants' Brief at 70.  Instead, the defendants insist, the transfer was part of an exchange between Idearc and the defendants, in which the directories business was exchanged for cash, debt, and stock. *Id*. at 70-73.  Because a dividend is a payment made to shareholders as a return on their investment, *Penington*, 155 A. at 517, the defendants conclude that the transfers to Verizon were not dividends.

The court is not persuaded by the defendants' arguments.  If the court assumes, as the plaintiff maintains, that the cash and debt that Idearc transferred was worth significantly more than the directories business, then the Verizon defendants received billions more than they gave.  This would have depleted Idearc, and therefore depleted the "trust fund" that creditors are entitled to look to for satisfaction of their debts.  See *In re Buckhead America Corporation*, 178 B.R. at 972.  While it is reasonable to call the spin-off an exchange, this does not affect the court's application of the unlawful dividend statute.  This is because the court will look to "the economic substance of the transaction."  September 19, 2011 Memorandum at 22 (quoting *Crowthers McCall Pattern, Inc.*, 129 B.R. at 1001).

Moreover, the defendants have not cited any cases in which a court concluded that such a non-sale[6] "exchange" would not be construed as a dividend.  In fact, under other circumstances, courts have concluded that "exchanges" could give rise to liability under unlawful dividend statutes.  See, *e.g.*, *Growe v. Bedard*, No. Civ. 03-198-B-S, 2004 WL 2677216, at *12 (D. Maine Nov. 23, 2004).

(c)  The plaintiff's unlawful dividend cash claim
is preempted by Section 546(e)

The plaintiff's unlawful dividend claim is in many ways similar to the plaintiff's fraudulent transfer claims in Count 1 and 2.  In turn, the defendants argue

---

[6]    The defendants do not argue that the spin-off was a sale.  If the spin-off was a sale, then Verizon would have been subject to billions in tax liability.

that the plaintiff's unlawful dividend claim is preempted by 11 U.S.C. § 546.  The

plaintiff's unlawful dividend claim can be divided into parts: the $2.4 billion in cash,

and the $7.1 billion in debt.  The court concludes that the plaintiff's cash unlawful

dividend claim is preempted by Section 546, but its debt unlawful dividend claim is

not.

The U.S. Constitution states that "the Laws of the United States . . . shall be

the supreme law of the land."  U.S. CONST. Art VI, cl. 2.  As a result, "state law is

preempted where it stands as an obstacle to the accomplishment and execution of the

full purposes and objectives of Congress."  *Arizona v. United States*, __ U.S. __, 132

S.Ct. 2492, 2505 (2012) (internal quotations omitted).  "Where a state statute

conflicts with, or frustrates, federal law, the former must give way."  *CSX*

*Transportation, Inc. v. Easterwood*, 507 U.S. 658, 663 (1993).

The Supreme Court has held that federal law may preempt state law in three

situations:

> First, when acting within constitutional limits, Congress is
> empowered to pre-empt state law by so stating in express
> terms.  Second, congressional intent to pre-empt state law
> in a particular area may be inferred where the scheme of
> federal regulation is sufficiently comprehensive to make
> reasonable the inference that Congress left no room for
> supplementary state regulation . . .  As a third alternative,
> in those areas where Congress has not completely displaced
> state regulation, federal law may nonetheless pre-empt
> state law to the extent it actually conflicts with federal law.
> Such a conflict occurs either because compliance with both
> federal and state regulations is a physical impossibility, or

> because the state law stands as an obstacle to the
> accomplishment and execution of the full purposes and
> objectives of Congress.

*California Federal Savings and Loan Association v. Guerra*, 479 U.S. 272, 280-81 (1987)

(internal citations and quotations omitted).

In *Contemporary Industries Corporation v. Frost*, 564 F.3d 981 (8th Cir. 2009),

the Eighth Circuit concluded that, because the plaintiff's fraudulent transfer claim

was barred under Section 546(e), the unlawful dividend claim was barred as well. *Id*.

at 988. Because the plaintiff in that case sought to recover the same payments the

court already held to be unavoidable under Section 546(e), "[a]llowing recovery

under these claims would render the § 546(e) exemption meaningless, and would

wholly frustrate the purpose behind that section." *Id*.

In this case, the plaintiff is seeking to recover for the cash payments Idearc

made to Verizon as a part of the spin-off. As the court has already explained, the

plaintiff's fraudulent transfer claims on these cash payments are barred by Section

546(e). Because allowing the plaintiff in this case to recover for the cash payments

under state unlawful dividend statute would render Section 546(e) meaningless, this

part of the plaintiff's unlawful dividend claim is barred as well.

The plaintiff makes a number of arguments as to why Section 546(e) does not

apply to the cash unlawful dividend claim. First, Section 546(e) expressly states that

it applies "notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this

title[;]" it does not expressly say that it applies to unlawful dividend claims. See also *Lehman Brothers Holdings v. JPMorgan Chase Bank, N.A.*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012) ("The plain language of section 546(e), read literally, provides limited immunity but does not bar Plaintiffs from maintaining all common law claims, intentional fraud claims and any other claims not expressly embraced by section 546(e)."). Moreover, in other parts of the Bankruptcy Code, Congress expressly states that state law does not apply. See *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 493 (3rd Cir. 1997) ("The clear lack of Congressional intent to preempt state law restrictions on transferring property of the estate is even more telling given the explicit language that Congress uses when it intends to displace state nonbankruptcy law in other provisions of the Bankruptcy Code."); *see also* 11 U.S.C. §§ 1123(a), 541(c)(1), 363(l) (expressly preempting the operation of state law). Finally, the plaintiff notes that the legislative history of Section 546(e) does not even mention state law unlawful dividend causes of action. Plaintiff's Omnibus Sur-Reply on Defendants' Motions for Summary Judgment ("Plaintiff's Sur-Reply") at 7-8 (docket entry 486). These arguments, while correct, only demonstrate that Congress did not expressly preempt federal law. As explained above, state law will be preempted "to the extent it actually conflicts with federal law." See *California Federal Savings and Loan Association*, 479 U.S. at 281.

The plaintiff also argues that to the extent that the cash transfers are void as a matter of law, Section 546(e) is inapplicable.  Plaintiff's Omnibus Response Brief at 47; see also *Enron Corporation v. Bear, Stearns International Limited*, 323 B.R. 857, 879 (Bankr. S.D.N.Y. 2005) ("If rendered void and a nullity, there was no securities transaction to complete and no settlement payment could result.  Therefore, the payment could not be considered a settlement payment that qualifies for protection from avoidance under section 546(e) of the Bankruptcy Code.").  However, the list of acts that are considered void under Delaware law is "very restricted."  *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (table).  Void acts include "fraud, gift, waste or *ultra vires* acts."  *Id*.  In this context, *ultra vires* acts are those acts "specifically prohibited by the corporation's charter, for which no implicit authority may be rationally surmised, or those acts contrary to basic principles of fiduciary law."  *Id*. at n.45.  However, under Delaware law, an "unlawful dividend is voidable," and not void.  See *In re Trace International Holdings, Inc.*, 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003) (citing *EBS Litigation LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3rd. Cir. 2002)).  Moreover, the plaintiff has provided no reason to suggest that the cash payments from Idearc to Verizon were in any way *ultra vires*.  See *Solomon*, 747 A.2d at 1114 n.45.  As the *Contemporary Industries* court explained, "[u]nlike void transactions, . . . voidable transactions are valid until annulled; thus, a voidable securities transaction creates an enforceable

- 44 -

settlement obligation and could result in a settlement payment entitled to § 546(e)

protection."  564 F.3d at 988 (citing *Enron Corporation*, 323 B.R. at 877-78).

(d)  The plaintiff's unlawful dividend debt claim
is not preempted by Section 546(e)

The plaintiff's complaint also alleges that the $7.1 billion in debt that Idearc

transferred to Verizon at the time of the spin-off was an unlawful dividend.  The

defendants argue that Section 546(e) preempts the unlawful dividend claim on the

Idearc debt.  However, because the $7.1 billion debt fraudulent consideration claim

would not have been barred by Section 546(e), Section 546(e) does not preempt the

operation of the state unlawful dividend statute.

On July 31, 2012, the court dismissed the plaintiff's Section 544(b) fraudulent

transfer claims on the $7.1 billion in Idearc debt.  July 31, 2012 Memorandum at 8-

19.  The court concluded that the plaintiff could not recover the value of the debt

from Verizon under 11 U.S.C. 550(a), which allows a bankruptcy trustee to recover

the value of property fraudulently transferred under Section 544(b).  *Id*.  Because

Idearc's issuance of debt to Verizon was the incurrence of an obligation, and not a

transfer of property, the plaintiff could not recover the value of the debt under

Section 550(a).  *Id*.

However, the court did not conclude at that time that the debt was *not* a

fraudulent transfer under Section 544(b) and applicable Texas law.  Therefore, if the

plaintiff had sued to avoid the Idearc debt under Section 544(b), without seeking to

- 45 -

recover the value of the debt under Section 550(a), then the plaintiff might have had a valid claim under 544(b).

Because the plaintiff might have had a valid 544(b) claim on the debt, then that claim might also have been barred under Section 546(e).  If the 544(b) debt claim were barred under Section 546(e), then the plaintiff's unlawful dividend claim would also be barred under the same preemption argument set forth above.

However, Sections 546(e) and 550(a) are similar, in that they only apply to transfers of property.  Section 546(e) provides that, notwithstanding Section 544(b), "the trustee may not avoid a *transfer* that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial institution[.]"  Like Section 550(a), Section 546(e) uses the word "transfer" to mean that the safe harbor applies only to transfers of property, and not the incurrence of obligations.  Other courts have come to the same conclusion.  See *In re MacMenamin's Grill Limited*, 450 B.R. 414, 431 (Bankr. S.D.N.Y. 2011) ("[S]ection 546(e)'s safe harbor does not extend to the avoidance of an obligation."); *In re Lehman Brothers Holdings Inc.*, 469 B.R. at 445-46.  Finally, the court notes that both the plaintiff and the defendants appear to agree that Section 546(e) does not apply to the incurrence of obligations.  Plaintiff's Omnibus Response Brief at 97; Verizon Defendants' Reply Brief in Support of Their Consolidated Motion for Summary Judgment at 25 (docket entry 446).  Because Section 546(e) would not have barred the plaintiff's Section 544(b) fraudulent transfer claim on the

debt, Section 546(e) does not preempt the plaintiff's unlawful dividend claim on the debt.

### (e)  Plaintiff's other arguments

The plaintiff asserts that Diercksen improperly delegated the Idearc board's authority to Andrew Cottichio, an Idearc officer, to declare a dividend.  Plaintiff's Omnibus Response Brief at 48.  On October 31, 2006, Diercksen passed a resolution authorizing Cottichio to sign the distribution agreement.  *Id*.  Because the alleged unlawful dividend in this case was the cash, debt, and stock that Idearc transferred to Verizon under the distribution agreement, the plaintiff maintains that Diercksen improperly delegated to Cottichio, who was not an Idearc director, the power to declare a dividend to Verizon.  However, the court does not believe that any sort of procedural failing affects the substance of the plaintiff's claim.  *See* FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5350 (2012) ("Courts have recognized . . . that a distribution to shareholders may amount to a legal dividend without the formal vote and resolution of directors, even though it was not designated as a dividend by the directors.").  As one leading treatise notes, " courts have upheld, without formal action by directors, distributions to shareholders of closely held corporations and distributions pursuant to unanimous consent or agreement of shareholders." *Id*.  In this case, the distribution of cash, debt, and stock was to

Idearc's only shareholder and was authorized (if not formally declared) by Idearc's only director.

The plaintiff avers that Idearc failed to formally revalue the book value of its assets. Plaintiff's Brief in Support of its Motion for Partial Summary Judgment ("Plaintiff's First Motion Brief") at 7 (docket entry 333). According to the plaintiff, the directories business' book value at the time of the spin-off was approximately $1.5 billion, which is far less than the $9 billion in debt that the spin-off imposed. *Id*. The plaintiff argues that Idearc should have revalued the book value of its assets, so that it could establish the necessary surplus needed to declare a dividend to Verizon. However, the Delaware Supreme Court has made it clear that "perfection in the process is not required." *Klang*, 702 A.2d at 152. "A mistake in documenting the surplus will not negate the substance of the action, which complies with the statutory scheme." *Id*. at 156. Therefore, if the defendants can establish at trial that Idearc had sufficient surplus at the time of the spin-off to declare the dividend, then the alleged dividend from Idearc to Verizon will have complied with the Delaware statutory scheme, and the plaintiff's unlawful dividend claim will fail.

## I.  Count 9:  Promoter Liability Claim
### (Against Verizon and Diercksen)

In Count 9, the plaintiff brings a claim of "promoter liability and breach of fiduciary duty" against Verizon and Diercksen. Complaint ¶¶ 79-114.

As the court has already explained, promoters "undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business." July 31, 2012 Memorandum at 28 (quoting *American Legacy Foundation v. Lorillard Tobacco Company*, 831 A.2d 335, 350 n.67 (Del. Ch. 2003) (quoting *Blish v. Thompson Automatic Arms Corporation*, 64 A.2d 581, 595 (Del. 1948)). "There is, of course, a fiduciary relationship between the promoters of a corporation and the corporation itself." *Gladstone v. Bennett*, 153 A.2d 577, 582 (Del. 1959). However, "a wholly owned subsidiary is not owed fiduciary duties by its corporate parent under normal circumstances." *In re Tronox Incorporated*, 450 B.R. 432, 438 (Bankr. S.D.N.Y. 2011). Nevertheless, "even when a subsidiary is wholly-owned, a parent corporation may owe fiduciary duties as a promoter when it is engaged in a plan or scheme of promotion, until the scheme has been concluded." *Id*. at 439 (citing *Bailes v. Colonial Press, Inc.*, 444 F.2d 1241 (5th Cir. 1971)). The court has already rejected three of the defendants' arguments in a previous order. *See* July 31, 2012 Memorandum at 29-31.

In the complaint, the plaintiff alleges that certain lawyers for Idearc owed fiduciary duties to Idearc, and that because Verizon and Diercksen "participated" in the breach of the lawyers' fiduciary duties to Idearc, they were liable for breach of fiduciary duties as well. Complaint ¶¶ 112-113. The plaintiff also seeks punitive

damages in connection with this claim. *Id*. ¶ 114.  However, because the plaintiff's claims fail on these two grounds under Delaware law, the defendants' motion for summary judgment on these issues is granted.  See *Gelof v. Prickett, Jones & Elliot, P.A.*, No. 4930-VCS, 2010 WL 759663, at *2 (Del. Ch. Feb. 19, 2010) (holding that "the attorney-client relationship is not a fiduciary relationship in the sense that there are special concerns for which there is no adequate remedy at law"); September 19, 2011 Memorandum at 16-17 ("[T]he court finds no authority to support Bank's demand for punitive damages in connection with its breach of fiduciary duty claim.").

The plaintiff submits that Texas or New York law, rather than Delaware law, applies to these aspects of its promoter liability and breach of fiduciary duty claim. Plaintiff's Omnibus Response Brief at 70.  The plaintiff contends that under Texas's "most significant relationship" choice of law test, a Texas state court will apply either Texas or New York law. *Id*.; see also *Casa Orlando Apartments, Limited v. Federal National Mortgage Association*, 624 F.3d 185, 190 (5th Cir. 2010).  However, under TEX. BUS. ORGS. CODE §§ 1.102-.103, 1.105 the law of the state of incorporation -- in this case, Delaware -- governs "(1) the rights, powers, and duties of [a corporation's] governing authority, governing persons, officers, owners, and members[.]"  This doctrine, known as the "internal affairs doctrine," applies for these aspects of the plaintiff's claim.  See *Hollis v. Hill*, 232 F.3d 460, 464-65 (5th Cir. 2000).  While the plaintiff is right to state that Idearc's lawyers are not owners, officers, or directors of

Idearc, the court does not believe that this fact renders the internal affairs doctrine inapplicable.  The plaintiff's promoter liability and breach of fiduciary duty claim is still the claim of Idearc, a corporation, brought against its former director and shareholder.  As a result, the defendants' motions for summary judgment are granted on the plaintiff's claims against Diercksen and Verizon for participating in certain lawyers' alleged breaches of fiduciary duties.  Moreover, the defendants' motions for summary judgment are also granted on the plaintiff's ability to recover of punitive damages.

### J.  Count 10:  Unjust Enrichment Claim

The court has already dismissed the plaintiff's unjust enrichment claim in a previous memorandum opinion and order.  July 31, 2012 Memorandum at 31-34.

### K.  Count 11:  Alter Ego Claim

The court has already dismissed the plaintiff's alter ego claim, but only to the extent that it is pled as a separate cause of action.  July 31, 2012 Memorandum at 34-36.

### III.  CONCLUSION

For the reasons stated above, the parties' motions for summary judgment are **GRANTED** in part and **DENIED** in part:

The defendants' motion for summary judgment on the solvency of Idearc on November 16, 2006 is **DENIED**.

For Counts 1 and 2, Verizon and VFS' motion for summary judgment is **GRANTED** on the plaintiff's fraudulent transfer claims on the $2.4 billion cash transfer.

For Count 3, Diercksen's motion for summary judgment on the breach of fiduciary duty claim is **DENIED** on all grounds, except it is **GRANTED** on any claim brought in excess of the applicable insurance coverage.  The plaintiff's motion for summary judgment on the fiduciary duty claim is **DENIED**.

For Count 4, Verizon and VFS' motion for summary judgment on aiding and abetting the breach of fiduciary duty claim is **DENIED**.

For Count 5, Verizon and VFS' motion for summary judgment on the fraudulent transfer claim arising out of the IMC loan is **DENIED**.

For Count 6, GTE and Verizon's motion for summary judgment on the fraudulent transfer claim arising out of the transfer of the international directories business is **DENIED**.

For Count 7, Verizon's motion for summary judgment on the fraudulent transfer claim on the interest payments is **GRANTED**.

For Count 8, Diercksen's and Verizon's motion for summary judgment on the unlawful dividend claim is **GRANTED** on the cash transfer, and **DENIED** on the issuance of debt.  The plaintiff's motion for summary judgment is **DENIED**.

For Count 9, Diercksen's and Verizon's motion for summary judgment on the promoter liability and breach of fiduciary duty claim is **DENIED**, except their motions are **GRANTED** on the plaintiff's claims against Diercksen and Verizon for participating in certain lawyers' alleged breaches of fiduciary duties, and on the plaintiff's ability to recover of punitive damages.

For Counts 10 and 11, the defendants' motions for summary judgment are **DENIED** as moot.

**SO ORDERED**.

September 14, 2012.

A. JOE FISH
**Senior United States District Judge**

- 53 -