UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL | ) | |
| ASSOCIATION, Litigation Trustee of the | ) | |
| Idearc Inc. *et al.* Litigation Trust, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | 3:10-CV-1842-G |
| VS. | ) | |
| | ) | |
| VERIZON COMMUNICATIONS INC., | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION**

From October 15, 2012 to October 26, 2012, the court conducted a ten-day

bench trial[1] in this case.  That trial was devoted to the resolution of a single factual

question:  What was the value of Idearc, Inc. ("Idearc") on November 17, 2006, the

---

[1]       On March 21, 2012, the court granted the defendants' motion to strike
the plaintiff's jury demand.  *See* Memorandum Opinion and Order of March 21,
2012 (docket entry 288).  On July 25, 2012, the court denied the plaintiff's motion
for reconsideration of the order striking the jury demand.  *See* Memorandum Opinion
and Order of July 25, 2012 (docket entry 459).  On September 10, 2012, the court
denied the plaintiff's motion for clarification of the order striking the jury demand.
*See* Order of September 10, 2012 (docket entry 521).

date of its spinoff from Verizon Communications Inc. ("Verizon")?  The parties

presented documentary exhibits and the testimony of witnesses to answer this

question.[2]  Based on this evidence, the court finds and concludes that the value of

Idearc on November 17, 2006 was at least $12 billion.

## I.  FINDINGS OF FACT

### A.  Procedural Background

#### 1.  *Nature of Action*

On September 15, 2010, U.S. Bank National Association, as Litigation Trustee

of the Idearc, Inc. *et. al.* Litigation Trust (the "Trustee"), filed this action against

Verizon, Verizon Financial Services LLC ("VFS"), GTE Corporation ("GTE"), and

John W. Diercksen ("Diercksen") (collectively, the "defendants"), alleging a variety of

claims arising out of Idearc's spinoff from Verizon.  *See* Plaintiff's Original Complaint

(docket entry 1).  The Trustee filed an amended complaint on November 30, 2011.

*See* Plaintiff's Amended Complaint and Jury Demand ("Amended Complaint")

(docket entry 161).

On July 31, 2012, the court granted in part and denied in part the defendants'

motion to dismiss the amended complaint.  *See* Memorandum Opinion and Order of

July 31, 2012 (docket entry 469).  The court dismissed the Trustee's fraudulent

---

[2]     The plaintiff introduced live testimony from three witnesses (two fact and one expert) and presented video depositions from two additional fact witnesses. The defendants called 16 live fact witnesses and four expert witnesses, and they also presented a video deposition from one additional fact witness.

conveyance claims (Counts 1 and 2 of the amended complaint) related to $7.1 billion in debt and the shares of stock that Idearc issued to Verizon in exchange for Verizon's domestic directories business. *Id.* at 19. The court additionally dismissed the Trustee's claim for unjust enrichment (Count 10) and for alter ego (Count 11) to the extent it was pled as a separate cause of action. *Id.* at 34, 36.

On August 8, 2012, the court granted in part and denied in part the Trustee's motion for summary judgment. *See* Memorandum Opinion and Order of August 8, 2012 (docket entry 485). The court granted summary judgment as to the new Idearc Board members' express ratification of certain spinoff resolutions dated November 16, 2006. *Id.* at 7. The court denied summary judgment as to the defendants' affirmative defense of ratification and did not decide whether the new Idearc Board approved or ratified the actions of the Idearc officers to effect the spinoff. *Id.* at 7-8.

On September 14, 2012, the court granted in part and denied in part the defendants' motion for summary judgment and denied the Trustee's motion for partial summary judgment. *See* Memorandum Opinion and Order of September 14, 2012 (docket entry 523). The court granted summary judgment dismissing the Trustee's fraudulent conveyance claims (Counts 1 and 2) related to Idearc's transfer to Verizon of approximately $2.5 billion in cash on the ground that such claims were barred by § 546(e) of the Bankruptcy Code. *Id.* at 24. The court also granted

summary judgment on the Trustee's fraudulent conveyance claim related to interest that Idearc paid on its debt (Count 7), *id.* at 35, and that portion of the Trustee's promoter fraud claim (Count 9) related to alleged aiding and abetting of attorneys' alleged fiduciary duty breaches and seeking punitive damages. *Id.* at 51. The court granted summary judgment on the breach of fiduciary duty claim against Diercksen (Count 3) insofar as it sought recovery in excess of applicable insurance coverage. *Id.* at 29. The court also concluded that the Trustee's unlawful dividend claim (Count 8) was preempted by the Bankruptcy Code insofar as it related to the approximately $2.5 billion transfer of cash. *Id.* at 40-45.

On August 22, 2012, the court issued an order bifurcating the trial of this action, limiting the first phase of the trial to a determination of "[w]hat was Idearc's value at the time it was spun off from Verizon in November of 2006?" *See* Order of August 22, 2012 (docket entry 504). All remaining factual questions were reserved for a potential second phase of trial. *Id.*

### 2. *The Parties*

The plaintiff is the trustee of a trust authorized to pursue claims as the successor-in-interest to Idearc, which was a wholly owned subsidiary of Verizon prior to the November 17, 2006 spinoff. After more than two years of operations as an independent, New York Stock Exchange-traded company, and in the wake of the Great Recession, Idearc filed a petition for reorganization under Chapter 11 of the

Bankruptcy Code in March 2009.  *See* Amended Complaint ¶ 25.  The Litigation

Trust was created as part of Idearc's Plan of Reorganization to pursue, among other

things, potential claims against the defendants.  *Id.* ¶¶ 29-30.

Defendant Verizon is a publicly traded company organized under Delaware

law.  *Id.* ¶ 10.  The defendants VFS and GTE are entities owned by Verizon.  *Id.* ¶¶ 2,

11-12.  The defendant Diercksen is an officer of Verizon and served as the sole

director of Idearc (formerly known as Verizon Directories Disposition Corporation)

("VDDC"), from its formation in June 2006 through November 16, 2006, the day

before the spinoff.  *Id.* ¶¶ 3, 21, 45, 107.

## B.  The Idearc Spinoff and its Terms

In connection with the spinoff, Verizon contributed its domestic print and

electronic directories business to Idearc in exchange for approximately $7.115 billion

in Idearc debt, $2.5 billion in cash, and 146 million shares of Idearc common stock.

*Id.* ¶¶ 2, 18.  Thereafter, Verizon distributed the Idearc common stock to its existing

shareholders.  *Id.*

In connection with the spinoff, Idearc incurred $9.115 billion in indebtedness

and received commitments from financial institutions to lend it up to an additional

$250 million through a revolving credit facility.  Idearc's debt was comprised of four

components:  (i) a $1.515 billion secured Term Loan A; (ii) a $250 million credit

facility known as the "Revolver"; (iii) a $4.75 billion secured Term Loan B; and

(iv) $2.85 billion in 8% Senior Notes due 2016 (the "Unsecured Notes").  *See*

Plaintiff's Exhibit ("PX") 1103 at 9-12 of 550 (Idearc, Inc. Form 8-K filed on

November 21, 2006, describing debt components); *see also* PX 1062 at 8 of 135

(Credit Agreement describing $1.515 billion in Term Loan A debt, $4.75 billion in

Term Loan B debt, and $250 million revolver); PX 1084 at 6 of 145 (Indenture

describing $2.85 billion unsecured notes).

## C.  Carlyn Taylor's Expert Report and Testimony

The only evidence of Idearc's value that the Trustee presented was in the form

of Carlyn Taylor ("Taylor")'s expert report and testimony.  The court does not find

this report and testimony persuasive and therefore does not accept Taylor's

conclusion that the value of Idearc was $8.15 billion on the date of the spin-off.

### 1.  *Taylor's Background and Qualifications*

Carlyn Taylor earned undergraduate and graduate degrees in economics.  *See*

Trial Transcript ("Tr.") Vol. 3 at 11:18-20.  She currently holds three investment

banking licenses from FINRA.  *Id.* at 12:3-4.  She is a certified public accountant,

holds an accreditation in business valuation, and is a certified insolvency and

restructuring accountant.  *Id.* at 12:5-8.  Taylor currently serves as a senior managing

director and heads the telecom, media, and entertainment industry practice at FTI

Consulting, Inc.  *Id.* at 9:18-10:15.  Taylor has advised clients in numerous

engagements in the telecom industry.  *Id.* at 31:20-32:4.  She routinely advises clients

with respect to valuation matters. *Id.* at 18:13-24:24; 25:4-28:5. Taylor has worked

on eleven different engagements in the yellow pages business, many of which involved

performing valuations for investors. Tr. Vol. 4A at 31:22-24. The court finds that

Taylor is highly qualified to offer an opinion regarding Idearc's value as of

November 17, 2006.

2. *Summary of Taylor's Valuation Conclusions*

a. Methodology for calculating total enterprise value

Taylor made three separate calculations of Idearc's value on the date of the

spinoff, one based on discounted cash flow (the "DCF method"), a second based on

EBITDA[3] multiples of a select group of public companies ostensibly similar to Idearc

(the "market multiple method"), and a third based on EBITDA multiples implied by

transactions involving public companies ostensibly similar to Idearc (the "comparable

transaction method"). Tr. Vol. 4A at 19:8-21:3. Using the DCF method, Taylor

arrived at a value for Idearc ranging from $5.4 to $6.3 billion. *Id.* at 92:14-22. Using

the market multiple method, Taylor arrived at a value ranging from $11.7 to $13.2

billion. Tr. Vol. 4B at 4:9-13. Using the comparable transaction method, Taylor

arrived at a value ranging from $13.4 to $15.8 billion. *Id.* at 5:11-6:6. By weighting

the DCF method calculation at 70%, the market multiple method calculation at 15%,

and the comparable transaction method calculation at 15%, Taylor ultimately arrived

---

[3]       EBITDA is "earnings before interest, taxes, depreciation, and
amortization."

at a value for Idearc that ranged from $7.5 to $8.8 billion.  Tr. Vol. 4A at 28:12-18, 115:7-9.  The midpoint of that range is $8.15 billion, which Taylor concluded was the value of Idearc on November 17, 2006, the date of its spinoff from Verizon.  *Id.* at 28:15-18.

Taylor gave no weight to the price at which Idearc's common stock traded on the New York Stock Exchange ("NYSE"), and she did not include in her report any determination of what total enterprise value for Idearc was implied by this trading price.  Tr. Vol. 3 at 56:20-57:4; Tr. Vol. 4B at 7:2-4.

b.  Taylor's conclusions under the market multiple method

Taylor used data about the trading multiples of five public companies comparable to Idearc in order to arrive at a trading multiple range and ultimately a valuation range for Idearc.  Taylor used the same companies (and multiples) that Houlihan Lokey had used when it performed a valuation analysis in connection with a solvency opinion it prepared for Idearc in the fall of 2006.  Tr. Vol. 4A 93:11-16.  These companies were:  Eniro, Seat Pagine Gialle SpA, Yellow Pages Income Fund, Yell Group plc, and RH Donnelley.  *Id.* at 95:3-98:20.  Of these, only RH Donnelley was, like Idearc, an incumbent print company operating in the United States.  *Id.* at 93:17-94:11; 95:20-96:5.

Using the market multiple method, Taylor arrived at a value for Idearc ranging from $11.7 billion to $13.2 billion.  Tr. Vol. 4B at 4:9-13.

In her final calculation of a valuation range for Idearc, Taylor assigned the market multiple method only 15% weight.  Tr. Vol. 4A at 115:7-9.  Taylor testified that one reason for this weighting included VIS's inferior financial performance relative to the other comparable directories companies.  *Id*. at 97:12-19.  Since the ostensibly comparable companies had shown recent revenue growth, while VIS had shown recent revenue decline, Taylor opined that the companies were not comparable enough to warrant weighting the market multiple method more highly.  *Id.*  Taylor also discounted the weight given to this method, because only RH Donnelley was an incumbent print company operating in the United States.  *Id*. at 93:17-94:11; 95:20-96:5.  Finally, she discounted this method, because RH Donnelley had received significant tax benefits in connection with its purchase of the Dex directories company, tax benefits that would not be available to Idearc after the spinoff.  *Id*. at 98:1-20, 105:3-106:15.

      c.  Taylor's conclusions under the comparable transaction method

The comparable transaction method examines sales of comparable companies, whether public or private, to derive a valuation multiple implied by each sale that can be applied, with appropriate adjustments, to the subject company.  *Id*. at 99:3-10.  Taylor's analysis began with the list of 17 company transactions compiled by Houlihan Lokey when it prepared its solvency opinion for Idearc.  *Id*. at 99:11-23.  Taylor then independently examined all available information regarding each

transaction and determined the extent to which those transactions were relevant useful comparables for valuing Idearc.  *Id.*

Using the comparable transaction method, Taylor arrived at a value for Idearc ranging from $13.4 billion to $15.8 billion.  Tr. Vol. 4B at 5:11-6:6.

In her final calculation of a valuation range for Idearc, Taylor assigned the comparable transaction method only 15% weight.  Taylor testified that the reasons for this weighting included (1) the fact that the 17 transactions compiled by Houlihan did not involve reasonably comparable companies, *see* Tr. Vol. 4A at 99:19-100:16, and (2) the fact that a Tax Sharing Agreement ("TSA") between Verizon and Idearc, *see* PX 1068,[4] in her opinion, prevented Idearc from accessing the transactions market (which conflicts with a premise of the comparable transaction method, namely, that the subject company has the ability to access that market).  Tr. Vol. 4A at 109:3-7; 109:15-110:9; 111:4-8; 111:14-112:3.

> d.  Taylor's DCF assumptions, methods and conclusions

A DCF valuation involves the following steps:  (a) project the company's free cash flow (EBITDA minus adjustments for capital expenditures and working capital changes) for a five-year period (the "Projection Period") (here, 2006-2010), and discount that projected cash flow back to the target date (here, November 17, 2006)

---

[4]      Since the spinoff had been structured as a tax-free transaction, the Tax Sharing Agreement was entered by the parties to allocate liability in the event the Internal Revenue Service later determined the transaction did not qualify for tax-free status.

using an appropriate discount rate; (b) estimate a "terminal value" of the company after the Projection Period (based on an estimated growth rate after the Projection Period), and discount that terminal value back to the target date using the same discount rate used in step (a); and (c) add the values derived from the first two steps together.  Tr. Vol. 4A 21:8-22:9; 73:3-74:8.

### i.   Projections

Taylor made three different calculations of Idearc's value under the DCF method.  These three calculations were based on three different projections of Idearc's free cash flow for the Projection Period.  The projections Taylor utilized included (1) a projection prepared by Taylor, in which she made adjustments to a "base case" projection that had been prepared by Verizon in 2006 (the "FTI Case"), *see* Tr. Vol. 4A at 53:20-54:3; 54:15-55:6; 58:11-16; PX 1849; PX 1851, (2) a (pessimistic) stress-test projection prepared by Houlihan Lokey before Houlihan offered its solvency opinion (the "Houlihan Downside Case"), *see* Tr. Vol. 4A at 48:19-20; 51:20-52:1; 57:25-58:5, and (3) a mathematical extrapolation of the trend of VIS's actual historical performance from 2003 to 2006 (the "Trend Case").  Tr. Vol. 4A at 48:19-22; 53:3-9; PX 1849; PX 1851.

### ii.   Terminal growth rate

Taylor derived her terminal growth rate using the Gordon Growth Model, standard in valuation literature.  Tr. Vol. 4A at 77:3-78:9; 81:1-9.  Taylor employed

the same terminal growth rate as the growth rate she used for the five-year Projection Period.  Tr. Vol. 4A at 77:11-78:5.  Terminal growth rate is the expected growth rate of the target company in perpetuity beyond the Projection Period.

### iii.  Discount rate

As is standard, Taylor applied the same discount rate to the calculated free cash flow in the Projection Period and the calculated terminal value of Idearc.  She arrived at her chosen discount rate of 9.75% by using a standard accepted formula called "Weighted Average Cost of Capital" (or "WACC").  Tr. Vol. 4A at 74:9-13. The formula uses two components, the cost of equity and the cost of debt.  The analyst weights these two components according to the optimal capital structure (debt to equity ratio) of the target company.  Tr. Vol. 4A at 75:11-76:14.  Taylor also applied a company specific risk premium of 2% in her calculation of Idearc's cost of equity.  Tr. Vol. 4A 76:17-77:2.  This resulted in an overall discount rate that was 1% higher than it would have been, had she not applied the company specific risk premium to Idearc's cost of equity.  *Id.*  Taylor testified that she added this premium to account for disadvantages and issues unique to Idearc (*e.g.*, operations concentrated in lower-growth, highly competitive urban markets; performance that lagged competitors; inexperienced management; and the TSA, which Taylor opined would have restricted Idearc's ability to execute certain strategic and financial options).  Tr. Vol. 4A 76:23-77:2.

iv.  Taylor's DCF method conclusions

By applying the 9.75% discount rate to both the terminal value and the three

sets of projected cash flows for the Projection Period, Taylor arrived at a range of

values for Idearc from $5.4 billion on the low end to $6.3 billion on the high end.

Taylor concluded that the midpoint of this range ($5.85 billion) most accurately

reflected the value of Idearc on November 17, 2006 under the DCF method.  Tr. Vol.

4A 83:22-84:4; 92:14-93:3.

The trading multiple implied by Taylor's DCF valuation ranges from 3.5x to

4.2x Idearc's actual 2006 EBITDA.  Tr. Vol. 10A at 82:25-83:25; Defendant's

Demonstrative ("DD") 4.13.  No competitor of Idearc had a market value anywhere

approaching that low a multiple.  Tr. Vol. 10A at 83:15-25; DD 4.13.

e.  Taylor's rejection of certain market evidence of Idearc's value

As part of her analysis of value, Taylor did not consider the trading price of

Idearc on the NYSE on the date of the spinoff.  She testified that, in her opinion,

investors overvalued Idearc because of various alleged misrepresentations and

omissions made by Verizon.  Tr. Vol. 3 at 56:13-57:4; Vol. 4A at 17:19-18:15; Vol.

4B at 33:20-34:9 (conceding that her opinion "turn[s]" on the proposition that "the

market was misled" into inflating Idearc's equity value by at least $4 billion).  First,

Taylor concluded that Verizon failed to disclose the significant differences in the

EBITDA margins generated by VIS's incumbent print and electronic businesses.  Tr.

Vol. 3 at 104:16-105:12; Vol. 4A at 15:2-17:18; Vol. 4B at 63:9-64:16.  Second, she also concluded that Verizon concealed the year-over-year declines in revenue in specific northeastern urban markets.  Tr. Vol. 3 at 96:17-99:14; 101:4-101:10; Vol. 4A at 12:2-17.  Third, Taylor opined that the fact that management had consistently failed to meet its projections, but hadn't disclosed these missed projections to the market, rendered Idearc's stock price unreliable.  Tr. Vol. 4A at 10:10-13.  Fourth, Taylor opined that the fact that Verizon did not disclose a pessimistic report by the consulting firm McKinsey about the directories business's future prospects rendered Idearc's stock price unreliable.  *Id*. at 14:5-12.  Taylor further testified that this was the first time she had ever opined that the market price of stock was completely unreliable as to a firm's value.  *Id*. at 18:7-15.

### 3. *Hopkins' Expert Rebuttal*

Mark Hopkins ("Hopkins") testified as Verizon's expert witness about both the value of Idearc and in rebuttal of Carlyn Taylor's report and testimony.  Hopkins was educated at Oxford University, where he received a Master of Arts with honors in chemistry.  Tr. Vol. 7B at 108:1-12.  He is currently employed as a senior managing director at CEG Group, working as a financial advisor in the restructuring and reorganization area.  *Id*. at 107:15-25.  He has also been employed as global head of shipping at Bank of America and as a partner at Ernst and Young in the restructuring group.  *Id.* at 108:13-23.  Hopkins testified that he has performed many valuation

and solvency analyses in the media industry, the telecommunications industry, and the energy industry.  *Id.* at 108:24-109:16.  The court recognized Hopkins's expertise and qualifications to express opinions in the areas of valuation and solvency.  *Id.* at 116:3-4.

### i.  Taylor's DCF analysis: projections

Hopkins testified that the financial projections (the free cash flows Taylor calculated during the Projection Period) that formed the foundation of Taylor's DCF valuation were unreliable for several reasons.  Tr. Vol. 8A at 57:1-24.  First, he testified that use of a purely historical average for a projection (which Taylor used in the "Trend Case") is incorrect, under accepted valuation principles.  *Id*. at 58:1-18; 59:16-24.  Second, he testified that use of a "stress test" projection like the Houlihan Downside Case is inappropriate for a DCF valuation, since the projection was prepared as a sensitivity analysis and not for purposes of valuation.  *Id.* at 59:25-60:4. Third, he testified that the FTI Case that Taylor created makes inappropriate adjustments to VIS's projections[5] and that, functionally, it is another "sensitivity

---

[5]      Hopkins testified that an adjustment Taylor made to Verizon's incumbent print revenue projection was inappropriate, because the projection Verizon had made was already conservative in that the projection was more pessimistic than industry reports indicated.  Tr. Vol. 8A at 61:24-62:8.  He also testified that the downward adjustment Taylor made to Verizon's projection of independent market growth was unjustified, because the company had historically experienced strong growth in this segment of its revenue and the company's projections for growth were again more conservative than industry expectations.  *Id.* at 62:9-15.  Hopkins further testified that, in his opinion, Taylor had misinterpreted

(continued...)

case" (like the Houlihan Downside Case) that is inappropriate to use for valuation purposes. *Id.* at 60:20-61:1.

### ii.  Taylor's DCF analysis:  terminal value

Hopkins testified that, in her analysis of Idearc's terminal value, Taylor assumed an annual rate of EBITDA decline in perpetuity that is commercially unreasonable and inappropriate in a DCF valuation. *Id.* at 64:1-25.  Hopkins testified that no one performing a (contemporaneous) valuation would have assumed such a sharp annual perpetual decline in Idearc's EBITDA, because an analyst would have assumed that management would take steps (possibly drastic steps) to assure that such steep EBITDA declines did not occur. *Id.* at 64:20-25.  Here, for example, Idearc had planned for an annual $200 million dividend that could be withdrawn in the event projected revenues did not meet their targets. *Id.* at 65:1-18.

### iii.  Taylor's DCF analysis:  discount rate

Hopkins also testified that the discount rate Taylor arrived at was too high for multiple reasons. *Id.* at 65:22-66:3.  First, it assumed a capital structure of 44% debt, 56% equity, which, while common in European companies, would not have been appropriate for a U.S. company like Idearc. *Id.* at 66:6-15.  Hopkins testified that

---

[5](...continued)
some of the electronic commerce numbers that Taylor had rejected in her analysis (and that had resulted in a lower projection for Verizon's electronic commerce revenue). *Id.* at 62:16-18.  And finally, Hopkins testified that he did not accept Taylor's view that Idearc would be unable to reduce its bad debt expense as much as Verizon projected it would. *Id.* at 62:19-63:3.

RH Donnelley, the company most comparable to Idearc, had a capital structure much more heavily weighted toward the debt side, an assumption that analysts would mimic in their calculation of a discount rate. *Id.* at 66:16-25. Second, Taylor's discount rate included a company specific risk premium of 2%. Hopkins testified that not only are company specific risk premiums disfavored as a means for the analyst to improperly insert his or her subjective hindsight, but that application of the company specific risk premium here constitutes a kind of "double counting," which violates standard valuation practice. *Id.* at 67:1-18. Hopkins testified that Taylor double counted, because she had already assumed drastically lower cash flows (by means of the adjustments she made to VIS's projections) than contemporaneous analysts. *Id.* Thus Taylor's model had already accounted for the company-specific risks Idearc faced, and there was no need to add a further "risk premium" in her calculation of a discount rate.

Indeed, it appears to the court that there were multiple instances of double counting that infected both Taylor's DCF analysis and her overall conclusions. For example, some of the same reasons that drove Taylor to apply a company specific risk premium drove her to weight the market multiple method and the comparable transaction method at only 15% each (*i.e.*, the fact that Idearc showed negative growth in revenue relative to its competitors and the fact that the TSA supposedly prevented Idearc from accessing the transactions market). *See, e.g.*, Tr. Vol. 4A at

76:23-77:2, 115:7-116:10.  The defendants also pointed out in post-trial briefing that one of the reasons Taylor weighted the market multiple method at 15% was that the companies used in Houlihan Lokey's analysis were not similar enough to Idearc.  *See* Defendants' Joint Post-Trial Reply Brief at 16 n.69 (docket entry 639).  However, in its own analysis, Houlihan had already applied a multiple discount to account for this dissimilarity.  *Id.*; *see also* Tr. Vol. 7B at 33:2-37:17.  Thus, to apply Houlihan's discounted multiple and then to weight the market multiple method at only 15% constitutes another form of double counting.

At nearly every step in the DCF analysis, Taylor selected inputs that forced Idearc's value lower.  From her selection of only the most pessimistic projections of Idearc's future performance, to her reliance on a "commercially unreasonable" terminal value projection and calculation, to her selection of a remarkably high discount rate, the method produced a valuation that is low in the extreme and that implied an incredibly low trading multiple for Idearc.  Hopkins testified that merely correcting for the errors in Taylor's discount rate and terminal value calculations would have yielded a DCF value $4.3 billion higher than Taylor's.  Tr. Vol. 8A at 68:11-69:7.  Thus, these corrections alone would have yielded a DCF valuation range of $9.7-10.6 billion, even before weighting that range and adding to it the weighted results of the market-based valuations.

### iv.  Outlier nature of Taylor's DCF valuation

Hopkins testified that Taylor's calculation of Idearc's value using the DCF method resulted in a significant outlier in relation to her calculations under the market multiple method and the comparable transaction method.  Tr. Vol. 8A 55:16-20; DX 507 at 6.  Hopkins also testified that typical valuation practice, according to the standard treatise authored by Shannon Pratt, dictates that in such a situation one would normally disregard the outlier.  *Id.* at 56:7-23.  Another option, which Taylor rejected, would have been to weight the outlier valuation lower than the other, more-consistent valuations.  *Id.*  A final option, according to the Pratt treatise, is to inquire further into the model that generated the outlier in order to determine what went wrong in producing such an outlier.  *Id.*  Taylor testified that this final option describes the approach her report took.  Tr. Vol. 4B at 31:18-32:2.  In light of Hopkins' testimony that Taylor's DCF valuation relied on generally unsupportable methods and inputs, or unsupportable combinations of methods and inputs, Taylor's testimony that she looked deeply at any potential flaws in her DCF valuation is not credible.  Rather than disregarding or assigning low weight to her DCF valuation, Taylor did the opposite.  She assigned low weight to the consistent valuations (the market multiple valuation and the comparable transaction valuation).

### 4.  *Market "Misrepresentations" and "Omissions"*

Taylor testified that, while it would be customary for a valuation professional

to consider the price of a company's stock publicly traded on an efficient market as a

prime indicator of its value, for her work in this case she refused to look at Idearc's

stock price because she believed that material information had been withheld from

the market.  Tr. Vol. 3 at 53:8-17, 56:22-57:4.

The defendants presented evidence regarding the information Idearc disclosed

in its Form 10 and Offering Memorandum for its Unsecured Notes.  These

documents contained comprehensive risk disclosures that were modeled upon the

disclosures made by other public directories companies.  Tr. Vol. 9A at 99:16-23;

100:10-101:13; 102:25-103:7.  The Form 10 and Offering Memorandum contained

extensive disclosures about the risks that Idearc would face following the spinoff.

They disclosed the general declining usage of print directories.  PX 901 at 33 (Form

10); PX 909 at 36-37 (Offering Memorandum).  They disclosed the changing

technologies and user preferences and uncertainty surrounding whether Idearc would

be able to respond adequately to these changes.  PX 901 at 32; PX 909 at 36.  They

disclosed increased and widespread competition from other print directory publishers,

including independent directories.  PX 901 at 32; PX 909 at 35.  They disclosed

Idearc's reliance on small and medium-sized businesses.  PX 901 at 35; PX 909 at 39.

They referred to the fact that a prolonged economic downturn or other events could

produce changes in shopping patterns.  PX 901 at 36; PX 909 at 40.  They disclosed disruptions or turnover among sales representatives.  PX 901 at 36; PX 909 at 40.

The defendants also presented evidence about the effects of the Tax Sharing Agreement on Idearc's ability to access the merger and acquisition market.  Thomas Wessel ("Wessel"), a tax expert, opined that the TSA permitted Idearc to engage in expansive merger and acquisition activity.  Tr. Vol. 6B at 61:15-24.  Specifically, he testified that the TSA did not limit the ability of (1) any third party to acquire 100 percent of Idearc's equity without triggering any tax liability pursuant to a Treasury Regulation known as the "Super Safe Harbor," *id*. at 62:6-9, (2) Idearc to acquire any entity for cash, *id.* at 62:18-64:15; *see also* Treasury Reg. § 1.355-7(b)(2), or (3) Idearc to acquire any entity in exchange for up to 49.9 percent of Idearc's outstanding equity, Tr. Vol. 6B at 108:6-16, allowing Idearc to double in size through a merger of equals.  Wessel further testified that a transaction that triggered prepayment of Idearc's debt would not jeopardize the status of the Term Loan B or the Unsecured Notes as "securities," as Idearc and Verizon expected the debt to be long-term at the time it was issued.  *Id.* at 67:4-68:10.  Furthermore, the TSA was publicly filed with the SEC and the court notes that its terms are not opaque or indecipherable by investment professionals.

5. *Court's Conclusions*

Taylor's outlier valuation of Idearc under the DCF method drove her conclusion that Idearc was worth only $8.15 billion on November 17, 2006, the date of the spinoff from Verizon.  There is no dispute that Taylor's valuation of Idearc using the DCF method produced an extreme outlier even within her own analysis, *see, e.g.,* DX 507 at 6, compared to the valuations that the market multiple and comparable transactions methods produced.  The court is not persuaded that Taylor's DCF valuation is more reliable than these other methods, which showed that Idearc was solvent on November 17, 2006.  The court is, however, persuaded by the expert rebuttal of Mark Hopkins, which showed that Taylor's DCF valuation was flawed in significant ways with respect to its most important inputs.  The court therefore has no evidence before it to conclude that Idearc was insolvent on November 17, 2006.  The only credible evidence before the court of Idearc's value shows that it was solvent on this date.  That evidence is found both in Taylor's report and in the following.

D.  <u>Market Evidence of the Value of Idearc on November 17, 2006</u>

On November 17, 2006, the day of the spinoff, the closing price of Idearc's common stock, as quoted on the NYSE, was $26.25 per share.  DX 611 at 2.  Idearc's common stock traded on a when-issued basis between November 6, 2006 and November 16, 2006.  *Id.*; *see also* DX 1629.  It closed on November 6, 2006 at $25.96, and it traded between $25.80 and $28.15 during the when-issued trading

period, *id.*, with average daily trading volume of approximately 1.45 million shares. DX 1629; *see also* Tr. Vol. 8A at 9:13-24 (testimony of Hopkins).  Idearc's stock price increased following the spinoff, reaching its highest closing price of $37.66 on May 23, 2007, more than six months after the spinoff.  DX 611 at 5.  The stock price remained above $24.00 through November 2, 2007.  *Id.* at 7.  On the date of the spinoff, there were 145,851,862 shares of Idearc common stock issued and outstanding.  PX 979 at 1; PX 1092 at 1.  Accordingly, the market value of Idearc's equity -- that is, the market value of its assets in excess of its liabilities -- was $3,828,611,378 on November 17, 2006.  Given Idearc's $9.115 billion in outstanding debt, and after subtracting the $100 million in cash on hand, which is included in the company's equity value but is not considered part of the company's total "enterprise value," *see* Tr. Vol. 8A at 11:9-15 (testimony of Hopkins), the total enterprise value of Idearc implied by trading on the NYSE was no less than $12.8 billion.[6]

### E.   Was the Market Misled as to Idearc's True Value?

The Trustee argued at trial that, while it is normally true that the market price of a company's stock is a reliable guide to value, in this case Verizon made misrepresentations and omissions about the business of Idearc that were material to

---

[6]     The court finds it likely that this figure accurately represents the value of Idearc on November 17, 2006.  The court remains agnostic about the precise final figure but finds it clear that Idearc's value was at least $12 billion on the date of the spinoff.

the stock's value.  Tr. Vol. 1A at 6:5-19.  These misrepresentations and omissions, the

Trustee urges, render the market price of Idearc's stock an unreliable guide to its

value.  *Id.*

The court will thus review the voluminous record the Trustee compiled, in

order to determine whether material information was withheld from the market or

material misrepresentations were made to the market.  For ease of presentation, these

items are divided into two separate categories:  (1) information the Trustee alleges

was withheld from the market, but that the court has found was actually disclosed;

and (2) information that was apparently withheld from the market, which the Trustee

argues was material, but that the court finds is immaterial to Idearc's value.

### 1.  *Information Alleged to Have Been Withheld from the Market That Was Actually Disclosed*

The following are items of material information that the Trustee argued were

not disclosed to the market and that therefore render Idearc's stock price an

unreliable guide to its value.  The court finds, based on extensive evidence presented

by the defendants, that each of these items of information was available to the

market.

### a.  Idearc's historical and projected future performance: dying "harvest business" or stable "cash cow"?

The Trustee argued that Verizon promoted Idearc to the market as a company

with significant growth potential, when Verizon knew that Idearc was actually a dying

business that would only continue to decline.  *Id.* at 6:20-7:24.  The Trustee

attempted to paint a distinction between a "growth company" and a "harvest

business" (*i.e.*, a dying business whose most efficient use is to be sold off in parts for

cash as it continues to decline), and to argue that key executives at Verizon, including

CEO Ivan Seidenberg ("Seidenberg") and VIS President Kathy Harless ("Harless"),

secretly believed (but did not disclose) that VIS was a dying harvest business.  *Id.*

 In contrast, the defendants presented ample evidence that Idearc was a mature,

stable business, capable of generating significant cash flow ( what it termed a "cash

cow," *see*, *e.g.*, Tr. Vol. 9B at 20:7-10) and that, for this reason, it was an attractive

business to investors.  The defendants also attempted to show that this picture of

Idearc's business and prospects was both widely available to the market and was

consistent with what top executives at Verizon believed and disclosed to the market

at or around the time of the spinoff.

 At the time of the spinoff, Verizon's Information Services division was the

second-largest directories business in the United States, publishing more than 1,200

directories (or "books") in 35 states and the District of Columbia.  DX 416 at 6, 16;

PX 901 at 79.  Its electronic yellow pages business, known as "Superpages.com," was

the leading Internet yellow pages in the country by market share.  DX 416 at 16, 18;

PX 901 at 16-17, 78-79.  Idearc was the incumbent publisher in 316 markets in the

legacy GTE and Bell Atlantic regions, and also an independent publisher in 42

markets.  It had a presence in 81 of the top 100 telecommunications markets across the United States and had a market share of at least 72 percent in its top 15 markets. DX 416 at 16; PX 901 at 79.

VIS, which was the name that Verizon used to describe the directories business in segment reporting in Securities and Exchange Commission ("SEC") filings, was a stable generator of large cash flows, considered by Verizon's senior management to be a "cash cow."  Tr. Vol. 9B at 20:7-10 (testimony of CFO Doreen Toben ("Toben")); Tr. Vol. 5B at 86:9-18 (testimony of VIS officer Dee Jones ("Jones")).

VIS historically had generated more than $3.4 billion in annual operating revenue.  DX 525 at 184-85.  For 2006, pro forma "LTM 6/30/06" revenue (*i.e.*, revenue for the "last twelve months ending June 30, 2006") was $3.256 billion.  DX 416 at 6; DX 313 at 41; PX 901 at 51.  VIS had adjusted EBITDA of $1.7 billion in 2005.  DX 416 at 50; DX 313 at 41.  VIS's 2006 EBITDA, the year of the spinoff, was estimated in the financing model to be approximately $1.559 billion.  DX 416 at 57; DX 314 at 8.  Historically, VIS's EBITDA margins were approximately 50 percent.  DX 416 at 50; DX 313 at 24.

Seidenberg testified about the historical performance of VIS, as reported in Verizon's annual SEC 10-K filings.  Describing the performance of the business in 2003, Seidenberg testified that:

> The way I look at this is from the CEO's perspective.  You have a top line of 3.763 billion dollars, and then you have

> a segment income after all the taxes and expenses are taken
> care of -- an income of 1.128 billion which basically says
> about a third of your business revenues show up in terms
> of [the] bottom line.  That's an extraordinarily powerful
> business . . . [I]t's very, very powerful.

Tr. Vol. 6A at 41:13-21.

Although VIS generated significant free cash flow, Verizon's management did not believe the division was fairly valued by investors as a component of Verizon's stock price.  At a time when stand-alone directories companies were trading at as much as 10 times EBITDA, Verizon was trading at only 5 to 5.5 times EBITDA.  Tr. Vol. 9B at 26:16-19.  Seidenberg testified that investors viewed Verizon's directories business "as having less value because [Verizon] owned it than if it was outside the company."  Tr. Vol. 6A at 53:13-15.  As a result, the investment bankers advising Verizon were of the view that "Verizon, plus Directories, as two separate companies, would be more valuable if investors could hold them that way than as one stock."  Tr. Vol. 7A at 86:22-87:3; Vol. 9B at 26:19-23.

In 2005 and 2006, there was significant investor interest in directories businesses.  Tr. Vol. 7A at 80:23-81:3; 81:18-22; Vol. 8B at 97:8-13.  Jennifer Nason ("Nason"), an executive at JP Morgan, testified that investors were buying up directories businesses and there was substantial interest in their steady cash flow.  Tr. Vol. 7A at 80:23-81:3.  Jonathan Yourkoski ("Yourkoski"), a Managing Director at Morgan Stanley, gave similar testimony concerning investor interest in directories

businesses, stating that "[t]he capital markets were very receptive to directories companies, both the debt and equity portions of those markets." Tr. Vol. 9A at 9:7-9.

The directories industry generated approximately $15 billion in revenue in 2005. DX 450 at 4. Industry analysts such as the Kelsey Group forecasted continued year-over-year growth in the industry, with revenue gains for independent directories and small declines for incumbent print directories. DX 416 at 25; PX 1060 at 74, 151. According to a memorandum submitted to Morgan Stanley's credit committee in connection with its investment in Idearc's debt, "[d]irectory advertising is often the primary form of paid advertising used by small- and medium-sized businesses due to its low cost and broad demographic distribution." DX 450 at 4. Continued demand from small and medium-sized businesses, coupled with substantial renewal rates -- which for Verizon were approximately 86 percent -- caused at least some investors to conclude that the revenue stream generated by incumbent directories businesses would remain stable. *Id.* at 12.

Between 2002 and 2006, there were numerous mergers and acquisitions in the directories industry. Among other transactions, in 2002, RH Donnelley bought the Sprint directories business at an 8.6 times EBITDA multiple, and private equity investors the Carlyle Group and Welsh Carson bought Qwest Dex at a 7.8 times EBITDA multiple; in 2004, private equity investor Bain Capital acquired Verizon's

Canadian directories business at close to a 13 times EBITDA multiple; in 2005, Yell

bought Transwestern at a 12.6 times EBITDA multiple; and, in 2005, RH Donnelley

acquired Dex Media at approximately a 10.9 times EBITDA multiple.  PX 27 at 31;

DX 330 at 43.  Moreover, the EBITDA multiples for these and other directories

transactions ranged from 7.4 times EBITDA to 14.1 times EBITDA, and were

increasing over time.  PX 27 at 31.  Private equity firms -- referred to by investment

bankers as financial sponsors -- exhibited significant interest in directories businesses

because of their high and stable cash flow.  DX 446 at 5; Tr. Vol. 9A at 16:9-19.

On August 25, 2005, Deutsche Bank Securities Inc. published a research

report by equity analyst Paul Ginocchio entitled, "Wall Street's view of the [Yellow

Pages] Industry, which stated, "Love the YP industry: RHD [RH Donnelley] and

DEX [Dex] have been our best two stock picks in the last year (out of 21 stocks

covered) -- still more upside to go."  DX 1856 at 3-4.  Under the heading "Why

Yellow Pages stocks are 'working,'" the analyst report touted the steady generation of

free cash flow by yellow pages businesses and noted that Deutsche Bank's two global

directories stock indices had risen 9 percent and 10.5 percent year to date versus only

3.6 percent growth of the S&P 500.  DX 1856 at 23-24, 27.

According to a separate Morgan Stanley analysis, which was presented to

Verizon in November 2005, the price of Dex's common stock had traded up 42

percent between July 2004 and November 2005, and the price of RH Donnelley's

common stock had increased by 50 percent during that same time period.  DX 446 at

5.  Morgan Stanley reported that "[i]nvestors are favoring directories . . . companies

due to predictable free cash flow and attractive yields."  *Id.*  In late August 2006,

Morgan Stanley again reported that "[i]nvestors continue to be attracted to high

margins and modest capital requirements characterizing the [directories] business."

DX 448 at 4; Tr. Vol. 7B at 65:21-66:3; Tr. Vol. 8B at 97:10-13; DX 437 at 4.

In October 2005, RH Donnelley announced that it had reached an agreement

to purchase Dex Media for approximately $4.2 billion.  DX 446 at 12.  To finance

the transaction, RH Donnelley borrowed $2.3 billion, leaving the combined company

with approximately $10.9 billion in outstanding debt.  PX 1333 at 130; DX 1417 at

59.  This debt represented approximately 7 times RH Donnelley's projected 2006

EBITDA.  DX 446 at 12; DX 776 at 8.

The Idearc spinoff resulted in significant demand for Idearc's debt securities.

Each tranche of the financing -- the $1.515 billion Term Loan A and the $250

million Revolver; the $4.750 billion Term Loan B; and the Unsecured Notes, the

most junior tranche of debt in the capital structure -- was oversubscribed by a

substantial amount.  The Term Loan A and Revolver were oversubscribed by 1.66

times, meaning that there were requests to finance 66 percent more of the Term Loan

A and Revolver than was necessary to complete the transaction.  PX 973; DX 382; Tr.

Vol. 9B at 117:1-23; Vol. 10B at 23:18-25:10.  The Term Loan B was oversubscribed

by 1.37 times, while the Unsecured Notes were oversubscribed by 3.5 times.  Tr. Vol. 10B at 24:2-25:10; Vol. 10A at 41:24-43:13.  As a result of the significant demand for Idearc debt, the yield on the debt instruments (*i.e.*, their interest rate) was even lower than the bankers advising Verizon had anticipated.  Tr. Vol. 9B at 118:6-10.

On April 10, 2007, Idearc filed a registration statement with the SEC related to the $2.85 billion Unsecured Notes.  PX 1196.  Beginning in early June 2007, after the registration statement was declared effective, and until November 2007, the Unsecured Notes traded at, above, or near par, reflecting investor confidence in Idearc's debt.  DX 612 at 1-4; Tr. Vol. 10A at 43:14-44:8.

There are, of course, significant questions that remain, notably whether Idearc was actually in much worse position than other directories companies but, by virtue of alleged misrepresentations and omissions, was unjustifiably swept up in a wave of general investor confidence in the apparent stability of the directories industry.  To answer this question, it is necessary to look to whether Verizon misrepresented to investors either the historical or projected performance of Idearc.  Verizon's annual SEC filings on Form 10-K and Idearc's Form 10 reflected that VIS had declining revenues from 2001 through 2006.  DX 525 at 184-85; PX 901 at 24, 51.  Industry analysts, including the Kelsey Group and Simba, predicted further declines for the incumbent print business.  PX 1060 at 219; Tr. Vol. 4B at 54:5-25; 56:7-58:2.  Many

public equity analysts also predicted continued revenue declines for VIS.  Tr. Vol. 4B

at 111:17-113:12; DX 1855 at 5; Tr. Vol. 9B at 40:12-41:5.

No equity investor or public-side debt investor had access to Idearc's financial

projections.  Tr. Vol. 9B at 89:13-19.  They were not included in the Form 10 that

Idearc filed with the SEC and were not included in any of the presentations that were

made to public-side lenders.  Tr. Vol. 9A at 110:16-111:3; PX 901.  Accordingly, the

only widely disseminated public information available to equity and public-side debt

investors showed actual, historical revenue declines (from Verizon's public SEC

filings) and projected future revenue declines (published by third-party analysts).  DX

488 at 36; Tr. Vol. 9B at 94:23-95:8.

The management forecasts that VIS made available to private-side investors

did not reflect substantial increases in revenue or free cash flow.  The forecasts

projected essentially flat EBITDA from 2006 through 2010 – decreasing from $1.559

billion in 2006 to $1.555 billion in 2007 and in 2008, and then increasing slightly to

$1.566 and $1.574 billion in 2009 and 2010.  DX 416 at 57; DX 314 at 8; DX 494

at 5.  The forecast of Idearc's free cash flow also reflected declines, decreasing from a

projected $459 million in 2006, to $432 million in 2007, to $425 million in 2008

and 2009, before increasingly slightly to $437 million in 2010.  DX 416 at 59.  The

Idearc forecasts were provided only to private-side lenders who agreed not to trade in

Idearc securities in the public markets, and to two rating agencies.  Tr. Vol. 4B at 41:4-42:5.

The Trustee did not produce evidence of any investor that relied upon Idearc's financial forecasts, which had projected flat EBITDA and free cash flow results, in making a decision to invest in Idearc debt or equity securities.  The Trustee also failed to introduce any evidence that supported its assertion that investors were only willing to purchase Idearc debt and equity, because they believed Idearc would have significant revenue and EBITDA growth.

Morgan Stanley, Citibank, and JP Morgan, three private-side investors that received Idearc management's financial forecasts, prepared their own projections for revenue, EBITDA, and free cash flow, rather than simply relying on the forecasts provided by Idearc's management.

Morgan Stanley's credit committee considered a "base case" of financial projections done by that firm, *see* Tr. Vol. 9A at 38:22-39:9, that estimated a decline in EBITDA from $1.558 billion in 2006 to $1.320 billion in 2013.  DX 450 at 15.  Morgan Stanley also forecasted a decline in free cash flow from $406 million to $360 million during the same time period.  DX 450 at 15; *see also id.* at 13.  Nevertheless, Morgan Stanley concluded that, on the date of the spinoff, Idearc would have a total enterprise value of $12.5 billion and an equity value of approximately $3.4 billion.  DX 450 at 4.

Citibank's base case estimated year-over-year revenue declines, as well as declining EBITDA margins.  DX 745 at 11.  Nevertheless, Citibank concluded that Idearc had a total enterprise value of $11.7 billion to $14.4 billion.  *Id.* at 19.

JP Morgan created a downside case that estimated annual declines in net revenue ranging from negative 4.2 percent to negative 2 percent and adjusted EBITDA falling from an estimated $1.559 billion in 2006 to $1.244 billion in 2014.  DX 422 at 83.

Goldman Sachs similarly prepared a downside forecast reflecting that EBITDA would decline annually between 2006 and 2014 by percentages ranging from 0.2 percent (2009) to 1.3 percent (2014).  PX 803 at 21.  Goldman Sachs' downside case reflected an estimated decline in free cash flow from $423.8 million in 2006 to $397.5 million in 2014.  *Id.*  Goldman Sachs calculated the enterprise value of Idearc on the date of the spinoff to be $12.465 billion, with an equity value of approximately $3.45 billion.  *Id.* at 5; Tr. Vol. 8B at 106:10-23.  Goldman Sachs' credit committee approved a $200 million commitment to the Term Loan A and the Revolver, recognizing, among other things, Idearc's "strong financial profile with significant free cash flow."  PX 803 at 11; Tr. Vol. 8B at 103:3-4.

Seidenberg also testified about his belief that Idearc would appeal to a different type of investor from those who held Verizon common stock.  In his view, Idearc

would appeal to investors that were interested in stable cash flow and a large dividend.  Tr. Vol. 6A at 73:11-18.

The defendants further presented evidence that indicates that, while VIS had not been growing, Verizon and VIS management believed at the time of the spinoff that VIS was a valuable, steady producer of EBITDA and free cash flow and that it could prosper as an independent company.  The Trustee's allegations that Seidenberg and Harless believed that the directories business was in "harvest" mode, and that Seidenberg and Harless withheld this information from prospective investors, are unsupported by the evidence.

The evidence introduced during the Phase I trial indicates that, prior to the spinoff, the future leadership of Idearc believed that VIS had not been able to reinvest into its business the substantial free cash flow that it had generated.  Harless testified that VIS had been unable to invest in its sales organization, in the print product, or in advertising in the years preceding the spinoff, and further that Idearc intended to make such investments following the spinoff.  Tr. Vol. 9A at 59:15-60:10.  Harless also testified that, during Idearc "roadshows" (investment presentations), she communicated to prospective investors Verizon's historical practice of utilizing the cash flow generated by the directories business to invest in other Verizon lines of business that were higher priorities to the overall company

(such as wireless and broadband), rather than investing the cash flow generated by the directories business back into the business itself.  *Id.* at 58:2-7; DX 1730.

The Trustee introduced an e-mail, *see* PX 1161, that Harless sent to members of the Idearc Board in January 2007, shortly after the spinoff, which memorialized questions that Harless had received from investors and her responses thereto.  In response to questions about whether Idearc could cut costs further, Harless's e-mail stated that "No -- We have been in Harvest mode for three years."  PX 1161. Questioned about this e-mail, Harless explained that, "number one, I'm referring back to when we were in Verizon, and we were cutting costs and not investing back into the directories business.  Verizon had other priorities in which they were investing the dollars."  Tr. Vol. 9A at 69:13-17.  Although the Trustee suggested that this e-mail reflects the internal views of Seidenberg and Harless, and that those views were withheld from the investment community, Harless testified that this e-mail reflected her actual statements to investors in various meetings that occurred in January 2007. *Id.* at 68:18-69:2.

The Trustee also alleged that, in July 2005, Diercksen and others entered into a fraudulent scheme to represent falsely that VIS would achieve a 2 percent growth in print revenues.  Tr. Vol. 1A at 18:1-9, 19:3-18.  The Trustee contended that, with this false projection of revenue growth, Verizon could maintain that its directories business had a value of $13 billion, which purportedly was necessary to support $9

billion in deleveraging through the spinoff.  There was no credible evidence that any such scheme occurred.

The Trustee repeatedly sought to elicit testimony that VIS's revenue and EBITDA forecasts were knowingly false.  To establish this, the Trustee sought to elicit testimony that the valuation ranges for the directories business, as presented to the Verizon Board in a November 2005 "Strategic Update," *see* PX 57, were based on unsupportably optimistic forecasts contained in the VIS 2006-2010 Plan of Record, *see* PX 100.  The Trustee alleged that the $10.5 billion to $15 billion DCF valuation range presented to the Verizon Board was premised on 2 percent annual growth for print business revenues.  Tr. Vol. 1A at 94:18-22, 97:3-6, 97:11-17; *but see* PX 100 at 54 (showing that the 2006-2010 Plan of Record only projected year-over-year overall revenue growth of 2 percent in 2009).  The Strategic Update itself, however, makes clear that the valuation range was based on the previous five-year Plan of Record forecasts (2005-2009) which projected a decline, not growth, in incumbent print revenue.  PX 57 at 8.  Moreover, John Fitzgerald ("Fitzgerald"), who was responsible for the valuation section of the Strategic Update, testified that the primary input into a DCF valuation is the perpetual growth rate for free cash flow, rather than changes in revenue in any single year.  Tr. Vol. 7A at 41:14-22; 42:9-43:13.

The Trustee also claimed that forecasts in the VIS financing model were knowingly false.  Tr. Vol. 1A at 8:9-10.  The evidence did not support this

contention.  Among other things, the evidence established that, in order to forecast

Idearc's performance following the spinoff, it was necessary for VIS to develop a

business plan that reflected projected financial performance of the directories business

as a separate, stand-alone entity, *i.e.*, wholly separated from Verizon.  This necessarily

required VIS to develop financial assumptions different from those when VIS was a

wholly owned subsidiary of Verizon.  Then-VIS Director of Financial Planning Jones,

who had primary responsibility for the budgeting and planning process, testified that

VIS "took [its] normal course five-year strategic plan, and then it was refined and

adjusted to reflect the stand-alone aspect of it versus it being a subsidiary of Verizon."

Tr. Vol. 5B at 88:12-15; 92:2-94:3.  Jones testified that this forecast was prepared

based on input from VIS President Harless and VIS chief financial officer Andy

Coticchio ("Coticchio"), and with consideration of the views of Verizon's corporate

finance department and McKinsey.  *Id.* at 91:19-103:19, 107:1-18.  The financing

model also reflected actions that Idearc management intended to adopt in response to

industry conditions.

The financing model included estimated expenses associated with Idearc's

assumption of various responsibilities that had previously been performed by Verizon.

*Id*. at 102:10-16.  The goal, as Jones testified, was to develop "a set of forecasts that

was achievable and realistic and supportable."  *Id*. at 104:11-13.

Numerous Verizon and Idearc executives testified credibly to their belief in the solvency of Idearc on the date of the spinoff, contradicting the Trustee's attempts to show that Verizon and Idearc's upper-level management knew that Idearc was a dying, "harvest" business.  *Id*. at 108:11-14; 113:3-7 (testimony of Jones); Vol. 9A at 64:6-13, 20-25 (testimony of Harless); Vol. 9B at 54:24-55:4 (testimony of Coticchio); Vol. 8B at 64:4-10 (testimony of Mueller, Idearc's post-spinoff Chairman of the Board).

Seidenberg, the chief executive officer of Verizon on the date of the spinoff, testified that he "supported and agreed with the opinion of all the experts that came in and showed us the net result of all the work they did.  So I agreed with the valuation number of 12.5 [billion dollars]."  Tr. Vol. 6A at 72:7-13.

Toben, the chief financial officer of Verizon on the date of the spinoff, testified that she believed Idearc's total enterprise value to be 7.5 times its estimated 2006 EBITDA or approximately $12.1 billion.  Tr. Vol. 9B at 43:24-44:3.

Jack Mueller, the Chairman of the Board of Idearc as of the spinoff, who had extensive experience in the telecommunications industry and spent hundreds of hours studying Idearc's business, its historical performance, its business model, and meeting with management in advance of the spinoff, testified to his belief that the "enterprise value of the to be spun Idearc" was "at least" "[$]11.5 to [$]12.5 billion."  Tr. Vol. 8B at 68:10-12, 17-18; 58:11-59:23.

Harless, Idearc's chief executive officer at the time of the spinoff, testified that she believed that "the implied equity value[] of between [$]2.6 billion and $4.1 billion" (which corresponds to a total enterprise value for Idearc of between $11.7 billion and $13.2 billion) was "very representative of the business." Tr. Vol. 9A at 71:25-72:10. Harless further testified that she believed that the value of Idearc's assets exceeded the value of its debts on November 17, 2006, and that she would not have agreed to be Idearc's CEO had she believed otherwise. *Id.* at 72:16-73:1.

Coticchio, Idearc's chief financial officer as of the spinoff, testified that he executed the Solvency Certificates associated with the Credit Agreement for the bank financing, *see* PX 1058 and the Unsecured Notes, *see* DX 652b, and that he believed the representations contained in the Solvency Certificates to be accurate on the date of their execution, November 17, 2006. Tr. Vol. 9B at 65:14-66:15, 68:7-69:24. The Solvency Certificate includes (among other things) the representation that "the fair value of the assets of [Idearc], at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise." PX 1058 at 2.

Jones, the Executive Director of Financial Planning and Analysis at the time of the spinoff (and later chief financial officer of Idearc and its successor, SuperMedia), testified that he believed Idearc was solvent on the date of the spinoff and that Idearc could pay its debts as they became due. Tr. Vol. 5B at 133:3-5, 133:15-17. Jones additionally testified that he received approximately 80,000 shares in Idearc and that,

other than to cover owed taxes, he held all of these shares up through Idearc's

bankruptcy.  *Id.* at 132:3-17.

The court finds this testimony credible and that the evidence contradicts the

picture the Trustee attempted to paint of a conspiracy among high-level Verizon and

Idearc executives to present to the market a false picture of Idearc's historical and

future prospects.

b.  Specific financial numbers

i.  Revenue declines in urban markets

The Trustee alleged that Verizon's yellow pages business "had been suffering a

double digit decline" in "the major urban markets" and that this decline was not

"shared with the market place."  Tr. Vol. 1A at 8:16-23; 20:6-9.  According to the

Trustee, these undisclosed declines were the "canary in the mineshaft," because major

urban markets were more likely to experience Internet competition and an "intrusion

by Google and Yahoo!."  *Id.* at 8:9-9:10.  The evidence, however, demonstrated that

investors knew that VIS had experienced greater revenue declines in its major urban

markets.

Bear Stearns and JP Morgan were provided with detailed information about

declining revenue in urban markets, including historical revenue figures on a book-by-

book basis.  Tr. Vol. 7A at 94:20-97:7; Vol. 7B at 87:8-88:16.  VIS management held

a two-day meeting in Dallas on March 22-23, 2006, which was attended by

representatives from JP Morgan, Bear Stearns, and the law firm Debevoise & Plimpton.  During that meeting VIS's senior management reviewed historical results region-by-region, including year-over-year performance in individual urban markets.  PX 233b; Tr. Vol. 9A at 95:23-96:25.  VIS management met again with the JP Morgan and Bear Stearns advisory and financing teams on April 18, 2006, during which they reviewed the same type of historical information.  Tr. Vol. 9B at 107:25-108:15.  Historical and projected performance on a book-by-book basis were included in the electronic data room that Idearc made available to the investment banks and their outside law firm, Cravath, Swaine & Moore.  *Id*. at 93:18-94:7; PX 2008; PX 2009.

The JP Morgan credit committee memo demonstrated a full awareness of historical revenue declines in major urban markets.  For example, the memo described declining print revenue in Manhattan from $105.5 million in 2004 to $85.3 million in 2005 to $64.3 million in 2006, and indicated that year-over-year declines were 9.7 percent, 19.2 percent, and 24.6 percent respectively in the years 2004-2006.  DX 422 at 106.  That credit memo further discussed print revenue declining in Boston from $145.8 million in 2004, to $136.2 million in 2005, to $126.4 million in 2006, and indicated that the year-over-year declines in print revenue were 5.6 percent, 6.6 percent, and 7.2 percent respectively in the years 2004-2006.  *Id.*  JP Morgan's credit committee memo states that Verizon had provided JP Morgan with projections for

2006 to 2010 that were "built up on a directory by directory basis" and that predicted continued declines in books like Manhattan (negative 18.5 percent CAGR[7] for 2005-2010) and Boston.  *Id.* at 72.

Verizon provided Houlihan Lokey with historical revenue information on a book-by-book basis in connection with its due diligence for its solvency opinion.  Tr. Vol. 7B at 20:13-22.  Morgan Stanley received similar information.  Morgan Stanley's files included historical market-by-market revenue information on both an as-published and an amortized basis, further broken down by national and local print. DX 936; DX 937; DX 939.  Yourkoski testified that Morgan Stanley received "historical, as well as projected, results for the national print revenue, I believe local print revenue as well as book-by-book or cluster-by-cluster information for the directories business."  Tr. Vol. 9A at 32:4-9.  These materials included the year-over-year results for the very northeast urban markets that the Trustee contended were not disclosed.

In addition, information concerning broadband penetration, competition from independent publishers, and the general decline in yellow pages revenue in the northeast urban markets was widely known at the time of the spinoff.  DX 563 at 3; DX 491 at 4-5; DX 361 at 4.  These issues were discussed in industry reports published by entities such as Simba and the Kelsey Group.  DX 842 at 3.  They were

---

[7]       CAGR is "compound annual growth rate."

discussed in equity analyst reports.  DX 1725 at 26; DX 510 at 33; DX 822 at 3.

They were also identified as "risk factors" in Idearc's Form 10 and in the Offering

Memorandum for the Unsecured Notes.  PX 901 at 32, 36, 63; PX 909 at 35, 40-41,

62.

      ii.  <u>Difference in profit margins between electronic and print business</u>

The Trustee's valuation expert, Taylor, testified that, in reaching her opinion

that Idearc's value from operations was $7.5 billion to $8.8 billion, she disregarded

the price of Idearc's common stock as traded on the NYSE and under-weighted the

two other leading market-based valuation methodologies (the comparable transaction

and market multiple methods).  Taylor testified that she did so based on her opinion

that the market price of Idearc was inflated because Verizon concealed material non-

public information about, among other things, the difference in profit margins

between VIS's incumbent print business and its electronic (Internet) business.  Tr.

Vol. 4A at 9:7-18:3.  Taylor testified that this was a "very important issue," that she

had "scoured the record," and that there was no evidence of any disclosure that

EBITDA margins on electronic business were lower than the EBITDA margins on the

incumbent print business.  Tr. Vol. 4B at 63:9-64:15; 64:17-22; 65:1-5.

The evidence at trial strongly contradicted Taylor's testimony on this point.

Citibank's credit committee memo stated that "[i]ncumbent print directories

traditionally enjoy[] low-50% EBITDA margin, while independent print and internet

have achieved high-10% margin and low-20% margin, respective[ly]."  DX 745 at 11. The memo additionally stated that Idearc's future chief financial officer Coticchio "mentioned that the Company expects margins of independent print and internet to improve to high-20% and approximately 30%, respectively."  *Id.*

Wachovia's credit committee memo stated that incumbent print margins are currently "Low 50%" but projected to be "Mid 50%"; Internet margins are currently "Mid 20%" and expected to grow to "High 30%"; and independent print margins are currently "High Teens %" and forecast to grow to "Upper 20%."  DX 491 at 4.

The Royal Bank of Scotland credit memo stated that the growth of the Internet and independent print businesses undercut overall EBITDA margins because they were lower margin businesses and that "the impact on EBITDA is magnified as growth segments generate lower margins (c.20%) versus the c.50% margins of the incumbent directories business."  Tr. Vol. 4B at 72:22-73:21.

BlackRock's credit memo stated that "internet has lower margins than print directories."  DX 361 at 4.

An Idearc presentation to the rating agency Moody's states that "independent margins expected to move toward[] target levels of 25%-30% (Yellow book is 24%) over the plan period. (2006 - 18% overall)."  "Internet margins expected to continue to improve over the plan period to high 30's low 40's (2006 in the mid 20's)."  DX 2392 at 12; Tr. Vol. 4B at 79:2-14.

- 45 -

A Deutsche Bank equity analyst report dated November 27, 2006, 10 days after the spinoff, stated that "[i]ncumbent directory EBITDA margins are in the low 50s percent range, independent margins are in the mid-teens and expected by management to get to the high 20s, and online margins in the mid 20s but expected by management to get to the high 30s." DX 510 at 4.

On cross-examination, Taylor was unable to offer any credible explanation for her failure to locate any of these disclosures.

### iii.   The "secular shift"

Taylor also testified that investors were unaware either that Verizon's directories business was undergoing a "secular change" or that Seidenberg believed that the business was supposedly in "harvest mode" and therefore needed to be sold off. Tr. Vol. 4A at 9:20-10:2.

The evidence demonstrated that investors were aware that VIS, as well as other incumbent directories businesses, was undergoing a secular change. In October 2004, Seidenberg stated in a Verizon quarterly earnings call that Verizon's directories business was facing "secular" change, comparing VIS to Verizon's traditional landline telephone business. Seidenberg also disclosed that print revenue -- as reflected in Verizon's publicly reported financial statements, which disclosed VIS financial performance as a separate segment -- was declining. DX 2354 at 31.

Documents introduced at trial from various banks also reflected a broad awareness that the directories business was experiencing "secular" change.  Citibank's credit memo, for example, states that "[t]otal revenue growth has been slowly declining in recent years due to a secular decline in print directory demand."  DX 745 at 10.  A December 2005 equity analyst report published by the RBC Capital Markets stated that "VIS . . . is experiencing a secular revenue decline," particularly "a secular decline in print directory usage."  PX 89 at 2-3; Tr. Vol. 5A at 11:20-12:3.

More generally, the competitive pressures facing incumbent directories businesses were widely discussed prior to November 2006.  In an August 2005 report on Wall Street's view of the Yellow Pages industry, Deutsche Bank equity analyst Paul Ginocchio stated that "Independent competition is ***the*** number one concern of directory shareholders, versus non-holders whose biggest concern is the Internet."  DX 1856 at 9.  The Kelsey Group predicted declining revenues for the incumbent print industry based on the competitive pressures from the Internet and independent publishers.  DX 842 at 3.  The Trustee's assertions that investors were unaware (1) that the directories business was facing "secular change," (2) of Seidenberg's views of that issue, or (3) that incumbent print revenue was declining in the face of competitive threats, were refuted by this evidence.  *See also* PX 1161, Tr. Vol. 9A at 68:18-69:2; DX 1730 at 7; Tr. Vol. 9A at 58:19-60:4.

In its opening statement, the Trustee claimed that an e-mail, *see* PX 121, from Seidenberg to Toben and Diercksen, in which Seidenberg provided feedback on a proposed work plan from McKinsey, demonstrated that Seidenberg believed that VIS's print business should be sold off for parts and that its leading electronic business was worthless.  Tr. Vol. 1A at 14:18-15:19.  Seidenberg testified at length about this e-mail, explaining that it reflected his perception that the directories business was undergoing a transformation similar to that experienced in the traditional telephone business.  Tr. Vol. 6A at 62:9-15.  He testified that his use of the term "secular change" reflected his perception of competition from "print businesses [that were] being established inside the territories where we were operating our own businesses" -- *i.e.*, a reference to competition from independent publishers -- as well as the impact of the Internet.  *Id.* at 63:3-12.  Seidenberg further testified that, prior to November 2006, these issues were frequently discussed by him and others at "conferences, external conferences and analyst meetings."  *Id.* at 63:19-20.

Seidenberg explained his reference in the e-mail to "a new business model separate from Verizon" as follows:

> That's a summation of a complicated problem into a couple of ideas.  So when you think about it, every new print company that came into existence to compete with Verizon came in with lower margins.  They cut prices. They established a very different model for the business than we had.  So my view is that a spun-out VIS would be able to take actions to invest in new product, perhaps cut pricing if that's what they needed to do, perhaps adjust

> their cost structure if that's what they needed to do and
> actually behave much more like a separately positioned
> independent public company much the same way that we
> did to ourselves in our telephone books . . .
>
> So in the longer term I thought that allowing the business
> to pivot to a public company and then create a new
> business from where we started was a good answer.  And
> the other obvious point to me was a spun-out VIS would
> have been the largest independent print business in the
> industry at that time.  So I think it would have
> commanded a lot of attention and would have been able to
> drive strategies around what I thought was ripe to unfold.

Tr. Vol. 6A at 64:8-19; 64:25-65:7.

Seidenberg's observations about how a private equity firm might manage

Verizon's directories business (if a private equity firm were to acquire it) by slashing

costs did not constitute a recommendation that VIS should do the same.  On the

contrary, Seidenberg testified that he believed that an independent VIS would follow

the approach taken in the telephone industry -- "[w]e ended up with mergers,

consolidation.  Consolidation created value, and I think this was something that I was

interested in pursuing here in the VIS business."  Tr. Vol. 6A at 62:15-18.

The Trustee also suggested that Verizon had failed to disclose that it was

experiencing secular decline more rapidly than its competitors.  Tr. Vol. 10B at 6:13-

14.  The internal analyses by the institutions that extended loans to Idearc or

purchased Idearc debt in connection with the spinoff reflect a pervasive awareness

that VIS had experienced greater quarter-over-quarter and year-over-year declines in

revenues than its competitors.  A Morgan Stanley presentation dated August 29, 2006, for example, included a table entitled "Directories Year over Year Revenue Growth" that shows, on a quarter-by-quarter basis from 2004 through the second quarter of 2006, the revenue growth numbers for VIS, AT&T, BellSouth, Dex, and RH Donnelley.  DX 448 at 12.  In each quarter, VIS had greater revenue declines than each of its competitors.  The same page of that presentation contained another table reflecting declines in EBITDA margins on a quarter-by-quarter basis.  Again, VIS's margins were generally lower than those of its competitors.  *Id.*  Morgan Stanley identified "Company Releases" as the source for these figures.  *Id.*

Documents prepared by JP Morgan and Bear Stearns demonstrated that these investment banks understood how VIS's revenue declines compared to its competitors.  A November 28, 2005 JP Morgan and Bear Stearns presentation contained a series of tables that analyze estimated revenue growth and EBITDA growth for the period between 2005 and 2007.  DX 387 at 17.  By these financial metrics, VIS was performing more poorly than Dex, RH Donnelley, BellSouth, and SBC.  *Id.*  The JP Morgan and Bear Stearns documents identified company filings and Wall Street research as the source of this information.  *Id.*

c.  The nature of the tax sharing agreement

Verizon structured the Idearc spinoff to qualify as a tax-free transaction under § 355 and other sections of the Internal Revenue Code.  PX 901 at 15; PX 1142 at

28.   Verizon obtained a ruling from the IRS that the transaction would meet certain requirements necessary to qualify for tax-free treatment, and Verizon obtained an opinion letter from the law firm Skadden Arps Slate Meagher & Flom, its outside tax counsel, with respect to the tax-free treatment of those aspects of the transaction not addressed by the IRS ruling.  Tr. Vol. 6B at 9:3-6; DX 543 at 5-18; Tr. Vol. 6B at 9:7; PX 1087 at 1-14.

As part of the spinoff Verizon and Idearc executed a Tax Sharing Agreement that allocated tax responsibilities between the two entities and that was intended to protect the tax-free status of the spinoff.  PX 1068 at 7-9.  In its opening statement, the Trustee said it would prove that Verizon engaged in a "false tax scheme" and that the TSA was "onerous" and "basically tied the hands of Idearc."  Tr. Vol. 1A at 10:2; 10:24-25.  The Trustee also contended that, by calling the agreement a "Tax Sharing Agreement" (rather than, for example, a "Tax Indemnity Agreement"), Verizon concealed Idearc's obligation to indemnify Verizon for any post-transaction conduct by Idearc that might cause the transaction to become taxable.  *Id.* at 23:1-4.  The Trustee additionally asserted, through its valuation expert Taylor, that the TSA reduced the marketability of Idearc and created a contingent tax liability that reduced Idearc's value.  The evidence admitted during the Phase I trial did not support these contentions.

A draft of the TSA was attached as an exhibit to Idearc's Form 10 Amendment No. 4 that was filed with the SEC on October 26, 2006.  DX 564 at 74-86; PX 901 at 4; Tr. Vol. 9A at 115:21-24.  In addition, the final executed copy of the TSA was filed with the SEC on November 21, 2006.  Tr. Vol. 4B at 42:23-43:4; PX 1068 at 1, 13-14.  The Form 10 described the TSA and contained extensive risk factors associated with it.  PX 901 at 4, 21-22, 26-27, 33, 38-39, 47, 115, 122; Tr. Vol. 9A at 113:10-116:6.  Accordingly, the terms of the TSA, including Idearc's indemnification obligations, were fully disclosed.  Taylor testified that its terms were plain and obvious, and could be readily understood without any tax expertise.  Tr. Vol. 4B at 44:11-46:16.  Taylor further testified that this "indemnification was something in the public domain," that "you don't have to be a tax person to understand [it]," and that "this is clear as to what they are indemnifying for."  *Id.* at 46:23-49:10.

The defendants' tax expert, Wessel, one of the leading practitioners in the field of tax-free spinoffs and the principal author of a 1,000-page treatise on transactions qualifying for tax-free status under § 355 of the Internal Revenue Code, *see* Tr. Vol. 6B at 49:23-50:24, testified that tax sharing agreements are typical in spinoff transactions.  He testified that each of the 25 or more consummated tax-free spinoffs with which he has been involved included a tax sharing agreement.  *Id.* at 44:17-24, 46:21-23.  Wessel further testified that the primary effect of a tax sharing agreement

- 52 -

is to create incentives for the spun off company to exercise diligence before engaging in a post-spin transaction that could undermine the tax-free status of the earlier spinoff. *Id.* at 45:4-5, 45:16-46:5.

Wessel's testimony about the effects of the TSA on Idearc is reviewed above. Wessel also testified that companies spun off from their corporate parents are routinely acquired in the two years following their spinoff despite agreements that contain terms that are materially identical to those contained in the Verizon-Idearc TSA. *Id.* at 71:4-73:2. Wessel testified that, consistent with the TSA, Idearc could be acquired after the spinoff without triggering any indemnification obligation to Verizon. As an example, Wessel testified that, if Google had wanted to acquire Idearc the day after the spinoff, it could have done so without triggering any tax obligations so long as there had been no substantial negotiations between Verizon and Google in the two years prior to the spinoff. *Id.* at 63:12-20.

The TSA did not impose onerous restrictions on Idearc's ability to prepay or refinance its debts following the spinoff. The TSA imposed no restrictions on Idearc's ability to prepay or refinance its $1.5 billion Term Loan A debt. *Id.* at 22:8-16, 60:20-23 . Rather, the restrictions on prepayment or refinancing applied only to the Term Loan B and the Unsecured Notes, in order to ensure those instruments would meet the definition of "securities" under § 361 of the Internal Revenue Code. *Id.* at 65:9-66:17; *see also* 26 U.S.C. § 361(a). That determination depends, in part, on

whether those instruments had sufficiently long-term maturities on the date of issuance, and whether there was a plan to prepay the debt.  Here, officers of both Verizon and Idearc signed a certification on the date of the spinoff stating that they had no intent to prepay Idearc's debt securities before maturity.  PX 1087 at 21, 22-23.  Wessel testified that the diligence contemplated by the TSA would be limited to confirming these facts.  Tr. Vol. 6B at 67:4-68:10.  Accordingly, if there had been a change in circumstances following the spinoff that caused Idearc management to want to prepay the debt, the representations in the certificate would still be true, and the prepayment would not have jeopardized the status of the Term Loan B or Unsecured Notes as "securities."  *Id.* at 65:24-66:17.

In this regard, the TSA imposed a reasonableness requirement on Verizon that permitted Idearc to engage in an acquisition or debt prepayment or refinancing upon providing to Verizon a "reasonably satisfactory" tax opinion from counsel or a new ruling from the IRS that such a transaction would not affect the tax-free status of the spinoff.  PX 1068 at 8; Tr. Vol. 6B at 58:13-59:3; 67:20-68:10.  Refusing to accept such an opinion might subject Verizon to liability for failing to deal with Idearc in good faith.  *Id.* at 68:6-10.

### d.  The "turnaround stories"

The Trustee represented that it would prove that Verizon developed and communicated "several false turnaround stories," including that past revenue declines

were caused by one-time events such as a 2003 Voluntary Separation Package that was offered to Verizon employees, the Big Dig in Boston, and the events of September 11, 2001 in Manhattan.  Tr. Vol. 1A at 9:17-25.  According to the Trustee, these events were "just made up stories," intended to disguise more fundamental operational and financial deficiencies in Verizon's directories business.  *Id.* at 21:3-4.  The Trustee failed to prove these allegations.

The evidence demonstrated that each of these events did, in fact, have at least some short-term impact on VIS, were well known to the financial institutions that lent money to Idearc or purchased its debt, and were accurately disclosed by Verizon and Idearc.  PX 901 at 36, 63-64.  For example, Verizon offered a voluntary separation package to employees in 2003, which was accepted by a substantial number of VIS sales personnel and significantly impacted historical financial performance.  Jones testified about the impact of this event, explaining that VIS lost half of its sales force as a result of this program.  Tr. Vol. 5B at 116:22-117:6.

At the beginning of 2003, VIS's sales force was 3,023.  DX 416 at 51.  VIS experienced turnover of 87.6 percent that year, such that approximately 375 sales persons who were working for VIS at the beginning of 2003 were still employed at year's end.  *Id.*  VIS began to rebuild its sales force almost immediately, ending 2003 with 2,155 sales personnel, reflecting a 28.7 percent total decline in the sales force and approximately 1,780 new hires.  *Id.*  Jones testified that VIS "had to rebuild the

sales force.  We had to give them time to gain tenure and get better at their job and more efficient and effective." Tr. Vol. 5B at 116:9-11; 116:22-117:6.  The voluntary separation program had a significant impact on VIS's financial performance for several years.  DX 416 at 51.  By the time of the spinoff, VIS had rebuilt its sales force, that sales force had been able to gain experience, and VIS reasonably expected that print revenue would stabilize in the future as a result.  Tr. Vol. 5B at 115:13-17.

The defendants also presented unrebutted evidence that the terrorist attacks on September 11, 2001, and the resulting changes in business and commuting patterns, reduced print revenue attributable to the Manhattan directories.  The terrorist attacks affected VIS's ability to deliver directories in high rise buildings, changed traffic patterns, and changed consumer usage.  Tr. Vol. 5B at 117:7-17.  VIS responded by "re-scoping" its books (*i.e.*, changing their geographic coverage) and by making changes to their delivery and distribution schedules.  DX 422 at 106, 112; DX 801 at 49, 53.

These one-time events adversely affected VIS's financial performance, and VIS responded with new initiatives and new strategies.  Tr. Vol. 5B at 116:12-20.  By 2006, VIS reasonably was "expecting and . . . forecasted similar performance" in the incumbent print business to that of its peers.  *Id*. at 115:21-22.  The defendants introduced evidence demonstrating that VIS's performance in 2006 was, in fact, improving in accordance with VIS's expectations.  PX 768 at 38; DX 2345 at 6; *see*

*also* Tr. Vol. 8A at 34:17-22 (testimony of Hopkins explaining how the company is able to look ahead at its future revenues). Although as-sold print revenue declined in 2005 by between 4 and 6 percent during the first eight months of the year (January through August), VIS's performance showed a 4 percentage point improvement in 2006 and revenue results that were consistent with its competitors. DX 416 at 52. Moreover, VIS's performance was in line with its business plan through August 2006 and had met its commitments to Verizon corporate (its budget) and to the bankers (the financing model). DX 2345 at 2, 5; Tr. Vol. 5B at 119:13-121:2. In an Operations Review with Verizon corporate, VIS characterized its performance as exhibiting a "turnaround" in print revenue. DX 2345 at 6. Although print revenues were forecast to continue to decline, the rate of that decline had stabilized, and was expected to remain stable, consistent with the expectations for the industry as a whole. Tr. Vol. 5B at 115:11-17. Likewise, in an October 28, 2006 report to the incoming Idearc Board, Harless reported that "the revenues on an as sold basis have regain[ed] traction and are improving every day . . . the southeast, central, and west territories are all positive results with the northeast and mid-atlantic performing better than plan and approaching flat (the sales momentum is back!!!)." PX 871.

The Trustee asserted that DX 142, an e-mail from Sophia Xu ("Xu"), a Verizon employee in the Strategic, Development, and Planning organization, constituted evidence of an allegedly false turnaround story. The events described in

Xu's e-mail (which included the voluntary separation package and the terrorist attacks), however, were not false. They were real and affected VIS's business performance. In addition, this e-mail was written following a March 2006 meeting in Dallas of representatives of Verizon, VIS, JP Morgan, Bear Stearns, and McKinsey, and Verizon's and VIS's outside counsel. Tr. Vol. 9A at 95:23-98:7. Given the extensive disclosures in the Form 10 and the other financing documents, and in light of the consistent testimony from Harless, Jones, and Coticchio (from VIS),[8] as well as others,[9] concerning the accuracy of the disclosures, the court finds Xu's word choice ("turnaround stories") to be irrelevant and of no evidentiary value.

### 2. *Information That Was Not Disclosed to the Market But That Is Not Material*

#### a. Verizon's internal "valuation" of Idearc in summer 2005

The Trustee claimed that it would prove that Verizon senior executives knew that the actual enterprise value of VIS was only $6.5 billion and therefore made affirmative misrepresentations or omissions about the directories business in order to obtain a higher valuation. The Trustee relies on PX 27, a July 2005 powerpoint presentation entitled "Directories -- Analysis of Alternatives," to support this

---

[8]   Tr. Vol. 9A at 56:11-24 (Harless testimony); Vol. 5B at 78:2-8, 78:14-79:24 (Jones testimony); Vol. 9B at 58:10-59:4 (Coticchio testimony).

[9]   Tr. Vol. 9B at 109:1-25 (testimony of Jessica Kearns from JP Morgan); Vol. 9A at 91:8-96:25 (testimony of Steven Slutzsky); Vol. 8B at 18:13-17 (testimony of Jeff Rosen).

allegation.  The evidence introduced during the Phase I proceedings demonstrated

that the Trustee's interpretation of this document was incorrect.

Verizon Executive Director of Corporate Development John Fitzgerald testified

that PX 27 did not reflect Verizon's internal determination that VIS had an

enterprise value of $6.5 billion.  Tr. Vol. 7A at 8:11-18; *see also* Vol. 1A at 75:6

(testimony of Diercksen that he never believed that the business had a value of $6.5

billion).  Fitzgerald testified that "[t]he final valuation was what it was when the

transaction was completed" -- that is, $12.8 billion.  Tr. Vol. 7A at 8:11-18.  The

$6.5 billion figure resulted from a downside case DCF analysis that evaluated a worst

case scenario for the print business alone, totally ignoring VIS's growing and valuable

electronic business, and that was based upon a set of assumptions as to both future

projections and the appropriate WACC, or discount rate.  *Id.* at 5:4-6:10, 7:9-25.

Fitzgerald also testified about the circumstances surrounding the creation of

this document.  He testified that, in June 2005, Verizon's Strategy, Planning and

Development group began a preliminary analysis of VIS in order to explore potential

options if Verizon management decided to divest the business.  Tr. Vol. 6B at 120:3-

9, 126:10-17.  The initial analysis, which is set forth in PX 27, was prepared by

different portions of the Strategy, Planning and Development organization in a few

weeks, without any direct input or assistance from any VIS executive involved in

operating the directories business.  *Id.* at 127:19-128:1, 128:25-129:6.  The

document included a preliminary evaluation of the market for directories businesses, as well as a wide range of possible values for VIS.  Tr. Vol. 7A at 8:6-8.  PX 27 set forth potential enterprise valuations for VIS ranging from $6.5 billion to $17.8 billion.  PX 27 at 32.

Fitzgerald testified that, beginning in late August 2005, he refined the potential valuation analysis based on, among other things, discussions with investment bankers and reviews of industry analyst reports.  Tr. Vol. 7A at 9:6-11. This included Fitzgerald's review of an August 2005 Deutsche Bank analyst report by Paul Ginocchio.  In that report, Deutsche Bank stated that a capital structure with a high debt to equity ratio (resulting in a lower discount rate, and therefore a higher valuation) was appropriate for an independent directories business.  *Id*. at 12:15-21.

In September 2005, Fitzgerald and his group were directed to evaluate divestiture options in greater detail, and they set forth their analysis in a formal presentation for senior management.  DX 129; Tr. Vol. 7A at 16:22-17:16. Fitzgerald testified that he was primarily responsible for this analysis, which "was intended to be presented" to the Chairman's Leadership Council ("CLC").  *Id.* at 17:9, 17:13-16.  Fitzgerald's presentation included a slide that contained a "football field," showing possible valuations ranging from $11.5 billion (the low end of a DCF analysis) to $16.5 billion (the high end of a comparable transactions analysis).  DX 129 at 7; Tr. Vol. 7A at 18:18-21:3.  Fitzgerald testified that the updated DCF

analysis resulted in a higher valuation for VIS than that set forth in PX 27 because he utilized a lower discount rate.  Tr. Vol. 7A at 20:16-21.  Fitzgerald explained that using a lower discount rate was appropriate because of an intervening reduction in the "risk free rate" provided by Verizon Treasury, as well as the Deutsche Bank analysis. DX 1856 at 88, 90; Tr. Vol. 7A at 14:11-22.  Fitzgerald also testified that he corrected several analytical flaws in the July 2005 DCF, which was improperly "combining historical growth rates near term and then applying plan growth rates longer term."  *Id.* at 21:11-18.  Fitzgerald additionally included revenues from VIS's electronic business in the later analysis, which he concluded resulted in a higher -- and in his view more reliable -- valuation of VIS.  *Id.* at 21:19-22, 22:11-14.

Fitzgerald testified that this updated valuation was not final, but that it "beg[an] to narrow the range that we are thinking about, but there's still no stated conclusion as to an answer."  *Id.* at 22:18-20.

The court is persuaded by Fitzgerald's testimony about the internal process at Verizon of valuing the directories business.  It cannot accept the Trustee's characterization of the $6.5 billion figure in PX 27 as a conclusion Verizon made in 2005 about the value of the directories business.  Nor can the court accept the Trustee's allegation that Verizon falsely represented the value of Idearc, or that the market had a distorted impression of Idearc's value because of such a representation.

In fact, the court finds that the failure to disclose to the market PX 27, and the number $6.5 billion represented therein, is immaterial to Idearc's value.

>    b.  Subjective views of individuals as to Idearc's management team

The Trustee asserted that the market value of Idearc was inflated because senior Verizon officials, including Diercksen, "knew that the management that would take over Idearc was not competent," but failed to share this alleged view with investors.  The court does not find this argument persuasive.  Tr. Vol. 1A at 8:2-4, 6-7.

Seidenberg testified that he had full confidence in Kathy Harless, the President of VIS and one of his direct reports.  Seidenberg testified that he "thought Kathy was extremely capable."  Tr. Vol. 6A at 43:21; *see also id.* at 43:9-13.

Diercksen authored an e-mail in which he stated, when contemplating incentives for Idearc's future management, that "approving a very large pool of options 'feels' like the wrong thing to do, and seems like we are feeding 'the rising tide of incompetence.'"  PX 869.  Diercksen testified that his e-mail reflected his frustration over a proposal under consideration to grant double bonuses to Idearc's management team.  Tr. Vol. 2A at 40:19-20.  Diercksen testified that, while he "respected Ms. Harless's management skills," he wrote this e-mail because he believed that awarding a double bonus was inappropriate.  *Id.* at 42:14-18.  The subjective views of one Verizon manager, expressed in this context, are insufficient to impose a

disclosure obligation on Verizon about management competence, particularly in light of Seidenberg's views.

The evidence further established that Diercksen and Harless had a strained relationship.  JP Morgan and Bear Stearns were aware of this tension and made an independent determination as to whether it was material to their decision to invest in Idearc and to lead its financing.  JP Morgan's Nason testified that she became aware of "some tension between Mr. Diercksen and Ms. Harless," which caused her "to take a longer, harder look perhaps at management and to have that as part of the diligence process."  Tr. Vol. 7A at 98:3-10.  Following its due diligence, JP Morgan concluded that VIS had "a very competent management team that knew their business very well."  *Id.* at 98:1-2.  Bear Stearns' Andrew Decker testified that he was aware of a "competitive dynamic" between Harless and Diercksen, which gave him no cause for concern because "large corporations have different personnel issues."  Tr. Vol. 7B at 82:13-19.  The Trustee failed to provide any evidentiary basis to require Verizon to make further disclosures about the competence of Idearc management.

The court finds that the (admittedly) strongly negative views of one individual within Verizon about the management at Idearc would not have been material to the market and do not undermine Idearc's stock price as an indicator of value.

c.  The internal negotiation of Idearc's final financing
model and the data room "cover up"

The Trustee argued that Verizon's corporate executives schemed to force upon

the management of VIS their version of a final financing model for Idearc, that this

version was unsupportably optimistic, and that, in order to defraud investors (and

ultimately the market), Verizon removed prior projections for its directories business

from the VIS data room and concealed a pessimistic report prepared by McKinsey.

The Trustee focused its attention on a string of e-mails between John

Fitzgerald, John Diercksen, and Thomas Bartlett, a Senior Vice President and

Controller in Corporate Financial Planning and Analysis at Verizon.  An April 11,

2006 e-mail from Fitzgerald states that a review of VIS's plan with Toben and

Diercksen would be followed by a "dictate to VIS on the final plan."  PX 283.  In

responding on April 12, 2006 to an e-mail containing a purported "offer" from VIS to

Verizon corporate regarding the financial model, Diercksen stated "where do they

come off with a best and final offer! . . . I think we need to talk to Ivan [Seidenberg]

and enforce this view on them."  PX 287.  Diercksen e-mailed Bartlett on April 13,

2006 and stated that "I suggest you call Andy [Coticchio] and tell him that this is a

mandate."  PX 300.

In response, the defendants presented testimony from both the Verizon

corporate department and the VIS/Idearc management stating that the process of

arriving at a final financing model for Idearc involved all of the normal give and take

negotiation one would expect to find in the budgeting process in corporate America. In addition, members of Idearc's management testified that the final financing model represented a "realistic expectation for the business."[10]

Jessica Kearns, a Managing Director at JP Morgan who worked on the spinoff, testified that replacing the preliminary 2006 Plan of Record (which was based on VIS's business as a Verizon subsidiary) with the final financing model (which reflected VIS as a stand-alone business, and contained less aggressive forecasts) in the data room was both standard and appropriate.  Tr. Vol. 9B at 86:14-16.

The defendants also point out that the final financing model that the corporate and management teams arrived at was less aggressive than prior plans of record.  *See* Defendants' Joint Post-Trial Reply Brief at 6.

The court finds that, despite the aggressive language exhibited in some e-mails by executives in Verizon's corporate department, there is not evidence sufficient to conclude that those executives forced an overly aggressive and ultimately unsustainable financing model on the management of VIS or Idearc.  Thus, disclosure of either the (sometimes aggressive) process of budget negotiation, or of the removal of prior financing plans from Verizon's data room, would not have had a material effect on the price of Idearc's stock.

_____

[10]      Tr. Vol. 5B at 106:23-107:11; Vol. 6A at 18:24-19:1 (testimony of Jones); Vol. 9A at 64:6-17, 20-25, 65:1-10 (testimony of Harless); Vol. 8B at 87:19-21 (testimony of Mueller); Vol. 9B at 34:18-25 (testimony of Toben).

## II.  <u>CONCLUSION</u>

Based on the foregoing evidence, the court finds and concludes that the total enterprise value of Idearc on November 17, 2006 was at least $12 billion.

January 22, 2013.

_A. Joe Fish_

**A. JOE FISH**
**Senior United States District Judge**