UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL | ) | |
| ASSOCIATION, Litigation Trustee of the | ) | |
| Idearc Inc. *et al.* Litigation Trust, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | 3:10-CV-1842-G |
| VS. | ) | |
| | ) | |
| VERIZON COMMUNICATIONS INC., | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## CONCLUSIONS OF LAW

On January 22, 2013, the court found, based on extensive evidence presented

at a bench trial, that the value of Idearc, Inc. ("Idearc") on November 17, 2006 was

at least $12 billion and that it was therefore solvent.  *See* Memorandum of Decision

("Decision") of January 22, 2013 at 2, 22 (docket entry 646).  On the same date the

court ordered the plaintiff in this case to show cause why, in light of this finding,

judgment for the defendants should not be entered on the plaintiff's claims not

previously disposed of.  *See* Order of January 22, 2013 ("Show Cause Order") (docket

entry 647).  Upon consideration of the briefing and motions submitted in response to

that order, the court concludes, for the reasons stated below, that judgment for the

defendants should be entered on all of the plaintiff's remaining claims[1] in this case.

In addition, the plaintiff's motion for entry of judgment on admissions and stipulated

facts (docket entry 649) is denied.

## I.  RULE 52(c)

"[When] a party has been fully heard on an issue during a nonjury trial and

the court finds against the party on that issue," FED. R. CIV. P. 52(c) authorizes the

court to enter judgment "on a claim . . . that, under the controlling law, can be

maintained . . . only with a favorable finding on that issue." FED. R. CIV. P. 52(c).

The plaintiff has been fully heard on the issues of Idearc's value and solvency.  The

court has found against the plaintiff on those issues.  *See* Decision at 2, 22.  For the

reasons set forth below, none of the plaintiff's claims can be maintained without a

favorable finding on Idearc's value and solvency.  Entry of judgment against the

plaintiff on all remaining claims is therefore appropriate.[2]

## II.  FRAUDULENT TRANSFER

### A.  Constructive Fraudulent Transfer

Because the plaintiff did not address the viability of its constructive fraudulent

transfer claims in its response to the court's order to show cause, it has effectively

---

[1]      A complete and accurate list of these claims may be found in the court's
show cause order.  *See* Show Cause Order at 2.

[2]      For a brief introduction to the nature of this action, the parties, and the
relevant facts, *see* Decision at 2-6.

conceded that these claims fail.  *See generally* Plaintiff's Brief Pursuant to Order to Show Cause ("Brief") (docket entry 648) and Plaintiff's Reply in Support of its Response to Order to Show Cause ("Reply") (docket entry 656).

The constructive fraudulent transfer claims[3] obviously fail on the merits, however, in light of the court's findings as to Idearc's value and solvency.  This is because those claims require the plaintiff to prove that Idearc was insolvent on the date of the spinoff and that it did not receive reasonably equivalent value for the cash and debt it transferred to Verizon in connection with the spinoff.  *See* TEX. BUS. & COM. CODE § 24.005(a)(2)[4] and 24.006.[5]

---

[3]     In Counts 5 and 6 of its amended complaint, the plaintiff singles out as fraudulent transfers specific transactions associated with the overall spinoff.  *See* Plaintiff's Amended Complaint and Jury Demand ("Complaint") ¶¶ 49-68 (docket entry 216); *see also* Memorandum Opinion and Order of September 14, 2012 at 30-32 (docket entry 523).  The court sees no reason to consider these transactions separately from the entire spinoff taken as a whole.  However, even if the counts and the transactions at issue in them were considered separately, they would fail for the same reasons that Counts 1 and 2 fail.  The court's valuation finding implies that the entities at issue (Idearc Media Corp. and Idearc Information Services) were solvent and received reasonably equivalent value (for purposes of constructive fraudulent transfer), and there are not sufficient badges of fraud as would indicate the transfers were made with "actual intent to hinder, delay, or defraud" (for purposes of actual fraudulent transfer).

[4]     "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation."

[5]     "A transfer made or obligation incurred by a debtor is fraudulent as to a (continued...)

In the context of a spinoff, the court has already noted that there is no effective difference between the insolvency analysis and the reasonably equivalent value analysis.  *See* Memorandum Opinion and Order of September 14, 2012 ("SJ Opinion") at 15 n.3 (docket entry 523), citing *VFB LLC v. Campbell Soup Company*, 482 F.3d 624, 636 (3d Cir. 2007).  Because Idearc had a total enterprise value of at least $12 billion on the date of the spinoff, it was both solvent[6] and received reasonably equivalent value[7] for the $9.1 billion in cash and debt it transferred to Verizon.

Judgment will therefore be entered for the defendants on the plaintiff's remaining constructive fraudulent transfer claims.

---

[5](...continued)
creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

[6]     "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  TEX. BUS. & COM. CODE § 24.003(a).  It is undisputed that Idearc's debts totaled approximately $9.1 billion on November 17, 2006, the date of the spinoff.  *See, e.g.*, SJ Opinion at 15.  Given the court's finding that Idearc's total enterprise value was at least $12 billion on November 17, 2006, Idearc clearly met Texas law's test for solvency at that time.

[7]     "[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"  See *VFB*, 482 F.3d at 631, quoting *In re Fruehauf Trailer Corporation*, 444 F.3d 203, 213 (3d Cir. 2006).

B. Actual Fraudulent Transfer

To sustain its claim that the transfers Verizon caused Idearc to make in connection with the spinoff were actual fraudulent transfers, the plaintiff must show that Verizon Communications Inc., GTE Corporation, Verizon Financial Services LLC ("Verizon") or John Diercksen ("Diercksen") (collectively, the "defendants") caused those transfers to be made "with actual intent to hinder, delay, or defraud any creditor" of Idearc. TEX. BUS. & COM. CODE § 24.005(a)(1).

The plaintiff argues that Idearc's value and solvency are immaterial to a determination of Verizon or Diercksen's intent in connection with the transactions consummating the spinoff. *See* Brief at 16. It cites a number of decisions that have held a solvency finding immaterial to particular actual fraudulent transfer claims. *Id.* at 17-18. There are two problems for the plaintiff, however. First, it has not presented specific direct evidence of the defendants' fraudulent intent, nor has it pointed to any such evidence that it may yet present. See, *e.g.*, *id.* at 17-18. Second, the weight of any circumstantial evidence of the defendants' intent the plaintiff has presented, or has noted remains to be presented, is negated by virtue of the court's valuation finding.

Direct evidence of fraudulent intent is, of course, always difficult to obtain. See, *e.g.*, *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 312 (Tex. App.--El Paso 2009, mandamus denied). Other than general allegations, the plaintiff has pointed to

- 5 -

no such specific evidence in the many briefs it has submitted in this case.  Neither has the plaintiff in the briefing presently before the court pointed to any specific direct evidence (*e.g.*, testimony, communications that reveal the state of mind of Verizon officers, *etc.*) of the defendants' fraudulent intent with regard to the spinoff transactions.[8]  The plaintiff is therefore left to rely on circumstantial evidence of the defendants' fraudulent intent, *i.e.*, the so-called "badges of fraud."  *See* TEX. BUS. & COM. CODE § 24.005(b)(1)-(11).

The plaintiff has elsewhere argued that it has evidence of five of the eleven badges of fraud.  *See* Brief in Support of Plaintiff's Omnibus Response in Opposition to Defendants' Motions for Summary Judgment ("Summary Judgment Response") at 77 (docket entry 430).  The finding that Idearc was worth at least $12 billion, though, negates two of those badges, reasonably equivalent value and solvency.  *See above* at 4 n.6-7; *see also* TEX. BUS. & COM. CODE § 24.005(b)(8)-(9).  A third, concealment, is negated by virtue of the court's findings that a plethora of material information relating to the spinoff was actually disclosed to the market.  *See* Decision at 41-58; *see also* TEX. BUS. & COM. CODE § 24.005(b)(3).  The only two badges of fraud that remain, transfer to an insider and transfer shortly before a substantial debt

---

[8]     The court will not consider at this late stage of the litigation the plaintiff's generic assertions that Idearc "acted with intent" to hinder, delay, or defraud.  *See, e.g.*, Brief at 18.  If the plaintiff cannot now, after voluminous discovery, point to specific examples of direct evidence of the defendants' fraudulent intent which remain to be presented, the court has no confidence that the plaintiff will uncover any at some indeterminate time in the future.

was incurred, *see* TEX. BUS. & COM. CODE § 24.005(b)(1) and (10), are plainly insufficient, standing alone, to support a finding that the defendants acted in the spinoff with actual intent to hinder, delay, or defraud its creditors.  This is because these two "badges" are features of every spinoff transaction that involves debt. Moreover, case law suggests that the presence of so few badges, in such a context, is insufficient as a matter of law to support a finding of actual intent to hinder, delay, or defraud.  See, *e.g.*, *Texas Custom Pools, Inc.*, 293 S.W.3d at 313-14; *MFS/Sun Life-Trust High Yield Series v. Van Dusen Airport Services Company*, 910 F. Supp. 913, 935 (S.D. N.Y. 1995).  The court concludes that the presence of these two badges alone (transfer to an insider and transfer shortly after a substantial debt was incurred), in the context of a spinoff transaction such as this one, is insufficient as a matter of law to support a conclusion that the defendants actually intended to hinder, delay, or defraud Idearc's creditors.

For these reasons, the court's valuation findings are dispositive with respect to the plaintiff's actual fraudulent transfer claims, and the court concludes that judgment is properly entered for the defendants on those claims.

## III.  BREACH OF FIDUCIARY DUTY

### A.  Breach of Fiduciary Duty:  John Diercksen

The court has already found, in connection with its consideration of the motions for summary judgment, that Idearc was Verizon's wholly-owned subsidiary.

- 7 -

*See* SJ Opinion at 26-27.  The court declines to reconsider that ruling at this stage of the case, especially in view of the fact that the plaintiff has never requested such reconsideration.  The court agrees with the defendants that this prior finding puts this case squarely within the rule, articulated in *Anadarko Petroleum Corporation v. Panhandle Eastern Corporation*, 545 A.2d 1171, 1174 (Del. 1988), that a corporate parent owes its wholly-owned subsidiary no fiduciary duties, other than a duty not to take actions that cause it to be unable to meet its legal obligations.  In addition, the director of a wholly-owned subsidiary (here, Diercksen) owes the subsidiary only the duty to manage it in the best interests of the corporate parent, so long as this does not "render the subsidiary unable to meet its legal obligations."  See *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200-01, 203 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007) (table); *see also* Defendants' Joint Consolidated Response to Plaintiff's Response to Order to Show Cause ("Response") at 6-7 (docket entry 651).  Since Idearc was solvent on the date of the spinoff, it cannot be argued plausibly that Verizon or Diercksen caused it to be unable to meet its legal obligations.[9]  While the plaintiff has pointed to a number of titillating allegations concerning Verizon and Diercksen's conduct in connection with the spinoff, *see, e.g.*, Brief at 14-16 and Reply at 3-9, none of these allegations can be said to have *caused*

---

[9]     It is clear that the *Trenwick* court focused exclusively on solvency, when considering whether a corporate subsidiary was rendered "unable to meet its legal obligations" by the transaction at issue in the case (the corporate parent causing its subsidiary to take on more debt).  See *Trenwick*, 906 A.2d at 203-04.

Idearc to be unable to meet legal obligations. *See also* SJ Opinion at 25. Therefore, neither Diercksen nor Verizon owed Idearc any other fiduciary duties. For this reason alone, the plaintiff cannot prevail on its breach of fiduciary duty claim against Diercksen.

That is not the only reason this claim fails, however. It is elementary that a plaintiff seeking compensatory damages must show damage "logically and reasonably related to the harm" for which compensation is sought. See, *e.g.*, *In re J.P. Morgan Chase & Company Shareholder Litigation*, 906 A.2d 766, 774 (Del. 2006). The problem for the plaintiff in this case is that, despite making numerous references to Diercksen's allegedly unsavory conduct in connection with the spinoff, *see above* at 8-9, the plaintiff has not demonstrated to this court that it has a coherent notion of how these unsavory actions are, in light of the solvency finding, logically or reasonably related to the $9 billion damage award it seeks.

In its post-trial briefing, the only references the plaintiff makes to damage to Idearc connected to the Counts 3 and 4 breach of fiduciary claims are found on pages 14-16 of its response to the show cause order. *See* Brief at 14-16. There, the plaintiff recites the basic elements of breach of fiduciary duty claims, before it asserts that "Diercksen breached his duties of care and loyalty by . . . acting unilaterally to authorize the Spin-off and declare the dividend paid to Verizon" and "Verizon . . . had knowledge that Idearc's board was not fully constituted, that Diercksen's

purported board actions were ineffective, and that, as a result, the Spin-off and related transfers were never properly authorized, damaging Idearc in at least the amount of the unauthorized transfers." *Id.* at 14.

What the plaintiff does not say is how Diercksen's alleged breaches or Verizon's supposed knowledge could possibly have damaged Idearc's creditors (particularly in so great an amount) in light of the court's valuation and solvency findings. Whatever corporate procedural missteps may have occurred preceding the spinoff, and whatever alleged "scheming" accompanied these missteps, the fact remains that as of November 17, 2006, Idearc's creditors were left with an entity that had assets worth well in excess of what would be required to protect their interests.

### B. <u>Aiding and Abetting Breach of Fiduciary Duty: Verizon</u>

In light of the fact that Diercksen is entitled to judgment on the plaintiff's claim against him for breach of fiduciary duty, there is no breach of duty remaining in this case for Verizon to have "aided and abetted." Thus, the Verizon defendants are also entitled to judgment on the plaintiff's claim against them for aiding and abetting Diercksen's alleged breaches of fiduciary duty.

### IV. <u>UNLAWFUL DIVIDEND</u>

In its summary judgment opinion of September 14, 2012, the court observed that the plaintiff's "unlawful dividend claim will fail" if "Idearc had sufficient

surplus[10] at the time of the spin-off to declare the dividend."[11]  *See* SJ Opinion at 48.

The plaintiff attempts to resist the force of this observation by focusing the court's

attention on a number of alleged formal missteps associated with the dividend's

declaration and payment.[12]  *See* Brief at 3-10.  What is unclear to the court, upon

review of this briefing, is how the plaintiff arrives at the conclusion that these

missteps warrant any remedy, let alone the outsized remedy it seeks in connection

with them.  *See* Plaintiff's Amended Complaint ("Complaint") ¶ 78 (docket entry

216) ("Verizon is likewise liable to the Trust for the full amount of the unlawful

dividends.")

    The plaintiff first argues that the dividend was illegal, because a duly

constituted board never declared it.  Brief at 3-5.  As authority for this proposition

---

[10]    Surplus is, as the court noted in that context, "the excess of net assets over the par value of the corporation's issued stock."  *Klang v. Smith's Food and Drug Centers, Inc.,* 702 A.2d 150, 153 (Del. 1997); *see also* 8 DEL. C. § 154.  "Net assets means the amount by which total assets exceed total liabilities."  *Id.* § 154.  In this case, the par value of each share of Idearc stock was one cent.  Brief in Support of Defendants' Response to Plaintiff's Motion for Partial Summary Judgment ("Defendants' Response to Plaintiff's First Motion") at 14 (docket entry 363).  Because Idearc issued more than 146 million shares, the total par value of Idearc's stock was approximately $1.46 million.

[11]    The court has found that Idearc's total enterprise value on the date of the spinoff was at least $12 billion.  Decision at 2.  This finding implies that Idearc plainly had assets in excess of its total liabilities, which totaled $9.1 billion, at the time of the spinoff.  Idearc therefore had sufficient surplus to pay a dividend.

[12]    The only transaction that remains a part of the plaintiff's unlawful dividend claim is Idearc's issuance of $7.1 billion in debt to Verizon.  *See* SJ Opinion at 41.

the plaintiff cites a Southern District of New York case that neither cites any Delaware case law nor is square with the facts of this case.  *Id.* at 3-4.  In *Pereira v. Cogan*, 294 B.R. 449 (S.D. N.Y. 2003), *vacated and remanded*, 413 F.3d 330 (2d Cir. 2005), *cert. denied*, 547 U.S. 1147 (2006), the court found a dividend illegal on two grounds.  The first was that the corporation issuing the dividend was insolvent at the time of the transaction, contrary to the situation here.  *Pereira*, 294 B.R. at 540.  The second reason the court gave was that the dividends were not declared by the Board in accord with section 170 of title 8 of the Delaware Code.  *Id.*; *see also* 8 Del. C. § 170.  The *Pereira* court gives no indication whether this second reason would have supported a finding of an "illegal" dividend, if the corporation had been solvent.  Nor does it indicate what remedy it would have considered appropriate in such an instance.  Nor finally does that court speculate on who might have standing to press such a claim.  In fact, this court has been unable to find any case in which a court found, in favor of creditors, that a solvent corporation's dividend was illegal solely because of a technical violation of § 170.

The plaintiff next argues that the dividend was illegal, because it was "declared" on October 31, 2006, before the transfers in connection with the spinoff were effected, and thus before Idearc actually had any surplus with which to declare a dividend.  Brief at 5-6.  In support of its argument, the plaintiff cites 8 Del. C. § 170's statement that "the directors of every corporation . . . may declare and pay

dividends upon the shares of its capital stock . . . out of its surplus . . . or . . . out of its net profits." The plaintiff also relies on a statement in *Vogtman v. Merchants' Mortgage and Credit Company*, 178 A. 99, 20 Del. Ch. 364 (1935), that "[in] deciding whether a dividend was rightfully made, the transaction must be viewed as of the time when it was declared." *Id.* at 370.

The plaintiff's rigid interpretation of the statute is undermined by a careful reading of *Vogtman*, by the lack of further case law supporting it, and by common sense. The defendants rightly argue that the *Vogtman* case does not come close to standing for the proposition that the plaintiff cites it for. *See* Response at 18. The defendants point out that the court "focused on whether the dividend had been paid out of surplus," noting accurately that "the *Vogtman* court repeatedly discussed the date the dividend was paid . . . and did not even note the date on which the dividend was declared." *Id*. Multiple times the *Vogtman* court relied on evidence of the corporation's net assets on December 31, 1932, the day prior to the dividend's payment. *Vogtman*, 20 Del. Ch at 370-72. Nowhere did it discuss the value of the corporation's net assets on the date the dividend was declared. The plaintiff has thus cited no relevant authority for the rigid view that a corporation must have the requisite surplus on the date the dividend is declared. Moreover, the plaintiff's strained interpretation of the statute would lead to absurd results; that interpretation

would make it exceedingly difficult for any corporation to accomplish a spinoff without running afoul of the statutory scheme.

The plaintiff's third argument is that the dividend was illegal because Idearc's board never acted to determine if a surplus existed. Brief at 6-8. The plaintiff's argument is undermined by case law and policy considerations. In its summary judgment opinion, the court quoted the statements in *Klang v. Smith's Food and Drug Centers, Inc.*, 702 A.2d 150, 152, 156 (Del. 1997), that "perfection in [the] process [of revaluing assets] is not required," and that "[a] mistake in documenting [a] surplus will not negate the substance of the action, which complies with the statutory scheme." *See* SJ Opinion at 48. The plaintiff correctly notes that the "statutory scheme" at issue in *Klang* was the Delaware Code's section 160 scheme for redemption of stock, which does not explicitly require board participation. Brief at 7-8; *see also* 8 Del. C. § 160. It argues that sections 170-173 set up a different statutory scheme, which does require such participation. *Id.* at 8; *see also* 8 Del. C. § 170-173.

The plaintiff, however, conveniently ignores the *Klang* court's policy discussion, which was the key to its holding that "perfection" in the asset revaluation process was not required to validly accomplish the stock redemption at issue in that case. The *Klang* court observed that "[i]t is helpful to recall the purpose behind Section 160. The General Assembly enacted the statute to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the

corporation." *Klang*, 702 A.2d at 154.  While the *Klang* court was discussing section

160, there can be no doubt that the purpose (at least as to a corporation's creditors)

driving the section 170 and 173 statutory scheme governing payment of dividends is

the same.  *See* SJ Opinion at 37.  The dividend here did not so "drain" Idearc of assets

that its creditors were inadequately protected.  Indeed, in the absence of a showing

that there was inadequate surplus (or no net profits) with which to declare a

dividend, this court doubts whether the trustee of a litigation trust representing

creditors of a bankrupt corporation has standing to complain of other imperfections

in the process of such dividend's payment.

Moreover, an overly rigid reading of the statutory scheme seems inappropriate

in the spinoff context.  The court has already accepted the plaintiff's argument that

such an approach to the definition of the term "dividend" is inappropriate.  *See* SJ

Opinion at 39-40.  In this court's opinion, what is crucial is that Verizon's

management team (even if they themselves did not consider the spinoff transactions a

technical "dividend") made reasonable efforts to ascertain what Idearc's value would

be on the date of the spinoff.  The court has documented some of these efforts in its

Memorandum of Decision.  *See* Decision at 34-41 and 58-61.  The result of these

estimations would have revealed, had management considered the question, that

Idearc would have sufficient surplus with which to declare a "dividend" on the date of

the spinoff.  In light of the court's valuation finding, Verizon's pre-spin valuation

estimations were not only reasonably performed but were reasonably accurate as well.

In any case, the ruling the plaintiff seeks here could have potentially

breathtaking consequences, in that it could theoretically allow creditors in cases of

bankruptcies that are not even plausibly connected to (or caused by) a prior spinoff to

recover the full amount of any debt or cash transferred in that spinoff, because of any

minor noncompliance with Section 170 or 173's requirements.[13]  This court refuses

to sanction such a sweeping elevation of form over substance.

Because the court has found that Idearc had adequate surplus on the date of

the spinoff with which to pay a dividend, the defendants are entitled to judgment on

the plaintiff's unlawful dividend claim.

## V.  PROMOTER LIABILITY

The court has previously ruled that no reasonable fact finder could conclude

that Idearc was not Verizon's wholly owned subsidiary.  *See* SJ Opinion at 26-27.

The effect of this ruling is to place this case squarely within the holdings articulated

in both *Anadarko*, *see above* at 8, and *Westlake Vinyls, Inc. v. Goodrich Corporation*, 518 F.

Supp. 2d 918, 939 (W.D. Ky. 2007) ("The weight of authority holds that a parent

corporation owes no fiduciary duties to its wholly-owned subsidiary.").  Since the

court has found that Idearc was solvent, Verizon and Diercksen owed it no fiduciary

---

[13]     Indeed, a holding in accord with what the plaintiff seeks could have
such grave consequences even if a bankruptcy were not in view.

duties that would give rise to a claim of promoter liability.  For this reason alone, judgment should be entered for the defendants on the plaintiff's promoter liability claim.

In conjunction with its response to the court's show cause order of January 22, 2013, the plaintiff filed an unsolicited motion for judgment, citing Rule 52(c) as the primary authority for this motion.  *See generally* Motion and Brief for Entry of Judgment ("Motion") (docket entry 649).  This motion attempts to bolster the plaintiff's promoter liability claim.  *Id.* at 7, 12.  Rule 52(c) permits judgment on partial findings against a party only where the court "finds against the party" on a dispositive issue.  FED. R. CIV. P. 52(c).  The court did not find against the Verizon defendants on any dispositive issue in its Memorandum of Decision.  *See generally* Decision.  More specifically, the court most certainly did not find against the Verizon defendants on the issue of Idearc's value, *see* Decision at 1, despite the plaintiff's absurd philosophical waxing on the indeterminate nature of the court's valuation finding.  *See* Motion at 2.  The plaintiff's motion for judgment is therefore denied.[14]

Moreover, the plaintiff attempts to incorporate the substance of this motion for judgment into its response to the court's show-cause order and its reply in support

---

[14]   The plaintiff attempts to rescue the motion by requesting that the court consider it a summary judgment motion.  *See* Motion at 2.  The court declines this invitation, since the plaintiff has already filed two summary judgment motions, *see* docket entries 332 and 378.  In the absence of leave to file multiple motions, the local rules permit only one summary judgment motion, *see* LR 56.2(b).  The plaintiff has not requested leave to file a third summary judgment motion.

of this response.  *See* Brief at 11 and Reply at 9.  This amounts to an attempt on the part of the plaintiff to file oversized briefs without first obtaining leave from the court.  Incredibly, the plaintiff has the audacity to complain about the Northern District of Texas's general briefing page limits without ever having requested leave from the court to file briefs exceeding those limits.  *See* Reply at 3.  The court has shown itself perfectly willing in this case to allow the parties both to supplement the record and to submit argument in excess of what the local rules typically permit.  *See generally* 3:10-CV-1842-G docket sheet.  Where a party does not first seek leave, however, the court will not permit blatant violations of its local rules.  For this reason, the court declines to consider any argument the plaintiff attempts to incorporate from the motion for judgment or the reply supporting the motion for judgment (docket entries 649 and 655) into the response and reply to the show cause order.

With respect to promoter liability, the plaintiff continues to press the notion that, as of the date of the spinoff, Idearc was not Verizon's wholly-owned subsidiary.  *See* Brief at 11-15 and Reply at 6-7.  The court agrees with the defendants that this exercise is, in substance, a request for the court to reconsider its holding in its summary judgment opinion of September 14, 2012.  *See* Response at 12-15.  All the evidence the plaintiff attempts to put on in support of this (re)argument, *see, e.g.*, Motion at 15, is evidence that was available to the plaintiff on the multiple motions to dismiss and for summary judgment.  The plaintiff has cited no intervening change

in the law binding on this court governing promoter liability, or ownership of subsidiaries, since the various motions to dismiss and for summary judgment were filed.  The court therefore declines to reconsider its earlier holding that no reasonable fact finder could conclude that Idearc was not Verizon's wholly-owned subsidiary.  SJ Opinion at 26-27.

Even if the court were to reconsider this holding, however, the court would still conclude that entry of judgment for the defendants on the plaintiff's promoter liability claim is appropriate at this time.  The problem for the plaintiff with respect to this claim, as with its breach of fiduciary duty claim against Diercksen, is that the plaintiff cannot show, in light of the court's solvency finding, how Idearc or its creditors were damaged by the specific actions the plaintiff names in the complaint, the motions for summary judgment, the responses to the motions for summary judgment, the proposed findings of fact and conclusions of law, and the joint pretrial order.

This is precisely why the promoter liability claim the plaintiff presses in its post-trial briefing relies on an entirely different theory, and refers to a different set of facts, than what appeared in the complaint.  The plaintiff's promoter liability claim has, at least until the post-trial briefing, been quite specifically a claim for breach of fiduciary duty, *see* Complaint ¶ 111.[15]  The core allegations of the plaintiff's promoter

---

[15]   In this claim the plaintiff seeks to recover compensatory damages,

(continued...)

liability claim, as set forth in the amended complaint, have been that Diercksen and Verizon schemed in the "promotion" of Idearc to accomplish an (allegedly fraudulent) tax-free, debt-for-debt exchange, which would relieve Verizon of a significant debt burden and load Idearc with debt it was unable to support. *Id.* ¶¶ 82-90. As a result, the plaintiff claimed, Diercksen and Verizon are liable for the allegedly unsustainable debt with which they saddled Idearc. *Id.* ¶¶ 113-14.

The fatal flaw in this theory, in light of the court's finding about Idearc's solvency, is that, in fact, the late-2006, post-spinoff Idearc was not "saddled" with unsupportable debt. Subsequent events -- including the Great Recession -- intervened, and Idearc later became unable to support its debt. However, in light of the court's solvency finding, these intervening events do not implicate Verizon and Diercksen, and they sever any causal link between Verizon and Diercksen's actions and Idearc's bankruptcy. The plaintiff has not even attempted to show, with any degree of specificity or detail, how -- in light of Idearc's solvency -- there could be any damage to Idearc's creditors that is logically and reasonably related to the specific breaches of fiduciary duty (*i.e.*, the actions in furtherance of the "tax scheme," *see*

---

[15](...continued)
which, as outlined above in section III. A., would require a showing of damage logically related to the alleged breach of duty.

Complaint ¶ 83) that have, from the time of the amended complaint, formed the core of the promoter liability claim.[16]

For all the foregoing reasons, the defendants are entitled to judgment on the plaintiff's promoter liability claim.

## VI. ALTER EGO

Because the court has concluded that the plaintiff cannot prevail on its other claims in this case, judgment for the defendants will also be entered on the plaintiff's alter ego "claim." *See* SJ Opinion at 51 and Show Cause Order at 2 n.*.

---

[16]    As already noted, it is obvious that the theory underlying the plaintiff's promoter liability claim has undergone a metamorphosis in the plaintiff's response to the court's show cause order.  Now for the first time the plaintiff includes, specifically in relation to this claim, bare allegations that Verizon:  (1) caused Idearc to enter illegal contracts; (2) caused Idearc to falsify record documents; (3) failed to stop Idearc from incurring debt; and (4) filed for bankruptcy protection, among others. *See* Brief at 12.  As far as the court has been able to determine, these allegations were never connected to the promoter liability claim in (1) the joint pretrial order filed by the parties (docket entry 572); (2) the plaintiff's proposed findings of fact and conclusions of law (which were addressed not simply to Phase I of the trial but to all issues remaining to be tried in the case) (docket entry 543); (3) the plaintiff's two summary judgment motions (docket entries 332 and 378); or (4) the plaintiff's responses to the defendant's motions for summary judgment and motions to dismiss (especially docket entry 430).  The court does not consider itself bound to allow the plaintiff to continue expending huge volumes of energy, time and money in pursuit of a claim that, after nearly three years of litigation, still does not appear to have a coherent theory underlying it.  Nor is the court required to consider a novel theory raised this late in the litigation.  See *Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."); see also *O'Hara v. General Motors Corporation*, 2006 WL 1094427 (N.D. Tex. Apr. 25, 2006) (Fish, C.J.) (refusing to consider legal theories raised for the first time in a plaintiff's response to a motion for summary judgment), *rev'd in part on other grounds*, 508 F.3d 753 (5th Cir. 2007).

## VII.  <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's motion for entry of judgment (docket entry 649) is **DENIED**.  Judgment will be entered for the defendants in accordance with these conclusions.

**SO ORDERED**.

June 18, 2013.

_____
**A. JOE FISH**
**Senior United States District Judge**